# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY,<br><br>          Plaintiff,<br><br>v.<br><br>HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)    Civil Action No. 05-10990-DPW<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT HARMAN'S OPPOSITION TO MIT'S MOTION TO COMPEL PRODUCTION OF DISCOVERY AND DEPOSITIONS

Robert J. Muldoon, Jr., BBO# 359480
James W. Matthews, BBO# 560560
Edward S. Cheng, BBO# 634063
Courtney A. Clark, BBO# 651381
**SHERIN AND LODGEN, LLP**
101 Federal Street
Boston, MA  02110

William A. Streff Jr., P.C.
Craig D. Leavell
Michelle A.H. Francis
**KIRKLAND & ELLIS LLP**
200 E. Randolph Dr.
Chicago, IL  60601
(312) 861-2000 (phone)
(312) 861-2200 (fax)

*Attorneys for Defendant*

February 21, 2006

Defendant Harman International Industries, Incorporated ("Harman") respectfully requests the Court deny plaintiff Massachusetts Institute of Technology's ("MIT") Motion to Compel (Docket Entry 45). Throughout this case, Harman has diligently responded to each of MIT's many requests concerning discovery. To date, Harman has produced more than 88,000 responsive documents, including certain documents that MIT seeks in the current Motion to Compel. Furthermore, the parties have agreed to a deposition schedule rendering Court intervention unnecessary in this respect. Most importantly, it is appropriate for MIT to resolve its discovery disputes with Harman through the meet and confer process rather than request the Court's assistance prematurely. MIT's motion to compel should be denied because its seeks production of discovery that is moot, premature, or does not require Court resolution.

## I.    HARMAN'S PRODUCTION OF DOCUMENTS

MIT argues that Harman has refused to produce documents in a timely manner. Specifically, MIT asserts that Harman has not produced documents from David Eelman, Paul Naife, or correspondence from its German employees. Harman disagrees. Throughout this litigation, Harman has timely responded to MIT's document requests. For the Court's benefit, Harman discusses each below:

### A.    Harman's Document Production Has Been Timely

MIT first contends that Harman waited three months to produce documents after Harman served its responses on September 6, 2006 to MIT's First Request for the Production of Documents and Things.[1] This is simply not true. On October 12, 2005, Harman produced its

---

[1] MIT incorrectly alleges that Harman required an extension to file its responses to MIT's request for production of documents. *See* MIT Motion to Compel at 2. Harman timely served its responses pursuant to Federal Rule of Civil Procedure 34(b) and Local Rule 34.1.

initial set of documents to MIT, consisting of approximately 4,200 pages of responsive documents (HAR 000001 - 004251) and a CD containing 437 files with 7,400 pages of responsive documents (later reproduced electronically on January 26, 2006). *See* Ahlberg Decl. at ¶ 2 (Exh. A).

Beginning with Harman's first production of documents and continuing throughout discovery in this case, Harman has diligently and promptly produced documents in response to MIT's requests. Specifically, Harman's document production to date consists of the following:

- October 12, 2005 - Harman produced approximately 4,200 pages (HAR 000001-004251) and one CD containing 437 files with 7,400 pages of responsive documents (later electronically produced again on January 26, 2006 in Bates range HAR 60268-67640).
- November 29, 2005 - Harman produced approximately 5,000 pages (HAR 004252 - 004709).
- January 9, 2006 - Harman produced approximately 1,700 pages (HAR 004710 - 6015).
- January 18, 2006 - Harman produced approximately 60,000 pages (HAR 006016-60267).
- January 26, 2006 - Harman reproduced approximately 7,400 pages (HAR 60268-67640) which Harman previously produced on October 12, 2005 on CD in 437 files.
- January 30, 2006 - Harman produced approximately 20,000 pages (HAR 67641-87235).
- February 9, 2006 - Harman produced 710 pages (HAR 87235-87945).
- February 12, 2006 - Harman produced 95 pages (HAR 087946-088042).
- February 17, 2006 - Harman produced 828 pages (HAR 088043-088871).

*See* Ahlberg Decl. (Exh. A).

Accordingly, Harman's document production has not only been timely but substantial. Furthermore, documents that MIT now seeks to compel have already been produced to MIT, as demonstrated below.

**B.    Harman Has Already Produced Documents from David Eelman**

Second, MIT alleges that Harman has not yet produced documents from David Eelman, Vice President of Finance for Harman Becker Automotive Systems, Inc. This is also incorrect. As early as November 2005, Harman produced documents from Mr. Eelman consisting of financial records and sales data of Harman's U.S. sales to date on the relevant products in this case. On January 31, 2006, *a week before MIT filed its Motion to Compel*, Harman sent MIT, via email, a spreadsheet summarizing the information produced on November 29, 2005, but organized in the form of an Excel spreadsheet. *See* Email from Jamal M. Edwards, Kirkland & Ellis LLP, to Kimberly A. Mottley, Proskauer Rose LLP (January 31, 2006) (Exh. B). Indeed, this Excel spreadsheet was specifically requested by MIT and created by Harman for MIT so as to reduce the volume of paper production and to simply MIT's review of the data. Under the Federal Rules, Harman was under no obligation to accommodate MIT's special request, but this is just one example of how Harman has gone above and beyond its discovery obligations under the Federal Rules.

Harman further supplemented its document production on February 9 and 10, 2006, as required by Federal Rule of Civil Procedure 26(e). Specifically, on February 9, 2006, Harman produced an updated version of the spreadsheet that was produced to MIT on January 31, 2006. *See* Email from Jamal M. Edwards, Kirkland & Ellis LLP, to Kimberly A. Mottley, Proskauer Rose LLP (February 9, 2006) (Exh. C). This revised spreadsheet included two extra columns consisting of the cost of each relevant product sold by Harman in the United States. On February 10, 2006, Mr. Eelman supplemented his previous document production by providing Harman's counsel with additional responsive documents consisting of seven (7) pages, and Harman immediately forwarded those seven pages to MIT. *See* E-mail from Ann H. Chen, Kirkland &

Ellis LLP, to Kimberly A. Mottley, Proskauer Rose LLP (February 10, 2006) (Exh. D).  Thus, Harman has supplemented—and continues to supplement, as appropriate—its document production and has promptly produced such supplementation to MIT when the case arises, pursuant to its obligations under Rule 26(e).

### C.    Harman Has Already Produced Documents from Paul Naife

Next, MIT argues that Harman has not produced documents from Paul Naife, Harman's Senior Vice-President of Sales and Marketing for North America and that this demonstrates Harman's "refusal" to provide a "date certain" as to when documents will be produced.  Harman disagrees.  Since the start of discovery, and as additional relevant documents have been identified, Harman has continually provided MIT with an estimate of when it will produce such documents.  *See, e.g.*, Email from Jamal Edwards, Kirkland & Ellis LLP, to David Cerveny, Proskauer Rose LLP (December 8, 2005) (Exh. E) (stating "I advised you that Harman will be producing additional responsive documents from our Farmington Hills location the week of December 19,  Assuming we receive the documents next week as expected, we should be able to produce them to MIT by Monday December 19.").  Harman cannot, and should not be required to guarantee a "date certain" on which it will produce documents.  Close of fact discovery in this case is still two months away.  Harman cannot promise to meet MIT's unilateral and arbitrary deadlines for production given the scope and quantity of responsive documents that Harman must produce in this case.  Harman's supplemental production to date demonstrates its continuing efforts to identify and produce responsive documents as discovery progresses.  The Federal Rules of Civil Procedure, including Rule 34, do not require Harman to produce documents on a "date certain" upon the opposing party's request.  Rule 34(b) only requires that a

request for production of documents "specify a *reasonable* time, place and manner of making the inspection and performing the related acts." Fed. R. Civ. P. 34(b) (emphasis added).

At all times, however, Harman has provided MIT with an estimate of when Harman expects it will produce documents, and Harman has diligently and promptly produced responsive documents. For example, during the parties' meet and confer on February 6, 2006, Harman informed MIT that it had just received Mr. Naife's documents (whom had only recently been identified as having knowledge relevant to this case) and would produce them as soon as possible after Harman transferred those documents into its electronic database, formatted them into TIFF format, reviewed them internally, labeled them, and designated them for confidentiality. *See* E-mail from Jamal M. Edwards, Kirkland & Ellis LLP, to Kimberly A. Mottley, Proskauer Rose LLP at 2 (February 6, 2006) (Exh. F) (confirming parties' conference regarding discovery issues). Indeed, in the following week, on February 17, 2006, Harman produced Mr. Naife's documents to MIT well in advance of his deposition date of April 4, 2006. *See* Email from Ann H. Chen, Kirkland & Ellis LLP, to Anne L. Boutin, Proskauer Rose LLP (February 17, 2006) (Exh. G). Harman has thus produced and continues to produce documents as quickly as possible under the circumstances. Harman should not be required to meet the unilateral deadlines MIT chooses to impose on Harman when it is solely convenient for MIT.

### E.    Harman Must Consider German Law in Collecting and Producing Correspondence from Harman's German Employees

MIT also seeks an order to compel Harman to produce correspondence from its German offices. Harman has informed MIT that the Bundesdatenschutzgesetz ("BDSG"), also known as the German Federal Data Protection Act, prohibits Harman from collecting and disseminating emails containing personal or private information without the consent of its employees. *See Bundesdatenschutzgesetz*, BGB1, I, 2954 (2003) (FRG) (BDSG) (English translation Exh. H);

*see also Volkswagen, A.G. v. Valdez*, 909 S.W. 2d 900, 901-02 (Tex. 1995).   Section 3 of the BDSG defines "personal data" as "any information concerning the personal or material circumstances of an identified or identifiable individual."   Section 4a provides that an individual must provide consent in writing before his or her personal data, including emails, may be collected.   Section 28 further requires that "the purposes for which the data are to be processed or used are to be stipulated in concrete terms" in connection with the collection of personal data. Accordingly, under the BDSG, Harman must determine, *inter alia*, which responsive documents from its German employees contain personal data, obtain consent in writing to collect such documents, and further stipulate in writing the purposes for which the personal information will be used.   Harman has contacted its German in-house and outside counsel, who are attempting to determine as quickly as possible how Harman may produce correspondence for this litigation without violating the BDSG.   Moreover, to the extent that documents do not contain personal information, Harman has already produced responsive documents from its German offices and employees.

To the extent that Harman determines that certain relevant documents are not discoverable under German law, a conflict would exist between German law and the right of the parties under United States law.   In such situations, United States courts have weighed the factors set forth in the Restatement (Third) of Foreign Relations Law § 442 (1987) to determine whether a United States court should order production of information located in a foreign country. *See Societe Nationale Industrielle Aeropostale v. United States*, 482 U.S. 522, 544 n.28 (1987) (adopting the analysis provided by the Restatement in determining the scope of the district court's power to order foreign discovery); *In re Baycol Prods. Litig.*, MDL No. 1432 (MJD/JGL), 2003 WL 220223449, at *6 (D. Minn. March 21, 2003) (applying factors set forth in

§ 442); *Volkswagen*, 909 S.W. 2d at 902 (same).  Specifically, when deciding whether to order the production of information located abroad, U.S. courts have taken into account the following factors:

    (a)    the importance to the investigation or litigation of the documents or other information requested;

    (b)    the degree of specificity of the request;

    (c)    whether the information originated in the United States;

    (d)    the availability of alternative means of securing the information; and

    (e)    the extent to which noncompliance with the request would undermine important interests of the United States, or compliance would undermine important interest of the state where the information is located."

*See In re Baycol*, 2003 WL 220223449, at *6 (citing *Aeropostale*, 482 U.S. at 544 n.28); *Volkswagen*, 909 S.W. 2d at 902.

Upon completion of its investigation, Harman will produce any additional responsive documents that are discoverable under German law.  To the extent that Harman determines that German law prohibits the inspection and production of certain documents, their production requires that MIT demonstrate, under these factors in § 442, that it is entitled to a court order for the production of such correspondence.  Accordingly, Harman respectfully asks that the Court deny MIT's motion to compel the correspondence of Harman's German employees as premature in light of Harman's ongoing investigation.

**F.    MIT's Motion to Compel Documents Should Be Denied**

Finally, MIT requests that this Court compel Harman to "complete its document production . . . within five days of the Court's order."  *See* Motion to Compel at 4, 12.  Such a request again demonstrates MIT's imposition of unilateral deadlines on Harman.  Harman respectfully suggests that a Court order requiring the completion of document production within

five days of such an order, well in advance of the close of discovery on April 21, 2006, is unfair and unduly burdensome.    In addition, in light of MIT's recent February 2, 2006 amended complaint adding infringement allegations on "imported" products as well as a new claim of willful infringement, *see* Amended Complaint (Docket Entry 44), Harman is now reviewing its document production—from both its U.S. and European offices—to ensure that it has produced documents responsive to MIT's recently-added allegations.

Such a unilateral deadline, if imposed, creates an unfair burden to Harman, one which MIT is not required to bear in kind.  This burden would be particularly unfair when viewed in light of MIT's discovery responses and document production to date, which demonstrate serious deficiencies. *See* Letter from Ann H. Chen, Kirkland & Ellis LLP, to Kimberly A. Mottley, Proskauer Rose LLP (February 16, 2006) (Exh. I); Letter from Ann H. Chen, Kirkland & Ellis LLP, to Kimberly A. Mottley, Proskauer Rose LLP (February 15, 2006) (Exh. J).[2]    More specifically, MIT has refused to answer Interrogatories seeking information necessary for Harman to direct its own discovery efforts,[3] refused to comply with the Court ordered date for

---

[2]    For instance, MIT has not produced Mr. Swartz's employment contract with MIT, nor has it produced responsive documents regarding Mr. Swartz's investigation related to the patent at issue that Mr. Swartz testified remain in his possession, custody and control. *See* Exhibit I.  Similarly, MIT has not produced, among other things, royalty reports and financial statements related to its license agreement of the patent at issue. *See* Exhibit J.

[3]    MIT refused to answer Harman's Interrogatories Nos. 1-5 until February 15, 2006, days after MIT filed its Motion to Compel. *See* MIT's Supplemental Answers to Harman's Interrogatories (February 15, 2006) (Exh. K).  In fact, MIT waited more than five months to respond to Harman's interrogatories, which were served on September 6, 2006.  Only on February 15, 2006 did MIT provide Harman with its "responses" to these interrogatories, and even then, MIT did not provide Harman with any substantive explanation of its claim construction or how it interprets any claim as reading on any Harman device.

the exchange of claim construction contentions, again necessary for Harman to direct discovery efforts,[4] and failed to produce documents that were provided to it by its witnesses.

MIT's claims that it has "completed its document production" (*see* Motion to Compel at 2) are of concern where discovery in this case has demonstrated MIT's failure to produce key documents. Indeed, after the depositions of Mssers. Swartz and Turner, Harman learned that documents identified by those witnesses in their depositions were never produced to Harman. *See* Exhibits I, J.[5] While MIT complains of Harman's allegedly deficient document production, to date, MIT has produced only 4,851 pages of documents. *See* Letter from Anne L. Boutin, Proskauer Rose LLP, to Lesley Ahlberg, Kirkland & Ellis LLP (February 14, 2006) (Exh. L); Ahlberg Declaration (Exh. A).

Accordingly, Harman respectfully asks that MIT's motion to compel the documents of Mssrs. Eelman and Naife be denied as moot. Harman further asks that the Court deny MIT's motion to compel with respect to the remaining document production contentions, as Harman has and continues to produce and supplement documents in a diligent and timely manner.

## II.    IDENTIFICATION OF CUSTODIAL SOURCES OF DOCUMENTS

MIT contends that Harman is required under Federal Rule of Civil Procedure 34 to designate the source of each document it has provided. To the contrary, Rule 34(b) confers no obligation on a party producing documents to provide, by Bates number, the source of the

---

[4]    MIT refused to meet its obligations under the Court's scheduling order, as amended by the agreement of the parties, to provide its claim construction on January 20, 2006. It was only on February 15, 2006 that MIT finally provided a response, and again, that response fails to provide a substantive explanation of its claim construction or how it interprets any claim as reading on any Harman device.

[5]    Rather than seek the Court's assistance in obtaining these missing documents, Harman has chosen instead to notify MIT of any discovery deficiencies and to resolve these discovery contentions between the parties themselves. *See id.* The parties are currently scheduled for a telephone conference on February 23, 2006, to discuss a resolution of their disputes regarding document production.

original documents. Rule 34(d) requires only that "[a] party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request." Fed. R. Civ. P. 34(d).

Harman initially offered to produce documents as they are kept in the usual course of business, which would allow MIT to understand where the documents originated and how they were organized. MIT rejected that offer and instead requested that Harman produce its documents electronically. Subsequently, Harman collected responsive documents from its North America and Germany offices and offered them for inspection at Harman's counsel's offices in Chicago. MIT again rejected that offer and requested that Harman transfer all documents electronically to MIT's vendor.

Because MIT refused Harman's offer to produce records as they are kept in the usual course of business, Harman has instead, when possible, notified MIT of the document sources or specific information those documents contain. *See, e.g.,* Exhibit E; *see also* Email from Jamal M. Edwards, Kirkland & Ellis LLP, to MIT_Harman@proskauer.com, Proskauer Rose LLP (January 30, 2006) (attached as composite Exhibit M); Letter from Jamal M. Edwards, Kirkland & Ellis LLP, to Kimberly A. Mottley, Proskauer Rose LLP at 4 (October 7, 2005) (attached as composite Exhibit M). Much of Harman's documents, however, were collected from a central document storage system and do not originate from one particular individual at Harman. Thus, for these documents, there is no more specific source than Harman itself. To the extent that Harman itself knows the sources of its documents, it has provided this information to MIT. Harman further notes that MIT has not provided Harman with the source or origin of each of its own documents.

The case cited by MIT, *Scripps Clinic and Research Found. v. Baxter Travenol Labs., Inc.*, CIV.A. No. 87-140-CMW, 1988 WL 70013 (D. Del. June 21, 1988), is inapposite here. In *Scripps*, the defendant did not provide any indication as to the source or subject matter of its production. *See id.* at *4 ("although the documents were arranged in bundles. . . most of the bundles contained no designation as to the origin of the file, the name of the file, or whether the bundle contained documents from multiple files."). Unlike the defendant in *Scripps*, Harman has provided MIT with the subject matter as well as source information of documents produced, when that information is available. *See, e.g.,* Exhs. E and M. Accordingly, Harman respectfully requests that the Court deny MIT's Motion to Compel as to document sources.

## III.    CONFIDENTIALITY DESIGNATIONS OF DOCUMENTS

As an initial matter, MIT failed to meet its obligations under Federal Rule of Civil Procedure 37(a)(2) and Local Rule 37.1 with respect to confidentiality designations. Namely, prior to filing its motion to compel, MIT did not raise this issue during the parties' pre-filing telephone conference on February 6, 2006. *See* Exhibit F. Rule 37 and Local Rule 37.1 were enacted, among other reasons, to ensure that parties communicate and attempt to resolve their discovery disputes before needlessly engaging the Court's time and resources in deciding such matters. Despite MIT's failure to comply with these Rules, Harman responds to MIT's contentions below.

### A.    Harman Is Properly Designating Its Documents Pursuant to the January 31, 2006 Protective Order

Harman's document production through January of 2006 contains the designation "Outside Counsel Only." Prior to the Court's recent entry of the agreed Protective Order on January 31, 2006 (Docket Entry 42), just one week prior to MIT's Motion to Compel, the parties agreed, out of an abundance of caution, that Harman would label its documents as "Outside

Counsel Only," until such a protective order was entered. *See* Letter from Kimberly A. Mottley, Proskauer Rose LLP, to Jamal M. Edwards, Kirkland & Ellis LLP, at 1 (October 4, 2005) (Exh. N) ("Thank you for your agreement to produce documents on an attorneys' eyes only basis *while we finalize the protective order*.") (emphasis added). As of the Court's January 31, 2005 entry of the Protective Order in this case, Harman has proceeded to designate its documents as either "Confidential" or "Highly Confidential," pursuant to the Protective Order. Indeed, in Harman's productions thus far in February, its documents have contained both such designations, including documents in Bates ranges HAR 088043 to HAR 088870. Harman has also begun to re-designate the approximately 88,000 documents it has already produced in order to comply with the January 31, 2006 Protective Order.

**B.    MIT Itself Has Not Re-Designated Its Documents**

Furthermore, rather than seeking Court intervention, MIT should have examined its own confidentiality designations on the documents produced to date. Upon review of MIT's documents, Harman has discovered that at least twenty-five (25) of its documents contain little or no information, yet were designated by MIT as "Highly Confidential, including numerous blank or substantially blank emails. *See* Exhibit J at 3. Moreover, each of these documents is responsive based on the subject that appears in the reference line of the emails.

Because Harman is currently re-designating its more than 88,000 documents and has already produced replacement copies of certain documents with confidentiality designations— and expects MIT to do the same—Harman asks that MIT's motion to compel be denied as moot. In the alternative, should the Court enter an order requiring a deadline for confidentiality designations, Harman respectfully requests that the Court order MIT to comply as well, keeping

in mind that Harman's document production of more than 88,000 documents far outweighs that of MIT's production of less than 5,000 pages.

## IV. DEPOSITION SCHEDULE

On September 28, 2005, MIT served Harman with its notice of Rule 30(b)(6) deposition, and on November 1, 2005, MIT served Harman with eight (8) deposition notices for this case. *See* Notices of Deposition (attached as composite Exhibit O). Since that time, the parties have been working toward a mutually agreed deposition schedule. Indeed, as of February 6, 2006, ***the day prior to MIT filing its Motion to Compel,*** Harman and MIT had agreed to deposition dates for eight of the ten witnesses noticed by MIT. Nonetheless, MIT contends that Harman 1) has not produced a witness for deposition; 2) fails to provide a deposition schedule; and 3) attempts to out-budget MIT with respect to deposition scheduling. Harman addresses each of these allegations in turn.

### A. MIT Has Deposed David Eelman

First, MIT complains that it has yet to take one deposition of a Harman witness as of the filing date of its motion to compel. At the time MIT filed its motion to compel, MIT was scheduled to take the deposition of David Eelman on February 14, 2005. The parties agreed to this deposition date as early as January 23, 2006. *See* Letter from Kimberly Mottley, Proskauer Rose LLP, to Craig Leavell, Kirkland & Ellis LLP, at 2 (January 23, 2006) (Exh. P) (agreeing also to the depositions of Mr. Giffin on February 15, 2006, and Mr. Radomski on February 22, 2006). Accordingly, MIT appeared and deposed Mr. Eelman on February 14, 2006, at Harman's counsel's offices in Chicago, Illinois. Therefore, at the time MIT filed its motion to compel, it was aware of Mr. Eelman's approaching deposition date.

Moreover, as of February 6, 2006, Harman and MIT had reached an agreement on deposition dates for eight of the ten witnesses noticed by MIT. MIT cannot now suggest that Harman is unwilling to provide witnesses, when, at the time MIT filed its motion, the parties had already reached agreement as to the majority of deposition dates for Harman's witnesses.

**B.    Harman and MIT Have Already Agreed to a Deposition Schedule**

Harman is confounded by MIT's assertions that Harman refuses to provide MIT with a firm deposition schedule. In particular, during the parties' telephone conference on February 6, 2006, *the day prior to the filing of MIT's motion to compel*, MIT and Harman agreed to the following deposition schedule:

- February 14, 2006:      Deposition of David Eelman
- February 15, 2006:      Deposition of Mike Giffin (now rescheduled for March 3, 2006)[6]
- February 22, 2006:      Deposition of Mike Radomski
- March 14, 2006:      Depositions of Joaqim Wietzke and Axel Brandes, to be taken back-to-back *at MIT's request*
- March 16, 2006:      Deposition of Guido Jeske
- March 28, 2006:      Deposition of Stefan Hanika-Heidl
- April 4, 2006:      Deposition of Paul Naife
- April 17 or 20, 2006:      Deposition of Robert Hart
- April 17 or 20, 2006:      Deposition of Charlie Call

*See* Exhibit F; Letter from Kimberly A. Mottley, Proskauer Rose LLP, to Craig D. Leavell, Kirkland & Ellis LLP (February 6, 2006) (Exh. R).

Even earlier, on January 23, 2006, MIT agreed to the deposition dates for Messrs. Eelman, Giffin, and Radomski. *See* Exhibit P at 2. Thus, with the exception of Robert Hart's

---

[6] On February 6, 2006, after the completion of the parties' telephone conference, Mr. Giffin informed Harman's counsel that he was required to travel to Europe the following week due to urgent business and was therefore unable to keep his originally scheduled deposition date of February 15, 2006. Upon receiving this information, Harman's counsel immediately contacted MIT to schedule a new deposition date of February 21, 2006, upon Mr. Giffin's return to the United States. *See* Email from Jamal M. Edwards, Kirkland & Ellis LLP, to Kimberly A. Mottley, Proskauer Rose LLP (February 6, 2006) (Exh. Q). This was unacceptable to MIT, and the parties subsequently agreed to depose Mr. Giffin on March 3, 2006 -- a date specifically requested by MIT.

deposition, for which Harman provided two dates to MIT, *all* of Harman's witnesses had been scheduled for depositions at the time MIT filed its motion to compel. Therefore, when MIT filed its motion to compel, Harman believed an agreement was in place as to the majority of deposition dates, excluding only Mr. Hart and Dr. Call, MIT's witness. The fact that the parties had a deposition schedule in place on February 6, 2006 demonstrates MIT's lack of good faith in filing its motion to compel, as required by Rule 37(a)(2) and Local Rule 37.1.

Additionally, MIT—and not Harman—has hindered Harman's attempts to reach a mutually agreed deposition schedule. Specifically, following the parties' telephone conference on February 6, 2006, MIT has:

- cancelled Mr. Eelman's deposition for February 14, 2006 due to Harman's alleged failure to provide documents, *see* Letter from Kimberly Mottley, Proskauer Rose LLP, to Jamal Edwards, Kirkland & Ellis LLP (February 7, 2006) (Exh. S), despite the fact that Harman had already provided sales documents to MIT as early as November 29, 2005, and provided that same information in spreadsheet format on January 31, 2006.[7]
- rescheduled the depositions of Mssrs. Eelman and Giffin on February 23, and 24, without confirming with Harman whether those witnesses or Harman's counsel were available on those dates. *See id.*
- on February 10, 2006, cancelled Mr. Radomski's deposition scheduled for February 22, 2006, due to MIT's counsel's schedule in another case, despite contending in its motion to compel that Harman's cancellation of Mr. Giffin's deposition due to urgent business reasons is unacceptable.[8] *See* Email from Kimberly A. Mottley, Proskauer Rose LLP, to Jamal M. Edwards, Kirkland & Ellis LLP (February 10, 2006) (Exh. T).

Despite MIT's conduct, Harman has sought to resolve any issues directly with MIT rather than seek the Court's time and resources. Indeed, in the case of Mr. Radomski, Harman and

---

[7]  MIT subsequently reinstated Mr. Eelman's deposition date -- and his deposition was indeed taken on February 14, 2006 -- after Harman emailed MIT a copy of Mr. Eelman's updated spreadsheet on February 9, 2006, a document which was an updated version of a document *previously produced* to MIT on January 31, 2006.

[8]  On February 15, 2006, MIT subsequently notified Harman that it would be available for Mr. Radomski's originally scheduled deposition date of February 22, 2006. Mr. Radomski's deposition is now scheduled, as originally planned, on February 22, 2006.

MIT have now resolved this matter among themselves, with Mr. Radomski's deposition rescheduled, at MIT's request, for February 22, 2006, as originally planned.

More importantly, as of the filing date of this response, Harman and MIT are in agreement as to a deposition schedule. *See* Letter from Kimberly A. Mottley, Proskauer Rose LLP to Jamal Edwards, Kirkland & Ellis LLP, at 2 (February 8, 2006) (Exh. U).[9] Moreover, six of the nine deposition dates currently in place are *the same dates* that the parties scheduled during their telephone conference on February 6, 2006. In other words, the deposition dates have not changed at all for Messrs. Eelman, Radomski, Jeske, Hanika-Heidl, Naife, and Dr. Wietzke. *See* Exhibit F. Accordingly, Harman has attempted at all times to reach a reasonable and efficient deposition schedule in this case.

### D.    Harman Has Proposed Dates To Achieve an Efficient Deposition Schedule

Finally, MIT argues that Harman's counsel is "attempting at every turn to run up the bill for MIT, an academic institution whose resources are dwarfed by that of Harman." *See* Motion to Compel at 8. In support of its contentions, MIT alleges that Harman has offered its witnesses for depositions "so far apart" as to require separate trips. Harman strongly disagrees.

First, on January 20, 2006, Harman offered three witnesses—Messrs. Eelman, Giffin, and Radomski—for deposition dates all within the same week of February 14-22, 2006. *See* Letter from Craig D. Leavell, Kirkland & Ellis LLP, to Kimberly A. Mottley, Proskauer Rose, LLP at 2 (January 20, 2006) (Exhibit V). Specifically, Harman proposed deposition dates for Mr. Eelman on February 14, 2006; Mr. Giffin for February 15, 2006; and Mr. Radomski on February 22, 2006. Furthermore, at MIT's request on February 6, 2006, Harman agreed to provide Dr.

---

[9] With respect to this letter, Harman agrees *only* to the deposition dates in MIT's February 8, 2005, and has not agreed to MIT's unilateral demands that Harman pay for all travel and deposition costs.

Wietzke and Mr. Brandes for consecutive depositions on the same day, March 14, 2006, and to provide Mr. Jeske for deposition two days later, on March 16, 2006. *See* Exhibit F. Rather than trying to "run up the bill" by scheduling depositions "far apart," Harman has, in reality, offered witnesses on the same day, on consecutive days, and within the same week.

Second, MIT indicates its understanding that "all the witnesses involved in this suit are busy people." *See* Motion to Compel at 9. Indeed, the dates Harman has offered to MIT must account for the schedules of Harman's employees, many of whom must travel regularly for their work or have professional obligations that conflict with dates sought by MIT. Neither MIT nor Harman can impose deposition dates upon individuals whose own schedules conflict with any deposition dates proposed by either party.

In addition, Harman's witnesses do not work in proximity to each other or to counsels' offices in Chicago, Boston, or Munich. The witnesses that MIT intends to depose (or has already deposed) work at or near the following widespread locations: Farmington Hills, Michigan; Martinsville, Indiana; Woodbury, New York; Northridge, California; Hamburg, Germany; Karlsruhe, Germany; and Karlsbad, Germany. *See* Harman's First Amended Initial Disclosures Pursuant to Rule 26(a)(1) (December 21, 2006) (Exh. W). Harman must not only schedule deposition dates for witnesses who do not live or work near counsels' offices in Chicago, Boston, or Munich, but Harman's witnesses must also allocate travel time to reach the deposition locations when determining their availability for deposition dates.

Third, the majority of Harman's research and development of its automotive products occur in Germany. Harman cannot produce technical witnesses who live or work in the United States if they do not exist. Because most of Harman's technical witnesses live and work in

Germany, depositions in this case require travel overseas and expenses incurred as a result thereof.[10]

### E.    MIT's Motion to Compel a Deposition Schedule Should be Denied as Moot

*Harman and MIT have already agreed to a deposition schedule.*  In its motion to compel, however, MIT requests that the Court set different deposition dates for the remaining witnesses. Because Harman and MIT have already resolved their deposition conflicts and reached agreement as to a deposition schedule, Harman sees no need for Court intervention. Accordingly, Harman respectfully asks that MIT's motion to compel a deposition schedule be denied as moot.

## V.    SUPPLEMENTAL WRITTEN DISCOVERY REQUESTS

Finally, MIT filed its motion requesting the Court to compel Harman to amend its initial disclosures to "identify knowledgeable witnesses" as to the issue of willful infringement, only five days after willfulness was pleaded on February 2, 2006.  MIT amended its complaint after the deadline to amend pleadings, with Harman's consent.  *See* Joint Motion to Amend Pleadings and for Entry of Confidentiality Order (Docket Entry 44).  Thus, MIT's motion to compel supplementation of initial disclosures is premature.

---

[10]  MIT alleges that its "resources are dwarfed by that of Harman," and therefore complains about traveling to where Harman's witnesses are located.  *See* Motion to Compel at 8.  An examination of public statements made by both Harman and MIT shows the exact opposite - that Harman's resources are in fact dwarfed by that of MIT.  In particular, MIT states on its website that its endowment "approaches $7 billion." *See* MIT, *Giving to MIT: Designating your gift - The Endowment*, http://giving.mit.edu/designating/endowment.html (last visited Feb. 16, 2006) (Exh. X) ("At the start of *The Campaign for MIT*, MIT's endowment was $3 billion. Today, it approaches $7 billion. This has been accomplished through a combination of gifts and investment performance, and is cause for celebration.").  In comparison, Harman reported net profits for FY 2005 of approximately $233 million, or about 3% of MIT's endowment.  *See* Harman International Press Release, "Harman International Reports Record Fourth Quarter and Full Year Results," http://www.harman.com/fp/index.isp?articleId=4.0 (last visited 2/17/06) (Exh. Y).

Moreover, supplementation of Harman's initial disclosures is unnecessary in this case. Federal Rule of Civil Procedure 26(e) provides that a party is under a duty to supplement its disclosures at appropriate intervals "if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information *has not otherwise been made known to the other parties during the discovery process or in writing.*" Fed. R. Civ. P. 26(e)(1) (emphasis added). MIT has been made aware throughout the discovery process, even prior to filing its amended complaint, about Harman's pre-suit discussions with MIT, during which Harman put forth its invalidity and non-infringement positions. In fact, documents produced by MIT include communications from Harman to MIT demonstrating Harman's good faith response and due inquiry upon notification of MIT's infringement allegations.[11] Thus, MIT has *otherwise been made aware of this information during the discovery process.* Harman therefore respectfully asks that the Court deny MIT's motion to compel Harman to supplement its initial disclosures.

## VI.    CONCLUSION

MIT's motion to compel identifies discovery issues that are premature, moot, or do not require resolution by the Court. Accordingly, Harman respectfully asks that the Court deny MIT's motion to compel (Docket Entry 45) in all respects.

---

[11]   These documents, produced by Mr. Swartz, include a letter dated January 19, 2005 from Meredith Addy, Harman's counsel, to Mr. Swartz asserting Harman's claim construction and discussing Harman's position non-infringement position. (Exh. Z)

Dated: February 21, 2006

Respectfully submitted,

/s/ Courtney A. Clark
Robert J. Muldoon, Jr., BBO# 359480
James W. Matthews, BBO# 560560
Edward S. Cheng, BBO# 634063
Courtney A. Clark, BBO# 651381
**SHERIN AND LODGEN, LLP**
101 Federal Street
Boston, MA 02110

William A. Streff Jr., P.C.
Craig D. Leavell
Michelle A.H. Francis
**KIRKLAND & ELLIS LLP**
200 E. Randolph Dr.
Chicago, IL 60601
(312) 861-2000 (phone)
(312) 861-2200 (fax)

*Attorneys for Defendant*

**EXHIBIT A**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY,<br><br>        Plaintiff,<br><br>v.<br><br>HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

· Civil Action No. 05-10990-DPW

## AFFIDAVIT OF LESLEY AHLBERG

I, Lesley Ahlberg, declare:

1.    I am a Legal Assistant at Kirkland & Ellis LLP. I have personal knowledge of the facts stated herein.

2.    On October 12, 2005, defendant Harman International Industries, Incorporated ("Harman") produced to MIT (via its vendor Pitney Bowes in Chicago, Illinois) approximately 4,200 pages of documents in Bates range HAR 000001- 004251, and one CD containing 437 files with approximately 7,400 pages of documents. The documents on the CD were later electronically produced to MIT on January 26, 2006 in Bates range HAR 60268-67640.

3.    On November 29, 2005, Harman produced to MIT approximately 5,000 pages of documents in Bates range HAR 004252 - 004709.

4.    On January 9, 2006, Harman produced to MIT approximately 1,700 pages of documents in Bates range HAR 004710 - 6015.

5.    On January 18, 2006, Harman produced to MIT approximately 60,000 pages of documents in Bates range HAR 006016-60267.

6.    On January 26, 2006, Harman produced to MIT approximately 7,400 pages of documents in Bates range HAR 60268-67640, which Harman also previously produced to MIT on October 12, 2005 in CD format.

7.    On January 30, 2006, Harman produced to MIT approximately 20,000 pages of documents in Bates range HAR 67641-87235.

8.    On February 9, 2006, Harman produced to MIT approximately 710 pages of documents in Bates range HAR 87235-87945.

9.    On February 12, 2006, Harman produced to MIT approximately 95 pages of documents in Bates range HAR 087946-088042.

10.    On February 17, 2006, Harman produced to MIT approximately 828 pages of documents in Bates range HAR 088043-088871.

11.    I declare under penalty of perjury that the foregoing is true and correct.


Executed on February ___, 2006


_____
Lesley Ahlberg

2

**EXHIBIT B**



Jamal
Edwards/Chicago/Kirkland-Elli
s
01/31/2006 03:01 PM

To   mit_harman@proskauer.com

cc   Harman-MIT

bcc

Subject   Harman Sales Data

Kim:

As requested, attached please find the excel version of the Harman sales data document referenced in my January 25, 2006 letter.

Regards,

Jamal.



HARMAN SALES DATA [EXCEL LEGAL_10754637_1].XLS

**JAMAL M. EDWARDS | KIRKLAND & ELLIS LLP**

200 East Randolph Drive ♦ 53rd Floor |Chicago, IL 60601 | 312.861.2464 **Direct** | 312.861.2200 **FAX**

**www.kirkland.com/jedwards**

**EXHIBIT C**



| | Jamal<br>Edwards/Chicago/Kirkland-Elli<br>s<br><br>02/09/2006 03:20 PM | To | kmottley@proskauer.com, mit_harman@proskauer.com |
|---|---|---|---|
| | | cc | Harman-MIT |
| | | bcc | |
| | | Subject | Harman v. MIT/ EXCEL version of Spreadsheet |

Counsel:

As a courtesy, attached please find an Excel version of the spreadsheet I transmitted previously.



copy of USNavProdSaleswVC.xls

**JAMAL M. EDWARDS | KIRKLAND & ELLIS LLP**
200 East Randolph Drive ♦ 53rd Floor |Chicago, IL 60601 | 312.861.2464 **Direct** | 312.861.2200 **FAX**
www.kirkland.com/jedwards

**EXHIBIT D**

Ann
Chen/Chicago/Kirkland-Ellis
02/10/2006 09:53 PM

To  kmottley@proskauer.com

cc  Harman-MIT

bcc

Subject  Fw: Scanned document from Kirkland Chicago
Scan/Chicago/Kirkland-Ellis

Kim,

These documents were produced to us from Dave Eelman today. We are not aware of any additional
responseive documents that he may have.

Ann H. Chen
Kirkland & Ellis, LLP
200 E. Randolph Drive
Chicago, IL 60601
Tel: (312) 861-6352
Fax: (312) 665-9059
email: achen@kirkland.com

 - Harman documents.pdf

**EXHIBIT E**



Jamal
Edwards/Chicago/Kirkland-Elli
s

12/08/2005 02:24 PM

To    "Cerveny, David" <dcerveny@proskauer.com>

cc    Harman-mit@kirkland.com, "MIT_Harman"
      <MIT_Harman@proskauer.com>

bcc

Subject    RE: MIT v. Harman - Discovery

Dave:

I am pleased we were able to make additional progress on discovery issues. To confirm, we addressed the following:

I. Document Production

I advised you that Harman will be producing additional responsive documents from our Farmington Hills location the week of December 19. Assuming we receive the documents next week as expected, we should be able to produce them to MIT by Monday December 19. I expect most of the documents will be produced on DVD. I expect these documents to include the following: customer specifications and correspondence, design plans and marketing/sales proposals and presentations, RFQs, quotes, end-user complaints and OEM customer complaints, and any additional documents that may be found after a reasonable search based on Harman's understanding of MIT's claims and requests.

I expect our product samples to be ready by December 19. We also have some additional paper documents that will be produced at that time, which were also collected from our Farmington Hills office.

You confirmed that MIT believes it has produced all responsive, non-privileged documents in its possession, custody or control, including documents from Mr. Swartz's, Mr. Call's and Dr. Davis' files. We will continue reviewing the documents received to date and will respond in writing regarding any deficiencies we notice.

II. Claim Construction/Contentions

We agreed we would confirm with our clients that the parties will agree to extend until January 20, 2006, the previously agreed January 4, 2006 deadline for exchange of proposed claim elements for construction and preliminary claim construction. This will allow both parties time to prepare and present their preliminary claim construction positions to each other so that the parties may determine where an agreement might be reached and to narrow the issues for construction by the Court. You stated that MIT's pleading will contain substantive responses to Harman's interrogatories Nos. 1-5. The parties will meet and confer on or around February 3, 2005, to discuss claim construction positions and room for agreement.

III. MIT's Supplemental Interrogatory Responses

You stated that you were nearly finished preparing MIT's supplemental responses to Harman's interrogatories Nos. 6-7, and that we could expect to receive them next week. You agreed to report back with a definitive date tomorrow.

IV. Depositions

We agreed that we would plan our first round of depositions for the week of January 9. Harman proposes that Mr. Swartz' deposition occur on Monday, Jan 9, and that the depositions of Harman's two witnesses occur on Jan 11 and 12. All three depositions will occur at Kirkland's Chicago office. You agreed to confirm Mr. Swartz' availability on January 9, 2006.

You also stated that you would check with Dr. Davis to confirm his availability for the Week of January 23. You stated that MIT would prefer his deposition to occur in Boston. Please confirm his availability as soon as possible.

We also agreed to work toward developing a tentative deposition schedule for all outstanding fact depositions by January 6. This will allow us time to discuss during our first round of depositions the week of January 9.

We agreed that further depositions, including Harman's 30(b)(6) will not occur until after February 3, 2006, thus allowing time for the parties to receive and confer about each others propose claim constructions, infringement contentions and invalidity positions. Harman will make every effort to present its 30(b)(6) designees soon thereafter, and we will work diligently to present dates in February that will work for both parties. We should confer again about potential dates when we discuss our tentative deposition schedule on January 6, and during our first round of depositions.

V. Amendment of Pleadings

We discussed a stipulated amendment of the complaint whereby MIT will amend only to allege willful infringement and infringement by import. You stated that MIT would agree to a very narrow amendment whereby MIT will limit its amendment to parroting the language of the statute regarding willful infringement and infringement by import into the United States. I told you that Harman was not inclined to agree to a shortened answer period, but that we would consider stipulating to answering only in response to MIT's narrow amendments, and that the amendment will not toll or delay the currently agreed schedule. We both agreed to confer again with our clients on this point and to confirm our agreement by e-mail afterwards.

As discussed, we both recognize that the proposals and agreements made during our call are subject to final approval by our clients and respective superiors. Nonetheless, it appears that we have made significant progress and I look forward to continued progress in the future.

Thanks for your cooperation,

Jamal.

**JAMAL M. EDWARDS | KIRKLAND & ELLIS LLP**

200 East Randolph Drive ♦ 53rd Floor |Chicago, IL 60601 | 312.861.2464 Direct | 312.861.2200 FAX

www.kirkland.com/jedwards

"Cerveny, David" <dcerveny@proskauer.com>

12/07/2005 04:31 PM

To "Jamal Edwards" <jedwards@kirkland.com> Harman-mit@kirkland.com, "MIT_Harman"
cc <MIT_Harman@proskauer.com>

Subjec RE: MIT v. Harman - Discovery
t

Jamal,

Your response is a step in the right direction, but we need to ensure that outstanding discovery issues are resolved in a timely and reasonable manner.  We are available tomorrow at noon est/11 cst to discuss all open discovery issues.  During that meeting and as part of any broader resolution, we expect Harman to commit to a definitive schedule for the completion of outstanding discovery, including document production dates, the scheduling of initial depositions, and a deadline for finalizing all remaining dates for the other noticed depositions.

Dave

---

**From:** Jamal Edwards [mailto:jedwards@kirkland.com]
**Sent:** Wednesday, December 07, 2005 3:24 PM
**To:** Cerveny, David
**Cc:** Harman-mit@kirkland.com; MIT_Harman
**Subject:** Re: MIT v. Harman - Discovery

Dave

Please let me know if my response yesterday does not address your concerns; and, if so, please confirm that you'll be available to discuss tomorrow at 11:00a CST.

Thanks,

Jamal.

**JAMAL M. EDWARDS | KIRKLAND & ELLIS LLP**
200 East Randolph Drive ♦ 53rd Floor | Chicago, IL 60601 | 312.861.2464 Direct | 312.861.2200 FAX
www.kirkland.com/jedwards

"Cerveny, David" <dcerveny@proskauer.com>

| | |
|---|---|
| | To "Jamal Edwards" <jedwards@kirkland.com> |
| 12/05/2005 07:24 PM | "MIT_Harman" <MIT_Harman@proskauer.com>, |
| | cc Harman-mit@kirkland.com |
| | Subjec MIT v. Harman - Discovery |
| | t |

Jamal,

It has now been more than two weeks since we agreed to a resolution of many of the outstanding discovery disputes, but, since then, Harman has not taken any action to follow through with those agreements. Last Tuesday, November 29, 2005, you indicated that Harman would be serving its amended initial disclosures today, that you would have deposition dates for Harman's 30(b)(6) deposition, and that you would have deposition dates for the two initial individual depositions that we had tentatively scheduled for the week of December 19, 2005 (which is now less than two weeks away). As you did not contact me today as I requested in my email of this morning to discuss the status of discovery, I presume that Harman does not have those dates and will not be serving its revised initial disclosures today.

Once again, we are in a position where we can no longer wait for Harman to comply with its discovery obligations, which it has continually failed to do for months on end. Thus, unless the parties reach a definitive agreement - no later than 5:00 p.m. e.s.t. on Wednesday, December 7, 2005 - regarding the scheduling of the noticed depositions, the scheduling of the remaining document production, the production of documents related to willfulness, and the other issues that the parties addressed two weeks ago, as outlined in my summary letter dated November 23, 2005, MIT plans to file a motion to compel.

We remain open to resolving these issues by agreement, but the issues must be finally resolved or we will seek an order from the Court directing that they be resolved.

David J. Cerveny
Proskauer Rose LLP
One International Place
Boston, Massachusetts  02110-2600
Tel:  617-526-9621
Fax: 617-526-9899
dcerveny@proskauer.com

This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify the sender immediately by replying to this message and destroy all copies of this message and any attachments. Thank you.

---------------------------------------------------------------------

This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure. If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them. Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.


===============================================================
======

*************************************************************
The information contained in this communication is

confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee.  It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful.  If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
****************************************************************

-------------------------------------------------------------------

This message and its attachments are sent from a law firm and may contain information that is
confidential and protected by privilege from disclosure. If you are not the intended recipient, you
are prohibited from printing, copying, forwarding or saving them. Please delete the message and
attachments without printing, copying, forwarding or saving them, and notify the sender
immediately.

**EXHIBIT F**



Jamal
Edwards/Chicago/Kirkland-Elli
s

02/06/2006 03:37 PM

To   kmottley@proskauer.com

cc   mit_harman@proskauer.com, Harman-MIT

bcc

Subject   MIT v. Harman/ Discovery Conference Today

Kim:

To confirm our conversation today:

<u>Depositions</u>

Wietzke and Brandes: Craig Leavell's Feb 6, 2006 e-mail, offered Professor Wietzke on March 21 and Axel Brandes on March 14. We did not offer them the say day. Nonetheless, we are reluctantly amenable to MIT's request to depose both Mr. Brandes and Professor Wietzke on the same day (but not simultaneously), provided that MIT is willing to limit its deposition time to 8 hours that day, between both witnesses (i.e., 4 hours with Wietzke and 4 hours with Brandes). Please bear in mind that we will not hold the witnesses for an unreasonable time that day, so we hope that MIT will use its time wisely. We advise against the above proposal, but understand MIT's request arises from its desire to avoid making multiple trips to Germany.

The remainder of the dates proposed in your letter today for Messrs. Jeske, Hanika-Heidl and Naife, are confirmed.

30(b)(6): Regarding Harman's 309(b)(6) deposition. I reiterated, and again reiterate, that we previously agreed (at MIT's request and in writing) to disclose the identity of Harman's 30(b)(6) designees 7 days prior to the deposition. As a courtesy, we have already disclosed the identity of Harman's designees for Topics 1 and 3.

I must correct my statement that Messrs. Jeske and Naife will both testify regarding Topic 3. Instead, I just learned that Mr. Naife will testify about all issues in Topic 3, except Harman's licensing activity ("licensing, and offers to license). Robert Hart, Harman's Topic 2 designee, will cover "licensing and offers to license." Mr. Hart is available either April 17th in Northridge, CA or April 20th in Las Vegas, NV. Depending upon which date MIT selects, we will use the remaining date (either Apr. 17 or Apr. 20) to depose Mr. Call in Ft. Myers.

We will provide further indication as to which sub-topics each witness will testify about, not later than 7 days prior to each deposition, as the parties previously agreed.

Butler: Rule 30(a)(2)(A) and L.R. 26.1 both make explicitly clear that MIT will need leave of court if "a proposed deposition would result in more than 10 depositions being taken..." MIT has already served and scheduled 10 depositions in this case. Thus, Harman continues to maintain that MIT will require leave of court to depose Mr. Butler. Should MIT elect to move for leave, Harman will gladly comply with the Court's order when that order is issued.

<u>Discovery Supplements</u>

As we've told you, Harman will supplement its discovery responses as required and when required by Rule 26(e). You should know that Rule 26(e)(1) provides that supplementation of initial disclosures is required only where: "the information has not otherwise been made known to the other parties during the discovery process or in writing." To date, we have already provided MIT with all of the non-privileged information required by Rule 26(a)(1) during the discovery process.

<u>Documents</u>

As we've already told you, we will be producing additional documents from Mr. Eelman this week. We just received Mr. Naife's documents last week on Thursday. Once we've had time to upload them to our system, review them, print or TIFF them, and bates label them, we will produce them to you expeditiously. You have agreed to take Mr. Naife's deposition on April 4. We will make every effort to get his documents to you well in advance of Mr. Naife's deposition. We do not, however, understand your claim that MIT needs Mr. Naife's documents to depose Mr. Radomski. We have already produced all of Mr. Radomski's non-privileged, responsive documents, many of which are duplicative of Mr. Naife's documents (thus, we also need to remove duplicates from Mr. Naife's production, which will also require some additional time).

As for source identification information: We continue to be puzzled by MIT's constant change of position regarding how Harman should produce its documents. Originally, I offered to make Harman's documents available for inspection as they are kept in the ordinary course of business at each of Harman's offices, both foreign and domestic. You refused to travel to Harman's various offices, inexplicably citing economic hardship on the part of MIT and efficiency issues. Per your request, we agreed to collect all of Harman's documents and produce them to MIT from Kirkland's Chicago office. In fact, you requested that we exchange copy sets on CD, which Harman was not initially willing to do. As a compromise, we agreed to collect Harman's documents electronically and produce them in concordance load files. As a result, we have not been collecting source information. Thus, it will be extremely burdensome for Harman to go back through its production and attempt to find all of this information, which MIT previously told Harman it did not want.

Again, in the spirit of compromise, we offered to identify the sources of Harman's correspondence files, on a forthcoming basis. As a result, when we produce Mr. Eelman's documents, we will identify them as such. We will do the same for Mr. Naife's documents and any other documents that we are able to identify. Also, on January 18, 2006, Harman produced documents bates labeled HAR 006016-HAR 60267, which included correspondence from Messrs. Radomski, Montealegre and Butler. Much of the German correspondence is protected from discovery by the German Federal privacy laws. The remainder of our documents are centrally-stored documents, which we do not have source information. If you have questions about specific documents, please let us know and we will attempt to help you.

<u>Motion to Compel</u>

You stated that MIT intends to file motions to compel Messrs. Eelman's and Naife's documents, and supplementation of Harman's initial disclosures and discovery responses in light of MIT's recently filed and entered Amended Complaint. As we discussed, we believe such a motion will be frivolous and wasteful in light of our discussions today. Harman has consistently evidenced a good faith intent to comply with its discovery obligations. As previously stated, Harman is committed to producing further documents as soon as possible; hopefully this week. The fact that Harman can not commit to MIT's unilateral, unsupported demands for "dates certain" and the like, does not justify a motion to compel and does not satisfy the parties' L.R. 37.1 meet and confer obligation. We hope that MIT will reconsider its plans to move the Court.

Regards,

Jamal.

**JAMAL M. EDWARDS | KIRKLAND & ELLIS LLP**
200 East Randolph Drive ♦ 53rd Floor |Chicago, IL 60601 | 312.861.2464 **Direct** | 312.861.2200 **FAX**
www.kirkland.com/jedwards

**EXHIBIT G**

| | | | |
|---|---|---|---|
| | Ann Chen/Chicago/Kirkland-Ellis 02/17/2006 03:15 PM | To | aboutin@proskauer.com |
| | | cc | MIT_Harman@proskauer.com, Lesley Ahlberg/Chicago/Kirkland-Ellis@K&E |
| | | bcc | |
| | | Subject | Fw: MIT v. Harman |

Ms. Boutin,

The documents in range HAR 088043 - HAR 088870 should be documents from Paul Naife.

Ann H. Chen
Kirkland & Ellis, LLP
200 E. Randolph Drive
Chicago, IL 60601
Tel: (312) 861-6352
Fax: (312) 665-9059
email: achen@kirkland.com
----- Forwarded by Ann Chen/Chicago/Kirkland-Ellis on 02/17/2006 03:13 PM -----



| | | | |
|---|---|---|---|
| | Lesley Ahlberg/Chicago/Kirkland-Ellis 02/16/2006 03:07 PM | To | aboutin@proskauer.com |
| | | cc | MIT_Harman@proskauer.com, Ann Chen/Chicago/Kirkland-Ellis@K&E |
| | | Subject | MIT v. Harman |

Ms. Boutin -

We have a CD containing images Bates labeled HAR 088043 - HAR 088870 ready to be picked up by your vendor.

Attached is a document bearing Bates numbers HAR 088871-HAR 088871.



HAR 88871-77.pdf

Lesley A. Ahlberg
Intellectual Property Legal Assistant
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312)861-3408

**EXHIBIT H**

| Bundesdatenschutzgesetz (BDSG) | Federal Data Protection Act |
|---|---|
| Stand: 1. Januar 2003 | as of 1 January 2003 |

| | |
|---|---|
| *Dieses Gesetz dient der Umsetzung der Richtlinie 95/46/EG des Europäischen Parlaments und des Rates vom 24. Oktober 1995 zum Schutz natürlicher Personen bei der Verarbeitung personenbezogener Daten und zum freien Datenverkehr (ABl. EG Nr. L 281, S. 31 ff).* | *This Act serves to implement directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data (OJ EC no. L 281, p. 31 ff.).* |

| Inhaltsübersicht | Contents |
|---|---|

**Erster Abschnitt
Allgemeine und gemeinsame Bestimmungen**

**Part I
General and common provisions**

| | | | |
|---|---|---|---|
| § 1 | Zweck und Anwendungsbereich des Gesetzes | Section 1 | Purpose and scope |
| § 2 | Öffentliche und nicht-öffentliche Stellen | Section 2 | Public and private bodies |
| § 3 | Weitere Begriffsbestimmungen | Section 3 | Further definitions |
| § 3a | Datenvermeidung und Datensparsamkeit | Section 3a | Data reduction and data economy |
| § 4 | Zulässigkeit der Datenerhebung, -verarbeitung und -nutzung | Section 4 | Admissibility of data collection, processing and use |
| § 4a | Einwilligung | Section 4a | Consent |
| § 4b | Übermittlung personenbezogener Daten ins Ausland sowie an über- und zwischenstaatliche Stellen | Section 4b | Transfer of personal data abroad and to supranational or international bodies |
| § 4c | Ausnahmen | Section 4c | Exceptions |
| § 4d | Meldepflicht | Section 4d | Obligatory registration |
| § 4e | Inhalt der Meldepflicht | Section 4e | Contents of the obligatory registration |
| § 4f | Beauftragter für den Datenschutz | Section 4f | Data protection official |
| § 4g | Aufgaben des Beauftragten für den Datenschutz | Section 4g | Duties of the data protection official |
| § 5 | Datengeheimnis | Section 5 | Confidentiality |
| § 6 | Unabdingbare Rechte des Betroffenen | Section 6 | Inalienable rights of the data subject |
| § 6a | Automatisierte Einzelentscheidung | Section 6a | Automated individual decision |
| § 6b | Beobachtung öffentlich zugänglicher Räume mit optisch-elektronischen Einrichtungen | Section 6b | Monitoring of publicly accessible areas with optic-electronic devices |
| § 6c | Mobile personenbezogene Speicher- und Verarbeitungsmedien | Section 6c | Mobile storage and processing media for personal data |
| § 7 | Schadensersatz | Section 7 | Compensation |
| § 8 | Schadensersatz bei automatisierter Datenverarbeitung durch öffentliche Stellen | Section 8 | Compensation in case of automated data processing by public bodies |
| § 9 | Technische und organisatorische Maßnahmen | Section 9 | Technical and organisational measures |
| § 9a | Datenschutzaudit | Section 9a | Data protection audit |
| § 10 | Einrichtung automatisierter Abrufverfahren | Section 10 | Establishment of automated retrieval procedures |
| § 11 | Erhebung, Verarbeitung oder Nutzung personenbezogener Daten im Auftrag | Section 11 | Commissioned collection, processing or use of personal data |

**Zweiter Abschnitt**
**Datenverarbeitung der öffentlichen Stellen**

**Part II**
**Data processing by public bodies**

**Erster Unterabschnitt**
**Rechtsgrundlagen der Datenverarbeitung**

**Chapter I**
**Legal basis for data processing**

§ 12    Anwendungsbereich

Section 12    Scope

§ 13    Datenerhebung

Section 13    Collection of data

§ 14    Datenspeicherung, -veränderung und -nutzung

Section 14    Storage, modification and use of data

§ 15    Datenübermittlung an öffentliche Stellen

Section 15    Transfer of data to public bodies

§ 16    Datenübermittlung an nicht-öffentliche Stellen

Section 16    Transfer of data to private bodies

§ 17    *weggefallen*

Section 17    *deleted*

§ 18    Durchführung des Datenschutzes in der Bundesverwaltung

Section 18    Implementation of data protection in the federal administration

**Zweiter Unterabschnitt**
**Rechte des Betroffenen**

**Chapter II**
**Rights of the data subject**

§ 19    Auskunft an den Betroffenen

Section 19    Provision of information to the data subject

§ 19a    Benachrichtigung

Section 19a    Notification

§ 20    Berichtigung, Löschung und Sperrung von Daten; Widerspruchsrecht

Section 20    Correction, erasure and blocking of data; right of objection

§ 21    Anrufung des Bundesbeauftragten für den Datenschutz

Section 21    Appeals to the Federal Commissioner for Data Protection

**Dritter Unterabschnitt**
**Bundesbeauftragter für den Datenschutz**

**Chapter III**
**Federal Commissioner for Data Protection**

§ 22    Wahl des Bundesbeauftragten für den Datenschutz

Section 22    Election of the Federal Commissioner for Data Protection

§ 23    Rechtsstellung des Bundesbeauftragten für den Datenschutz

Section 23    Legal status of the Federal Commissioner for Data Protection

§ 24    Kontrolle durch den Bundesbeauftragten für den Datenschutz

Section 24    Monitoring by the Federal Commissioner for Data Protection

§ 25    Beanstandungen durch den Bundesbeauftragten für den Datenschutz

Section 25    Complaints lodged by the Federal Commissioner for Data Protection

§ 26    Weitere Aufgaben des Bundesbeauftragten für den Datenschutz

Section 26    Further duties of the Federal Commissioner for Data Protection

**Dritter Abschnitt**
**Datenverarbeitung nicht-öffentlicher Stellen und öffentlich-rechtlicher Wettbewerbsunternehmen**

**Part III**
**Data processing by private bodies and public-law enterprises participating in competition**

**Erster Unterabschnitt**
**Rechtsgrundlagen der Datenverarbeitung**

**Chapter I**
**Legal basis for data processing**

§ 27    Anwendungsbereich

Section 27    Scope

| § 28 | Datenerhebung, -verarbeitung und -nutzung für eigene Zwecke | Section 28 | Collection, processing and use of data for own purposes |
| § 29 | Geschäftsmäßige Datenerhebung und -speicherung zum Zweck der Übermittlung | Section 29 | Collection and storage of data in the course of business for the purpose of transfer |
| § 30 | Geschäftsmäßige Datenerhebung und -speicherung zum Zweck der Übermittlung in anonymisierter Form | Section 30 | Collection and storage of data in the course of business for the purpose of transfer in anonymised form |
| § 31 | Besondere Zweckbindung | Section 31 | Limitation of use to specific circumstances |
| § 32 | *weggefallen* | Section 32 | *deleted* |

**Zweiter Unterabschnitt**
**Rechte des Betroffenen**

**Chapter II**
**Rights of the data subject**

| § 33 | Benachrichtigung des Betroffenen | Section 33 | Notification of the data subject |
| § 34 | Auskunft an den Betroffenen | Section 34 | Provision of information to the data subject |
| § 35 | Berichtigung, Löschung und Sperrung von Daten | Section 35 | Correction, erasure and blocking of data |

**Dritter Unterabschnitt**
**Aufsichtsbehörde**

**Chapter III**
**Supervisory authority**

| § 36 | *weggefallen* | Section 36 | *deleted* |
| § 37 | *weggefallen* | Section 37 | *deleted* |
| § 38 | Aufsichtsbehörde | Section 38 | Supervisory authority |
| § 38a | Verhaltensregeln zur Förderung der Durchführung datenschutzrechtlicher Regelungen | Section 38a | Code of conduct to promote the implementation of data protection provisions |

**Vierter Abschnitt**
**Sondervorschriften**

**Part IV**
**Special provisions**

| § 39 | Zweckbindung bei personenbezogenen Daten, die einem Berufs- oder besonderen Amtsgeheimnis unterliegen | Section 39 | Limited use of personal data subject to professional or special official secrecy |
| § 40 | Verarbeitung und Nutzung personenbezogener Daten durch Forschungseinrichtungen | Section 40 | Processing and use of personal data by research institutes |
| § 41 | Erhebung, Verarbeitung und Nutzung personenbezogener Daten durch die Medien | Section 41 | Collection, processing and use of personal data by the media |
| § 42 | Datenschutzbeauftragter der Deutschen Welle | Section 42 | Data protection official of *Deutsche Welle* |

**Fünfter Abschnitt**
**Schlussvorschriften**

**Part V**
**Final provisions**

| § 43 | Bußgeldvorschriften | Section 43 | Administrative offences |
| § 44 | Strafvorschriften | Section 44 | Criminal offences |

**Sechster Abschnitt**
**Übergangsvorschriften**

**Part IV**
**Transitional provisions**

| § 45 | Laufende Verwendungen | Section 45 | Current applications |
| § 46 | Weitergeltung von Begriffsbestimmungen | Section 46 | Overreaching validity of definitions |

| Anlage | Annex |
|---|---|
| (zu § 9 Satz 1) | (to the first sentence of Section 9 of this Act) |

| Erster Abschnitt<br>Allgemeine und gemeinsame Bestim-<br>mungen | Part I<br>General and common provisions |
|---|---|
| **§ 1**<br>**Zweck und Anwendungsbereich des**<br>**Gesetzes** | **Section 1**<br>**Purpose and scope** |
| (1) Zweck dieses Gesetzes ist es, den Ein-zelnen davor zu schützen, dass er durch den Umgang mit seinen perso-nenbezogenen Daten in seinem Persön-lichkeitsrecht beeinträchtigt wird. | (1) The purpose of this Act is to protect the individual against his right to privacy being impaired through the handling of his per-sonal data. |
| (2) Dieses Gesetz gilt für die Erhebung, Verarbeitung und Nutzung personenbezo-gener Daten durch | (2) This Act shall apply to the collection, processing and use of personal data by |
| 1. öffentliche Stellen des Bundes, | 1. public bodies of the Federation, |
| 2. öffentliche Stellen der Länder, soweit der Datenschutz nicht durch Landesge-setz geregelt ist und soweit sie | 2. public bodies of the *Länder* in so far as data protection is not governed by *Land* legislation and in so far as they |
|    a) Bundesrecht ausführen oder |    a) execute federal law or, |
|    b) als Organe der Rechtspflege tätig werden und es sich nicht um Ver-waltungsangelegenheiten handelt, |    b) act as bodies of the judicature and are not dealing with administrative matters, |
| 3. nicht öffentliche Stellen, soweit sie die Daten unter Einsatz von Datenverar-beitungsanlagen verarbeiten, nutzen o-der dafür erheben oder die Daten in o-der aus nicht automatisierten Dateien verarbeiten, nutzen oder dafür erheben, es sei denn, die Erhebung, Verarbei-tung oder Nutzung der Daten erfolgt ausschließlich für persönliche oder fa-miliäre Tätigkeiten. | 3. private bodies in so far as they process or use data by means of data process-ing systems or collect data for such systems, process or use data in or from non-automated filing systems or collect data for such systems, except where the collection, processing or use of such data is effected solely for personal or family activities. |
| (3) Soweit andere Rechtsvorschriften des Bundes auf personenbezogene Daten ein-schließlich deren Veröffentlichung anzu-wenden sind, gehen sie den Vorschriften dieses Gesetzes vor. Die Verpflichtung zur Wahrung gesetzlicher Geheimhaltungs-pflichten oder von Berufs- oder besonderen Amtsgeheimnissen, die nicht auf gesetz-lichen Vorschriften beruhen, bleibt unbe-rührt. | (3) In so far as other legal provisions of the Federation are applicable to personal data, including their publication, such provisions shall take precedence over the provisions of this Act. This shall not affect the duty to observe the legal obligation of maintaining secrecy or professional or special official confidentiality not based on legal provi-sions. |
| (4) Die Vorschriften dieses Gesetzes ge-hen denen des Verwaltungsverfahrensge-setzes vor, soweit bei der Ermittlung des Sachverhalts personenbezogene Daten verarbeitet werden. | (4) The provisions of this Act shall take precedence over those of the Administra-tive Procedures Act in so far as personal data are processed in ascertaining the facts. |

(5) Dieses Gesetz findet keine Anwendung, sofern eine in einem anderen Mitgliedstaat der Europäischen Union oder in einem anderen Vertragsstaat des Abkommens über den Europäischen Wirtschaftsraum belegene verantwortliche Stelle personenbezogene Daten im Inland erhebt, verarbeitet oder nutzt, es sei denn, dies erfolgt durch eine Niederlassung im Inland. Dieses Gesetz findet Anwendung, sofern eine verantwortliche Stelle, die nicht in einem Mitgliedstaat der Europäischen Union oder in einem anderen Vertragsstaat des Abkommens über den Europäischen Wirtschaftsraum belegen ist, personenbezogene Daten im Inland erhebt, verarbeitet oder nutzt. Soweit die verantwortliche Stelle nach diesem Gesetz zu nennen ist, sind auch Angaben über im Inland ansässige Vertreter zu machen. Die Sätze 2 und 3 gelten nicht, sofern Datenträger nur zum Zweck des Transits durch das Inland eingesetzt werden. § 38 Abs. 1 Satz 1 bleibt unberührt.

(5) This Act shall not apply in so far as a controller located in another member state of the European Union or in another state party to the Agreement on the European Economic Area collects, processes or uses personal data, except where such collection, processing or use is carried out by a branch in Germany. This Act shall apply in so far as a controller which is not located in a member state of the European Union or in another state party to the Agreement on the European Economic Area collects, processes or uses personal data in Germany. In so far as the controller is to be named under this Act, information is also to be furnished on representatives established in Germany. Sentences 2 and 3 shall not apply in so far as data storage media are employed solely for the purposes of transit through Germany. The first sentence of Section 38 (1) shall remain unaffected.

## § 2
### Öffentliche und nicht-öffentliche Stellen

## Section 2
### Public and private bodies

(1) Öffentliche Stellen des Bundes sind die Behörden, die Organe der Rechtspflege und andere öffentlich-rechtlich organisierte Einrichtungen des Bundes, der bundesunmittelbaren Körperschaften, Anstalten und Stiftungen des öffentlichen Rechts sowie deren Vereinigungen ungeachtet ihrer Rechtsform. Als öffentliche Stellen gelten die aus dem Sondervermögen Deutsche Bundespost durch Gesetz hervorgegangenen Unternehmen, solange ihnen ein ausschließliches Recht nach dem Postgesetz zusteht.

(1) "Public bodies of the Federation" means the authorities, the bodies of the judicature and other public-law institutions of the Federation, of the Federal corporations, establishments and foundations under public law as well as of their associations irrespective of their legal structure. The successor companies created from the Special Fund *Deutsche Bundespost* by act of law are considered public bodies as long as they have an exclusive right under the Postal Law.

(2) Öffentliche Stellen der Länder sind die Behörden, die Organe der Rechtspflege und andere öffentlich-rechtlich organisierte Einrichtungen eines Landes, einer Gemeinde, eines Gemeindeverbandes und sonstiger der Aufsicht des Landes unterstehender juristischer Personen des öffentlichen Rechts sowie deren Vereinigungen ungeachtet ihrer Rechtsform.

(2) "Public bodies of the *Länder*" means the authorities, the bodies of the judicature and other public-law institutions of a *Land*, of a municipality, an association of municipalities or other legal persons under public law subject to *Land* supervision as well as of their associations irrespective of their legal structure.

(3) Vereinigungen des privaten Rechts von öffentlichen Stellen des Bundes und der Länder, die Aufgaben der öffentlichen Verwaltung wahrnehmen, gelten ungeachtet der Beteiligung nicht-öffentlicher Stellen als öffentliche Stellen des Bundes, wenn

(3) Private-law associations of public bodies of the Federation and the *Länder* performing public administration duties shall be regarded as public bodies of the Federation, irrespective of private shareholdings, if

1. sie über den Bereich eines Landes hinaus tätig werden oder

1. they operate beyond the territory of a *Land* or

2. dem Bund die absolute Mehrheit der Anteile gehört oder die absolute Mehrheit der Stimmen zusteht.

2. the Federation possesses the absolute majority of shares or votes.

Andernfalls gelten sie als öffentliche Stellen der Länder.

Otherwise they shall be regarded as public bodies of the *Länder*.

(4) Nicht-öffentliche Stellen sind natürliche und juristische Personen, Gesellschaften und andere Personenvereinigungen des privaten Rechts, soweit sie nicht unter die Absätze 1 bis 3 fallen. Nimmt eine nicht-öffentliche Stelle hoheitliche Aufgaben der öffentlichen Verwaltung wahr, ist sie insoweit öffentliche Stelle im Sinne dieses Gesetzes.

§ 3
Weitere Begriffsbestimmungen

(1) Personenbezogene Daten sind Einzelangaben über persönliche oder sachliche Verhältnisse einer bestimmten oder bestimmbaren natürlichen Person (Betroffener).

(2) Automatisierte Verarbeitung ist die Erhebung, Verarbeitung oder Nutzung personenbezogener Daten unter Einsatz von Datenverarbeitungsanlagen. Eine nicht automatisierte Datei ist jede nicht automatisierte Sammlung personenbezogener Daten, die gleichartig aufgebaut ist und nach bestimmten Merkmalen zugänglich ist und ausgewertet werden kann.

(3) Erheben ist das Beschaffen von Daten über den Betroffenen.

(4) Verarbeiten ist das Speichern, Verändern, Übermitteln, Sperren und Löschen personenbezogener Daten. Im Einzelnen ist, ungeachtet der dabei angewendeten Verfahren:

1. Speichern das Erfassen, Aufnehmen oder Aufbewahren personenbezogener Daten auf einem Datenträger zum Zweck ihrer weiteren Verarbeitung oder Nutzung,

2. Verändern das inhaltliche Umgestalten gespeicherter personenbezogener Daten,

3. Übermitteln das Bekanntgeben gespeicherter oder durch Datenverarbeitung gewonnener personenbezogener Daten an einen Dritten in der Weise, dass

   a) die Daten an den Dritten weitergegeben werden oder

   b) der Dritte zur Einsicht oder zum Abruf bereitgehaltene Daten einsieht oder abruft,

4. Sperren das Kennzeichnen gespeicherter personenbezogener Daten, um ihre weitere Verarbeitung oder Nutzung einzuschränken,

5. Löschen das Unkenntlichmachen gespeicherter personenbezogener Daten.

(5) Nutzen ist jede Verwendung personenbezogener Daten, soweit es sich nicht um Verarbeitung handelt.

(4) "Private bodies" means natural or legal persons, companies and other private-law associations in so far as they are not covered by sub-sections 1 to 3 above. To the extent that a private body performs sovereign public administration duties, it shall be treated as a public body for the purposes of this Act.

Section 3
Further definitions

(1) "Personal data" means any information concerning the personal or material circumstances of an identified or identifiable individual (the data subject).

(2) "Automated processing" means the collection, processing or use of personal data by means of data processing systems. A non-automated filing system is any non-automated collection of personal data which is similarly structured and which can be accessed and evaluated according to specific characteristics.

(3) "Collection" means the acquisition of data on the data subject.

(4) "Processing" means the storage, modification, transfer, blocking and erasure of personal data. In particular cases, irrespective of the procedures applied:

1. "storage" means the entry, recording or preservation of personal data on a storage medium so that they can be processed or used again,

2. "modification" means the alteration of the substance of stored personal data,

3. "transfer" means the disclosure to a third party of personal data stored or obtained by means of data processing either

   a) through transmission of the data to the third party or

   b) through the third party inspecting or retrieving data held ready for inspection or retrieval,

4. "blocking" means labelling stored personal data so as to restrict their further processing or use,

5. "erasure" means the deletion of stored personal data.

(5) "Use" means any utilisation of personal data other than processing.

(6) Anonymisieren ist das Verändern personenbezogener Daten derart, dass die Einzelangaben über persönliche oder sachliche Verhältnisse nicht mehr oder nur mit einem unverhältnismäßig großen Aufwand an Zeit, Kosten und Arbeitskraft einer bestimmten oder bestimmbaren natürlichen Person zugeordnet werden können.

(6a) Pseudonymisieren ist das Ersetzen des Namens und anderer Identifikationsmerkmale durch ein Kennzeichen zu dem Zweck, die Bestimmung des Betroffenen auszuschließen oder wesentlich zu erschweren.

(7) Verantwortliche Stelle ist jede Person oder Stelle, die personenbezogene Daten für sich selbst erhebt, verarbeitet oder nutzt oder dies durch andere im Auftrag vornehmen lässt.

(8) Empfänger ist jede Person oder Stelle, die Daten erhält. Dritter ist jede Person oder Stelle außerhalb der verantwortlichen Stelle. Dritte sind nicht der Betroffene sowie Personen und Stellen, die im Inland, in einem anderen Mitgliedstaat der Europäischen Union oder in einem anderen Vertragsstaat des Abkommens über den Europäischen Wirtschaftsraum personenbezogene Daten im Auftrag erheben, verarbeiten oder nutzen.

(9) Besondere Arten personenbezogener Daten sind Angaben über die rassische und ethnische Herkunft, politische Meinungen, religiöse oder philosophische Überzeugungen, Gewerkschaftszugehörigkeit, Gesundheit oder Sexualleben.

(10) Mobile personenbezogene Speicher- und Verarbeitungsmedien sind Datenträger,

1. die an den Betroffenen ausgegeben werden,

2. auf denen personenbezogene Daten über die Speicherung hinaus durch die ausgebende oder eine andere Stelle automatisiert verarbeitet werden können und

3. bei denen der Betroffene diese Verarbeitung nur durch den Gebrauch des Mediums beeinflussen kann.

(6) "Rendering anonymous" means the modification of personal data so that the information concerning personal or material circumstances can no longer or only with a disproportionate amount of time, expense and labour be attributed to an identified or identifiable individual.

(6a) "Aliasing" means replacing a person's name and other identifying characteristics with a label, in order to preclude identification of the data subject or to render such identification substantially difficult.

(7) "Controller" means any person or body collecting, processing or using personal data on his or its own behalf or commissioning others to do the same.

(8) "Recipient" means any person or body receiving data. "Third party" means any person or body other than the controller. This shall not include the data subject or persons and bodies commissioned to collect, process or use personal data in Germany, in another member state of the European Union or in another state party to the Agreement on the European Economic Area.

(9) "Special categories of personal data" means information on a person's racial and ethnic origin, political opinions, religious or philosophical convictions, union membership, health or sex life.

(10) "Mobile personal storage and processing media" means storage media

1. which are issued to the data subject,

2. on which personal data can be processed automatically beyond the storage function by the issuing body or another body and

3. which enable the data subject to influence this processing only by using the medium.

## § 3a
### Datenvermeidung und Datensparsamkeit

Gestaltung und Auswahl von Datenverarbeitungssystemen haben sich an dem Ziel auszurichten, keine oder so wenig personenbezogene Daten wie möglich zu erheben, zu verarbeiten oder zu nutzen. Insbesondere ist von den Möglichkeiten der Anonymisierung und Pseudonymisierung Gebrauch zu machen, soweit dies möglich ist und der Aufwand in einem angemessenen Verhältnis zu dem angestrebten Schutzzweck steht.

## § 4
### Zulässigkeit der Datenerhebung, -verarbeitung und -nutzung

(1) Die Erhebung, Verarbeitung und Nutzung personenbezogener Daten sind nur zulässig, soweit dieses Gesetz oder eine andere Rechtsvorschrift dies erlaubt oder anordnet oder der Betroffene eingewilligt hat.

(2) Personenbezogene Daten sind beim Betroffenen zu erheben. Ohne seine Mitwirkung dürfen sie nur erhoben werden, wenn

1. eine Rechtsvorschrift dies vorsieht oder zwingend voraussetzt oder

2. a) die zu erfüllende Verwaltungsaufgabe ihrer Art nach oder der Geschäftszweck eine Erhebung bei anderen Personen oder Stellen erforderlich macht oder

   b) die Erhebung beim Betroffenen einen unverhältnismäßigen Aufwand erfordern würde

   und keine Anhaltspunkte dafür bestehen, dass überwiegende schutzwürdige Interessen des Betroffenen beeinträchtigt werden.

(3) Werden personenbezogene Daten beim Betroffenen erhoben, so ist er, sofern er nicht bereits auf andere Weise Kenntnis erlangt hat, von der verantwortlichen Stelle über

1. die Identität der verantwortlichen Stelle,

2. die Zweckbestimmungen der Erhebung, Verarbeitung oder Nutzung und

3. die Kategorien von Empfängern nur, soweit der Betroffene nach den Umständen des Einzelfalles nicht mit der Übermittlung an diese rechnen muss,

## Section 3a
### Data reduction and data economy

Data processing systems are to be designed and selected in accordance with the aim of collecting, processing or using no personal data or as little personal data as possible. In particular, use is to be made of the possibilities for aliasing and rendering persons anonymous, in so far as this is possible and the effort involved is reasonable in relation to the desired level of protection.

## Section 4
### Admissibility of data collection, processing and use

(1) The collection, processing and use of personal data shall be admissible only if permitted or prescribed by this Act or any other legal provision or if the data subject has consented.

(2) Personal data shall be collected from the data subject. They may be collected without his participation only if

1. a legal provision prescribes or peremptorily presupposes such collection or

2. a) the nature of the administrative duty to be performed or the business purpose necessitates collection of the data from other persons or bodies or

   b) collection of the data from the data subject would necessitate disproportionate effort

and there are no indications that overriding legitimate interests of the data subject are impaired.

(3) If personal data are collected from the data subject, the controller is to inform him as to

1. the identity of the controller,

2. the purposes of collection, processing or use and

3. the categories of recipients only in so far as the circumstances of the individual case provide no grounds for the data subject to assume that data will be transferred to such recipients,

zu unterrichten. Werden personenbezoge-
ne Daten beim Betroffenen aufgrund einer
Rechtsvorschrift erhoben, die zur Auskunft
verpflichtet, oder ist die Erteilung der Aus-
kunft Voraussetzung für die Gewährung
von Rechtsvorteilen, so ist der Betroffene
hierauf, sonst auf die Freiwilligkeit seiner
Angaben hinzuweisen. Soweit nach den
Umständen des Einzelfalles erforderlich
oder auf Verlangen, ist er über die Rechts-
vorschrift und über die Folgen der Verwei-
gerung von Angaben aufzuklären.

unless the data subject has already ac-
quired such knowledge by other means. If
personal data are collected from the data
subject pursuant to a legal provision which
makes the supply of particulars obligatory
or if such supply is the prerequisite for the
granting of legal benefits, the data subject
shall be informed that such supply is
obligatory or voluntary, as the case may
be. In so far as the circumstances of the
individual case dictate or at his request, he
shall be informed of the legal provision and
of the consequences of withholding par-
ticulars.

## § 4a
### Einwilligung

(1) Die Einwilligung ist nur wirksam, wenn
sie auf der freien Entscheidung des Be-
troffenen beruht. Er ist auf den vorgesehe-
nen Zweck der Erhebung, Verarbeitung
oder Nutzung sowie, soweit nach den Um-
ständen des Einzelfalles erforderlich oder
auf Verlangen, auf die Folgen der Verwei-
gerung der Einwilligung hinzuweisen. Die
Einwilligung bedarf der Schriftform, soweit
nicht wegen besonderer Umstände eine
andere Form angemessen ist. Soll die Ein-
willigung zusammen mit anderen Erklärun-
gen schriftlich erteilt werden, ist sie beson-
ders hervorzuheben.

(2) Im Bereich der wissenschaftlichen For-
schung liegt ein besonderer Umstand im
Sinne von Absatz 1 Satz 3 auch dann vor,
wenn durch die Schriftform der bestimmte
Forschungszweck erheblich beeinträchtigt
würde. In diesem Fall sind der Hinweis
nach Absatz 1 Satz 2 und die Gründe, aus
denen sich die erhebliche Beeinträchtigung
des bestimmten Forschungszwecks ergibt,
schriftlich festzuhalten.

(3) Soweit besondere Arten personenbe-
zogener Daten (§ 3 Abs. 9) erhoben, ver-
arbeitet oder genutzt werden, muss sich
die Einwilligung darüber hinaus ausdrück-
lich auf diese Daten beziehen.

## Section 4a
### Consent

(1) Consent shall be effective only when
based on the data subject's free decision.
He shall be informed of the purpose of
collection, processing or use and, in so far
as the circumstances of the individual case
dictate or at his request, of the conse-
quences of withholding consent. Consent
shall be given in writing unless special
circumstances warrant any other form. If
consent is to be given together with other
written declarations, it shall be made dis-
tinguishable in its appearance.

(2) In the field of scientific research, a spe-
cial circumstance pursuant to the third
sentence of sub-section 1 above shall also
be deemed to exist where the defined pur-
pose of research would be impaired con-
siderably if consent were obtained in writ-
ing. In such case the information pursuant
to the second sentence of sub-section 1
above and the reasons from which consid-
erable impairment of the defined purpose
of research would arise shall be recorded
in writing.

(3) In so far as special categories of per-
sonal data (Section 3 (9)) are collected,
processed or used, the consent must fur-
ther refer expressly to these data.

## § 4b
### Übermittlung personenbezogener Daten ins Ausland sowie an über- oder zwischenstaatliche Stellen

(1) Für die Übermittlung personenbezoge-
ner Daten an Stellen

1. in anderen Mitgliedstaaten der Europäi-
schen Union,

2. in anderen Vertragsstaaten des Ab-
kommens über den Europäischen Wirt-
schaftsraum oder

3. der Organe und Einrichtungen der Eu-
ropäischen Gemeinschaften

## Section 4b
### Transfer of personal data abroad and to supranational or international bodies

(1) The transfer of personal data to bodies

1. in other Member States of the European
Union,

2. in other states parties to the Agreement
on the European Economic Area or

3. institutions and bodies of the European
Communities

gelten § 15 Abs. 1, § 16 Abs. 1 und §§ 28 bis 30 nach Maßgabe der für diese Übermittlung geltenden Gesetze und Vereinbarungen, soweit die Übermittlung im Rahmen von Tätigkeiten erfolgt, die ganz oder teilweise in den Anwendungsbereich des Rechts der Europäischen Gemeinschaften fallen.

(2) Für die Übermittlung personenbezogener Daten an Stellen nach Absatz 1, die nicht im Rahmen von Tätigkeiten erfolgt, die ganz oder teilweise in den Anwendungsbereich des Rechts der Europäischen Gemeinschaften fallen, sowie an sonstige ausländische oder über- oder zwischenstaatliche Stellen gilt Absatz 1 entsprechend. Die Übermittlung unterbleibt, soweit der Betroffene ein schutzwürdiges Interesse an dem Ausschluss der Übermittlung hat, insbesondere wenn bei den in Satz 1 genannten Stellen ein angemessenes Datenschutzniveau nicht gewährleistet ist. Satz 2 gilt nicht, wenn die Übermittlung zur Erfüllung eigener Aufgaben einer öffentlichen Stelle des Bundes aus zwingenden Gründen der Verteidigung oder der Erfüllung über- oder zwischenstaatlicher Verpflichtungen auf dem Gebiet der Krisenbewältigung oder Konfliktverhinderung oder für humanitäre Maßnahmen erforderlich ist.

(3) Die Angemessenheit des Schutzniveaus wird unter Berücksichtigung aller Umstände beurteilt, die bei einer Datenübermittlung oder einer Kategorie von Datenübermittlungen von Bedeutung sind; insbesondere können die Art der Daten, die Zweckbestimmung, die Dauer der geplanten Verarbeitung, das Herkunfts- und das Endbestimmungsland, die für den betreffenden Empfänger geltenden Rechtsnormen sowie die für ihn geltenden Standesregeln und Sicherheitsmaßnahmen herangezogen werden.

(4) In den Fällen des § 16 Abs. 1 Nr. 2 unterrichtet die übermittelnde Stelle den Betroffenen von der Übermittlung seiner Daten. Dies gilt nicht, wenn damit zu rechnen ist, dass er davon auf andere Weise Kenntnis erlangt, oder wenn die Unterrichtung die öffentliche Sicherheit gefährden oder sonst dem Wohl des Bundes oder eines Landes Nachteile bereiten würde.

(5) Die Verantwortung für die Zulässigkeit der Übermittlung trägt die übermittelnde Stelle.

(6) Die Stelle, an die die Daten übermittelt werden, ist auf den Zweck hinzuweisen, zu dessen Erfüllung die Daten übermittelt werden.

shall be subject to Section 15 (1), Section 16 (1) and Sections 28 to 30 in accordance with the laws and agreements applicable to such transfer, in so far as transfer is effected in connection with activities which fall in part or in their entirety within the scope of the law of the European Communities.

(2) Sub-section 1 shall apply *mutatis mutandis* to the transfer of personal data to bodies in accordance with sub-section 1 when effected outside of activities which fall in part or in their entirety within the scope of the law of the European Communities and to the transfer of such data to other foreign, supranational or international bodies. Transfer shall not be effected in so far as the data subject has a legitimate interest in excluding transfer, in particular if an adequate level of data protection is not guaranteed at the bodies stated in the first sentence of this sub-section. The second sentence shall not apply if transfer is necessary in order to enable a public body of the Federation to perform its duties for compelling reasons of defence or to discharge supranational or international duties in the field of crisis management or conflict prevention or for humanitarian measures.

(3) The adequacy of the afforded level of protection shall be assessed in the light of all circumstances surrounding a data transfer operation or a category of data transfer operations; particular consideration shall be given to the nature of the data, the purpose, the duration of the proposed processing operation, the country of origin, the recipient country and the legal norms, professional rules and securities measures which apply to the recipient.

(4) In the cases referred to in Section 16 (1) No. 2 above, the body transferring the data shall inform the data subject of the transfer of his data. This shall not apply if it can be assumed that he will acquire knowledge of such transfer in another manner or if such information would jeopardise public safety or otherwise be detrimental to the Federation or a *Land*.

(5) Responsibility for the admissibility of the transfer shall rest with the body transferring the data.

(6) The body to which the data are transferred shall be informed of the purpose for which the data are transferred.

| § 4c<br>Ausnahmen | Section 4c<br>Exceptions |
|---|---|
| (1) Im Rahmen von Tätigkeiten, die ganz oder teilweise in den Anwendungsbereich des Rechts der Europäischen Gemeinschaften fallen, ist eine Übermittlung personenbezogener Daten an andere als die in § 4b Abs. 1 genannten Stellen, auch wenn bei ihnen ein angemessenes Datenschutzniveau nicht gewährleistet ist, zulässig, sofern | (1) In connection with activities which fall in part or in their entirety within the scope of the law of the European Communities, the transfer of personal data to bodies other than those stated in Section 4b (1) above shall be admissible even if such bodies do not guarantee an adequate level of data protection, in so far as |
| 1. der Betroffene seine Einwilligung gegeben hat, | 1. the data subject has given his consent, |
| 2. die Übermittlung für die Erfüllung eines Vertrags zwischen dem Betroffenen und der verantwortlichen Stelle oder zur Durchführung von vorvertraglichen Maßnahmen, die auf Veranlassung des Betroffenen getroffen worden sind, erforderlich ist, | 2. the transfer is necessary for the performance of a contract between the data subject and the controller or the implementation of pre-contractual measures taken in response to the data subject's request, |
| 3. die Übermittlung zum Abschluss oder zur Erfüllung eines Vertrags erforderlich ist, der im Interesse des Betroffenen von der verantwortlichen Stelle mit einem Dritten geschlossen wurde oder geschlossen werden soll, | 3. the transfer is necessary for the conclusion or performance of a contract which has been or is to be entered into in the interest of the data subject between the controller and a third party, |
| 4. die Übermittlung für die Wahrung eines wichtigen öffentlichen Interesses oder zur Geltendmachung, Ausübung oder Verteidigung von Rechtsansprüchen vor Gericht erforderlich ist, | 4. the transfer is necessary on important public interest grounds, or for the establishment, exercise or defence of legal claims, |
| 5. die Übermittlung für die Wahrung lebenswichtiger Interessen des Betroffenen erforderlich ist oder | 5. the transfer is necessary in order to protect the vital interests of the data subject, |
| 6. die Übermittlung aus einem Register erfolgt, das zur Information der Öffentlichkeit bestimmt ist und entweder der gesamten Öffentlichkeit oder allen Personen, die ein berechtigtes Interesse nachweisen können, zur Einsichtnahme offen steht, soweit die gesetzlichen Voraussetzungen im Einzelfall gegeben sind. | 6. the transfer is made from a register which is intended to provide information to the public and which is open to consultation either by the public in general or by any person who can demonstrate a legitimate interest, to the extent that the statutory conditions are fulfilled in the particular case. |
| Die Stelle, an die die Daten übermittelt werden, ist darauf hinzuweisen, dass die übermittelten Daten nur zu dem Zweck verarbeitet oder genutzt werden dürfen, zu dessen Erfüllung sie übermittelt werden. | It shall be pointed out to the recipient body that the transferred data may be processed or used only for the purpose for which they have been transferred. |

(2) Unbeschadet des Absatzes 1 Satz 1 kann die zuständige Aufsichtsbehörde einzelne Übermittlungen oder bestimmte Arten von Übermittlungen personenbezogener Daten an andere als die in § 4b Abs. 1 genannten Stellen genehmigen, wenn die verantwortliche Stelle ausreichende Garantien hinsichtlich des Schutzes des Persönlichkeitsrechts und der Ausübung der damit verbundenen Rechte vorweist; die Garantien können sich insbesondere aus Vertragsklauseln oder verbindlichen Unternehmensregelungen ergeben. Bei den Post- und Telekommunikationsunternehmen ist der Bundesbeauftragte für den Datenschutz zuständig. Sofern die Übermittlung durch öffentliche Stellen erfolgen soll, nehmen diese die Prüfung nach Satz 1 vor.

(3) Die Länder teilen dem Bund die nach Absatz 2 Satz 1 ergangenen Entscheidungen mit.

### § 4d
### Meldepflicht

(1) Verfahren automatisierter Verarbeitungen sind vor ihrer Inbetriebnahme von nicht-öffentlichen verantwortlichen Stellen der zuständigen Aufsichtsbehörde und von öffentlichen verantwortlichen Stellen des Bundes sowie von den Post- und Telekommunikationsunternehmen dem Bundesbeauftragten für den Datenschutz nach Maßgabe von § 4e zu melden.

(2) Die Meldepflicht entfällt, wenn die verantwortliche Stelle einen Beauftragten für den Datenschutz bestellt hat.

(3) Die Meldepflicht entfällt ferner, wenn die verantwortliche Stelle personenbezogene Daten für eigene Zwecke erhebt, verarbeitet oder nutzt, hierbei höchstens vier Arbeitnehmer mit der Erhebung, Verarbeitung oder Nutzung personenbezogener Daten beschäftigt und entweder eine Einwilligung der Betroffenen vorliegt oder die Erhebung, Verarbeitung oder Nutzung der Zweckbestimmung eines Vertragsverhältnisses oder vertragsähnlichen Vertrauensverhältnisses mit den Betroffenen dient.

(4) Die Absätze 2 und 3 gelten nicht, wenn es sich um automatisierte Verarbeitungen handelt, in denen geschäftsmäßig personenbezogene Daten von der jeweiligen Stelle

1. zum Zweck der Übermittlung oder

2. zum Zweck der anonymisierten Übermittlung

gespeichert werden.

(2) Without prejudice to the first sentence of Section 1, the competent supervisory authority may authorise individual transfers or certain categories of transfers of personal data to bodies other than those stated in Section 4b (1) above, if the controller adduces adequate safeguards with respect to the protection of privacy and exercise of the corresponding rights; such safeguards may in particular result from contractual clauses or binding corporate regulations. In the case of postal and telecommunications companies, competence lies with the Federal Commissioner for Data Protection. In so far as transfer is to be effected by public bodies, the latter shall carry out the examination in accordance with the first sentence of Section 1 above.

(3) The Länder shall notify the Federation of the decisions made in accordance with sentence 1 of Section 2 above.

### Section 4d
### Obligatory registration

(1) Prior to putting automated processing procedures into operation, private controllers of the competent supervisory authorities, public controllers of the Federation and postal and telecommunications companies shall register such procedures with the Federal Commissioner for Data Protection in accordance with Section 4e.

(2) Obligatory registration shall not apply if the controller has appointed a data protection official.

(3) Obligatory registration shall further not apply if the controller collects, processes or uses personal data for its own purposes, provided that a maximum of four employees are concerned with the collection, processing or use of personal data and either consent has been obtained from the data subject or the collection, processing or use serves the purposes of a contract or a quasi-contractual fiduciary relationship with the data subject.

(4) Sub-sections 2 and 3 above shall not apply in cases of automated processing in which the controller concerned stores personal data in the course of business

1. for the purpose of transfer or

2. for the purpose of anonymised transfer.

(5) Soweit automatisierte Verarbeitungen besondere Risiken für die Rechte und Freiheiten der Betroffenen aufweisen, unterliegen sie der Prüfung vor Beginn der Verarbeitung (Vorabkontrolle). Eine Vorabkontrolle ist insbesondere durchzuführen, wenn

1. besondere Arten personenbezogener Daten (§ 3 Abs. 9) verarbeitet werden oder

2. die Verarbeitung personenbezogener Daten dazu bestimmt ist, die Persönlichkeit des Betroffenen zu bewerten einschließlich seiner Fähigkeiten, seiner Leistung oder seines Verhaltens,

es sei denn, dass eine gesetzliche Verpflichtung oder eine Einwilligung des Betroffenen vorliegt oder die Erhebung, Verarbeitung oder Nutzung der Zweckbestimmung eines Vertragsverhältnisses oder vertragsähnlichen Vertrauensverhältnisses mit dem Betroffenen dient.

(6) Zuständig für die Vorabkontrolle ist der Beauftragte für den Datenschutz. Dieser nimmt die Vorabkontrolle nach Empfang der Übersicht nach § 4g Abs. 2 Satz 1 vor. Er hat sich in Zweifelsfällen an die Aufsichtsbehörde oder bei den Post- und Telekommunikationsunternehmen an den Bundesbeauftragten für den Datenschutz zu wenden.

## § 4e
### Inhalt der Meldepflicht

Sofern Verfahren automatisierter Verarbeitungen meldepflichtig sind, sind folgende Angaben zu machen:

1. Name oder Firma der verantwortlichen Stelle,

2. Inhaber, Vorstände, Geschäftsführer oder sonstige gesetzliche oder nach der Verfassung des Unternehmens berufene Leiter und die mit der Leitung der Datenverarbeitung beauftragten Personen,

3. Anschrift der verantwortlichen Stelle,

4. Zweckbestimmungen der Datenerhebung, -verarbeitung oder -nutzung,

5. eine Beschreibung der betroffenen Personengruppen und der diesbezüglichen Daten oder Datenkategorien,

6. Empfänger oder Kategorien von Empfängern, denen die Daten mitgeteilt werden können,

7. Regelfristen für die Löschung der Daten,

8. eine geplante Datenübermittlung in Drittstaaten,

(5) In so far as automated processing operations involve risks for the rights and liberties of the data subject, they are subject to examination prior to the beginning of processing (prior checking). Prior checking is to be carried out in particular when

1. special categories of personal data (Section 3 (9)) are to be processed or

2. the processing of personal data is intended to appraise the data subject's personality, including his abilities, performance or conduct,

unless a statutory obligation applies, the data subject's consent has been obtained or the collection, processing or use serves the purposes of a contract or a quasi-contractual fiduciary relationship with the data subject.

(6) Prior checking is the responsibility of the data protection official. The latter shall carry out prior checking after receiving the list in accordance with the first sentence of Section 4g (2). In cases of doubt, he is to refer to the supervisory authority or, in the case of postal and telecommunications companies, to the Federal Commissioner for Data Protection.

## Section 4e
### Contents of the obligatory registration

In so far as automated processing procedures are subject to obligatory registration, the following information is to be furnished:

1. Name or title of the controller,

2. owners, managing boards, managing directors or other lawfully or constitutionally appointed managers and the persons placed in charge of data processing,

3. address of the controller,

4. purposes of collecting, processing or using data,

5. a description of the groups of data subjects and the appurtenant data or categories of data,

6. recipients or categories of recipients to whom the data may be transferred,

7. standard periods for the erasure of data,

8. any planned data transfer in third states,

9. eine allgemeine Beschreibung, die es ermöglicht, vorläufig zu beurteilen, ob die Maßnahmen nach § 9 zur Gewährleistung der Sicherheit der Verarbeitung angemessen sind.

§ 4d Abs. 1 und 4 gilt für die Änderung der nach Satz 1 mit-geteilten Angaben sowie für den Zeitpunkt der Aufnahme und der Beendigung der meldepflichtigen Tätigkeit ent-sprechend.

### § 4f
### Beauftragter für den Datenschutz

(1) Öffentliche und nicht-öffentliche Stellen, die personenbezogene Daten automatisiert erheben, verarbeiten oder nutzen, haben einen Beauftragten für den Datenschutz schriftlich zu bestellen. Nicht-öffentliche Stellen sind hierzu spätestens innerhalb eines Monats nach Aufnahme ihrer Tätigkeit verpflichtet. Das Gleiche gilt, wenn personenbezogene Daten auf andere Weise erhoben, verarbeitet oder genutzt werden und damit in der Regel mindestens 20 Personen beschäftigt sind. Die Sätze 1 und 2 gelten nicht für nicht-öffentliche Stellen, die höchstens vier Arbeitnehmer mit der Erhebung, Verarbeitung oder Nutzung personenbezogener Daten beschäftigen. Soweit aufgrund der Struktur einer öffentlichen Stelle erforderlich, genügt die Bestellung eines Beauftragten für den Datenschutz für mehrere Bereiche. Soweit nicht-öffentliche Stellen automatisierte Verarbeitungen vornehmen, die einer Vorabkontrolle unterliegen oder personenbezogene Daten geschäftsmäßig zum Zweck der Übermittlung oder der anonymisierten Übermittlung erheben, verarbeiten oder nutzen, haben sie unabhängig von der Anzahl der Arbeitnehmer einen Beauftragten für den Datenschutz zu bestellen.

(2) Zum Beauftragten für den Datenschutz darf nur bestellt werden, wer die zur Erfüllung seiner Aufgaben erforderliche Fachkunde und Zuverlässigkeit besitzt. Mit dieser Aufgabe kann auch eine Person außerhalb der verantwortlichen Stelle betraut werden. Öffentliche Stellen können mit Zustimmung ihrer Aufsichtsbehörde einen Bediensteten aus einer anderen öffentlichen Stelle zum Beauftragten für den Datenschutz bestellen.

9. a general description enabling preliminary assessment as to whether the measures in accordance with Section 9 to guarantee the safety of processing are adequate.

Section 4d (1) and (4) shall apply *mutatis mutandis* to the amendment of information furnished in accordance with sentence 1 above and to the time of commencement and termination of the activity subject to obligatory registration.

### Section 4f
### Data protection official

(1) Public and private bodies which collect, process or use personal data automatically shall appoint in writing a data protection official. Private bodies are obliged to appoint such an officer within one month of commencing their activities. The same shall apply where personal data are processed by other means and at least 20 persons are permanently employed for this purpose. The first and second sentences above shall not apply to private bodies which deploy a maximum of four employees to collect, process or use personal data. In so far as the structure of a public body requires, the appointment of one data protection official for several areas shall be sufficient. In so far as private bodies carry out automated processing operations which are subject to prior checking or collect, process or use personal data in the course of business for the purposes of transfer or anonymised transfer, they are to appoint a data protection official irrespective of the number of employees.

(2) Only persons who possess the specialised knowledge and demonstrate the reliability necessary for the performance of the duties concerned may be appointed data protection official. A person from outside the body concerned may also be entrusted with this duty. Subject to the approval of their supervisory authority, public bodies may appoint an employee from another public body as data protection official.

(3) Der Beauftragte für den Datenschutz ist dem Leiter der öffentlichen oder nicht-öffentlichen Stelle unmittelbar zu unterstellen. Er ist in Ausübung seiner Fachkunde auf dem Gebiet des Datenschutzes weisungsfrei. Er darf wegen der Erfüllung seiner Aufgaben nicht benachteiligt werden. Die Bestellung zum Beauftragten für den Datenschutz kann in entsprechender Anwendung von § 626 des Bürgerlichen Gesetzbuchs, bei nicht-öffentlichen Stellen auch auf Verlangen der Aufsichtsbehörde, widerrufen werden.

(4) Der Beauftragte für den Datenschutz ist zur Verschwiegenheit über die Identität des Betroffenen sowie über Umstände, die Rückschlüsse auf den Betroffenen zulassen, verpflichtet, soweit er nicht davon durch den Betroffenen befreit wird.

(5) Die öffentlichen und nicht-öffentlichen Stellen haben den Beauftragten für den Datenschutz bei der Erfüllung seiner Aufgaben zu unterstützen und ihm insbesondere, soweit dies zur Erfüllung seiner Aufgaben erforderlich ist, Hilfspersonal sowie Räume, Einrichtungen, Geräte und Mittel zur Verfügung zu stellen. Betroffene können sich jederzeit an den Beauftragten für den Datenschutz wenden.

## § 4g
### Aufgaben des Beauftragten für den Datenschutz

(1) Der Beauftragte für den Datenschutz wirkt auf die Einhaltung dieses Gesetzes und anderer Vorschriften über den Datenschutz hin. Zu diesem Zweck kann sich der Beauftragte für den Datenschutz in Zweifelsfällen an die für die Datenschutzkontrolle bei der verantwortlichen Stelle zuständige Behörde wenden. Er hat insbesondere

1. die ordnungsgemäße Anwendung der Datenverarbeitungsprogramme, mit deren Hilfe personenbezogene Daten verarbeitet werden sollen, zu überwachen; zu diesem Zweck ist er über Vorhaben der automatisierten Verarbeitung personenbezogener Daten rechtzeitig zu unterrichten,

2. die bei der Verarbeitung personenbezogener Daten tätigen Personen durch geeignete Maßnahmen mit den Vorschriften dieses Gesetzes sowie anderen Vorschriften über den Datenschutz und mit den jeweiligen besonderen Erfordernissen des Datenschutzes vertraut zu machen.

(3) The data protection official shall be directly subordinate to the head of the public or private body. He shall be free to use his specialised knowledge in the area of data protection. He shall suffer no disadvantage through the performance of his duties. The appointment of a data protection official may be revoked by applying Section 626 of the Civil Code *mutatis mutandis* or, in the case of private bodies, at the request of the supervisory authority.

(4) The data protection official shall be bound to maintain secrecy on the identity of the data subject and on circumstances permitting conclusions to be drawn about the data subject, unless he is released from this obligation by the data subject.

(5) The public and private bodies shall support the data protection official in the performance of his duties and in particular, to the extent needed for such performance, make available assistants as well as premises, furnishings, equipment and other resources. Data subjects may approach the data protection official at any time.

## Section 4g
### Duties of the data protection official

(1) The data protection official shall work towards ensuring compliance with this Act and other data protection provisions. For this purpose, the data protection official may consult the competent authority responsible for data protection control with regard to the controller concerned. In particular, he shall

1. monitor the proper use of data processing programs with the aid of which personal data are to be processed; for this purpose he shall be informed in good time of projects for automatic processing of personal data,

2. take suitable steps to familiarise the persons employed in the processing of personal data with the provisions of this Act and other provisions concerning data protection, and with the various special requirements of data protection.

(2) Dem Beauftragten für den Datenschutz ist von der verantwortlichen Stelle eine Übersicht über die in § 4e Satz 1 genannten Angaben sowie über zugriffsberechtigte Personen zur Verfügung zu stellen. Im Fall des § 4d Abs. 2 macht der Beauftragte für den Datenschutz die Angaben nach § 4e Satz 1 Nr. 1 bis 8 auf Antrag jedermann in geeigneter Weise verfügbar. Im Fall des § 4d Abs. 3 gilt Satz 2 entsprechend für die verantwortliche Stelle.

(3) Auf die in § 6 Abs. 2 Satz 4 genannten Behörden findet Absatz 2 Satz 2 keine Anwendung. Absatz 1 Satz 2 findet mit der Maßgabe Anwendung, dass der behördliche Beauftragte für den Datenschutz das Benehmen mit dem Behördenleiter herstellt; bei Unstimmigkeiten zwischen dem behördlichen Beauftragten für den Datenschutz und dem Behördenleiter entscheidet die oberste Bundesbehörde.

## § 5
### Datengeheimnis

Den bei der Datenverarbeitung beschäftigten Personen ist untersagt, personenbezogene Daten unbefugt zu erheben, zu verarbeiten oder zu nutzen (Datengeheimnis). Diese Personen sind, soweit sie bei nicht-öffentlichen Stellen beschäftigt werden, bei der Aufnahme ihrer Tätigkeit auf das Datengeheimnis zu verpflichten. Das Datengeheimnis besteht auch nach Beendigung ihrer Tätigkeit fort.

## § 6
### Unabdingbare Rechte des Betroffenen

(1) Die Rechte des Betroffenen auf Auskunft (§§ 19, 34) und auf Berichtigung, Löschung oder Sperrung (§§ 20, 35) können nicht durch Rechtsgeschäft ausgeschlossen oder beschränkt werden.

(2) The controller shall provide the data protection official with an overview of the information stipulated in the first sentence of Section 4e and a list of persons entitled to access. In the event of Section 4d (2), the data protection official shall, on request, make the information under Nos. 1 to 8 of the first sentence of Section 4e available to anyone in an appropriate manner. In the event of Section 4d (3), the second sentence shall apply *mutatis mutandis* for the controller.

(3) Sentence 2 of Section 2 shall not apply to the authorities stated in sentence 4 of Section 6 (2). Sentence 2 of Section 1 shall apply on condition that the authority's data protection official contacts the head of the authority; any disagreements between the authority's data protection official and the head of the authority shall be settled by the supreme federal authority.

## Section 5
### Confidentiality

Persons employed in data processing shall not collect, process or use personal data without authorisation (confidentiality). On taking up their duties such persons, in so far as they work for private bodies, shall be required to give an undertaking to maintain such confidentiality. This undertaking shall continue to be valid after termination of their activity.

## Section 6
### Inalienable rights of the data subject

(1) The data subject's right of access (Sections 19, 34) and to correction, erasure or blocking (Sections 20, 35) may not be excluded or restricted by a legal transaction.

(2) Sind die Daten des Betroffenen automatisiert in der Weise gespeichert, dass mehrere Stellen speicherungsberechtigt sind, und ist der Betroffene nicht in der Lage festzustellen, welche Stelle die Daten gespeichert hat, so kann er sich an jede dieser Stellen wenden. Diese ist verpflichtet, das Vorbringen des Betroffenen an die Stelle, die die Daten gespeichert hat, weiterzuleiten. Der Betroffene ist über die Weiterleitung und jene Stelle zu unterrichten. Die in § 19 Abs. 3 genannten Stellen, die Behörden der Staatsanwaltschaft und der Polizei sowie öffentliche Stellen der Finanzverwaltung, soweit sie personenbezogene Daten in Erfüllung ihrer gesetzlichen Aufgaben im Anwendungsbereich der Abgabenordnung zur Überwachung und Prüfung speichern, können statt des Betroffenen den Bundesbeauftragten für den Datenschutz unterrichten. In diesem Fall richtet sich das weitere Verfahren nach § 19 Abs. 6.

### § 6a
### Automatisierte Einzelentscheidung

(1) Entscheidungen, die für den Betroffenen eine rechtliche Folge nach sich ziehen oder ihn erheblich beeinträchtigen, dürfen nicht ausschließlich auf eine automatisierte Verarbeitung personenbezogener Daten gestützt werden, die der Bewertung einzelner Persönlichkeitsmerkmale dienen.

(2) Dies gilt nicht, wenn

1. die Entscheidung im Rahmen des Abschlusses oder der Erfüllung eines Vertragsverhältnisses oder eines sonstigen Rechtsverhältnisses ergeht und dem Begehren des Betroffenen stattgegeben wurde oder

2. die Wahrung der berechtigten Interessen des Betroffenen durch geeignete Maßnahmen gewährleistet und dem Betroffenen von der verantwortlichen Stelle die Tatsache des Vorliegens einer Entscheidung im Sinne des Absatzes 1 mitgeteilt wird. Als geeignete Maßnahme gilt insbesondere die Möglichkeit des Betroffenen, seinen Standpunkt geltend zu machen. Die verantwortliche Stelle ist verpflichtet, ihre Entscheidung erneut zu prüfen.

(3) Das Recht des Betroffenen auf Auskunft nach den §§ 19 und 34 erstreckt sich auch auf den logischen Aufbau der automatisierten Verarbeitung der ihn betreffenden Daten.

(2) If the data of the data subject are stored by means of automated procedures such that several bodies are entitled to store and if the data subject is unable to ascertain which body has stored the data, he may approach any of these bodies. Such body is obliged to forward the request of the data subject to the body which has stored the data. The data subject shall be informed of the forwarding of the request and of the identity of the body concerned. The bodies listed in Section 19 (3) of this Act, public prosecution and police authorities as well as public finance authorities may, in so far as they store personal data in performing their legal duties within the area of application of the Fiscal Code for monitoring and control purposes, inform the Federal Commissioner for Data Protection instead of the data subject. In such case the further procedure shall be as described in Section 19 (6) of this Act.

### Section 6a
### Automated individual decision

(1) Decisions which have legal consequences for or substantially impair the interests of the data subject must not be based exclusively on the automated processing of personal data which serve to evaluate individual personal characteristics.

(2) This shall not apply if

1. the decision is made in connection with the conclusion or fulfilment of a contract or any other legal relationship and the data subject's request has been met or

2. protection of the data subject's justified interests is ensured via appropriate measures and the controller notifies the data subject of the existence of a decision pursuant to sub-section 1. In particular, the possibility for the data subject to assert his standpoint shall constitute an appropriate measure. The controller shall be obliged to review its decision.

(3) The data subject's right of access in accordance with Sections 19 and 34 shall also extend to the logic pattern of the data concerning his person.

## § 6b
### Beobachtung öffentlich zugänglicher Räume mit optisch-elektronischen Einrichtungen

(1) Die Beobachtung öffentlich zugänglicher Räume mit optisch-elektronischen Einrichtungen (Videoüberwachung) ist nur zulässig, soweit sie

1. zur Aufgabenerfüllung öffentlicher Stellen,

2. zur Wahrnehmung des Hausrechts oder

3. zur Wahrnehmung berechtigter Interessen für konkret festgelegte Zwecke

erforderlich ist und keine Anhaltspunkte bestehen, dass schutzwürdige Interessen der Betroffenen überwiegen.

(2) Der Umstand der Beobachtung und die verantwortliche Stelle sind durch geeignete Maßnahmen erkennbar zu machen.

(3) Die Verarbeitung oder Nutzung von nach Absatz 1 erhobenen Daten ist zulässig, wenn sie zum Erreichen des verfolgten Zwecks erforderlich ist und keine Anhaltspunkte bestehen, dass schutzwürdige Interessen der Betroffenen überwiegen. Für einen anderen Zweck dürfen sie nur verarbeitet oder genutzt werden, soweit dies zur Abwehr von Gefahren für die staatliche und öffentliche Sicherheit sowie zur Verfolgung von Straftaten erforderlich ist.

(4) Werden durch Videoüberwachung erhobene Daten einer bestimmten Person zugeordnet, ist diese über eine Verarbeitung oder Nutzung entsprechend den §§ 19a und 33 zu benachrichtigen.

(5) Die Daten sind unverzüglich zu löschen, wenn sie zur Erreichung des Zwecks nicht mehr erforderlich sind oder schutzwürdige Interessen der Betroffenen einer weiteren Speicherung entgegenstehen.

## § 6c
### Mobile personenbezogene Speicher- und Verarbeitungsmedien

(1) Die Stelle, die ein mobiles personenbezogenes Speicher- und Verarbeitungsmedium ausgibt oder ein Verfahren zur automatisierten Verarbeitung personenbezogener Daten, das ganz oder teilweise auf einem solchen Medium abläuft, auf das Medium aufbringt, ändert oder hierzu bereithält, muss den Betroffenen

1. über ihre Identität und Anschrift,

2. in allgemein verständlicher Form über die Funktionsweise des Mediums einschließlich der Art der zu verarbeitenden personenbezogenen Daten,

## Section 6b
### Monitoring of publicly accessible areas with optic-electronic devices

(1) Monitoring publicly accessible areas with optic-electronic devices (video surveillance) is allowable only in so far as it is necessary

1. to fulfil public tasks,

2. to exercise the right to determine who shall be allowed or denied access or

3. to pursue rightful interests for precisely defined purposes

and if there are no indications that the data subjects' legitimate interests prevail.

(2) The fact that the area is being monitored and the controller's identity shall be made discernible by appropriate means.

(3) Data that have been collected under sub-section 1 above may be processed or used if this is necessary for the pursued purpose and if there are no indications that the data subjects' legitimate interests prevail. They may only be processed or used for another purpose if this is necessary to avert dangers to state security or public safety or to prosecute crimes.

(4) Where data collected through video-surveillance are attributed to an identified person, this person shall be informed about such processing or use in conformity with Sections 19a and 33.

(5) The data shall be deleted without delay, if they are no longer needed for the pursued purpose or if the data subject's legitimate interests stand in the way of any further storage.

## Section 6c
### Mobile storage and processing media for personal data

(1) A body which issues a mobile storage and processing medium for personal data or which applies a procedure for the automated processing of personal data which runs in part or in its entirety on such a medium to the medium or modifies or makes such data available must inform the data subject

1. of its identity and address,

2. of the medium's mode of functioning in generally comprehensible terms, including the type of personal data to be processed,

3. darüber, wie er seine Rechte nach den §§ 19, 20, 34 und 35 ausüben kann, und

4. über die bei Verlust oder Zerstörung des Mediums zu treffenden Maßnahmen

unterrichten, soweit der Betroffene nicht bereits Kenntnis erlangt hat.

(2) Die nach Absatz 1 verpflichtete Stelle hat dafür Sorge zu tragen, dass die zur Wahrnehmung des Auskunftsrechts erforderlichen Geräte oder Einrichtungen in angemessenem Umfang zum unentgeltlichen Gebrauch zur Verfügung stehen.

(3) Kommunikationsvorgänge, die auf dem Medium eine Datenverarbeitung auslösen, müssen für den Betroffenen eindeutig erkennbar sein.

## § 7
### Schadensersatz

Fügt eine verantwortliche Stelle dem Betroffenen durch eine nach diesem Gesetz oder nach anderen Vorschriften über den Datenschutz unzulässige oder unrichtige Erhebung, Verarbeitung oder Nutzung seiner personenbezogenen Daten einen Schaden zu, ist sie oder ihr Träger dem Betroffenen zum Schadensersatz verpflichtet. Die Ersatzpflicht entfällt, soweit die verantwortliche Stelle die nach den Umständen des Falles gebotene Sorgfalt beachtet hat.

## § 8
### Schadensersatz bei automatisierter Datenverarbeitung durch öffentliche Stellen

(1) Fügt eine verantwortliche öffentliche Stelle dem Betroffenen durch eine nach diesem Gesetz oder nach anderen Vorschriften über den Datenschutz unzulässige oder unrichtige automatisierte Erhebung, Verarbeitung oder Nutzung seiner personenbezogenen Daten einen Schaden zu, ist ihr Träger dem Betroffenen unabhängig von einem Verschulden zum Schadensersatz verpflichtet.

(2) Bei einer schweren Verletzung des Persönlichkeitsrechts ist dem Betroffenen der Schaden, der nicht Vermögensschaden ist, angemessen in Geld zu ersetzen.

(3) Die Ansprüche nach den Absätzen 1 und 2 sind insgesamt auf einen Betrag von 130 000 Euro begrenzt. Ist aufgrund desselben Ereignisses an mehrere Personen Schadensersatz zu leisten, der insgesamt den Höchstbetrag von 130 000 Euro übersteigt, so verringern sich die einzelnen Schadensersatzleistungen in dem Verhältnis, in dem ihr Gesamtbetrag zu dem Höchstbetrag steht.

3. how he can exercise his rights in accordance with Sections 19, 20, 34 and 35, and

4. of the measures to be undertaken in the event of loss or destruction of the medium,

in so far as the data subject has not already acquired such knowledge.

(2) The body which is subject to the obligations stipulated in sub-section 1 shall ensure that devices or facilities which are necessary in order to enable the data subject to assert his right of access are available in adequate numbers for use free of charge.

(3) Communications procedures which initiate data processing on the medium must be clearly apparent to the data subject.

## Section 7
### Compensation

Where a controller causes harm to the data subject through the collection, processing or use of his personal data that is inadmissible or incorrect under the provisions of this Act or other data protection provisions, such controller or its supporting organisation shall be obliged to compensate the data subject for the harm thus caused. This obligation to provide compensation shall not apply if the controller has exercised due care in accordance with the circumstances of the case concerned.

## Section 8
### Compensation in case of automated data processing by public bodies

(1) Where a public body causes harm to the data subject through the automated collection, processing or use of his personal data that is inadmissible or incorrect under the provisions of this Act or other data protection provisions, such body's supporting organisation shall be obliged to compensate the data subject for the harm thus caused, irrespective of any fault.

(2) In grave cases of violation of privacy, the data subject shall receive adequate pecuniary compensation for the immaterial harm caused.

(3) The claims under sub-sections 1 and 2 above shall be limited to a total amount of € 130,000. Where, due to the same occurrence, compensation has to be paid to several persons and exceeds the maximum amount of € 130,000, the compensation paid to each of them shall be reduced in proportion to the maximum amount.

(4) Sind bei einer automatisierten Verarbeitung mehrere Stellen speicherungsberechtigt und ist der Geschädigte nicht in der Lage, die speichernde Stelle festzustellen, so haftet jede dieser Stellen.

(5) Hat bei der Entstehung des Schadens ein Verschulden des Betroffenen mitgewirkt, gilt § 254 des Bürgerlichen Gesetzbuchs.

(6) Auf die Verjährung finden die für unerlaubte Handlungen geltenden Verjährungsvorschriften des Bürgerlichen Gesetzbuchs entsprechende Anwendung.

### § 9
### Technische und organisatorische Maßnahmen

Öffentliche und nicht-öffentliche Stellen, die selbst oder im Auftrag personenbezogene Daten erheben, verarbeiten oder nutzen, haben die technischen und organisatorischen Maßnahmen zu treffen, die erforderlich sind, um die Ausführung der Vorschriften dieses Gesetzes, insbesondere die in der Anlage zu diesem Gesetz genannten Anforderungen, zu gewährleisten. Erforderlich sind Maßnahmen nur, wenn ihr Aufwand in einem angemessenen Verhältnis zu dem angestrebten Schutzzweck steht.

### § 9a
### Datenschutzaudit

Zur Verbesserung des Datenschutzes und der Datensicherheit können Anbieter von Datenverarbeitungssystemen und -programmen und datenverarbeitende Stellen ihr Datenschutzkonzept sowie ihre technischen Einrichtungen durch unabhängige und zugelassene Gutachter prüfen und bewerten lassen sowie das Ergebnis der Prüfung veröffentlichen. Die näheren Anforderungen an die Prüfung und Bewertung, das Verfahren sowie die Auswahl und Zulassung der Gutachter werden durch besonderes Gesetz geregelt.

### § 10
### Einrichtung automatisierter Abrufverfahren

(1) Die Einrichtung eines automatisierten Verfahrens, das die Übermittlung personenbezogener Daten durch Abruf ermöglicht, ist zulässig, soweit dieses Verfahren unter Berücksichtigung der schutzwürdigen Interessen der Betroffenen und der Aufgaben oder Geschäftszwecke der beteiligten Stellen angemessen ist. Die Vorschriften über die Zulässigkeit des einzelnen Abrufs bleiben unberührt.

(2) Die beteiligten Stellen haben zu gewährleisten, dass die Zulässigkeit des Abrufverfahrens kontrolliert werden kann. Hierzu haben sie schriftlich festzulegen:

(4) If, in the case of automated processing, several bodies are entitled to store the data and the injured person is unable to ascertain the controller of the filing system, each body shall be liable.

(5) Section 254 of the Civil Code shall apply to contributory negligence on the part of the data subject.

(6) The limitation provisions stipulated for tortious acts in the Civil Code shall apply *mutatis mutandis* with regard to statutory limitation.

### Section 9
### Technical and organisational measures

Public and private bodies processing personal data either on their own behalf or on behalf of others shall take the technical and organisational measures necessary to ensure the implementation of the provisions of this Act, in particular the requirements set out in the annex to this Act. Measures shall be required only if the effort involved is reasonable in relation to the desired level of protection.

### Section 9a
### Data protection audit

In order to improve data protection and data security, suppliers of data processing systems and programmes and bodies conducting data processing can have their data protection concepts and their technical facilities examined and evaluated by independent and approved appraisers, and can publish the result of the audit. The detailed requirements pertaining to examination and evaluation, the procedure and selection and approval of the appraisers are stipulated in a separate act.

### Section 10
### Establishment of automated retrieval procedures

(1) An automated procedure for the retrieval of personal data may be established in so far as such procedure is appropriate, having due regard to the legitimate interests of the data subjects and to the duties or business purposes of the bodies involved. The provisions on the admissibility of retrieval in a particular case shall remain unaffected.

(2) The bodies involved shall ensure that the admissibility of the retrieval procedure can be monitored. For such purpose they shall specify in writing:

1. Anlass und Zweck des Abrufverfahrens,

2. Dritte, an die übermittelt wird,

3. Art der zu übermittelnden Daten,

4. nach § 9 erforderliche technische und organisatorische Maßnahmen.

Im öffentlichen Bereich können die erforderlichen Festlegungen auch durch die Fachaufsichtsbehörden getroffen werden.

(3) Über die Einrichtung von Abrufverfahren ist in Fällen, in denen die in § 12 Abs. 1 genannten Stellen beteiligt sind, der Bundesbeauftragte für den Datenschutz unter Mitteilung der Festlegungen nach Absatz 2 zu unterrichten. Die Einrichtung von Abrufverfahren, bei denen die in § 6 Abs. 2 und in § 19 Abs. 3 genannten Stellen beteiligt sind, ist nur zulässig, wenn das für die speichernde und die abrufende Stelle jeweils zuständige Bundes- oder Landesministerium zugestimmt hat.

(4) Die Verantwortung für die Zulässigkeit des einzelnen Abrufs trägt der Dritte, an den übermittelt wird. Die speichernde Stelle prüft die Zulässigkeit der Abrufe nur, wenn dazu Anlass besteht. Die speichernde Stelle hat zu gewährleisten, dass die Übermittlung personenbezogener Daten zumindest durch geeignete Stichprobenverfahren festgestellt und überprüft werden kann. Wird ein Gesamtbestand personenbezogener Daten abgerufen oder übermittelt (Stapelverarbeitung), so bezieht sich die Gewährleistung der Feststellung und Überprüfung nur auf die Zulässigkeit des Abrufes oder der Übermittlung des Gesamtbestandes.

(5) Die Absätze 1 bis 4 gelten nicht für den Abruf allgemein zugänglicher Daten. Allgemein zugänglich sind Daten, die jedermann, sei es ohne oder nach vorheriger Anmeldung, Zulassung oder Entrichtung eines Entgelts, nutzen kann.

## § 11
### Erhebung, Verarbeitung oder Nutzung personenbezogener Daten im Auftrag

(1) Werden personenbezogene Daten im Auftrag durch andere Stellen erhoben, verarbeitet oder genutzt, ist der Auftraggeber für die Einhaltung der Vorschriften dieses Gesetzes und anderer Vorschriften über den Datenschutz verantwortlich. Die in den §§ 6, 7 und 8 genannten Rechte sind ihm gegenüber geltend zu machen.

1. the reason for and purpose of the retrieval procedure,

2. third parties to whom transfer is effected,

3. the type of data to be transferred,

4. the technical and organisational measures required under Section 9 of this Act.

In the public sector the supervisory authorities may lay down such specifications.

(3) In cases where the bodies mentioned in Section 12 (1) of this Act are involved, the Federal Commissioner for Data Protection shall be notified of the establishment of retrieval procedures and of the specifications made under sub-section 2 above. The establishment of retrieval procedures in which the bodies mentioned in Sections 6 (2) and 19 (3) of this Act are involved shall be admissible only if the federal or *Land* ministries responsible for the controller of the filing system and for the retrieving body or their representatives have given their consent.

(4) Responsibility for the admissibility of retrieval in a particular case shall rest with the third party to whom transfer is effected. The controller of the filing system shall examine the admissibility of retrieval only if there is cause for such examination. The controller of the filing system shall ensure that the transfer of personal data can be ascertained and checked at least by means of suitable sampling procedures. If all personal data are retrieved or transferred (batch processing), it shall be sufficient to ensure that the admissibility of the retrieval or transfer of all data can be ascertained and checked.

(5) Sub-sections 1 to 4 above shall not apply to the retrieval of generally accessible data. Generally accessible data are data which anyone can use, be it with or without prior registration, permission or the payment of a fee.

## Section 11
### Commissioned collection, processing or use of personal data

(1) Where other bodies are commissioned to collect, process or use personal data, responsibility for compliance with the provisions of this Act and with other data protection provisions shall rest with the principal. The rights referred to in Sections 6, 7 and 8 of this Act shall be asserted vis-à-vis the principal.

(2) Der Auftragnehmer ist unter besonderer Berücksichtigung der Eignung der von ihm getroffenen technischen und organisatorischen Maßnahmen sorgfältig auszuwählen. Der Auftrag ist schriftlich zu erteilen, wobei die Datenerhebung, -verarbeitung oder -nutzung, die technischen und organisatorischen Maßnahmen und etwaige Unterauftragsverhältnisse festzulegen sind. Er kann bei öffentlichen Stellen auch durch die Fachaufsichtsbehörde erteilt werden. Der Auftraggeber hat sich von der Einhaltung der beim Auftragnehmer getroffenen technischen und organisatorischen Maßnahmen zu überzeugen.

(3) Der Auftragnehmer darf die Daten nur im Rahmen der Weisungen des Auftraggebers erheben, verarbeiten oder nutzen. Ist er der Ansicht, dass eine Weisung des Auftraggebers gegen dieses Gesetz oder andere Vorschriften über den Datenschutz verstößt, hat er den Auftraggeber unverzüglich darauf hinzuweisen.

(4) Für den Auftragnehmer gelten neben den §§ 5, 9, 43 Abs. 1 Nr. 2, 10 und 11, Abs. 2 Nr. 1 bis 3 und Abs. 3 sowie § 44 nur die Vorschriften über die Datenschutzkontrolle oder die Aufsicht, und zwar für

1. a) öffentliche Stellen,

   b) nicht-öffentliche Stellen, bei denen der öffentlichen Hand die Mehrheit der Anteile gehört oder die Mehrheit der Stimmen zusteht und der Auftraggeber eine öffentliche Stelle ist,

   die §§ 18, 24 bis 26 oder die entsprechenden Vorschriften der Datenschutzgesetze der Länder.

2. die übrigen nicht-öffentlichen Stellen, soweit sie personenbezogene Daten im Auftrag als Dienstleistungsunternehmen geschäftsmäßig erheben, verarbeiten oder nutzen, die §§ 4f , 4g und 38.

(5) Die Absätze 1 bis 4 gelten entsprechend, wenn die Prüfung oder Wartung automatisierter Verfahren oder von Datenverarbeitungsanlagen durch andere Stellen im Auftrag vorgenommen wird und dabei ein Zugriff auf personenbezogene Daten nicht ausgeschlossen werden kann.

(2) The agent shall be carefully selected, with particular regard for the suitability of the technical and organisational measures taken by him. The commission shall be given in writing, specifying the collection, processing and use of the data, the technical and organisational measures and any subcommissions. In the case of public bodies, the commission may be given by the supervisory authority. The principal shall verify compliance with the technical and organisational measures undertaken by the agent.

(3) The agent may collect, process or use the data only as instructed by the principal. If he thinks that an instruction of the principal infringes this Act or other data protection provisions, he shall point this out to the principal without delay.

(4) For the agent the only applicable provisions other than those of Sections 5, 9, 43 (1), Nos. 2, 10 and 11, (2) Nos. 1 to 3 and (3) and Section 44 of this Act shall be the provisions on data protection control or supervision, namely for

1. a) public bodies,

   b) private bodies where the public sector possesses the majority of shares or votes and where the principal is a public body,

   Sections 18, 24 to 26 of this Act or the relevant data protection laws of the *Länder*,

2. other private bodies in so far as they are commissioned to collect, process or use personal data in the course of business as service enterprises, Sections 4 f, 4 g and 38 of this Act.

(5) Sub-sections 1 to 4 shall apply *mutatis mutandis* if other bodies are commissioned to carry out the inspection or maintenance of automated procedures or data processing systems, in the course of which the possibility of personal data being accessed cannot be excluded.

**Zweiter Abschnitt**
**Datenverarbeitung der öffentlichen Stellen**

**Erster Unterabschnitt**
**Rechtsgrundlagen der Datenverarbeitung**

**§ 12**
**Anwendungsbereich**

(1) Die Vorschriften dieses Abschnittes gelten für öffentliche Stellen des Bundes, soweit sie nicht als öffentlich-rechtliche Unternehmen am Wettbewerb teilnehmen.

(2) Soweit der Datenschutz nicht durch Landesgesetz geregelt ist, gelten die §§ 12 bis 16, 19 bis 20 auch für die öffentlichen Stellen der Länder, soweit sie

1. Bundesrecht ausführen und nicht als öffentlich-rechtliche Unternehmen am Wettbewerb teilnehmen oder

2. als Organe der Rechtspflege tätig werden und es sich nicht um Verwaltungsangelegenheiten handelt.

(3) Für Landesbeauftragte für den Datenschutz gilt § 23 Abs. 4 entsprechend.

(4) Werden personenbezogene Daten für frühere, bestehende oder zukünftige dienst- oder arbeitsrechtliche Rechtsverhältnisse erhoben, verarbeitet oder genutzt, gelten anstelle der §§ 13 bis 16, 19 bis 20 der § 28 Abs. 1 und 3 Nr. 1 sowie die §§ 33 bis 35, auch soweit personenbezogene Daten weder automatisiert verarbeitet noch in nicht automatisierten Dateien verarbeitet oder genutzt oder dafür erhoben werden.

**§ 13**
**Datenerhebung**

(1) Das Erheben personenbezogener Daten ist zulässig, wenn ihre Kenntnis zur Erfüllung der Aufgaben der verantwortlichen Stelle erforderlich ist.

(1a) Werden personenbezogene Daten statt beim Betroffenen bei einer nicht-öffentlichen Stelle erhoben, so ist die Stelle auf die Rechtsvorschrift, die zur Auskunft verpflichtet, sonst auf die Freiwilligkeit ihrer Angaben hinzuweisen.

(2) Das Erheben besonderer Arten personenbezogener Daten (§ 3 Abs. 9) ist nur zulässig, soweit

1. eine Rechtsvorschrift dies vorsieht oder aus Gründen eines wichtigen öffentlichen Interesses zwingend erfordert,

2. der Betroffene nach Maßgabe des § 4a Abs. 3 eingewilligt hat,

**Part II**
**Data processing by public bodies**

**Chapter I**
**Legal basis for data processing**

**Section 12**
**Scope**

(1) The provisions of this Part shall apply to public bodies of the Federation in so far as they do not participate in competition as public-law enterprises.

(2) Where data protection is not governed by Land legislation, Sections 12 to 16, 19 and 20 of this Act shall also apply to public bodies of the Länder in so far as they

1. execute federal law and do not participate in competition as public-law enterprises or

2. act as bodies of the judicature and are not dealing with administrative matters.

(3) Section 23 (4) of this Act shall apply mutatis mutandis to Land commissioners for data protection.

(4) If personal data are collected, processed or used for the purpose of past, present or future service or employment contracts, Section 28 (1) and (3), No. 1, as well as Sections 33 to 35 of this Act shall apply instead of Sections 13 to 16, 19 to 20, also in so far as personal data are neither processed by automated procedures nor processed or used in automated filing systems or collected for such filing systems.

**Section 13**
**Collection of data**

(1) The collection of personal data shall be admissible if knowledge of them is needed to perform the duties of the bodies collecting them.

(1a) Where personal data are collected from a private body and not from the data subject, such body shall be informed of the legal provision requiring the supply of particulars or that such supply is voluntary, as the case may be.

(2) The collection of special types of personal data (Section 3 (9)) is permissible only in so far as

1. such collection is stipulated in a legal provision or essential on account of an important public interest,

2. the data subject has consented pursuant to Section 4a (3) of this Act,

3. dies zum Schutz lebenswichtiger Interessen des Betroffenen oder eines Dritten erforderlich ist, sofern der Betroffene aus physischen oder rechtlichen Gründen außerstande ist, seine Einwilligung zu geben,

4. es sich um Daten handelt, die der Betroffene offenkundig öffentlich gemacht hat,

5. dies zur Abwehr einer erheblichen Gefahr für die öffentliche Sicherheit erforderlich ist,

6. dies zur Abwehr erheblicher Nachteile für das Gemeinwohl oder zur Wahrung erheblicher Belange des Gemeinwohls zwingend erforderlich ist,

7. dies zum Zweck der Gesundheitsvorsorge, der medizinischen Diagnostik, der Gesundheitsversorgung oder Behandlung oder für die Verwaltung von Gesundheitsdiensten erforderlich ist und die Verarbeitung dieser Daten durch ärztliches Personal oder durch sonstige Personen erfolgt, die einer entsprechenden Geheimhaltungspflicht unterliegen,

8. dies zur Durchführung wissenschaftlicher Forschung erforderlich ist, das wissenschaftliche Interesse an der Durchführung des Forschungsvorhabens das Interesse des Betroffenen an dem Ausschluss der Erhebung erheblich überwiegt und der Zweck der Forschung auf andere Weise nicht oder nur mit unverhältnismäßigem Aufwand erreicht werden kann oder

9. dies aus zwingenden Gründen der Verteidigung oder der Erfüllung über- oder zwischenstaatlicher Verpflichtungen einer öffentlichen Stelle des Bundes auf dem Gebiet der Krisenbewältigung oder Konfliktverhinderung oder für humanitäre Maßnahmen erforderlich ist.

## § 14
### Datenspeicherung, -veränderung und -nutzung

(1) Das Speichern, Verändern oder Nutzen personenbezogener Daten ist zulässig, wenn es zur Erfüllung der in der Zuständigkeit der verantwortlichen Stelle liegenden Aufgaben erforderlich ist und es für die Zwecke erfolgt, für die die Daten erhoben worden sind. Ist keine Erhebung vorausgegangen, dürfen die Daten nur für die Zwecke geändert oder genutzt werden, für die sie gespeichert worden sind.

(2) Das Speichern, Verändern oder Nutzen für andere Zwecke ist nur zulässig, wenn

1. eine Rechtsvorschrift dies vorsieht oder zwingend voraussetzt,

3. such collection is necessary in order to protect vital interests of the data subject or of a third party, in so far as the data subject is unable to give his consent for physical or legal reasons,

4. such collection concerns data which the data subject has evidently made public,

5. such collection is necessary in order to avert a substantial threat to public safety,

6. such collection is necessary in order to avert substantial detriment to the common weal or to protect substantial interests of the common weal,

7. such collection is necessary for the purposes of preventive medicine, medical diagnosis, health care or the administration of health services and the processing of these data is carried out by medical personnel or other persons who are subject to an obligation to maintain secrecy,

8. such collection is necessary for the purposes of scientific research, where the scientific interest in carrying out the research project substantially outweighs the data subject's interest in excluding collection and the purpose of the research cannot be achieved in any other way or would otherwise necessitate disproportionate effort, or

9. such collection is necessary in order to enable a public body of the Federation to perform its duties for compelling reasons of defence or to discharge supranational or international duties in the field of crisis management or conflict prevention or for humanitarian measures.

## Section 14
### Storage, modification and use of data

(1) The storage, modification or use of personal data shall be admissible where it is necessary for the performance of the duties of the controller of the filing system and if it serves the purposes for which the data were collected. If there has been no preceding collection, the data may be modified or used only for the purposes for which they were stored.

(2) Storage, modification or use for other purposes shall be admissible only if

1. a legal provision prescribes or peremptorily presupposes this,

2. der Betroffene eingewilligt hat,

3. offensichtlich ist, dass es im Interesse des Betroffenen liegt, und kein Grund zu der Annahme besteht, dass er in Kenntnis des anderen Zwecks seine Einwilligung verweigern würde,

4. Angaben des Betroffenen überprüft werden müssen, weil tatsächliche Anhaltspunkte für deren Unrichtigkeit bestehen,

5. die Daten allgemein zugänglich sind oder die verantwortliche Stelle sie veröffentlichen dürfte, es sei denn, dass das schutzwürdige Interesse des Betroffenen an dem Ausschluss der Zweckänderung offensichtlich überwiegt,

6. es zur Abwehr erheblicher Nachteile für das Gemeinwohl oder einer Gefahr für die öffentliche Sicherheit oder zur Wahrung erheblicher Belange des Gemeinwohls erforderlich ist,

7. es zur Verfolgung von Straftaten oder Ordnungswidrigkeiten, zur Vollstreckung oder zum Vollzug von Strafen oder Maßnahmen im Sinne des § 11 Abs. 1 Nr. 8 des Strafgesetzbuchs oder von Erziehungsmaßregeln oder Zuchtmitteln im Sinne des Jugendgerichtsgesetzes oder zur Vollstreckung von Bußgeldentscheidungen erforderlich ist,

8. es zur Abwehr einer schwerwiegenden Beeinträchtigung der Rechte einer anderen Person erforderlich ist oder

9. es zur Durchführung wissenschaftlicher Forschung erforderlich ist, das wissenschaftliche Interesse an der Durchführung des Forschungsvorhabens das Interesse des Betroffenen an dem Ausschluss der Zweckänderung erheblich überwiegt und der Zweck der Forschung auf andere Weise nicht oder nur mit unverhältnismäßigem Aufwand erreicht werden kann.

(3) Eine Verarbeitung oder Nutzung für andere Zwecke liegt nicht vor, wenn sie der Wahrnehmung von Aufsichts- und Kontrollbefugnissen, der Rechnungsprüfung oder der Durchführung von Organisationsuntersuchungen für die verantwortliche Stelle dient. Das gilt auch für die Verarbeitung oder Nutzung zu Ausbildungs- und Prüfungszwecken durch die verantwortliche Stelle, soweit nicht überwiegende schutzwürdige Interessen des Betroffenen entgegenstehen.

2. the data subject has consented,

3. it is evident that this is in the interest of the data subject and there is no reason to assume that he would withhold consent if he knew of such other purpose,

4. particulars supplied by the data subject have to be checked because there are actual indications that they are incorrect,

5. the data are generally accessible or the controller would be permitted to publish them, unless the data subject clearly has an overriding legitimate interest in excluding the change of purpose,

6. this is necessary in order to avert substantial detriment to the common weal or to protect substantial interests of the common weal,

7. this is necessary to prosecute criminal or administrative offences, to implement sentences or measures as defined in Section 11 (1), No. 8 of the Penal Code or reformatory or disciplinary measures as defined in the Youth Courts Act, or to execute decisions imposing administrative fines,

8. this is necessary to avert a grave infringement of another person's rights or

9. this is necessary in order to conduct scientific research, scientific interest in conduct of the research project substantially outweighs the interest of the data subject in excluding the change of purpose, and the research purpose cannot be attained by other means or can be attained thus only with disproportionate effort.

(3) Processing or use for other purposes shall not be deemed to occur if this serves the exercise of powers of supervision or control, the execution of auditing or the conduct of organisational studies for the controller of the filing system. This shall also apply to processing or use for training and examination purposes by the controller, unless the data subject has overriding legitimate interests.

(4) Personenbezogene Daten, die ausschließlich zu Zwecken der Datenschutzkontrolle, der Datensicherung oder zur Sicherstellung eines ordnungsgemäßen Betriebes einer Datenverarbeitungsanlage gespeichert werden, dürfen nur für diese Zwecke verwendet werden.

(5) Das Speichern, Verändern oder Nutzen von besonderen Arten personenbezogener Daten (§ 3 Abs. 9) für andere Zwecke ist nur zulässig, wenn

1. die Voraussetzungen vorliegen, die eine Erhebung nach § 13 Abs. 2 Nr. 1 bis 6 oder 9 zulassen würden oder

2. dies zur Durchführung wissenschaftlicher Forschung erforderlich ist, das öffentliche Interesse an der Durchführung des Forschungsvorhabens das Interesse des Betroffenen an dem Ausschluss der Zweckänderung erheblich überwiegt und der Zweck der Forschung auf andere Weise nicht oder nur mit unverhältnismäßigem Aufwand erreicht werden kann.

Bei der Abwägung nach Satz 1 Nr. 2 ist im Rahmen des öffentlichen Interesses das wissenschaftliche Interesse an dem Forschungsvorhaben besonders zu berücksichtigen.

(6) Die Speicherung, Veränderung oder Nutzung von besonderen Arten personenbezogener Daten (§ 3 Abs. 9) zu den in § 13 Abs. 2 Nr. 7 genannten Zwecken richtet sich nach den für die in § 13 Abs. 2 Nr. 7 genannten Personen geltenden Geheimhaltungspflichten.

## § 15
### Datenübermittlung an öffentliche Stellen

(1) Die Übermittlung personenbezogener Daten an öffentliche Stellen ist zulässig, wenn

1. sie zur Erfüllung der in der Zuständigkeit der übermittelnden Stelle oder des Dritten, an den die Daten übermittelt werden, liegenden Aufgaben erforderlich ist und

2. die Voraussetzungen vorliegen, die eine Nutzung nach § 14 zulassen würden.

(2) Die Verantwortung für die Zulässigkeit der Übermittlung trägt die übermittelnde Stelle. Erfolgt die Übermittlung auf Ersuchen des Dritten, an den die Daten übermittelt werden, trägt dieser die Verantwortung. In diesem Fall prüft die übermittelnde Stelle nur, ob das Übermittlungsersuchen im Rahmen der Aufgaben des Dritten, an den die Daten übermittelt werden, liegt, es sei denn, dass besonderer Anlass zur Prüfung der Zulässigkeit der Übermittlung besteht. § 10 Abs. 4 bleibt unberührt.

(4) Personal data stored exclusively for the purpose of monitoring data protection, safeguarding data or ensuring proper operation of a data processing system may be used exclusively for such purposes.

(5) The storage, modification or use of special types of personal data (Section 3 (9)) for other purposes shall be permissible only if

1. the requirements which would permit collection in accordance with Section 13 (2), Nos. 1 to 6 or No. 9 are met or

2. this is necessary for the conduct of scientific research, scientific interest in conduct of the research project substantially outweighs the interest of the data subject in excluding the change of purpose, and the research purpose cannot be attained by other means or can be attained thus only with disproportionate effort.

In weighing up the circumstances in accordance with sentence 1, No. 2, the scientific interest in the research project is to receive special consideration in the context of the public interest.

(6) The storage, modification or use of special types of personal data (Section 3 (9)) for the purposes stated in Section 13 (2), No. 7 shall be subject to the obligations to maintain secrecy which apply to the persons stated in Section 13 (2), No. 7.

## Section 15
### Transfer of data to public bodies

(1) The transfer of personal data to public bodies shall be admissible if

1. this is necessary for the performance of duties of the transferring body or the third party to whom the data are transferred and

2. the requirements of Section 14 of this Act are met.

(2) Responsibility for the admissibility of transfer shall rest with the transferring body. If the data are transferred at the request of the third party to whom the data are transferred, the latter shall bear responsibility. In such case the transferring body shall merely examine whether the request for transfer lies within the remit of the third party to whom the data are transferred, unless there is special reason to examine the admissibility of transfer. Section 10 (4) of this Act shall remain unaffected.

(3) Der Dritte, an den die Daten übermittelt werden, darf diese für den Zweck verarbeiten oder nutzen, zu dessen Erfüllung sie ihm übermittelt werden. Eine Verarbeitung oder Nutzung für andere Zwecke ist nur unter den Voraussetzungen des § 14 Abs. 2 zulässig.

(4) Für die Übermittlung personenbezogener Daten an Stellen der öffentlich-rechtlichen Religionsgesellschaften gelten die Absätze 1 bis 3 entsprechend, sofern sichergestellt ist, dass bei diesen ausreichende Datenschutzmaßnahmen getroffen werden.

(5) Sind mit personenbezogenen Daten, die nach Absatz 1 übermittelt werden dürfen, weitere personenbezogene Daten des Betroffenen oder eines Dritten so verbunden, dass eine Trennung nicht oder nur mit unvertretbarem Aufwand möglich ist, so ist die Übermittlung auch dieser Daten zulässig, soweit nicht berechtigte Interessen des Betroffenen oder eines Dritten an deren Geheimhaltung offensichtlich überwiegen; eine Nutzung dieser Daten ist unzulässig.

(6) Absatz 5 gilt entsprechend, wenn personenbezogene Daten innerhalb einer öffentlichen Stelle weitergegeben werden.

## § 16
### Datenübermittlung an nicht-öffentliche Stellen

(1) Die Übermittlung personenbezogener Daten an nicht-öffentliche Stellen ist zulässig, wenn

1. sie zur Erfüllung der in der Zuständigkeit der übermittelnden Stelle liegenden Aufgaben erforderlich ist und die Voraussetzungen vorliegen, die eine Nutzung nach § 14 zulassen würden, oder

2. der Dritte, an den die Daten übermittelt werden, ein berechtigtes Interesse an der Kenntnis der zu übermittelnden Daten glaubhaft darlegt und der Betroffene kein schutzwürdiges Interesse an dem Ausschluss der Übermittlung hat. Das Übermitteln von besonderen Arten personenbezogener Daten (§ 3 Abs. 9) ist abweichend von Satz 1 Nr. 2 nur zulässig, wenn die Voraussetzungen vorliegen, die eine Nutzung nach § 14 Abs. 5 und 6 zulassen würden oder soweit dies zur Geltendmachung, Ausübung oder Verteidigung rechtlicher Ansprüche erforderlich ist.

(2) Die Verantwortung für die Zulässigkeit der Übermittlung trägt die übermittelnde Stelle.

(3) The third party to whom the data are transferred may process or use the transferred data for the purpose for which they were transferred. Processing or use for other purposes shall be admissible only if the requirements of Section 14 (2) of this Act are met.

(4) Sub-sections 1 to 3 above shall apply *mutatis mutandis* to the transfer of personal data to bodies of public-law religious societies, provided it is ensured that the latter take adequate data protection measures.

(5) Where personal data that may be transferred under sub-section 1 above are linked to other personal data of the data subject or a third party in such a way that separation is not possible or is possible only with unreasonable effort, transfer of the latter data shall also be admissible, unless the data subject or a third party clearly has an overriding justified interest in keeping them secret; use of these data shall be inadmissible.

(6) Sub-section 5 above shall apply *mutatis mutandis* if personal data are transmitted within a public body.

## Section 16
### Transfer of data to private bodies

(1) The transfer of personal data to private bodies shall be admissible if

1. this is necessary for the performance of the duties of the transferring body and the requirements of Section 14 of this Act are met or

2. the third party to whom the data are transferred credibly proves a justified interest in knowledge of the data to be transferred and the data subject does not have a legitimate interest in excluding their transfer. By way of derogation from sentence 1, No. 2, the transfer of special types of personal data (Section 3 (9)) is permissible only if the requirements which would permit use in accordance with Section 14 (5) and (9) are met, or in so far as this is necessary in order to assert, exercise or defend legal claims.

(2) Responsibility for the admissibility of transfer shall rest with the transferring body.

(3) In den Fällen der Übermittlung nach Absatz 1 Nr. 2 unterrichtet die übermittelnde Stelle den Betroffenen von der Übermittlung seiner Daten. Dies gilt nicht, wenn damit zu rechnen ist, dass er auf andere Weise Kenntnis erlangt, oder wenn die Unterrichtung die öffentliche Sicherheit gefährden oder sonst dem Wohle des Bundes oder eines Landes Nachteile bereiten würde.

(4) Der Dritte, an den die Daten übermittelt werden, darf diese nur für den Zweck verarbeiten oder nutzen, zu dessen Erfüllung sie ihm übermittelt werden. Die übermittelnde Stelle hat ihn darauf hinzuweisen. Eine Verarbeitung oder Nutzung für andere Zwecke ist zulässig, wenn eine Übermittlung nach Absatz 1 zulässig wäre und die übermittelnde Stelle zugestimmt hat.

§ 17

*weggefallen*

§ 18
Durchführung des Datenschutzes in der Bundesverwaltung

(1) Die obersten Bundesbehörden, der Präsident des Bundeseisenbahnvermögens sowie die bundesunmittelbaren Körperschaften, Anstalten und Stiftungen des öffentlichen Rechts, über die von der Bundesregierung oder einer obersten Bundesbehörde lediglich die Rechtsaufsicht ausgeübt wird, haben für ihren Geschäftsbereich die Ausführung dieses Gesetzes sowie anderer Rechtsvorschriften über den Datenschutz sicherzustellen. Das Gleiche gilt für die Vorstände der aus dem Sondervermögen Deutsche Bundespost durch Gesetz hervorgegangenen Unternehmen, solange diesen ein ausschließliches Recht nach dem Postgesetz zusteht.

(2) Die öffentlichen Stellen führen ein Verzeichnis der eingesetzten Datenverarbeitungsanlagen. Für ihre automatisierten Verarbeitungen haben sie die Angaben nach § 4e sowie die Rechtsgrundlage der Verarbeitung schriftlich festzulegen. Bei allgemeinen Verwaltungszwecken dienenden automatisierten Verarbeitungen, bei welchen das Auskunftsrecht des Betroffenen nicht nach § 19 Abs. 3 oder 4 eingeschränkt wird, kann hiervon abgesehen werden. Für automatisierte Verarbeitungen, die in gleicher oder ähnlicher Weise mehrfach geführt werden, können die Festlegungen zusammengefasst werden.

(3) In cases of transfer under subsection 1, No. 2 above, the transferring body shall inform the data subject of the transfer of his data. This shall not apply if it can be assumed that he will acquire knowledge of such transfer in another manner or if such information would jeopardise public safety or otherwise be detrimental to the Federation or a *Land*.

(4) The third party to whom the data are transferred may process or use the transferred data only for the purpose for which they were transferred to him. The transferring body shall point this out to him. Processing or use for other purposes shall be admissible if transfer under sub-section 1 above would be admissible and the transferring body has consented.

Section 17
Transfer of data to bodies outside the area of application of this Act

*deleted*

Section 18
Implementation of data protection in the federal administration

(1) The supreme federal authorities, the President of the Federal Railway Property as well as the federal corporations, establishments and foundations under public law subject to only legal supervision by the Federal Government or a supreme federal authority shall ensure that this Act and other legal provisions concerning data protection are implemented in their respective spheres of activity. The same shall apply to the managing boards of the successor companies created from the Special Fund *Deutsche Bundespost* by act of law as long as they have an exclusive right under the Postal Law.

(2) Public bodies shall keep a register of the data processing systems used. In respect of their automated processing operations, they shall record the information in accordance with Section 4e and the legal basis for processing in writing. This requirement can be waived in the case of automated processing operations for administrative purposes which involve no restrictions of the data subject's right of access in accordance with Section 19 (3) or (4). The specifications may be combined for automated processing operations which are conducted several times in the same manner or a similar manner.

| Zweiter Unterabschnitt<br>Rechte des Betroffenen | Chapter II<br>Rights of the data subject |
|---|---|
| **§ 19**<br>**Auskunft an den Betroffenen** | **Section 19**<br>**Provision of information to the data subject** |

(1) Dem Betroffenen ist auf Antrag Auskunft zu erteilen über

1. die zu seiner Person gespeicherten Daten, auch soweit sie sich auf die Herkunft dieser Daten beziehen,

2. die Empfänger oder Kategorien von Empfängern, an die die Daten weitergegeben werden, und

3. den Zweck der Speicherung.

In dem Antrag soll die Art der personenbezogenen Daten, über die Auskunft erteilt werden soll, näher bezeichnet werden. Sind die personenbezogenen Daten weder automatisiert noch in nicht automatisierten Dateien gespeichert, wird die Auskunft nur erteilt, soweit der Betroffene Angaben macht, die das Auffinden der Daten ermöglichen, und der für die Erteilung der Auskunft erforderliche Aufwand nicht außer Verhältnis zu dem vom Betroffenen geltend gemachten Informationsinteresse steht. Die verantwortliche Stelle bestimmt das Verfahren, insbesondere die Form der Auskunftserteilung, nach pflichtgemäßem Ermessen.

(2) Absatz 1 gilt nicht für personenbezogene Daten, die nur deshalb gespeichert sind, weil sie aufgrund gesetzlicher, satzungsmäßiger oder vertraglicher Aufbewahrungsvorschriften nicht gelöscht werden dürfen, oder ausschließlich Zwecken der Datensicherung oder der Datenschutzkontrolle dienen und eine Auskunftserteilung einen unverhältnismäßigen Aufwand erfordern würde.

(3) Bezieht sich die Auskunftserteilung auf die Übermittlung personenbezogener Daten an Verfassungsschutzbehörden, den Bundesnachrichtendienst, den Militärischen Abschirmdienst und, soweit die Sicherheit des Bundes berührt wird, andere Behörden des Bundesministeriums der Verteidigung, ist sie nur mit Zustimmung dieser Stellen zulässig.

(4) Die Auskunftserteilung unterbleibt, soweit

1. die Auskunft die ordnungsgemäße Erfüllung der in der Zuständigkeit der verantwortlichen Stelle liegenden Aufgaben gefährden würde,

2. die Auskunft die öffentliche Sicherheit oder Ordnung gefährden oder sonst dem Wohle des Bundes oder eines Landes Nachteile bereiten würde oder

---

(1) The data subject shall, at his request, be provided with information on

1. stored data concerning him, including any reference in them to their origin,

2. the recipients or categories of recipients to whom the data are transmitted, and

3. the purpose of storage.

The request should specify the type of personal data on which information is to be provided. If the personal data are stored neither by automated procedures nor in non-automated filing systems, information shall be provided only in so far as the data subject supplies particulars making it possible to locate the data and the effort needed to provide the information is not out of proportion to the interest in such information expressed by the data subject. The controller shall exercise due discretion in determining the procedure for providing such information and, in particular, the form in which it is provided.

(2) Sub-section 1 above shall not apply to personal data which are stored merely because they may not be erased due to legal, statutory or contractual provisions on their preservation or exclusively serve purposes of data security or data protection control and the provision of information would require disproportionate effort.

(3) If the provision of information relates to the transfer of personal data to authorities for the protection of the constitution, to the Federal Intelligence Service, the Federal Armed Forces Counterintelligence Office and, where the security of the Federation is concerned, other authorities of the Federal Ministry of Defence, it shall be admissible only with the consent of such bodies.

(4) Information shall not be provided if

1. this would be prejudicial to the proper performance of the duties of the controller,

2. this would impair public safety or order or otherwise be detrimental to the Federation or a *Land* or

3. die Daten oder die Tatsache ihrer Spei-
cherung nach einer Rechtsvorschrift o-
der ihrem Wesen nach, insbesondere
wegen der überwiegenden berechtigten
Interessen eines Dritten, geheim
gehalten werden müssen

und deswegen das Interesse des Betroffe-
nen an der Auskunftserteilung zurücktreten
muss.

(5) Die Ablehnung der Auskunftserteilung
bedarf einer Begründung nicht, soweit
durch die Mitteilung der tatsächlichen und
rechtlichen Gründe, auf die die Entschei-
dung gestützt wird, der mit der Auskunfts-
verweigerung verfolgte Zweck gefährdet
würde. In diesem Fall ist der Betroffene
darauf hinzuweisen, dass er sich an den
Bundesbeauftragten für den Datenschutz
wenden kann.

(6) Wird dem Betroffenen keine Auskunft
erteilt, so ist sie auf sein Verlangen dem
Bundesbeauftragten für den Datenschutz
zu erteilen, soweit nicht die jeweils zustän-
dige oberste Bundesbehörde im Einzelfall
feststellt, dass dadurch die Sicherheit des
Bundes oder eines Landes gefährdet wür-
de. Die Mitteilung des Bundesbeauftragten
an den Betroffenen darf keine Rückschlüs-
se auf den Erkenntnisstand der verantwort-
lichen Stelle zulassen, sofern diese nicht
einer weitergehenden Auskunft zustimmt.

(7) Die Auskunft ist unentgeltlich.

## § 19a
### Benachrichtigung

(1) Werden Daten ohne Kenntnis des Be-
troffenen erhoben, so ist er von der Spei-
cherung, der Identität der verantwortlichen
Stelle sowie über die Zweckbestimmungen
der Erhebung, Verarbeitung oder Nutzung
zu unterrichten. Der Betroffene ist auch
über die Empfänger oder Kategorien von
Empfängern von Daten zu unterrichten,
soweit er nicht mit der Übermittlung an
diese rechnen muss. Sofern eine Über-
mittlung vorgesehen ist, hat die Unterrich-
tung spätestens bei der ersten Übermitt-
lung zu erfolgen.

(2) Eine Pflicht zur Benachrichtigung be-
steht nicht, wenn

1. der Betroffene auf andere Weise
Kenntnis von der Speicherung oder der
Übermittlung erlangt hat,

2. die Unterrichtung des Betroffenen einen
unverhältnismäßigen Aufwand erfordert
oder

3. die Speicherung oder Übermittlung der
personenbezogenen Daten durch Ge-
setz ausdrücklich vorgesehen ist.

3. the data or the fact that they are being
stored must be kept secret in accor-
dance with a legal provision or by virtue
of their nature, in particular on account
of an overriding justified interest of a
third party

and for this reason the interest of the data
subject in the provision of information must
be subordinated.

(5) Reasons need not be stated for the
refusal to provide information if the state-
ment of the actual and legal reasons on
which the decision is based would jeop-
ardise the purpose pursued by refusing to
provide information. In such case it shall be
pointed out to the data subject that he may
appeal to the Federal Commissioner for
Data Protection.

(6) If no information is provided to the data
subject, it shall at his request be supplied
to the Federal Commissioner for Data
Protection unless the relevant supreme
federal authority determines in a particular
case that this would jeopardise the security
of the Federation or a *Land*. The transfer
from the Federal Commissioner to the data
subject must not allow any conclusions to
be drawn as to the knowledge at the dis-
posal of the controller, unless the latter
consents to more extensive information
being provided.

(7) Information shall be provided free of
charge.

## Section 19a
### Notification

(1) If data are collected without the data
subject's knowledge, he is to be informed
of storage, of the controller's identity and of
the purposes of collection, processing or
use. The data subject is also to be notified
of the recipients or categories of recipients
of data, except where he must expect
transfer to such recipients. When transfer is
envisaged, notification is to be provided at
the time of the first transfer at the latest.

(2) Notification shall not be required if

1. the data subject has received knowl-
edge by other means of the storage or
transfer of the data,

2. notification of the data subject would
require disproportionate effort or

3. the law expressly provides for storage
or transfer of the personal data.

Die verantwortliche Stelle legt schriftlich fest, unter welchen Voraussetzungen von einer Benachrichtigung nach Nummer 2 oder 3 abgesehen wird.

(3) § 19 Abs. 2 bis 4 gilt entsprechend.

The controller shall stipulate in writing under what conditions notification shall not be provided in accordance with Nos. 2 or 3 above.

(3) Section 19 (2) to (4) shall apply *mutatis mutandis.*

## § 20
### Berichtigung, Löschung und Sperrung von Daten; Widerspruchsrecht

## Section 20
### Correction, erasure and blocking of data; right of objection

(1) Personenbezogene Daten sind zu berichtigen, wenn sie unrichtig sind. Wird festgestellt, dass personenbezogene Daten, die weder automatisiert verarbeitet noch in nicht automatisierten Dateien gespeichert sind, unrichtig sind, oder wird ihre Richtigkeit von dem Betroffenen bestritten, so ist dies in geeigneter Weise festzuhalten.

(1) Incorrect personal data shall be corrected. If it is established that personal data which have neither been processed by automated procedures nor stored in automated filing systems are incorrect, or if their correctness is contested by the data subject, this is to be recorded in an appropriate manner.

(2) Personenbezogene Daten, die automatisiert verarbeitet oder in nicht automatisierten Dateien gespeichert sind, sind zu löschen, wenn

(2) Personal data which are processed by automated procedures or stored in non-automated filing systems are to be erased if

1. ihre Speicherung unzulässig ist oder

1. their storage is inadmissible or

2. ihre Kenntnis für die verantwortliche Stelle zur Erfüllung der in ihrer Zuständigkeit liegenden Aufgaben nicht mehr erforderlich ist.

2. knowledge of them is no longer required by the controller of the filing system for the performance of his duties.

(3) An die Stelle einer Löschung tritt eine Sperrung, soweit

(3) Instead of erasure, personal data shall be blocked in so far as

1. einer Löschung gesetzliche, satzungsmäßige oder vertragliche Aufbewahrungsfristen entgegenstehen,

1. preservation periods prescribed by law, statutes or contracts rule out any erasure,

2. Grund zu der Annahme besteht, dass durch eine Löschung schutzwürdige Interessen des Betroffenen beeinträchtigt würden, oder

2. there is reason to assume that erasure would impair legitimate interests of the data subject or

3. eine Löschung wegen der besonderen Art der Speicherung nicht oder nur mit unverhältnismäßig hohem Aufwand möglich ist.

3. erasure is not possible or is only possible with disproportionate effort due to the specific type of storage.

(4) Personenbezogene Daten, die automatisiert verarbeitet oder in nicht automatisierten Dateien gespeichert sind, sind ferner zu sperren, soweit ihre Richtigkeit vom Betroffenen bestritten wird und sich weder die Richtigkeit noch die Unrichtigkeit feststellen lässt.

(4) Personal data which are processed by automated procedures or stored in non-automated filing systems shall also be blocked if the data subject disputes that they are correct and it cannot be ascertained whether they are correct or incorrect.

(5) Personenbezogene Daten dürfen nicht für eine automatisierte Verarbeitung oder Verarbeitung in nicht automatisierten Dateien erhoben, verarbeitet oder genutzt werden, soweit der Betroffene dieser bei der verantwortlichen Stelle widerspricht und eine Prüfung ergibt, dass das schutzwürdige Interesse des Betroffenen wegen seiner besonderen persönlichen Situation das Interesse der verantwortlichen Stelle an dieser Erhebung, Verarbeitung oder Nutzung überwiegt. Satz 1 gilt nicht, wenn eine Rechtsvorschrift zur Erhebung, Verarbeitung oder Nutzung verpflichtet.

(6) Personenbezogene Daten, die weder automatisiert verarbeitet noch in einer nicht automatisierten Datei gespeichert sind, sind zu sperren, wenn die Behörde im Einzelfall feststellt, dass ohne die Sperrung schutzwürdige Interessen des Betroffenen beeinträchtigt würden und die Daten für die Aufgabenerfüllung der Behörde nicht mehr erforderlich sind.

(7) Gesperrte Daten dürfen ohne Einwilligung des Betroffenen nur übermittelt oder genutzt werden, wenn

1. es zu wissenschaftlichen Zwecken, zur Behebung einer bestehenden Beweisnot oder aus sonstigen im überwiegenden Interesse der verantwortlichen Stelle oder eines Dritten liegenden Gründen unerlässlich ist und

2. die Daten hierfür übermittelt oder genutzt werden dürften, wenn sie nicht gesperrt wären.

(8) Von der Berichtigung unrichtiger Daten, der Sperrung bestrittener Daten sowie der Löschung oder Sperrung wegen Unzulässigkeit der Speicherung sind die Stellen zu verständigen, denen im Rahmen einer Datenübermittlung diese Daten zur Speicherung weitergegeben wurden, wenn dies keinen unverhältnismäßigen Aufwand erfordert und schutzwürdige Interessen des Betroffenen nicht entgegenstehen.

(9) § 2 Abs. 1 bis 6, 8 und 9 des Bundesarchivgesetzes ist anzuwenden.

### § 21
### Anrufung des Bundesbeauftragten für den Datenschutz

Jedermann kann sich an den Bundesbeauftragten für den Datenschutz wenden, wenn er der Ansicht ist, bei der Erhebung, Verarbeitung oder Nutzung seiner personenbezogenen Daten durch öffentliche Stellen des Bundes in seinen Rechten verletzt worden zu sein. Für die Erhebung, Verarbeitung oder Nutzung von personenbezogenen Daten des Bundes gilt dies nur, soweit diese in Verwaltungsangelegenheiten tätig werden.

(5) Personal data must not be collected, processed or used for automated processing or processing in non-automated filing systems if the data subject files an objection with the controller and an examination reveals that the data subject's legitimate interest outweighs the controller's interest in such collection, processing or use, on account of the data subject's personal situation. Sentence 1 shall apply only when an obligation to carry out collection, processing or use is established by a legal provision.

(6) Personal data which are neither processed by automatic procedures nor stored in a non-automated filing system are to be blocked if, in the individual case concerned, the authority establishes that legitimate interests of the data subject would be impaired without such blockage and the data are no longer required in order for the authority to be able to discharge its duties.

(7) Blocked data may be transferred or used without the consent of the data subject only if

1. this is indispensable for scientific purposes, for use as evidence or for other reasons in the overriding interests of the controller of the data or a third party and

2. transfer or use of the data for this purpose would be admissible if they were not blocked.

(8) The correction of incorrect data, the blocking of disputed data and the erasure or blocking of data due to inadmissible storage shall be notified to the bodies to which these data are transmitted for storage within the framework of regular data transfer, provided that this does not require disproportionate effort and does not conflict with any legitimate interests of the data subject.

(9) Section 2 (1) to (6), (8) and (9) of the Federal Archives Act shall apply.

### Section 21
### Appeals to the Federal Commissioner for Data Protection

Anyone may appeal to the Federal Commissioner for Data Protection if he believes that his rights have been infringed through the collection, processing or use of his personal data by public bodies of the Federation. This shall apply to the collection, processing or use of personal data by courts of the Federation only in so far as they deal with administrative matters.

| | |
|---|---|
| **Dritter Unterabschnitt**<br>**Bundesbeauftragter für den Daten-**<br>**schutz** | **Chapter III**<br>**Federal Commissioner for Data Protection** |

| **§ 22**<br>**Wahl des Bundesbeauftragten für den**<br>**Datenschutz** | **Section 22**<br>**Election of the Federal Commissioner**<br>**for Data Protection** |
|---|---|

(1) Der Deutsche Bundestag wählt auf Vorschlag der Bundesregierung den Bundesbeauftragten für den Datenschutz mit mehr als der Hälfte der gesetzlichen Zahl seiner Mitglieder. Der Bundesbeauftragte muss bei seiner Wahl das 35. Lebensjahr vollendet haben. Der Gewählte ist vom Bundespräsidenten zu ernennen.

(1) On a proposal from the Federal Government the *Bundestag* shall elect the Federal Commissioner for Data Protection with over half of the statutory number of its members. The Federal Commissioner must be at least 35 years old at the time of his election. The person elected shall be appointed by the Federal President.

(2) Der Bundesbeauftragte leistet vor dem Bundesminister des Innern folgenden Eid:

(2) The Federal Commissioner shall swear the following oath in the presence of the Federal Minister of the Interior:

„Ich schwöre, dass ich meine Kraft dem Wohle des deutschen Volkes widmen, seinen Nutzen mehren, Schaden von ihm wenden, das Grundgesetz und die Gesetze des Bundes wahren und verteidigen, meine Pflichten gewissenhaft erfüllen und Gerechtigkeit gegen jedermann üben werde. So wahr mir Gott helfe."

"I swear to do everything in my power to further the well-being of the German people, to protect it from harm and to defend the Basic Law and the laws of the Federation, to perform my duties conscientiously and to exercise justice in all my dealings, so help me God."

Der Eid kann auch ohne religiöse Beteuerung geleistet werden.

The reference to God may be omitted from the oath.

(3) Die Amtszeit des Bundesbeauftragten beträgt fünf Jahre. Einmalige Wiederwahl ist zulässig.

(3) The term of office of the Federal Commissioner shall be five years. It may be renewed once.

(4) Der Bundesbeauftragte steht nach Maßgabe dieses Gesetzes zum Bund in einem öffentlich-rechtlichen Amtsverhältnis. Er ist in Ausübung seines Amtes unabhängig und nur dem Gesetz unterworfen. Er untersteht der Rechtsaufsicht der Bundesregierung.

(4) The Federal Commissioner shall, as directed by this Act, have public-law official status with respect to the Federation. He shall be independent in the performance of his duties and subject to the law only. He shall be subject to the legal supervision of the Federal Government.

(5) Der Bundesbeauftragte wird beim Bundesministerium des Innern eingerichtet. Er untersteht der Dienstaufsicht des Bundesministeriums des Innern. Dem Bundesbeauftragten ist die für die Erfüllung seiner Aufgaben notwendige Personal- und Sachausstattung zur Verfügung zu stellen; sie ist im Einzelplan des Bundesministeriums des Innern in einem eigenen Kapitel auszuweisen. Die Stellen sind im Einvernehmen mit dem Bundesbeauftragten zu besetzen. Die Mitarbeiter können, falls sie mit der beabsichtigten Maßnahme nicht einverstanden sind, nur im Einvernehmen mit ihm versetzt, abgeordnet oder umgesetzt werden.

(5) The Federal Commissioner shall be established with the Federal Minister of the Interior. He shall be subject to the hierarchical supervision of the Federal Minister of the Interior. The Federal Commissioner shall be provided with the personnel and material resources necessary for the performance of his duties; these resources shall be shown in a separate chapter of the budget of the Federal Minister of the Interior. The posts shall be filled in agreement with the Federal Commissioner. If they do not agree to the envisaged measure, staff members may be transferred, delegated or relocated only in agreement with the Federal Commissioner.

(6) Ist der Bundesbeauftragte vorübergehend an der Ausübung seines Amtes verhindert, kann der Bundesminister des Innern einen Vertreter mit der Wahrnehmung der Geschäfte beauftragen. Der Bundesbeauftragte soll dazu gehört werden.

(6) If the Federal Commissioner is temporarily prevented from performing his duties, the Federal Minister of the Interior may appoint a substitute to perform such duties. The Federal Commissioner shall be consulted on such appointment.

## § 23
### Rechtsstellung des Bundesbeauftragten für den Datenschutz

(1) Das Amtsverhältnis des Bundesbeauftragten für den Datenschutz beginnt mit der Aushändigung der Ernennungsurkunde. Es endet

1.  mit Ablauf der Amtszeit,

2.  mit der Entlassung.

Der Bundespräsident entlässt den Bundesbeauftragten, wenn dieser es verlangt oder auf Vorschlag der Bundesregierung, wenn Gründe vorliegen, die bei einem Richter auf Lebenszeit die Entlassung aus dem Dienst rechtfertigen. Im Fall der Beendigung des Amtsverhältnisses erhält der Bundesbeauftragte eine vom Bundespräsidenten vollzogene Urkunde. Eine Entlassung wird mit der Aushändigung der Urkunde wirksam. Auf Ersuchen des Bundesministers des Innern ist der Bundesbeauftragte verpflichtet, die Geschäfte bis zur Ernennung seines Nachfolgers weiterzuführen.

(2) Der Bundesbeauftragte darf neben seinem Amt kein anderes besoldetes Amt, kein Gewerbe und keinen Beruf ausüben und weder der Leitung oder dem Aufsichtsrat oder Verwaltungsrat eines auf Erwerb gerichteten Unternehmens noch einer Regierung oder einer gesetzgebenden Körperschaft des Bundes oder eines Landes angehören. Er darf nicht gegen Entgelt außergerichtliche Gutachten abgeben.

(3) Der Bundesbeauftragte hat dem Bundesministerium des Innern Mitteilung über Geschenke zu machen, die er in Bezug auf sein Amt erhält. Das Bundesministerium des Innern entscheidet über die Verwendung der Geschenke.

(4) Der Bundesbeauftragte ist berechtigt, über Personen, die ihm in seiner Eigenschaft als Bundesbeauftragter Tatsachen anvertraut haben, sowie über diese Tatsachen selbst das Zeugnis zu verweigern. Dies gilt auch für die Mitarbeiter des Bundesbeauftragten mit der Maßgabe, dass über die Ausübung dieses Rechts der Bundesbeauftragte entscheidet. Soweit das Zeugnisverweigerungsrecht des Bundesbeauftragten reicht, darf die Vorlegung oder Auslieferung von Akten oder anderen Schriftstücken von ihm nicht gefordert werden.

## Section 23
### Legal status of the Federal Commissioner for Data Protection

(1) The mandate of the Federal Commissioner for Data Protection shall commence on delivery of the certificate of appointment. It shall end

1.  on expiry of his term of office,

2.  on his dismissal.

The Federal President shall dismiss the Federal Commissioner at the latter's request or on a proposal by the Federal Government when there are grounds which, in the case of an established judge, justify dismissal from service. In the event of termination of office, the Federal Commissioner shall receive a document signed by the Federal President. Dismissal shall be effective on delivery of this document. If the Federal Minister of the Interior so requests, the Federal Commissioner shall be obliged to continue his work until a successor has been appointed.

(2) The Federal Commissioner shall not hold any other paid office or pursue any gainful activity or occupation in addition to his official duties and shall not belong to the management, supervisory board or board of directors of a profit-making enterprise nor to a government or a legislative body of the Federation or a *Land*. He may not deliver extra-judicial opinions in exchange for payment.

(3) The Federal Commissioner shall inform the Federal Ministry of the Interior of any gifts that he receives in the performance of his duties. The Federal Ministry of the Interior shall decide how such gifts shall be used.

(4) The Federal Commissioner shall be entitled to refuse to give testimony as a witness on persons who have entrusted information to him in his capacity as Federal Commissioner and on such information itself. This shall also apply to the staff of the Federal Commissioner, on condition that the Federal Commissioner decides on the exercise of this right. Within the scope of the Federal Commissioner's right to refuse to give testimony as a witness, he may not be required to submit or surrender files or other documents.

(5) Der Bundesbeauftragte ist, auch nach Beendigung seines Amtsverhältnisses, verpflichtet, über die ihm amtlich bekannt gewordenen Angelegenheiten Verschwiegenheit zu bewahren. Dies gilt nicht für Mitteilungen im dienstlichen Verkehr oder über Tatsachen, die offenkundig sind oder ihrer Bedeutung nach keiner Geheimhaltung bedürfen. Der Bundesbeauftragte darf, auch wenn er nicht mehr im Amt ist, über solche Angelegenheiten ohne Genehmigung des Bundesministeriums des Innern weder vor Gericht noch außergerichtlich aussagen oder Erklärungen abgeben. Unberührt bleibt die gesetzlich begründete Pflicht, Straftaten anzuzeigen und bei Gefährdung der freiheitlichen demokratischen Grundordnung für deren Erhaltung einzutreten. Für den Bundesbeauftragten und seine Mitarbeiter gelten die §§ 93, 97, 105 Abs. 1, § 111 Abs. 5 in Verbindung mit § 105 Abs. 1 sowie § 116 Abs. 1 der Abgabenordnung nicht. Satz 5 findet keine Anwendung, soweit die Finanzbehörden die Kenntnis für die Durchführung eines Verfahrens wegen einer Steuerstraftat sowie eines damit zusammenhängenden Steuerverfahrens benötigen, an deren Verfolgung ein zwingendes öffentliches Interesse besteht, oder soweit es sich um vorsätzlich falsche Angaben des Auskunftspflichtigen oder der für ihn tätigen Personen handelt. Stellt der Bundesbeauftragte einen Datenschutzverstoß fest, ist er befugt, diesen anzuzeigen und den Betroffenen hierüber zu informieren.

(6) Die Genehmigung, als Zeuge auszusagen, soll nur versagt werden, wenn die Aussage dem Wohle des Bundes oder eines deutschen Landes Nachteile bereiten oder die Erfüllung öffentlicher Aufgaben ernstlich gefährden oder erheblich erschweren würde. Die Genehmigung, ein Gutachten zu erstatten, kann versagt werden, wenn die Erstattung den dienstlichen Interessen Nachteile bereiten würde. § 28 des Bundesverfassungsgerichtsgesetzes bleibt unberührt.

(5) The Federal Commissioner shall be obliged, even after termination of his service, to maintain secrecy concerning information of which he has knowledge by reason of his duties. This shall not apply to communications made in the normal course of duties or concerning facts which are common knowledge or are not sufficiently important to warrant confidential treatment. The Federal Commissioner may not, even after leaving the service, make any pronouncements or statements either in or out of court concerning such matters without the consent of the Federal Ministry of the Interior. This provision shall not, however, affect his duty by law to report criminal offences and to take action to uphold the free democratic fundamental order whenever it is jeopardised. Sections 93, 97, 105 (1), Section 111 (5) in conjunction with Section 105 (1) and Section 116 (1) of the Fiscal Code shall not apply to the Federal Commissioner for Data Protection and his staff in so far as the fiscal authorities require such knowledge in order to conduct legal proceedings due to a tax offence and a related tax procedure, the prosecution of which is necessary on account of a compelling public interest, or in so far as the person obliged to provide information or persons acting on his behalf have intentionally provided false information. If the Federal Commissioner establishes a violation of data protection provisions, he shall be authorised to file charges and to inform the data subject accordingly.

(6) Consent to give testimony as a witness shall be refused only when such testimony would be to the detriment of the Federation or a *Land* or seriously jeopardise or impede the performance of public duties. Consent to deliver an opinion may be refused where it would be against the interest of the service. Section 28 of the Act on the Federal Constitutional Court shall remain unaffected.

(7) Der Bundesbeauftragte erhält vom Beginn des Kalendermonats an, in dem das Amtsverhältnis beginnt, bis zum Schluss des Kalendermonats, in dem das Amtsverhältnis endet, im Fall des Absatzes 1 Satz 6 bis zum Ende des Monats, in dem die Geschäftsführung endet, Amtsbezüge in Höhe der einem Bundesbeamten der Besoldungsgruppe B 9 zustehenden Besoldung. Das Bundesreisekostengesetz und das Bundesumzugskostengesetz sind entsprechend anzuwenden. Im Übrigen sind die §§ 13 bis 20 und 21a Abs. 5 des Bundesministergesetzes mit der Maßgabe anzuwenden, dass an die Stelle der zweijährigen Amtszeit in § 15 Abs. 1 des Bundesministergesetzes eine Amtszeit von fünf Jahren und an die Stelle der Besoldungsgruppe B 11 in § 21a Abs. 5 des Bundesministergesetzes die Besoldungsgruppe B 9 tritt. Abweichend von Satz 3 in Verbindung mit den §§ 15 bis 17 und 21a Abs. 5 des Bundesministergesetzes berechnet sich das Ruhegehalt des Bundesbeauftragten unter Hinzurechnung der Amtszeit als ruhegehaltsfähige Dienstzeit in entsprechender Anwendung des Beamtenversorgungsgesetzes, wenn dies günstiger ist und der Bundesbeauftragte sich unmittelbar vor seiner Wahl zum Bundesbeauftragten als Beamter oder Richter mindestens in dem letzten gewöhnlich vor Erreichen der Besoldungsgruppe B 9 zu durchlaufenden Amt befunden hat.[*]

(8) Absatz 5 Satz 5 bis 7 gilt entsprechend für die öffentlichen Stellen, die für die Kontrolle der Einhaltung der Vorschriften über den Datenschutz in den Ländern zuständig sind.

### § 24
### Kontrolle durch den Bundesbeauftragten für den Datenschutz

(1) Der Bundesbeauftragte für den Datenschutz kontrolliert bei den öffentlichen Stellen des Bundes die Einhaltung der Vorschriften dieses Gesetzes und anderer Vorschriften über den Datenschutz.

(2) Die Kontrolle des Bundesbeauftragten erstreckt sich auch auf

(7) From the beginning of the calendar month in which he commences his duties until the end of the calendar month in which he terminates his duties or, in the event of the sixth sentence of sub-section 1 above being applied, until the end of the month in which his activities cease, the Federal Commissioner shall receive the remuneration of a grade B 9 federal official. The Federal Act on Travel Expenses and the Federal Act on Removal Expenses shall apply *mutatis mutandis*. In all other respects, Sections 13 to 20 and 21a (5) of the Act on Federal Ministers shall apply, except that the period of office of two years provided in Section 15 (1) of the Act on Federal Ministers shall be replaced by a period of office of five years and pay grade B 11 as stipulated in Section 21a (5) of the Act on Federal Ministers shall be replaced by pay grade B 9. Notwithstanding the third sentence above in conjunction with Sections 15 to 17 and 21a (5) of the Act on Federal Ministers, the pension of the Federal Commissioner shall be calculated, taking account of the pensionable period of service, on the basis of the Civil Servants Pensions Act if this is more favourable and if, immediately before his election, the Federal Commissioner held as a civil servant or judge at least the last position customarily required before reaching the B 9 pay grade.

(8) Sentences 5 to 7 of Section 5 shall apply *mutatis mutandis* to the public bodies which are responsible for monitoring compliance with the provisions on data protection in the individual *Länder*.

### Section 24
### Monitoring by the Federal Commissioner for Data Protection

(1) The Federal Commissioner for Data Protection shall monitor compliance with the provisions of this Act and other data protection provisions by public bodies of the Federation.

(2) Monitoring by the Federal Commissioner shall also extend to

---

[*] Gemäß Artikel 3 Nr. 2 des Versorgungsänderungsgesetzes 2001 vom 20. Dezember 2001 (BGBl. I S. 3926) ist am 1. Januar 2003 § 23 Abs. 7 wie folgt geändert worden:
a) Satz 3 wird wie folgt gefasst:
„Im Übrigen sind die §§ 13 bis 20 und 21a Abs. 5 des Bundesministergesetzes mit den Maßgaben anzuwenden, dass an die Stelle der zweijährigen Amtszeit in § 15 Abs. 1 des Bundesministergesetzes eine Amtszeit von fünf Jahren und an die Stelle der Besoldungsgruppe B 11 in § 21a Abs. 5 des Bundesministergesetzes die Besoldungsgruppe B 9 tritt."
b) In Satz 4 wird die Angabe „§§ 15 bis 17" durch die Angabe „§§ 15 bis 17 und 21a Abs. 5" ersetzt.

1. von öffentlichen Stellen des Bundes erlangte personenbezogene Daten über den Inhalt und die näheren Umstände des Brief-, Post- und Fernmeldeverkehrs und

2. personenbezogene Daten, die einem Berufs- oder besonderen Amtsgeheimnis, insbesondere dem Steuergeheimnis nach § 30 der Abgabenordnung, unterliegen.

Das Grundrecht des Brief-, Post- und Fernmeldegeheimnisses des Artikels 10 des Grundgesetzes wird insoweit eingeschränkt. Personenbezogene Daten, die der Kontrolle durch die Kommission nach § 15 des Artikel 10-Gesetzes unterliegen, unterliegen nicht der Kontrolle durch den Bundesbeauftragten, es sei denn, die Kommission ersucht den Bundesbeauftragten, die Einhaltung der Vorschriften über den Datenschutz bei bestimmten Vorgängen oder in bestimmten Bereichen zu kontrollieren und ausschließlich ihr darüber zu berichten. Der Kontrolle durch den Bundesbeauftragten unterliegen auch nicht personenbezogene Daten in Akten über die Sicherheitsüberprüfung, wenn der Betroffene der Kontrolle der auf ihn bezogenen Daten im Einzelfall gegenüber dem Bundesbeauftragten widerspricht.

(3) Die Bundesgerichte unterliegen der Kontrolle des Bundesbeauftragten nur, soweit sie in Verwaltungsangelegenheiten tätig werden.

(4) Die öffentlichen Stellen des Bundes sind verpflichtet, den Bundesbeauftragten und seine Beauftragten bei der Erfüllung ihrer Aufgaben zu unterstützen. Ihnen ist dabei insbesondere

1. Auskunft zu ihren Fragen sowie Einsicht in alle Unterlagen, insbesondere in die gespeicherten Daten und in die Datenverarbeitungsprogramme, zu gewähren, die im Zusammenhang mit der Kontrolle nach Absatz 1 stehen,

2. jederzeit Zutritt in alle Diensträume zu gewähren.

Die in § 6 Abs. 2 und § 19 Abs. 3 genannten Behörden gewähren die Unterstützung nur dem Bundesbeauftragten selbst und den von ihm schriftlich besonders Beauftragten. Satz 2 gilt für diese Behörden nicht, soweit die oberste Bundesbehörde im Einzelfall feststellt, dass die Auskunft oder Einsicht die Sicherheit des Bundes oder eines Landes gefährden würde.

1. personal data obtained by public bodies of the Federation on the contents of and the specific circumstances relating to correspondence, postal communications and telecommunications and

2. personal data subject to professional or special official secrecy, especially tax secrecy under Section 30 of the Tax Code.

The fundamental right to privacy of correspondence, posts and telecommunications as enshrined in Article 10 of the Basic Law is in so far curtailed. Personal data subject to monitoring by the commission set up under Section 15 of the Act on Article 10 shall not be subject to monitoring by the Federal Commissioner for Data Protection unless the commission requests the Federal Commissioner to monitor compliance with data protection provisions in connection with specific procedures or in specific areas and to report thereon exclusively to it. Personal data in files on the security check shall not be subject to monitoring by the Federal Commissioner if the data subject files a complaint with the Federal Commissioner objecting to monitoring of the data relating to his person in the individual case concerned.

(3) The activities of judges at federal courts which directly serve the purposes of adjudication shall be exempted from monitoring.

(4) Public bodies of the Federation shall be obliged to support the Federal Commissioner and his assistants in the performance of their duties. In particular they shall be granted

1. information in reply to their questions as well as the opportunity to inspect all documents, especially stored data and data processing programs, connected with the monitoring referred to in subsection 1 above,

2. access to all official premises at any time.

The authorities referred to in Sections 6 (2) and 19 (3) of this Act shall afford support exclusively to the Federal Commissioner himself and the assistants appointed by him in writing. The second sentence above shall not apply to such authorities where the supreme federal authority establishes in a particular case that such information or inspection would jeopardise the security of the Federation or a *Land*.

(5) Der Bundesbeauftragte teilt das Ergebnis seiner Kontrolle der öffentlichen Stelle mit. Damit kann er Vorschläge zur Verbesserung des Datenschutzes, insbesondere zur Beseitigung von festgestellten Mängeln bei der Verarbeitung oder Nutzung personenbezogener Daten, verbinden. § 25 bleibt unberührt.

(6) Absatz 2 gilt entsprechend für die öffentlichen Stellen, die für die Kontrolle der Einhaltung der Vorschriften über den Datenschutz in den Ländern zuständig sind.

§ 25
Beanstandungen durch den Bundesbeauftragten für den Datenschutz

(1) Stellt der Bundesbeauftragte für den Datenschutz Verstöße gegen die Vorschriften dieses Gesetzes oder gegen andere Vorschriften über den Datenschutz oder sonstige Mängel bei der Verarbeitung oder Nutzung personenbezogener Daten fest, so beanstandet er dies

1. bei der Bundesverwaltung gegenüber der zuständigen obersten Bundesbehörde,

2. beim Bundeseisenbahnvermögen gegenüber dem Präsidenten,

3. bei den aus dem Sondervermögen Deutsche Bundespost durch Gesetz hervorgegangenen Unternehmen, solange ihnen ein ausschließliches Recht nach dem Postgesetz zusteht, gegenüber deren Vorständen,

4. bei den bundesunmittelbaren Körperschaften, Anstalten und Stiftungen des öffentlichen Rechts sowie bei Vereinigungen solcher Körperschaften, Anstalten und Stiftungen gegenüber dem Vorstand oder dem sonst vertretungsberechtigten Organ

und fordert zur Stellungnahme innerhalb einer von ihm zu bestimmenden Frist auf. In den Fällen von Satz 1 Nr. 4 unterrichtet der Bundesbeauftragte gleichzeitig die zuständige Aufsichtsbehörde.

(2) Der Bundesbeauftragte kann von einer Beanstandung absehen oder auf eine Stellungnahme der betroffenen Stelle verzichten, insbesondere wenn es sich um unerhebliche oder inzwischen beseitigte Mängel handelt.

(3) Die Stellungnahme soll auch eine Darstellung der Maßnahmen enthalten, die aufgrund der Beanstandung des Bundesbeauftragten getroffen worden sind. Die in Absatz 1 Satz 1 Nr. 4 genannten Stellen leiten der zuständigen Aufsichtsbehörde gleichzeitig eine Abschrift ihrer Stellungnahme an den Bundesbeauftragten zu.

(5) The Federal Commissioner shall inform the public body of the results of his monitoring. He may combine them with proposals for improving data protection, especially for rectifying irregularities discovered in the processing or use of personal data. Section 25 of this Act shall remain unaffected.

(6) Sub-section 2 above shall apply *mutatis mutandis* to public bodies responsible for monitoring compliance with data protection provisions in the *Länder*.

Section 25
Complaints lodged by the Federal Commissioner for Data Protection

(1) Should the Federal Commissioner for Data Protection discover infringements of this Act or of other data protection provisions or other irregularities in the processing or use of personal data, he shall lodge a complaint

1. in the case of the federal administration, with the competent supreme federal authority,

2. in the case of the Federal Railway Property, with the President,

3. in the case of the successor companies created from the Special Fund *Deutsche Bundespost* by act of law, as long as they have an exclusive right under the Postal Law, with their managing boards,

4. in the case of federal corporations, establishments and foundations under public law as well as associations of such corporations, establishments and foundations, with the managing board or the relevant representative body

and shall request a statement by a date which he shall determine. In the cases referred to in No. 4 of the first sentence above, the Federal Commissioner shall at the same time inform the competent supervisory authority.

(2) The Federal Commissioner may dispense with a complaint or with a statement from the body concerned especially if the irregularities involved are insignificant or have meanwhile been rectified.

(3) The statement to be delivered should also describe the measures taken as a result of the Federal Commissioner's complaint. The bodies referred to in No. 4 of the first sentence of sub-section 1 above shall submit to the competent supervisory authority a copy of the statement communicated to the Federal Commissioner.

## § 26
### Weitere Aufgaben des Bundesbeauf-
### tragten für den Datenschutz

(1) Der Bundesbeauftragte für den Daten-
schutz erstattet dem Deutschen Bundestag
alle zwei Jahre einen Tätigkeitsbericht. Er
unterrichtet den Deutschen Bundestag und
die Öffentlichkeit über wesentliche Ent-
wicklungen des Datenschutzes.

(2) Auf Anforderung des Deutschen Bun-
destages oder der Bundesregierung hat
der Bundesbeauftragte Gutachten zu
erstellen und Berichte zu erstatten. Auf
Ersuchen des Deutschen Bundestages,
des Petitionsausschusses, des Innenaus-
schusses oder der Bundesregierung geht
der Bundesbeauftragte ferner Hinweisen
auf Angelegenheiten und Vorgänge des
Datenschutzes bei den öffentlichen Stellen
des Bundes nach. Der Bundesbeauftragte
kann sich jederzeit an den Deutschen Bun-
destag wenden.

(3) Der Bundesbeauftragte kann der Bun-
desregierung und den in § 12 Abs. 1 ge-
nannten Stellen des Bundes Empfehlungen
zur Verbesserung des Datenschutzes ge-
ben und sie in Fragen des Datenschutzes
beraten. Die in § 25 Abs. 1 Nr. 1 bis 4 ge-
nannten Stellen sind durch den Bundesbe-
auftragten zu unterrichten, wenn die Emp-
fehlung oder Beratung sie nicht unmittelbar
betrifft.

(4) Der Bundesbeauftragte wirkt auf die
Zusammenarbeit mit den öffentlichen Stel-
len, die für die Kontrolle der Einhaltung der
Vorschriften über den Datenschutz in den
Ländern zuständig sind, sowie mit den
Aufsichtsbehörden nach § 38 hin. § 38
Abs. 1 Satz 3 und 4 gilt entsprechend.

### Dritter Abschnitt
### Datenverarbeitung nicht-öffentlicher
### Stellen und öffentlich-rechtlicher Wett-
### bewerbsunternehmen

### Erster Unterabschnitt
### Rechtsgrundlagen der Datenverarbei-
### tung

## § 27
### Anwendungsbereich

(1) Die Vorschriften dieses Abschnittes
finden Anwendung, soweit personenbezo-
gene Daten unter Einsatz von Datenverar-
beitungsanlagen verarbeitet, genutzt oder
dafür erhoben werden oder die Daten in
oder aus nicht automatisierten Dateien
verarbeitet, genutzt oder dafür erhoben
werden durch

1.  nicht-öffentliche Stellen,

## Section 26
### Further duties of the Federal Commis-
### sioner for Data Protection

(1) The Federal Commissioner for Data
Protection shall submit an activity report to
the *Bundestag* every two years. Such re-
port should inform the *Bundestag* and the
public on key developments in the field of
data protection.

(2) When so requested by the *Bundestag*
or the Federal Government, the Federal
Commissioner shall draw up opinions and
reports. When so requested by the *Bunde-
stag*, the Petitions Committee, the Internal
Affairs Committee or the Federal Govern-
ment, the Federal Commissioner shall also
investigate data protection matters and
occurrences at public bodies of the Fed-
eration. The Federal Commissioner may at
any time consult the *Bundestag*.

(3) The Federal Commissioner may make
recommendations on the improvement of
data protection to the Federal Government
and to the bodies of the Federation referred
to in Section 12 (1) of this Act and may
advise them in matters regarding data
protection. The bodies referred to in Nos. 1
to 4 of Section 25 (1) of this Act shall be
informed by the Federal Commissioner
when the recommendation or advice does
not concern them directly.

(4) The Federal Commissioner shall seek
cooperation with public bodies responsible
for monitoring compliance with data protec-
tion provisions in the *Länder* and with su-
pervisory authorities under Section 38 of
this Act. Sentences 3 and 4 of Section 38
(1) shall apply *mutatis mutandis*.

### Part III
### Data processing by private bodies and
### public-law enterprises participating in
### competition

### Chapter I
### Legal basis for data processing

## Section 27
### Scope

(1) The provisions of this Part shall apply
in so far as personal data are processed or
used by means of data processing systems
or collected for such purposes, or in so far
as data are processed or used in or from
automated filing systems or collected for
such purposes by

1.  private bodies,

2.  a) öffentliche Stellen des Bundes, soweit sie als öffentlich-rechtliche Unternehmen am Wettbewerb teilnehmen,

    b) öffentliche Stellen der Länder, soweit sie als öffentlich-rechtliche Unternehmen am Wettbewerb teilnehmen, Bundesrecht ausführen und der Datenschutz nicht durch Landesgesetz geregelt ist.

Dies gilt nicht, wenn die Erhebung, Verarbeitung oder Nutzung der Daten ausschließlich für persönliche oder familiäre Tätigkeiten erfolgt. In den Fällen der Nummer 2 Buchstabe a gelten anstelle des § 38 die §§ 18, 21 und 24 bis 26.

(2) Die Vorschriften dieses Abschnittes gelten nicht für die Verarbeitung und Nutzung personenbezogener Daten außerhalb von nicht automatisierten Dateien, soweit es sich nicht um personenbezogene Daten handelt, die offensichtlich aus einer automatisierten Verarbeitung entnommen worden sind.

## § 28
### Datenerhebung, -verarbeitung und -nutzung für eigene Zwecke

(1) Das Erheben, Speichern, Verändern oder Übermitteln personenbezogener Daten oder ihre Nutzung als Mittel für die Erfüllung eigener Geschäftszwecke ist zulässig,

1.  wenn es der Zweckbestimmung eines Vertragsverhältnisses oder vertragsähnlichen Vertrauensverhältnisses mit dem Betroffenen dient,

2.  soweit es zur Wahrung berechtigter Interessen der verantwortlichen Stelle erforderlich ist und kein Grund zu der Annahme besteht, dass das schutzwürdige Interesse des Betroffenen an dem Ausschluss der Verarbeitung oder Nutzung überwiegt, oder

3.  wenn die Daten allgemein zugänglich sind oder die verantwortliche Stelle sie veröffentlichen dürfte, es sei denn, dass das schutzwürdige Interesse des Betroffenen an dem Ausschluss der Verarbeitung oder Nutzung gegenüber dem berechtigten Interesse der verantwortlichen Stelle offensichtlich überwiegt.

Bei der Erhebung personenbezogener Daten sind die Zwecke, für die die Daten verarbeitet oder genutzt werden sollen, konkret festzulegen.

(2) Für einen anderen Zweck dürfen sie nur unter den Voraussetzungen des Absatzes 1 Satz 1 Nr. 2 und 3 übermittelt oder genutzt werden.

2.  a) public bodies of the Federation in so far as they participate in competition as public-law enterprises,

    b) public bodies of the *Länder* in so far as they participate in competition as public-law enterprises, execute federal law and data protection is not governed by *Land* legislation.

This shall not apply where the collection, processing or use of such data is effected solely for personal or family activities. In the cases referred to in No. 2 a) above, Sections 18, 21 and 24 to 26 shall apply instead of Section 38.

(2) The provisions of this Part shall not apply to the processing and use of personal data outside of non-automated filing systems in so far as they are not personal data clearly taken from an automated processing operation.

## Section 28
### Collection, processing and use of data for own purposes

(1) The collection, storage, modification or transfer of personal data or their use as a means of fulfilling one's own business purposes shall be admissible

1.  in accordance with the purposes of a contract or a quasi-contractual fiduciary relationship with the data subject,

2.  in so far as this is necessary to safeguard justified interests of the controller of the filing system and there is no reason to assume that the data subject has an overriding legitimate interest in his data being excluded from processing or use,

3.  if the data is generally accessible or the controller of the filing system would be entitled to publish them, unless the data subject's legitimate interest in his data being excluded from processing or use clearly outweighs the justified interest of the controller of the filing system.

In connection with the collection of personal data, the purposes for which the data are to be processed or used are to be stipulated in concrete terms.

(2) Transfer or use for another purpose shall be admissible only if the requirements of Section 1, sentence 1, Nos. 2 and 3 are met.

(3) Die Übermittlung oder Nutzung für einen anderen Zweck ist auch zulässig:

1. soweit es zur Wahrung berechtigter Interessen eines Dritten oder

2. zur Abwehr von Gefahren für die staatliche und öffentliche Sicherheit sowie zur Verfolgung von Straftaten erforderlich ist, oder

3. für Zwecke der Werbung, der Markt- und Meinungsforschung, wenn es sich um listenmäßig oder sonst zusammengefasste Daten über Angehörige einer Personengruppe handelt, die sich auf

   a) eine Angabe über die Zugehörigkeit des Betroffenen zu dieser Personengruppe,

   b) Berufs-, Branchen- oder Geschäftsbezeichnung,

   c) Namen,

   d) Titel,

   e) akademische Grade,

   f) Anschrift und

   g) Geburtsjahr

   beschränken

und kein Grund zu der Annahme besteht, dass der Betroffene ein schutzwürdiges Interesse an dem Ausschluss der Übermittlung oder Nutzung hat, oder

4. wenn es im Interesse einer Forschungseinrichtung zur Durchführung wissenschaftlicher Forschung erforderlich ist, das wissenschaftliche Interesse an der Durchführung des Forschungsvorhabens das Interesse des Betroffenen an dem Ausschluss der Zweckänderung erheblich überwiegt und der Zweck der Forschung auf andere Weise nicht oder nur mit unverhältnismäßigem Aufwand erreicht werden kann.

In den Fällen des Satzes 1 Nr. 3 ist anzunehmen, dass dieses Interesse besteht, wenn im Rahmen der Zweckbestimmung eines Vertragsverhältnisses oder vertragsähnlichen Vertrauensverhältnisses gespeicherte Daten übermittelt werden sollen, die sich

1. auf strafbare Handlungen,

2. auf Ordnungswidrigkeiten sowie

3. bei Übermittlung durch den Arbeitgeber auf arbeitsrechtliche Rechtsverhältnisse

beziehen.

---

(3) Transfer or use for another purpose shall also be admissible:

1. in so far as it is necessary to protect the justified interests of a third party or

2. to avert threats to the state security and public safety and to prosecute criminal offences or

3. for purposes of advertising, market and opinion research if the data, compiled in lists or otherwise combined, concern members of a group of persons and are restricted to

   a) the data subject's membership of this group of persons,

   b) occupation or type of business,

   c) name,

   d) title,

   e) academic degrees,

   f) address and

   g) year of birth

and if there is no reason to assume that the data subject has a legitimate interest in his data being excluded from transfer, or

4. if this is necessary in the interest of a research institute for the conduct of scientific research, if scientific interest in conduct of the research project substantially outweighs the interest of the data subject in excluding the change of purpose and if the research purpose cannot be attained by other means or can be attained thus only with disproportionate effort.

In the cases referred to in the first sentence of No. 3, it is to be assumed that such interest exists where data are to be transferred which were stored for the purposes of a contract or a quasi-contractual fiduciary relationship and which concern

1. criminal offences,

2. administrative offences and,

3. when transferred by the employer, to the legal status under labour law.

(4) Widerspricht der Betroffene bei der verantwortlichen Stelle der Nutzung oder Übermittlung seiner Daten für Zwecke der Werbung oder der Markt- oder Meinungsforschung, ist eine Nutzung oder Übermittlung für diese Zwecke unzulässig. Der Betroffene ist bei der Ansprache zum Zweck der Werbung oder der Markt- oder Meinungsforschung über die verantwortliche Stelle sowie über das Widerspruchsrecht nach Satz 1 zu unterrichten; soweit der Ansprechende personenbezogene Daten des Betroffenen nutzt, die bei einer ihm nicht bekannten Stelle gespeichert sind, hat er auch sicherzustellen, dass der Betroffene Kenntnis über die Herkunft der Daten erhalten kann. Widerspricht der Betroffene bei dem Dritten, dem die Daten nach Absatz 3 übermittelt werden, der Verarbeitung oder Nutzung für Zwecke der Werbung oder der Markt- oder Meinungsforschung, hat dieser die Daten für diese Zwecke zu sperren.

(5) Der Dritte, dem die Daten übermittelt worden sind, darf diese nur für den Zweck verarbeiten oder nutzen, zu dessen Erfüllung sie ihm übermittelt werden. Eine Verarbeitung oder Nutzung für andere Zwecke ist nicht-öffentlichen Stellen nur unter den Voraussetzungen der Absätze 2 und 3 und öffentlichen Stellen nur unter den Voraussetzungen des § 14 Abs. 2 erlaubt. Die übermittelnde Stelle hat ihn darauf hinzuweisen.

(6) Das Erheben, Verarbeiten und Nutzen von besonderen Arten personenbezogener Daten (§ 3 Abs. 9) für eigene Geschäftszwecke ist zulässig, soweit nicht der Betroffene nach Maßgabe des § 4a Abs. 3 eingewilligt hat, wenn

1. dies zum Schutz lebenswichtiger Interessen des Betroffenen oder eines Dritten erforderlich ist, sofern der Betroffene aus physischen oder rechtlichen Gründen außerstande ist, seine Einwilligung zu geben,

2. es sich um Daten handelt, die der Betroffene offenkundig öffentlich gemacht hat,

3. dies zur Geltendmachung, Ausübung oder Verteidigung rechtlicher Ansprüche erforderlich ist und kein Grund zu der Annahme besteht, dass das schutzwürdige Interesse des Betroffenen an dem Ausschluss der Erhebung, Verarbeitung oder Nutzung überwiegt, oder

(4) If the data subject objects vis-à-vis the controller of the filing system to the use or transfer of his data for purposes of advertising or of market opinion research, use or transfer for such purposes shall be inadmissible. In approaching the data subject for the purpose of advertising or market or opinion research, the data subject shall be informed of the identity of the controller and the right of objections in accordance with sentence 1 above; in so far as the party approaching the data subject uses personal data of the latter which are stored by a body which is unknown to him, he shall also ensure that the data subject is able to obtain information on the origin of the data. If the data subject lodges an objection to the processing or use of the data for the purpose of advertising or market or opinion research with the third party to whom the data are transferred pursuant to sub-section 3, the latter shall block the data for these purposes.

(5) The third party to whom the data have been transferred may process or use the transferred data only for the purpose for which they were transferred to him. Processing or use for other purposes shall be admissible for private bodies only if the requirements of sub-sections 1 and 2 above are met and for public bodies only if the requirements of Section 14 (2) are met. The transferring body shall point this out to the third party.

(6) The collection, processing and use of special types of personal data (Section 3 (9)) for own business purposes shall be admissible when the data subject has not consented in accordance with Section 4a (3) if

1. this is necessary in order to protect vital interests of the data subject or of a third party, in so far as the data subject is unable to give his consent for physical or legal reasons,

2. the data concerned has evidently been made public by the data subject,

3. this is necessary in order to assert, exercise or defend legal claims and there is no reason to assume that the data subject has an overriding legitimate interest in excluding such collection, processing or use, or

4. dies zur Durchführung wissenschaftlicher Forschung erforderlich ist, das wissenschaftliche Interesse an der Durchführung des Forschungsvorhabens das Interesse des Betroffenen an dem Ausschluss der Erhebung, Verarbeitung und Nutzung erheblich überwiegt und der Zweck der Forschung auf andere Weise nicht oder nur mit unverhältnismäßigem Aufwand erreicht werden kann.

(7) Das Erheben von besonderen Arten personenbezogener Daten (§ 3 Abs. 9) ist ferner zulässig, wenn dies zum Zweck der Gesundheitsvorsorge, der medizinischen Diagnostik, der Gesundheitsversorgung oder Behandlung oder für die Verwaltung von Gesundheitsdiensten erforderlich ist und die Verarbeitung dieser Daten durch ärztliches Personal oder durch sonstige Personen erfolgt, die einer entsprechenden Geheimhaltungspflicht unterliegen. Die Verarbeitung und Nutzung von Daten zu den in Satz 1 genannten Zwecken richtet sich nach den für die in Satz 1 genannten Personen geltenden Geheimhaltungspflichten. Werden zu einem in Satz 1 genannten Zweck Daten über die Gesundheit von Personen durch Angehörige eines anderen als in § 203 Abs. 1 und 3 des Strafgesetzbuchs genannten Berufes, dessen Ausübung die Feststellung, Heilung oder Linderung von Krankheiten oder die Herstellung oder den Vertrieb von Hilfsmitteln mit sich bringt, erhoben, verarbeitet oder genutzt, ist dies nur unter den Voraussetzungen zulässig, unter denen ein Arzt selbst hierzu befugt wäre.

(8) Für einen anderen Zweck dürfen die besonderen Arten personenbezogener Daten (§ 3 Abs. 9) nur unter den Voraussetzungen des Absatzes 6 Nr. 1 bis 4 oder des Absatzes 7 Satz 1 übermittelt oder genutzt werden. Eine Übermittlung oder Nutzung ist auch zulässig, wenn dies zur Abwehr von erheblichen Gefahren für die staatliche und öffentliche Sicherheit sowie zur Verfolgung von Straftaten von erheblicher Bedeutung erforderlich ist.

(9) Organisationen, die politisch, philosophisch, religiös oder gewerkschaftlich ausgerichtet sind und keinen Erwerbszweck verfolgen, dürfen besondere Arten personenbezogener Daten (§ 3 Abs. 9) erheben, verarbeiten oder nutzen, soweit dies für die Tätigkeit der Organisation erforderlich ist. Dies gilt nur für personenbezogene Daten ihrer Mitglieder oder von Personen, die im Zusammenhang mit deren Tätigkeitszweck regelmäßig Kontakte mit ihr unterhalten. Die Übermittlung dieser personenbezogenen Daten an Personen oder Stellen außerhalb der Organisation ist nur unter den Voraussetzungen des § 4a Abs. 3 zulässig. Absatz 3 Nr. 2 gilt entsprechend.

4. this is necessary for the purposes of scientific research, where the scientific interest in carrying out the research project substantially outweighs the data subject's interest in excluding collection, processing and use and the purpose of the research cannot be achieved in any other way or would otherwise necessitate disproportionate effort.

(7) The collection of special types of personal data (Section 3 (9)) shall further be admissible if this is necessary for the purposes of preventive medicine, medical diagnosis, health care or treatment or the administration of health services and the processing of these data is carried out by medical personnel or other persons who are subject to an obligation to maintain secrecy. The processing and use of data for the purposes stated in sentence 1 shall be subject to the obligations to maintain secrecy which apply to the persons stated in sentence 1. The collection, processing or use of data on the health of persons by members of a profession other than those stipulated in Section 203 (1) and (3) of the Penal Code, the exercising of which profession involves determining, curing or alleviating illnesses or producing or selling aids shall be admissible only under those conditions according to which a doctor would also be authorised for these purposes.

(8) Special types of personal data (Section 3 (9)) may be transferred or used only if the requirements of sub-section 6, Nos. 1 to 4 or the first sentence of sub-section 7 are met. Transfer or use shall also be admissible if necessary to avert substantial threats to state security or public safety and to prosecute major criminal offences.

(9) Organisations of a political, philosophical or religious nature and trade union organisations may collect, process or use special types of personal data (Section 3 (9)) in so far as this is necessary for the organisation's activities. This shall apply only to personal data of their members or of persons who maintain regular contact with the organisations in connection with the purposes of their activities. The transfer of these personal data to persons or bodies outside of the organisation concerned shall be admissible only if the requirements of Section 4a (3) are met. Sub-section 3, No. 2 shall apply *mutatis mutandis*.

## § 29
### Geschäftsmäßige Datenerhebung und -speicherung zum Zweck der Übermittlung

(1) Das geschäftsmäßige Erheben, Speichern oder Verändern personenbezogener Daten zum Zweck der Übermittlung, insbesondere wenn dies der Werbung, der Tätigkeit von Auskunfteien, dem Adresshandel oder der Markt- und Meinungsforschung dient, ist zulässig, wenn

1. kein Grund zu der Annahme besteht, dass der Betroffene ein schutzwürdiges Interesse an dem Ausschluss der Erhebung, Speicherung oder Veränderung hat, oder

2. die Daten aus allgemein zugänglichen Quellen entnommen werden können oder die verantwortliche Stelle sie veröffentlichen dürfte, es sei denn, dass das schutzwürdige Interesse des Betroffenen an dem Ausschluss der Erhebung, Speicherung oder Veränderung offensichtlich überwiegt.

§ 28 Abs. 1 Satz 2 ist anzuwenden.

(2) Die Übermittlung im Rahmen der Zwecke nach Absatz 1 ist zulässig, wenn

1. a) der Dritte, dem die Daten übermittelt werden, ein berechtigtes Interesse an ihrer Kenntnis glaubhaft dargelegt hat oder

   b) es sich um listenmäßig oder sonst zusammengefasste Daten nach § 28 Abs. 3 Nr. 3 handelt, die für Zwecke der Werbung oder der Markt- oder Meinungsforschung übermittelt werden sollen, und

2. kein Grund zu der Annahme besteht, dass der Betroffene ein schutzwürdiges Interesse an dem Ausschluss der Übermittlung hat.

§ 28 Abs. 3 Satz 2 gilt entsprechend. Bei der Übermittlung nach Nummer 1 Buchstabe a sind die Gründe für das Vorliegen eines berechtigten Interesses und die Art und Weise ihrer glaubhaften Darlegung von der übermittelnden Stelle aufzuzeichnen. Bei der Übermittlung im automatisierten Abrufverfahren obliegt die Aufzeichnungspflicht dem Dritten, dem die Daten übermittelt werden.

## Section 29
### Collection and storage of data in the course of business for the purpose of transfer

(1) The collection, storage or modification of personal data in the course of business for the purpose of transfer, in particular when this serves the purposes of advertising, the activities of credit inquiry agencies, trading in addresses or market or opinion research, shall be admissible if

1. there is no reason to assume that the data subject has a legitimate interest in excluding such collection, storage or modification, or

2. the data are retrievable from generally accessible sources or the controller would be permitted to publish them, unless the data subject clearly has an overriding legitimate interest in excluding such collection, storage or modification.

The first sentence of Section 28 (1) shall be applied.

(2) Transfer for the purposes specified in sub-section 1 shall be admissible if

1. a) the third party to whom the data are transferred credibly proves a justified interest in knowledge of the data or

   b) the data pursuant to Section 28 (3), No. 3 of this Act have been compiled in lists or otherwise combined and are to be transferred for purposes of advertising or of market or opinion research and

2. there is no reason to assume that the data subject has a legitimate interest in his data being excluded from transfer.

The second sentence of Section 28 (3) of this Act shall apply *mutatis mutandis*. In the case of transfer under No. 1 (a) above, the reasons for the existence of a justified interest and the means of credibly presenting them shall be recorded by the transferring body. In the case of transfer through automated retrieval, such recording shall be required of the third party to whom the data are transferred.

(3) Die Aufnahme personenbezogener Daten in elektronische oder gedruckte Adress-, Telefon-, Branchen- oder vergleichbare Verzeichnisse hat zu unterbleiben, wenn der entgegenstehende Wille des Betroffenen aus dem zugrunde liegenden elektronischen oder gedruckten Verzeichnis oder Register ersichtlich ist. Der Empfänger der Daten hat sicherzustellen, dass Kennzeichnungen aus elektronischen oder gedruckten Verzeichnissen oder Registern bei der Übernahme in Verzeichnisse oder Register übernommen werden.

(4) Für die Verarbeitung oder Nutzung der übermittelten Daten gilt § 28 Abs. 4 und 5.

(5) § 28 Abs. 6 bis 9 gilt entsprechend.

§ 30
Geschäftsmäßige Datenerhebung und -speicherung zum Zweck der Übermittlung in anonymisierter Form

(1) Werden personenbezogene Daten geschäftsmäßig erhoben und gespeichert, um sie in anonymisierter Form zu übermitteln, sind die Merkmale gesondert zu speichern, mit denen Einzelangaben über persönliche oder sachliche Verhältnisse einer bestimmten oder bestimmbaren natürlichen Person zugeordnet werden können. Diese Merkmale dürfen mit den Einzelangaben nur zusammengeführt werden, soweit dies für die Erfüllung des Zwecks der Speicherung oder zu wissenschaftlichen Zwecken erforderlich ist.

(2) Die Veränderung personenbezogener Daten ist zulässig, wenn

1. kein Grund zu der Annahme besteht, dass der Betroffene ein schutzwürdiges Interesse an dem Ausschluss der Veränderung hat, oder

2. die Daten aus allgemein zugänglichen Quellen entnommen werden können oder der die verantwortliche Stelle sie veröffentlichen dürfte, soweit nicht das schutzwürdige Interesse des Betroffenen an dem Ausschluss der Veränderung offensichtlich überwiegt.

(3) Die personenbezogenen Daten sind zu löschen, wenn ihre Speicherung unzulässig ist.

(4) § 29 gilt nicht.

(5) § 28 Abs. 6 bis 9 gilt entsprechend.

(3) Personal data are not to be included in electronic or printed address, telephone, classified or similar directories if it is evident from the electronic or printed directory or register that such inclusion is contrary to the will of the data subject. The recipient of the data shall ensure that labels from electronic or printed directories or registers are retained upon adoption into directories or registers.

(4) Section 28 (4) and (5) shall apply to processing or use of the transferred data.

(5) Section 28 (6) to (9) shall apply *mutatis mutandis.*

Section 30
Collection and storage of data in the course of business for the purpose of transfer in anonymised form

(1) If personal data are collected and stored in the course of business in order to transfer them in anonymised form, the characteristics enabling information concerning personal or material circumstances to be attributed to an identified or identifiable individual shall be stored separately. Such characteristics may be combined with the information only where necessary for storage or scientific purposes.

(2) The modification of personal data shall be admissible if

1. there is no reason to assume that the data subject has a legitimate interest in his data being excluded from modification or

2. the data can be taken from generally accessible sources or the controller of the filing system would be entitled to publish them, unless the data subject clearly has an overriding legitimate interest in his data being excluded from modification.

(3) Personal data shall be erased if their storage is inadmissible.

(4) Section 29 shall not apply.

(5) Section 28 (6) to (9) shall apply *mutatis mutandis.*

## § 31
### Besondere Zweckbindung

Personenbezogene Daten, die ausschließlich zu Zwecken der Datenschutzkontrolle, der Datensicherung oder zur Sicherstellung eines ordnungsgemäßen Betriebes einer Datenverarbeitungsanlage gespeichert werden, dürfen nur für diese Zwecke verwendet werden.

## § 32

*weggefallen*

## Zweiter Unterabschnitt
### Rechte des Betroffenen

## § 33
### Benachrichtigung des Betroffenen

(1) Werden erstmals personenbezogene Daten für eigene Zwecke ohne Kenntnis des Betroffenen gespeichert, ist der Betroffene von der Speicherung, der Art der Daten, der Zweckbestimmung der Erhebung, Verarbeitung oder Nutzung und der Identität der verantwortlichen Stelle zu benachrichtigen. Werden personenbezogene Daten geschäftsmäßig zum Zweck der Übermittlung ohne Kenntnis des Betroffenen gespeichert, ist der Betroffene von der erstmaligen Übermittlung und der Art der übermittelten Daten zu benachrichtigen. Der Betroffene ist in den Fällen der Sätze 1 und 2 auch über die Kategorien von Empfängern zu unterrichten, soweit er nach den Umständen des Einzelfalles nicht mit der Übermittlung an diese rechnen muss.

(2) Eine Pflicht zur Benachrichtigung besteht nicht, wenn

1. der Betroffene auf andere Weise Kenntnis von der Speicherung oder der Übermittlung erlangt hat,

2. die Daten nur deshalb gespeichert sind, weil sie aufgrund gesetzlicher, satzungsmäßiger oder vertraglicher Aufbewahrungsvorschriften nicht gelöscht werden dürfen oder ausschließlich der Datensicherung oder der Datenschutzkontrolle dienen und eine Benachrichtigung einen unverhältnismäßigen Aufwand erfordern würde,

3. die Daten nach einer Rechtsvorschrift oder ihrem Wesen nach, namentlich wegen des überwiegenden rechtlichen Interesses eines Dritten, geheim gehalten werden müssen,

4. die Speicherung oder Übermittlung durch Gesetz ausdrücklich vorgesehen ist,

## Section 31
### Limitation of use to specific purposes

Personal data stored exclusively for the purposes of data protection control or data security or to ensure the proper operation of a data processing system may be used only for these purposes.

## Section 32
### Obligatory registration

*deleted*

## Chapter II
### Rights of the data subject

## Section 33
### Notification of the data subject

(1) If personal data are stored for the first time for one's own purposes without the data subject's knowledge, the data subject shall be notified of such storage, the type of data, the purposes of collection, processing or use and the identity of the controller. If personal data are stored in the course of business without the data subject's knowledge for the purpose of transfer, the data subject shall be notified of their initial transfer and of the type of data transferred. In the cases covered by the first and second sentences above, the data subject shall also be notified of the categories of recipients, in so far as he cannot be expected to assume transfer to such recipients according to the circumstances of the individual case concerned.

(2) Notification shall not be required if

1. the data subject has received knowledge by other means of the storage or transfer of the data,

2. the data are stored merely because they may not be erased due to legal statutory or contractual provisions on their preservation or exclusively serve purposes of data security or data protection control and notification would require disproportionate effort,

3. the data must be kept secret in accordance with a legal provision or by virtue of their nature, in particular on account of an overriding legal interest of a third party,

4. the law expressly provides for such storage or transfer,

5. die Speicherung oder Übermittlung für Zwecke der wissenschaftlichen Forschung erforderlich ist und eine Benachrichtigung einen unverhältnismäßigen Aufwand erfordern würde,

6. die zuständige öffentliche Stelle gegenüber der verantwortlichen Stelle festgestellt hat, dass das Bekanntwerden der Daten die öffentliche Sicherheit oder Ordnung gefährden oder sonst dem Wohle des Bundes oder eines Landes Nachteile bereiten würde,

7. die Daten für eigene Zwecke gespeichert sind und

a) aus allgemein zugänglichen Quellen entnommen sind und eine Benachrichtigung wegen der Vielzahl der betroffenen Fälle unverhältnismäßig ist, oder

b) die Benachrichtigung die Geschäftszwecke der verantwortlichen Stelle erheblich gefährden würde, es sei denn, dass das Interesse an der Benachrichtigung die Gefährdung überwiegt, oder

8. die Daten geschäftsmäßig zum Zweck der Übermittlung gespeichert sind und

a) aus allgemein zugänglichen Quellen entnommen sind, soweit sie sich auf diejenigen Personen beziehen, die diese Daten veröffentlicht haben, oder

b) es sich um listenmäßig oder sonst zusammengefasste Daten handelt (§ 29 Abs. 2 Nr. 1 Buchstabe b)

und eine Benachrichtigung wegen der Vielzahl der betroffenen Fälle unverhältnismäßig ist.

Die verantwortliche Stelle legt schriftlich fest, unter welchen Voraussetzungen von einer Benachrichtigung nach Satz 1 Nr. 2 bis 7 abgesehen wird.

## § 34
### Auskunft an den Betroffenen

(1) Der Betroffene kann Auskunft verlangen über

1. die zu seiner Person gespeicherten Daten, auch soweit sie sich auf die Herkunft dieser Daten beziehen,

2. Empfänger oder Kategorien von Empfängern, an die Daten weitergegeben werden, und

3. den Zweck der Speicherung.

5. storage or transfer is necessary for the purposes of scientific research and notification would require disproportionate effort,

6. the relevant public body has stated to the controller of the filing system that publication of the data would jeopardise public safety or order or would otherwise be detrimental to the Federation or a *Land*,

7. the data are stored for one's own purposes and

a) are taken from generally accessible sources and notification is unfeasible on account of the large number of cases concerned or

b) notification would considerably impair the business purposes of the controller of the filing system, unless the interest in notification outweighs such impairment, or

8. the data are stored in the course of business for the purpose of transfer and

a) are taken from generally accessible sources in so far as they relate to those persons who published these data or

b) the data are compiled in lists or otherwise combined (Section 29 (2), No. 1 (b) of this Act)

and notification is unfeasible on account of the large number of cases concerned.

The controller shall stipulate in writing under what conditions notification shall not be provided in accordance with sentence 1, Nos. 2 to 7.

## Section 34
### Provision of information to the data subject

(1) The data subject may request information on

1. stored data concerning him, including any reference in them to their origin and recipient,

2. recipients or categories of recipients to whom data are transmitted and

3. the purpose of storage.

Er soll die Art der personenbezogenen Daten, über die Auskunft erteilt werden soll, näher bezeichnen. Werden die personenbezogenen Daten geschäftsmäßig zum Zweck der Übermittlung gespeichert, kann der Betroffene über Herkunft und Empfänger nur Auskunft verlangen, sofern nicht das Interesse an der Wahrung des Geschäftsgeheimnisses überwiegt. In diesem Fall ist Auskunft über Herkunft und Empfänger auch dann zu erteilen, wenn diese Angaben nicht gespeichert sind.

He should specify the type of personal data on which information is to be provided. If the personal data are stored in the course of business for the purpose of transfer, the data subject may request information on their origin and recipient only if there is no overriding interest in protecting trade secrets. In such case, information on the origin and recipient shall be provided even if these particulars are not stored.

(2) Der Betroffene kann von Stellen, die geschäftsmäßig personenbezogene Daten zum Zweck der Auskunftserteilung speichern, Auskunft über seine personenbezogenen Daten verlangen, auch wenn sie weder in einer automatisierten Verarbeitung noch in einer nicht automatisierten Datei gespeichert sind. Auskunft über Herkunft und Empfänger kann der Betroffene nur verlangen, sofern nicht das Interesse an der Wahrung des Geschäftsgeheimnisses überwiegt.

(2) In the case of bodies which store personal data in the course of business for the purpose of supplying information, the data subject may request information on his personal data even if they are not stored in an automated processing procedure or in a non-automated filing system. The data subject may request information on their origin and recipient only if there is no overriding interest in protecting trade secrets.

(3) Die Auskunft wird schriftlich erteilt, soweit nicht wegen der besonderen Umstände eine andere Form der Auskunftserteilung angemessen ist.

(3) Information shall be provided in writing unless special circumstances warrant any other form.

(4) Eine Pflicht zur Auskunftserteilung besteht nicht, wenn der Betroffene nach § 33 Abs. 2 Satz 1 Nr. 2, 3 und 5 bis 7 nicht zu benachrichtigen ist.

(4) The provision of information shall not be required if the data subject does not have to be notified in accordance with Section 33 (2), sentence 1, Nos. 2, 3 and 5 to 7 of this Act.

(5) Die Auskunft ist unentgeltlich. Werden die personenbezogenen Daten geschäftsmäßig zum Zweck der Übermittlung gespeichert, kann jedoch ein Entgelt verlangt werden, wenn der Betroffene die Auskunft gegenüber Dritten zu wirtschaftlichen Zwecken nutzen kann. Das Entgelt darf über die durch die Auskunftserteilung entstandenen direkt zurechenbaren Kosten nicht hinausgehen. Ein Entgelt kann in den Fällen nicht verlangt werden, in denen besondere Umstände die Annahme rechtfertigen, dass Daten unrichtig oder unzulässig gespeichert werden, oder in denen die Auskunft ergibt, dass die Daten zu berichtigen oder unter der Voraussetzung des § 35 Abs. 2 Satz 2 Nr. 1 zu löschen sind.

(5) Information shall be provided free of charge. However, if the personal data are stored in the course of business for the purpose of transfer, a fee may be charged if the data subject can use the information vis-à-vis third parties for commercial purposes. The fee shall not exceed the costs directly attributable to the provision of information. No fee may be charged in cases where special circumstances give rise to the assumption that stored personal data are incorrect or that their storage was inadmissible, or where the information has revealed that the personal data have to be corrected or, subject to No. 1 of the second sentence of Section 35 (2) of this Act, have to be erased.

(6) Ist die Auskunftserteilung nicht unentgeltlich, ist dem Betroffenen die Möglichkeit zu geben, sich im Rahmen seines Auskunftsanspruchs persönlich Kenntnis über die ihn betreffenden Daten und Angaben zu verschaffen. Er ist hierauf in geeigneter Weise hinzuweisen.

(6) Where information is not provided free of charge, the data subject shall be given the possibility to acquire personal knowledge of the data and particulars concerning him within the framework of his entitlement to information. This shall be pointed out to him in a suitable manner.

### § 35
### Berichtigung, Löschung und Sperrung von Daten

### Section 35
### Correction, erasure and blocking of data

(1) Personenbezogene Daten sind zu berichtigen, wenn sie unrichtig sind.

(1) Incorrect personal data shall be corrected.

(2) Personenbezogene Daten können außer in den Fällen des Absatzes 3 Nr. 1 und 2 jederzeit gelöscht werden. Personenbezogene Daten sind zu löschen, wenn

1. ihre Speicherung unzulässig ist,

2. es sich um Daten über die rassische oder ethnische Herkunft, politische Meinungen, religiöse oder philosophische Überzeugungen oder die Gewerkschaftszugehörigkeit, über Gesundheit oder das Sexualleben, strafbare Handlungen oder Ordnungswidrigkeiten handelt und ihre Richtigkeit von der verantwortlichen Stelle nicht bewiesen werden kann,

3. sie für eigene Zwecke verarbeitet werden, sobald ihre Kenntnis für die Erfüllung des Zwecks der Speicherung nicht mehr erforderlich ist, oder

4. sie geschäftsmäßig zum Zweck der Übermittlung verarbeitet werden und eine Prüfung jeweils am Ende des vierten Kalenderjahres beginnend mit ihrer erstmaligen Speicherung ergibt, dass eine längerwährende Speicherung nicht erforderlich ist.

(3) An die Stelle einer Löschung tritt eine Sperrung, soweit

1. im Fall des Absatzes 2 Nr. 3 einer Löschung gesetzliche, satzungsmäßige oder vertragliche Aufbewahrungsfristen entgegenstehen,

2. Grund zu der Annahme besteht, dass durch eine Löschung schutzwürdige Interessen des Betroffenen beeinträchtigt würden, oder

3. eine Löschung wegen der besonderen Art der Speicherung nicht oder nur mit unverhältnismäßig hohem Aufwand möglich ist.

(4) Personenbezogene Daten sind ferner zu sperren, soweit ihre Richtigkeit vom Betroffenen bestritten wird und sich weder die Richtigkeit noch die Unrichtigkeit feststellen lässt.

(5) Personenbezogene Daten dürfen nicht für eine automatisierte Verarbeitung oder Verarbeitung in nicht automatisierten Dateien erhoben, verarbeitet oder genutzt werden, soweit der Betroffene dieser bei der verantwortlichen Stelle widerspricht und eine Prüfung ergibt, dass das schutzwürdige Interesse des Betroffenen wegen seiner besonderen persönlichen Situation das Interesse der verantwortlichen Stelle an dieser Erhebung, Verarbeitung oder Nutzung überwiegt. Satz 1 gilt nicht, wenn eine Rechtsvorschrift zur Erhebung, Verarbeitung oder Nutzung verpflichtet.

(2) Personal data may be erased at any time, except in the cases specified in sub-section 3, Nos. 1 and 2. Personal data in filing systems shall be erased if

1. their storage is inadmissible,

2. they concern information on racial or ethnic origin, political opinions, religious or philosophical convictions, union membership, health or sex life, criminal offences or administrative offences and the controller is unable to prove their correctness,

3. they are processed for one's own purposes, as soon as knowledge of them is no longer needed for fulfilling the purpose for which they are stored, or

4. they are processed in the course of business for the purpose of transfer and an examination five calendar years after their first being stored shows that further storage is not necessary.

(3) Instead of erasure, personal data shall be blocked in so far as

1. in the case of sub-section 2, No. 3 above, preservation periods prescribed by law, statutes or contracts rule out any erasure,

2. there is reason to assume that erasure would impair legitimate interests of the data subject or

3. erasure is not possible or is only possible with disproportionate effort due to the specific type of storage.

(4) Personal data shall also be blocked if the data subject disputes that they are correct and it cannot be ascertained whether they are correct or incorrect.

(5) Personal data must not be collected, processed or used for automated processing or processing in non-automated filing systems if the data subject files an objection with the controller and an examination reveals that the data subject's legitimate interest outweighs the controller's interest in such collection, processing or use, on account of the data subject's personal situation. Sentence 1 shall apply only when an obligation to carry out collection, processing or use is established by a legal provision.

(6) Personenbezogene Daten, die unrichtig sind oder deren Richtigkeit bestritten wird, müssen bei der geschäftsmäßigen Datenspeicherung zum Zweck der Übermittlung außer in den Fällen des Absatzes 2 Nr. 2 nicht berichtigt, gesperrt oder gelöscht werden, wenn sie aus allgemein zugänglichen Quellen entnommen und zu Dokumentationszwecken gespeichert sind. Auf Verlangen des Betroffenen ist diesen Daten für die Dauer der Speicherung seine Gegendarstellung beizufügen. Die Daten dürfen nicht ohne diese Gegendarstellung übermittelt werden.

(7) Von der Berichtigung unrichtiger Daten, der Sperrung bestrittener Daten sowie der Löschung oder Sperrung wegen Unzulässigkeit der Speicherung sind die Stellen zu verständigen, denen im Rahmen einer Datenübermittlung diese Daten zur Speicherung weitergegeben werden, wenn dies keinen unverhältnismäßigen Aufwand erfordert und schutzwürdige Interessen des Betroffenen nicht entgegenstehen.

(8) Gesperrte Daten dürfen ohne Einwilligung des Betroffenen nur übermittelt oder genutzt werden, wenn

1. es zu wissenschaftlichen Zwecken, zur Behebung einer bestehenden Beweisnot oder aus sonstigen im überwiegenden Interesse der verantwortlichen Stelle oder eines Dritten liegenden Gründen unerlässlich ist und

2. die Daten hierfür übermittelt oder genutzt werden dürften, wenn sie nicht gesperrt wären.

### Dritter Unterabschnitt
### Aufsichtsbehörde

§ 36 und § 37

*weggefallen*

---

(6) Where they are stored in the course of business for the purpose of transfer, personal data which are incorrect or whose correctness is disputed need not be corrected, blocked or erased except in the cases mentioned in sub-section 2, No. 2 above, if they are taken from generally accessible sources and are stored for documentation purposes. At the request of the data subject, his counter-statement shall be added to the data for the duration of their storage. The data may not be transferred without this counter-statement.

(7) The correction of incorrect data, the blocking of disputed data and the erasure or blocking of data due to inadmissible storage shall be notified to the bodies to which these data are transmitted for storage in the course of a data transfer process, provided that this does not require disproportionate effort and the data subject has no overriding legitimate interests.

(8) Blocked data may be transferred or used without the consent of the data subject only if

1. this is indispensable for scientific purposes, for use as evidence or for other reasons in the overriding interests of the controller of the data or a third party and

2. transfer or use of the data for this purpose would be admissible if they were not blocked.

### Chapter III
### Supervisory authority

Section 36
Appointment of a data protection official

*deleted*

## § 38
### Aufsichtsbehörde

(1) Die Aufsichtsbehörde kontrolliert die Ausführung dieses Gesetzes sowie anderer Vorschriften über den Datenschutz, soweit diese die automatisierte Verarbeitung personenbezogener Daten oder die Verarbeitung oder Nutzung personenbezogener Daten in oder aus nicht automatisierten Dateien regeln einschließlich des Rechts der Mitgliedstaaten in den Fällen des § 1 Abs. 5. Die Aufsichtsbehörde darf die von ihr gespeicherten Daten nur für Zwecke der Aufsicht verarbeiten und nutzen; § 14 Abs. 2 Nr. 1 bis 3, 6 und 7 gilt entsprechend. Insbesondere darf die Aufsichtsbehörde zum Zweck der Aufsicht Daten an andere Aufsichtsbehörden übermitteln. Sie leistet den Aufsichtsbehörden anderer Mitgliedstaaten der Europäischen Union auf Ersuchen ergänzende Hilfe (Amtshilfe). Stellt die Aufsichtsbehörde einen Verstoß gegen dieses Gesetz oder andere Vorschriften über den Datenschutz fest, so ist sie befugt, die Betroffenen hierüber zu unterrichten, den Verstoß bei den für die Verfolgung oder Ahndung zuständigen Stellen anzuzeigen sowie bei schwerwiegenden Verstößen die Gewerbeaufsichtsbehörde zur Durchführung gewerberechtlicher Maßnahmen zu unterrichten. Sie veröffentlicht regelmäßig, spätestens alle zwei Jahre, einen Tätigkeitsbericht. § 21 Satz 1 und § 23 Abs. 5 Satz 4 bis 7 gelten entsprechend.

(2) Die Aufsichtsbehörde führt ein Register der nach § 4d meldepflichtigen automatisierten Verarbeitungen mit den Angaben nach § 4e Satz 1. Das Register kann von jedem eingesehen werden. Das Einsichtsrecht erstreckt sich nicht auf die Angaben nach § 4e Satz 1 Nr. 9 sowie auf die Angabe der zugriffsberechtigten Personen.

(3) Die der Kontrolle unterliegenden Stellen sowie die mit deren Leitung beauftragten Personen haben der Aufsichtsbehörde auf Verlangen die für die Erfüllung ihrer Aufgaben erforderlichen Auskünfte unverzüglich zu erteilen. Der Auskunftspflichtige kann die Auskunft auf solche Fragen verweigern, deren Beantwortung ihn selbst oder einen der in § 383 Abs. 1 Nr. 1 bis 3 der Zivilprozessordnung bezeichneten Angehörigen der Gefahr strafgerichtlicher Verfolgung oder eines Verfahrens nach dem Gesetz über Ordnungswidrigkeiten aussetzen würde. Der Auskunftspflichtige ist darauf hinzuweisen.

## Section 38
### Supervisory authority

(1) The supervisory authority shall monitor implementation of this Act and other data protection provisions governing the automated processing of personal data or the processing or use of personal data in or from non-automated filing systems, including the rights of the members states in the cases under Section 1 (5) of this Act. The supervisory authority may process and use the data which it stores for supervisory purposes only; Section 14 (2), Nos. 1 to 3, 6 and 7 shall apply *mutatis mutandis*. The supervisory authority may, in particular, transfer data to other supervisory authorities for supervisory purposes. On request, it shall provide supplementary assistance to other Member States of the European Union (administrative assistance). If the supervisory authority establishes a breach of this Act or other data protection provisions, it shall be authorised to notify the data subjects accordingly, to report the breach to the bodies responsible for prosecution or punishment and, in cases of serious breaches, to notify the trade supervisory authority in order to initiate measures under industrial law. It shall publish an activity report on a regular basis, but every two years at the latest. The first sentence of Section 21 and sentences 4 to 7 of Section 23 (5) shall apply *mutatis mutandis*.

(2) The supervisory authority shall keep a register of the automated processing operations which are subject to obligatory registration in accordance with Section 4d, stating the information specified in the first sentence of Section 4e. The register shall be open to inspection by any person. The right to inspection shall not extend to the information in accordance with Section 4e, sentence 1, No. 9 or stipulation of the persons entitled to access.

(3) The bodies subject to monitoring and the persons responsible for their management shall provide the supervisory authority on request and without delay with the information necessary for the performance of its duties. A person obliged to provide information may refuse to do so where he would expose himself or one of the persons designated in Section 383 (1), Nos. 1 to 3, of the Code of Civil Procedure to the danger of criminal prosecution or of proceedings under the Administrative Offences Act. This shall be pointed out to the person obliged to provide information.

(4) Die von der Aufsichtsbehörde mit der Kontrolle beauftragten Personen sind befugt, soweit es zur Erfüllung der der Aufsichtsbehörde übertragenen Aufgaben erforderlich ist, während der Betriebs- und Geschäftszeiten Grundstücke und Geschäftsräume der Stelle zu betreten und dort Prüfungen und Besichtigungen vorzunehmen. Sie können geschäftliche Unterlagen, insbesondere die Übersicht nach § 4g Abs. 2 Satz 1 sowie die gespeicherten personenbezogenen Daten und die Datenverarbeitungsprogramme, einsehen. § 24 Abs. 6 gilt ent-sprechend. Der Auskunftspflichtige hat diese Maßnahmen zu dulden.

(5) Zur Gewährleistung des Datenschutzes nach diesem Gesetz und anderen Vorschriften über den Datenschutz, soweit diese die automatisierte Verarbeitung personenbezogener Daten oder die Verarbeitung personenbezogener Daten in oder aus nicht automatisierten Dateien regeln, kann die Aufsichtsbehörde anordnen, dass im Rahmen der Anforderungen nach § 9 Maßnahmen zur Beseitigung festgestellter technischer oder organisatorischer Mängel getroffen werden. Bei schwerwiegenden Mängeln dieser Art, insbesondere, wenn sie mit besonderer Gefährdung des Persönlichkeitsrechts verbunden sind, kann sie den Einsatz einzelner Verfahren untersagen, wenn die Mängel entgegen der Anordnung nach Satz 1 und trotz der Verhängung eines Zwangsgeldes nicht in angemessener Zeit beseitigt werden. Sie kann die Abberufung des Beauftragten für den Datenschutz verlangen, wenn er die zur Erfüllung seiner Aufgaben erforderliche Fachkunde und Zuverlässigkeit nicht besitzt.

(6) Die Landesregierungen oder die von ihnen ermächtigten Stellen bestimmen die für die Kontrolle der Durchführung des Datenschutzes im Anwendungsbereich dieses Abschnittes zuständigen Aufsichtsbehörden.

(7) Die Anwendung der Gewerbeordnung auf die den Vorschriften dieses Abschnittes unterliegenden Gewerbebetriebe bleibt unberührt.

### § 38a
### Verhaltensregeln zur Förderung der Durchführung datenschutzrechtlicher Regelungen

(1) Berufsverbände und andere Vereinigungen, die bestimmte Gruppen von verantwortlichen Stellen vertreten, können Entwürfe für Verhaltensregeln zur Förderung der Durchführung von datenschutzrechtlichen Regelungen der zuständigen Aufsichtsbehörde unterbreiten.

(4) The persons appointed by the supervisory authority to exercise monitoring shall be authorised, in so far as necessary for the performance of the duties of the supervisory authority, to enter the property and premises of the body during business hours and to carry out checks and inspections there. They may inspect business documents, especially the list stipulated in the first sentence of Section 4g (2) of this Act as well as the stored personal data and the data processing programs. Section 24 (6) of this Act shall apply *mutatis mutandis*. The person obliged to provide information shall permit such measures.

(5) To guarantee data protection under this Act and other data protection provisions governing the automated processing of personal data or the processing of personal data in or from non-automated filing systems, the supervisory authority may instruct that, within the scope of the requirements set out in Section 9 of this Act, measures be taken to rectify technical or organisational irregularities discovered. In the event of grave irregularities of this kind, especially where they are connected with a specific impairment of privacy, the supervisory authority may prohibit the use of particular procedures if the irregularities are not rectified within a reasonable period contrary to the instruction pursuant to the first sentence above and despite the imposition of a fine. The supervisory authority may demand the dismissal of the data protection official if he does not possess the specialised knowledge and demonstrate the reliability necessary for the performance of his duties.

(6) The *Land* governments or the bodies authorised by them shall designate the supervisory authorities responsible for monitoring the implementation of data protection within the area of application of this Part.

(7) The Industrial Code shall continue to apply to commercial firms subject to the provisions of this Part.

### Section 38a
### Code of conduct to promote the implementation of data protection provisions

(1) Professional associations and other associations which represent specific groups of controllers may submit draft rules of conduct to promote the implementation of data protection provisions to the competent supervisory authority.

(2) Die Aufsichtsbehörde überprüft die Vereinbarkeit der ihr unterbreiteten Entwürfe mit dem geltenden Datenschutzrecht.

### Vierter Abschnitt
### Sondervorschriften

### § 39
### Zweckbindung bei personenbezogenen Daten, die einem Berufs- oder besonderen Amtsgeheimnis unterliegen

(1) Personenbezogene Daten, die einem Berufs- oder besonderen Amtsgeheimnis unterliegen und die von der zur Verschwiegenheit verpflichteten Stelle in Ausübung ihrer Berufs- oder Amtspflicht zur Verfügung gestellt worden sind, dürfen von der verantwortlichen Stelle nur für den Zweck verarbeitet oder genutzt werden, für den sie sie erhalten hat. In die Übermittlung an eine nicht-öffentliche Stelle muss die zur Verschwiegenheit verpflichtete Stelle einwilligen.

(2) Für einen anderen Zweck dürfen die Daten nur verarbeitet oder genutzt werden, wenn die Änderung des Zwecks durch besonderes Gesetz zugelassen ist.

### § 40
### Verarbeitung und Nutzung personenbezogener Daten durch Forschungseinrichtungen

(1) Für Zwecke der wissenschaftlichen Forschung erhobene oder gespeicherte personenbezogene Daten dürfen nur für Zwecke der wissenschaftlichen Forschung verarbeitet oder genutzt werden.

(2) Die personenbezogenen Daten sind zu anonymisieren, sobald dies nach dem Forschungszweck möglich ist. Bis dahin sind die Merkmale gesondert zu speichern, mit denen Einzelangaben über persönliche oder sachliche Verhältnisse einer bestimmten oder bestimmbaren Person zugeordnet werden können. Sie dürfen mit den Einzelangaben nur zusammengeführt werden, soweit der Forschungszweck dies erfordert.

(3) Die wissenschaftliche Forschung betreibenden Stellen dürfen personenbezogene Daten nur veröffentlichen, wenn

1. der Betroffene eingewilligt hat oder

2. dies für die Darstellung von Forschungsergebnissen über Ereignisse der Zeitgeschichte unerlässlich ist.

(2) The supervisory authority shall examine the compatibility of the submitted drafts with the applicable law on data protection.

### Part IV
### Special provisions

### Section 39
### Limited use of personal data subject to professional or special official secrecy

(1) Personal data which are subject to professional or special official secrecy and which have been supplied by the body bound to secrecy in the performance of its professional or official duties may be processed or used by the controller of the filing system only for the purpose for which he has received them. In the event of transfer to a private body, the body bound to secrecy must give its consent.

(2) The data may be processed or used for another purpose only if the change of purpose is permitted by special legislation.

### Section 40
### Processing and use of personal data by research institutes

(1) Personal data collected or stored for scientific research purposes may be processed or used only for such purposes.

(2) The personal data shall be rendered anonymous as soon as the research purpose permits this. Until such time the characteristics enabling information concerning personal or material circumstances to be attributed to an identified or identifiable individual shall be stored separately. They may be combined with the information only to the extent required by the research purpose.

(3) Bodies conducting scientific research may publish personal data only if

1. the data subject has consented or

2. this is indispensable for the presentation of research findings on contemporary events.

§ 41
Erhebung, Verarbeitung und Nutzung
personenbezogener Daten durch die
Medien

(1) Die Länder haben in ihrer Gesetzgebung vorzusehen, dass für die Erhebung, Verarbeitung und Nutzung personenbezogener Daten von Unternehmen und Hilfsunternehmen der Presse ausschließlich zu eigenen journalistisch-redaktionellen oder literarischen Zwecken den Vorschriften der §§ 5, 9 und 38a entsprechende Regelungen einschließlich einer hierauf bezogenen Haftungsregelung entsprechend § 7 zur Anwendung kommen.

(2) Führt die journalistisch-redaktionelle Erhebung, Verarbeitung oder Nutzung personenbezogener Daten durch die Deutsche Welle zur Veröffentlichung von Gegendarstellungen des Betroffenen, so sind diese Gegendarstellungen zu den gespeicherten Daten zu nehmen und für dieselbe Zeitdauer aufzubewahren wie die Daten selbst.

(3) Wird jemand durch eine Berichterstattung der Deutschen Welle in seinem Persönlichkeitsrecht beeinträchtigt, so kann er Auskunft über die der Berichterstattung zugrunde liegenden, zu seiner Person gespeicherten Daten verlangen. Die Auskunft kann nach Abwägung der schutzwürdigen Interessen der Beteiligten verweigert werden, soweit

1. aus den Daten auf Personen, die bei der Vorbereitung, Herstellung oder Verbreitung von Rundfunksendungen berufsmäßig journalistisch mitwirken oder mitgewirkt haben, geschlossen werden kann,

2. aus den Daten auf die Person des Einsenders oder des Gewährsträgers von Beiträgen, Unterlagen und Mitteilungen für den redaktionellen Teil geschlossen werden kann,

3. durch die Mitteilung der recherchierten oder sonst erlangten Daten die journalistische Aufgabe der Deutschen Welle durch Ausforschung des Informationsbestandes beeinträchtigt würde.

Der Betroffene kann die Berichtigung unrichtiger Daten verlangen.

(4) Im Übrigen gelten für die Deutsche Welle von den Vorschriften dieses Gesetzes die §§ 5, 7, 9 und 38a. Anstelle der §§ 24 bis 26 gilt § 42, auch soweit es sich um Verwaltungsangelegenheiten handelt.

Section 41
Collection, processing and use of personal data by the media

(1) The *Länder* are to ensure in their legislation that regulations corresponding to the provisions of Sections 5, 9 and 38a of this Act, including an appurtenant regulation on liability in accordance with Section 7 of this Act, shall apply to the collection, processing and use of personal data by enterprises or auxiliary enterprises in the press exclusively for their own journalistic-editorial or literary purposes.

(2) If journalistic-editorial processing or use of personal data by *Deutsche Welle* leads to the publication of counter-statements by the data subject, such counter-statements shall be combined with the stored data and preserved for the same period as the data themselves.

(3) If the privacy of a person is impaired by reporting by *Deutsche Welle*, he may request information on the stored personal data on which the reporting was based. Such information may be refused, after considering the legitimate interests of the parties concerned, in so far as

1. the data enable conclusions to be drawn as to the persons who are or have been professionally involved in a journalistic capacity in the preparation, production or dissemination of broadcasts,

2. the data enable conclusions to be drawn as to the supplier or source of contributions, documents and communications for the editorial part,

3. disclosure of the data obtained by research or other means would compromise *Deutsche Welle's* journalistic function by divulging its information resources.

The data subject may request that incorrect data be corrected.

(4) In all other respects, Sections 5, 7, 9 and 38a of this Act shall apply to *Deutsche Welle*. Instead of Sections 24 to 26 of this Act, Section 42 shall apply even where administrative matters are concerned.

§ 42
Datenschutzbeauftragter der Deutschen Welle

(1) Die Deutsche Welle bestellt einen Beauftragten für den Datenschutz, der an die Stelle des Bundesbeauftragten für den Datenschutz tritt. Die Bestellung erfolgt auf Vorschlag des Intendanten durch den Verwaltungsrat für die Dauer von vier Jahren, wobei Wiederbestellungen zulässig sind. Das Amt eines Beauftragten für den Datenschutz kann neben anderen Aufgaben innerhalb der Rundfunkanstalt wahrgenommen werden.

(2) Der Beauftragte für den Datenschutz kontrolliert die Einhaltung der Vorschriften dieses Gesetzes sowie anderer Vorschriften über den Datenschutz. Er ist in Ausübung dieses Amtes unabhängig und nur dem Gesetz unterworfen. Im Übrigen untersteht er der Dienst- und Rechtsaufsicht des Verwaltungsrates.

(3) Jedermann kann sich entsprechend § 21 Satz 1 an den Beauftragten für den Datenschutz wenden.

(4) Der Beauftragte für den Datenschutz erstattet den Organen der Deutschen Welle alle zwei Jahre, erstmals zum 1. Januar 1994 einen Tätigkeitsbericht. Er erstattet darüber hinaus besondere Berichte auf Beschluss eines Organes der Deutschen Welle. Die Tätigkeitsberichte übermittelt der Beauftragte auch an den Bundesbeauftragten für den Datenschutz.

(5) Weitere Regelungen entsprechend den §§ 23 bis 26 trifft die Deutsche Welle für ihren Bereich. Die §§ 4f und 4g bleiben unberührt.

Fünfter Abschnitt
Schlussvorschriften

§ 43
Bußgeldvorschriften

(1) Ordnungswidrig handelt, wer vorsätzlich oder fahrlässig

1. entgegen § 4d Abs. 1, auch in Verbindung mit § 4e Satz 2, eine Meldung nicht, nicht richtig, nicht vollständig oder nicht rechtzeitig macht,

2. entgegen § 4f Abs. 1 Satz 1 oder 2, jeweils auch in Verbindung mit Satz 3 und 6, einen Beauftragten für den Datenschutz nicht, nicht in der vorgeschriebenen Weise oder nicht rechtzeitig bestellt,

---

Section 42
Data protection official of *Deutsche Welle*

(1) *Deutsche Welle* shall appoint a data protection official, who shall take the place of the Federal Commissioner for Data Protection. The data protection official shall be appointed by the board of administration for a term of four years upon nomination by the director-general; reappointments shall be admissible. The office of data protection official may be exercised alongside other duties within the broadcasting corporation.

(2) The data protection official shall monitor compliance with the provisions of this Act and with other provisions concerning data protection. He shall be independent in the exercise of this office and shall be subject to the law only. In all other respects he shall be subject to the official and legal authority of the board of administration.

(3) Anyone may appeal to the data protection official in accordance with the first sentence of Section 21 of this Act.

(4) The data protection official shall submit an activity report to the organs of *Deutsche Welle* every two years, beginning on 1 January 1994. In addition he shall submit special reports pursuant to a decision by an organ of *Deutsche Welle*. The data protection official shall forward the activity reports to the Federal Commissioner for Data Protection as well.

(5) *Deutsche Welle* shall make further arrangements for its area of activity in accordance with Sections 23 to 26 of this Act. Sections 4f and 4g of this Act shall remain unaffected.

Part V.
Final provisions

Section 43
Administrative offences

(1) An administrative offence shall be deemed to have been committed by anyone who, whether intentionally or through negligence,

1. contrary to Section 4d (1), also in conjunction with the second sentence of Section 4e of this Act, fails to submit a notification, fails to do so within the prescribed time limit or fails to provide complete particulars,

2. contrary to the first or second sentence of Section 4f (1) of this Act, fails to appoint a data protection official or fails to do so within the prescribed time limit or in the prescribed manner,

3. entgegen § 28 Abs. 4 Satz 2 den Betroffenen nicht, nicht richtig oder nicht rechtzeitig unterrichtet oder nicht sicherstellt, dass der Betroffene Kenntnis erhalten kann,

4. entgegen § 28 Abs. 5 Satz 2 personenbezogene Daten übermittelt oder nutzt,

5. entgegen § 29 Abs. 2 Satz 3 oder 4 die dort bezeichneten Gründe oder die Art und Weise ihrer glaubhaften Darlegung nicht aufzeichnet,

6. entgegen § 29 Abs. 3 Satz 1 personenbezogene Daten in elektronische oder gedruckte Adress-, Rufnummern-, Branchen- oder vergleichbare Verzeichnisse aufnimmt,

7. entgegen § 29 Abs. 3 Satz 2 die Übernahme von Kennzeichnungen nicht sicherstellt,

8. entgegen § 33 Abs. 1 den Betroffenen nicht, nicht richtig oder nicht vollständig benachrichtigt,

9. entgegen § 35 Abs. 6 Satz 3 Daten ohne Gegendarstellung übermittelt,

10. entgegen § 38 Abs. 3 Satz 1 oder Abs. 4 Satz 1 eine Auskunft nicht, nicht richtig, nicht vollständig oder nicht rechtzeitig erteilt oder eine Maßnahme nicht duldet oder

11. einer vollziehbaren Anordnung nach § 38 Abs. 5 Satz 1 zuwiderhandelt.

(2) Ordnungswidrig handelt, wer vorsätzlich oder fahrlässig

1. unbefugt personenbezogene Daten, die nicht allgemein zugänglich sind, erhebt oder verarbeitet,

2. unbefugt personenbezogene Daten, die nicht allgemein zugänglich sind, zum Abruf mittels automatisierten Verfahrens bereithält,

3. unbefugt personenbezogene Daten, die nicht allgemein zugänglich sind, abruft oder sich oder einem anderen aus automatisierten Verarbeitungen oder nicht automatisierten Dateien verschafft,

4. die Übermittlung von personenbezogenen Daten, die nicht allgemein zugänglich sind, durch unrichtige Angaben erschleicht,

---

3. contrary to the second sentence of Section 28 (4) of this Act, fails to notify the data subject, or fails to do so within the prescribed time limit or in the prescribed manner, or fails to ensure that the data subject is able to obtain due knowledge,

4. transfers or uses personal data contrary to the second sentence of Section 28 (5) of this Act,

5. contrary to the third or fourth sentence of Section 29 (2) of this Act, fails to record the reasons described there or the means of credibly presenting them,

6. incorporates personal data into electronic or printed address, telephone number, classified or similar directories contrary to the first sentence of Section 29 (3) of this Act,

7. contrary to the second sentence of Section 29 (3) of this Act, fails to ensure the adoption of labels,

8. contrary to Section 33 (1) of this Act, fails to notify the data subject or fails to do so correctly or completely,

9. contrary to the third sentence of Section 35 (5) of this Act, transfers data without a counter-statement,

10. contrary to the first sentence of Section 38 (3) of this Act, fails to provide information or fails to do so correctly, completely or within the prescribed time limit or fails to permit a measure

11. fails to comply with an executable instruction under the first sentence of Section 38 (5) of this Act.

(2) An administrative offence shall be deemed to have been committed by anyone who, whether intentionally or through negligence,

1. collects or processes personal data which are not generally accessible without authorisation,

2. holds personal data which are not generally accessible ready for retrieval by means of an automated procedure without authorisation,

3. retrieves personal data which are not generally accessible or obtains such data for themselves or another from automated processing operations without authorisation,

4. obtains by means of incorrect information the transfer of personal data which are not generally accessible,

5. entgegen § 16 Abs. 4 Satz 1, § 28 Abs. 5 Satz 1, auch in Verbindung mit § 29 Abs. 4, § 39 Abs. 1 Satz 1 oder § 40 Abs. 1, die übermittelten Daten für andere Zwecke nutzt, indem er sie an Dritte weitergibt, oder

6. entgegen § 30 Abs. 1 Satz 2 die in § 30 Abs. 1 Satz 1 bezeichneten Merkmale oder entgegen § 40 Abs. 2 Satz 3 die in § 40 Abs. 2 Satz 2 bezeichneten Merkmale mit den Einzelangaben zusammenführt.

(3) Die Ordnungswidrigkeit kann im Fall des Absatzes 1 mit einer Geldbuße bis zu fünfundzwanzigtausend Euro, in den Fällen des Absatzes 2 mit einer Geldbuße bis zu zweihundertfünfzigtausend Euro geahndet werden.

### § 44
### Strafvorschriften

(1) Wer eine in § 43 Abs. 2 bezeichnete vorsätzliche Handlung gegen Entgelt oder in der Absicht, sich oder einen anderen zu bereichern oder einen anderen zu schädigen, begeht, wird mit Freiheitsstrafe bis zu zwei Jahren oder mit Geldstrafe bestraft.

(2) Die Tat wird nur auf Antrag verfolgt. Antragsberechtigt sind der Betroffene, die verantwortliche Stelle, der Bundesbeauftragte für den Datenschutz und die Aufsichtsbehörde.

### Sechster Abschnitt
### Übergangsvorschriften

### § 45
### Laufende Verwendungen

Erhebungen, Verarbeitungen oder Nutzungen personenbezogener Daten, die am 23. Mai 2001 bereits begonnen haben, sind binnen drei Jahren nach diesem Zeitpunkt mit den Vorschriften dieses Gesetzes in Übereinstimmung zu bringen. Soweit Vorschriften dieses Gesetzes in Rechtsvorschriften außerhalb des Anwendungsbereichs der Richtlinie 95/46/EG des Europäischen Parlaments und des Rates vom 24. Oktober 1995 zum Schutz natürlicher Personen bei der Verarbeitung personenbezogener Daten und zum freien Datenverkehr zur Anwendung gelangen, sind Erhebungen, Verarbeitungen oder Nutzungen personenbezogener Daten, die am 23. Mai 2001 bereits begonnen haben, binnen fünf Jahren nach diesem Zeitpunkt mit den Vorschriften dieses Gesetzes in Übereinstimmung zu bringen.

5. contrary to the first sentence of Section 16 (4) and the first sentence of Section 28 (5) if this Act, also in conjunction Section 29 (4), the first sentence of Section 39 (1) or Section 40 (1) of this Act, uses data for other purposes by transmitted them to third parties, or

6. contrary to the second sentence of Section 30 (1) of this Act, combines the characteristics mentioned in the first sentence of Section 30 (1) with the information or, contrary to the third sentence of Section 40 (2), combines the characteristics mentioned in the second sentence of Section 40 (2) with the information.

(3) Administrative offences shall be punishable by a fine of up to € 25,000 in case of sub-section 1 above, and by a fine of up to € 250,000 in the cases under sub-section 2 above.

### Section 44
### Criminal offences

(1) Anyone wilfully committing an offence specified in Section 43 (2) of this Act in exchange for payment or with the intention of enriching himself or another person or of harming another person shall be liable to imprisonment for up to two years or to a fine.

(2) Such offences shall be prosecuted only if a complaint is filed. Complaints may be filed by the data subject, the Federal Commissioner for Data Protection and the supervisory authority.

### Part VI
### Transitional provisions

### Section 45
### Current applications

Collections, processing or usages of personal data which have already begun on 23 May 2001 shall be harmonised with the provisions of this Act within three years of the aforesaid date. In so far as provisions of this Act are applied in legal provisions outside of the scope of application of directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data, collections, processing or usages of personal data which have already begun on 23 May 2001 shall be harmonised with the provisions of this Act within five years of the aforesaid date.

## § 46
### Weitergeltung von Begriffsbestimmungen

(1) Wird in besonderen Rechtsvorschriften des Bundes der Begriff Datei verwendet, ist Datei

1. eine Sammlung personenbezogener Daten, die durch automatisierte Verfahren nach bestimmten Merkmalen ausgewertet werden kann (automatisierte Datei), oder

2. jede sonstige Sammlung personenbezogener Daten, die gleichartig aufgebaut ist und nach bestimmten Merkmalen geordnet, umgeordnet und ausgewertet werden kann (nicht automatisierte Datei).

Nicht hierzu gehören Akten und Aktensammlungen, es sei denn, dass sie durch automatisierte Verfahren umgeordnet und ausgewertet werden können.

(2) Wird in besonderen Rechtsvorschriften des Bundes der Begriff Akte verwendet, ist Akte jede amtlichen oder dienstlichen Zwecken dienende Unterlage, die nicht dem Dateibegriff des Absatzes 1 unterfällt; dazu zählen auch Bild- und Tonträger. Nicht hierunter fallen Vorentwürfe und Notizen, die nicht Bestandteil eines Vorgangs werden sollen.

(3) Wird in besonderen Rechtsvorschriften des Bundes der Begriff Empfänger verwendet, ist Empfänger jede Person oder Stelle außerhalb der verantwortlichen Stelle. Empfänger sind nicht der Betroffene sowie Personen und Stellen, die im Inland, in einem anderen Mitgliedstaat der Europäischen Union oder in einem anderen Vertragsstaat des Abkommens über den Europäischen Wirtschaftsraum personenbezogene Daten im Auftrag erheben, verarbeiten oder nutzen.

### Anlage
### (zu § 9 Satz 1)

Werden personenbezogene Daten automatisiert verarbeitet oder genutzt, ist die innerbehördliche oder innerbetriebliche Organisation so zu gestalten, dass sie den besonderen Anforderungen des Datenschutzes gerecht wird. Dabei sind insbesondere Maßnahmen zu treffen, die je nach der Art der zu schützenden personenbezogenen Daten oder Datenkategorien geeignet sind,

1. Unbefugten den Zutritt zu Datenverarbeitungsanlagen, mit denen personenbezogene Daten verarbeitet oder genutzt werden, zu verwehren (Zutrittskontrolle),

## Section 46
### Overreaching validity of definitions

(1) Where the term "filing system" is employed in special legal provisions of the Federation, a filing system is

1. a set of personal data which can be evaluated according to specific characteristics by means of automated procedures (automated filing system) or

2. any other set of personal data which is similarly structured and can be arranged, rearranged and evaluated according to specific characteristics (non-automated filing system).

This shall not include files and sets of files, unless they can be rearranged and evaluated by means of automated procedures.

(2) Where the term "file" is employed in special legal provisions of the Federation, a file is any document serving official purposes which does not fall within the definition of a filing system as specified in subsection 1 above; this shall include image and sound recording media. It shall not include drafts and notes that are not intended to form part of a record.

(3) Where the term "recipient" is employed in special legal provisions of the Federation, a recipient is any person or body other than the controller. This shall not include the data subject or persons and bodies commissioned to collect, process or use personal data in Germany, in another member state of the European Union or in another state party to the Agreement on the European Economic Area.

### Annex
### (to the first sentence of Section 9 of this Act)

Where personal data are processed or used automatically, the internal organisation of authorities or enterprises is to be arranged in such a way that it meets the specific requirements of data protection. In particular, measures suited to the type of personal data or data categories to be protected shall be taken,

1. to prevent unauthorised persons from gaining access to data processing systems with which personal data are processed or used (access control),

2. zu verhindern, dass Datenverarbeitungssysteme von Unbefugten genutzt werden können (Zugangskontrolle),

3. zu gewährleisten, dass die zur Benutzung eines Datenverarbeitungssystems Berechtigten ausschließlich auf die ihrer Zugriffsberechtigung unterliegenden Daten zugreifen können, und dass personenbezogene Daten bei der Verarbeitung, Nutzung und nach der Speicherung nicht unbefugt gelesen, kopiert, verändert oder entfernt werden können (Zugriffskontrolle),

4. zu gewährleisten, dass personenbezogene Daten bei der elektronischen Übertragung oder während ihres Transports oder ihrer Speicherung auf Datenträger nicht unbefugt gelesen, kopiert, verändert oder entfernt werden können, und dass überprüft und festgestellt werden kann, an welche Stellen eine Übermittlung personenbezogener Daten durch Einrichtungen zur Datenübertragung vorgesehen ist (Weitergabekontrolle),

5. zu gewährleisten, dass nachträglich überprüft und festgestellt werden kann, ob und von wem personenbezogene Daten in Datenverarbeitungssysteme eingegeben, verändert oder entfernt worden sind (Eingabekontrolle),

6. zu gewährleisten, dass personenbezogene Daten, die im Auftrag verarbeitet werden, nur entsprechend den Weisungen des Auftraggebers verarbeitet werden können (Auftragskontrolle),

7. zu gewährleisten, dass personenbezogene Daten gegen zufällige Zerstörung oder Verlust geschützt sind (Verfügbarkeitskontrolle),

8. zu gewährleisten, dass zu unterschiedlichen Zwecken erhobene Daten getrennt verarbeitet werden können.

2. to prevent data processing systems from being used without authorisation (access control),

3. to ensure that persons entitled to use a data processing system have access only to the data to which they have a right of access, and that personal data cannot be read, copied, modified or removed without authorisation in the course of processing or use and after storage (access control),

4. to ensure that personal data cannot be read, copied, modified or removed without authorisation during electronic transmission or transport, and that it is possible to check and establish to which bodies the transfer of personal data by means of data transmission facilities is envisaged (transmission control),

5. to ensure that it is possible to check and establish whether and by whom personal data have been input into data processing systems, modified or removed (input control),

6. to ensure that, in the case of commissioned processing of personal data, the data are processed strictly in accordance with the instructions of the principal (job control),

7. to ensure that personal data are protected from accidental destruction or loss (availability control),

8. to ensure that data collected for different purposes can be processed separately.

**EXHIBIT I**

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Ann H. Chen
To Call Writer Directly:
312 861-6352
achen@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200
Dir. Fax: 312 861-2200

February 16, 2006

**VIA ELECTRONIC MAIL**

Kimberly Mottley, Esq.
Proskauer Rose LLP
One International Place
Boston, MA 02110-2600

        Re:    *MIT v. Harman International Industries, Inc.*, No. 05-10990 DPW

Dear Kim:

      I write regarding additional deficiencies in MIT's document production.

      During the deposition of Robert Swartz on February 7, 2006, he testified as to certain documents and information that he has, or believes he has, in his possession, custody or control. Upon a review of MIT's document production to date and based on Mr. Swartz's own testimony, it appears that a number of documents have not been produced to Harman. Specifically, we are requesting the following responsive documents:

- Mr. Swartz's employment contract with the MIT Media Lab. We only have the "Independent Contractor Information" form (MIT 01381-01382) which Mr. Swartz apparently completed, but we do not have his employment contract with MIT.

- Any and all written assessments regarding the '685 patent and related subject matter conducted by Mr. Swartz, including but not limited to those which he testified he had provided to MIT or MIT's Media Lab.

- Mr. Swartz's files containing any and all research and/or data that, according to his testimony, he maintains regarding "all navigation systems."

- Any and all printouts of websites Mr. Swartz visited in order to review and collect information on navigation system products, including those he testified remain in his possession, custody, and control.

KIRKLAND & ELLIS LLP

Kimberly Mottley, Esq.
February 16, 2006
Page 2

- Any and all documents related to Mr. Swartz's "Porsche communication management investigation," which he testified remain in his possession, custody and control.

- Any and all emails regarding the '685 patent and related subject matter which Mr. Swartz sent from his email address "RS@interaccess.com." Mr. Swartz testified that during 2003-05, he may have sent correspondence regarding the '685 patent and related subject matter using the email address "RS@interaccess.com."

- Any and all copies of communications concerning the '685 patent and related subject matter sent by Mr. Swartz to MIT, including the MIT Media Lab and Karin Rivard at the MIT Technology Licensing Office ("TLO"). Mr. Swartz testified in his deposition that he had forwarded his files to MIT and specifically to Ms. Rivard. If the communications between Mr. Swartz and Ms. Rivard include those listed on MIT's privilege log, please indicate such items by privilege log entry number.

- Information Mr. Swartz received from Siemens, referenced during his deposition and in MIT 00042, including but not limited to: (1) the CD-ROM from sent from Siemens to Mr. Swartz, (2) "claim chart US 5,177,685," (3) "SAE Technical Paper Series, Doc. No. 870139," (4) "GB 2,278,196 A," and (5) "3 figures showing BMW 7-series navigation system (1994)."

- Any and all drafts (paper and electronic), emails, files on floppy disks and CDs, and hard drive files, regarding Mr. Swartz's correspondence and communication to others (including Garmin, BMW, Alpine, Thales, Toyota, Siemens, Harman, and others) concerning the '685 patent and related subject matter. In particular, Mr. Swartz testified that he did not search all of his files, including those on CDs and those he may have shared with his assistant Shana Langer, for all responsive drafts or emails. Please confirm that Mr. Swartz has conducted a thorough search for all responsive documents in his possession, custody, and control and produce these documents promptly. These should include documents maintained by his assistant, Ms. Langer.

- Mr. Swartz also testified that he examined the "Navtech S-document." Please confirm whether that document is MIT 03140-03361, which is entitled "NavTech PSF Specification for SDAL Format" dated October 1999. If this is indeed the document referenced by Mr. Swartz in his deposition, please also inform us whether he has any updated versions of this document, as the one produced by

## KIRKLAND & ELLIS LLP

Kimberly Mottley, Esq.
February 16, 2006
Page 3

MIT is dated "October 1999." Please further confirm that Mr. Swartz has produced all documents in his possession, custody and control regarding Navtech, his communications with Navtech, and his research of Navtech and its databases.

It is apparent from Mr. Swartz's deposition testimony that he has not produced all responsive documents in his possession, custody, or control, including the documents listed above, in accordance with Harman's document requests and interrogatories. It is also apparent that Mr. Swartz has not conducted a thorough search for all responsive documents in his possession, custody, and control. We request that MIT promptly produce all such responsive documents, identify the Bates numbers if those documents have already been produced, or specifically state that no such documents exist within its custody or control.

To the extent that Mr. Swartz is unable to produce documents that he testified were in his possession, custody, and control, please provide an explanation as to why he cannot produce. To the extent that these documents raise additional issues for which Harman is entitled to discovery, or if it appears that Mr. Swartz failed to preserve and produce certain evidence in this case, we reserve the right to re-examine Mr. Swartz pursuant to Rule 30(d) of the Federal Rules of Civil Procedure.

We look forward to hearing from you by the close of business on February 17, 2006, and to resolving these issues in our future telephone conference that we are in the process of scheduling.

Sincerely,

Ann H. Chen

**EXHIBIT J**

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Ann H. Chen
To Call Writer Directly:
312 861-6352
achen@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200
Dir. Fax 312 861-2200

February 15, 2006

**VIA ELECTRONIC MAIL**

Kimberly Mottley, Esq.
Proskauer Rose LLP
One International Place
22nd Floor
Boston, MA 02110

Re:     *MIT v. Harman International Industries, Inc.*, No. 05-10990 DPW

Dear Kim:

I write regarding deficiencies in MIT's document production.

**First,** during the February 9, 2006 deposition of Jack Turner, he was unable to confirm whether he had produced all documents in his possession, custody, or control responsive to Harman's First Set of Requests for Production of Documents and Things and First Set of Interrogatories. Please confirm that Mr. Turner has produced all such documents.

In addition, Mr. Turner testified during his deposition that he gave MIT's attorneys certain responsive documents. MIT, however, has not produced those documents to Harman. For example, Mr. Turner testified that he produced (1) a copy of the NEC license agreement regarding the '685 patent and (2) the GoThere license agreement regarding the '685 patent to MIT's attorneys. To date, we have not received a copy of those license agreements, nor have we received any royalty reports related to these license agreements.

In addition to the NEC and GoThere license agreements, we have not received the following responsive documents Mr. Turner identified or referenced in his deposition:

- Technology Disclosure Form for Case 5088TS (MIT's case number assigned to the '685 patent);

- Joint ownership agreement and all database artifacts related to such an agreement between the Technology Licensing Office ("TLO") and the MIT Media Lab concerning the '685 patent;

London          Los Angeles          Munich          New York          San Francisco          Washington, D.C.

# KIRKLAND & ELLIS LLP

Kimberly Mottley, Esq.
February 15, 2006
Page 2

- GoThere's written research and development plan submitted to the MIT Technology Licensing Office with respect to its license of the '685 patent;

- Presentation for GoThere, including research and development plans, referenced in the TLO's agreement file regarding GoThere;

- All financial statements regarding the GoThere license agreement, including those referenced in MIT's agreement financial summary for the GoThere license agreement;

- All royalty reports regarding the GoThere license agreement, including those referenced in MIT's agreement financial summary for the GoThere license agreement;

- Any working models created with respect to the GoThere license agreement, including the working model created on or approximately December 31, 2000 that is referenced in MIT's agreement financial summary for the GoThere license agreement;

- Patent option agreement sent by Mr. Turner to Zen Chu of GoThere;

- MIT Conflict of Interest Policy, which Mr. Turner identified as attached to the GoThere license agreement; and

- License agreements between MIT and other parties relating to the subject matter of the '685 patent, including the license agreement between MIT and Akamai, identified by Mr. Turner in his deposition.

Please confirm with us that Mr. Turner has produced all responsive documents in his possession, custody, or control -- including those identified above -- in accordance with Harman's document requests and interrogatories. If MIT has already produced these documents, please provide us with the corresponding Bates numbers.

*Second*, MIT 01766-67 is an email from Jack Turner regarding "BackSeat Driver Patent Case 5088." This email refers to (1) "The Team" slide, (2) "GoThere's U.S. and foreign patent applications," and (3) "VC pitch slides." These documents referenced in the email (MIT 01766-67) were not produced to Harman.

# KIRKLAND & ELLIS LLP

Kimberly Mottley, Esq.
February 15, 2006
Page 3

Please inform us when you will produce the above attachments referenced in MIT 01766-67.

*Third*, upon our review of MIT's document production, MIT has produced documents that are missing information or contain only email heading without text. Each of these email documents is clearly responsive based upon the subject identified in the reference line. For example, the following emails are missing entire messages or substantial portions thereof: MIT 02002, MIT02003, MIT 02005, MIT 02104, MIT 02101, MIT 02058, MIT 02057, MIT 02056, MIT 02060, MIT 02059, MIT 02096 or 02006 or 02086 (the Bates stamp is difficult to read), MIT 02067, MIT 01702, MIT 01703, MIT 02090, MIT 02091, MIT 02097, MIT 02098, MIT 02096, MIT 02099, MIT 02100, MIT 02079, MIT 02078, MIT 01024, and MIT 02055

Please inform us when you will produce the above documents in their entirety.

*Fourth*, MIT has designated the above referenced documents (those missing all or substantial information) as "Highly Confidential." Given that these documents contain little or no substantive information, this designation is apparently incorrect. We ask that MIT review its confidentiality designations for all its documents produced to date and confirm that they have been correctly designated as pursuant to the protective order, entered by the Court on January 31, 2006.

*Fifth*, MIT has produced emails which list attachments, but those attachments have not been produced to Harman. For example, the following are emails whose attachments have not been produced: MIT 02090, MIT 02093-94, MIT 02095, MIT 01749, MIT 02001, MIT 02075, and MIT 02074.

Please inform us when you will produce the attachments to these documents in their entirety as well as other email attachments that MIT has not yet produced. If they have already been produce, please provide the corresponding Bates ranges.

Given the apparent deficiencies in MIT's document production, we request that MIT promptly produce such documents, identify the Bates numbers if those documents have already been produced, or specifically state that no such documents exist within its custody or control.

## KIRKLAND & ELLIS LLP

Kimberly Mottley, Esq.
February 15, 2006
Page 4

We look forward to hearing from you by the close of business on February 16, 2006.

Sincerely,

Ann H. Chen

**EXHIBIT K**

# PROSKAUER ROSE LLP

One International Place
22nd Floor
Boston, MA 02110
Telephone 617-526-9600
Fax 617-526-9899

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

Kimberly A. Mottley
Direct Dial: 617-526-9616
Email: kmottley@proskauer.com

February 15, 2006

*Via Electronic Mail*

Craig D. Leavell, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois  60601

Re:    MIT v. Harman International Industries, Inc., No. 05-10990 DPW (D. Mass.)

Dear Craig:

I write pursuant to the parties' agreement to exchange preliminary claim constructions, and amended interrogatory responses, today.

MIT's amended responses to interrogatories 1-5 are enclosed herewith.  As you'll see, MIT's response to Interrogatory No. 5 incorporates by reference MIT's updated infringement contentions, which are attached thereto.

MIT's preliminary claim construction contentions are discussed below.  Of course, because we don't have your contentions yet, this is only a preliminary exchange for discussion purposes, and MIT reserves the right to add to or modify its positions at any time prior to the Court's issuance of its *Markman* decision, based on positions Harman takes or the evidence adduced during discovery.

PROSKAUER ROSE LLP

Craig D. Leavell, Esq.
February 15, 2006
Page 2

**Claim Construction**

At this time, MIT believes that, but for the following terms for which clarification may prove useful for the jury, the remaining terms of the claims of U.S. Patent No. 5,177,685 should be given their ordinary meaning, and do not require further construction by the Court:

1.     physical connectivity: how pieces of pavement connect (support is found in Col. 2, lns. 13-14 of the patent).

2.     legal connectivity:     whether one can legally drive onto a physically connected piece of pavement (support is found in Col. 2, lns. 14-16 of the patent).

3.     discourse generator:    a functional module, in software or hardware, which composes driving instructions and other messages according to a *discourse model*, for delivery at the appropriate time and place, and based on the current position of a vehicle and its planned route, (support is found in Col. 3, lns. 35-38; Col. 13, lns. 46-47; and Col. 23, lns. 6-15 of the patent). A "discourse model" is a way to provide information needed by a conversation participant in context to enable the conversation participant to determine why an utterance was provided and what the utterance means.

*          *          *

Sincerely,

Kimberly A. Mottley

Enclosures

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY,

        Plaintiff,

v.

HARMAN INTERNATIONAL
INDUSTRIES, INCORPORATED,

        Defendant.

Case No: 05-10990 DPW
Hon. Douglas P. Woodlock

## MIT'S AMENDED RESPONSE TO HARMAN'S
## FIRST SET OF INTERROGATORIES (Nos. 1-5)

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff,

Massachusetts Institute of Technology ("MIT") submits the following amended responses and

objections to Harman International Industries, Incorporated's ("Harman's") First Set of

Interrogatories (Nos. 1-5) (the "Interrogatories"):

### GENERAL OBJECTIONS

The following general statements and objections are incorporated into each of MIT's

responses, as set forth there in full, even if not repeated therein:

1.    MIT objects to the Interrogatories to the extent they refer to an Appendix A to

Harman's First Set of Document Requests to MIT, which does not exist.

2.    MIT objects to Harman's method of counting, but under Harman's counting method,

Harman has served twenty-nine (29) interrogatories, and thus has exceeded the twenty-five (25)

permitted by Rule 33 of the Federal Rules of Civil Procedure. Upon mutual agreement of

counsel as to method of counting the parties' respective interrogatories, MIT will provide additional appropriate responses, if necessary.

3.  MIT objects to the Interrogatories to the extent they call for disclosure of information protected by the attorney-client privilege, work-product doctrine, and/or any other privilege or immunity.  In the event that any response given by MIT contains privileged or protected information, its disclosure is inadvertent and shall not constitute a waiver of any privilege or protection with respect to the divulged information or any other information.

4.  MIT objects to the Interrogatories to the extent they attempt or purport to impose obligations on MIT beyond those required by the Federal Rules of Civil Procedure 26 and 33, or the Local Rules of Practice of the United States District Court for the District of Massachusetts.

5.  MIT objects to the Interrogatories to the extent that they seek information already in Harman's possession, equally available to Harman, and/or publicly available.

6.  MIT objects to the Interrogatories to the extent that they seek information not in the possession, custody, or control of MIT, information not owned or belonging to MIT, or information that is subject to a non-disclosure obligation pursuant to a confidentiality agreement with a third-party.

7.  MIT objects to the Interrogatories to the extent that they are vague, ambiguous, and/or confusing, incomprehensible and/or unanswerable because of undefined or ill-defined terms and/or confusing syntax, or they fail to describe with reasonable particularity the information sought.

8.  MIT objects to the Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and/or designed solely to harass MIT.

9.  MIT objects to the Interrogatories to the extent that they seek information not relevant to the subject matter of the present lawsuit and/or are not reasonably calculated to lead to the discovery of admissible evidence.

10.  The information supplied in MIT's responses may not be based solely upon the knowledge of the executing parties, but may include the knowledge of MIT's agents, representatives, and attorney(s), unless privileged.

11.  MIT expressly reserves all objections as to relevance and/or admissibility of any information disclosed in its objections and/or responses.

12.  MIT's willingness to provide responses to any of the Interrogatories is not a concession that the subject matter of the particular Interrogatory is discoverable, relevant to this action, or admissible as evidence.

13.  To the extent MIT adopts any terms used by Harman in its Interrogatories, such adoption is specifically limited to the objection and responses herein, and does not constitute an admission of law or fact by MIT.

14.  The presence or absence of any general or specific objection does not mean that MIT does not object on any other grounds.

15.  MIT has responded to the Interrogatories as it interprets and understands each Interrogatory made therein.  If Harman subsequently asserts an interpretation of any Interrogatory that differs from the understanding of MIT, MIT reserves the right to supplement its objections and responses.

16.  MIT incorporates its General Objections to Harman's First Set of Requests for the Production of Documents and Things (Nos. 1-29) as if fully set forth herein.

17. The responses set forth below are based on information presently known to MIT. MIT expressly reserves the right to complete its investigation and discovery of the facts and to rely, at the time of trial or in other proceedings, upon documents and evidence in addition to the information provided regardless of whether such information is newly discovered or currently in existence. MIT may, in the future, obtain or locate additional information responsive to these Interrogatories. Further, a complete response to certain Interrogatories depends in part upon information to be adduced from Harman or third parties during discovery, which is ongoing. MIT, therefore, reserves its right, at any time, to revise, amend, correct, supplement, modify, or clarify its responses, on a timely basis, in accordance with Federal Rules of Civil Procedure 26 and 33.

## SPECIFIC OBJECTIONS AND RESPONSES

### INTERROGATORY NO. 1

State MIT's proposed construction, and all bases supporting such construction, of the following element of claim 1 of U.S. Patent No. 5,177,685 (the "Patent-In-Suit"): "a map database functionally connected to said computing apparatus which distinguishes between physical and legal connectivity."

### RESPONSE TO INTERROGATORY NO. 1

MIT objects to this Interrogatory because MIT has not yet completed its factual and legal analysis with regard to claim construction, and thus contention interrogatories regarding the interpretation of each claim are premature at this stage of the litigation. MIT further objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges.

Subject to, and without waiving, the foregoing general and specific objections, MIT incorporates by reference its preliminary claim constructions set forth in its February 15, 2006 letter sent herewith.

## INTERROGATORY NO. 2

For each asserted claim of the Patent-in-Suit, identify each element that MIT contends is written in means-plus-function form as permitted under 35 U.S.C. § 112 ¶6 and, for each such element, identify the specified function for that element and the corresponding structure, material, or acts described in the specification as required by 35 U.S.C. § 112 ¶6. MIT's response to this interrogatory should appear in columns 2 and 3 of Table A in Appendix A and should include citations to all evidence (by column and line number, or by figure and item number) allegedly supporting MIT's identified function.

## RESPONSE TO INTERROGATORY NO. 2

MIT objects to this Interrogatory because MIT has not yet completed its factual and legal analysis with regard to infringement and claim construction, and thus contention interrogatories regarding the interpretation of each claim are premature at this stage of the litigation. MIT further objects to this Interrogatory to the extent that it asks that MIT provide information in a certain format.

Subject to, and without waiving, the foregoing general and specific objections, MIT states that there are no elements of any asserted claim of the Patent-in-Suit written in means-plus-function form.

## INTERROGATORY NO. 3

For each element identified in response to Interrogatory No. 2 above, state whether MIT contends that Harman literally infringes that element (i) because the structure identical to that identified in response to Interrogatory No. 2 above for that element is found in each accused product and, if MIT contends that identical structure exists, provide a detailed explanation of where such identical structure for that element is found in each accused product; or because (ii) a structure equivalent to that identified in response to Interrogatory No. 2 above for that element is found in each accused product and, if MIT contends that equivalent structure exists, provide a detailed explanation of where such equivalent structure for that element is found in each accused product. MIT's response to this interrogatory should appear in columns 4 of Table A in Appendix A and should include citations to all evidence allegedly supporting MIT's contention and its identified structure.

## RESPONSE TO INTERROGATORY NO. 3

See Response to Interrogatory No. 2.

## INTERROGATORY NO. 4

For each element identified in response to Interrogatory No. 2 above, state whether MIT contends that Harman infringes that element under the doctrine of equivalents and, if MIT contends that doctrine of equivalents infringement exists, provide a detailed explanation of where that element is found in each accused product and the bases for MIT's contention that the differences between the element and the accused product are insubstantial and that the element and the accused product perform substantially the same function in substantially the same way to achieve substantially the same result. MIT's response to this interrogatory should appear in

column 6 of Table A in Appendix A and should include citations to all evidence allegedly supporting MIT's contentions.

## RESPONSE TO INTERROGATORY NO. 4

See Response to Interrogatory No. 2.

## INTERROGATORY NO. 5

For each element of each asserted claim not identified in response to Interrogatory No. 2 above, provide a detailed explanation of where that element is found in each accused product and a statement as to whether that element is alleged to be present literally or under the doctrine of equivalents. For each element that is alleged to be present under the doctrine of equivalents, MIT's explanation should include the bases for MIT's contention that the differences between the claim element and the structure in the accused product are insubstantial that the element and the accused product perform substantially the same function in substantially the same way to achieve substantially the same result. MIT's response to this interrogatory should appear in column 7 of Table A in Appendix A and should include citations to all evidence allegedly supporting MIT's contentions.

## RESPONSE TO INTERROGATORY NO. 5

MIT objects to this Interrogatory because MIT has not yet completed its factual and legal analysis with regard to infringement and claim construction, and thus contention interrogatories are premature at this stage of the litigation.  MIT further objects to this Interrogatory to the extent that it asks that MIT provide information in a certain format.

Subject to, and without waiving, the foregoing general and specific objections, MIT hereby incorporates by reference its preliminary infringement contentions served herewith.  MIT

further states that its preliminary infringement contentions are based on literal infringement at this time.

Dated: February 15, 2006

Respectfully submitted,

Massachusetts Institute of Technology,

By its Attorneys,

Steven M. Bauer (BBO# 542531)
John W. Pint (BBO# 660548)
Kimberly A. Mottley (BBO# 651190)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110-2600
Phone: 617-526-9600
Fax:    617-526-9899

## CERTIFICATION

I, the undersigned, have reviewed MIT's Amended Responses to Harman's First Set of Interrogatories (Nos. 1-5). The responses set forth herein, subject to inadvertent or undiscovered errors or omissions, are based on and therefore necessarily limited by the records and information still in existence, presently recollected, thus far discovered in the course of preparation of the responses, and currently available to MIT. Consequently, MIT reserves the right to make any changes in or additions to any of these responses if it appears at any time that errors or omissions have been made therein or that more accurate or complete information has become available. Subject to the limitations set forth herein, said responses are true to the best of my present knowledge, information and belief.

I hereby certify under penalty of perjury that the foregoing is true and correct.

Executed on this ___ day of February, 2006.

_____
John H. Turner, Jr.
Associate Director, Technology Licensing Office
On behalf of Massachusetts Institute of Technology

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 15, 2006, I caused a true and correct copy of

MIT's AMENDED RESPONSES TO HARMAN'S FIRST SET OF INTERROGATORIES

(NOS. 1-5) to be served on the following counsel of record via email:

Robert J. Muldoon, Jr.
**SHERIN AND LODGEN, LLP**
101 Federal Street
Boston, MA 02110

William A. Streff Jr., P.C.
Craig D. Leavell
Michelle A. H. Francis
Jamal M. Edwards
**KIRKLAND & ELLIS LLP**
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000 (phone)
(312) 861-2200 (fax)

By: _Kimberly A. Mottley_
Kimberly A. Mottley

**EXHIBIT L**

**PROSKAUER ROSE LLP**

One International Place
Boston, MA 02110-2600
Telephone 617.526.9600
Fax 617.526.9899

NEW YORK
LOS ANGELES
WASHINGTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

Anne L. Boutin
Direct Dial 617.526.9892
aboutin@proskauer.com

February 14, 2006

**Electronic Mail**

Lesley Ahlberg
Paralegal
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

Re:    MIT v. Harman International Industries, Inc., No. 05-10990 DPW (D. Mass.)

Dear Ms. Ahlberg:

Enclosed please find an additional document produced on behalf of our client MIT, bearing the Bates number MIT 04851 and having the designation "Confidential".

Should you have any questions, please contact me at the above number.

Very truly yours,

Anne L. Boutin

Enclosure

**REDACTED**

-----Original Message-----
From: Robert Swartz [mailto:rswartz@media.mit.edu]
Sent: Wednesday, October 27, 2004 4:52 PM
To: Meredith Addy; Robert Hart
Subject: MIT Navigation Patents -- Status

I just wanted to give you a status report.

Preparing a response to you has taken a little longer than we expected.
However our review is nearly completed and we expect that we will have
a response from our attorney shortly. I expect it will be not be much
longer than a week, and possibly sooner.

Thanks,

Bob Swartz

**CONFIDENTIAL**

**MIT 04851**

**EXHIBIT M**



|  | |
| --- | --- |
| Jamal Edwards/Chicago/Kirkland-Ellis | **To** mit_harman@proskauer.com |
| | **cc** Harman-MIT |
| 01/30/2006 10:51 AM | **bcc** |
| | **Subject** MIT v. Harman/Document Production |

Dear Counsel:

Harman is today producing for inspection and/or pick up documents bates labeled HAR 067641-083031 (CD HAR006) and HAR 083032-087234) (CD HAR 007), which contain e-mail and correspondence collected from Harman's Farmington Hills, MI and Northridge, CA offices.  Please contact Lesley Ahlberg or Michael Viglione at 312.861.2000 to make any arrangements.

Regards,

Jamal.

**JAMAL M. EDWARDS | KIRKLAND & ELLIS LLP**
200 East Randolph Drive ♦ 53rd Floor |Chicago, IL 60601 | 312.861.2464 **Direct** | 312.861.2200 **FAX**
www.kirkland.com/jedwards

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Jamal M. Edwards
To Call Writer Directly:
(312) 861-2464
jedwards@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200
Dir. Fax: (312) 660-0719

October 7, 2005

**VIA FACSIMILE**

Kimberly A. Mottley, Esq.
Proskauer Rose LLP
One International Place, 14th Floor
Boston, MA 02110-2600

Re:     *MIT v. Harman Int'l Indus. Inc.*,
        Case No. 05-10990 DPW

Dear Kimberly:

This letter responds to your October 4, 2005 letter, and memorializes the additional issues discussed during our teleconference on Monday, October 3, 2005, which were not included in your letter.

1.    <u>Harman Affiliates</u>

Your letter accurately reflects my representation that, to the best of our knowledge and based upon our current understanding of MIT's claims, Harman has responded to MIT's discovery requests on behalf of all Harman entities that have relevance to this action. Each of these relevant Harman entities have been disclosed in Harman's initial disclosures. Should we learn of any additional entities not previously disclosed, we will supplement accordingly.

2.    <u>Protective Order</u>

We are reviewing MIT's revisions to our revised version of the protective order, which I received from you today. This letter should address many of the outstanding issues. If there are any remaining issues, we will respond as soon as possible. As you've already noted, we have agreed to produce documents on an "outside attorney's-eyes-only" basis, pending negotiation, execution, and entry of the protective order.

During our teleconference, we discussed paragraph 3, regarding the use of bates ranges and identifying prefixes. I can confirm that Harman will produce documents with bates ranges and identifying prefixes (*e.g.* "HAR") or other appropriate prefixes. This provision may remain in the protective order.

London          Los Angeles          Munich          New York          San Francisco          Washington, D.C.

# KIRKLAND & ELLIS LLP

Kimberly A. Mottley, Esq.
October 7, 2005
Page 2

Regarding paragraph 4, concerning the confidentiality of deposition transcripts: You indicated that MIT will agree to designate depositions as presumptively confidential for 15 business days, as opposed to its original proposal of 30 days. Harman will agree to a 15 day presumptive confidentiality period for depositions designations, provided that a deposition is not designated "confidential" during the deposition. We will follow the procedure for objections and leave of court, as set forth in the remainder of this provision.

We also discussed paragraph 6(b), which defines which of the parties' employees and counsel may have access to confidential documents. You asked that Harman allow Jack Turner to have access to Harman's confidential documents, even though he does not meet the definition of "in-house counsel" (you stated that he is not a lawyer). After he executes an appropriate undertaking, Harman will allow Jack Turner to see its confidential documents as MIT's in-house representative, provided that MIT will allow Robert Hart at least the same level of access to its confidential documents.

During our call, you requested that both parties agree to file redacted versions of any documents filed under seal. I can confirm that Harman will agree to file a redacted version, along with any sealed documents filed, where redaction may reasonably be accomplished.

We also discussed the expert objection period described in paragraph 6(c), regarding independent experts. You requested that we agree to a 7-day period to object to each other's experts, after an expert is disclosed by the retaining party. I advised you that Harman does not intend to disclose the identity of any non-testifying experts, nor do we intend to limit the number of non-testifying experts with whom we will consult. You indicated that MIT does not object to the parties using non-testifying experts, provided that neither party will show an opponent's confidential documents to a consulting expert, without first disclosing them and following the procedure for objections and leave of court, as provided in the protective order. Harman will agree to these terms.

I also informed you that Harman does not agree to the inadvertent production language contained in paragraph 14. Instead, I proposed that each party accept an affirmative obligation to return any documents received, which objectively appear to be privileged; after which the parties can address whether the document should have been disclosed or deemed waived, with a final resort to the court where necessary. Based upon your letter, I understand that MIT has rejected this proposal and agreed to strike paragraph 14 in its entirety. *See* October 4, 2005 Mottley Letter to Edwards at 1. Given this understanding, we believe that any issues of inadvertent production and/or privilege waiver will be governed by the applicable case law and federal rules.

# KIRKLAND & ELLIS LLP

Kimberly A. Mottley, Esq.
October 7, 2005
Page 3

Regarding paragraph 21, concerning notices: I proposed that each party agree to serve any notices required or allowed under the protective order by 5:00 p.m. in the sending parties' time zone. You indicated that MIT would agree to such a requirement.

3.     Depositions

You indicated that MIT will present Swartz on November 15th in Boston. We noticed Mr. Swartz' deposition for September 22, 2005. Please advise at to whether Mr. Swartz is available on an earlier date, preferably in October.

We are reviewing MIT's notice of the 30(b)(6) deposition of Harman. We will be responding to the notice soon. After we identify the proper designees, we will be glad to discuss deposition scheduling.

4.     Harman's Discovery Responses

As I explained to you, Harman believes that MIT's Document Request Nos. 6,7, 11-15, 17 and 18, are objectionable, for at least the reasons stated in our responses. You admitted that Request Nos. 6 and 7 relate to willfulness, yet MIT has not pleaded willful infringement in its complaint. Your October 4, 2005 confirms that MIT will not be amending its complaint, notwithstanding our objections and willingness to reconsider after seeing MIT's amended complaint. It is not clear whether MIT refuses to amend to cure our objections, or whether MIT has decided it will not amend its complaint at all. Please confirm that MIT is not alleging willful, contributory and/or doctrine of equivalents infringement, and that MIT will not make any other amendments that might cure Harman's objections.

You also reiterated MITs dispute of our counting objections regarding the number of interrogatories served by MIT. As I told you, Harman stands by its objections. MIT's desire to reciprocate with the same objections can not delay MIT's response. We look forward to receiving MIT's responses within 30 days of service, and addressing MIT's objections after that time.

Regarding our invocation of Rule 33(d) in lieu of answering certain of MIT's interrogatories, I confirmed that Harman will identify the documents cited in our 33(b) responses, by bates ranges, as soon as we are able. You confirmed that MIT will await receipt of the documents produced under Rule 33(d) in response to Interrogatories Nos. 5 – 8, after which you will advise whether MIT will withdraw its objections.

# KIRKLAND & ELLIS LLP

Kimberly A. Mottley, Esq.
October 7, 2005
Page 4

We also discussed Harman's incorporation of its initial disclosures into its responses to MIT's interrogatories. As I told you, we prepared our initial disclosures, intending to disclose each of the key persons with relevant knowledge and the subject of their expertise. You advised that MIT wanted to know which people are "best suited for depositions," so as to avoid deposing multiple people for the same information. I informed you that we are amenable to conferring with you regarding each person disclosed in Harman's initial disclosures to help minimize any unnecessary duplicate depositions. You also agreed that we would revisit this issue, if necessary, after the 30(b)(6) deposition of Harman, which should help identify which employees are responsible for many of the activities and subjects of interest to MIT.

5.    <u>Document Production</u>

I told you that we will be making available for inspection and/or copying in our Chicago office, a CD containing electronic documents collected from Harman's German facilities. The CD will be numbered, and each file will also be numbered (with ranges, if possible). We are making this CD available in Chicago as a courtesy, and Harman does not commit to doing so in the future. I also told you we would produce in Chicago a box of documents, including mostly product manuals and marketing material. We will also provide copies of the financial documents we currently have. You advised that MIT will send a copy service to copy the CD and any paper documents we produce in Chicago, after we notify you that the documents are available. We expect to be in a position to make them available next week.

I also advised that we may have large volume of paper documents coming from Harman's German facilities, which MIT will have to inspect in Munich. We are still in the process of reviewing and collecting these documents. I will keep you informed of our progress.

Very truly yours,

Jamal M. Edwards

cc: Robert J. Muldoon, Esq.

**EXHIBIT N**

# PROSKAUER ROSE LLP

One International Place
22nd Floor
Boston, MA 02110
Telephone 617-526-9600
Fax 617-526-9899

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

Kimberly A. Mottley
Direct Dial: 617-526-9616
Email: kmottley@proskauer.com

October 4, 2005

<u>Via Email</u>

Jamal M. Edwards, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

Re:     MIT v. Harman International Industries, Inc.,
        <u>Civil Action No. 05-10990 DPW, U.S.D.C. Mass.</u>

Dear Jamal:

I write to follow-up on a few issues we discussed yesterday.

1.     <u>Discovery From Harman Affiliates</u>

Thank you for your representation that Harman has responded to MIT's discovery requests on behalf of all Harman affiliates that have relevance to this action (and, thus, is not withholding discovery, forcing MIT to subpoena Harman affiliates). I appreciate this clarification of Harman's General Objection No. 6.

2.     <u>Protective Order</u>

I look forward to receipt of the redlined Microsoft Word version of the protective order later today. Once I receive this, I will accept the changes you made to which we do not object, and redline in any additional text that we agreed upon during our conversation.

I will wait to hear back from you on former paragraphs 3 (concerning Bates labeling), 6 (the notice and objection provisions), and 21 (concerning deadline for notices). As to former paragraph 14, we will leave it stricken in its entirety.

Thank you for your agreement to produce documents on an attorneys' eyes only basis while we finalize the protective order.

**PROSKAUER ROSE LLP**

Jamal M. Edwards
October 4, 2005
Page 2

3.    <u>Depositions</u>

As I informed you yesterday, Mr. Swartz is available for deposition in Boston on November 15, 2005. As you also know, we are offering his availability with a view toward establishing a global schedule of the entire first round of depositions, including Harman's deponents it will provide in response to MIT's 30(b)(6) notice. Please let me know as soon as possible when you have dates of availability for the 30(b)(6) witnesses so that we can negotiate the final schedule for this first round.

4.    <u>Documents</u>

As to documents, I look forward to hearing from you later this week when the CD(s) and box of documents are ready for our vendor to pick up and copy. I understand that you will also let me know when the paper documents in Germany, and those from Harman Consumer Group, are ready for inspection.

As for Harman's objections to MIT's Document Request Nos. 6, and 7, we see no need to amend our complaint in order to receive discovery pursuant to these requests. I look forward to hearing from you whether Harman will agree to supplement its responses to these requests, as well as Request Nos. 11, 13, 14, 15, 17, and 18.

Finally, can you please confirm that you will be identifying the sources of the documents Harman produces (by pre-production number, and subsequently by Bates number)?

\*            \*            \*

I look forward to hearing from you later this week.

Yours truly,

Kimberly A. Mottley

**EXHIBIT P**

# PROSKAUER ROSE LLP

One International Place
22ⁿᵈ Floor
Boston, MA 02110
Telephone 617-526-9600
Fax 617-526-9899

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

Kimberly A. Mottley
Direct Dial: 617-526-9616
Email: kmottley@proskauer.com

January 23, 2006

*Via Electronic Mail*

Craig D. Leavell, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

> Re:     MIT v. Harman International Industries, Inc., No. 05-10990 DPW (D. Mass.)

Dear Craig:

I write in response to your three letters sent last Friday evening, January 20, 2006, and email sent earlier today, and to address a few other outstanding discovery issues.

## Product Samples

We were surprised by your letter, and Jamal Edwards' follow-up email, regarding the product samples. You told us on more than one occasion that the product samples you had available in Chicago were substantially modified from the versions Harman makes available to its customers (in your attempts to justify the $3,000 "cost" of those samples). Why do you continue playing games? Let our Chicago paralegal inspect the products -- we've been asking for two days -- and let's see if we can resolve it. Better yet, if you ship the product samples to your Boston counsel, and let us look at them, we can resolve this matter quickly. If the products are what you now represent them to be, the dispute may be moot. But, we cannot tell so long as you make it difficult for us to inspect.

I gather from your letter that the products are still in Chicago. May we now inspect them today?

**PROSKAUER ROSE LLP**

Craig D. Leavell, Esq.
January 23, 2006
Page 2

<u>Source Code</u>

You know our position on the source code. The cases cited in your letter are irrelevant, especially as most involve litigation between competitors, and the electronic data (email files) are different from the source code at issue here. Of course, for every case you cite, there is a court that requires the production to counsel when there is no reason to question counsel's security.

You have refused to tell us why you believe the code would be more secure at Sherin and Lodgen's Boston office, than at Proskauer's office. You have expressed no reason as why we should have to coordinate with your local counsel every time we want to view the source code, nor will we agree to restrictions on our rights to print the source code. Because you refuse to produce the electronic source code for us to secure at our offices under the same conditions as your local counsel would secure it here, we remain at an impasse.

Further, in our previous conversations, you refused to produce a printed-out, hard copy of the full source code to us for housing in our offices. Has your position changed? We cannot agree at this point to accept a hard copy in lieu of the electronic version of the code, and you have no right to condition production of the written source code on our agreement not to seek the electronic code. Until you produce the source code, however, we cannot even evaluate whether there is another way we might resolve this dispute. Please let me know.

<u>Depositions</u>

MIT has noticed depositions of individuals it expects will be knowledgeable based on Harman's discovery produced to date. Harman's rotating door of knowledgeable persons identified in its initial disclosures and its repeated delays in producing documents which might shed further light on this has made this process difficult, to say the least. Certainly, we will try to ascertain which persons are worth deposing as we get more information during discovery. However, to the extent we find it necessary to depose more than 10 witnesses, we will seek leave from the Court to do so, if you refuse voluntarily to provide those depositions. Of course, in that event, we will tell the Court that we needed extra depositions because Harman refused to be forthcoming and cooperative.

We will take the deposition of Mr. Eelman on February 14 in Chicago, Mr. Giffin on February 15 in Chicago, and Mr. Rodamski on February 22 in Chicago. Because each of these witnesses has already been properly noticed, subject only to mutual agreement on time and place, we will not "re-notice" the already-noticed depositions once scheduled.

We have now given you dates for all the depositions Harman noticed. When will you give us dates of availability for the other noticed Harman depositions? In addition to your position refusing to provide dates for technical witnesses, you still have not provided dates of

**PROSKAUER ROSE LLP**

Craig D. Leavell, Esq.
January 23, 2006
Page 3

availability of several non-technical witnesses, including Messers. Naife, Jeske, and Harman's 30(b)(6) witness as to Topic 3.

You inquired as to when you can expect MIT's claim construction contentions – this is addressed in our motion to compel. MIT's initial infringement contentions were served on you on November 4, 2005. When you provide the samples of the product and the source code, we will be in a position to discuss a claim construction exchange. Of course, if you are prepared to exchange contentions, as you say, why don't you just send us yours now and we can see if there is, in fact, any likelihood of real disagreement.

We are also still awaiting the name of Harman's 30(b)(6) witness as to Topic 2, so that we can respond to your proposal of April 18 for that deposition. Your January 20 letter leads us to believe that you still have not modified Harman's initial disclosures to reflect that you now concede willful infringement issues are now in the case. Please update your disclosures immediately, and confirm that your document production (and privilege log) completed this week will include documents relevant to willful infringement. Regardless, Topic 2 also involves Harman's invalidity claims, which Harman put at issue with its Answer.

Finally, we asked that you let us know by the end of last week whether you represent Mr. Rauterberg. As we have not heard from you, we understand that you do not represent him and we are free to contact him directly.

## Documents

In your January 17 letter, you stated that the emails you have in your possession were awaiting privilege review, and you expected to produce them "very soon." It's now been almost another week with no word from you that any of those emails are available. Please let us know whether our vendor can pick up any additional documents today.

Also, I never heard back from you in response to our request that Harman produce documents it has available electronically in electronic form (such as the sales spreadsheet we discussed, which you have in Excel format). Please let us know whether you will agree to do so.

Please confirm that the documents you have already made available include Dr. Wietzke's production pursuant to his subpoena. If they do not, please let us know a date certain by which you expect to produce those documents.

Can you please let us know, by Bates Number range, the source of the documents you have produced? We have the right to know from whose files, and from which location, these documents have been produced. In addition, please let us know the location of the original documents, so that we can inspect them as necessary.

**PROSKAUER ROSE LLP**

Craig D. Leavell, Esq.
January 23, 2006
Page 4

Finally, we have not exchanged privilege logs since October 2004. When will you be producing a supplementation to the privilege log?

*                    *                    .*

I look forward to hearing from you on these issues.

Sincerely,

Kimberly A. Mottley

**EXHIBIT Q**



Jamal
Edwards/Chicago/Kirkland-Ellis

02/06/2006 03:58 PM

To    kmottley@proskauer.com

cc    MIT_HARMAN@PROSKAUER.COM, Harman-MIT

bcc

Subject    MIT v. Harman/ Reschedule of Giffin Deposition

Mr. Giffin just alerted me to an urgent business issue that will require him to travel to Europe this week and next week.   As a result, he will not be available for deposition on February 15.   Instead, we offer Mr. Giffin on February 21, in Chicago.  We expect this will not present a problem because you will already be in Chicago for Mr. Radomski's deposition on February 22.    Please confirm the above change.

Thanks,

Jamal.


**JAMAL M. EDWARDS | KIRKLAND & ELLIS LLP**
200 East Randolph Drive ♦ 53rd Floor |Chicago, IL 60601 | 312.861.2464 Direct | 312.861.2200 FAX
www.kirkland.com/jedwards

**EXHIBIT R**

**PROSKAUER ROSE LLP**

One International Place
22nd Floor
Boston, MA 02110
Telephone 617-526-9600
Fax 617-526-9899

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

Kimberly A. Mottley
Direct Dial: 617-526-9616
Email: kmottley@proskauer.com

February 6, 2006

*Via Electronic Mail*

Craig D. Leavell, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

Re:    MIT v. Harman International Industries, Inc., No. 05-10990 DPW (D. Mass.)

Dear Craig:

I write in response to your emails sent Friday afternoon, February 3, 2006 and this morning regarding depositions, and also as to certain other outstanding discovery issues.

1.    Depositions

Here is our proposed schedule, based on your information about the deponents' availability:

March 14:    You initially offered both Dr. Wietzke and Mr. Brandes on March 14. We will depose both on that day, either back-to-back or simultaneously, in Germany.

March 16:    We will depose Mr. Jeske (both as an individual, and as Harman's 30(b)(6) witness as to topic 1) in Germany.

March 28:    We will depose Mr. Hanika-Heidl in Germany.

April 4:    We will depose Mr. Naife in Chicago (both as an individual, and as Harman's 30(b)(6) witness as to category 3).

Please tell us what you mean by your comment that Mr. Naife will testify on Harman's behalf as to "part of" category 3. Also, please tell us who your additional deponent for the "other parts" of category 3 will be, and when they are available for deposition so that we can schedule those depositions.

**PROSKAUER ROSE LLP**

Craig D. Leavell, Esq.
February 6, 2006
Page 2

Please note that we may also notice Mr. Butler's deposition for that week after we take Mr. Radomski's deposition. We hope you will be reasonable in trying to schedule their depositions back-to-back for efficiency purposes.

As to Harman's 30(b)(6) witness for Topic 2, although a week has gone by since the Court allowed our joint motion to amend the pleadings, you still have failed to update Harman's written discovery to reflect any changes (such as in your identification of knowledgeable persons in your initial disclosures and interrogatories). Please do so immediately, and identify the witness you have been referring to as your Topic 2 witness, so that we can discuss scheduling. Also, please note that we have other case commitments that conflict with the April 18 date you suggested for that deposition.

2.    <u>Documents</u>

We have yet to receive from you the documents produced to you by Mr. Eelman, which we expected last week. His deposition is scheduled for next week – where are the documents? We also look forward to receiving Mr. Naife's document production this week.

Also, you have ignored my requests for a meet and confer conference so that we can discuss whether we can come to agreement on identification of sources of Harman's document productions. If we cannot meet by the end of the day today, we will move the Court to compel.

\*          \*          \*

I look forward to hearing from you on these issues.

Sincerely,

Kimberly A. Mottley

**EXHIBIT S**

# PROSKAUER ROSE LLP

One International Place
22ⁿᵈ Floor
Boston, MA 02110
Telephone 617-526-9600
Fax 617-526-9899

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

Kimberly A. Mottley
Direct Dial:  617-526-9616
Email: kmottley@proskauer.com

February 7, 2006

*Via Electronic Mail*

Jamal M. Edwards, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois  60601

    Re:  <u>MIT v. Harman International Industries, Inc.</u>, No. 05-10990 DPW (D. Mass.)

Dear Jamal:

    I write to follow up on yesterday's conversation, and in response to your email sent last night, concerning scheduling of depositions.

    Mr. Eelman and Mr. Giffin's depositions are currently scheduled for February 14 and 15 of next week.  In our January 26, 2006 conversation, you told me that you would produce Mr. Eelman's documents early last week.  Over a week has passed, and you have not produced the documents, nor will you agree to a date certain for that production.  With Mr. Eelman's deposition now less than a week away without any of his documents in hand, we are forced to postpone his deposition.

    Your continuous game-playing with deposition dates, including the last minute cancellation of Mr. Giffin's deposition, is unacceptable.  We are unavailable to take his deposition on February 21.  We can take his and Mr. Eelman's depositions on February 23 and 24th.  We are seeking the Court's assistance in getting you to set a reasonable deposition schedule for the remaining noticed depositions.  We hope that these two depositions can be conveniently scheduled without further intervention from the Court.

        Sincerely,

        Kimberly A. Mottley

**EXHIBIT T**



"Mottley, Kimberly"
<kmottley@proskauer.com>

02/10/2006 11:04 AM

To  "Jamal Edwards" <jedwards@kirkland.com>

cc  Harman-MIT@kirkland.com, "MIT_Harman"
    <MIT_Harman@proskauer.com>

bcc

Subject  MIT/Harman - Radomski Deposition

Jamal -

We've just been scheduled to appear in Court for another case on February 22. Please let us know if Mr. Radomski is available on February 23. If not, please let us know if he's available on March 2, and if not then, another day the week of February 27.

Thanks.

Kim


Kimberly A. Mottley| PROSKAUER ROSE LLP
One International Place | Boston, MA 02110-2600
V: 617.526.9616 | F: 617.526.9899
kmottley@proskauer.com | www.proskauer.com


--------------------------------------------------------------------------

This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure. If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them. Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.

=======================================================================
=========

**EXHIBIT U**

# PROSKAUER ROSE LLP

One International Place
22ⁿᵈ Floor
Boston, MA 02110
Telephone 617-526-9600
Fax 617-526-9899

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

Kimberly A. Mottley
Direct Dial: 617-526-9616
Email: kmottley@proskauer.com

February 8, 2006

*Via Electronic Mail*

Jamal M. Edwards, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

Re:     MIT v. Harman International Industries, Inc., No. 05-10990 DPW (D. Mass.)

Dear Jamal:

I am responding to your several e-mails of today regarding deposition scheduling. It appears that while you say you are ready to "compromise," the offers you make certainly are no better or more fair than what you have already unilaterally imposed on us.

We strongly object to the deposition schedule you have suggested for your witnesses, and will not withdraw our motion to compel depositions from Harman in a timely, cost-efficient schedule with the witnesses produced generally in the order we have requested, and with the witnesses provided to us so that we have sufficient time to digest what we learn from the depositions to seek additional relevant discovery. We have asked for the depositions for months, we want the depositions now, and we believe they should be scheduled to minimize the costs to the parties. We have provided precisely those courtesies to Harman, but have yet to get any such courtesy in return.

At this point, because you refuse to offer dates, times and places of witnesses in any reasonable order, it appears that we will have to take the depositions on the dates you have unilaterally provided (as set forth below), unless the Court orders a more efficient schedule prior to those dates pursuant to our motion. However, even if the depositions take place on the schedule and in the locations you demand, that will not moot our motion -- to the extent that any depositions are completed prior to the Court's ruling on our motion, we will ask the Court to order reimbursement to us for the travel expenses of making unnecessary multiple trips, trips to remote locations, and hotel costs if we have to stay extra nights waiting for your witnesses to be available.

**PROSKAUER ROSE LLP**

Jamal M. Edwards, Esq.
February 8, 2006
Page 2

In addition, we will continue to press the Court for additional time, for MIT only, to conclude fact discovery 45 days after the last deposition you offer us, whenever that is. It is unfair and prejudicial for you to offer 30(b)(6) witnesses during the last week of fact discovery, when we have been seeking the depositions for so long.

The deposition schedule you have offered, and that we will confirm subject to revision if the Court grants our motion prior to any of these dates, is as follows:

February 14 - Mr. Eelman (Chicago) - We have agreed to a date to depose Mr. Eelman, and you tell us he remains available. Yet here we are two days after you told us you were then burning his "few" documents to a CD, and you *still* haven't made these documents available. Where are these documents? If you can provide them to us in-hand tomorrow, Thursday, by email, fax, or otherwise, we can salvage the February 14 date. The deposition on that date is entirely in your hands.

February 22 - Mr. Rodamski (Chicago)

March 3 - Mr. Giffin (Chicago) (We will ask for our costs to attend this deposition, since you won't provide this witness at the same time as our earlier two trips to Chicago.)

March 14 - Dr. Wietzke (Germany)

March 16 - Mr. Jeske (Germany)

March 21 - Mr. Brandes (Germany)

March 28 - Mr. Hanika-Heidl (Germany) (We will ask the Court for either our hotel costs or airfare, or both, depending on what is the most cost-efficient way for us to take these four witnesses spread over three weeks, since you won't produce the witnesses in a cost-effective schedule.)

April 4 - Mr. Naife (Chicago) (We will ask for our costs to attend this deposition, since you won't provide this witness at the same time as our earlier two trips to Chicago.)

April 17 - Mr. Hart (Northridge, CA) (We will ask for our hotel and travel costs to attend this deposition in California, since you won't provide this witness in Chicago, despite the fact that he readily travels to depositions around the country in this matter. We could, alternatively, depose him in Boston at any time that he is here for a Boston-based deposition, such as next week.)

April 20 - Mr. Call (Fort Myers, FL)

**PROSKAUER ROSE LLP**

Jamal M. Edwards, Esq.
February 8, 2006
Page 3

        We hope that you will reconsider your proposed schedule and impose on your client to make its witnesses available sooner and closer together, rather than continue to press this matter before the Court.


                                Sincerely,

                                *Kimberly A. Mottley*

                                Kimberly A. Mottley

**EXHIBIT V**

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Craig D. Leavell
To Call Writer Directly:
(312) 861-2105
cleavell@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200

January 20, 2006

**VIA E-MAIL**

Kimberly A. Mottley, Esq.
Proskauer Rose LLP
One International Place, 14th Floor
Boston, MA 02110-2600

> Re:  *MIT v. Harman Int'l Indus. Inc.,*
> Case No. 05-10990 DPW

Dear Kimberly:

I am writing in response to your January 18, 2006 letter to Jamal Edwards and MIT's motion to compel, as they relate to depositions.

Contrary to the assertions in your letter and in MIT's motion to compel, Mr. Radomski is a technical witness, and we have offered him for February 3 despite MIT's refusal to provide us with any of its claim construction or infringement contentions. As we have stated on previous telephone conversations, we do not believe it is appropriate for MIT to demand depositions of Harman technical witnesses, and expect them to defend themselves and Harman, before providing even the most basic information about MIT's allegations. More specifically, Harman is entitled to MIT's current understanding of its claim constructions, prior to the depositions of technical witnesses, as reflected in the Court's Scheduling Order. MIT's position that additional discovery from Harman is necessary to provide MIT's claim construction is improper, for it is only after the claims have been construed, without reference to the accused device, that those claims, as construed, are applied to the accused device to determine infringement. *See SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107 (Fed. Cir. 1985). Nonetheless, in the spirit of compromise, we offered a firm date for Mr. Radomski, and MIT declined this date. We are again checking Mr. Rodamski's availability, and have a proposed date for you, as discussed below.

Your letter withdrew MIT's deposition notices for Mr. Munn and Mr. Molzen, but reserved the right to re-notice their depositions. Harman wants to be very clear on the following point, so there is no misunderstanding:  MIT is entitled to 10 depositions, and 10 depositions only. MIT has already served 10 deposition notices. Our discussions with you regarding which Harman individuals have knowledge about certain topics was meant to allow MIT to carefully

# KIRKLAND & ELLIS LLP

Kimberly A. Mottley Esq.
January 20, 2006
Page 2

choose how to allocate those 10 depositions. MIT is free to use them however MIT wants, so long as MIT stays within the 10 deposition limit.

During a teleconference earlier this week, we told you that Mr. Radomski and Mr. Butler had basically the same knowledge about the same Harman products. We have since learned that Mr. Butler's knowledge is more applicable to the Harley products and Mr. Radomski's knowledge is more applicable to the Chrysler RB4 products. Please consider this when determining whether MIT wants to use one of its 10 depositions to depose Mr. Butler.

Contrary to your letter, we have offered Mr. Eelman for any time between February 13-17, not just the 15th. If you wish to minimize travel, then we are willing to depose Mr. Davis in Chicago, since he is located in Canada and must take a flight to his deposition whether it is in Boston or Chicago. It has been difficult finding available dates for the Harman witnesses, and we will not be able to accommodate your travel schedule in every instance. Nonetheless, we can offer these preliminary dates for depositions of Harman witnesses. If these dates work for you, please let us know as soon as possible before any conflicts arise:

| | |
|---|---|
| Dave Eelman | Feb. 14 in Chicago |
| Mike Giffin | Feb. 15 in Chicago |
| Mike Rodamski | Feb. 22 in Chicago |

Regarding our designee for topic #2 of MIT's 30(b)(6) notice, it is my understanding that we have agreed to identify 30(b)(6) designees one week before the deposition. I am willing to see if Harman will agree to accommodate your request to alter that agreement, but the designee we are currently considering is not one of the 9 fact witnesses noticed by MIT for deposition. Thus, because MIT has already used up its 10 deposition notices, MIT must not have considered this person an "important" witness. This should alleviate your concerns about this deposition being scheduled relatively late in the discovery period. This person was not identified on our initial disclosures because MIT had not asserted any allegation of willful infringement.

With respect to the remaining Harman technical witnesses, when can we expect MIT's claim construction and infringement positions? The Court's scheduling order (as modified by agreement by the parties) provides for the exchange of claim construction positions this Friday, January 20. You have already told us that MIT has no intention of abiding by that Order. Harman's Interrogatories 1-5 has been outstanding for several months, and yet MIT has still provided no substantive response. Please let us know when we will receive MIT's positions on claim construction and infringement, and we can work to find dates thereafter for the remaining technical witnesses you have noticed.

# KIRKLAND & ELLIS LLP

Kimberly A. Mottley Esq.
January 20, 2006
Page 3

With respect to the dates of the depositions of the MIT witnesses, the dates you offered yesterday on the phone were not conditioned upon any dates for Harman witnesses, and we have already accepted your offer for those dates. We consider those dates to be firm and agreed upon, as follows:

| | |
|---|---|
| Swartz | February 7 in Boston |
| Schmandt | February 8 in Boston |
| Turner | February 9 in Boston |
| Davis | February 16 in Boston |
| Call | April 13 in Ft. Myers |

Very truly yours,

Craig D. Leavell

**EXHIBIT W**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BOSTON DIVISION

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY,

Plaintiff,

v.

HARMAN INTERNATIONAL INDUSTRIES,
INCORPORATED,
A Delaware Corporation,
                                    Defendant.

Case No: 05-10990 DPW
Hon. Douglas P. Woodlock

HARMAN'S FIRST AMENDED

INITIAL DISCLOSURES PURSUANT TO RULE 26(a)(1)

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and the Court's Scheduling

Order, defendant Harman International Industries, Incorporated ("Harman") makes the following

supplemental initial disclosures to Plaintiff based upon information reasonably available to Harman

at the present time.  These disclosures supersede and replace any earlier served disclosures.  As

additional information becomes available during the course of this action, Harman may exercise its

right to supplement these initial disclosures in accordance with Rule 26(e) of the Federal Rules of

Civil Procedure.

# I.    IDENTIFICATION OF INDIVIDUALS

### Rule 26(a)(1)(A):

**The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of information.**

Based on the information currently available to it, and the information that MIT has disclosed about the claims it is asserting and/or Harman products it is accusing, Harman identifies the following individuals:

| INDIVIDUAL | SUBJECT | LOCATION |
|---|---|---|
| Dr. Joachim Wietzke<br>Professor | Navigation System Creation | Beim Wasserturm 6a<br>Karlsruhe 76228<br>Germany |
| Ronne Reimann<br><br>Peter Will | Navigation System Creation, Development, Testing, & Operation | Unknown address in Germany |
| Karl Rauterberg<br>Director, Telematics & Navigation<br><br>Stefan Hanika-Heidl<br>Manager, Digital Map<br><br>Harald Lussen<br>Digital Map | Navigation System Database Structure & Operation | innovative systems Gmbh<br>Navigation-Multimedia<br>Wendenstrasse 130, 20537<br>Hamburg, Germany |
| Axel Brandes<br>Manager, Software Development<br><br>Harald Wellmann<br>Manager, Software Development | Navigation System Software | innovative systems GmbH<br>Navigation-Multimedia<br>Wendenstrasse 130, 20537<br>Hamburg, Germany |

| Guido Jeske<br>Manager, Product Management | Harman Navigation System Customers<br><br>Harman Navigation System Products<br><br>Harman Navigation System Vendors, Suppliers, & Distributors | innovative systems GmbH navigation-multimedia Wendenstrasse 130, 20537 Hamburg, Germany |
|---|---|---|
| Michael Rodamski<br>Senior Manager, Infotainment Systems, North America<br><br>Tom Butler<br>Manager, Sales - North America | Harman Navigation Systems, U.S. Sales and Marketing | Harman Becker Automotive Systems, Inc.<br>39001 West 12 Mile Road Farmington Hills, MI 48331 |
| David Eelman<br>Director, Finance and Controlling | Harman Navigation Systems, U.S. Financials | Harman Becker Automotive Systems, Inc.<br>1201 South Ohio Street Martinsville, IN 46151 |
| Chet Simon<br>Senior Vice President Finance<br><br>Mike Giffin<br>President, Mobile Audio | Harman Consumer Group U.S. U.S. Navigation System Sales | Harman Consumer Group 250 Crossways Parkway Woodbury, NY 11797 |
| Steve Montealegre<br>Director, Product Development (EPU)<br><br>Michael Ruf<br>Vice President Engineering Europe<br><br>Marek Neumann<br>Director Program Management Europe | Harman Navigation Systems Structure, Function and Operation | Harman Becker Automotive Systems GmbH Becker-Göring-Str. 16 76307 Karlsbad, Germany |

Harman may identify additional individuals in its document production, its interrogatory responses, and/or in documents produced by MIT.

## II.    PRODUCTION OF DOCUMENTS

### Rule 26(a)(1)(B)

**A copy of, or a description by category and location of all documents, data compilations, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for the impeachment.**

Harman has identified and gathered documents and things which are currently located at the offices of Kirkland & Ellis International LLP, Maximilianstrasse 11, 80539 Muenchen, Germany, and which are available for inspection and production at a mutually convenient time, subject to the terms of a mutually agreed protective order.  Such documents generally fall without limitation into the following categories:

- Hardware and software for the Harman products accused of infringing;

- Design and development documents for the map database in the Harman products accused of infringing;

- Product literature for the Harman products accused of infringing, including manuals and installation guides;

- Documents reflecting the sales volumes of Harman products accused of infringing;

- Financial documents showing U.S. sales volume, revenue, costs, gross and net profits for Harman U.S. navigation system products accused of infringing, to the extent such documents exist.

Harman does not know which claims of the patent-in-suit MIT will assert in this litigation, or the scope that MIT will ascribe to the asserted claims.  Harman also does not know the precise number of Harman products that MIT will accuse of infringment, or how MIT contends that such products allegedly infringe.  Harman likewise does not know what positions MIT may adopt in support of its allegations relating to validity, infringement, enforceability, willfulness, damages or any other

potential relief.    Therefore, Harman cannot reasonably identify at this time what additional documents may exist which relate to such positions and claims that may arise in this action.  To the extent additional documents and things are hereafter identified, Harman will make those documents and things available for inspection and production at a mutually convenient time, subject to the terms of a mutually agreed protective order.

## III.    COMPUTATION OF DAMAGES

### Rule 26(a)(1)(C):

**A computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure on which such computation is based, including materials bearing on the nature and extent of injuries suffered.**

Harman seeks damages to the extent permissible under the applicable laws.    At this point, Harman has not determined the nature and extent of the injuries it has suffered and continues to suffer as a result of MIT's allegations of infringement against Harman and its customers.    At a minimum, Harman intends to seek compensatory damages for any injuries resulting from MIT's allegations of infringement and for having to defend against such claims.  Once Harman has received information and documents from MIT, Harman will supplement its disclosure in accordance with Rule 26(e) of the Federal Rules of Civil Procedure or in the form of an interrogatory response.

## IV.    INSURANCE AGREEMENTS

### Rule 26(a)(1)(D):

**For inspection and copying as under Rule 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

None applicable.

[THIS SPACE INTENTIONALLY LEFT BANK]

Dated: December 21, 2005                     Respectfully submitted,


Robert J. Muldoon, Jr., BBO# 359480
James W. Matthews, BBO# 560560
Edward S. Cheng, BBO# 634063
Courtney A. Clark, BBO# 651381
**SHERIN AND LODGEN, LLP**
101 Federal Street
Boston, MA 02110

William A. Streff Jr., P.C.
Michelle A. H. Francis
Jamal M. Edwards
**KIRKLAND & ELLIS LLP**
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000 (phone)
(312) 861-2200 (fax)

*Attorneys for Defendant*

6

**EXHIBIT X**

## GIVING TO MIT

My gift list | I

- **Give** r
- **Find** v intere
- **Conta**

MIT's priorities
Why MIT needs your support
**Designating your gift**

:: **The endowment**
:: Financial aid
:: Student life and learning
:: Special initiatives
:: Schools and departments
:: Labs, programs, and centers
:: Faculty teaching and research
:: Bricks and mortar
:: Libraries
:: Arts and museums
:: Student activities
:: Class projects

Ways to give
Recognizing our donors
FAQs
Home

**Search**

by keyword

 

by fund name/number

Home > Designating your gift > The endowment

# The endowment

Endowments stand at the very heart of an educational enterprise. They are its past, present, and future—all at once.

Income from the MIT endowment plays a vital role in supporting the Institute's work, which means gifts to the endowment help maintain our core strengths. Without a continual infusion of endowment resources over time, we simply can't sustain the excellence and ambitions of the Institute.

At the start of *The Campaign for MIT,* MIT's endowment was $3 billion. Today, it approaches $7 billion. This has been accomplished through a combination of gifts and investment performance, and is cause for celebration.

But at least five other institutions have endowments greater than ours—some substantially greater. For example, Harvard's endowment now exceeds $22 billion. And excellent schools like Harvard (and Stanford, and Princeton, and Yale, and others) are rarely content to stand in place. As our friendly competitors have expanded their own capital resources over the past decade, the Institute's level of endowment has proven increasingly inadequate. MIT must therefore continue to grow its endowment, through both investment returns and new gifts, to meet the needs of today and tomorrow.

We welcome all gifts to MIT's endowment, and suggest you consider directing your contribution to the fund listed below:

**Unrestricted Endowment Fund**
Supports MIT's endowment for unrestricted purposes. Income generated by the Unrestricted Endowment Fund addresses critical needs, essential services, and new programs.

add to my gift list
add to my interest list

The endow the res gifts — togethe investn income those g from m genera of MIT and frie

Giving to MIT: Designating your gift > The endowment                    Page 2 of 2



services, and new programs.

And if you have any questions, please don't hesitate to contact us.

*The endowment is managed by staff in the MIT Investment Management Company, in accordance with policies and procedures established by the board of the MIT Investment Management Company and the MIT Corporation. Wellington Management Company serves as one of the Institute's investment managers and advisors for publicly traded securities, both domestic and international.*

*The Institute has a significant investment program in non-marketable and marketable alternative investments, in both the domestic and international markets. Non-marketable alternatives include areas such as venture capital. Marketable alternatives include areas such as event arbitrage and hedge funds. The alternative investments are typically managed by several independent organizations through pooled investment funds. The investment objective is to maximize total return, consistent with prudent levels of risk in the portfolio.*

[ top ]



Giving to MIT
Room 10-110, Massachusetts Institute of Technology
77 Massachusetts Ave., Cambridge, MA 02139-4307
E-mail: giving@mit.edu  Phone: 617.253.0129
©2005 MIT

MIT Home | Alumni Association | MIT News Office | Site map

**EXHIBIT Y**

Harman International
PRESS RELEASE

August 17, 2005

FOR IMMEDIATE RELEASE
Contact: Greg Henry
Harman International Industries, Incorporated
202-393-1101

**HARMAN INTERNATIONAL**
**REPORTS RECORD FOURTH QUARTER AND FULL YEAR RESULTS**

Washington, D.C. – Harman International Industries, Incorporated (NYSE: HAR) today announced record results for the fourth quarter and full fiscal year 2005. Net sales for the quarter were $808.0 million compared to $726.0 million during the same period a year ago, an increase of 11 percent. Net income for the three months was $79.2 million, a 22 percent increase above the $59.0 million earned in the fourth quarter last year. Earnings per diluted share for the three months were $1.01 versus $0.76 a year ago.

For the fiscal year ended June 30, 2005, net sales were $3.031 billion, an increase of 17 percent compared to $2.711 billion in the prior year. Net income rose 47 percent to $232.3 million versus $157.9 million. Earnings per diluted share were $3.01 for the fiscal year compared to $2.27 a year ago.

Automotive net sales for the fiscal year were $2.126 billion versus $1.873 billion in the prior year, an increase of 13 percent. Automotive operating income was $343.1 million versus $308.3 million last year. Consumer net sales increased 17 percent to $418.3 million, compared to $356.6 million last year. Consumer operating income was $26.7

HARMAN INTERNATIONAL - FINANCIAL PRESS RELEASES

August 17, 2005
Page -2-

Dr. Sidney Harman, Executive Chairman, and Bernard Girod, Vice Chairman and Chief Executive Officer, commented:

"We achieved record sales and earnings in fiscal 2005 and we are confident that we can carry this momentum into the next fiscal year. Automotive had a solid year, due in part to the successful launch of a new infotainment system for Audi. Continued strong operations results by our consumer and multimedia products divisions are financial technologies that allow better interaction of products used by audio professionals.

During the year we modified our balance sheet which combines the acquisition of QNX Software Systems. We reduced debt and repurchased 1.3 million shares of the Company's common stock. The Board of Directors increased authorization for the repurchase of the Company's common stock by 4 million shares to a total of 20 million shares.

It is your expectation that earnings for the quarter ending September 30, 2005 and the fiscal year ending June 30, 2006 will be $0.64 and $3.30, respectively.

At 4:30 p.m. EDT today, Harman International will host an analyst and investor conference call to discuss the results for the three and twelve months ended June 30, 2005, and to offer management's outlook for future periods. To participate in the conference call, please dial (800) 553-0329 or for international calls dial (612) 332-0932 prior to 4:30 p.m. EDT. Please ask the operator know that you would like to join the Harman international call.

A replay of this conference call will be available following the conclusion of the call at approximately 8:00 p.m. EDT. The replay will be available through August 24, 2005. To access the replay, please call (800) 475-6701 or for international calls (320) 365-3844. The access code number is 792204.

AT&T will also the web-casting the presentation. The web-cast can be accessed at http://65.197.15.87/confcast, enter the Access Code: #792204 and then click Go. There

http://www.harman.com/fb/index.jsp?articleId=4.0

2/17/2006

August 18, 2005
Page 2

Harman International Industries, Incorporated (www.harman.com) is a leading manufacturer of high-quality, high-fidelity audio products and electronic systems for the automotive, consumer and professional markets. The Company's stock is listed on the New York Stock Exchange under the symbol: HAR.

HARMAN INTERNATIONAL - FINANCIAL PRESS RELEASES

## HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED
### CONDENSED STATEMENTS OF OPERATIONS
(in thousands except per share amounts)

| | Three Months Ended June 30, | | Twelve Months Ended June 30, | |
|---|---|---|---|---|
| | 2005 | 2004 | 2005 | 2004 |
| Net sales | | | | |
| Cost of sales | | | | |
| Gross profit | | | | |
| Selling, general and administrative expenses | | | | |
| Operating income | | | | |
| Other expenses: | | | | |
| Interest expense, net | | | | |
| Miscellaneous, net | | | | |
| Income before income taxes | | | | |
| Income tax expense | | | | |
| Net income | | | | |
| Basic earnings per share | | | | |
| Diluted earnings per share | | | | |
| Shares outstanding – Basic | | | | |
| Shares outstanding – Diluted | | | | |

2/17/2006

HARMAN INTERNATIONAL - FINANCIAL PRESS RELEASES

http://www.harman.com/fo/index.isp?articleId=4.0

## HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED
### CONDENSED CONSOLIDATED BALANCE SHEETS
(000s omitted)

| | June 30, 2005 | June 30, 2004 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 331,214 | 286,308 |
| Investments | 403,001 | 21,101 |
| Accounts receivable | 311,950 | 382,511 |
| Inventories | 346,008 | 291,719 |
| Other current assets | | 146,406 |
| Total current assets | 1,382,203 | 1,104,135 |
| Property, plant and equipment | 495,616 | 434,923 |
| Goodwill | 845,071 | 251,522 |
| Other assets | 167,520 | 98,962 |
| Total assets | $ 2,469,249 | 1,949,470 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Short-term borrowings | $ 3,595 | 2,608 |
| Current portion of long-term debt | 651 | 2,431 |
| Accounts payable and accrued liabilities | 725,804 | 655,405 |
| Total current liabilities | 730,070 | 662,256 |
| Long-term debt | 330,791 | 387,616 |
| Other non-current liabilities | 66,594 | 63,844 |

HARMAN INTERNATIONAL - FINANCIAL PRESS RELEASES

**EXHIBIT Z**

MEREDITH MARTIN ADDY
312-321-4280
maddy@usebrinks.com

**BRINKS**
**HOFER**
**GILSON**
**&LIONE**®

Intellectual Property
Law Worldwide

January 19, 2005

*Via Hand Delivery*

Robert Swartz
Manager, Intellectual Property
New Media Laboratory
Massachusetts Institute of Technology
Room E15-208
20 Ames Street
Cambridge, MA 02139-4307

**RE:**   Invalidity of MIT Patent No. 5,177,685

Dear Bob:

We appreciate being able at last to review MIT's patent position as presented in the November 17, 2004 letter from Charles Call. Given MIT's positions, we are more certain that U.S. Patent No. 5,177,685 (the "'685 patent") is invalid and unenforceable. MIT bases its arguments either on irrelevant aspects or misinterpretation of the Streeter, Thoone, and Zeevi references. Moreover, MIT's claim construction eviscerates distinctions made during prosecution, and hence, also renders the '685 patent invalid based on references such as Harris. Finally, MIT's analysis of inequitable conduct misapplies the law and fails to acknowledge the facts that support inequitable conduct.

Given the evidence of invalidity, as strengthened by MIT's own positions on infringement, and the strong evidence of inequitable conduct, MIT certainly can imagine that it is difficult for Harman to consider taking a license under the terms that previously

CONFIDENTIAL
MIT 00196

Robert Swartz
January 19, 2005
Page 2

have been proposed. The analysis provided below is based on our review to date, and we

reserve the right to supplement in the future as additional information is uncovered. By

providing this response, Harman is not waiving any of its arguments relating to

noninfringement or invalidity.

**I.     Claim Construction**

MIT defines claim 1 as the following:

> The patented system and Harman's products include a route-finder which
> accepts the desired destination from the driver and accepts the vehicle's
> current position from a location system, consults a map database, computes
> a route to the destination, and then composes discourse that is translated
> into spoken form to direct the driver along that computed route from the
> current position (claim 1).

Call Letter at 1-2. Under this construction, claim 1 is invalid, not only based on the

references cited in previous correspondence, but also based on references cited during the

prosecution of the '685 patent because this construction eviscerates distinctions made

during prosecution to obtain allowance.

For example, "Digital Map Dependent Functions of Automatic Vehicle Location

Systems," by C. B. Harris et al., IEEE Position and Location Symposium, pp. 79-87, 1988,

IEEE CH2675-7 ("Harris") renders claim 1 invalid under MIT's claim construction.

MIT's construction ignores arguments made during the prosecution of the '685 patent to

distinguish Harris, as shown in the following:

> These maps have some questionable design decisions on the
> representation of legal restrictions.... The Calgary map [Harris reference]
> represents legal topology (one ways, banned turns) as a link attribute
> instead of in the network topology. It may be that the street network

CONFIDENTIAL
MIT 00197

Robert Swartz
January 19, 2005
Page 3

represents only physical topology, with the assumption that legal topology will be equivalent to the physical topology unless specially indicated.

The Back Seat Driver appears to be unique in maintaining separate but equal representations for physical and legal topology. These two topologies should be integrated because legal topology is needed for route finding, and physical topology for route description.

Information Disclosure Statement, p. 9. Appendix 1 of this letter includes the chart for claim 1 from pages 1 and 2 of the appendix to Mr. Call's letter and adds the disclosure from the Harris reference in the right-hand column. Appendix 1 shows that, under MIT's claim construction, Harris anticipates at least claim 1.

MIT further argues that Harman infringes claims 11, 19-21, 27-29, 32-36, 45-49, and 53-58. Harman does not agree with the claim construction proffered by MIT, or the conclusion that Harman infringes these claims. In fact, MIT admits in its own documents that Harman does not infringe at least some of these asserted claims. *See, e.g.*, claim 57 ("The automobile navigation system of claim 1 wherein said computing apparatus is not installed in the automobile, . . ." and MIT's analysis: "Harman's computing apparatus is installed in the automobile"; claim 58 "The automobile navigation system of claim 57 wherein said means for communication is two cellular phones in said automobile . . ." and MIT's analysis: "Harman does not use two cellular phones."). Regardless, even under MIT's construction, these claims also are invalid as shown in the enclosed chart at Appendix 2.

## II.    Invalidity Positions

As an initial matter, MIT's analysis entirely fails to address the invalidity of the claims due to the Geographic Data File Standard. Moreover, the letter merely focuses on

CONFIDENTIAL
MIT 00198

Robert Swartz
January 19, 2005
Page 4

invalidity due to anticipation, and fails to address invalidity of the claims due to obviousness. Regardless, we address MIT's arguments, noting that MIT focuses on irrelevant aspects or misinterpretations of Streeter, Thoone, and Zeevi.

## A.     The Streeter Reference

MIT argues that Streeter is not enabling. However, these arguments fail both legally and factually. MIT contends that for enablement, the Streeter disclosure must be adequate for one of ordinary skill in the art to make and use the claimed invention "without further experimentation." Call letter at 4. While Harman disagrees that one of ordinary skill would need to experiment after reading Streeter, MIT applies the wrong standard. The legal standard for determining whether a reference is enabling is whether the disclosure is adequate for one of ordinary skill in the art to practice the invention without experimentation that is "unduly extensive." *Utter v. Hiraga*, 845 F.2d 993, 998 (Fed. Cir. 1988). Hence, a reference may be enabling even though some experimentation is necessary to make the device work. *Bruning v. Hirose*, 161 F.3d 681, 686 (Fed. Cir. 1998). MIT cites a case from the pharmaceutical context, *Elan Pharmaceuticals, Inc. v. Mayo Foundation for Medical Education & Research*, which is inapposite to whether the Streeter reference is enabling. In the programming context, Streeter is enabling at least because, as Streeter itself discloses, a programmer of reasonable skill could write a satisfactory navigational program with ordinary effort given the teachings of the Streeter reference:

> To implement such a system requires a computer stored, geographical data
> base and a way to search such a data base for a route between two points.

CONFIDENTIAL
MIT 00199

Robert Swartz
January 19, 2005
Page 5

> This is clearly possible with current technology. . . . Given a route, text
> instructions could be generated and transmitted to an in-car computer and
> converted to voice by a resident text-to-speech synthesizer chip.

*See* Streeter at 24; *see also Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 943 (Fed. Cir.

1990). Finally, MIT argues that Streeter is not enabling because Streeter did not build or

use an operable navigation system. Call Letter at 4 ("Streeter et al. neither built nor used,

and never attempted to build or use, nor does their paper purport to describe, an operable

navigation system. The paper thus falls far short of the requirement that, to serve as an

anticipating reference, it must contain a disclosure that is adequate to enable one of

ordinary skill in the art to make and use the claimed invention without further

experimentation.") Again, this is simply not the standard for determining whether a

reference is enabling. A reference can be enabling even if a device has never been built.

*See Pfaff v. Wells Elecs, Inc.*, 525 U.S. 55, 61 (1998).

MIT fails to point to a single limitation from the asserted claims of the '685 patent

that is missing in Streeter. Rather, MIT argues that certain claim limitations disclosed in

Streeter are not enabled by Streeter. Harman disagrees. MIT states that Streeter does not

explain: (1) how to program a computing apparatus to coordinate system processes, or (2)

how to make a workable discourse generator. As support, MIT generally refers to the

"significant and lengthy effort" and the "development of numerous complex techniques"

by MIT. Call Letter at 5. MIT further asserts that there are "manifold technical

challenges" in building a workable navigation system. *Id.* at 7. However, MIT fails to

cite any of the "numerous and complex techniques" or "manifold technical challenges,"

CONFIDENTIAL
MIT 00200

Robert Swartz
January 19, 2005
Page 6

and none of these "techniques" or "challenges" are '685 claim limitations, as required to overcome Streeter.

MIT acknowledges that Streeter teaches that the map database should include "road-system topology, the distances between intersections, direction of travel of streets, and placement of exit and entrance ramps to major road." Yet, MIT states that the Streeter reference "doesn't describe the structure or content of the database that would accomplish those objectives . . . ." Call letter at 5. Again, this is not the standard for determining whether a reference is enabling. The standard is whether one of ordinary skill in the art can practice the invention without experimentation that is "unduly extensive." *Utter*, 845 F.2d at 998. Streeter provides precisely that information by teaching that a computer stored database is "clearly possible with current technology." Streeter at 24. Moreover, by requiring the database structure to be improperly read-into the claim limitations of the '685 patent, MIT's invalidity analysis is inconsistent with MIT's infringement analysis. Claims must be interpreted the same way for infringement and validity. *See J.T. Eaton & Co. v. Atlantic Past & Glue Co.*, 106 F.3d 1563, 1570 (Fed. Cir. 1997).

While MIT acknowledges that Streeter teaches three location systems: (1) radio methods, (2) dead reckoning, and (3) proximity or sign post methods, MIT also argues that "nowhere is it suggested that any of these three methods could or should consult a map database to determine the automobile's current position with respect to the map database as claimed." Call Letter at 6. This is incorrect. As the '685 patent states, and

CONFIDENTIAL
MIT 00201

Robert Swartz
January 19, 2005
Page 7

MIT quotes in the same letter, "Every dead reckoning system uses some form of map matching." Col. 12, lines 58-59; Call Letter at 8. Therefore Streeter, which teaches dead reckoning, teaches map matching. In addition, Streeter teaches consulting a map database to determine the automobile's current position, as shown in the following:

> With an inertial guidance system communicating with a geographical data base, it would be possible to determine when the driver had made an error. Thus, knowledge of the road system would make it possible to reinitialize the driver's position, which is not possible using only an inertial guidance system.

Streeter at 561.

Finally, MIT states that Streeter does not teach route calculation where the starting position is determined by the location system. Again, this is incorrect. Streeter teaches that the inertial guidance system, communicating with the map database, allows the system "to reinitialize the driver's position . . . ." Streeter at 561. Thus, Streeter teaches determination of the vehicle's current position by the location system. MIT's flawed reliance on enablement reveals the strength of Streeter.

**B.    The Thoone Patent**

MIT proffers only two arguments to rebut invalidity based on Thoone; neither argument has merit. First, MIT argues that Thoone only teaches manually inputting the starting position for calculating the route. While Thoone teaches manual input of the starting position and uses the starting position for route calculation, Thoone also teaches that the starting position of the vehicle may be determined from the location system:

> When now the vehicle is stopped, then in fact the last-determined coordinates are the coordinates of the starting point of the next journey

CONFIDENTIAL
MIT 00202

Robert Swartz
January 19, 2005
Page 8

> made by the vehicle. Since these last-determined coordinates are now
> accurately known, they can readily be used as the starting position for the
> next journey. To this end the central unit is provided with a non-volatile
> memory, for example incorporated in the position-locating means, in which
> non-volatile memory these last-determined vehicle position coordinates are
> stored. The non-volatile memory is for example powered by the storage
> battery of the vehicle and is charged under control of a charging pulse
> generated upon stopping the vehicle, for example from the switching-off of
> the ignition.

Thoone, Col. 23, lines 29–42; see also col. 5, line 55 – col. 6, line 3.

Second, MIT argues that Thoone does not describe how spoken discourse is composed and generated. MIT acknowledges that Thoone teaches delivery of instructions to the driver via a speech generator and a loudspeaker. MIT states, however, that the "Thoone patent provides little information regarding the generation of spoken instructions." Call letter at 9. MIT's conclusory arguments are inapposite. Thoone provides a detailed block diagram of the system in Figures 1 and 13. Thoone further provides detailed teachings as to what instructions should be provided, and how the instructions should be provided (aurally using speech generator 14 and loudspeaker 10). Thoone's teachings are sufficiently detailed to enable one of ordinary skill in the art to program a computer to generate the discourse, and Thoone's teachings read directly on the claims of the '685 patent.

C.    The Zeevi Patent

MIT proffers only two arguments as to why Zeevi does not invalidate the claims. Similar to MIT's arguments with Streeter and Thoone, MIT argues first that Zeevi "does not disclose calculating a route from the current vehicle position produced by a position

CONFIDENTIAL
MIT 00203

Robert Swartz
January 19, 2005
Page 9

sensor to a driver-supplied destination location." MIT is referring to one embodiment in
Zeevi, which teaches driver input of the current vehicle position. However, MIT has
failed to acknowledge that a second embodiment discloses a position sensor that produces
the current vehicle position used for calculating the route. Specifically, Zeevi teaches that
a new route may be calculated from a current position, produced by a position sensor, if
the vehicle deviates from the determined route (*i.e.*, the vehicle is off course) or if the
driver enters additional information about the journey (*e.g.*, traffic information, blocked
roads, preferred road). Zeevi, Col. 13, lines 7-25; Col. 8, lines 42-49; Col. 14, line 66 –
col. 15, line 15. In those instances, the Zeevi navigation system calculates a new route
based on the current position (determined by the position sensors) and the input
destination. Therefore, contrary to MIT's assertion, Zeevi discloses calculating a route
from the current vehicle position produced by a position sensor.

Second, MIT argues that Zeevi "fails to disclose a system of generating 'discourse'
as disclosed and claimed in the Back Seat Driver Patent." According to MIT, because
Zeevi provides examples of commands, such as "left," "right," and "forward," the Zeevi
reference does not teach "discourse." This argument is without merit. First, MIT's
definition of discourse is contrary to the ordinary meaning of the term "discourse," the
specification of the '685 patent, and the claims of the '685 patent. Second, Zeevi teaches
providing discourse commands, even under MIT's definition.

The ordinary meaning of the term disclosure is defined as "verbal expression in
speech or writing." American Heritage Dictionary. A command of "left" or "right" is

CONFIDENTIAL
MIT 00204

Robert Swartz
January 19, 2005
Page 10

clearly discourse under this ordinary meaning.    Consistent with this definition, the '685 patent teaches that discourse may be as simple as a command to go "left" or "right":

> Each act has a description function to generate a description of the action. The description function takes inputs specifying the size of the description (brief or long), the tense (past, present or future), and the reference position. A short description is the minimum necessary for the act. It is typically an imperative (e.g. "Bear left."). [Col. 15, lines 26-32.]

> A brief description consists of only a verb phrase. The verb depends on the type of act. Besides the verb itself, the verb phrase must say which way to go. In most cases, the word "left" or "right" is sufficient. [Col. 15, lines 39-43.]

Finally, the claims of the '685 patent also define discourse as including a short command, such as a command to go left or right. *See, e.g.,* claim 45 ("The automobile navigation system of claim 1 **wherein said discourse generated comprises** a long description of an act given substantially before the act is to be performed and **a short description** given at the time the act is to be performed," emphasis added).    Therefore, Zeevi's examples of "left," "right," and "forward" qualify as discourse as properly defined by the ordinary meaning and the intrinsic evidence of the '685 patent.

Finally, even if one were to adopt MIT's definition of discourse as complex spoken instructions, Zeevi still meets the limitation.    Zeevi teaches that "[e]ach instruction will include guidance information and the name of the current street in which the vehicle is located."    Zeevi, Col. 7, line 65-67.    Zeevi further teaches that "the output means may function to provide a visual display, or to provide audible spoken information, or to provide both spoken information and the visual display."    *Id.,* Col. 2, lines 30-33.    When

CONFIDENTIAL
MIT 00205

Robert Swartz
January 19, 2005
Page 11

the output provides both spoken information and visual information, the spoken information is simpler, as cited in Mr. Call's letter. When the output is only audio, Zeevi teaches that complex instructions, including both guidance information and the name of the current street, may be provided orally. *Id.*, Col. 7, line 65-67. Therefore, Zeevi teaches discourse, under MIT's definition as well.

**III.     Inequitable Conduct**

MIT's cursory and incomplete analysis of the prosecution irregularities surrounding the '685 patent reveal its vulnerability here. A patent is unenforceable on grounds of inequitable conduct if the patentee withheld material information from the PTO with intent to mislead or deceive the PTO into allowing the claims. *Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253, 1256 (Fed. Cir. 1997). When withheld information is highly material, a lower showing of deceptive intent is sufficient to establish inequitable conduct. *See American Hoist & Derrick Co. v. Sowa & Sons. Inc.*, 725 F.2d 1350, 1363 (Fed. Cir. 1984). Moreover, "direct proof of wrongful intent is rarely available but may be inferred from clear and convincing evidence of the surrounding circumstances." *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 746 F. Supp. 1413, 1415 (N.D. Col. 1990), *aff'd*, 925 F.2d 1480 (Fed. Cir. 1990). The conduct at issue must be viewed in light of all the evidence. *See Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1234 (Fed. Cir. 2003).

In this case, there is little doubt that Streeter and Thoone are highly material. Moreover, as MIT acknowledges, the inventors knew about Streeter and the previous

CONFIDENTIAL
MIT 00206

Robert Swartz
January 19, 2005
Page 12

work of Thoone; yet, the inventors chose not to submit either Streeter or Thoone to the PTO. Further, the inventors themselves credit Streeter as the basis of their work and yet mischaracterize the teachings of Streeter in the Thesis. Given that the references are: uncited to the PTO, admittedly highly material, and mischaracterized in the Thesis, the available evidence, even without formal discovery, shows that the patent likely was procured through inequitable conduct. *See, e.g., Critikon*, 120 F.3d at 1257. ("[A] patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead," and hence, a ruling on inequitable conduct.).

## IV.    Conclusion

In December 2003, Harman made a *prima facie* showing that the '685 patent is invalid. Although appreciative that MIT prepared the legal analysis by Mr. Call in November 2004, the analysis misapplies the law and the facts. If anything, Mr. Call's opinion reinforces the invalidity of the '685 patent. Moreover, the facts supporting inequitable conduct further support invalidity. Based on the evidence of invalidity, MIT's positions on infringement, and the facts favoring inequitable conduct, it is difficult for Harman to engage in licensing discussions at this time.

Regards,

Meredith Martin Addy

cc:  Robert Hart, Esq.
Enclosures
Appendix 1 and Appendix 2

CONFIDENTIAL
MIT 00207

## APPENDIX 1

### INVALIDITY OF CLAIM 1 OF U.S. PATENT NO. 5,177,685 USING MIT'S CLAIM CONSTRUCTION

| Claim Element | MIT's Assertions Regarding Harman Navigation Systems | Harris reference |
|---|---|---|
| 1. An automobile navigation system which produces spoken instructions to direct a driver of an automobile to a destination in real time comprising: | Both the Harman/Kardon TrafficPro and the Harman RB4 navigation system provide turn-by-turn voice prompts that allow the driver to keep his or her eyes on the road | Harris provides turn-by-turn voice prompts that allow the driver to keep his or her eyes on the road. P. 84. |
| computing apparatus for running and coordinating system processes, | "TrafficPro . . . determines the direction and distance from the destination by means of a digital street map, a navigation computer and sensors". {9} | "A digital map and associated database of a road network are vital for computer-assisted land navigation by Automatic Vehicle Location (AVL) systems." Abstract. |
| driver input means functionally connected to said computing apparatus for entering data into said computing apparatus, said data including a desired destination, | The driver can select a destination using the right control knob. {12} | Destination points may be input into the system, such as by a keyboard. P. 82-83. |
| a map database functionally connected to said computing apparatus which distinguishes between physical and legal connectivity, | "The navigation CDs contain a digitized street map. Highways, state and county roads, as well as local streets are detailed in this street map. Larger cities and communities are mapped in detail. For smaller towns and communities, the regional and unclassified roads or through-roads and the town centers are included. One-way streets, pedestrian zones, no-turn intersections and other traffic regulations are taken into account as much as possible." {9} | "In the spatial domain one must be aware of special road network features such as one way streets, restricted areas, over and under passes, cul-de-sacs, banned turns, traffic circles, clover leafs, parking lots and meridians. These features can be embedded into the network topology data as attributes to links. Included in the spatial domain considerations is the fact that route determination is not only location dependent but direction dependent as well." P. 83 (emphasis added). |
| position sensing apparatus installed in the automobile and functionally connected to said computing apparatus for providing said computing apparatus data for determining | "TrafficPro uses . . . determines the direction and distance from the destination by means of a digital street map, a navigation computer and sensors. A speedometer | The Harris reference teaches position sensing apparatus to monitor the direction and turns of the vehicle. P. 82-83 |

CONFIDENTIAL
MIT 00208

| Claim Element | MIT's Assertions Regarding Harman Navigation Systems | Harris reference |
|---|---|---|
| the automobile's current position, | and reverse signal are also used to calculate the route." {9} | |
| a location system functionally connected to said computing apparatus for accepting data from said position sensing apparatus, for consulting said map database, and for determining the automobile's current position relative to the map database, | "TrafficPro uses a comparison of its sensor system with the data of a digital map and the help of the GPS (Global Positioning System) receiver to determine location. | "The most familiar form of AVL positioning whose operation depends on digital map information is augmented dead reckoning. It combines a dead reckoning system with map matching techniques to provide positional updates [9]. By identifying a turn made at an intersection, a match can be made to the digital map and coordinates retrieved from the map coordinate database." P. 82. |
| a route-finder functionally connected to said computing apparatus, for accepting the desired destination from said driver input means and the current position from said location system, for consulting said map database, and for computing a route to the destination, | TrafficPro accepts a destination from the driver {12}, a current position from the GPS aided location system {9}, consults the map database {9}, and computes a route to the destination {17-22} | Harris accepts the destination from the driver, the current position from the location system, consults the map data base, and computes a route to the destination. P. 83-84. |
| a discourse generator functionally connected to said computing apparatus for accepting the current position from said location system and the route from said route finder, for consulting said map database, and for composing discourse including instructions and other messages for directing the driver to the destination from the current position, | TrafficPro composes instructions and other messages for directing the driver to the destination from the current position from the location system by consulting the map database. Typical instructions and recommendations are described at {20-21} of the Guide. | Harris composes instructions and other messages for directing the driver to the destination from the current position from the location system by consulting the map database. Typical instructions include: <br> "'Drive for one mile to the tricky intersection of Broadway, Norwood Ave., and Bath Ave. Turn right onto Bath. The Shadow Lawn Savings and Loan Co. is on the right corner. If you've come to Third Avenue, you've gone too far. Remember: it's one mile to |

2

CONFIDENTIAL
MIT 00209

| Claim Element | MIT's Assertions Regarding Harman Navigation Systems | Harris reference |
|---|---|---|
| | | your right onto Bath.'" P. 84. |
| a speech generator functionally connected to said discourse generator for generating speech from said discourse provided by said discourse generator, and | The speech generator can produce speech in one of several languages spoken in either a male or female voice selectable by the driver {27} | Harris teaches that the aural information is in digital form. P. 84. |
| voice apparatus functionally connected to said speech generator for communicating said speech provided by said speech generator to said driver. | The speech generator is connected to an audio output system that provides spoken instructions through the car's loudspeakers, with controllable volume. | Speakers are inherent in the Harris reference to transmit the aural information to the driver. |

3

CONFIDENTIAL
MIT 00210

APPENDIX 2

### INVALIDITY OF SELECT DEPENDENT CLAIMS OF U.S. PATENT NO. 5,177,685 USING MIT'S CLAIM CONSTRUCTION

| Dependent Claims of the '685 Patent | Invalidity due to Prior Art (Exemplary References) |
|---|---|
| 11. The automobile navigation system of claim 1 wherein said map database includes lane information. | Thoone anticipates claim 11. Thoone teaches a map database which may include lane information. Col. 9, lines 11-29. |
| 19. The automobile navigation system of claim 1 wherein said map database includes a database of service locations. | Thoone anticipates claim 19. Thoone teaches that the map database may include information about service locations, such as "hotels, petrol stations, etc." Col. 9, lines 36-38; see also col. 7, lines 58-62.<br><br>Streeter anticipates claim 19. Streeter teaches that the map database may include information about service locations, such as businesses. P. 554. |
| 20. The automobile navigation system of claim 1 wherein said map database includes a listing of famous places by name. | Thoone anticipates claim 20. Thoone teaches that the map database may include a listing of famous places by name. Col. 9, lines 7-11.<br><br>Streeter anticipates claim 20. Streeter teaches that the map database may include a listing of famous places by name. P. 554. |
| 21. The automobile navigation system of claim 1 further comprising means for updating said map database. | Thoone anticipates claim 21. Thoone teaches that map database may be updated by obtaining and loading an updated CD. Col. 7, lines 54-62.<br><br>Zeevi anticipates claim 21. Zeevi teaches various "plug-in" units which enables the map database to be updated. Col. 3, line 20 – col. 4, line 16. |
| 27. The automobile navigation system of claim 1 wherein said route finder is adapted to find a best route according to any one of three cost metrics: distance, speed, simplicity. | Zeevi anticipates claim 27. Zeevi teaches that the route finder is adapted to find a best route by distance or simplicity. Col. 11, lines 44-49; col. 11, line 66 – col. 12, line 15; col. 12, lines 16-31. |
| 28. The automobile navigation system of claim 1 wherein said route finder is adapted to calculate a new route if the driver or vehicle navigation system makes an error or if the route is unnavigable due to unforeseen circumstances, wherein said new route does not simply backtrack to the point of the error if a better route from the current location exists. | Zeevi anticipates claim 28. Zeevi teaches that the route finder can calculate a new route if the driver makes an error or if the road is unnavigable, with the new route being based on the driver's current position. Col. 8, lines 42-49; col. 13, lines 8-15; col. 14, line 46 – col. 15, line 15.<br><br>Streeter anticipates claim 28. Streeter teaches that the route finder can calculate a new route if the driver makes an error, with the new route being based on the driver's current position. P. 561. |

CONFIDENTIAL
MIT 00211

| Dependent Claims of the '685 Patent | Invalidity due to Prior Art (Exemplary References) |
|---|---|
| 29. The automobile navigation system of claim 1 wherein said route finder is adapted to calculate a new route while the automobile is in motion, wherein said new route will begin from the location of the automobile at the time the calculation of the new route is completed. | Zeevi anticipates claim 29. Zeevi teaches that if the current route is not followed due to road blocks, detours, unintentionally driving in the wrong direction or failing to observe the recommendations, the system immediately calculates a new route. Col. 8, lines 42–49; col. 13, lines 8-15; col. 14, line 46 – col. 15, line 15.<br><br>Streeter anticipates claim 29. Streeter teaches that if the current route is not followed due to road blocks, detours, unintentionally driving in the wrong direction or failing to observe the recommendations, the system immediately calculates a new route. P. 561. |
| 32. The automobile navigation system of claim 1 wherein said location system is a position-keeping (dead-reckoning) system. | Thoone anticipates claim 32. Thoone teaches that the location system may be a dead-reckoning system. Col. 3, lines 41-46.<br><br>Streeter anticipates claim 32. Streeter teaches that the location system may be a dead-reckoning system. P. 550. |
| 33. The automobile navigation system of claim 1 wherein said location system is a hybrid of position-keeping and position-finding systems. | Thoone anticipates claim 33. Thoone teaches that the location system may be a hybrid of position keeping (such as dead-reckoning) and position-finding (such as GPS). Col. 6, lines 20-22. |
| 34. The automobile navigation system of claim 1 wherein said location system employs map matching. | Thoone anticipates claim 34. Thoone teaches that the location system uses map matching. Col. 18, lines 33-41.<br><br>Streeter anticipates claim 34. Streeter teaches that the location system uses map matching. P. 550, line 7. |
| 35. The automobile navigation system of claim 1 wherein said position sensing apparatus comprises displacement and direction sensors installed in the automobile. | Thoone anticipates claim 35. Thoone teaches that the position sensing apparatus include displacement and direction sensors (such as a magnetic compass, accelerometer 6, or speedometer 7) installed in the automobile. Col. 2, lines 1-3; col. 7, lines 30-37, lines 62-66.<br><br>Zeevi anticipates claim 35. Zeevi teaches that the position sensing apparatus includes displacement and direction sensors (such as a distance sensor 4, angle sensor 5, and compass) installed in the automobile. Col. 7, lines 19-36. |
| 36. The automobile navigation system of claim 1 wherein said position sensing apparatus measures displacement with an odometer. | Thoone anticipates claim 36. Thoone teaches that the position sensing apparatus measures displacement with "an odometer." Col. 7, lines 62-66. |
| 45. The automobile navigation system of claim 1 wherein said discourse generated comprises a long description of an act given substantially before the act is to be performed and a short description given at the time the act is to be performed. | Streeter anticipates claim 45. Streeter teaches that the vocal directions may be repeated. Streeter teaches that the first discourse may contain a longer description of the discourse, and a later discourse may contain a shorter description. P. 552-53. |

CONFIDENTIAL
MIT 00212

| Dependent Claims of the '685 Patent | Invalidity due to Prior Art (Exemplary References) |
|---|---|
| 46. The automobile navigation system of claim 45 wherein said long descriptions includes cues. | Streeter anticipates claim 46. Streeter teaches that the longer description may contain cues, such as "distance between turns, street to turn onto, and direction of turn." P. 553. |
| 47. The automobile navigation system of claim 46 wherein said cue is a landmark. | Streeter anticipates claim 47. Streeter teaches that the cue may be a landmark. P. 554. |
| 48. The automobile navigation system of claim 1 wherein said driver input means includes means for said driver to demand immediate instructions, or clarification or repetition of instructions already provided. | Streeter anticipates claim 48. Streeter teaches that the driver can instruct to have the current instruction repeated. P. 554-55.<br><br>Harris anticipates claim 48. Harris teaches that the driver can request a display of the planned route and can "zoom into the portion of interest (Figure 2)." P. 80. |
| 49. The automobile navigation system of claim 1 wherein said driver input means includes means for said driver to indicate to said navigation system that a given instruction provided by said system is impossible to complete for some reason and that a new route must be calculated. | Zeevi anticipates claim 49. Zeevi teaches a system which allows the driver to indicate when a road is blocked, whereupon the unit recalculates a detour route around the blocked street. Col. 8, lines 42-49; col. 13, lines 8-15. |
| 53. The automobile navigation system of claim 1 wherein said automobile navigation system informs a driver if an error has been made as detected by the location system. | Zeevi anticipates claim 53. Zeevi teaches that the navigation system informs the driver if an error has been made. Col. 8, lines 42-49; col. 13, lines 8-15.<br><br>Streeter anticipates claim 53. Streeter teaches that the navigation system may inform the driver of an error if the inertial guidance system has detected that the driver has made an error. P. 553, 561. |
| 54. The automobile navigation system of claim 1 wherein said discourse generator is responsive to a user-model stored in said computing apparatus to customize discourse to the requirements and preferences of said driver. | Zeevi anticipates claim 54. Zeevi teaches a navigation system which is responsive to driver preferences for selecting the fastest, shortest, or other route attributes. Col. 11, lines 44-49; col. 11, line 66 – col. 12, line 15; col. 12, lines 16-31. |
| 55. The automobile navigation system of claim 1 wherein said speech generator is a speech synthesizer. | Streeter anticipates claim 55. Streeter teaches a speech generator that is a speech synthesizer. P. 561 |
| 56. The automobile navigation system of claim 1 wherein said speech generator uses digitized speech. | Streeter anticipates claim 56. Streeter teaches a speech generator that is a speech synthesizer, which uses digitized speech. P. 561. |

3

CONFIDENTIAL
MIT 00213

| Dependent Claims of the '685 Patent | Invalidity due to Prior Art (Exemplary References) |
|---|---|
| 57. The automobile navigation system of claim 1 wherein said computing apparatus is not installed in the automobile, and said automobile navigation system further comprises means for communication between said computing apparatus and the automobile navigation system components installed in the automobile. | Streeter anticipates claim 57. Streeter teaches that the computing apparatus may be installed at a general site, with the discourse generated by the computing apparatus being sent to the automobile using a mobile telephone. P. 561. |
| 58. The automobile navigation system of claim 57 wherein said means for communication is two cellular phones in said automobile, one of which is connected to a modem, and two phones connected to said computing apparatus, one of which is connected to a modem, whereby one data channel and one voice channel between said automobile and said computing apparatus is created. | Streeter renders claim 58 obvious. Streeter teaches that the computing apparatus installed at the general site may communicate with the automobile using a mobile telephone. P. 561. Given that Streeter teaches that one mobile telephone to communicate with the automobile, it would have been obvious to modify Streeter such that two cellular phones are used to communicate between the general site and the automobile, with one mobile phone for a data channel and the second mobile phone for a voice channel. |

4

CONFIDENTIAL
MIT 00214