UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY,<br><br>Plaintiff,<br><br>v.<br><br>HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED,<br><br>Defendant. | Civil Action No.: 05-10990 DPW<br><br>Magistrate Judge Judith G. Dein |

**MIT'S REPLY IN SUPPORT OF ITS
MOTION TO COMPEL PRODUCTION OF DISCOVERY AND DEPOSITIONS**

MIT submits this Reply in support of its Motion to Compel (Docket Entry No. 45) because Harman, in its Opposition, argues as though it has fully and promptly complied with all its discovery obligations, making MIT's motions to compel moot and irrelevant. In fact, the delays by Harman, and its counsel, in gathering and producing the discovery MIT requested over ***seven months ago*** are inexplicable, and inexcusable. Unfortunately, it is only when a motion to compel is pending that Harman's counsel seem to take their discovery obligations seriously. That is why MIT has now ***twice*** had to file motions to compel, to force Harman to produce the discovery MIT needs to maintain the April 21, 2006 fact discovery cut-off.

Despite what Harman says in its Opposition, at least the following disputes remain ripe for this Court to address:

1) <u>Harman's refusal to produce relevant documents from relevant witnesses in a timely and complete manner</u>: Harman's counsel has yet to produce many responsive documents either from Mr. Eelman, its financial witness, or from its German employees' files, who designed and developed the accused products and who Harman says are most knowledgeable about the

1

workings of the products; or to inform MIT of custodial information for the documents it has produced, beyond extremely scant information given to date (such as, the documents came from Germany); or to provide correct confidentiality designations for the vast majority of its document production; and

        2)     <u>Harman's refusal to schedule witnesses in an efficient and cooperative schedule</u>: While Harman has "offered" a schedule for the remaining depositions, MIT agreed to that schedule expressly stating it was doing so under objection, and with the express reservation that MIT's Motion for more efficient scheduling would remain pending.  MIT informed Harman that if the depositions had to be taken before this Court rendered a decision on MIT's Motion, MIT would modify its requested relief to seek its costs associated with the inefficient scheduling of those depositions.  MIT's decision to take the depositions before the Court ruled on MIT's motion was no concession to Harman – it was mandated by the fact that discovery closes shortly.  Harman should not "win" simply by refusing to negotiate or be reasonable, under the pressure of a time deadline.

MIT's efforts prior to filing its Motion, to obtain the discovery sought therein, were met with refusals by Harman's counsel "because the rules did not require reasonableness," and continue to be met with noncommittal statements that Harman's counsel will get to MIT's requests "in due course," when they are not "busy" with other matters.  It is interesting that Harman, the billion-dollar company represented by Kirkland & Ellis, is trying to play the role of the resource-limited Defendant unable to respond to routine discovery obligations in a timely manner.  Just as happened with MIT's first Motion to compel, only after MIT filed its Motion would Harman's counsel find the time to respond to certain issues raised therein.  At this point, regardless of whether Harman produces the requested discovery, an order should issue from this Court as to the discovery remaining "in progress," and the discovery about which the parties are still at odds.

I.   **Harman's Continued Refusal to a) Produce Documents in a Timely Manner, b) Reveal the Sources and Custodians of its Documents Produced, and c) Correct the Confidentiality Designations for those Documents that Have Been Produced.**

   A.   **Harman's Still-Lacking Document Production.**

      1.   **Eelman Documents**

MIT's counsel deposed David Eelman, Vice President of Finance for Harman Becker Automotive Systems, Inc., on Tuesday, February 14, 2006. Harman's counsel sent MIT's counsel the bulk of the documents produced from Mr. Eelman on February 9 and 10, 2006, the Thursday and Friday prior to his Chicago deposition.[1] Certainly, that production was not "timely" as Harman claims.

More importantly, however, even *that* production was incomplete, as Mr. Eelman testified in his deposition that he did not gather and send to counsel over a dozen different *types* of documents which were responsive to MIT's requests, and which bear on such relevant issues as sales, cost, and projection information on the accused products. (See Ex. A attached hereto.) While Harman's counsel continues discussions on whether it will produce those documents (without expressly refusing to do so), MIT requests that this Court order that Harman complete its production with respect to Mr. Eelman within five (5) days of the Court's order, or set another date certain for completion of this production. Once that production is complete, MIT will revisit the issue of whether it will be necessary to seek a continued deposition of Mr. Eelman, and costs and fees for that travel to that continued deposition.[2]

---

[1] While Harman would have this Court believe that MIT knew that a spreadsheet that had been produced in November 2005 was created at the direction of Mr. Eelman, of course, that is not true because Harman's counsel refused to identify the custodians of its documents. This is a perfect example of the need for Harman to make such an identification, prior to the future depositions of its witnesses.

[2] Harman's counsel's arguments that MIT's document productions are similarly lacking is wrong. Most of the documents Harman sought by the letters they attached as exhibits to

3

### 2. German Documents

Remarkably, over *seven months* have passed since MIT served its discovery requests, and only now does Harman's counsel state that Harman has not yet produced correspondence from its German offices based on "German Federal privacy laws." Yet **Harman's counsel** say they have not yet even decided whether those laws apply. There is no reason Harman's counsel's investigation of this issue was not conducted *seven months ago*, when the discovery requests were served.

The German privacy law, and the cases cited by Harman applying that law, are inapposite here. The German Federal Data Protection Act, as Harman concedes, only restricts access to documents containing "personal or material circumstances of an identified or identifiable individual." (See Ex. H to Harman's Opposition.) The types of information shown in the case law to be protected by this act are that which is highly personal in nature – not the type of information sought by MIT's discovery requests.

In Baycol, the documents sought were limited to performance evaluations of employees. In re Baycol Prods. Litig., MDL No. 1432 (MJD/JGL), 2003 WL 220223449, at *6 (D. Minn. March 21, 2003) (denying the discovery sought, based on a deficient showing of necessity by Plaintiffs, and the likelihood that they had other access to the information within those documents). Similarly, in the Volkswagen case, the court addressed production of a German entity's telephone book with direct work numbers and private home numbers of its employees. Volkswagen, A.G. v. Valdez, 909 S.W.2d 900 (Tex. 1995).

---

their Opposition brief *had already been produced* by MIT in its document production last year – and several of which were even **marked as exhibits by Harman's counsel during depositions**. (See Ex. B.) Clearly, Harman created this list solely for purposes of making the allegation against MIT.

Here, Harman is not withholding a discreet subset of documents containing personal information about its employees – it is currently withholding **_all_** of its German entities' employees' files, including email, pending its "ongoing" investigation. Furthermore, Harman's counsel has refused to log the documents it will ultimately choose to withhold on this basis, thereby depriving MIT of any opportunity to challenge its eventual designations. (See Ex. B.)

Even if the information sought were personal information as covered by the Act, the documents sought by MIT fall under the exception set forth in 28(3) of the Act, as "[t]ransfer or use for another purpose…in so far as it is necessary to protect the justified interests of a third party." (See Ex. H to Harman's Opposition.) Here, MIT's justified interests in soliciting discovery about Harman's products, as included within Harman's German entity's employees' files, place the documents sought squarely within this exception.

Regardless, even if there were a conflict of laws here, the factors cited by Harman for consideration in such a conflict situation weigh in MIT's favor. These documents are likely to contain information important to MIT's claims of infringement; MIT's requests are specific, as set forth in detail in its discovery requests; and MIT has no alternative means to access the broad array of discoverable information that might fall within those documents.

Thus, this Court should order Harman to comply with its discovery obligations, and produce any documents responsive to MIT's requests, which it has had for over *seven months* now, within five (5) days of this Court's order, or another date deemed appropriate by this Court.

MIT further requests that only MIT, and not Harman, be permitted to take additional fact discovery for a period of one month following the current April 21, 2006 fact discovery deadline, to allow MIT time to use these documents in further discovery requests and depositions.

**B.**     **<u>Harman's Misrepresentations with Respect to Custodial Information.</u>**

Taking vast liberties with the facts, Harman misrepresents both the history of its document production efforts, and the scope of its information with respect to the sources of its documents. It is only with respect to documents produced this month that has Harman made any attempt to reveal with specificity the documents produced by any particular individual.

Harman's statements that it has acquiesced to MIT's demands concerning document production are just plain wrong. A detailed history of the back and forth on these issues is unnecessary here, but it bears noting that Harman's counsel has produced documents according only to how *Harman's* counsel wanted them produced, and only when *Harman's* counsel wanted them produced.

The type of custodial information Harman's counsel has shared with MIT for its pre-February 2006 productions has been scant (e.g., documents from the German entities; documents from the U.S. entities), and it has never paired Bates ranges of documents to custodians. Thus, to date, no Harman witness has been able to testify as to which specific documents came from his files. Yet, in last week's deposition of Harman's sales engineer, Mr. Radomski, MIT's counsel learned that the documents submitted by Harman's U.S. employees to Harman's counsel for production were loaded onto a central server database prior to their production. Certainly, there is a record of which documents were loaded onto that database by which witnesses.

Although counsel for Harman has stated that "he will look into this," MIT notes for the Court that this strongly suggests that more information has been available to Harman's counsel about custodians of its document productions, and Harman's counsel simply hasn't undertaken the diligence to uncover this information, choosing instead to make sweeping assertions to the Court which may be untrue.

6

### C. Harman's Delays in Designating Its Document Productions.

Although counsel have come to agreements as to the confidentiality of certain types of documents (e.g., publicly available documents will be designated non-confidential), Harman's counsel has yet to designate the vast majority of its production. While Harman's counsel claims the effort is "underway," he then says that that effort is a "low priority." (See Ex. B.) MIT properly designated its document productions, prior to producing them to Harman. While Harman complains that *some* MIT documents may have been mis-designated, MIT promptly de-designated those documents when brought to its attention by Harman. Harman, on the other hand, *hasn't even initially designated its production*.

MIT's counsel need the proper designation now, so that they know which documents they can share with their client in preparing this case. It is not appropriate to force MIT's counsel to consult with Harman's counsel every time they want to show their client a particular document.

## II. Harman's Continued Refusal to Agree to a Reasonable and Efficient Deposition Schedule.

Contrary to Harman's statements in its opposition, the issue of efficient deposition scheduling is still ripe for this Court's consideration. While counsel for the parties have set a schedule for depositions moving forward, MIT has agreed to those dates with the *express* understanding that, should this Court grant MIT's Motion prior to certain of those depositions, that schedule may change, and should the Court grant MIT's Motion after the depositions, MIT would seek costs and expenses MIT has incurred because of the inefficient scheduling.

MIT has had to make two separate trips to Chicago for the first two depositions in this case – those of Mr. Eelman and Mr. Radomski – and will have to travel again to Chicago at least once more for Mr. Naife's deposition (and possibly a fourth time for the deposition of Mr.

Montealegre, a newly noticed deponent, unless Harman's counsel schedules his deposition for the same week as Mr. Naife's deposition).

MIT hereby seeks the travel costs and expenses for the at least two unnecessary trips to Chicago, where Harman's counsel should have worked with its witnesses to construct a reasonable and efficient schedule.

Harman also still will not agree to a date for Mr. Hart's deposition any earlier than the week that fact discovery closes (despite the fact that he regularly sits in on the depositions taken in this case, as a spectator), and thus this issue also remains ripe for court intervention.

Finally, as to the German depositions, while some progress has been made to consolidate three of those depositions to the week of March 13, 2006 (thus, still requiring two trips to Germany), MIT has had to postpone those depositions because of Harman's refusal to produce the documents from its German employees' files. Without these documents in-hand now, less than two weeks before those depositions are scheduled, and with no promise of prompt production of such documents, MIT's counsel will not have adequate time to prepare for those depositions. At this time, MIT requests that this Court order Harman to produce those four German witnesses (Dr. Wietzke, Mr. Jeske, Mr. Brandes, and Mr. Hanika-Heidl) for deposition in a single week, at least two weeks after Harman completes its production from its German entities.

## **REQUEST FOR RELIEF**

WHEREFORE, MIT respectfully requests that this Court issue an order:

(1) Requiring Harman to complete its document production by Mr. Eelman, and from its German employees' files, within five days of this Court's order, and granting MIT the right to conduct one month of additional fact discovery past the April 21, 2006 deadline;

(2) Requiring Harman to identify, by Bates number range, the source location, source file, and custodian of the documents it has produced, immediately;

(3) Order Harman to produce replacement copies of its documents, labeled with the confidentiality designations as set forth in the Court ordered protective order, immediately;

(4) Order Harman 1) to reimburse MIT for the unnecessary travel costs and expenses of its multiple trips to Chicago; 2) to produce for deposition in Germany Dr. Wietzke, Mr. Brandes, Mr. Jeske, and Mr. Hanika-Heidl during a single week, at least two weeks after completion of its production of German documents, as individuals and in their capacities as 30(b)(6) witnesses for Harman; and 3) to produce Mr. Hart for deposition on another date in the month of March 2006, for his deposition as an individual and 30(b)(6) witness on Harman's behalf; and

(5) Order such other and further relief as the Court deems equitable and/or appropriate.

Respectfully Submitted,

Massachusetts Institute of Technology,
By its Attorneys,

/s/ Steven M. Bauer
Steven M. Bauer (BBO# 542531)
Kimberly A. Mottley (BBO# 651190)
John W. Pint (BBO# 660548)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110-2600
Phone:  617-526-9600
Fax:      617-526-9899

March 2, 2006

**CERTIFICATE OF SERVICE**

      I certify that on March 2, 2006, I caused a copy of the forgoing document to be served upon counsel of record for Harman International Industries by electronic means using the Court's ECF system.

                                              /s/ Steven M. Bauer
                                              Steven M. Bauer

**PROSKAUER ROSE LLP**

One International Place
22nd Floor
Boston, MA 02110
Telephone 617-526-9600
Fax 617-526-9899

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

**Kimberly A. Mottley**
Direct Dial: 617-526-9616
Email: kmottley@proskauer.com

February 27, 2006

*Via Electronic Mail*

Craig D. Leavell, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

Re: <u>MIT v. Harman International Industries, Inc.</u>, No. 05-10990 DPW (D. Mass.)

Dear Craig:

I write following up on the deposition of Mr. Eelman, which revealed that at least the following documents have not been produced:

1. Sales and cost information from HBAS's ERP system (akin to that provided in HAR 87946-88035) for the Harley Davidson navigation systems;

2. Cost reports for the TrafficPro and Harley Davidson products, as generated for the RB4 product, including a capital expenditure summary and summary of R&D cost;

3. Documents reflecting sales or projected sales of the accused products, including the following types of documents described by Mr. Eelman as containing such information:

   a. quarterly and annual reports on sales by platform;
   b. weekly sales forecasts;
   c. requests for quotes (other than those already produced);
   d. project studies (other than the one already produced);
   e. capital asset requisition forms;
   f. business plans;
   g. EDI (electronic data interchange) information / reports, which Mr. Eelman described as 12-week rolling customer forecasts;
   h. 5-year plan documents;

**PROSKAUER ROSE LLP**

Craig D. Leavell, Esq.
February 27, 2006
Page 2

4. General ledger reports from the SAP database on vendors of parts of accused products, and license fees paid for each; and

5. PowerPoint presentation slides (in electronic form) for project review presentations.

*   *   *

If you think Harman has produced the documents listed above, please identify them by Bates number, as per our agreement to do the same during yesterday's conversation.

We would like to know by Tuesday, February 28, whether you will agree to search for and produce the above listed information / documents. Are you available for a call at 2:00 p.m. EST that day to discuss?

Sincerely,

*Kimberly A. Mottley*
Kimberly A. Mottley

**PROSKAUER ROSE LLP**

One International Place
22nd Floor
Boston, MA 02110
Telephone 617-526-9600
Fax 617-526-9899

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

**Kimberly A. Mottley**
Direct Dial: 617-526-9616
Email: kmottley@proskauer.com

February 27, 2006

*Via Electronic Mail*

Craig D. Leavell, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

      Re:    <u>MIT v. Harman International Industries, Inc.</u>, No. 05-10990 DPW (D. Mass.)

Dear Craig:

      I write to memorialize our February 23, 2006 conversation. I've addressed our agreements concerning depositions, and will address Harman's response to Interrogatory No. 1, in separate letters.

      1.    <u>**Exception Files**</u>: You stated that you had these, and agreed to put them in the mail to us on February 23. We understand that Harman has reserved its rights to revisit privilege and confidentiality issues with respect to those files, to the extent we are able to open them.

      2.    <u>**Illegible / Potentially Redacted Documents in Harman's Production Noted in Anne Boutin's February 10 Letter**</u>: You confirmed that neither Harman (nor its counsel) have redacted any documents in its productions. You also agreed to produce better copies of the illegible documents.

      In conjunction with that request, we requested electronic versions of the PowerPoint presentations within your production. You stated that you may be able to get these for us, and will get back to us on that. We also confirmed that any redactions within MIT's production are listed on its privilege log.

      3.    <u>**Administrative Issues with MIT's Production Noted in Ann Chen's February 15, 2006 letter**</u>: We discussed the documents referenced in the "third" and "fifth" paragraphs in Ms. Chen's letter. Several of the pages noted therein were complete pages with no apparent problem, including: MIT 02002, 02003, 02005, 02006, 02067, 01702, 01703, 01024, and 02001.

**PROSKAUER ROSE LLP**

Craig D. Leavell, Esq.
February 27, 2006
Page 2

We are working on finding out whether MIT still has the text or attachments not included in the remaining documents noted in Ms. Chen's letter, and we will let you know as soon as that investigation is complete.

    **4.**    <u>**De-designations of Confidentiality**</u>: We mutually agreed that any publicly-available documents (e.g., publications, patents, and websites) within Harman's and MIT's document productions will be de-designated to non-confidential, to the extent they were previously designated otherwise, unless those documents bear any notes or alterations of any kind.

    We agreed to get back to you shortly on whether we are willing to de-designate the documents listed in Ms. Chen's February 15 letter. We also agreed to consider any additional specific requests for re-designation, but will not be re-evaluating our entire production as we have already made a good faith effort to label them in accordance with the protective order.

    You stated that you are working on de-designating Harman's document production, although it is a "low priority" to your other ongoing work, and you would not state a date certain for completion of that effort. You also stated that you would consider specific requests for de-designations, and respond immediately to those, in the interim. We requested permission to share MIT's Infringement Contentions Chart with Jack Turner. You stated that you would let us know either February 23 or 24. We look forward to hearing from you on that today.

    **5.**    <u>**German Correspondence Files**</u>: You stated that you will not be logging any documents on the basis of the German privacy laws, as you do not think you have access to those documents in order to log them.

    **6.**    <u>**Email / Document Sources**</u>: You stated that it was your impression that all of the witnesses listed by Harman in any of its initial disclosures or interrogatory responses had searched their files for responsive documents, including their email files, and sent any responsive documents found to counsel or the central server for production. You agreed to confirm this, and to let us know.

    You also agreed to check whether there is a way to tell who loaded which documents onto the server, as a means to identify the sources of those documents, and to let us know. You also agreed to try to identify the source custodians in Harman's future document productions.

    We mentioned that, to the extent we cannot reach agreement on the source information, we will be noticing a deposition of the person responsible for gathering the documents, and move the Court to compel that deposition if necessary, as we have concerns that Harman has made misrepresentations to the Court about the amount of information it has in this respect.

PROSKAUER ROSE LLP

Craig D. Leavell, Esq.
February 27, 2006
Page 3

      7.    **<u>Discovery Bearing on Willfulness / Reliance on Advice of Counsel</u>**: You stated that you have produced the opinion of counsel, and that we will have Harman's position on what other documents it will be producing based on its reliance on advice of counsel hopefully by today. (Our review of the documents shows no such production. If you still think it has been produced, please identify the Bates range of the document. If not, please let us know when this production is forthcoming.)

      You also stated that you would review Harman's Response to Interrogatory No. 9, and consider supplementing that, or Harman's initial disclosures, with information including identification of those involved with solicitation or provision of the opinion, other than Meredith Addy and Robert Hart, whom you have already identified during our conversations. We look forward to hearing from you on this.

      8.    **<u>Harman's Patents and Patent Applications (Document Request No. 8)</u>**: You stated that you were initially told Harman had no patents or patent applications concerning the design of Harman's navigation system products, but that you were recently told that was not the case and you will get back to us about this. We look forward to hearing from you on this, and your supplemental production of any responsive documents.

      9.    **<u>Harman's Projections Documents (Document Request No. 11)</u>**: You stated that the RB3/RB4 has no current projections, as it has been discontinued, and that other projections documents had been produced. We've addressed by separate letter the types of documents missing from the production that reflect this information, which Mr. Eelman testified about during his deposition. Please let us know when we can expect those documents.

      10.    **<u>NTG4 Product</u>**: We informed you that we intend to bring the NTG4 product into the case as an accused product. You stated that, until we specifically accuse that product as an infringing product in an interrogatory response, Harman won't produce additional information. However, you also stated that you are in the process of gathering documents concerning that product so that you will be prepared to make prompt supplemental productions once MIT accuses that product in an interrogatory response.

      11.    **<u>Harman's License Agreements (Document Request No. 17)</u>**: You stated that your client is reviewing approximately 800 license agreements to figure out which are reasonably related to navigation systems or components thereof, other than the Zeevi license which you have already produced. You stated that the client considers this a high priority, and will get back to us.

      12.    **<u>Other Accusations of Infringement by Harman Navigation Systems</u>**: You stated that you will be producing documents related to the Zeevi dispute, including the complaint and patent, that you are unaware of any other pleadings related to that dispute, and that you will

PROSKAUER ROSE LLP

Craig D. Leavell, Esq.
February 27, 2006
Page 4

check and let us know whether there is any correspondence relevant to that dispute in Harman's possession, custody or control. You further stated that the Zeevi dispute is the only dispute Harman has had in which a navigation system has been accused of infringement.

      13.    **Identification of Individuals Knowledgeable about Harman's Licensing and Patent Practices (Interrogatory No. 2)**: You stated that Robert Hart is knowledgeable about Harman's licensing practice, and that you will confirm for us whether Mr. Hart is also the most knowledgeable person on Harman's patent practices, and whether there may also be someone else in Germany knowledgeable on that topic.

      14.    **Wietzke Documents**: You stated your impression that Ms. Chen was gathering the documents from Professor Wietzke last week, while in Germany, and that you expect Harman to be producing those documents, and other documents collected from Germany bearing on importation, once she returns from Germany.

      15.    **TrafficPro Invoice**: We asked for an invoice for the TrafficPro sample we agreed to purchase from Harman. You stated that Lesley Ahlberg will be sending us such an invoice.

      16.    **Documents Sought by Ann Chen's February 15, 2006 Letter, Which MIT Already Produced, Some of Which Harman Marked as Exhibits During Depositions**: I noted, and you agreed, that MIT has already produced the NEC license agreement, GoThere license agreement, and GoThere presentation (the latter two which you marked in Chris Schmandt's deposition). We also noted that other documents Ms. Chen sought have already been produced, and we provided the Bates numbers for those documents, including the patent option agreement, MIT's conflict of interest policy, GoThere's research and development plan, "The Team" slide, and "VC Pitch Slides" (the last three of which you also marked as exhibits during Mr. Schmandt's deposition).

      17.    **Other Documents Sought by Ann Chen's February 15, 2006 Letter**: We confirmed that the "joint ownership agreement" referenced in MIT's financial documents was merely a database artifact for accounting purposes, as opposed to an actual contract. We also confirmed our understanding that MIT knows of no working model associated with the GoThere license, and to work with our client to try to figure out what that entry refers to, if possible.

      We agreed to search for and produce or log the Technology Disclosure Form for Case 5088TS. We also agreed to confirm that any financial statements or royalty reports associated with the GoThere Agreement had been produced, and make a supplemental production if necessary. We also agreed to search for, and produce or log, any of "GoThere's U.S. and foreign patent applications."

**PROSKAUER ROSE LLP**

Craig D. Leavell, Esq.
February 27, 2006
Page 5

    We agreed to confirm that the TLO has no other license agreements bearing on automobile navigation systems.

    **18.    Documents Sought by Ann Chen's February 16, 2006 Letter Based on Mr. Swartz's Deposition**: Again, several of the documents sought herein were already produced to Harman, and we identified the Bates numbers for you, including the Siemens '685 claim chart, SAE Technical Paper Series, Doc. No. 870139, and the 3 figures of BMW 7-series navigation system.

    We agreed to search for, and produce or log, the following documents:
- Mr. Swartz's employment contract with the Media Lab;
- Any additional files after reasonable search containing research or data on navigation systems;
- Any additional print-outs of websites Mr. Swartz visited to collect information on navigation system products within his possession, custody or control;
- Any additional documents related to his "Porsche communication management investigation"; and
- The "GB 2,278,196 A" reference.

    We also agreed to confirm that Mr. Swartz's search included communications that would have been sent from his "rs@interaccess.com" email address, and drafts, emails, files on floppy disks and CDs, and hard drive files.

    We will not waive privilege with respect to any of Mr. Swartz's written assessments regarding the '685 patent which he provided to MIT, or communications between Mr. Swartz and MIT (including Karin Rivard) or the Media Lab related to the '685 patent. We will confirm that any such documents have been included in MIT's privilege log.

    We will confirm that the "Navtech S-document" Mr. Swartz reviewed was MIT 03140-03361, and that he does not have any updated versions of this document.

                    *            *            *

    I look forward to working with you further this week to check the status of our ongoing efforts, and hopefully set some deadlines for the supplementations.

                                          Sincerely,

                                          Kimberly A. Mottley