UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY,

       Plaintiff,

v.

HARMAN INTERNATIONAL
INDUSTRIES, INCORPORATED,

       Defendant.

Civil Action No.: 05-10990 DPW

Magistrate Judge Judith G. Dein

## MIT'S MOTION TO COMPEL DISCOVERY
## OVER WHICH HARMAN HAS WAIVED PRIVILEGE

Harman International Industries, Inc. ("Harman") has *expressly* waived privilege over discovery bearing on MIT's allegations of willful infringement – by expressly stating that Harman will rely on the advice of counsel in defense of MIT's willful infringement allegations, by identifying its opinion counsel as a likely trial witness, and by producing 100 documents related to such issues. *Despite these waivers*, Harman now attempts to pick and choose which discovery it will produce to MIT, in clear contravention of well-established case law, and has presumably instructed its opinion counsel to similarly block such discovery. Thus, MIT hereby moves to compel this discovery from Harman.

Harman has *expressly* waived privilege and work product protections over the discovery MIT seeks herein, by:

    **1.**    **Harman's Express Reliance on Advice of Counsel:** Harman explicitly stated that it will rely on the advice of counsel in response to MIT's willful infringement claim. This Court has held that such reliance effects a waiver over *all documents "considered, reviewed, prepared or relied on by…[the attorney] …related to the factual basis of any opinion*

1

*expressed* to [the accused infringer]." Nitinol Med. Tech., Inc. v. AGA Med. Corp., 135 F. Supp. 2d 212, 219 (D. Mass. 2000) (Dein, M.J.) (emphasis added); see also Novartis Pharm. Corp. v. Eon Labs Mfg, Inc., 206 F.R.D. 396, 398 (D. Del. 2002) (Farnan, J.) (holding that "everything with respect to the subject matter of the counsel's advice is discoverable").

**2.    Harman's Identification of its Opinion Counsel as a Likely Trial Witness:** Harman has identified its opinion counsel as a likely trial witness, and yet it refuses to specify which issues she will testify about. Harman refuses to agree that this opinion counsel won't testify about her opinion on validity, enforceability, and infringement of the patent-in-suit. To the extent she is a trial witness, providing such opinion testimony on the stand, MIT is entitled to discover everything related to that opinion, including her internal thought processes and attorney work product related thereto.

**3.    Harman's Production of 100 Privileged Documents:** Even prior to informing MIT that Harman would rely on the advice of counsel defense, Harman's trial counsel produced approximately 100 privileged documents, concerning various topics, including communications between Harman and its opinion counsel, trial counsel, and internal communications between in-house counsel and Harman executives. Under established Massachusetts and First Circuit precedent, that production waived privilege over not only those 100 documents, but also *"all other such communications on the same subject."* Amgen Inc. v. Hoechst Marion Roussel, Inc., 190 F.R.D. 287, 292 (D. Mass. 2000) (emphasis added); Texaco Puerto Rico, Inc. v. Dept. of Consumer Affairs, et al., 60 F.3d 867, 883-84 (1st Cir. 1995).

Despite these broad waivers, Harman is withholding documents bearing on its opinion of counsel defense, as well as the other subjects discussed in the 100 documents Harman produced in January. Perhaps more troubling, Harman is refusing to instruct its opinion counsel (who is holding Harman's documents for it) to produce this discovery, even pursuant to subpoenas served on her by MIT.

This is yet another obstructionist tactic designed to drive up the cost of the litigation, by refusing to produce documents that any court would require. MIT hereby asks the Court to compel Harman to produce the documents wrongfully withheld by Harman, and instruct its opinion counsel to produce the discovery sought by MIT's subpoenas.

# I.    Harman's Waivers of Privilege and Work Product Protections.

### A.    Harman's Reliance on Advice of Counsel Waived Privilege and Work Product Protections Over All Discovery Concerning its Opinions of Counsel.

In a February 8, 2006 letter, Harman's trial counsel Kirkland & Ellis ("Kirkland") informed MIT that Harman would be relying on the advice of counsel, in defense of MIT's willful infringement allegations.  (See Ex. 1 attached hereto.)  As such, Harman later produced to MIT the written opinion of Harman's primary opinion counsel, Meredith Addy of Brinks Hofer Gilson & Lione ("Brinks Hofer").  Harman does not dispute that such reliance waives attorney-client privilege with respect to communications between Harman and its opinion counsel concerning the opinion.  However, Harman and Brinks Hofer claim that this waiver does not extend to attorney work product of its opinion counsel, or any other discovery concerning those opinions not communicated directly to Harman.  This argument is contradicted by established case law.

"[B]y asserting the advice of counsel defense, [Harman] ha[s] waived [its] attorney work product immunity" and "[a]ll documents containing work product relevant to the [issues contained in counsel's opinion] must be produced."  Mushroom Assoc. v. Monterey Mushrooms, Inc., 1992 WL 442892, at *5 (N.D. Cal. May 19, 1992) (attached for the Court's convenience as Ex. 2 hereto).  In Mushroom Associates, the court explained the relevance and importance of permitting discovery of such information:

> Turning to discovery of opinion or mental impression work product, ….  The work product is directly at issue.  For example, knowing what the attorney thought about infringement bears directly on the defendants' advice of counsel defense in this case.  Also, the plaintiff's need for this information is compelling. The only way plaintiff can attack the defendants' advice of counsel defense is by having access to circumstances and factors surrounding the advice.  ***Discovery of mental impression work product may be the only way to have access to the circumstances and factors surrounding the advice.***

Id. (emphasis added).

Judge Farnan in the District of Delaware, renowned for its patent expertise, agreed in his opinion in the Novartis case, stating:

> In the Court's view, the starting point for the analysis is the infringer['s] decision to waive the attorney-client privilege. … Where, as here, a party relies on the advice of counsel defense to a charge of willful infringement, the Court concludes that that party has expressly waived its privilege with respect to attorney-client communications and work product documentation. Having concluded that these privileges are waived, the Court concludes that ***everything with respect to the subject matter of counsel's advice is discoverable, despite the protection that is normally afforded to attorney-client communications and work product material.***

Novartis Pharm. Corp. v. Eon Labs Mfg., Inc., 206 F.R.D. 396, 398 (D. Del. 2002) (attached for the Court's convenience as Ex. 3 hereto).

Indeed, even in this very Court, Magistrate Judge Dein has stated that where the defendant knows of the factual basis for counsel's opinion, defendant waives the attorney work-product privilege with respect to documents related to that factual basis. Nitinol Med. Tech., Inc. v. AGA Med. Corp., 135 F. Supp. 2d 212, 219 (D. Mass. 2000) (attached for the Court's convenience as Ex. 4 hereto). According to Judge Dein's decision in Nitinol, the scope of Harman's waiver would at least extend to

> [a]ll documents considered, reviewed, prepared or relied on by [Harman] related to the factual basis of any opinion expressed to [Harman] concerning the [subject matter of the advice of counsel] to the extent that the factual basis was discussed with or otherwise conveyed to [Harman] either generally or specifically.

Id. Clearly, here, where Harman received a written opinion from counsel stating the bases for counsel's conclusions therein, MIT is entitled to such discovery.

**B.    Harman Cannot Identify Its Opinion Counsel as a Trial Witness, While Simultaneously Obstructing Discovery Bearing on Her Opinion.**

In an attempt to resolve some of the disputes raised herein, MIT asked whether Harman would agree that it would not call its opinion counsel as a trial witness, stating that if Harman were to make that assertion, perhaps the parties might be able to reach agreement as to the scope of discovery MIT would seek from Harman's opinion counsel.  (See Ex. 5 attached hereto.) Harman refused to make that representation, and instead affirmed that Harman reserves the right to call Ms. Addy as a trial witness.  (See Ex. 6 attached hereto.)  In a subsequent conversation between counsel, Harman's counsel even refused to agree that Ms. Addy would not be testifying at trial about her opinion.

If Ms. Addy has any potential of taking the stand at trial to testify about her opinion as to the validity, enforceability or infringement of the ''685 patent-in-suit, MIT has every right to probe into her thought processes in reaching that opinion, and all things she considered in arriving at that opinion, without restriction to what was actually communicated to Harman. Harman cannot use attorney work product as a shield, preventing MIT from discovering impeachment evidence – Ms. Addy's thought processes and considerations in rendering her opinion – while at the same time expecting to call her at trial to testify about the veracity of that very opinion.  On this basis alone, MIT should have unfettered access to discovery from Harman's opinion counsel on issues relating to the '685 patent.

**C.    Harman's Production of 100 Privileged Documents Waived Privilege and Work Product Protections Over All Discovery Concerning the Same Subject Matter as Those Documents.**

On January 17, 2006, Harman's counsel produced approximately ***100 privileged documents*** to MIT.  These included communications between Harman and its opinion counsel, Ms. Addy; communications between Brinks Hofer attorneys, Harman, and Kirkland;

communications between Brinks Hofer attorneys and Kirkland; and communications internal to Harman between in-house counsel and Harman executives. The subject matter of these communications was varied, but included, *inter alia*, validity and infringement of the '685 patent-in-suit; litigation strategy; operation of Harman's navigation system products; communications and meetings with Harman's customers concerning MIT and the '685 patent; and other license agreements Harman considered relevant during the license negotiations between Harman and MIT that predate this suit.

These 100 documents appeared within the first 3,000 pages of the approximately 80,000 page production, including the ***very first document*** of that production. ***Sixteen days later***, on February 2, 2006, Kirkland wrote to MIT's counsel requesting return of the documents, claiming the production had been "inadvertent," resulting from "negligence" of its vendor. (See Ex. 7 attached hereto.) MIT pointed out to Harman that Judge Young had issued a precedential opinion in a similar case, Amgen Inc. v. Hoechst Marion Roussel, Inc., which recognized such a production as a waiver of the attorney client privilege and work product protection over such documents. 190 F.R.D. 287, 292 (D. Mass. 200) (attached for the Court's convenience as Ex. 8 hereto). (See Ex. 9 attached hereto.) Harman acceded to Judge Young's views, agreeing that MIT could keep the documents and that Harman would expressly waive the privilege regarding them. (See Ex. 1 attached hereto.)

In Amgen, Judge Young set out five factors for consideration in deciding whether such "inadvertent" productions waive attorney-client privilege and work product protections:

> (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the amount of time it took the producing party to recognize its error, (3) the scope of the production, (4) the extent of the inadvertent disclosure, and (5) the overriding interest of fairness and justice.

Id. (applying Federal common law principles to govern the privilege analysis).

In strikingly similar circumstances to the present case, Judge Young deemed defendant's production in Amgen a waiver of both the attorney-client and work product protections, and hinted that such production could effect a subject matter waiver as well, pursuant to the First Circuit's decision in Texaco Puerto Rico, Inc. v. Dept. of Consumer Affairs, et al. Id. at 293 (declining to opine on subject matter waiver, as Plaintiff had not raised the issue of subject matter waiver in its briefs); 60 F.3d 867, 883-84 (1st Cir. 1995).

As to the reasonableness of defendant's counsel's precautions taken to prevent inadvertent disclosure, Judge Young held in that "a knowledgeable attorney or legal assistant should quickly have reviewed the performance of the vendor to ensure that the proper documents were copied." Amgen, 190 F.R.D. at 292. The same is true here, as it is clear that no knowledgeable person reviewed the production before it was produced to MIT (as evident by the facts that the ***first document*** in the production was a privileged communication, and that all 100 of these documents appeared within the ***first 3,000 pages of production***.

In Amgen, Judge Young found that five days to recognize the production error was too long. Here, Harman did not discover its error until *over two weeks later*, providing no excuse for this delay. Id. at 292-93.

According to Judge Young in Amgen, the "sheer magnitude of the disclosure [] [200 documents there, 100 documents here] counsels against a determination that [defendant's counsel's] precautions were adequate." Id. at 293. There is no doubt that Kirkland's production in this case was substantial – indeed, approximately ***100 documents*** were produced. Thus, the sheer magnitude of this production manifests the lack of precautions taken to guard against inadvertent production. (Notably, Judge Young found unpersuasive defendant's pleas that the

privileged documents were contained in a production of over 70,000 pages; thus, it matters not that Harman's production was part of a voluminous production.) Id.

Finally, in assessing the "overriding interest of fairness and justice," Judge Young in Amgen found that, given the egregiousness of the inadvertent production, it would all but close the door on the waiver rule if it was not granted in the case at hand, and "it would be unjust to reward such gross negligence by providing relief from waiver." Id. at 293. The same is true in this case. Thus, Harman's production of those 100 documents waived privilege over those documents.

However, the waiver effected by that production doesn't stop with those 100 documents. As Judge Young stated in Amgen, First Circuit precedent mandates that "a waiver premised on inadvertent disclosure will be deemed to encompass *all other such communications on the same subject*." Id. at 293; see Texaco Puerto Rico, Inc. v. Dept. of Consumer Affairs, et al., 60 F.3d 867, 883-84 (1st Cir. 1995) (attached for the Court's convenience as Ex. 10 hereto).

Thus, Kirkland's inadvertent production waived privilege over all communications concerning the same subjects of the produced documents. The subject matter of the documents produced was varied, and included:

1.    validity, enforceability and infringement of the '685 patent-in-suit:  including correspondence between Harman and Brinks Hofer; correspondence between Brinks Hofer and Kirkland; and also correspondence between Harman, Brinks Hofer, and another opinion counsel Lawrence Hadley of Hennigan, Bennett & Dorman LLP;

2.    litigation strategy, including Harman's decision to file a preemptive strike suit against MIT during licensing negotiations, in order to obtain favorable jurisdiction:  including correspondence between Harman and Kirkland concerning the litigation, including draft pleadings; correspondence between Harman, Kirkland, and Brinks Hofer concerning litigation and licensing strategy; correspondence between Brinks Hofer and Kirkland concerning litigation and licensing strategy; and also correspondence internal to Harman between its in-house attorneys and executives concerning litigation and licensing strategy;

3.    operation of Harman's navigation system products:  including correspondence between Harman and Brinks Hofer;

4.    communications and meetings with Harman's customers concerning MIT and the '685 patent: including correspondence between Harman and Brinks Hofer; and also correspondence between Harman, Kirkland, and Brinks Hofer; and

5.    other license agreements Harman considered relevant during the license negotiations between Harman and MIT: including communications between Harman and Brinks Hofer.

Thus, the scope of Harman's waiver of privilege and work product protections effected by its inadvertent production of documents encompasses "all other such communications on [these] same subject[s]."  Texaco, 60 F.3d at 883-84.

II.    **Harman's Wrongful Withholding of Documents.**

Despite the two broad waivers of attorney client privilege and work product detailed above, Harman continues to withhold on its privilege log documents within the scope of those waivers.  (See Ex. 11 attached hereto.)[1]  Specifically, Harman continues to withhold:

1.    correspondence between Brinks Hofer and Harman concerning MIT's patents and license negotiations (see Ex. 10, Entry Nos. 36-38, 42-48, 50-51, 53, and 61-67);

2.    correspondence between Brinks Hofer, Kirkland and sometimes Harman's in-house attorney, concerning MIT's patents (see Ex. 10, Entry Nos. 17, 31, 34-35, 39, 49, 57-60);

3.    pre-suit correspondence between Kirkland and Harman concerning litigation (see Ex. 10, Entry Nos. 205, 236); and

4.    correspondence between Harman's in-house counsel and Harman executives concerning MIT's patent allegations and licensing (see Ex. 10, Entry Nos. 180, 188, 194-197, 199-200, 241-242).

Harman has no supportable claim that these types of documents remain protected, following Harman's waivers in this case.

---

[1] Harman's counsel claim that they intend to produce another updated privilege log, containing more detailed descriptions of the documents withheld.  However, based on MIT's counsel's discussions with Kirkland, that updated log will not resolve the disputes raised herein.

Certainly, all four types of documents were within the 100 documents Harman produced to MIT in January, thereby waiving privilege over all documents concerning the same subject matter under First Circuit law, as discussed above. In addition, Harman waived any remaining privilege and work product protections as to at least types 1 and 2 described above, to the extent that those documents relate to the subjects discussed in Ms. Addy's opinions rendered to Harman concerning MIT's patents. Thus, this Court should compel Harman immediately to produce to MIT the documents listed in its privilege log entries specified above.

Moreover, it simply cannot be the case that all documents bearing on the same subject matter of the 100 produced documents (the 5 topics specified in Section I.C above) have already been listed on Harman's short privilege log. As such, MIT requests that this Court compel Harman to produce all other documents not yet logged which bear on those subjects.

### III.   Harman's Refusal to Allow Its Opinion Counsel to Produce Discovery.

Harman similarly refuses to permit its opinion counsel, Brinks Hofer, to fulfill its obligations in response to subpoenas served on it, by which MIT seeks documents and a deposition of Ms. Addy. Indeed, in response to those subpoenas, MIT sought only what Magistrate Judge Dein required in the Nitinol case –

> All documents and information considered, reviewed, prepared, or relied upon by any Brinks Hofer attorney, or relating to the factual basis of any opinion or advice rendered by any Brinks Hofer attorney to Harman, concerning the issue of whether Harman infringed U.S. Patent No. 5,177,685, including whether that patent is invalid or unenforceable.

(See Ex. 12 attached hereto.)

Rather than permit this discovery from its opinion counsel, Harman presumably instructed Brinks Hofer to file a motion to quash the subpoenas in the Northern District of

Illinois, which it did. **This Court** should decide the scope of Harman's waiver of privilege. Harman waived its privilege *in Massachusetts*, both by inadvertent production, and reliance on the advice of counsel. *Massachusetts* is where Ms. Addy will purportedly testify at trial.

Moreover, Brinks Hofer has no say in whether it produces the work product at issue here, as the work product does not belong to Brinks Hofer – it belongs to Harman, a litigant in this case, pending here in the District of Massachusetts. There is no question that Harman has control – indeed, ownership – of the discovery sought, as it is well-established law that work product belongs to the client – not its attorney. See e.g., Spivey v. Zant, 683 F.2d 881, 885 (5th Cir. 1982); Martin v. Valley Nat'l Bank of Ariz., 140 F.R.D. 291, 320 (S.D.N.Y. 1991) ("the rule does not give an attorney the right to withhold work product from his own client").

Thus, MIT asks that this Court compel Harman to instruct Brinks Hofer to comply with the subpoenas served by MIT, to the extent required under the case law cited above, permitting discovery into the work product of Brinks Hofer concerning the opinions it rendered to Harman concerning the '685 patent-in-suit.

## **REQUEST FOR RELIEF**

For the reasons above discussed, MIT respectfully requests that this Court:

1.      Order Harman to produce to MIT, within two (2) business days of this Court's order, the documents listed in its privilege log entries specified above, as well as all other documents not included on Harman's privilege log which relate to the same subject matter of the 100 privileged documents produced to MIT in January (as specified in Section I.C above);

2.      Order Harman to instruct its opinion counsel, Brinks Hofer, to submit to MIT's requests for discovery related to Brinks Hofer's opinion of counsel rendered to MIT, including all documents and deposition testimony related to the subject matter of that opinion, and to

instruct Brinks Hofer to withdraw its motion to quash the subpoena (currently pending in the

Northern District of Illinois); and

3.    Grant MIT such other and further relief as the Court deems equitable and/or

appropriate.

## Compliance with Local Rules 7.1 and 37.1

MIT's counsel discussed the matters raised herein with Harman's counsel in numerous

conversations in February and March of 2006, most recently on March 31, 2006, attempting to

resolve these disputes.  As the disputes remain unresolved, MIT now seeks the Court's

assistance.

Respectfully Submitted,

Massachusetts Institute of Technology,
By its Attorneys,

/s/ Steven M. Bauer
Steven M. Bauer (BBO# 542531)
Kimberly A. Mottley (BBO# 651190)
John W. Pint (BBO# 660548)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110-2600
Phone:  617-526-9600
Fax:      617-526-9899

April 3, 2006

## CERTIFICATE OF SERVICE

I certify that on April 3, 2006, I caused a copy of the forgoing document to be served
upon counsel of record for Harman International Industries by electronic means using the
Court's ECF system.

/s/ Steven M. Bauer
Steven M. Bauer

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

| | | |
|---|---|---|
| Jamal M. Edwards<br>To Call Writer Directly:<br>(312) 861-2464<br>jedwards@kirkland.com | 312 861-2000<br><br>www.kirkland.com | Facsimile:<br>312 861-2200<br>Dir. Fax: (312) 660-0719 |

February 8, 2006

## VIA E-MAIL

Steven M. Bauer, Esq.
Proskauer Rose LLP
One International Place, 14th Floor
Boston, MA 02110-2600

> Re:　*MIT v. Harman Int'l Indus. Inc.,*
> No. 05-10990 DPW (D. Mass.).

Dear Steven:

We have reviewed your February 6, 2006 letter, responding to our request that MIT return the privileged documents Harman inadvertently produced earlier than expected. We are disappointed to learn that that MIT refuses to cooperate and observe traditional rules of professional ethics. Instead, your letter only further demonstrates that MIT has filed and proceeded in this action vexatiously and with the ultimate purpose of harassing Harman.

Rather that respect the professional and courteous request of counsel (which we are ethically bound to do, according to the ABA's Model Rules, and as suggested and approved by Chief Judge Young in the very case you cite), you insist on misusing documents that are clearly privileged and about which you've been advised were inadvertently produced. Kirkland & Ellis LLP took reasonable and appropriate precautionary measures to prevent inadvertent production, including electronically marking documents in a manner that was intended to segregate these documents for further review. A technical error is responsible for this mistake, which MIT improperly seeks to exploit. This is not the result of attorney neglect or any lack of diligence on our parts. We will be happy to document and demonstrate our efforts to the Court. We are certain that our facts are distinguishable from those in the *Amgen* case you cited.

Curiously, your firm did not even comply with the procedures employed by counsel in *Amgen*. In that *Amgen*:

> [C]ounsel for Amgen [unlike MIT here], sent a letter to [Hoechst's counsel, Choate, Hall & Stewart] asking whether the documents had been produced intentionally. Upon receiving the letter … the attorney responsible for the document production, reviewed the documents identified in the letter and

# KIRKLAND & ELLIS LLP

Steven Bauer Esq.
February 8, 2006
Page 2

> determined that they had been produced as a result of the paralegal's error. [Hoechst's counsel] then phoned [Amgen's counsel] and informed him that production of the documents was not intentional and he asked [Amgen's counsel] to return the documents immediately.  Also on July 22, 1999, [counsel] sent a letter to [Amgen's counsel] to the same effect.

> On July 23, 1999, … co-counsel for Amgen [unlike counsel for MT here], sent a letter to [Hoechst's counsel] that even though Amgen was not prepared to return the documents, Amgen's counsel would segregate the documents and refrain from reviewing them further.  [Amgen's counsel] requested the production of a privilege log identifying the documents and stating the basis for the claim of privilege…[Hoechst's counsel] agreed to [Amgen's] request and on August 16, 1999, [Hoechst's counsel] provided to Amgen's counsel a comprehensive privilege log that identified each of the documents and stated the basis for the claim of privilege.  Finally, by letter dated October 5, 1999, Amgen['s] counsel informed Hoechst counsel … that Amgen would not return the documents.

*Amgen*, 190 F.R.D. 287, 289 (D. Mass. 2000) (citations omitted).

When discussing the ethical propriety of *Amgen's* conduct, Chief Judge Young, "credit[ed]" Amgen for "segregating the documents and refraining from reviewing them further until this dispute is resolved." *Id.* at 290.  Yet, MIT refused to even do this much.  From your letter spelling out the location and alleged relevance of these documents, the record clearly shows that you inappropriately reviewed Harman's documents, contrary to the procedure approved by the Court in *Amgen*.

Your attempts to exploit our mistake—one that has been made by numerous attorneys, law firms, and companies, including MIT—is extremely disturbing.  In fact, in *Amgen*, Choate, Hall & Stewart, ***the same firm that prosecuted the Patent-In-Suit on MIT's behalf, also inadvertently produced privileged documents*** and moved the court for the return of the documents.  Also, contrary to the position MIT is now taking, MIT has previously argued that its opponent—the Government, no doubt—***should not have access to the privileged documents MIT voluntarily disclosed***.  *United States v. MIT*, 129 F.3d 681, 686, 688 (1st Cir. 1997).  Yet again, the record shows that MIT changes its positions to suit its own self-serving objectives.

# KIRKLAND & ELLIS LLP

Steven Bauer Esq.
February 8, 2006
Page 3


MIT's decision to ignore Harman's good faith efforts to work patiently and fairly with you and your colleagues in addressing the numerous mistakes that you've made is disappointing. We are shocked that MIT is inexplicably unwilling to return the same professional courtesy where it matters most—the preservation of the attorney-client privilege, which is a hallmark of our judicial system and one of the country's oldest and most protected privileges.

As a first gesture of professional courtesy:  Harman overlooked the fact that MIT failed to even mention the word "import" in its Complaint—let alone plead it.  Harman even stipulated to MIT's motion to amend to add an import allegation, even though MIT failed to plead it before the court-ordered amendment deadline.  While we have found no cases where a court has approved of a complaint that, like yours in this case, failed to even mention infringement by "importing," the cases are legion where courts have held that the plaintiff must allege "import" infringement to state a claim.  *See, e.g.*, *Home & Nature Inc. v. Sherman Specialty Co., Inc.*, 322 F. Supp. 2d 260, 265 (E.D.N.Y. 2004) ("A complaint for patent infringement satisfies the above requirements, as well as the limited criteria of Rule 8(a), when the plaintiff: (1) alleges ownership of the asserted patent, (2) names each individual defendant, (3) cites the patent that is allegedly infringed, (4) describes the manner in which the defendants allegedly infringe, and (5) identifies the specific sections of the patent law invoked.") (plaintiff plead "import[ing], making, using…") (citing *Phonometrics, Inc. v. Hospitality Franchise Sys., Inc*., 203 F.3d 790, 794 (Fed. Cir. 2000) (complaint must "describe the means by which the defendants infringe"); *see also Alsip v. Nielsen Media Research, Inc.*, 2004 WL 315269 (S.D.N.Y 2004) (finding proper complaint requires plaintiff to plead defendant infringed by "importing, making, using, selling…").

As a second gesture: Harman also overlooked the fact that MIT failed to even cite the statutory provision governing willful infringement, let alone even mention the word "willful" in its complaint.  Yet, this is a clear Federal Circuit requirement.  *See Phonomentrics, supra*; at 794 (complaint required to "point to the specific sections of the patent law invoked"); *cf. Alsip*, 2004 WL 315269 at *3 (complaint satisfies Rule 8 because it, *inter alia*, "indicates that their claims are based on defendants' willful acts of direct and indirect infringement").  Again, Harman graciously stipulated to an amendment, where MIT's complaint was fatally deficient.

Harman has even been flexible by allowing MIT to withdraw some of the 10 depositions notices it prematurely filed, before allowing time for discovery to progress so as to allow the parties to determine the identity of the witnesses who are most knowledgeable and most likely to testify at trial.  And, the foregoing is only a limited rendition of Harman's cooperativeness—there is much more.

# KIRKLAND & ELLIS LLP

Steven Bauer Esq.
February 8, 2006
Page 4


The fact that MIT is unwilling to reciprocate and extend the professional courtesy that even the ABA suggests is due, even despite Harman's continued and documented cooperativeness, only further evidences MIT's bad faith in this litigation.

Finally, your claim that Harman has somehow improperly withheld privileged documents has no merit. As we have explained before, the documents you now have were produced prematurely. We have every right to maintain and withhold privileged documents, until Harman elects to waive privilege with respect to those documents, if it so chooses. The fact that these documents do not yet appear on Harman's privilege log is irrelevant at this point because the parties agreed to exchange their amended privilege logs on Friday, February 10, 2006. The privilege log you currently have is thus not current. Our amended privilege log will contain the documents MIT refuses to return.

Nonetheless, we are willing to resolve this issue—as yet another gesture of undeserved professional courtesy—by allowing MIT to maintain these documents now, because Harman is waiving privilege concerning the documents already produced, for the limited purpose of proving our defense against MIT's recently-added, frivolous claim of willful infringement. As of the date these documents were produced (January 17, 2006), however, MIT had no justifiable need for these documents because willfulness was not then an issue in the case. We intended to further review the documents prior to producing them or lodging them on our privilege log to ensure that we had produced all responsive documents on the issue of willfulness. Your refusal to allow us to do this is baffling.

Additional documents will be forthcoming, including our opinion of counsel, for which Harman also intends to waive privilege for the limited purposes of establishing Harman's defense to MIT's recently-added claim of willful infringement.


Very truly yours,

Jamal M. Edwards


JME/slm

cc:     Robert J. Muldoon, Esq.

# KIRKLAND & ELLIS LLP

Steven Bauer Esq.
February 8, 2006
Page 5



**Motions, Pleadings and Filings**

United States District Court,
N.D. California.
MUSHROOM ASSOCIATES, Plaintiff,
v.
MONTEREY MUSHROOMS, INC., et al.,
Defendants.
**No. C-91-1092 TEH (PJH).**

May 19, 1992.

ORDER RE: PLAINTIFF'S MOTION TO COMPEL
DISCOVERY

HAMILTON, United States Magistrate Judge.

**\*1** The hearing on the plaintiff's motion to compel discovery was heard on May 8, 1992. Laura L. Kulhanjian and Richard P. Doyle, Jr. appeared for the plaintiff. Louis M. Lupin appeared on behalf of all the defendants except for Remy Industries, which is not an interested party to the issues raised. Having read the parties' briefs and heard their arguments, this court orders as follows.

I. INTRODUCTION.

The plaintiff has alleged in its complaint that the defendants infringed its "Processing of Mushrooms with Reduced Weight Loss" patent ("the '832 patent"). Pursuant to this litigation, the plaintiff served its first set of interrogatories and its first set of requests for production of documents. In particular, defendants' response to Interrogatory # 7 in the plaintiff's first set of interrogatories sets the stage for the discovery dispute before this court.

In its full context, Interrogatory # 7 asks, "If Monterey Mushrooms intends to rely on advice of counsel as. a defense to infringement of the 1832 PATENT, IDENTIFY all such opinions." The defendants correctly noted in their response to Interrogatory # 7 that the advice of counsel defense is not a defense to patent infringement per se, but it is a defense to willful infringement. *See King Instrument Corp. v. Otari Corp., 767 F.2d 853, 867 (Fed.Cir.1985), cert. den., 475 U.S. 1016 (1986).*

Making this distinction clear, the defendants identified and produced the opinion it intends to rely upon in its defense of the willful infringement allegation. Based on this response, and not disputed by the defendants at the hearing, it is clear that the defendants intend to use the advice of counsel defense to defend against the charge of willful infringement.

The plaintiff now seeks supplementation of discovery requests based on the defendants' admission that they will use the advice of counsel defense at trial. Specifically, it seeks further responses to the following discovery requests listed in Plaintiff's Exhibit "C" attached to its points and authorities: Interrogatory # 7 and Requests for Production # 's 9, 10, 11, 12, 13, 14, 15, 41,, 44, and 49 directed to Monterey Mushrooms, Interrogatory # 7 and Requests for Production # 's 9. 10, 11, 12, 13, 14, 15, 38,, 39, 43, and 51 directed to Le Champignon, Interrogatory # 7 and Requests for Production # ls 9, 10, 11, 12, 13, 140 15, 38, 44, 50 directed to Max Beauvais, and Interrogatory # 7 and Requests for Production # ls 9, 10, 11, 12, 13, 14, 15, 38, 44, and 50 directed to Seratec. In essence, the plaintiff argues that the defendants have waived all attorney-client privilege and attorney work product immunity for documents pertaining to the infringement of the '832 patent by invoking the advice of counsel defense. [FN1] Because of this waiver, all documents pertaining to infringement previously requested under the specified discovery requests, but withheld as privileged, would now have to be produced. The defendants argue that the attorney-client privilege has only been waived, if at all, as to those communications pertaining to willful infringement, and that they still are entitled to work product immunity for certain documents.

II. DISCUSSION.

A. *Plaintiff's motion is properly before this court.*

**\*2** The defendants argue that the plaintiff's motion does not result from an outstanding discovery request, and is therefore not properly before the court. The plaintiff's notion requests that this court issue three orders: 1) compelling further response to Interrogatory # 7; 2) Compelling further production of documents pursuant to requests specified in Exhibit "C" of the plaintiff's points and authorities;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.R.D.                                                                                              Page 2
Not Reported in F.R.D., 1992 WL 442892 (N.D.Cal.), 24 U.S.P.Q.2d 1767
**(Cite as: 1992 WL 442892 (N.D.Cal.))**

and 3) ordering defendants not to claim privilege with respect to certain matters in future depositions.

Turning to the first proposed order, Interrogatory # 7 only asks for identification of opinions upon which the defendants intend to rely for their advice of counsel defense. Clearly, the defendants have identified the Dr. Neeley letter dated September 8, 1989. The plaintiff has given this court no reason to believe that there are any other opinions that the defendants intend to rely upon as a basis for their defense. Consequently, this court finds that the defendants have complied with Interrogatory # 7 and no further discussion of this interrogatory is merited.

Turning to the third proposed order, this court is not prepared to make orders concerning depositions that have not even been noticed. The plaintiff seems to suggest that it will be entitled to conduct further discovery should this court rule in its favor on the present discovery motion. However, this motion only pertains to outstanding discovery requests, and any order this court makes will only pertain to that outstanding discovery. Because no deposition has been noticed, this court will not make any order regarding depositions.

The plaintiff's first and third proposed orders are denied.

Turning to the second proposed order, this court finds that the document requests specified in Exhibit "C" of the plaintiff's points and authorities provides the basis for a ruling on the privilege issue. The plaintiff's notion essentially asks for all documents that pertain to infringement that were previously withheld under the attorney-client privilege or the work product immunity. specifically, Request for Production # 41 directed to Monterey Mushrooms, Request for Production # 38 directed to Le Champignon, Request for Production # 38 directed to Max Beauvais, and Request for Production # 38 directed to Seratec cover the class of documents sought by the plaintiff. [FN2] Consequently, the plaintiff's discovery motion is properly before this court on the basis that the plaintiff seeks further production pursuant to these requests for production.

B. *Advice of counsel defense waives the attorney-client privilege and the work product immunity,*

The defendants spent much time discussing the confidential nature of a letter dated September 8, 1989, written by defendants' counsel, Dr. Neeley, to defendant Monterey Mushrooms concerning possible

infringement. The defendants produced this letter pursuant to the plaintiff's discovery request as evidence that they did not willfully infringe the plaintiff's patent. Essentially, the defendants argued at the hearing that this was not a confidential letter; therefore its disclosure did not constitute a waiver of the attorney-client privilege or the work product immunity. The plaintiff took the position that the confidential nature of the letter was irrelevant. According to the plaintiff, it is the fact that the defendants have claimed the advice of counsel defense that has resulted in the waiver of any privileges, not the disclosure of a protected document. [FN3] Consequently, the issue becomes, does a waiver of the attorney-client privilege and the work product immunity occur when a party claims the advice of counsel defense in a patent action? Because this court ultimately finds that a waiver occurred upon the assertion of the advice of counsel defense, it makes no finding as to whether the September 8, 1989 letter was a confidential communication whose disclosure might also have waived the attorney-client privilege.

1. *The Attorney-Client Privilege,*

**\*3** The plaintiff seeks increased damages and attorneys' fees as provided for in 35 U.S.C. § § 284, 285 based upon its claim that the defendants willfully infringed the '832 patent. As noted previously, a party may rely on advice of counsel as a defense to willful infringement. As indicated in their responses to Interrogatory # 7, the defendants intend to use this defense.

The use of the advice of counsel defense is not without its implications. By relying on the advice of counsel defense, the defendants have injected their counsel's advice as an issue into this litigation. "The deliberate injection of the advice of counsel into a case waives the attorney-client privilege as to communications and documents relating to the advice." *Handgards, Inc. v. Johnson & Johnson,* 413 F.Supp. 926, 929 (N.D.Cal.1976).

A survey of patent case law has convinced this court that the use of the advice of counsel defense waives the attorney-client privilege. In *Tr. of Leland Stanford Jr. Univ. v. Coulter Corp.,* 118 F.R.D. 532 (S.D.Fla.1987), the court, upon a finding that the defendant might use the advice of counsel defense to the plaintiff's claim of willful infringement, allowed discovery of documents protected by the attorney-client privilege. The defendant waived the attorney-client privilege by deliberately injecting the advice of

Not Reported in F.R.D.                                                                                                Page 3
Not Reported in F.R.D., 1992 WL 442892 (N.D.Cal.), 24 U.S.P.Q.2d 1767
**(Cite as: 1992 WL 442892 (N.D.Cal.))**

counsel into the case as a defense. *Id.* at 533. In *Key Technology, Inc. v. Simco/Ramic Crop.,* 137 F.R.D. 322, 325 (D.Or.1991), the court acknowledged that, " ... where a party intends to rely on such a defense at trial, the opposing party is entitled to examine that material [privileged documents pertaining to the patent] during pretrial discovery." In *McNeil-PPC. Inc. v. Procter 4 Gamble Co.,* 138 F.R.D. 136, 137 (D.Colo.1991), the court observed that reliance upon the advice of counsel defense waives the attorney client privilege. In *W.L. Gore & Associates v. Tetratec Corp.,* 15 U.S.P.Q.2d 1048, 1051 (E.D.Penn.1989), found that, "[i]t is well-settled that a client may intentionally or unintentionally waive his privilege ... by asserting reliance upon advice of counsel as an essential element of his defense."

The underlying principle supporting waiver when a party relies upon the advice of counsel defense is fairness. A party should not be allowed to rely on self-serving documents in its defense while withholding potentially damaging information under the guise of the attorney-client privilege. *See Handgards, Inc.,* 413 F.Supp. at 929. Clearly, the party claiming the advice of counsel has a tough choice: claim the defense or claim the attorney-client privilege. However, tough choices are usually only disfavored when the choice is between constitutional rights. Because no constitutional rights are at stake, the defendants must live with their decision to claim the advice of counsel as a defense. *Abbott Laboratories v. Baxter Travenol Laboratories,* 676 F.Supp. 831, 832-833 (N.D.Ill.1987).

**\*4** The defendants argue that if a waiver has occurred, the scope of that waiver should be limited to documents pertaining to willful infringement. It is difficult to perceive the distinction between documents pertaining to infringement and documents pertaining to willful infringement. If the defendants definition of the scope of willful infringement is simply the September 8, 1989 letter, then the defendants have narrowed the scope too far. A party needs access to privileged information underlying the advisory letter because it cannot analyze reliance upon the advice of counsel without reference to the circumstances surrounding the issuance of the advice or the formation of the opinions contained in the advice. *Antonious v. Wilson Sporting Goods Company,* No. 89 C 6675, 1990 W.L. 106530, at \*2 (N.D.Ill.1990). This court finds that the defendants have waived the attorney-client privilege with respect to all documents pertaining to the infringement of the '832 patent.

2. *The work product immunity.*

Some courts have found that the invocation of the advice of counsel defense waives both the attorney-client privilege and work product immunity. *See McNeil-PPC, 138 F.R.D. at 137; W.L. Gore & Associates, 15 U.S.P.Q.2d at 1051.* Certainly, principles of fairness as enunciated with respect to the attorney-client privilege seem just as applicable to the work product immunity. If a party is going to attack another party's reliance on advice of counsel, information covered by the work product immunity would aid in that attack.

However, the work product immunity is distinct from the attorney client privilege and merits its own analysis. A party's, " ... waiver of the attorney-client privilege does not necessarily mean that the protection afforded by the work product doctrine is also breached." *Handgards, Inc.,* 413 F.Supp. at 929. Furthermore, the work product immunity is largely codified in Fed.R.Civ.P. 26(b), a distinction the attorney-client privilege lacks.

Fed.R.Civ.P. 26(b)(3) makes a distinction between most work product and mental impressions of the attorney. According to Rule 26(b)(3), most work product may be discoverable upon a showing of substantial need and inability without undue hardship to obtain substantially equivalent materials. In *Handgards,* Judge Orrick found that mental impressions are not absolutely protected by the work product immunity. *Handgards, Inc.,* 413 F.Supp. at 931. He also found that when an attorney's opinion work product is directly at issue and the need for production is compelling, the opinion work product is discoverable. *Id.* at 933.

In most instances where the advice of counsel is an issue, the party seeking discovery will be able to meet the standard imposed by Rule 26(b)(3). A substantial need exists for the work product so that the discovering party can adequately address the advice of counsel defense. Also, the discovering party cannot obtain substantially equivalent materials because the specific work product is directly at issue. For instance, although the discovering party could obtain its own test results concerning a patent, the tests results known to counsel at the time advice is given are what is relevant when a party asserts the advice of counsel defense. Consequently, it is difficult to imagine the circumstances where the standard for discovering the vast majority of work product will not be met in an advice of counsel case.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.R.D.                                                                                    Page 4
Not Reported in F.R.D., 1992 WL 442892 (N.D.Cal.), 24 U.S.P.Q.2d 1767
**(Cite as: 1992 WL 442892 (N.D.Cal.))**

**\*5** Turning to discovery of opinion or mental impression work product, the heightened standard suggested by *Handgards* is met in an advice of counsel case. The work product is directly at issue. For example, knowing what the attorney thought about infringement bears directly on the defendants' advice of counsel defense in this case. Also, the plaintiff's need for this information is compelling. The only way plaintiff can attack the defendants' advice of counsel defense is by having access to circumstances and factors surrounding the advice. Discovery of mental impression work product may be the only way to have access to the circumstances and factors surrounding the advice.

By asserting the advice of counsel defense, the defendants have waived their attorney work product immunity. All documents containing work product relevant to the infringement issue must be produced. Recognizing the importance of the work product immunity, the waiver in this case with respect to opinion work product must be strictly construed. Any documents that contain opinion work product pertinent to issues beyond the infringement issue may be redacted.

3. *Finding on waiver by claiming advice of counsel precludes ruling on waiver by disclosure,*

Because this court has found that the defendants waived the attorney-client privilege and the work product immunity by invoking the advice of counsel defense, it is not necessary to examine the defendants argument that waiver did not occur by disclosure. To the extent that the parties have created a subset of documents known as "test results", those documents, just as any others that pertain to the infringement issue, are subject to this order. In other words, test results pertaining to the infringement issue that would normally be protected by the work product immunity are no longer protected and must be produced.

III. CONCLUSION.

The plaintiff's motion to compel discovery is GRANTED. The defendants must produce all documents pertaining to the infringement issue that are subject to the discovery requests listed above and previously withheld under the attorney-client privilege or work product immunity. Privileged documents that do not pertain to the infringement issue need not be produced. To the extent that the initial response to a particular request for production was that the party had no documents satisfying the

request, no further response is required.

IT IS SO ORDERED.

FN1. The plaintiff initially claimed the waiver covered all documents pertaining to the validity, enforceability, and infringement of the '832 patent. At the hearing, defendants' counsel represented that their advice of counsel defense would be invoked solely on the infringement issue. Accepting this representation, the plaintiff agreed not to request documents bearing on validity and enforceability issues.

FN2. Request for Production of Documents # 41 directed to Monterey Mushrooms provides: All documents relating to any opinion, investigation or determination as to whether the offering for sale or sale of processed mushrooms infringe the '832 patent. Request for Production # 38 directed to the other three defendants is virtually identical.

FN3. In their moving papers, the plaintiff seemed to argue that a waiver by disclosure had occurred. However, at the hearing, the plaintiff made it clear that it believed that the advice of counsel defense resulted in waiver, not the disclosure of an allegedly privileged document.

Not Reported in F.R.D., 1992 WL 442892 (N.D.Cal.), 24 U.S.P.Q.2d 1767

**Motions, Pleadings and Filings (Back to top)**

• 3:91CV01092 (Docket) (Apr. 10, 1991)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



▷

**Motions, Pleadings and Filings**


United States District Court,
D. Delaware.
NOVARTIS PHARMACEUTICALS
CORPORATION, Novartis AG, Novartis Pharma
AG,
and Noavrtis International Pharmaceutical Ltd.,
Plaintiff,
v.
EON LABS MANUFACTURING, INC., Defendant.
**No. CIV.A.00-800-JJF.**

March 28, 2002.

Patent infringement action was brought. Claimants moved to compel discovery. The District Court, Farnan, J., held that alleged infringer waived privilege to withhold from discovery any documents or materials related to counsel's noninfringement opinion, including work product.

Motion granted.

See, also, 206 F.R.D. 392.

West Headnotes

Patents 🔑 292.3(2)
291k292.3(2) Most Cited Cases
Alleged patent infringer, asserting defense of reliance upon advice of patent counsel that it was not infringing claimant's patent, waived privilege to withhold from discovery any documents or communications in its or counsel's possession related in any way to counsel's noninfringement opinion, including counsel's work product. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.
*396 Stuart B. Young, Young, Conaway, Stargatt & Taylor, Wilmington, DE, for plaintiffs.

George H. Seitz, III, Seitz, Van Ogtrop & Green, P.A., Wilmington, DE, for defendant.

### MEMORANDUM OPINION

FARNAN, District Judge.

Presently before the Court is Plaintiffs' Motion To Compel Discovery Materials Improperly Withheld by Eon (D.I.139). By their Motion, Plaintiffs seek to compel various categories of documents. However, this Memorandum Opinion, will focus only on the portion of Plaintiffs' Motion which seeks to compel the production of all documents underlying Defendant's advice of counsel defense to Plaintiffs' claim of willful infringement. For the reasons set forth below, the Court will compel Defendant to produce all of the documents underlying its advice of counsel defense to Plaintiffs' claim of willful infringement.

### I. Background

In June 1998, Defendant Eon Labs Manufacturing, Inc. (hereinafter "Eon") prepared and submitted an application for Federal Drug Administration (hereinafter "FDA") approval of a cyclosporin-based product intended for sale to transplant patients. (D.I. 145 at 4). On January 13, 2000, the FDA approved Eon's application. (D.I. 145 at 4).

In an Amended Complaint filed on February 8, 2001, Plaintiffs Novartis Pharmaceuticals Corporation, Novartis AG, Novartis Pharma AG, and Novartis International Pharmaceutical Ltd. (collectively "Novartis") brought this action against Eon, alleging, among other things, that Eon willfully infringed Novartis' United States Patent No. 5,389,382 (hereinafter " '382 Patent"). [FN1] (D.I. 145 at 1). As a defense to Novartis' charge of willful infringement, Eon relies on a written opinion it received in March 2000 from its patent counsel, Thomas Pontani, Esquire, concluding that it is "unlikely" that Eon is infringing the '382 Patent. (D.I. 145 at 7). Mr. Pontani's law firm, Cohen, Pontani, Lieberman & Pavane (hereinafter "Cohen, Pontani"), also represents Eon as trial counsel in this litigation.

> FN1. The Original Complaint was filed only by Novartis Pharmaceuticals Corporation on August 30, 2000.

During the course of discovery, Novartis requested that Eon produce all written and *397 oral legal advice it received from Cohen, Pontani with respect to the infringement, invalidity, and unenforceability of the '382 Patent, including all documents

206 F.R.D. 396
206 F.R.D. 396
(Cite as: 206 F.R.D. 396)

underlying that advice. (D.I. 145 at 7). In response, Eon produced Mr. Pontani's March 2000 non-infringement opinion letter and all documents related to communications between Eon and Mr. Pontani concerning the opinion. (D.I. 145 at 7; D.I. 152 at 4). Shortly after Novartis received these documents, Novartis wrote to Eon, requesting that Eon supplement its production to include all documents and communications that were considered by Cohen, Pontani in rendering its advice to Eon. (D.I. 145 at 8). Eon responded, offering to produce communications between Mr. Pontani and Eon relating only to the non-infringement opinion letter and refusing to produce any work product materials utilized by Mr. Pontani but not communicated to Eon. (D.I. 145 at 8; 152 at 4). As a result of Eon's unwillingness to produce the work product materials, Novartis filed the instant Motion, seeking to compel Eon to produce all written and oral advice, including all documents underlying that advice, that Eon received from Cohen, Pontani, which either directly or indirectly relates to the '382 Patent. (D.I. 139; D.I. 145).

## II. Discussion

By its Motion, Novartis contends that because Eon has decided to rely on the legal advice of its patent counsel as a defense to Novartis' charge of willful infringement, Eon has waived its privilege with respect to all documents in Cohen, Pontani's files which either directly or indirectly relate to the subject matter of Mr. Pontani's legal advice to Eon. (D.I. 145 at 8). Citing a broad range of cases in this district and others, Novartis contends that all information relied upon by Mr. Pontani in forming his opinion is discoverable, regardless of whether that information was communicated to Eon, because it is highly probative of the accused infringer's state of mind. (D.I. 145 at 18-20); *See Mosel Vitelic Corp. v. Micron Technology, Inc., 162 F.Supp.2d 307 (D.Del.2000); Dunhall Pharma., Inc. v. Discus Dental, Inc., 994 F.Supp. 1202 (C.D.Cal.1998); Hoover Universal, Inc. v. Graham Packaging Corp., 44 U.S.P.Q.2d 1596 (C.D.Cal.1996); Mushroom Assocs. v. Montery Mushrooms, Inc., 24 U.S.P.Q.2d 1767, 1992 WL 442892 (N.D.Cal.1992).* Additionally, because Eon's patent and trial counsel work for the same law firm, Novartis contends that Eon must produce all legal advice it received from *any* member of the Cohen, Pontani law firm with regard to the subject matter of Mr. Pontani's opinion. (D.I. 145 at 15-16; D.I. 156 at 5).

In response, Eon relies on the case of *Thorn EMI N. Am. v. Micron Technology, 837 F.Supp. 616 (D.Del.1993)* and its progeny. Eon contends that materials considered by patent counsel in rendering an opinion, but not communicated to the alleged infringer, are protected as work product and not discoverable because they are irrelevant to the alleged infringer's state of mind. (D.I. 152 at 4-5). Because Eon has produced the opinion of its patent counsel and all documents related to communications between Eon and its patent counsel concerning that opinion, Eon contends that Novartis' Motion to compel the production of other documents in Cohen, Pontani's files should be denied pursuant to *Thorn*. (D.I. 152 at 7).

The decisions in *Thorn* and *Mosel* reflect consistent views on the extent to which the attorney-client privilege is waived when an accused infringer relies on the opinion of counsel as a defense to a claim of willful infringement. *See Thorn, 837 F.Supp. 616; Mosel, 162 F.Supp.2d 307.* Specifically, both decisions agree that communications between the attorney and his or her client are discoverable. *Id.*

With respect to attorney work product, however, *Thorn* and *Mosel* differ with regard to the extent to which they permit inquiry into these materials. Despite their different views, both *Thorn* and *Mosel* focus their respective analyses on the accused infringer's state of mind. In this regard, the issue of whether certain documents are discoverable turns for both courts on the question of whether the documents and communications sought are sufficiently probative of the accused infringer's state of mind.

The narrower view, as reflected in *Thorn*, concludes that only communications between **\*398** counsel and the accused infringer are probative of the accused infringer's state of mind. *See Thorn, 837 F.Supp. at 622.* Thus, *Thorn* limits the scope of discovery to communications between counsel and the accused infringer, and does not permit inquiry into counsel's work product. *Id.*

The broader view reflected in *Mosel* concludes that counsel's work product is highly probative of the accused infringer's state of mind. *See Mosel, 162 F.Supp.2d at 312.* In so holding, the *Mosel* court reasoned "... [I]t would be irrational to assume that there could be no relationship between what counsel really thought (as reflected in [their] private papers) and what [counsel] in fact communicated to [the] client." *Mosel, 162 F.Supp.2d at 312 (citing Electro Scientific Indus., Inc. v. General Scanning, Inc., 175 F.R.D. 539, 545 (N.D.Cal.1997)).* Thus, the *Mosel* view permits discovery into counsel's work product,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as well as any communications between counsel and the accused infringer. *See id.*

If the Court accepts the premise that the analysis for this discovery issue should focus only on the accused infringer's state of mind, depending on the facts of the dispute, the Court would rest its decision somewhere between *Thorn* and *Mosel* since both opinions represent a reasonable approach. However, the Court is persuaded that it should modify its analysis from those undertaken by *Thorn* and *Mosel*. In the Court's view, the starting point for the analysis is the infringer decision to waive the attorney-client privilege.

A waiver is defined as "the voluntary, intentional relinquishment of a known right." BLACK'S LAW DICTIONARY 1417 (Special Deluxe 5th ed.1979). An express waiver is absolute. *Id.* Where, as here, a party relies on the advice of counsel defense to a charge of willful infringement, the Court concludes that that party has expressly waived its privilege with respect to attorney-client communications and work product documentation. Having concluded that these privileges are waived, the Court concludes that everything with respect to the subject matter of counsel's advice is discoverable, despite the protection that is normally afforded to attorney-client communications and work product material. [FN2]

> FN2. The Court recognizes that an alleged infringer could incur undue prejudice as a result of the scope of discovery required. Accordingly, in the future, the Court will consider separating the issues of willfulness and damages from the other patent issues.

The Court, under a somewhat different set of facts, reached a similar conclusion in *RCA Corp. v. Data General Corp.,* 1986 WL 15693 (D.Del. July 2, 1986). In *RCA,* Data General Corp. (hereinafter "Data General") relied on the advice of its counsel as a defense to the charge of willful infringement. *See RCA,* 1986 WL 15693, *1. RCA Corp. (hereinafter "RCA") subsequently sought all documents relating in any way to opinions on the validity or infringement of the patent at issue. *Id.* Data General objected, arguing that it was entitled to withhold all documents which were not "directly related" to the opinions of counsel. *Id.* The Court recognized that attorney-client communications are generally not subject to disclosure; however, the Court noted that a client waives this privilege by asserting reliance upon the advice of counsel as an essential element of its defense. *Id.* The Court held that a waiver of the

attorney-client privilege in this context is not limited to documents directly related to counsel's opinion, but rather, extends to all documents relating to the subject matter of counsel's advice. *Id.*

RCA also sought to compel two specific documents from a third party, Price Waterhouse, Data General's auditor. *See RCA,* 1986 WL 15693, *2. At the request of Data General, Price Waterhouse withheld these documents on the ground that they were protected by work product immunity. *Id.* Specifically, Data General argued that the two documents in question were prepared by an agent of Data General and reflected the mental impressions of a Data General attorney, and concerned pending or anticipated litigation. *Id.* The Court recognized that, under Federal Rule of Civil Procedure 26(b)(3), attorney work product is not discoverable absent a showing of extraordinary circumstances. *Id.* (citing *Bogosian v. Gulf Oil Corp.,* 738 F.2d 587, 593 (3rd Cir.1984)); *see also* Fed.R.Civ.P. 26(b)(3) (permitting discovery into work product only upon a showing of "substantial need" and "undue hardship" in obtaining the substantial equivalent of the information by other means). However, this **\*399** Court concluded that where a party asserts the advice of counsel as an essential element of its defense, work product immunity, like attorney-client privilege, is also waived with respect to the subject matter of counsel's advice. *See RCA,* 1986 WL 15693, *2. Accordingly, this Court held that work product immunity was waived to the extent that the Price Waterhouse documents related to Data General's opinion of counsel. *Id.*

Although the issues before the Court in *RCA* were more discrete than in the instant case, there is no reason why an accused infringer's waiver of the attorney-client privilege should not be considered unlimited, and therefore, apply broadly to any and all materials available to the attorneys rendering the legal advice. In the Court's view, it is critical for the patentee to have a full opportunity to probe, not only the state of mind of the infringer, but also the mind of the infringer's lawyer upon which the infringer so firmly relied. There is no reason why the alleged infringer's waiver of the attorney-client privilege should not be considered absolute, encompassing materials typically protected by the work product doctrine.

Further the Court believes this approach, in addition to being consistent with the principles of waiver, supports the policy considerations of an advice of counsel defense. Specifically, by focusing on the

206 F.R.D. 396
206 F.R.D. 396
**(Cite as: 206 F.R.D. 396)**

Page 4

waiver as the gateway for permissible discovery, the defense will most likely only be invoked by infringers who prudently and sincerely sought competent advice from competent counsel. Moreover, focusing on the infringer's waiver rather than state of mind may reduce the chances of legal gamesmanship creeping into the practice of rendering infringement and validity opinions.

 In sum, because Eon has relied on the advice of counsel defense, the Court concludes that Eon has waived any privilege that may pertain to those documents and communications related in any way to its counsel's opinion. Accordingly, the Court will grant Novartis' Motion To Compel to the extent it seeks the production of all documents relied upon in forming Mr. Pontani's opinion.

 As for Novartis' additional request for production, the Court is also persuaded that Eon should be compelled to produce all legal advice it received from *any* member of the Cohen, Pontani law firm with regard to the subject matter of Mr. Pontani's opinion. Eon has not only elected to engage in the unconventional and risky arrangement of having opinion and trial counsel from the same law firm, but Eon's opinion counsel, Mr. Pontani, has actually entered an appearance in this matter. Because the Court cannot differentiate between opinion and trial counsel, the Court will grant Novartis' Motion To Compel to the extent it seeks the production of all legal advice Eon received from the Cohen, Pontani law firm relating to the subject matter of Mr. Pontani's opinion.

**III. Conclusion**

 For the reasons discussed, the Court will grant Novartis' Motion To Compel (D.I.139) to the extent it seeks the production of all documents relied upon in forming the basis of Mr. Pontani's opinion, and the production of all legal advice Eon received from the Cohen, Pontani law firm relating to the subject matter of Mr. Pontani's opinion.

 An appropriate Order will be entered.

 206 F.R.D. 396

 **Motions, Pleadings and Filings (Back to top)**

• 1:00CV00800 (Docket) (Aug. 30, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



United States District Court,
D. Massachusetts.
NITINOL MEDICAL TECHNOLOGIES, INC. and
Lloyd A. Marks, Plaintiffs,
v.
AGA MEDICAL CORPORATION, Defendant.
**No. CIV.A. 98-12506-NG.**

Oct. 26, 2000.

Patent infringement plaintiff moved to compel discovery. The District Court, Dein, United States Magistrate Judge, held that: (1) defendant's reliance on counsel's advice that its conduct was non-infringing waived attorney-client privilege with respect to counsel communications relating to infringement, but not with respect to communications relating to patent's validity or enforceability, and (2) defendant's reliance on counsel's advice did not waive attorney work-product privilege with respect to documents related to factual basis for counsel's opinion unless it could be shown that defendant knew of factual basis for counsel's opinion.

Ordered accordingly.

West Headnotes

**[1] Witnesses** ⚙219(3)
410k219(3) Most Cited Cases
Patent infringement defendant's reliance on counsel's advice that its conduct was non-infringing waived attorney-client privilege with respect to counsel communications relating to infringement, but not with respect to communications relating to patent's validity or enforceability.

**[2] Patents** ⚙292.3(2)
291k292.3(2) Most Cited Cases
Patent infringement defendant's reliance on counsel's advice that its conduct was non-infringing did not waive attorney work-product privilege with respect to documents related to factual basis for counsel's opinion unless it could be shown that defendant knew of factual basis for counsel's opinion; relevant issue was reasonableness of defendant's conduct, not reasonableness of counsel's opinion.

**Patents** ⚙328(2)
291k328(2) Most Cited Cases

5,108,420. Cited.
**\*212** William F. Lee, Hale & Dorr, Boston, MA, for Nitinol Medical Technologies Inc., Plaintiff.

Thomas C. O'Konski, Cesari & McKenna, Boston, MA, Paul T. Dietz, Nikolai, Mersereau & Dietz, Minneapolis, MN, for AGA Medical Corporation, Defendant.

**\*213** *SUPPLEMENTAL MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO COMPEL REGARDING WAIVER OF ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT IMMUNITY*

DEIN, United States Magistrate Judge.

This Supplemental Order will address the sole issue remaining in connection with the parties' cross-motions to compel--namely, whether the defendant AGA Medical Corp. has waived the attorney-client privilege and its counsel's work product immunity by asserting that it relied on the opinion of its counsel. [FN1] For the reasons detailed herein, unless AGA affirmatively withdraws its reliance on advice of counsel in connection with both its defense of the complaint and its counterclaims, additional materials relating to the advice given by counsel must be produced.

FN1. This court issued its initial order on Plaintiffs' Motion to Compel (# 14) and Defendant's Motion to Compel (# 56) on September 14, 2000. On October 18, 2000, this Court issued a Supplemental Order on Plaintiffs' Motion to Compel relating to the production of devices for destructive testing. The issues addressed in the present order, which have recently been briefed, are the only remaining issues raised by the Motions to Compel.

*BACKGROUND*

In its complaint filed on December 12, 1998, the plaintiffs (collectively "Nitinol") contend that the defendant ("AGA") infringed on plaintiffs' Patent No. 5,108,420 (" '420 Patent"), and that such infringement was willful. AGA has answered the complaint denying infringement and asserting as affirmative defenses that the '420 Patent is not valid and enforceable. The defendant also has

135 F.Supp.2d 212
135 F.Supp.2d 212, 49 Fed.R.Serv.3d 833
**(Cite as: 135 F.Supp.2d 212)**

counterclaimed for a declaration of invalidity, unenforceability, and non-infringement of the '420 Patent.

On June 24, 1999, Nitinol served a First Request for Production of Documents and Things and First Set of Interrogatories. Interrogatory No. 10 asked AGA to:

Identify any opinion of counsel concerning the validity, enforceability, or infringement of the '420 patent that AGA has relied upon in making, using, or selling any of the Accused Devices, state whether the opinion was oral or written, state the date upon which AGA received the opinion, identify the person(s) who rendered the opinion, identify each person to whom the opinion was directed, state whether the opinion was directed to the issue of validity, enforceability, or infringement, or to some or all of such issues, identify each person who was informed of the substance or conclusion of the opinion, and identify each person who received a copy of the opinion, if it was written.

In response, AGA objected "to the extent that the information requested is protected by the work product doctrine and attorney-client privilege" and further answered as follows:

Subject to and without waiving the general and specific objections, AGA Medical Corporation states that it has relied on the letters written by its counsel dated January 14, 1998 and January 21, 1998, both of which are being produced and made available for inspection. The documents themselves identify the person who rendered the opinion, each person to whom the opinion was directed, whether the opinion was directed to the issue of validity, enforceability or infringement, each person who informed of the substance or conclusions of the opinion, and each person who received a copy of the opinion. Notwithstanding the above, the production of these documents should in no way be construed as **214 a waiver of attorney-client privilege related to all other matters. [FN2]

FN2. The quoted language is from AGA's responses to interrogatories which were served on January 14, 2000. A substantively identical answer was served on June 13, 2000. The court does not have a copy of the original answers which seemingly were served on or about July 26, 1999.

AGA did, in fact, produce these letters of counsel to Nitinol in response to this interrogatory, although no copies have been provided to this court. It is agreed, however, that the letters were signed by one of AGA's trial counsel. It also appears that these letters may have been produced in response to plaintiffs' First Request for Production of Documents and Things No. 28 ("[a]ll documents relating to any contention by AGA that it has not willfully infringed the '420 patent") and No. 36 ("[a]ll documents relating to any opinions of counsel received by AGA with respect to the infringement, validity, or enforceability of the '420 patent"). In response to these requests, AGA raised several general and specific objections including the objection that the request "seeks information protected by the attorney-client privilege or the attorney work product doctrine." However, AGA continued, "[s]ubject to the general and specific objections and without waiving them, responsive non-privileged documents, if any, will be produced or made available for inspection ..." at the offices of defendant's counsel.

Nitinol contends that AGA's decision to produce the opinions of counsel in defense of a claim of willful infringement "waives the attorney-client privilege and work product immunity with respect to other documents related to the subject matter of the opinion." The categories of documents Nitinol is seeking from both AGA and its counsel are attached to its Supplemental Memorandum (# 77) in the form of an Exhibit to a proposed subpoena to counsel and are described *infra.*

AGA objects to the production of any further documents at this time. AGA contends that (1) AGA has not yet raised an advice of counsel defense and should not be called upon to do so until trial on the issue of willfulness; (2) the issue of willfulness relates to damages, and damages discovery has been severed; and (3) the scope of the requested discovery is too broad.

## DISCUSSION
### 1. AGA Has Asserted Reliance On Advice Of Counsel

The issue of reliance on advice of counsel is a common one in patent infringement cases. That is because:

when a party learns of the existence of a patent, that party must obtain the advice of competent legal counsel before undertaking any actions that may constitute infringement. The failure to seek legal advice is a factor that supports a finding of willful infringement. Conversely, a party's reliance on the advice of counsel is a factor that militates

135 F.Supp.2d 212                                                                                                              Page 3
135 F.Supp.2d 212, 49 Fed.R.Serv.3d 833
**(Cite as: 135 F.Supp.2d 212)**

against a finding of willfulness.

*Valois of Am., Inc. v. Risdon Corp.,* No. 3:95 CV 1850 AHN, 1998 WL 1661397, at *2 (D.Conn. Dec.18, 1998) (quoting *Edward Lowe Indus., Inc. v. Oil-Dri Corp. of Am.,* No. 94 C 7568, 1995 WL 609231, at *3 (N.D.Ill. Oct.13, 1995)). As a result, the following common scenario often arises:

The current convention in patent litigation strategy is as follows: the patent owner opens with a claim for willful infringement; the alleged infringer answers by denying willful infringement and asserts good faith reliance on advice of counsel as an affirmative defense; then the owner serves contention interrogatories **\*215** and document requests seeking the factual basis for that good faith reliance defense and the production of documents relating to counsel's opinion; the alleged infringer responds by seeking to defer responses and a decision by disclosure of the opinion; the owner counters by moving to compel; and the alleged infringer moves to stay discovery and for separate trials.

*Valois of Am.,* 1998 WL 1661397, at *3 (quoting *Johns Hopkins Univ. v. CellPro,* 160 F.R.D. 30, 34 (D.Del.1995)). This is substantively the scenario presented by the instant case, except that the opinion letters of counsel have already been produced.

A fair reading of AGA's answer to Interrogatory No. 10 and its response to Nitinol's requests for documents establishes that AGA has indicated that it intends to rely on advice of counsel. There is no question, and AGA does not dispute, that when a party asserts an advice of counsel defense, the result is at least some waiver of the attorney-client and work product privileges, though the scope of the waiver may be the subject of discussion. *See Saint-Gobain/Norton Indus. Ceramics Corp. v. General Electric Corp.,* 884 F.Supp. 31, 33 (D.Mass.1995). Despite its pleadings, however, AGA now claims that even though it did rely on counsel, it has not yet made a decision as to whether to assert a reliance on counsel defense.

This court sees no benefit in holding AGA to a defense it does not intend to assert at trial. For the reasons detailed below, it is now the appropriate time for AGA to make the decision as to whether it intends to rely on the advice of counsel in support of any of its claims or defenses. [FN3] Therefore, it is ORDERED that unless AGA serves and files within seven (7) days of the date of this Order written notice that it does not intend to rely on the advice of counsel in connection with any claim or defense of this action, it must produce the materials described below.

If AGA does provide such written notice, it shall be precluded from introducing any evidence or relying at trial on any claim or defense of advice of counsel. [FN4]

FN3. The parties address the issue whether the production was "voluntary" or "inadvertent" in connection with whether there has been a waiver of the attorney-client privilege. AGA also claims it demanded the letters back if their production would constitute a waiver of the attorney-client privilege with respect to other documents. Since AGA is being given the option of withdrawing its reliance on the opinion letters, the issues of whether the disclosures were inadvertent and, if so, the implications with respect to the attorney-client privilege, do not have to be reached.

FN4. Of course, AGA may decide at trial not to assert reliance on advice of counsel even if it produces the material called for by this Order.

**2. *A Stay Of Discovery On This Issue Is Not Warranted***

AGA contends that it should not be called upon to determine whether it intends to rely on advice of counsel at this time because the defense is related to damages and damage discovery has been severed. In addition, AGA has filed a motion for bifurcation of the issue of willfulness for trial which is presently pending before the district judge to whom this case has been assigned for trial. None of these factors justify a stay of discovery on the issue of reliance of counsel.

This case is almost two years old, and discovery should have been virtually completed by this time on both issues of liability and damages. According to the Joint Motion to Extend Certain Pre-Trial Deadlines, which was allowed by the court on February 20, 2000, fact and expert discovery **\*216** with respect to liability was to be completed by July 31, 2000, and fact and expert discovery relating to damages is to be completed by October 31, 2000. Dispositive motions are due on December 29, 2000.

While it is apparent that the parties have not met these deadlines, it is also clear that damages discovery has never been severed, as AGA now contends. Rather, the discovery has been staggered. Therefore, the discovery schedule does not justify a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 F.Supp.2d 212
135 F.Supp.2d 212, 49 Fed.R.Serv.3d 833
**(Cite as: 135 F.Supp.2d 212)**

Page 4

stay of production of documents relating to an advice of counsel defense.

In addition, many courts have found that the issue of willfulness is inextricably intertwined with issues of liability. *See, e.g., Home Elevators, Inc. v. Millar Elevator Serv. Co.,* 933 F.Supp. 1090, 1092 (N.D.Ga.1996) (denying motion to bifurcate and motion to stay discovery relating to advice of counsel issue), *citing Kimberly-Clark Corp. v. James River Corp.,* 131 F.R.D. 607, 609 (N.D.Ga.1989); *Real v. Bunn-O-Matic Corp.,* 195 F.R.D. 618, 624-626 (N.D.Ill.2000) (same). As the court held in *THK Am. Inc. v. NSK Co. Ltd.,* 151 F.R.D. 625 (N.D.Ill.1993):

> [a] willfulness determination, that is, the defendant's state of mind when it infringed the patent, is a finding of fact inextricably bound to the facts underlying the alleged infringement. In reaching a willfulness determination, a trial court weighs evidence of the totality of the surrounding circumstances in order to ascertain the infringer's good faith or its willfulness. Factors considered include: the infringer's deliberate copying of the ideas or designs of the inventor, the infringer's knowledge of the inventor's patent rights, any good faith belief or invalidity or infringement formed by the infringer after an investigation of the inventor's patent rights, and the infringer's behavior as a litigant. Undoubtedly, because willfulness is determined from the totality of the circumstances it is the reason why some courts prefer to include the issue of willfulness with the liability phase of a bifurcated trial.

*Id.* at 629-630 (denying motion for separate trial on issue of willfulness and motion to stay production of attorney opinion letter) and cases cited.

The motion to bifurcate the trial is not before me and I will not prejudge the motion. However, in view of the above cited cases, the lengthy discovery period which has already passed in this case, and the straightforward issues presented in this patent infringement case, bifurcation of the issue of reliance on advice of counsel is not justified, at least in the discovery stage. Moreover, since the opinion letters have already been produced, the basic substance of the privileged communication is already known to the opposing party.

**3. *The Scope Of The Production***

Nitinol contends that by relying on advice of counsel and producing the opinion letters, AGA has waived the attorney-client privilege on all other communications "related to the subject matter" of the

opinion letters. [FN5] In addition, Nitinol contends that AGA has waived any work product protection with respect to (1) all documents reflecting communications between the client and the lawyer providing the opinion, and (2) with respect to documents that were not shared with the client, all documents from the lawyer's files relating **\*217** to the factual assertions in the lawyer's opinion. [FN6]

> FN5. Specifically, Nitinol is seeking from AGA and its counsel "all documents constituting, evidencing or reflecting communications between [counsel] or any member of [his] firm and [AGA] concerning or related to the non-infringement, infringement, invalidity, validity or enforceability" of the '420 Patent.

> FN6. Specifically, Nitinol is seeking from defendant's counsel "[a]ll documents considered, reviewed, prepared or relied on by you or any member or employee of your firm related to the factual basis of any opinion expressed to [AGA] concerning the non-infringement, infringement, invalidity, validity or enforceability of" the '420 Patent.

AGA objects to the scope of the discovery being requested by Nitinol. AGA contends that (1) the opinion letter which it produced [FN7] relates only to "non-infringement," and that it should not have to produce any documents relating to "infringement, invalidity, validity or enforceability," (2) any production should be limited to "potentially damaging information" prepared by the attorney which is inconsistent with the opinion letter and casts doubts on the opinions expressed by counsel, and (3) counsel should only be required to produce documents that were actually conveyed to the client.

> FN7. Although the defendant's answer to Interrogatory No. 10 refers to two letters, the memoranda on the attorney-client privilege filed with the court refer to only one letter.

### *Attorney-Client Privilege*

[1] It is beyond question that the "deliberate injection of the advice of counsel into a case waives the attorney-client privilege ...," it is the scope of the waiver which must be decided. *See Mushroom Assoc. v. Monterey Mushrooms, Inc.,* 1992 WL 442892, at \*3 (N.D.Cal.1992) (quoting *Handgards Inc. v. Johnson & Johnson,* 413 F.Supp. 926, 929 (N.D.Cal.1976)). The waiver of the attorney-client privilege is predicated on the conclusion that a "party

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 F.Supp.2d 212                                                                    Page 5
135 F.Supp.2d 212, 49 Fed.R.Serv.3d 833
**(Cite as: 135 F.Supp.2d 212)**

should not be allowed to rely on self-serving documents in its defense while withholding potentially damaging information under the guise of the attorney-client privilege." *Micron Separations, Inc. v. Pall Corp.,* 159 F.R.D. 361, 365 (D.Mass.1995) (citation omitted).

Based on the foregoing, this court rules that AGA has waived the attorney-client privilege with respect to communications relating to the subject matter of the opinion given by counsel, Mr. Dietz. *See Micron Separations, Inc.,* 159 F.R.D. at 363-64, and cases cited. AGA contends that it obtained the advice of counsel only on the issue of "non-infringement." [FN8] The court does not have a copy of the opinion. The issue of infringement is distinct from the issues of validity and enforceability. [FN9] *See Saint-Gobain/Norton Indus. Ceramics Corp.,* 884 F.Supp. at 33 The "waiver of the attorney-client privilege as to one issue does [not] serve as a waiver of the privilege as to all issues." *Micron Separations, Inc.,* 159 F.R.D. at 365, n. 8, citation omitted.

> FN8. AGA does not identify other specific limitations which it thinks are relevant. If there are *specific* documents AGA believes should be protected but which have been ordered produced, this court will entertain specific motions for protective orders provided such motions are timely filed in accordance with the Order below.

> FN9. For discovery purposes, the court does not see a distinction between "non-infringement" and "infringement."

Applying these principles to the instant case, and in light of the documents requested by Nitinol, this court finds that AGA and its counsel are to produce:
    All documents constituting, evidencing or reflecting communications between AGA and Attorney Dietz or any other member or employee of his firm concerning or related to the non-infringement or infringement of the '420 Patent.
    In the event that Nitinol contends that the opinion letters cover topics other than non-infringement, this court will review **\*218** the letters upon motion of counsel. In any event, AGA is cautioned "that while it is not required to disclose privileged documents relating to enforceability and [validity] at this time, undisclosed opinion evidence will not be admitted at trial to dispute the charge of willful infringement." *Saint-Gobain/Norton Indus. Ceramics Corp.,* 884 F.Supp. at 34.

### Work Product Doctrine

[2] As plaintiff recognizes, there is a split of authority relating to whether work product documents that were not shared with the client must be produced. [FN10] Nitinol asks this court to follow *Cordis Corp. v. SciMed Life Sys., Inc.,* 980 F.Supp. 1030 (D.Minn.1997). In *Cordis,* patent counsel, who had rendered an opinion on which the defendant had relied, had commissioned certain experiments by several consultants. Counsel relied on the results of those experiments in rendering its opinion. The court concluded that "the Plaintiff may properly discover the work papers of [counsel] insofar as they relate to the garnering of factual bases for the opinions that are expressed in the firm's letter opinions to the Defendant." *Id.* at 1034.

> FN10. Nitinol is not seeking opinion work product but is only seeking documents "related to the factual basis of any opinion." Therefore, this court does not need to address whether documents reflecting the mental impressions, conclusions or legal theories of trial counsel need to be produced. *See Micron Separations, Inc.,* 159 F.R.D. at 366.

All courts agree that it is the alleged infringer's state of mind which is relevant, and the inquiry is whether the infringer's reliance on the opinion of counsel was reasonable. *See id.* at 1032. As the court explained in *Thorn EMI N. Am., Inc. v. Micron Tech., Inc.,* 837 F.Supp. 616, 620 (D.Del.1993), "evidence that the infringer had actual notice of the patent, and evidence that the infringer sought, obtained and justifiably relied on legal advice from counsel on whether or not the patents were invalid or infringed" is relevant to whether an infringer acted willfully. In assessing whether an infringer's reliance on an opinion of counsel was reasonable:
    courts have found it relevant to look to when the infringer sought counsel's advice (before or after commencing the infringing activities); the infringer's knowledge of the attorney's independence, skill and competence; the infringer's knowledge of the nature and extent of analysis performed by counsel in providing the opinion; and whether the opinion contains sufficient internal indicia of credibility, including a validity analysis predicated on a review of the file histories, and an infringement analysis that compares and contrasts the potentially infringing method of apparatus with the patented inventions.
    *Id.,* citations omitted.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Unless it can be established that the defendant knew of the factual basis for counsel's opinions, such work product should not have to be produced. [FN11] For example, in *Cordis,* it appears that the defendant knew that experiments had been conducted, at which point information about the experiments would be relevant to the defendant's state of mind. In contrast, in the present case there is no evidence before the court as to what the opinions were, much less what information the defendant had about the bases for the opinions. On this record, the analysis applied in *Thorn EMI N. Am., Inc.,* 837 F.Supp. at 620-21 (distinguished by the *219 *Cordis* court), should be applied here. The inquiry should focus on what AGA knew about its counsel's "independence, skill and competence to provide the opinions, what [AGA] knew about the nature and extent of analysis performed by the firm, and what [AGA] knew and had concluded about the credibility, value and reasonableness of the opinion." *Id.* at 621. *See also Micron Separations, Inc.,* 159 F.R.D. at 363. The document request framed by Nitinol is too broad at this time.

> FN11. Of course, the fact that an alleged infringer did not have information about the factual basis of counsel's opinion may, in and of itself, be relevant to whether the infringer's reliance on the opinion was relevant.

Balancing the competing interests at issue here, paragraph 2 of the document request to counsel shall be modified to provide as follows:

> All documents considered, reviewed, prepared or relied on by Attorney Dietz or any member or employee of his firm related to the factual basis of any opinion expressed to AGA concerning the non-infringement or infringement of the '420 Patent to the extent that the factual basis was discussed with or otherwise conveyed to AGA either generally or specifically.

As in the case of the attorney-client privilege discussed above, any evidence not produced on the grounds of work product protection will not be admissible at trial.

### ORDER
WHEREFORE, it is ORDERED that:

1. Unless AGA serves and files within seven (7) days of the date of this Order written notice that it does not intend to rely on the advice of counsel in connection with any claim or defense of this action, it must produce the materials described below. If AGA does provide such written notice, it shall be precluded from introducing any evidence or relying at trial on any claim or defense of advice of counsel.

2. Unless AGA serves and files the notice described in the preceding paragraph, AGA shall produce the following documents within fourteen (14) days of the date of this Order:

> All documents constituting, evidencing or reflecting communications between AGA and Attorney Dietz or any other member or employee of his firm concerning or related to the non-infringement or infringement of the '420 Patent.

Similarly, counsel for AGA shall produce the following documents within fourteen (14) days of the date of this Order:

> All documents constituting, evidencing or reflecting communications between AGA and Attorney Dietz or any other member or employee of his firm concerning or related to the non-infringement or infringement of the '420 Patent.

> All documents considered, reviewed, prepared or relied on by Attorney Dietz or any member or employee of his firm related to the factual basis of any opinion expressed to AGA concerning the non-infringement or infringement of the '420 Patent to the extent that the factual basis was discussed with or otherwise conveyed to AGA either generally or specifically.

3. In the event that AGA believes that specific documents or materials ordered herein to be produced should remain privileged for reasons not addressed herein, AGA may file a specific motion(s) for a protective order within fourteen (14) days of the date of this Order. Nitinol shall file a response seven (7) days thereafter.

### ORDER ON DEFENDANT'S MOTION FOR A PROTECTIVE ORDER
The Defendant's Motion for a Protective Order dated November 21, 2000 is ALLOWED IN PART, and DENIED IN PART.

The production ordered by this court on October 26, 2000 shall be limited to documents *220 in existence on or before the date this litigation was commenced.

The Defendants shall also produce:

> All documents constituting, evidencing or reflecting opinions of Attorney Dietz or any other member of his firm relating to the infringement or non-infringement of the '420 patent which contradict or which are in any way inconsistent with the opinions of counsel dated January 14,

135 F.Supp.2d 212
135 F.Supp.2d 212, 49 Fed.R.Serv.3d 833
**(Cite as: 135 F.Supp.2d 212)**

1998 and January 21, 1998 which have previously been produced. This document request shall cover the period to the present.

AGA shall produce the documents ordered produced by this court on October 26, 2000 and herein by no later than December 15, 2000. Failure to produce all responsive documents by December 15, 2000 shall result in the imposition of sanctions.

135 F.Supp.2d 212, 49 Fed.R.Serv.3d 833

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

One International Place
22nd Floor
Boston, MA 02110
Telephone 617-526-9600
Fax 617-526-9899

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

# PROSKAUER ROSE LLP

Kimberly A. Mottley
Direct Dial: 617-526-9616
Email: kmottley@proskauer.com

March 30, 2006

*Via Electronic Mail*

Craig D. Leavell, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois  60601

Re:      MIT v. Harman International Industries, Inc., No. 05-10990 DPW (D. Mass.)

Dear Craig:

I write concerning the subpoenas MIT served on Harman's opinion counsel – Meredith Addy and Brinks Hofer – in this case.

As you know, Brinks Hofer filed a motion to quash those subpoenas yesterday.  The privilege Brinks Hofer asserts here is Harman's to waive – not Brinks Hofer's.  In fact, Harman has already waived this privilege by relying on the advice of counsel in response to MIT's claim of willful infringement, and by its production of the 100 privileged documents back in January. If the question is how broad is Harman's waiver, then that is a question to be answered by the Boston court, where Harman effected the waiver.

Brinks Hofer never responded to our inquiry as to whether Harman will agree not to call Ms. Addy as a trial witness in this case.  Should Harman agree to this, we may be able to reach agreement on a narrower scope of discovery to seek from Ms. Addy and Brinks Hofer.

Because this issue should be resolved by the Court here in Boston, where Harman is litigating this case and waived the privilege – not by a new judge unfamiliar with the facts of the case in Chicago, we need to discuss this matter with you no later than tomorrrow, so that MIT can file its own motion for resolution of this issue as soon as possible.

Are you available for a call tomorrow at 2:00 p.m. to discuss?

Sincerely,

Kimberly A. Mottley

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Craig D. Leavell
To Call Writer Directly:
312 861-2105
cleavell@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200
Dir. Fax: 312 861-2200

March 30, 2006

**<u>Via Electronic Mail</u>**

Kimberly A. Mottley
Associate
Proskauer Rose LLP
One International Place, 14th Floor
Boston, Massachusetts 02110-2600

> **Re:     *MIT v. Harman International Industries, Inc.,* No. 05-10990 DPW**

Dear Kim:

The motion filed by Brinks Hofer seeks a protective order to limit the scope of discovery and testimony from Ms. Addy and her firm to be commiserate with the scope of Harman's waiver of privilege as it relates to Harman's opinion of counsel defense to MIT's recently-added claim for willful infringement. Harman has reviewed the motion filed by Brinks Hofer and agrees with its position regarding the limited scope of Harman's waiver. Harman does not understand what basis MIT could have to conclude otherwise. Please let me know MIT's position with respect to the scope of Harman's waiver and the basis for that position. Assuming I have that information in time to review it before 2:00 pm tomorrow, then I will be available to discuss this issue with MIT. I suggest you also check with Mr. Remus at Brinks Hofer to confirm that he is available, too, because I believe that Brinks Hofer should participate in any call on this subject.

With respect to the other issues raised in your letter, Harman reserves the right to call Ms. Addy at trial, and the issue addressed by Brinks Hofer's motion is properly before the Northern District of Illinois, which is the Court that issued the third-party subpoena at issue.

Very truly yours,

Craig D. Leavell

CDL/db

London          Los Angeles          Munich          New York          San Francisco          Washington, D.C.

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois  60601

Ann H. Chen
To Call Writer Directly:
312 861-6352
achen@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200
Dir. Fax: 312 665-9059

February 2, 2006

**VIA EMAIL**

Kimberly A. Mottley, Esq.
Proskauer Rose LLP
One International Place, 14th Floor
Boston, MA  02110

Re:  *MIT v. Harman Int'l Indus., Inc.* , Case No. 05-10990 DPW

Dear Kim:

We just discovered that on January 18, 2006, we inadvertently produced to you a series of documents that are protected by the attorney-client, work product or other privilege. Despite our specific instructions to the contrary and our clear internal designation of these documents as privileged, our litigation support services mistakenly included the documents identified below in our electronic production.

As you know, our inadvertent production of these privileged documents does not waive any privilege.  We request that MIT segregate the following documents and return them to us immediately:

| | |
|---|---|
| HAR 006016-17 | HAR 006344 |
| HAR 006035 | HAR 006346 |
| HAR 006037 | HAR 006349 |
| HAR 006067 | HAR 006351 |
| HAR 006069 | HAR 006356 |
| HAR 006083-87 | HAR 006397-99 |
| HAR 006098 | HAR 006465 |
| HAR 006135-37 | HAR 006504-05 |
| HAR 006148-49 | HAR 006515-18 |
| HAR 006151-52 | HAR 006632 |
| HAR 006192-96 | HAR 006635 |
| HAR 006287 | HAR 006640 |
| HAR 006290-91 | HAR 00647-53 |
| HAR 006307-08 | HAR 006655-58 |
| HAR 006311 | HAR 006660-71 |
| HAR 006313-14 | HAR 006673 |
| HAR 006330 | HAR 006676 |
| HAR 006337 | HAR 006678-80 |
| HAR 006340 | HAR 006687 |

## KIRKLAND & ELLIS LLP

February 2, 2006
Page 2

| | |
|---|---|
| HAR 006690 | HAR 007121-22 |
| HAR 006692 | HAR 007130-32 |
| HAR 006695 | HAR 007134 |
| HAR 006697 | HAR 007136-48 |
| HAR 006699-704 | HAR 007154 |
| HAR 0066706-09 | HAR 007164 |
| HAR 006711-59 | HAR 007167 |
| HAR 006761-62 | HAR 007170-78 |
| HAR 006764-69 | HAR 007368 |
| HAR 006774-81 | HAR 007519 |
| HAR 006783-84 | HAR 007629 |
| HAR 006812 | HAR 007708 |
| HAR 006839 | HAR 007783 |
| HAR 006866-67 | HAR 007874 |
| HAR 006879-92 | HAR 007917 |
| HAR 006906-19 | HAR 007968 |
| HAR 006927-28 | HAR 008078 |
| HAR 006941 | HAR 008157 |
| HAR 006984 | HAR 008232 |
| HAR 007004-07 | HAR 008323 |
| HAR 007009-30 | HAR 008366 |
| HAR 007039-48 | HAR 008417 |
| HAR 007050 | HAR 008607 |
| HAR 007063-75 | HAR 008758 |
| HAR 007078 | HAR 008761-80 |
| HAR 007109 | HAR 008785-815 |
| HAR 007112-18 | HAR 008826-27. |

We appreciate your cooperation.

Very truly yours,

Ann H. Chen

cc:    Robert Muldoon, Esq.



**Motions, Pleadings and Filings**

United States District Court,
D. Massachusetts.
AMGEN INC., Plaintiff,
v.
HOECHST MARION ROUSSEL, INC. and
Transkaryotic Therapies, Inc., Defendants.
**No. CIV.A. 97-10814-WGY.**

Jan. 18, 2000.

On defendant's motion to compel return of inadvertently produced documents, the District Court, Young, Chief Judge, held that defendant's inadvertent disclosure of privileged documents effected waiver of attorney-client privilege and work-product protection.

Motion denied.

West Headnotes

**[1] Witnesses** 222
410k222 Most Cited Cases
Party claiming the protection of a privilege bears the burden of demonstrating, by a fair preponderance of the evidence, not only that the privilege applies, but also that it has not been waived.

**[2] Witnesses** 198(1)
410k198(1) Most Cited Cases
The attorney-client privilege protects communications made between an attorney and a client for the sake of obtaining legal advice.

**[3] Federal Civil Procedure** 1600(3)
170Ak1600(3) Most Cited Cases
Work product doctrine protects: (1) documents or other tangible things; (2) prepared in anticipation of litigation; (3) by or for a party or a party's representative. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

**[4] Federal Civil Procedure** 1600(3)
170Ak1600(3) Most Cited Cases
Underlying purpose of the work product doctrine is to protect the integrity of the adversarial process by creating a zone of privacy for those matters prepared by or for the party or the party's counsel in anticipation of litigation.

**[5] Federal Civil Procedure** 1600(5)
170Ak1600(5) Most Cited Cases

**[5] Witnesses** 219(3)
410k219(3) Most Cited Cases
Whether inadvertent disclosure effects waiver of attorney-client privilege and work-product protection depends on the circumstances, including: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the amount of time it took the producing party to recognize its error, (3) the scope of the production, (4) the extent of the inadvertent disclosure, and (5) the overriding interest of fairness and justice.

**[6] Federal Civil Procedure** 1600(5)
170Ak1600(5) Most Cited Cases

**[6] Witnesses** 219(3)
410k219(3) Most Cited Cases
Defendant's inadvertent disclosure of privileged documents effected waiver of attorney-client privilege and work-product protection, considering defendant's inadequate precautions to prevent inadvertent disclosure, the magnitude of the disclosure which consisted of approximately 200 documents comprising 3821 pages, and overriding interests of fairness and justice which dictated the recognition of a waiver of the privileges.
**\*288** Michael R. Gottfried, Burns & Levinson, Boston, MA, Douglass C. Hochstetler, Edward M. O'Toole, Jane J. Choi, Michael F. Borun, Kevin M. Flowers, Marshall, O'Toole, Gerstein, Murray & Borun, Chicago, IL, Lloyd R. Day, Jr., David M. Madrid, Robert M. Galvin, Linda A. Baxley, Jennifer R. Dupre, Deborah E. Fishman, Jackie N. Nakamura, Christopher E. Stretch, Craig H. Casebeer, Day Casebeer Madrid Winters & Batchelder LLP, Cupertino, CA, Michael R. Gottfried, Dennis D. Allegretti, Richard M. Wong, Duane, Morris & Heckscher LLP, Boston, MA, for plaintiff.

Robert S. Frank, Jr., Mark A. Michelson, Choate, Hall & Stewart, Boston, MA, Peter C. McCabe, III, Raymond C. Perkins, Winston & Strawn, New York City, Steven F. Molo, Winston & Strawn, Chicago, IL, Kenneth B. Herman, Herbert F. Schwartz, James F. Haley, Jr., Russell W. Faegenburg, Fish & Neave,

190 F.R.D. 287                                                                                    Page 2
190 F.R.D. 287, 45 Fed.R.Serv.3d 1095, 53 U.S.P.Q.2d 1898
**(Cite as: 190 F.R.D. 287)**

New York City, for defendants.

*MEMORANDUM AND ORDER*

YOUNG, Chief Judge.

 Amgen Inc. ("Amgen") is embroiled in complex patent litigation with Hoechst Marion Roussel, Inc. ("Hoechst") and Transkaryotic Therapies, Inc. ("Transkaryotic"). Sweeping discovery requests have been met by equally adroit countermoves. Discovery motions fall as the gentle rain. Amidst this preliminary grappling, counsel for Hoechst has made the misstep feared by all litigators, inadvertently producing to Amgen 3,821 privileged documents from the files of Hoechst attorney Maynard R. Johnston, Esq. Hoechst, not surprisingly, wants its privileged documents back. [FN1] Amgen refuses.

> FN1. More precisely, Hoechst has moved, pursuant to Fed.R.Civ.P. 37, to compel Amgen to return the documents and has requested an order prohibiting Amgen and its counsel from reading, using, disclosing, or referring to any information contained in the documents.

 Since I have for years taught the survey course on evidence at various of our local law schools and at continuing legal education programs, this is a matter to which I have given some thought. Here's how I formulated the rule in a 1991 lecture on evidence for Massachusetts Continuing Legal Education:

> The second aspect of the attorney-client privilege-- and this applies in both federal and Massachusetts state courts--deals with inadvertent disclosure. It used to be that an inadvertent disclosure operated as a waiver of the privilege. Also, if an eaves dropper heard something, then the privilege was waived. That's gone now. If you make a mistake in your production of documents and you disclose an attorney-client communication, the other side can't use it if the disclosure was inadvertent.

 William G. Young, *Reflections of a Trial Judge* 243 (MCLE, 1998). The analysis required by this actual case, however, reveals the above formulation to be overly simplistic.

I. *Factual Background*

 During June and July, 1999, five lawyers and two legal assistants at Choate, Hall & Stewart ("Choate"), one of the two law firms representing the defendants Hoechst and Transkaryotic, reviewed over 200,000 pages of documents collected from Hoechst personnel. *See* Marandett Aff. ¶ 2. The purpose of the review was to identify and withhold privileged documents while at the same time producing documents that were responsive to Amgen's document requests. *See id.* During the week of July 12 through 16, 1999, four small boxes were identified by a member of the Choate team as consisting entirely of privileged documents that had been collected from the files of Hoechst in-house counsel, Maynard R. Johnson, Esq. *See id.* at ¶ 4. These documents were segregated from responsive non-privileged documents and placed on a separate shelf in order to be withheld from production. *See id.* Yet, when Choate's outside copy vendor arrived to **\*289** collect non-privileged responsive documents to be numbered and copied for production, due to an error by a paralegal working with the copy vendor, the boxes containing the privileged documents were taken from the separate shelf. *See id.* The copy vendor labeled these documents HMR532618 to 536439. *See id.* As a result of the paralegal's error, the privileged documents (some 3821 pages that filled approximately one large archive box) were included among the twenty-three archive boxes containing more than 70,000 pages that were produced to Amgen's counsel on July 16, 1999. *See id.*

 On July 22, 1999, Edward M. O'Toole, counsel for Amgen, sent a letter to Choate's co-counsel Herbert F. Schwartz of Fish & Neave asking whether the documents had been produced intentionally. *See id.* at ¶ 5, Ex. A. Upon receiving the letter, Eric J. Marandett, the Choate attorney responsible for the document production, reviewed the documents identified in the letter and determined that they had been produced as a result of the paralegal's error. *See id.* at ¶ 5. Mr. Marandett then phoned Mr. O'Toole and informed him that production of the documents was not intentional and he asked Mr. O'Toole to return the documents immediately. *See id.* at ¶ 6. Also on July 22, 1999, Mr. Marandett sent a letter to Mr. O'Toole to the same effect. *See id.* at ¶ 6, Ex. B.

 On July 23, 1999, Lloyd R. Day, Jr., co-counsel for Amgen, sent a letter to Mr. Marandett indicating that even though Amgen was not prepared to return the documents, Amgen's counsel would segregate the documents and refrain from reviewing them further. *See id.* at ¶ 7, Ex. C. Mr. Day requested the production of a privilege log identifying the documents and stating the basis for the claim of privilege. *See id.* at ¶ 7. Hoechst agreed to Mr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

190 F.R.D. 287                                                                                          Page 3
190 F.R.D. 287, 45 Fed.R.Serv.3d 1095, 53 U.S.P.Q.2d 1898
**(Cite as: 190 F.R.D. 287)**

Day's request and on August 16, 1999, Hoechst provided to Amgen's counsel a comprehensive privilege log that identified each of the documents and stated the basis for the claim of privilege. *See id.* at ¶ 8, Ex. D. Finally, by letter dated October 5, 1999, Amgen counsel Robert Galvin informed Hoechst counsel Douglas Gilbert that Amgen would not return the documents. *See id.* at ¶ 10, Ex. I. Consequently, Hoechst moves this Court to compel return of the inadvertently produced documents.

II. *Discussion*

A. *Standard of Review*

[1] The party claiming the protection of a privilege bears the burden of demonstrating, by a fair preponderance of the evidence, not only that the privilege applies, but also that it has not been waived. *See In re Grand Jury Subpoena (Zerendow), 925 F.Supp. 849, 855 (D.Mass.1995)* (Saris, J.); *see also State ex rel. Allstate Ins. Co. v. Gaughan, 203 W.Va. 358, 508 S.E.2d 75, 95-96 (1998)* ("We further hold that the party inadvertently disclosing attorney-client privileged communication bears the burden of showing by a preponderance of evidence that the communication should retain its privileged status."). Thus, Hoechst must prove that it did not waive the privilege when its attorneys inadvertently produced the documents. Furthermore, since state law does not supply the rule of decision with respect to Amgen's claims against the defendants, federal common law governs the privilege analysis. *See Fed.R.Evid. 501*; *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs, 60 F.3d 867, 883 (1st Cir.1995).*

B. *The Attorney-Client Privilege and Work Product Doctrine*

[2] The attorney-client privilege protects communications made between an attorney and a client for the sake of obtaining legal advice. *See Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)* (Gorton, J.); *City of Worcester v. HCA Management Co., Inc., 839 F.Supp. 86, 88 (D.Mass.1993)* (Gorton, J.); *United States v. United Shoe Machinery Corp., 89 F.Supp. 357, 358-59 (D.Mass.1950)* (Wyzanski, J.). The privilege assures both attorneys and clients that discussions regarding their cases which are made in confidence will remain so. "Without this assurance, attorneys and clients might be inhibited from engaging in the free, complete and candid exchange of information that is the cornerstone of an effective attorney-client

relationship." *Fleet Nat'l Bank v. Tonneson & Co., 150 F.R.D. 10, 13 (D.Mass.1993)* (Karol, M.J.).

**\*290** [3][4] As announced in the landmark case of *Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947)*, and ultimately codified in *Federal Rule of Civil Procedure 26(b)(3)*, the work product doctrine protects (1) documents or other tangible things, (2) prepared in anticipation of litigation, (3) by or for a party or a party's representative. *See HCA Management, 839 F.Supp. at 88.* The underlying purpose of the work product doctrine is to protect the integrity of the adversarial process by creating a zone of privacy for those matters prepared by or for the party or the party's counsel in anticipation of litigation. *See Hickman, 329 U.S. at 510-11, 67 S.Ct. 385; HCA Management, 839 F.Supp. at 88.* Thus, in their distinctive manners, both the attorney-client privilege and the work product doctrine serve vital social policies.

C. *Inadvertent Disclosure of Privileged Communications*

Although courts are consistent in lauding the social value of these privileges, they differ significantly with respect to the effect an inadvertent disclosure of privileged information has on the claim of privilege. [FN2] Doctrinally, the question is under what circumstances, if any, an inadvertent disclosure of privileged communications constitutes a waiver of the privilege. Courts across the country approach this question in any of three different ways.

> FN2. The ethical duties of an attorney who receives inadvertently-produced documents is also presently a matter of some dispute. *See* Paul D. Boynton, "MBA Panel: OK To Keep Opponent's 'Lost' Mail," 27 Mass. Law. Wkly. 2569, 2569, 2603 (1999). Relying substantially on the attorney's duty zealously to advocate for the client's interests, the Massachusetts Bar Association's Committee on Professional Ethics advised that an attorney who mistakenly received a potentially privileged letter was not ethically bound to return the letter. *See* MBA Comm. on Professional Ethics, Op. 4 (1999). The opinion was widely criticized and flew in the face of contrary American Bar Association formal ethics opinions, which advised the recipient attorney to refrain from reading the documents and comply with any request made by the negligent attorney, including a

190 F.R.D. 287                                                                                            Page 4
190 F.R.D. 287, 45 Fed.R.Serv.3d 1095, 53 U.S.P.Q.2d 1898
**(Cite as: 190 F.R.D. 287)**

request to return the documents, or refrain from using the documents until a court definitively resolves the proper disposition of the materials. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 382 (1994); ABA Comm. on Ethics and Professional Responsibility, Formal Op. 368 (1992). To its credits, Amgen followed the latter approach by segregating the documents and refraining from reviewing them further until this dispute is resolved.

Some courts follow the "never waived" approach, which holds that a disclosure that was merely negligent can never effect a waiver because, *a fortiori,* the holder of the privilege lacks a subjective intent to forgo protection. *See, e.g., Corey v. Norman, Hanson & DeTroy,* 742 A.2d 933, 941-42 (Me.1999); *Helman v. Murry's Steaks, Inc.,* 728 F.Supp. 1099, 1104 (D.Del.1990); *Kansas-Nebraska Natural Gas Co., Inc. v. Marathon Oil Co.,* 109 F.R.D. 12, 21 (D.Neb.1983); *Mendenhall v. Barber-Greene Co.,* 531 F.Supp. 951, 954-55 (N.D.Ill.1982). As the *Mendenhall* court explained, "if we are serious about the attorney-client privilege and its relation to the client's welfare, we should require more than such negligence by counsel before the client can be deemed to have given up the privilege." *Mendenhall,* 531 F.Supp. at 955. No judge in this District has ever adopted this analysis.

Instead, my colleagues in the District of Massachusetts have adhered to either of two different approaches. One option has been termed the "strict accountability" rule because it effects a waiver of the privilege regardless of the privilege holder's intent or inadvertence. *See, e.g., Ares-Serono, Inc. v. Organon Int'l B.V.,* 160 F.R.D. 1, 4 (D.Mass.1994) (Bowler, M.J.); *International Digital Systems Corp. v. Digital Equipment Corp.,* 120 F.R.D. 445, 449-50 (D.Mass.1988) (Collings, M.J.); *see also Carter v. Gibbs,* 909 F.2d 1450, 1451 (Fed.Cir.1990) (en banc); *In re Sealed Case,* 877 F.2d 976, 980 (D.C.Cir.1989). In *International Digital Systems,* the court explained that "[w]hen confidentiality is lost through 'inadvertent' disclosure, the Court should not look at the intention of the disclosing party.... It follows that the Court should not examine the adequacy of the precautions taken to avoid 'inadvertent' disclosure either." *International Digital Systems,* 120 F.R.D. at 449-50. In reaching this conclusion, Magistrate Judge Collings reasoned that there would be "little benefit" **\*291** in continuing to recognize a privilege which has as its foundation the

principle of confidentiality when that confidentiality has already been breached. *See id.* at 449. In addition, the court pointed out that an automatic waiver rule would best encourage attorneys to safeguard their confidences from inadvertent disclosures. *See id.* at 450.

[5] Apart from the "never waived" and the "strict accountability" approaches, a third option strikes a balance between these two rigid solutions. *See, e.g., Milford Power Ltd. Partnership v. New England Power Co.,* 896 F.Supp. 53, 58 (D.Mass.1995) (Gorton, J.) (considering totality of circumstances surrounding the inadvertent production of documents); *HCA Management,* 839 F.Supp. at 89 (same); *Fleet Nat'l Bank,* 150 F.R.D. at 16 (examining precautions taken to avoid inadvertent disclosure); *see also Gray v. Bicknell,* 86 F.3d 1472, 1483-84 (8th Cir.1996) (applying Missouri law which had not yet addressed the issue); *Alldread v. City of Grenada,* 988 F.2d 1425, 1434 (5th Cir.1993); *Allstate,* 203 W.Va. 358, 508 S.E.2d at 95; (adopting "middle test" for West Virginia). Massachusetts, for example, adheres to the "middle test." *See In re Reorganization of Electric Mutual Liability Ins. Co., Ltd. (Bermuda), ("EMLICO")* 425 Mass. 419, 423, 681 N.E.2d 838 (1997) ("[A] client may be deemed to have met the burden of establishing that a privilege exists and no waiver has occurred if adequate steps have been taken to ensure a document's confidentiality."). [FN3] This approach empowers courts to consider a number of circumstances relating to the inadvertent production, including (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the amount of time it took the producing party to recognize its error, (3) the scope of the production, (4) the extent of the inadvertent disclosure, and (5) the overriding interest of fairness and justice. *See HCA Management,* 839 F.Supp. at 89 (citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 104 F.R.D. 103, 105 (S.D.N.Y.1985)). Thus, depending on the totality of these factors, the court may rule either that the inadvertent disclosure has effected a waiver of the privilege or that the privilege remains intact.

FN3. Until the Massachusetts Supreme Judicial Court adopted the flexible "middle test" in the *EMLICO* decision in 1997, justices of the Massachusetts Superior Court had tended in recent years to follow the "never waived" approach, *see, e.g. Flynn v. Kasmet,* Norfolk Civ. No. 92- 02875-B, slip op. (Mass.Super.Ct. Aug. 10, 1993) (Mulligan, J.) (considering all three

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

approaches in a very clear opinion and adopting the "never waived" approach). One problem with this approach was that some justices went so far as to "suppress" data derived from privileged information inadvertently disclosed.

Amgen argues in its brief that the First Circuit has foreclosed further common law evolution of this issue by adopting the strict accountability approach. *See* Amgen Opp. at 5 (citing *Texaco, 60 F.3d at 867).* While the certainty and efficiency with which the First Circuit in *Texaco* dismisses the claim that the district court erred in determining that an inadvertent disclosure of documents constituted a waiver of the privilege might suggest that the First Circuit was embracing the strict accountability rule, *see Texaco, 60 F.3d at 883,* closer examination reveals that the First Circuit has adopted no particular approach. *See id.* The First Circuit explains that "[i]t is apodictic that inadvertent disclosures *may* work a waiver of the attorney-client privilege." *Id.* (emphasis added). Unlike the strict accountability rule, which rigidly requires that all inadvertent disclosures constitute a waiver, the word "may" provides for discretion. Furthermore, while the First Circuit cites the strict waiver opinion of the D.C. Circuit, *In re Sealed Case, 877 F.2d at 979-80,* it also cites two other circuit court opinions which employ the balancing language of the "middle test." *See Texaco, 60 F.3d at 883* (citing *Alldread, 988 F.2d at 1434; In re Grand Jury Proceedings, 727 F.2d 1352, 1356 (14th Cir.1984]))*. In addition, the First Circuit describes the negligent conduct of the disclosing party, a description which would be unnecessary had the First Circuit adopted the strict accountability rule since the disclosing party's intent or negligence is irrelevant to the application of that rule. *See Texaco, 60 F.3d at 883 n. 7.* In light of these observations, this Court is not bound to follow the strict accountability rule.

**\*292** Having considered at length each of the three alternatives, the nature of the privileges at stake, and the consequences flowing from the adoption of each approach, this Court aligns itself with those which employ the "middle test." As the Eighth Circuit explained in *Gray,* the middle test "strikes the appropriate balance between protecting attorney-client privilege and allowing, in certain situations, the unintended release of privileged documents to waive that privilege." *Gray, 86 F.3d at 1484.* In particular, each of the two rigid alternatives fails to take highly relevant issues into account. The "never waived" approach, for example, creates little incentive for attorneys to guard privileged material closely and

fails fully to recognize that even an inadvertent disclosure undermines the confidentiality which undergirds the privileges. *See id.* at 1483. Likewise, while the strict accountability rule certainly holds attorneys and clients accountable for their lack of care, it nonetheless diminishes the attorney-client relationship because, in rendering all inadvertent disclosures--no matter how slight or justifiable--waivers of the privileges, the rule further undermines the confidentiality of communications. *See id.* "If, when a document stamped 'attorney-client privileged' is inadvertently released, it and all related documents lose their privileged status, then clients will have a much greater hesitancy to fully inform their attorney." *Id.* In addition, the work product doctrine promotes the efficiency of the judicial system by protecting the confidentiality of documents which are absolutely essential in preparing a case for trial. Applying the strict accountability rule to work product would all but compel attorneys and their clients to forgo the use of these particularly valuable trial preparation documents. Providing a measure of flexibility, the "middle test" best incorporates each of these concerns and accounts for the errors that inevitably occur in modern, document-intensive litigation. *See id.* at 1484. As the Eighth Circuit concluded, "[t]he middle test provides the most thoughtful approach, leaving the trial court broad discretion as to whether waiver occurred and, if so, the scope of that waiver." *Id.* In light of the preceding considerations, the Court joins the many jurisdictions throughout the federal and state systems that have adopted the flexible "middle test."

D. *Application of the "Middle Test"*

[6] This Court thus turns to examine (1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the amount of time it took the producing party to recognize its error, (3) the scope of the production, (4) the extent of the inadvertent disclosure, and (5) the overriding interest of fairness and justice. *See HCA Management, 839 F.Supp. at 89* (citing *Lois Sportswear, 104 F.R.D. at 104).* Hoechst points to its attorneys' segregation of privileged documents from responsive, non-privileged documents as evidence of "extensive precautions to prevent the disclosure of privileged information." *See* Hoechst Mem. at 4, 8-9. While such actions are surely more responsible than those employed by the disclosing party in *Texaco, 60 F.3d at 883 n. 7,* this conduct merely describes the act of document production and falls short of demonstrating precautions intended to prevent inadvertent disclosure. Although the Court recognizes that

Hoechst did make some effort to prevent inadvertent disclosure by placing the boxes filled with privileged documents on a shelf separate from the documents intended to be produced, easily-accomplished additional precautions were obviously still needed. For example, particularly because Hoechst's attorneys outsourced the copying of the documents to a copy vendor, a knowledgeable attorney or legal assistant should quickly have reviewed the performance of the vendor to ensure that the proper documents were copied. The ease with which this disclosure could have been prevented informs the Court's ruling that Choate's precautions were not reasonable. In addition, the sheer magnitude of the disclosure far exceeds any inadvertent disclosure the Court has encountered in prior cases and counsels against a determination that Choate's precautions were adequate.

Moreover, it took Hoechst five days to recognize its error and then only after counsel for Amgen drew Hoechst's attention to the privileged documents. *Compare \*293Fleet Nat'l Bank,* 150 F.R.D. at 16 n. 11 (recognizing that counsel realized its mistake within a few days of its occurrence and before the inadvertently reviewed document was copied and produced to opposing counsel).

True, the Choate team reviewed over 200,000 documents and ultimately produced more than 70,000 of them. An occasional inadvertently-produced document would be more comprehensible under the circumstances of such a large production. Here the total scope of the production was necessarily broad and is but indicative of the extensive discovery required in the context of complex litigation. Yet, such a substantial release of privileged information as occurred here (approximately 200 documents comprising 3821 pages) suggests that little can be done to reverse the damage. While Hoechst is quick to point out that Amgen has suspended review of the documents until this Court issues an order, it is clear that, in addition to Mr. O'Toole, other personnel were involved in reviewing the disclosed documents. *See* Wong Dec., Ex. A; Amgen Opp. at 10. Thus, with respect to both the number of documents produced and the number of individuals who have already seen the documents, the scope of the disclosure in this case is dramatic.

Finally, the overriding interests of fairness and justice also dictate the recognition of a waiver of the privileges. While the Court is sensitive to the fact that Hoechst may be disadvantaged by the carelessness of its attorneys, it would be unjust to

reward such gross negligence by providing relief from waiver. In fact, if the Court does not hold that a waiver has occurred under the egregious circumstances here presented, it might as well adopt the "never waived" rule and preclude such a holding in all cases. Hoechst's motion to compel return of inadvertently-produced documents is thus DENIED.

### E. *Subject Matter Waiver*

The First Circuit stated in *Texaco,* "[i]n general, a waiver premised on inadvertent disclosure will be deemed to encompass 'all other such communications on the same subject.' " *Texaco,* 60 F.3d at 883-84 (*quoting Weil v. Investment/Indicators, Research & Mgmt., Inc.,* 647 F.2d 18, 24 ([9th Cir.1981]); *see also* 6 Moore's Federal Practice, ¶ 26.49[5], at 26-175 (1999)). In light of the massive disclosure perpetrated by Choate, the rigid application of such a subject matter waiver rule effectively could force Hoechst to open its confidential files for Amgen inspection. Yet, upon close examination of Amgen's Opposition Memorandum, Amgen has not actually raised the issue of subject matter waiver. *See* Amgen Opp. at 10-11. Contrary to the language in heading IV of its memorandum, which references subject matter waiver, Amgen actually argues in that section that there are *alternative bases* to justify a determination of waiver. *See id.* (raising issues of waiver due either to prior disclosures or the advice of counsel defense to willful infringement). Amgen does not address the different, and more troubling, question of the extent to which waiver of the privileges constitutes a waiver of all such attorney-client and work product documents evidencing such subject matter. *See id.* In light of the potentially far-reaching consequences of such a holding as well as the failure on the part of Amgen to raise the issue directly, this Court expresses no opinion regarding subject matter waiver.

It is SO ORDERED.

190 F.R.D. 287, 45 Fed.R.Serv.3d 1095, 53 U.S.P.Q.2d 1898

### **Motions, Pleadings and Filings (Back to top)**

• 1:97cv10814 (Docket) (Apr. 15, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

One International Place
22ⁿᵈ Floor
Boston, MA 02110
Telephone 617-526-9600
Fax 617-526-9899

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

# PROSKAUER ROSE LLP

Steven M. Bauer
Direct Dial:  617-526-9700
Email: sbauer@proskauer.com

February 6, 2006

*Via Electronic Mail*

Jamal M. Edwards, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois  60601

Re:     <u>MIT v. Harman International Industries, Inc.</u>, No. 05-10990 DPW (D. Mass.)

Dear Jamal:

I write in response to Ms. Chen's February 2, 2006 letter, requesting the return of approximately 100 documents that you produced on January 17, 2006.

We are surprised that you have asked for these documents back.  They are all documents that *should* have been produced long ago, because they are clearly relevant to your defense to willful infringement.  Whether you intended to produce these documents now, or a few weeks from now, is irrelevant.  We simply have avoided the need to move to compel the Court to produce these documents in time for our depositions of your witnesses.

In response to your reference to the ethical rules, there was no indication in your production that the production of these documents was inadvertent.  Notably, even if there was evidence that your production now was "inadvertent" (as your colleague says in her letter but which evidence is clearly lacking), in this district, production of documents such as these, clearly relevant to the issues in the case, as a matter of law waives any attorney-client privilege or work product protection for such documents.  <u>See</u> <u>Amgen Inc. v. Hoechst Marion Roussel, Inc.</u>, 190 F.R.D. 287, 292 (D. Mass. 2000) (where counsel claimed that there was an inadvertent production of 200 documents, Chief Judge Young found that defendants in that case waived the attorney-client privilege and work product protection, in view of: "(1) the reasonableness of the precautions taken to prevent inadvertent disclosure, (2) the amount of time it took the producing party to recognize its error, (3) the scope of the production, (4) the extent of the inadvertent disclosure, and (5) the overriding interest of fairness and justice").

PROSKAUER ROSE LLP

Jamal M. Edwards, Esq.
February 6, 2006
Page 2

In <u>Amgen</u>, Judge Young held that "a knowledgeable attorney or legal assistant should quickly have reviewed the performance of the vendor to ensure that the proper documents were copied." <u>Id.</u> It appears that your firm did not do any such review before production. According to Judge Young, the "sheer magnitude of the disclosure [] [200 documents there, 100 documents here] counsels against a determination that [defendant's counsel's] precautions were adequate." Finally, Judge Young found that five days to recognize the error was too long, whereas here, you claim to have discovered the error *weeks* later.

Clearly, the circumstances weigh more heavily in support of waiver here than in <u>Amgen</u>.

As in <u>Amgen</u>, your production of privileged documents is substantial. Approximately ***100 documents*** were produced. The sheer magnitude of this production manifests the lack of precautions taken to guard against inadvertent production.

Moreover, all of these documents were located within the first 3,000 pages of the production. Even the ***very first document*** in the production is one you are seeking returned. It will be obvious to the Court that no effort was undertaken by your firm to review these documents after they were returned from the vendor, prior to their production.

Of course, you provide no reason for the fact that you made these documents available on January 17, 2006, but did not express any concern until ***sixteen days*** later. In <u>Amgen</u>, five days was deemed too long.

Perhaps most telling here, is that we proposed language for handling of inadvertent production in our draft protective order sent to your firm on August 24, 2005. Your colleagues expressly *deleted* that section in its entirety, in your responsive draft sent to us on September 28, 2005.

We do not see any ethical or legal obligation to return the documents. They were produced voluntarily by your firm, they are relevant to the case, there is no evidence that they were produced by mistake, and indeed, the entire issue is a "red-herring" because you had an obligation to produce these documents because willful infringement is in the case. You have no right to selectively withhold privileged documents, and we are surprised that you now ask for these documents to be returned.

**PROSKAUER ROSE LLP**

Jamal M. Edwards, Esq.
February 6, 2006
Page 3

Finally, we note that none of these documents appear on any privilege log. We are now investigating to what extent you have wrongly withheld other documents and whether we will need to move to compel production of similarly withheld documents concerning the same subject matter. See id. at 293; see also Texaco Puerto Rico, Inc. v. Dept. of Consumer Affairs, et al., 60 F.3d 867, 884-84 (1st Cir. 1995) ("In general, a waiver premised on inadvertent disclosure will be deemed to encompass 'all other such communications on the same subject.'") (internal citations omitted).

Sincerely,

Steven M. Bauer



**Briefs and Other Related Documents**

United States Court of Appeals,
First Circuit.
TEXACO PUERTO RICO, INC., et al., Plaintiffs,
Appellees,
v.
DEPARTMENT OF CONSUMER AFFAIRS, et al.,
Defendants, Appellants.
No. 94-2076.

Heard March 8, 1995.
Decided July 19, 1995.

Puerto Rico Department of Consumer Affairs (DACO) petitioned for restitution from gasoline wholesalers based on profits accrued during pendency of injunction prohibiting Department from enforcing regulation on gross profit margins earned by wholesalers. The United States District Court for the District of Puerto Rico, Jose Antonio Fuste, J., 862 F.Supp. 692, denied petition. On appeal, the Court of Appeals, Selya, Circuit Judge, held that: (1) district court did not abuse its discretion in refusing to grant Department restitution from wholesalers; (2) district court did not commit clear error in determining that neither attorney-client privilege nor deliberative process privilege protected from discovery correspondence between Department or other government representatives and Department's outside counsel; and (3) any error was harmless in district court's privilege determinations.

Affirmed.

West Headnotes

**[1] Federal Courts** 🔑932.1
170Bk932.1 Most Cited Cases
Party against whom erroneous judgment or decree has been carried into effect is entitled, in event of reversal, to be restored by his adversary to that which he has lost thereby.

**[2] Implied and Constructive Contracts** 🔑4
205Hk4 Most Cited Cases
Restitution is not matter of right, but matter of sound equitable discretion.

**[3] Implied and Constructive Contracts** 🔑4
205Hk4 Most Cited Cases
Because restitution is creature of equity, claimant can prevail only by showing that it will offend equity and good conscience if the other party is permitted to retain disputed funds.

**[4] Implied and Constructive Contracts** 🔑4
205Hk4 Most Cited Cases
"Restitution" is remedy ex gratia that court will withhold when justice of case does not call for it.

**[5] Equity** 🔑39(1)
150k39(1) Most Cited Cases
Central feature of equity jurisdiction is ability to assess all relevant facts and circumstances and tailor appropriate relief on case-by-case basis.

**[6] Federal Courts** 🔑932.1
170Bk932.1 Most Cited Cases
Claims for restitution arising out of vacation or reversal of judgment are tested by same standards as other claims for restitution. Restatement of Restitution § 74.

**[7] Federal Courts** 🔑932.1
170Bk932.1 Most Cited Cases
Rule, that claims for restitution arising out of vacation or reversal of judgment are tested by same standards as other claims for restitution, obtains in respect to both public and private actions and, thus, applies when restitutionary claim arises out of errant injunction barring enforcement of governmental regulation. Restatement of Restitution § 74.

**[8] Federal Courts** 🔑850.1
170Bk850.1 Most Cited Cases
Court of Appeals reviews factual findings that undergird trial court's ultimate determination only for clear error.

**[9] Federal Courts** 🔑776
170Bk776 Most Cited Cases
Trial court's articulation and application of legal principles is scrutinized by Court of Appeals de novo.

**[10] Federal Courts** 🔑848
170Bk848 Most Cited Cases

60 F.3d 867                                                                    Page 2
60 F.3d 867, 32 Fed.R.Serv.3d 121
**(Cite as: 60 F.3d 867)**

To the extent that findings of fact can be shown to have been predicated upon, or induced by, errors of law, they will be accorded diminished respect on appeal.

**[11]** Federal Courts 🔑813
170Bk813 Most Cited Cases
Court of Appeals reviews district court's ultimate decision to grant or withhold equitable remedy for abuse of discretion.

**[12]** Federal Courts 🔑812
170Bk812 Most Cited Cases
Overall, abuse-of-discretion standard of review is deferential and not appellant-friendly.

**[13]** Federal Courts 🔑812
170Bk812 Most Cited Cases
Solicitude extended by reviewing court takes into account that trial judge, who has had first-hand exposure to litigants and evidence, is in considerably better position to bring scales into balance than appellate tribunal.

**[14]** Federal Courts 🔑812
170Bk812 Most Cited Cases
Court of Appeals ordinarily will not find abuse of discretion unless perscrutation of record provides strong evidence that trial judge indulged serious lapse in judgment.

**[15]** Implied and Constructive Contracts 🔑4
205Hk4 Most Cited Cases

**[15]** War and National Emergency 🔑123
402k123 Most Cited Cases
District court did not abuse its discretion in refusing to grant to Puerto Rico Department of Consumer Affairs (DACO) restitution from gasoline wholesalers based on profits accrued during pendency of injunction prohibiting DACO from enforcing regulation on wholesalers' gross profit margins; district court permissibly found that DACO would not have adopted permanent regulation during injunction period limiting profit margins to level lower than actually earned, that wholesalers' profits were reasonable, that DACO unreasonably delayed in seeking restitution and acted in bad faith, that wholesalers detrimentally relied on DACO's representations, and that harm to Puerto Rico economy would outweigh benefit of restitution award. 3 L.P.R.A. § 341b.

**[16]** Implied and Constructive Contracts 🔑4

205Hk4 Most Cited Cases
Because restitution is founded on concept of unjust enrichment, court considering request for restitution must investigate extent to which target received benefit. Restatement of Restitution § 1 comment.

**[17]** War and National Emergency 🔑155
402k155 Most Cited Cases
Puerto Rico Department of Consumer Affairs (DACO), as claimant for restitution, bore burden of proving conferral and extent of benefit, in DACO's action seeking restitution from gasoline wholesalers based on profits accrued during pendency of injunction prohibiting DACO from enforcing regulation on gross profit margins earned by wholesalers. 3 L.P.R.A. § 341b.

**[18]** War and National Emergency 🔑123
402k123 Most Cited Cases
In determining whether to grant Puerto Rico Department of Consumer Affairs (DACO) restitution from gasoline wholesalers based on profits accrued during pendency of injunction prohibiting DACO from enforcing regulation on wholesalers' gross profit margins, reasonableness vel non of wholesalers' profits was appropriate factor for inclusion in court's equitable balancing. 3 L.P.R.A. § 341b.

**[19]** Federal Courts 🔑845
170Bk845 Most Cited Cases
Choosing between experts in jury-waived trial is principally business of district court, not Court of Appeals.

**[20]** Evidence 🔑570
157k570 Most Cited Cases
Credibility determinations respecting expert witnesses are prerogative and duty of district judge in bench trial.

**[21]** War and National Emergency 🔑152.1
402k152.1 Most Cited Cases
In determining whether to grant Puerto Rico Department of Consumer Affairs (DACO) restitution from gasoline wholesalers based on profits accrued during pendency of injunction prohibiting DACO from enforcing regulation on wholesalers' gross profit margins, in weighing equities, district court's finding, that DACO's actions in seeking restitution had been marked by unreasonable delay, was not improper functional equivalent of raising laches defense against government; court was fully entitled to use delay as one of a number of factors bearing on outcome. 3 L.P.R.A. § 341b.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 F.3d 867                                                                                                    Page 3
60 F.3d 867, 32 Fed.R.Serv.3d 121
**(Cite as: 60 F.3d 867)**

**[22] United States** 🗝133
393k133 Most Cited Cases
Laches ordinarily cannot be raised as defense against government in action brought to enforce public right or protect public interest.

**[23] United States** 🗝133
393k133 Most Cited Cases
Unavailability of laches as defense against government in action brought to enforce public right or protect public interest does not mean that sovereign's dilatoriness in seeking equitable remedy must be totally disregarded by chancery court.

**[24] Equity** 🗝54
150k54 Most Cited Cases
Equitable defense and equitable factor are conceptually and practically distinct; "equitable defense" entirely precludes cause of action or precludes equitable remedy.

**[25] Equity** 🗝54
150k54 Most Cited Cases
In evaluating equitable defense, court considers only plaintiff's conduct and is free to refuse to grant any remedy if standards of equity are not met by plaintiff.

**[26] Equity** 🗝54
150k54 Most Cited Cases
Equitable factor must always be weighed in concert with other relevant factors.

**[27] Equity** 🗝54
150k54 Most Cited Cases
As part of balancing equities, court examines both parties' conduct and hardships that could potentially obtain as result of judicial decision granting or denying relief.

**[28] Equity** 🗝54
150k54 Most Cited Cases
For purposes of determining whether to grant relief, overall balance of equities and hardships may preclude claim, notwithstanding fact that claim is not precluded by equitable defense.

**[29] Administrative Law and Procedure** 🗝309.1
15Ak309.1 Most Cited Cases
Government agencies, like private corporations, have obligation to conduct their affairs in reasonably efficient manner.

**[30] Equity** 🗝64
150k64 Most Cited Cases
Equity ministers to the vigilant, not to those who sleep upon their rights.

**[31] Equity** 🗝65(1)
150k65(1) Most Cited Cases
Court called upon to do equity should always consider whether petitioning party has acted in bad faith or with unclean hands.

**[32] Equity** 🗝65(3)
150k65(3) Most Cited Cases
Doctrine of unclean hands only applies when claimant's misconduct is directly related to merits of controversy between parties, that is, when the tawdry acts in some measure affect equitable relations between parties in respect of something brought before court for adjudication.

**[33] War and National Emergency** 🗝123
402k123 Most Cited Cases

**[33] War and National Emergency** 🗝159
402k159 Most Cited Cases
Meetings between Puerto Rico government and gasoline wholesalers, in which wholesalers were warned to cooperate with government in implementing excise tax by refraining from lowering gasoline prices, were relevant to good faith, or lack thereof, of Puerto Rico Department of Consumer Affairs (DACO) in seeking restitution some years thereafter from wholesalers based on profits accrued during pendency of injunction prohibiting DACO from enforcing regulation on gross profit margins earned by wholesalers. 3 L.P.R.A. § 341b.

**[34] Implied and Constructive Contracts** 🗝4
205Hk4 Most Cited Cases
Court considering restitutionary remedy may properly weigh factor of reliance in its equitable balancing.

**[35] Injunction** 🗝185.1
212k185.1 Most Cited Cases
Although bond or escrow fund is not prerequisite for restitution in cases involving improperly granted injunctions, court called upon to perform equitable balancing may nonetheless weigh absence of bond or other fund as factor in its equitable assay.

**[36] Equity** 🗝54

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 F.3d 867                                                                      Page 4
60 F.3d 867, 32 Fed.R.Serv.3d 121
**(Cite as: 60 F.3d 867)**

150k54 Most Cited Cases
Court asked to dispense equitable remediation should give serious consideration to public interest.

**[37] Federal Courts** 🗝848
170Bk848 Most Cited Cases
Very nature of trial judge's interactive role assures intimate familiarity with nuances of ongoing litigation that appellate judges, handicapped by sterility of impassive record, cannot hope to match.

**[38] Federal Courts** 🗝870.1
170Bk870.1 Most Cited Cases
Because Court of Appeals regards existence of privilege as factual determination for trial court, district court's finding of no privilege can be overturned only if clearly erroneous.

**[39] Witnesses** 🗝198(1)
410k198(1) Most Cited Cases
Attorney-client privilege protects not only giving of professional advice to those who can act on it, but also giving of information to lawyer to enable him to give sound and informed advice.

**[40] Witnesses** 🗝198(1)
410k198(1) Most Cited Cases
Purpose of attorney-client privilege is to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in observance of law and administration of justice.

**[41] Federal Courts** 🗝855.1
170Bk855.1 Most Cited Cases
District court did not commit clear error in determining that attorney-client privilege did not apply so as to protect from discovery correspondence between Puerto Rico Department of Consumer Affairs (DACO) or other government representatives and DACO's outside counsel, in DACO's action seeking restitution from gasoline wholesalers based on profits accrued during pendency of injunction prohibiting DACO from enforcing regulation on gross profit margins earned by wholesalers; district court properly found that DACO inadvertently disclosed some of correspondence to wholesaler's legal representatives and that DACO delegated policymaking authority to its outside counsel to such extent that counsel ceased to function as lawyers and began to function as regulators. 3 L.P.R.A. § 341b.

**[42] Witnesses** 🗝219(3)

410k219(3) Most Cited Cases
Inadvertent disclosures may work waiver of attorney-client privilege.

**[43] Witnesses** 🗝219(3)
410k219(3) Most Cited Cases
In general, waiver of attorney-client privilege premised on inadvertent disclosure will be deemed to encompass all other such communications on same subject.

**[44] Witnesses** 🗝200
410k200 Most Cited Cases
Attorney-client privilege attaches only when attorney acts in that capacity.

**[45] Federal Courts** 🗝855.1
170Bk855.1 Most Cited Cases
District court did not commit clear error in determining that deliberative process privilege did not protect from discovery correspondence between Puerto Rico Department of Consumer Affairs (DACO) or other government representatives and DACO's outside counsel, in DACO's action seeking restitution from gasoline wholesalers based on profits accrued during pendency of injunction prohibiting DACO from enforcing regulation on gross profit margins earned by wholesalers; district court properly found that wholesalers had made strong showing of arbitrariness and discriminatory motives on DACO's part, and had concluded that DACO acted in bad faith over lengthy period of time. 3 L.P.R.A. § 341b.

**[46] Witnesses** 🗝216(1)
410k216(1) Most Cited Cases
"Deliberative process privilege" shields from public disclosure confidential interagency memoranda on matters of law or policy.

**[47] Witnesses** 🗝216(1)
410k216(1) Most Cited Cases
Deliberative process privilege rests on policy of affording reasonable security to decisionmaking process within government agency.

**[48] Witnesses** 🗝216(1)
410k216(1) Most Cited Cases
To qualify for deliberative process privilege, document must be "predecisional," that is, antecedent to adoption of agency policy, and "deliberative," that is, actually related to process by which policies are formulated.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 F.3d 867                                                                                                                  Page 5
60 F.3d 867, 32 Fed.R.Serv.3d 121
**(Cite as: 60 F.3d 867)**

**[49]** Witnesses ⚷216(1)
410k216(1) Most Cited Cases
Because deliberative process privilege is restricted to intragovernmental exchange of thoughts that actively contribute to agency's decisionmaking process, factual statements or postdecisional documents explaining or justifying decision already made are not shielded.

**[50]** Witnesses ⚷216(1)
410k216(1) Most Cited Cases
Even if document satisfies criteria for protection under deliberative process privilege, nondisclosure is not automatic; privilege is qualified one, and is not absolute.

**[51]** Witnesses ⚷216(1)
410k216(1) Most Cited Cases
In determining whether to honor assertion of deliberative process privilege, court must weigh competing interests.

**[52]** Witnesses ⚷216(1)
410k216(1) Most Cited Cases
At bottom, deliberative process privilege is discretionary one.

**[53]** Witnesses ⚷216(1)
410k216(1) Most Cited Cases
In deciding how to exercise its discretion as to whether to afford protection to document under deliberative process privilege, inquiring court should consider, among other things, interests of litigants, society's interest in accuracy and integrity of factfinding, and public's interest in honest, effective government.

**[54]** Witnesses ⚷216(1)
410k216(1) Most Cited Cases
Deliberative process privilege is routinely denied when documents sought may shed light on alleged government malfeasance.

**[55]** Federal Courts ⚷895
170Bk895 Most Cited Cases
Any error was harmless in district court's determinations that neither attorney-client privilege nor deliberative process privilege protected from discovery correspondence between Puerto Rico Department of Consumer Affairs (DACO) or other government representatives and DACO's outside counsel, in DACO's action seeking restitution from gasoline wholesalers based on profits accrued during pendency of injunction prohibiting DACO from enforcing regulation on gross profit margins earned by wholesalers; court mentioned only one of the 18 challenged documents in denying DACO's claim for restitution, which was only small fraction of evidence on which court relied in reaching its conclusion. 3 L.P.R.A. § 341b.

**[56]** Federal Courts ⚷898
170Bk898 Most Cited Cases
Litigant's substantial rights are not offended by admission of cumulative evidence.

***871** Lynn R. Coleman, with whom Pedro R. Pierluisi, Secretary of Justice, Roberto Ruiz Comas, Director, Federal Litigation Div., Dep't. of Justice, Richard L. Brusca, Matthew W.S. Estes, Laura A. Ingraham, and Skadden, Arps, Slate, Meagher & Flom, Washington, DC, were on brief, for appellants.

Alan M. Grimaldi, with whom Jerrold J. Ganzfried, Patricia G. Butler, Howrey & Simon, Washington, DC, William Estrella, San Juan, PR, and Ricks P. Frazier, Coral Gables, FL, were on brief, for appellee Texaco Puerto Rico, Inc.

Donald B. Craven, with whom James P. Tuite, Anthony F. Shelley, James R. Lovelace, Alvaro I. Anillo, Miller & Chevalier, Chtd, Washington, DC, Luis Sanchez Betances, Jaime Sifre Rodriguez, Miguel P. Cancio Bigas, and Sanchez Betances & Sifre, Hato Rey, PR, were on brief, for appellee Esso Standard Oil Co. (P.R.).

Ana Matilde Nin, with whom Rafael Perez-Bachs, Gilberto J. Marxuach-Torros, and McConnell Valdes, Hato Rey, PR, were on brief, for appellee Shell Co. (P.R.) Ltd.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

SELYA, Circuit Judge.

In 1986, the Puerto Rico Department of Consumer Affairs (DACO) took a small, tentative step toward regulating the profit margins of gasoline wholesalers. The wholesalers treated this move as a declaration of war. They mounted a courtroom counteroffensive and succeeded in obtaining an injunction against the enforcement of DACO's embryonic regulation. Following a series of pitched battles that stretched from San Juan to Boston to the banks of the Potomac and back again, DACO emerged victorious.

Long after the injunction had been vacated, DACO purposed to exact tribute from the vanquished.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 F.3d 867                                                                                                                Page 6
60 F.3d 867, 32 Fed.R.Serv.3d 121
**(Cite as: 60 F.3d 867)**

Specifically, it sought restitution from the wholesalers based on the "excess" profits that they allegedly earned while **\*872** shielded by the injunction. The district court declined to grant the envisioned spoils. We affirm.

## I. BACKGROUND

This is presumably the final skirmish in a decade-long conflict. Other jousts are chronicled in a series of published opinions. *See, e.g., Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988)* (*Isla III* ); *Tenoco Oil Co. v. Department of Consumer Affairs, 876 F.2d 1013 (1st Cir.1989); Isla Petroleum Corp. v. Puerto Rico Dep't of Consumer Affairs, 811 F.2d 1511 (Temp.Emer.Ct.App.1986)* (*Isla II* ); *Texaco Puerto Rico, Inc. v. Mojica Maldonado, 862 F.Supp. 692 (D.P.R.1994)* (*TPR II* ); *Texaco Puerto Rico, Inc. v. Ocasio Rodriguez, 749 F.Supp. 348 (D.P.R.1990)* (*TPR I* ); *Isla Petroleum Corp. v. Department of Consumer Affairs, 640 F.Supp. 474 (D.P.R.1986)* (*Isla I* ). Given the detail contained in these earlier opinions, we believe that a condensed summary of the hostilities will suffice for the nonce.

From 1973 forward, the federal government imposed price controls on the sale of petroleum and petroleum products. *See* 15 U.S.C. § § 751-760h (as amended). At the time federal controls ended in early 1981, the regulatory scheme limited wholesalers' gross profit margins (GPMs) on the sale of gasoline to 8.6 cents per gallon. [FN1] *See Tenoco, 876 F.2d at 1015* (recounting history of federal regulatory policy). Although bureaucrats are reputed to abhor a vacuum, DACO--an arm of Puerto Rico's government empowered by local law to regulate prices and profit margins in order to protect consumers, *see* P.R. Laws Ann. tit. 3, § 341b (1982)--did not immediately impose its own controls.

> FN1. A GPM represents the difference between the sales price and the seller's acquisition cost. The latter cost includes the price of the gasoline plus excise taxes, but excludes operating costs. *See Tenoco, 876 F.2d at 1015.*

By 1985, the GPMs of gasoline wholesalers in Puerto Rico ranged from 6.9¢ to 16.76¢ per gallon. In early 1986, world oil prices plummeted--but the price of gasoline in Puerto Rico (both wholesale and retail) failed to follow suit. The Puerto Rico legislature, ostensibly concerned that the oil

companies were taking unfair advantage, imposed an excise tax on crude oil and refined petroleum products. In connection with the new tax, DACO promulgated an administrative order under date of April 23, 1986. The order prohibited wholesalers from passing the tax through to retailers. It also froze wholesale and retail gasoline prices at their March 31, 1986 levels.

When, thereafter, world oil prices soared, the price freeze forced several wholesalers to sell gasoline at prices below their acquisition costs. Since large oil companies are not in business to lose money, a coterie of wholesalers (including the trio that appear as appellees here) wasted little time in asking the federal district court to enjoin enforcement of the April 23 order. Moving with equal celerity, the district court scheduled a trial on the merits for May 21, 1986. *See* Fed.R.Civ.P. 65(a)(2) (authorizing the district court to "order the trial on the merits to be advanced and consolidated with the hearing on the application [for preliminary injunction]"). On May 20, DACO reshuffled the cards; it rescinded the price freeze and issued what it called a "temporary" order that harked back to the former, federally inspired ceiling and established, in lieu of the thawed freeze, maximum GPMs of 8.6¢ per gallon for petroleum wholesalers. The May 20 order also scheduled a public hearing for June 2 to "receive comments from all interested persons on the adequacy of this Temporary Order and on any modifications that should be made to attain a situation where primary reliance can be placed on competitive market forces to maintain fair margins at all levels of distribution and fair prices for the consumer."

This maneuver did not derail the litigation. The district court merely switched tracks, trained its sights on the May 20 edict, and went forward with a three-day bench trial. On June 4--roughly ten days after the trial ended-- the court enjoined enforcement of the May 20 order on federal preemption and other constitutional grounds. *See Isla I, 640 F.Supp. at 515.*

**\*873** DACO appealed the preemption ruling to the Temporary Emergency Court of Appeals (TECA), *see* 15 U.S.C. § 754(a)(1) (granting TECA exclusive jurisdiction over claims arising directly under the Emergency Petroleum Allocation Act of 1973), and appealed the remaining rulings (*e.g.,* the invalidation of the order on due process and takings grounds) to this court. We stayed proceedings pending consideration of the preemption ruling. TECA

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 F.3d 867                                                                                                      Page 7
60 F.3d 867, 32 Fed.R.Serv.3d 121
**(Cite as: 60 F.3d 867)**

affirmed that ruling, *see Isla II, 811 F.2d at 1519,* but the Justices reversed, holding that federal law did not forbid state regulation of gasoline prices. *See Isla III, 485 U.S. at 499-501, 108 S.Ct. at 1352-1354.* This court then took up DACO's concurrent appeal and vacated the district court's injunction as premature. *See Tenoco, 876 F.2d at 1024.*

On June 27, 1989 (the day after we issued our mandate incinerating the district court's injunction), DACO promulgated an interim order establishing a maximum GPM of 11¢ per gallon, effective forthwith. Its final order, issued on November 30, 1989, adopted a ceiling of 13¢ per gallon. That order withstood a vigorous constitutional challenge by the wholesalers. *See TPR I, 749 F.Supp. 348.*

An ensuing period of unaccustomed tranquility ended abruptly in mid-1992 when DACO again took up the cudgels. It issued a so-called remedial order in which it sought to recoup almost $250,000,000 in profits exceeding an 8.6¢ per gallon GPM that it estimated three wholesalers--Texaco Puerto Rico, Inc., Esso Standard Oil Co. (P.R.), and the Shell Company (Puerto Rico) Ltd. (appellees here)--had earned during the three-year life (June 1986 to June 1989) of the errant injunction. [FN2] The wholesalers quickly repaired to the district court and requested protection from the remedial order. Before the court could act, DACO issued a revised remedial order. Under its terms, a wholesaler could choose between paying a refund based on a retrospective GPM of 13¢ per gallon for the injunction period or paying one based on whatever profit margin would have allowed it to achieve an annual return on assets equal to the average return on assets for the electric utility industry, plus one percent, during the same period.

>   FN2. We refer to the three oil companies collectively as "the wholesalers," and individually as "Texaco," "Esso," and "Shell."

The wholesalers were not mollified. They challenged the revised remedial order and, on April 1, 1993, DACO rescinded it. This hasty retreat did not restore the peace, for the agency simply attacked on a different front. It revivified the court action originally instituted by the oil companies and filed a motion for restitution seeking an award equal to the excess profits that the wholesalers would have been forced to disgorge but for the pendency of the improvidently issued injunction. Following a tumultuous period of discovery, *see, e.g., infra* Part

III (discussing certain disputed discovery rulings), and a three-week bench trial, the court denied the motion for restitution on September 9, 1994. *See TPR II, 862 F.Supp. at 709.* DACO now appeals.

## II. THE MERITS

Our analysis of the merits is partitioned into four segments. We discuss the nature of restitution, parse the decision below, limn the standard of review, and, finally, examine the record to determine whether the denial of restitution can be upheld.

### A. The Nature of Restitution.

[1][2][3][4] In its motion, DACO sought restitution based upon the hoary adage "that a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby." *Arkadelphia Milling Co. v. St. Louis S.W. Ry. Co.,* 249 U.S. 134, 145, 39 S.Ct. 237, 242, 63 L.Ed. 517 (1919). We agree with this tenet, but caution that it tells only half the tale. Restitution is not a matter of right, but a matter of sound equitable discretion. *See Atlantic Coast Line R.R. Co. v. Florida,* 295 U.S. 301, 310, 55 S.Ct. 713, 716-717, 79 L.Ed. 1451 (1935); **\*874***Democratic Central Comm. v. Washington Metro. Area Transit Comm'n,* 485 F.2d 786, 825 (D.C.Cir. 1973); *Restatement of Restitution § 142,* cmt. a, at 568 (1937). Because restitution is a creature of equity, a claimant can prevail only by showing that it will offend "equity and good conscience" if the other party is permitted to retain the disputed funds. *Atlantic Coast Line,* 295 U.S. at 309, 55 S.Ct. at 716. Put another way, restitution is a remedy *ex gratia* that a court will withhold when "the justice of the case does not call for it...." *Id.* at 310, 55 S.Ct. at 716-717; *accord Williams v. Washington Metro. Area Transit Comm'n,* 415 F.2d 922, 941-47 (D.C.Cir.1968), *cert. denied,* 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969).

[5] This emphasis on the particulars of each individual case is consistent with the central feature of equity jurisdiction: "the ability to assess all relevant facts and circumstances and tailor appropriate relief on a case by case basis." *Rosario-Torres v. Hernandez-Colon,* 889 F.2d 314, 321 (1st Cir.1989) (en banc); *see also Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591-592, 88 L.Ed. 754 (1944) ("The essence of equity jurisdiction has been the power ... to mould each decree to the necessities of the particular case."); *Lussier v. Runyon,* 50 F.3d 1103, 1110 (1st Cir.1995) (stating

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 F.3d 867                                                                                                      Page 8
60 F.3d 867, 32 Fed.R.Serv.3d 121
**(Cite as: 60 F.3d 867)**

that "the hallmarks of equity have long been flexibility and particularity"), *petition for cert. filed* (U.S. June 5, 1995) (No. 94-1979).

[6][7] Claims for restitution arising out of the vacation or reversal of a judgment are tested by the same standards as other claims for restitution. *See Atlantic Coast Line,* 295 U.S. at 310, 55 S.Ct. at 716-717; *see also* Restatement, *supra,* § 74, at 302-03 ("A person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed or set aside, unless restitution would be inequitable...."). This approach obtains in respect to both public and private actions, and, thus, applies when, as now, a restitutionary claim arises out of an errant injunction barring enforcement of a governmental regulation. *See, e.g., Arkadelphia,* 249 U.S. at 145, 39 S.Ct. at 241-242 (ordering restitution by a regulated company that charged more during an injunction period than the rate ultimately deemed lawful); *Williams,* 415 F.2d at 941-47 (similar); *see also United States v. Morgan,* 307 U.S. 183, 197-98, 59 S.Ct. 795, 802-03, 83 L.Ed. 1211 (1939).

**B. *The Decision Below.***

The district court predicated its denial of DACO's motion for restitution on alternative grounds. In the first place, the court determined that there was no benefit to be restored as the wholesalers had not profited from the injunction. *See TPR II,* 862 F.Supp. at 705-06. This determination rested upon a finding that DACO failed to show that it would have regulated wholesalers' GPMs during the relevant period but for the improvidently issued injunction. *See id.* at 702-06. In the second place, the court determined that, even assuming that the injunction conferred an economic benefit, "the balance of equities" did not require "a disgorgement of profits earned six to eight years ago." *Id.* at 706.

This latter determination rested upon an analysis of five equitable factors. First, based on evidence regarding the competitiveness of the gasoline market and earnings in other industries, the court found that the wholesalers "did not benefit disproportionately from the lack of regulation." *Id.* at 707. Next, the court found DACO guilty of "unreasonable delay" in seeking restitution. *Id.* Third, the court concluded that DACO exhibited bad faith with regard to Texaco, Esso, and Shell. *See id.* Fourth, the court determined that DACO's actions during the injunction period had lulled the wholesalers into believing that DACO would not demand restitution.

*See id.* at 708. Finally, the court thought that the public interest did not favor a restitutionary order. *See id.*

**C. *Standard of Review.***

[8][9][10] Appellate review often calls into play a blend of rules. So it is here. We review the factual findings that undergird the trial court's ultimate determination only for clear error. *See Lussier,* 50 F.3d at 1111; *Reilly v. United States,* 863 F.2d 149, 163 (1st Cir.1988). In contrast, the trial court's articulation and application of legal principles is scrutinized *de novo. See \*875Cumpiano v. Banco Santander P.R.,* 902 F.2d 148, 152 (1st Cir.1990). Thus, "to the extent that findings of fact can be shown to have been predicated upon, or induced by, errors of law, they will be accorded diminished respect on appeal." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 972 F.2d 453, 457 (1st Cir.1992).

[11][12][13][14] The main event evokes a different criterion. We review a district court's ultimate decision to grant or withhold an equitable remedy for abuse of discretion. *See, e.g., Lussier,* 50 F.3d at 1111; *Rosario-Torres,* 889 F.2d at 323. Overall, the abuse-of-discretion standard is deferential, *see, e.g., Dopp v. Pritzker,* 38 F.3d 1239, 1253 (1st Cir.1994), and "not appellant-friendly," *Lussier,* 50 F.3d at 1111. The solicitude extended by a reviewing court takes into account that the trial judge, "who has had first-hand exposure to the litigants and the evidence, is in a considerably better position to bring the scales into balance than an appellate tribunal." *Rosario-Torres,* 889 F.2d at 323. For this reason, the court of appeals ordinarily will not find an abuse of discretion unless perscrutation of the record provides strong evidence that the trial judge indulged a serious lapse in judgment. *See id.*

We inspect the voluminous record with these precepts in mind to ascertain whether the denial of DACO's motion for restitution is sustainable.

**D. *Discussion.***

The court below began with the question of benefit, and treated that question as a discrete inquiry. *See TPR II,* 862 F.Supp. at 700. But this approach tends to put the cart before the horse. A court mulling a restitutionary remedy must almost always perform an equitable assay. Rather than isolating the question of whether the targeted party received a benefit (and if so, the likely extent thereof), we think it is preferable in the first instance to incorporate that question into the assay proper, unless, of course, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

state of the evidence is such that the court can conclude with minimal effort that no benefit has been received. If, however, the factual situation is more cloudy and speculative, it ordinarily will prove a more fruitful use of judicial energies to fold the issue of benefit into the wider issue of equity. Thus, the probability or improbability of whether DACO would have regulated wholesalers' profits during the injunction period can initially be conceived as a relevant, though not dispositive, equitable factor. More precise findings as to the incidence and effect of any benefit can then be pinpointed as part of a calculation anent damages if restitution is ultimately found to be a condign remedy in a particular situation.

With this preface, we turn to an examination of the judgment below. For ease in reference, we treat each group of factual findings as a separate integer in the equitable equation. The methodologic innovation that we have described-- introducing the question of whether the wholesalers benefitted from the injunction (and if so, to what extent) into the assay proper--does not require remand. The lower court made detailed factual findings on the question of benefit, and we can easily align those findings along the preferred legal matrix. *See Societe Des Produits Nestle v. Casa Helvetia, Inc.,* 982 F.2d 633, 642 (1st Cir.1992); *United States v. Mora,* 821 F.2d 860, 869 (1st Cir.1987).

[15][16] **1. Benefit.** Because restitution is founded on the concept of unjust enrichment, a court considering a request for restitution must investigate the extent to which the target "received a benefit." Restatement, *supra,* § 1, cmt. a, at 12. In a case such as this, the problems of proof are readily evident. The regulation that the district court enjoined was clearly labelled as temporary when promulgated, and the injunction prevented further regulation (temporary or permanent). Thus, DACO found itself, at trial, in an epistemological quandary: it had to prove that, had the district court sent the wholesalers packing, it (DACO) would have put into effect a more durable regulation that would have capped GPMs at a level below what the wholesalers actually earned during the pendency of the injunction.

The district court found DACO's strivings inadequate to this daunting task. In the court's view, DACO's adoption of temporary margin controls in 1986 did not "evidence[ ] an **\*876** intent to implement a long-term regulatory plan" to curb profit margins but, instead, constituted "a short-term erratic

response" to an unprecedented situation. *TPR II,* 862 F.Supp. at 702. The court stressed that the unique combination of exigent circumstances to which DACO reacted soon dissipated, *see id.* at 702-03; that DACO thereafter made an in-depth study of the desirability of regulation, *see id.* at 704; and that, upon completion of the study, DACO decided not to regulate, *see id.* On this basis, the district court concluded that the stopgap measure would have been abandoned when the exigency abated; that DACO would not have implemented other GPM regulations during the June 1986-June 1989 time frame; and that, therefore, the wholesalers received no monetary advantage from the injunction. *See id.* at 707.

For the most part, this conclusion is adequately anchored in the record. Later actions are often revelatory of earlier intentions, *see, e.g., United States v. Sutton,* 970 F.2d 1001, 1007 (1st Cir.1992) (holding that "challenged testimony, though it centered around later-occurring events, was relevant to show appellant's intent at an earlier date"); *United States v. Mena,* 933 F.2d 19, 25 n. 5 (1st Cir.1991) (similar); *see also Dedham Water,* 972 F.2d at 460 n. 4 (applying principle in affirming district court's findings in analogous circumstances), and DACO's actions when freed from the specter of preemption indicate quite plainly that long-term regulation was not on the agenda.

The United States Supreme Court decided *Isla III* on April 19, 1988. Within days, DACO disseminated a press release in which its Secretary, Pedro Ortiz Alvarez (Ortiz), crowed that the Court had "restored to Puerto Rico the historic power to regulate gasoline prices." Shortly thereafter, DACO commenced an administrative proceeding to determine whether controls should be introduced. To this end, it requested (and received) financial data and other information from the wholesalers. It also sought industry input as to whether the commonwealth should set either price or margin controls on gasoline, and held public hearings beginning in the fall of 1988 to consider the desirability of controls, the problems that might arise incident to them, and the reasonableness of existing profit margins in the industry.

In December, as the administrative proceeding wound down, Esso's general manager, Charles Griffith, met with Secretary Ortiz. According to Griffith, Ortiz informed him that DACO had completed its study and decided against imposing controls because "the market was behaving." Later that month, a daily newspaper, *El Nuevo Dia,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 F.3d 867                                                                                                Page 10
60 F.3d 867, 32 Fed.R.Serv.3d 121
**(Cite as: 60 F.3d 867)**

published an article based on an interview with Secretary Ortiz. The article reported that DACO had elected "not to regulate gasoline prices and to instead adopt 'close supervision' of the industry." The newspaper quoted Secretary Ortiz as conceding that the wholesalers had not earned "excessive profits."

 In January of 1989, Ortiz resigned. The new Secretary, Jorge R. Ocasio Rodriguez (Ocasio), told Griffith that he was aware of the earlier study and of his predecessor's conclusions, and that he "intend[ed] to follow [Secretary Ortiz's] policies" in regard to petroleum wholesalers. In fact, DACO did not adopt controls until June 27, 1989--the day after the district court's injunction had been lifted--and then attributed the about-face to newly emergent "erratic and unstable" price fluctuations in the Puerto Rico market.

 Noting this chronology of inaction laced with reassurances, and remarking bits of trial testimony such as Secretary Ortiz' oft-stated preference for a free market system, the district court concluded that DACO's failure to impose any controls for over a year after the Supreme Court's decision in *Isla III* cleared the regulatory path demonstrated that it lacked long-term regulatory intent, and that in all likelihood it would not have regulated wholesalers' profits during the June 1986--June 1989 time frame even if the injunction had never issued.

 We believe the district court's finding that, during the injunction period, DACO would not have adopted a permanent regulation limiting profit margins to a level lower than those actually earned by the wholesalers is sustainable on this record. Still, DACO's assault on this determination possesses convictive force in one respect. The district **877 court focused almost exclusively on DACO's actions from and after April of 1988 (when the Supreme Court overruled TECA and gave the green light to state regulation) in attempting to divine DACO's regulatory intent dating back to mid-1986. This strikes us as a sufficiently accurate barometer of *long-term* regulatory intent, but fails to deal satisfactorily with the near term. The stopgap order that DACO promulgated on May 20, 1986 would have remained in effect for *some* period but for the injunction. Thus, even if the district court's finding is accepted, some benefit--however small--still might have accrued to the wholesalers by reason of the district court's abrupt suspension of this order.

 [17] That said, DACO's proof does not permit us to quantify that presumed benefit. Because DACO, as

the claimant for restitution, bears the burden of proving the conferral and extent of a benefit, *see Atlantic Coast Line,* 295 U.S. at 309, 55 S.Ct. at 716, this failure of proof looms large. [FN3] We do not suggest that uncertainty as to the extent of the benefit acts as an automatic bar to DACO's claim for restitution, but for purposes of equitable balancing, it neutralizes any advantage that DACO might otherwise achieve on the question of benefit. In the last analysis, then, this factor is a wash.

> FN3. DACO's estimate of the benefit received--it says that the wholesalers charged their customers anywhere from $64,500,000 to $250,000,000 more during the injunction period than DACO would have permitted--is not only unproven but also deserves to be taken with a good deal of salt. DACO whips up the lower of these frothy figures by suggesting that, absent the injunction, it would have limited the wholesalers' GPMs to a level no higher than 13¢ per gallon throughout the relevant period, and, therefore, that any earnings above that plateau are the fruits of the errant injunction. The higher figure is presumably derived in the same way, but using a projected regulatory ceiling of 8.6¢ per gallon (the ceiling imposed in the May 20, 1986 temporary order) for the entire three-year span. These gaudy claims enjoy little or no record support.

 **2. The Wholesalers' GPMs.** The district court analyzed the wholesalers' profit margins during the pendency of the injunction and concluded that they "did not benefit disproportionately from the lack of regulation." *TPR II,* 862 F.Supp. at 707. DACO disputes the relevancy of this factor. It argues that equity does not require there to be a disproportionate benefit, but, rather, that restitution is appropriate so long as the targeted party benefitted *at all* from the erroneous injunction. In this view of the universe, the reasonableness of the wholesalers' earnings is beside the point.

 [18] Once again, DACO's conception of equity is too inelastic. "The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor." Restatement, *supra,* § 1, cmt. c, at 13. As the district court noted, a finding that the wholesalers' actual profit margins were unreasonably high would assist in showing that "the money was received in such circumstances that the possessor will give offense to equity and good

60 F.3d 867                                                                                    Page 11
60 F.3d 867, 32 Fed.R.Serv.3d 121
**(Cite as: 60 F.3d 867)**

conscience if permitted to retain it." *TPR II,* 862 F.Supp. at 701 (quoting *Atlantic Coast Line,* 295 U.S. at 309, 55 S.Ct. at 716). The converse is equally true: the fact that the wholesalers' profits were reasonable (or unreasonably low, for that matter), tends to make the denial of restitution more in keeping with equitable principles. Either way, the reasonableness *vel non* of the wholesalers' profits is a concinnous factor for inclusion in the court's equitable balancing. *See* Restatement, *supra,* § 74, cmt. c, at 305 (suggesting that a party who receives a benefit is not liable to make restitution therefor unless the circumstances attendant to receipt or retention of the benefit render its enjoyment inequitable).

The district court based its assessment that the wholesalers' earnings during the relevant period were reasonable on a series of subsidiary findings. It gave weight to the fact that the wholesalers' profits "were in line with profits earned during the unregulated period after federal controls were terminated, and before the 1986 regulation was enacted." *TPR II,* 862 F.Supp. at 706. It then performed a comparative analysis [FN4] and verified **\*878** that the wholesalers' returns "were in line with various competitive industries and investment alternatives" during the injunction period. *Id.* Last but not least, the court observed that the wholesale market remained competitive throughout the period, thus ensuring that margins were held to acceptable levels. *See id.*

> FN4. The court used as congeners such benchmarks as returns on assets in the electric utility industry, returns on government bonds, and returns on investments in the industrial distribution services, and fuel industries. *See TPR II,* 862 F.Supp. at 706.

[19][20] DACO suggests that these findings have a tenuous basis in fact--but this is a fairly typical rejoinder of a party seeking to surmount the high hurdle of clear-error review. The district court relied mainly on the testimony of four economists presented as expert witnesses by the wholesalers. We have studied their testimony (including the plethoric exhibits associated therewith), and we are fully persuaded that, given this evidence, the district court had a solid basis for finding that, during the injunction period, the wholesale market in Puerto Rico was staunchly competitive, and that the profits earned by Texaco, Esso, and Shell were reasonable. Although DACO's expert testified in a diametrically opposite vein, choosing between experts in a jury-

waived trial is principally the business of the district court, not the court of appeals. *See, e.g., Keller v. United States,* 38 F.3d 16, 25 (1st Cir.1994). Consequently, we decline DACO's invitation to second-guess the trial court's scorecard in respect to dueling experts. [FN5] *See Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (explaining the virtual impregnability of a trial judge's finding based on a reasoned decision to credit the testimony of one witness over another).

> FN5. The court below offered sound reasons for siding with the wholesalers' experts. Equally as important, it viewed the testimony of appellant's expert, Dr. Logan, "with some skepticism in light of his intimate involvement with DACO," his former employment by DACO's counsel, and his status as "the putative author of the 13-cent regulation." *TPR II,* 862 F.Supp. at 706. Though DACO cries foul due to the court's "gratuitous swipe" at Dr. Logan's bona fides, such credibility determinations are the prerogative--indeed, the duty--of the district judge in a bench trial. *See, e.g., Anthony v. Sundlun,* 952 F.2d 603, 606 (1st Cir.1991) (stating that appellate courts "ought not to disturb supportable findings, based on witness credibility, made by a trial judge who has seen and heard the witnesses at first hand").

[21] **3.** *Delay.* In weighing the equities, the lower court found that "DACO's actions in seeking restitution have been marked by unreasonable delay." *TPR II,* 862 F.Supp. at 707. DACO asserts that the court's inclusion of this factor is improper as a matter of law because it is the functional equivalent of raising a laches defense against the government. We do not agree.

[22][23] It is true that laches ordinarily cannot be raised as a defense against the government in an action brought to enforce a public right or protect a public interest. *See Illinois v. Kentucky,* 500 U.S. 380, 388, 111 S.Ct. 1877, 1883, 114 L.Ed.2d 420 (1991) (noting that "the laches defense is generally inapplicable against a state"); *Block v. North Dakota ex rel. Bd. of Univ. and Sch. Lands,* 461 U.S. 273, 294, 103 S.Ct. 1811, 1823-24, 75 L.Ed.2d 840 (1983) (O'Connor, J., dissenting) (collecting authorities). But the unavailability of laches as a defense does not mean that the sovereign's dilatoriness in seeking an equitable remedy must be totally disregarded by a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

chancery court.  We explain briefly.

[24][25][26][27][28] An equitable defense and an equitable factor are conceptually and practically distinct.  The divagation is subtle, but significant.  An equitable defense "bar[s] the cause of action entirely, or bar [s] ... the equitable remedy."  1 Dan B. Dobbs, *Law of Remedies* § 2.4(1), at 91 (2d ed. 1993).  Moreover, in evaluating an equitable defense, the court considers only the plaintiff's conduct and is free to "deny all remedies if the plaintiff does not meet equity's standards."  *Id.* § 2.4(5), at 108-09.  In contrast, an equitable factor must always be weighed in concert with other relevant factors.  *See id.* at 109.  Moreover, as part of balancing the equities, the court "looks at the conduct of both parties and the potential hardships that might result from a judicial decision either way."  *Id.* From a practical standpoint, then, "[e]ven when an equitable defense does not bar the claim, the total balance of equities and hardships might do so."  *Id.,* § 2.4(1), at 91.

Here, the district court explicitly disclaimed any intent to apply the equitable doctrine of laches as a bar to DACO's motion.  **\*879** *See TPR II, 862 F.Supp. at 702 n. 8.*  In its search for the case's equitable epicenter, however, the court was fully entitled to use delay as one of a number of factors bearing on the outcome.  This is precisely what Judge Fusté did, and there is no principled basis for DACO's suggestion that he mouthed the vocabulary of equitable balancing as a means of surreptitiously injecting a barred laches defense into the case.  Indeed, in considering DACO's delay as part of the equitable balance, the judge merely honored the precept that the government, when it seeks an equitable remedy, "is no more immune to the general principles of equity than any other litigant."  *United States v. Second Nat'l Bank, 502 F.2d 535, 548 (5th Cir.1974).*

DACO also contends that the district court clearly erred in finding prejudicial delay.  This contention is unpersuasive.  The evidence shows that DACO first raised the refund issue in its June 1989 interim order.  DACO did nothing further on this score until ten months later, when it sent letters to the wholesalers conveying its "preliminary views" on the suitability of refunds.  DACO then dropped the refund issue like a hot potato and did not resurrect it until August 20, 1992, when the then-Secretary, Guillermo Mojica Maldonado (Mojica), announced at a press conference that he planned to seek refunds from the wholesalers.  All told, DACO waited three years

after this court vacated the injunction to commit itself to the pursuit of restitution.

DACO does not dispute the accuracy of this chronology, but takes vigorous exception to the court's conclusion that "[t]his type of stopping and starting, delaying and then proceeding[,] must be considered prejudicial to the wholesalers, who had to run their business with the threat of multimillion dollar refunds occasionally flaring up and then disappearing."  *TPR II, 862 F.Supp. at 707.*  DACO offers a myriad of excuses for its procrastination;  it intimates that, as a government agency, torpor is to be expected;  it claims to have undergone numerous changes in staff and leadership during the period;  and it says that its attention was diverted because of ongoing litigation over its proposed 13¢ GPM that lasted until March of 1991.  The district court dismissed these excuses as lame.  We, too, find them insufficient.

[29] Government agencies, like private corporations, have an obligation to conduct their affairs in a reasonably efficient manner.  *See Potomac Elec. Power Co. v. ICC, 702 F.2d 1026, 1034 (D.C.Cir.1983)* (warning that "excessive delay saps the public confidence in an agency's ability to discharge its responsibilities").  An entity that chooses to indulge inefficiencies cannot expect to be granted special dispensations.  If "[t]he mills of the bureaucrats grind slow," *United States v. Meyer, 808 F.2d 912, 913 (1st Cir.1987),* then the agency, having called the tune, must pay the piper.  *See, e.g., United States v. Baus, 834 F.2d 1114, 1123 (1st Cir.1987)* (holding that the government "should not be allowed by words and inaction to lull a party into a false sense of security and then by an abrupt volte-face strip the party of its defenses");  *Cutler v. Hayes, 818 F.2d 879, 896 (D.C.Cir.1987)* (explaining that, when an administrative agency loiters, "the consequences of dilatoriness may be great").  By like token, neither government agencies nor private employers can escape responsibility for the exercise of due diligence merely because of employee turnover.  Department heads and other key personnel may come and go, but the institution must endure.  *See Cutler, 818 F.2d at 896-97.*  Similarly, preoccupation with other litigation is hardly a reason for extreme delay.  *See, e.g., Mendez v. Banco Popular, 900 F.2d 4, 6-7 (1st Cir.1990)* (district court did not abuse discretion in failing to grant extension of time based on attorney's busy trial calendar);  *Pinero Schroeder v. Federal Nat'l Mortgage Ass'n, 574 F.2d 1117, 1118 (1st Cir.1978)* (same).  And in all events, litigation ending in *early 1991* cannot credibly explain why

60 F.3d 867, 32 Fed.R.Serv.3d 121
**(Cite as: 60 F.3d 867)**

DACO took no firm position until *August 1992.*

[30] We will not wax longiloquent.   It is trite, but true, that equity ministers to the vigilant, not to those who sleep upon their rights.   *See, e.g., Sandstrom v. Chemlawn Corp.,* 904 F.2d 83, 87 (1st Cir.1990). Given the uncontradicted evidence, we believe that the district court acted lawfully in ruling that **880 unreasonable delay on DACO's part militates against relief.

[31][32] **4. Bad Faith.**   It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands.   *See Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945) (explaining that the doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief");   *see also Dobbs, supra,* at 109;   *see generally K-Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 910- 12 (1st Cir.1989) (discussing "unclean hands" doctrine in relation to the equitable maxim that "he who seeks equity must do equity"). But even though equitable doctrines are renowned for their elasticity, they are not without all limits.   The doctrine of unclean hands only applies when the claimant's misconduct is directly related to the merits of the controversy between the parties, that is, when the tawdry acts "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication."   *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 148, 78 L.Ed. 293 (1933).

 In the case at bar, the test was met.   The district court found pervasive evidence of bad faith on DACO's part, directly related to the core elements of the dispute *sub judice.   See TPR II,* 862 F.Supp. at 707.   Although DACO brands this finding clearly erroneous and worse--for instance, DACO claims, without a shred of record support, that the finding is "tinged with political, rather than legal, analysis," Appellants' Brief at 37--we believe that there is ample evidence in the record to support the district court's perspective.

 In making its finding of bad faith, the lower court relied heavily on two occurrences.   The court found that, in the spring of 1986, while the government of Puerto Rico was pondering the advisability of an excise tax, *see supra* p. 872, high-level officials, including the President of the Senate and the Secretary of State, summoned executives of the three

appellees to a series of private audiences.   The court further found that "the wholesalers were warned that they should cooperate with the government in the implementation of the new tax by refraining from further lowering gas prices, so that the government could achieve revenue from the tax...."   *TPR II,* 862 F.Supp. at 695.   The discussions were blunt.   To offer one illustration, Jose Luis Blanco, Esso's operations manager at the time, testified that the Secretary of State uttered "a very strong threat" to the effect that, if Esso failed to acquiesce in the government's strategy, the company's continued existence in Puerto Rico would be "very difficult."

[33] DACO claims that these thinly veiled minations had no bearing on margin regulations imposed well after the excise tax was enacted.   This claim is disingenuous.   Past is prologue, and the district court plausibly could find--as it did--that the 1986 meetings were part of the same overall course of conduct that led to the push for restitution six years later.   After all, the meetings involved the same principals and the same subject matter, and, with the benefit of hindsight, can be viewed as a harbinger of things to come.   On this basis, the district court did not err in concluding that the 1986 meetings were relevant to DACO's good faith (or lack thereof) in seeking restitution some years thereafter.   This is particularly true in that, shortly after the government "suggested" that the wholesalers refrain from lowering gasoline prices, DACO attempted to justify its regulation of GPMs on the ground that the wholesalers' prices were too high.   Thus, in effect, DACO bore a degree of responsibility for creating the "excess profits" that it later attempted to recapture, first via the excise tax, and then by dint of the motion for restitution.

 The second pillar of the court's conclusion lacks the dramatic impact of these strong-arm tactics, but affords a closer temporal link.   The court thought that the actions of Secretary Mojica in and around 1992 betokened bad faith.   *See TPR II,* 862 F.Supp. at 707.   At trial, Mojica admitted that he had chosen the 8.6¢ figure based not on any economic rationale, but as a stratagem to enhance DACO's negotiating position.   The **881 district court found this behavior "irresponsible."   *Id.*   And Secretary Mojica made a bad situation worse by issuing a remedial order that singled out Texaco, Esso, and Shell, whilst leaving unscathed a number of other wholesalers who had exceeded the 8.6¢ margin.   The lower court found that these efforts to exact restitution from the appellees--and from no other similarly situated wholesalers--smacked of bad faith, *see id.,* and DACO can point to no evidence that refutes the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 F.3d 867                                                                                                    Page 14
60 F.3d 867, 32 Fed.R.Serv.3d 121
**(Cite as: 60 F.3d 867)**

implication of selective targeting in retaliation for the appellees' active opposition to the government's desires.

 We think that the record as a whole corroborates the district court's determination that the 8.6¢ figure was chosen as a crude club to bludgeon the wholesalers into a settlement, without regard for the economic realities of the petroleum industry. Indeed, the nisi prius roll is replete with evidence suggesting this unhappy conclusion. For one thing, DACO's chief economist, Carlos Lasanta, testified that he had advised his superiors that the 8.6¢ margin was economically inadequate, yet DACO persisted in its plan. For another thing, Secretary Mojica testified that he issued the remedial order and set the ceiling without even pausing to review the administrative record. [FN6]

>    FN6. DACO asserts that, because the remedial order "was only the starting point for [its] consideration of the appropriate level of refunds," the terms of the order "cannot rationally be considered evidence of bad faith." Appellants' Brief at 38-39. This *ipse dixit* does not withstand scrutiny. When Secretary Mojica announced the promulgation of the remedial order, he presented the 8.6¢ figure not as a guidepost to a determination of the eventual measure, but as a fait accompli. Moreover, the order itself described "a maximum profit margin of 8.6 cents per gallon" as "conclusive and undebatable." DACO retreated from this figure only after the wholesalers sought judicial protection.

 In sum, the grounds relied upon by the district court pass muster. Because the remedy of restitution is premised on the concept of unjust enrichment, DACO's actions both in 1986 and in 1992 sabotage its present attempt to seize the high ground by asserting that the wholesalers took unfair advantage of the erroneous injunction. Hence, we are unwilling to disturb the court's determination that DACO's actions were tinged with bad faith.

 [34] **5. *Reliance.*** A court considering a restitutionary remedy may properly weigh the factor of reliance in its equitable balancing. *See Moss v. Civil Aeronautics Bd.,* 521 F.2d 298 (D.C.Cir.1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1460, 47 L.Ed.2d 732 (1976). In doing so here, the court found that the statements of two different Secretaries (Ortiz and Ocasio) led the wholesalers to believe that DACO

regarded their margins "to be reasonable, and therefore, that restitution of such reasonable profits would not later be demanded." *TPR II,* 862 F.Supp. at 708. Moreover, the wholesalers convinced the court that they justifiably relied on those statements in formulating their business plans. *See id.*

 The record is consistent with these findings. It is not farfetched to think that Secretary Ortiz's statements, *see, e.g., supra* p. 876, could have lulled the wholesalers into a false sense of security. *See, e.g., Insurance Co. v. Mowry,* 96 U.S. 544, 547, 24 L.Ed. 674 (1877) ("A representation as to the future can be held to operate as an estoppel ... where it relates to an intended abandonment of an existing right, and is made to influence others, and by which they have been induced to act."). Then, too, the wholesalers adduced explicit evidence of reliance, credited by the trier. A number of executives testified that they took the Secretary's statements regarding the reasonableness of their firms' profit margins at face value, and authorized investments in Puerto Rico that they would not otherwise have approved. We cannot hold that the court clearly erred in detecting detrimental reliance on these facts. *See, e.g., Cumpiano,* 902 F.2d at 152 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (quoting *Anderson,* 470 U.S. at 573-74, 105 S.Ct. at 1511-12).

 [35] The court's finding of detrimental reliance is bolstered by another circumstance. When Judge Fuste issued the injunction, DACO could have--but did not--ask him to require a bond or an escrow account. *See \*882Inland Steel Co. v. United States,* 306 U.S. 153, 156-57, 59 S.Ct. 415, 417-18, 83 L.Ed. 557 (1939) (holding that court acted lawfully in conditioning injunction against ICC on establishment of escrow account to defray possible restitutionary obligations). Although a bond or escrow fund is not a prerequisite for restitution in cases involving injunctions, *see, e.g., Newfield House, Inc. v. Mass. Dep't of Pub. Welfare,* 651 F.2d 32, 39 n. 12 (1st Cir.) (holding that "the need for a[n injunction] bond is limited to the recovery of damages and has no application to a claim of restitution of amounts subsequently found to have been undue"), *cert. denied,* 454 U.S. 1114, 102 S.Ct. 690, 70 L.Ed.2d 653 (1981), a court called upon to perform equitable balancing may nonetheless weigh the absence of a bond or other fund as a factor in its equitable assay. *See Moss,* 521 F.2d at 314; *see also Thompson v. Washington,* 551 F.2d 1316, 1321 (D.C.Cir.1977). This is the music to which the district court marched.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*See TPR II, 862 F.Supp. at 708*. Just as the existence of a bond or other fund would have undercut any claim of detrimental reliance, so, too, their absence lends credence to the wholesalers' lament.

[36] **6. *Public Interest.*** It cannot be gainsaid that a court asked to dispense equitable remediation should give serious consideration to the public interest. *See Morgan, 307 U.S. at 194, 59 S.Ct. at 801* ("It is familiar doctrine that the extent to which a court of equity may grant or withhold its aid, and the manner of moulding its remedies may be affected by the public interest involved."); *Rosario-Torres, 889 F.2d at 323* (similar). Here, the district court found that the public interest would be disserved by granting restitution. The court reasoned "that investment in Puerto Rico by the gasoline companies would be curtailed, or that Esso, Texaco and/or Shell [might] even leave the island completely, resulting in a possible loss of jobs and competitiveness in the wholesaling market." *TPR II, 862 F.Supp. at 708*.

At trial, DACO made no effort to contradict the wholesalers' testimony on this point. In this venue, it likewise abjures any challenge to the testimony's relevance. Instead, DACO complains about the district court's related statement that DACO had "failed to propose a cogent plan to restore losses" to the Puerto Rico motorists who bore the brunt of the alleged overcharges. *Id.* In DACO's eyes, depositing a restitutionary award into the commonwealth's general fund comprises an entirely satisfactory trickle-down substitute for the court's envisioned plan of direct payments to motorists.

Once again, DACO's fascination with a single tree obscures its view of the forest. The district court's rescript, properly read, does not hold that depositing refunds into the commonwealth's coffers is repugnant to the public interest in an absolute sense. The court's point is quite different. Judge Fuste expressed the belief that the clear harm to the Puerto Rico economy that would result from levying a huge restitution award outweighed the benefit accruing from refunds that would not directly compensate the injured victims. Though such a judgment call may be arguable, we are unprepared to say that it represents a clearly erroneous assessment of the evidence. *Cf., e.g., Moss, 521 F.2d at 308* ("The bite which is effectively taken from future earnings by a recovery fund may in turn impair the health of the industry, to the disadvantage of the fare-payers themselves.").

[37] **7. *Recapitulation.*** We have fashioned a tried-and-true framework for gauging claimed abuses of discretion:

> In making discretionary judgments, a district court abuses its discretion when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales.

*United States v. Roberts, 978 F.2d 17, 21 (1st Cir.1992); accord Dopp, 38 F.3d at 1253* (listing other cases). Here, the record discloses that the district court made a careful appraisal within the contours of this tested framework. DACO has failed to show that the court, in performing this appraisal and arriving at its judgment, overlooked appropriate factors, considered inappropriate factors, or made a detectable mistake in weighing the evidence. Mindful, as we are, that **\*883** "[t]he very nature of a trial judge's interactive role assures an intimate familiarity with the nuances of ongoing litigation--a familiarity that appellate judges, handicapped by the sterility of an impassive record, cannot hope to match," *Dopp, 38 F.3d at 1253,* we decline to place a heavy appellate thumb on the scales of justice and thereby upset the trier's delicate balancing of the competing equities in this unusual situation.

## III. OTHER ISSUES

In addition to its assault upon the district court's equitable determination, DACO mounts a more narrowly targeted offensive on a second front. In this regard, DACO assigns error to a series of discovery rulings that together forced the disclosure of eighteen agency documents, mostly in the nature of correspondence between DACO (or other government representatives) and DACO's outside counsel. This attempt to open a second front is little more than a diversionary sortie, poorly outfitted and easily repulsed.

[38] We set the stage. In ordering disclosure as a subset of a broader order that DACO turn over the "complete administrative file" in the case to the wholesalers, the court determined that these writings were not entitled to protection under either the attorney-client privilege or the deliberative process privilege. We consider the district court's privilege rulings cognizant that, "[b]ecause we regard the existence of a privilege as a factual determination for the trial court ... the district court's finding of no privilege can be overturned only if clearly erroneous." *United States v. Wilson, 798 F.2d 509, 512 (1st Cir.1986); accord United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20,*

27 (1st Cir.1989). Since local law does not supply the rule of decision anent DACO's claim for restitution, federal common law governs our analysis of the wrangling over privileges. *See* Fed.R.Evid. 501.

## A. *Attorney-Client Privilege.*

[39][40] The Supreme Court has described the attorney-client privilege as "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The privilege protects "not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Id.* at 390, 101 S.Ct. at 683. The purpose of the privilege is "to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* at 389, 101 S.Ct. at 682.

[41] In its unpublished order requiring revelation of the eighteen documents, the district court rejected DACO's claim of attorney-client privilege on two grounds. First, the court found that DACO waived any such privilege because four of the documents "were inadvertently shown to Texaco's legal representatives" during their initial review of the administrative file. [FN7] We examine the underpinnings of this ruling.

> FN7. At trial, the district court described how this bevue occurred:
> You people [DACO] told them [Texaco's representatives], here is a room full of papers, you can take a look at them. They looked at them, they found them and then when you discovered that they had seen them and that they wanted copies of those, then you came running here seeking an order.

[42] It is apodictic that inadvertent disclosures may work a waiver of the attorney-client privilege. *See, e.g., In re Sealed Case,* 877 F.2d 976, 979-80 (D.C.Cir.1989); *In re Grand Jury Proceedings,* 727 F.2d 1352, 1356 (4th Cir.1984); *see also Alldread v. City of Grenada,* 988 F.2d 1425, 1434 (5th Cir.1993). Thus, it beggars credulity to argue that the district court erred in entering a turnover order anent the four documents to which Texaco's representatives previously had been exposed. Apart from that fairly obvious conclusion, however, it also must be

recognized that inadvertent disclosures can have a significance that transcends the documents actually disclosed.

[43] In general, a waiver premised on inadvertent disclosure will be deemed to encompass "**884** all other such communications on the same subject." *Weil v. Investment/Indicators, Research & Mgmt., Inc.,* 647 F.2d 18, 24-25 & n. 13 (9th Cir.1981); *accord In re Sealed Case,* 877 F.2d at 980-81; *see also* 4 J.M. Moore & J.D. Lucas, *Moore's Federal Practice* ¶ 26.11[2], at 26-185 (1994). Since DACO does not contend that the four carelessly unveiled documents concerned a different topic than the other fourteen documents in the group, we think that, under the deferential standard of review applicable to privilege questions, the district court had an adequate basis for disregarding the attorney-client privilege vis-a-vis all eighteen documents.

[44] The district court's alternative ground for ordering disclosure is equally solid. The court found as a fact, after in camera inspection of the disputed documents, that outside counsel had become an integral part of the adjudicative decisionmaking process. Based on this factual finding, the court ruled that the attorney-client privilege did not apply because, when an administrative agency engaged in an adjudicative function delegates its responsibilities to outside counsel, then the work product generated by the firm is part of the adjudicative process itself and, hence, beyond the reach of the attorney-client privilege.

DACO resists this analysis, pontificating that such a doctrine "would render the attorney-client privilege meaningless where state or local governments employ counsel and rely on their advice." Appellants' Brief at 47. But this trumpeting misapprehends the tenor of the district court's ruling. The attorney-client privilege attaches only when the attorney acts in that capacity. *See Bay State Ambulance,* 874 F.2d at 27-28; *Wilson,* 798 F.2d at 512; *United States v. United Shoe Mach. Corp.,* 89 F.Supp. 357, 358-59 (D.Mass.1950). Here, the district court found, in substance, that DACO delegated policymaking authority to its outside counsel to such an extent that counsel ceased to function as lawyers and began to function as regulators. Therefore, DACO could not invoke the attorney-client privilege in connection with the documents at issue.

We cannot term this finding clearly erroneous. The record shows that DACO's counsel had, in fact,

60 F.3d 867                                                                                                      Page 17
60 F.3d 867, 32 Fed.R.Serv.3d 121
**(Cite as: 60 F.3d 867)**

drafted remedial orders that DACO adopted verbatim; that Dr. Logan, an employee of DACO's counsel, was the "putative author of the [1989] 13-cent regulation," *TPR II,* 862 F.Supp. at 706; and that counsel had developed adjudicative data that the agency later reissued as its own. Nor can we term the finding unsupported in law. *See Mobil Oil Corp. v. Department of Energy,* 102 F.R.D. 1, 9-10 (N.D.N.Y.1983) (rejecting claim of attorney-client privilege where proponent failed to show that lawyers were acting in their capacities as attorney advisors rather than as regulatory decisionmakers; *Coastal Corp. v. Duncan,* 86 F.R.D. 514, 521 (D.Del.1980) (similar; observing that such a showing is particularly important in a situation in which "attorneys function primarily as policy-makers rather than as lawyers").

**B. Deliberative Process Privilege.**

[45][46][47] DACO also takes exception to the district court's ruling that the deliberative process privilege did not exempt the same cache of documents from production. The deliberative process privilege "shields from public disclosure confidential inter-agency memoranda on matters of law or policy." *National Wildlife Fed'n v. United States Forest Serv.,* 861 F.2d 1114, 1116 (9th Cir.1988). The privilege rests on a policy of affording reasonable security to the decisionmaking process within a government agency. *See NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975).

[48][49] The Supreme Court has restricted the deliberative process privilege to materials that are both predecisional and deliberative. *See EPA v. Mink,* 410 U.S. 73, 88, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973). In other words, to qualify for the privilege, a document must be (1) predecisional, that is, "antecedent to the adoption of agency policy," and (2) deliberative, that is, actually "related to the process by which policies are formulated." *National Wildlife,* 861 F.2d at 1117 (citation omitted). Because the deliberative process privilege is restricted to the intra-governmental exchange of thoughts *885 that actively contribute to the agency's decisionmaking process, factual statements or post-decisional documents explaining or justifying a decision already made are not shielded. *See Sears, Roebuck,* 421 U.S. at 151-52, 95 S.Ct. at 1516-17; *Mink,* 410 U.S. at 88, 93 S.Ct. at 836; *see also Developments in the Law-- Privileged Communications,* 98 Harv.L.Rev. 1450, 1620-21 (1985).

[50][51] Even if a document satisfies the criteria for

protection under the deliberative process privilege, nondisclosure is not automatic. The privilege "is a qualified one," *FTC v. Warner Communications Inc.,* 742 F.2d 1156, 1161 (9th Cir.1984), and "is not absolute." *First Eastern Corp. v. Mainwaring,* 21 F.3d 465, 468 n. 5 (D.C.Cir.1994). Thus, in determining whether to honor an assertion of the privilege, a court must weigh competing interests. *See id.; see also Developments, supra,* at 1621 (noting that courts asked to apply the privilege must engage in "ad hoc balancing of the evidentiary need against the harm that may result from disclosure").

[52][53][54] At bottom, then, the deliberative process privilege is "a discretionary one." *In re Franklin Nat'l Bank Sec. Litig.,* 478 F.Supp. 577, 582 (E.D.N.Y.1979). In deciding how to exercise its discretion, an inquiring court should consider, among other things, the interests of the litigants, society's interest in the accuracy and integrity of factfinding, and the public's interest in honest, effective government. *See Warner Communications,* 742 F.2d at 1162. Consequently, "where the documents sought may shed light on alleged government malfeasance," the privilege is readily overcome. *Franklin,* 478 F.Supp. at 582; *see also Bank of Dearborn v. Saxon,* 244 F.Supp. 394, 401-03 (E.D.Mich.1965) ("the real public interest under such circumstances is not the agency's interest in its administration but the citizen's interest in due process"), *aff'd,* 377 F.2d 496 (6th Cir.1967).

Assuming, arguendo, that the documents at issue are both predecisional and deliberative--a matter on which we need not opine--the district court's rejection of the deliberative process privilege is nevertheless impervious to DACO's attack. The court supportably found that the wholesalers had made a "strong showing" of arbitrariness and discriminatory motives on DACO's part. Given the discretionary nature of the deliberative process privilege, and the district court's warranted conclusion that DACO acted in bad faith over a lengthy period of time, *see supra* Part II(D)(4), we resist the urge to tinker with the court's determination that the wholesalers' interest in due process and fairness outweighed DACO's interest in shielding its deliberations from public view. [FN8]

> FN8. We note in passing that the district court's waiver analysis, made in connection with DACO's claim of attorney-client privilege, *see supra* Part III(A), arguably applies to the deliberative process privilege as well. Because the privilege lacks vitality

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

60 F.3d 867
60 F.3d 867, 32 Fed.R.Serv.3d 121
**(Cite as: 60 F.3d 867)**

Page 18

here, we will not pursue the question of waiver beyond noting that it is apparently unsettled. *Compare, e.g., Clark v. Township of Falls, 124 F.R.D. 91, 93-94 (E.D.Pa.1988)* (holding that a municipality waived any claim of executive privilege by prior disclosure) *with, e.g., Redland Soccer Club, Inc. v. Department of Army, 55 F.3d 827, 855-56 (3d Cir.1995)* (holding that inadvertent disclosure of documents did not give rise to waiver of deliberative process privilege).

### C. *Harmless Error.*

[55] We add a postscript to our discussion of the district court's discovery rulings. In all events, we do not believe that the district court's rejection of DACO's privilege claims affected DACO's substantial rights. Any error was, therefore, harmless. *See Fed.R.Civ.P. 61* (explaining that a court "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties").

[56] In denying DACO's claim for restitution, the district court mentioned only one of the eighteen challenged documents (a June 1989 memorandum from DACO's outside counsel to Governor Hernandez Colon). *See TPR II, 862 F.Supp. at 705.* The court cited this memorandum as additional support for its factual finding that contemporaneous events, rather than a long-term commitment to regulation, spurred DACO's actions in June of 1989. The memorandum comprised only a small fraction of the evidence on which the court relied in reaching this conclusion. **\*886** *See supra* Part II(D)(1) (limning other evidence). It is axiomatic that a litigant's substantial rights are not offended by the admission of cumulative evidence. *See, e.g., Doty v. Sewall, 908 F.2d 1053, 1056 (1st Cir.1990); Garbincius v. Boston Edison Co., 621 F.2d 1171, 1175 (1st Cir.1980); deMars v. Equitable Life Assur. Soc'y, 610 F.2d 55, 62 (1st Cir.1979).*

## IV. CONCLUSION

We need go no further. There are neither precise answers nor perfect solutions when a court is forced to deal with the shadowy world of what might have been. Where, as here, the customary deference accorded to the trial court as factfinder is augmented by due respect for that court's equitable discretion, appellate courts should hesitate to meddle. In this instance, the judge, who had handled the case from its inception, weighed and balanced the equities, and

juxtaposed the parties' rights with painstaking care. Thus, whether or not we, if writing on a pristine page, might have concluded otherwise, we are unable to tease an abuse of discretion out of what is quintessentially a judgment call.

*Affirmed.*

60 F.3d 867, 32 Fed.R.Serv.3d 121

**Briefs and Other Related Documents (Back to top)**

• 1994 WL 16011482 (Appellate Brief) Joint Brief (Final Version) of Plaintiff-Appellees ESSO Standard Oil Co. (P.R) and Texaco Puerto Rico Inc. (1994)

• 1994 WL 16011483 (Appellate Brief) Final Brief of the Shell Company (Puerto Rico) Limited (1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Harman Privilege Log - March 30, 2006

| Priv. Doc No. | Date | Author | Recipient | CC | Description | Privilege Asserted | Comments |
|---|---|---|---|---|---|---|---|
| PRIV-17 | 3/4/2005 | M. Addy | M. Francis | B. Nwaokai | E-mail | AC/AWP | Redaction - communication conveying information to outside counsel re MIT's patent allegations. |
| PRIV-31 | 8/2/2004 | W. Streff | M. Addy | | E-mail | AC | Correspondence between outside counsel re MIT issue |
| PRIV-34 | 8/26/2004 | B. Nwaokai | M. Addy | | E-mail | AC/AWP | Internal correspondence between outside counsel re communications with R. Swartz re negotiations with MIT |
| PRIV-35 | 9/13/2004 | W. Streff | M. Addy | R. Hart | E-mail | AC, AWP | Correspondence between outside counsel re correspondence with R. Swartz |
| PRIV-36 | 10/7/2004 | R. Hart | M. Addy | | E-mail and attachments | AC/AWP | Correspondence between in-house and outside counsel re language for Harman internal memorandum concerning patents |
| PRIV-37 | 10/7/2004 | M. Addy | R. Hart | | E-mail | AC | Correspondence between in-house and outside counsel re language for Harman internal memorandum concerning patents |
| PRIV-38 | 10/7/2004 | M. Addy | R. Hart | | E-mail and attachments | AC/AWP | Correspondence between in-house and outside counsel re language for Harman internal memorandum concerning patents |
| PRIV-39 | 11/17/2004 | M. Addy | W. Streff | R. Hart; J. Pioli; A. Penn | E-mail | AC | Redaction; communication conveying information to outside counsel re MIT's patent allegations |
| PRIV-42 | 1/10/2005 | M. Addy | R. Hart | | E-mail | AC, AWP | Correspondence between in-house and outside counsel re patent not in suit |
| PRIV-43 | 1/10/2005 | R. Hart | M. Addy | | E-mail | AC, AWP | Correspondence between in-house and outside counsel re patent not in suit. |
| PRIV-44 | 1/29/2005 | R. Hart | M. Addy | | E-mail | AC, AWP | Correspondence between in-house and outside counsel re language for Harman internal memorandum |
| PRIV-45 | 1/31/2005 | M. Addy | R. Hart | | E-mail | AC | Correspondence between in-house and outside counsel re language for Harman internal memorandum |

| Priv. Doc. No. | Date | Author | Recipient | CC | Description | Privilege Asserted | Comments |
|---|---|---|---|---|---|---|---|
| PRIV-46 | 2/9/2005 | T. Bast | R. Hart | M. Addy | E-mail and attachment | AC, AWP | Correspondence between in-house and outside counsel re MIT patent allegations |
| PRIV-47 | 2/9/2005 | M. Addy | R. Hart | J. Retsky; M. Addy | E-mail and attachments | AC, AWP | Correspondence between in-house and outside counsel re MIT patent allegations |
| PRIV-48 | 2/9/2005 | J. Retsky | M. Addy; R. Hart | | E-mail | AC | Correspondence between in-house and outside counsel re MIT patent allegations |
| PRIV-49 | 2/11/2005 | R. Hart | W. Streff; M. Addy | | E-mail with attachments | AC, AWP | Correspondence between in-house and outside counsel re language for Harman internal memorandum |
| PRIV-50 | 2/14/2005 | R. Hart | M. Addy | C. Limperis Miranda | E-mail | AC | Correspondence between in-house and outside counsel in preparation for meetings with MIT |
| PRIV-51 | 2/16/2005 | R. Hart | J. Perracchio | K. Brown; E. Summers; M. Addy; T. Bast | E-mail | AC | Correspondence between in-house and outside counsel re meeting with MIT |
| PRIV-53 | 2/16/2005 | J. Perracchio | R. Hart | K. Brown; E. Summers; M. Addy; T. Bast | E-mail | AC | Correspondence between in-house and outside counsel re meeting with MIT |
| PRIV-57 | 3/2/2005 | R. Hart | M. Addy; W. Streff | | E-mail | AC/AWP | Redaction. Correspondence conveying information to outside counsel re MIT's patent allegations |
| PRIV-58 | 3/4/2005 | M. Addy | M. Francis | B. Nwaokai | E-mail | AC/AWP | Redaction; Correspondence conveying information to outside counsel re MIT's patent allegations |
| PRIV-59 | 3/9/2005 | M. Addy | R. Hart | M. Francis; A. Penn | E-mail and Power point presentation | AC/AWP | Redaction, Correspondence conveying information to outside counsel re MIT's patent allegations |
| PRIV-60 | 3/10/2005 | R. Hart | M. Francis; M. Addy | | E-mail and attachments | AC/AWP | Correspondence conveying information to outside counsel re MIT's patent allegations |

2

| Priv. Doc. No. | Date | Author | Recipient | CC | Description | Privilege Asserted | Comments |
|---|---|---|---|---|---|---|---|
| PRIV-61 | 3/27/2005 | R. Hart | M. Addy | R. Hart | E-mail | AC | Correspondence between in-house and outside counsel re MIT patent allegations |
| PRIV-62 | 3/31/2005 | R. Hart | M. Addy | | E-mail | AC/AWP | Correspondence between in-house and outside counsel re outside counsel |
| PRIV-63 | 3/31/2005 | R. Hart | M. Addy | | E-mail | AC | Correspondence between in-house and outside counsel re prior meeting re MIT |
| PRIV-64 | 3/31/2005 | M. Addy | R. Hart | | E-mail and attachments | AC | Correspondence between in-house and outside counsel re meeting with MIT |
| PRIV-65 | 6/30/2005 | R. Hart | M. Addy; T. Bast | | E-mail and attachments | AC | Correspondence between in-house and outside counsel re prior art for patent not at issue. |
| PRIV-66 | 6/30/2005 | M. Addy | R. Hart; T. Bast | A. Penn | E-mail and attachments | AC | Correspondence between in-house and outside counsel re prior art concerning patent not at issue. |
| PRIV-67 | 7/8/2005 | R. Hart | T. Bast; A. Brandes; Rauterberg; H. Wellman; M. Addy | K. | | | Correspondence between in-house counsel and client re patent issues relating to patent not at issue. |
| PRIV-180 | 1/23/2005 | J. Perracchio | R. Hart | | E-mail | AC | Correspondence between in-house counsel re MIT patent allegations. |
| PRIV-188 | 2/10/2005 | E. Summers | J. Perracchio | R. Hart | E-mail with attachments | AC, AWP | Correspondence between in-house and outside counsel rendering legal advice re language for internal memorandum. |
| PRIV-194 | 2/11/2005 | E. Summers | R. Hart | J. Perracchio | E-mail | AC | Correspondence between in-house and outside counsel rendering legal advice re language for internal memorandum. |
| PRIV-195 | 2/13/2005 | R. Hart | R. Hart | | E-mail | AC, AWP | Correspondence between in-house counsel rendering legal advice re research re licensing. |
| PRIV-196 | 2/14/2005 | T. Bast | R. Hart | | E-mail | AC | Correspondence between in-house counsel re potential MIT meeting. |
| PRIV-197 | 2/24/2005 | Miranda | R. Hart | | E-mail | AC | Correspondence within Harman re research re licensing |
| PRIV-199 | 2/28/2005 | C. Limperis Miranda | R. Hart | | E-mail | AC | Correspondence from in-house counsel to outside counsel regarding research licensing |

| Priv. Doc. No. | Date | Author | Recipient | CC | Description | Privilege Asserted | Comments |
|---|---|---|---|---|---|---|---|
| PRIV-200 | 2/24/2005 | C. Limperis Miranda | R. Hart | | E-mail and attachments | AC | Correspondence from in-house counsel to outside counsel regarding research licensing |
| PRIV-205 | 3/8/2005 | M. Francis | R. Hart | | E-mail with attachments | AC, AWP | Correspondence between outside & in-house counsel re potential litigation. |
| PRIV-236 | 3/12/2005 | R. Hart | W. Streff; M. Francis | | E-mail | AC | Correspondence between outside & in-house counsel seeking legal advice |
| PRIV-237 | 11/10/2003 | J. Perracchio | D. Nelson; T. Heed | S. Montealegre; T. Bal; T. Brummett; K. Shire; M. Soldwisch; P. Roessger | E-mail | AC | Correspondence from in-house counsel rendering legal advice re language in product literature |
| PRIV-238 | 11/10/2003 | D. Nelson | J. Perracchio; T. Heed | S. Montealegre; T. Bal; T. Brummett; K. Shire; M. Soldwisch; P. Roessger; J. Hall | E-mail | AC | Correspondence from in-house counsel rendering legal advice re language in product literature |
| PRIV-239 | 11/11/2003 | D. Nelson | P. Roessger; J. Perracchio; T. Heed Soldwisch | S. Montealegre; T. Bal; T. Brummett; K. Shire; M. Soldwisch | E-mail | AC | Correspondence from in-house counsel rendering legal advice re language in product literature |

4

| Priv. Doc. No. | Date | Author | Recipient | CC | Description | Privilege Asserted | Comments |
|---|---|---|---|---|---|---|---|
| PRIV-240 | 12/16/2003 | D. Nelson | J. Perracchio; P. Roessger | S. Brummett; K. Shire | E-mail | AC | Correspondence from in-house counsel rendering legal advice re language in product literature |
| PRIV-241 | 10/12/2001 | J. Perracchio | J. Childress | S. Montealegre | E-mail | AC | Correspondence from in-house counsel rendering legal advice re licensing |
| PRIV-242 | 10/17/2001 | S. Montealegre | J. Perracchio | S. Ernst; M. Munn | E-mail | AC | Correspondence with in-house counsel rendering legal advice re licensing |
| PRIV-243 | 4/16/2003 | J. Millington | J. Perracchio | S. Montealegre; V. Droege | E-mail | AC | Correspondence with in-house counsel seeking legal review of foreign version of product literature |
| PRIV-244 | 4/17/2003 | T. Heed | S. Montealegre | J. Perracchio | E-mail | AC | Correspondence with in-house counsel seeking legal review of display language and related issues |
| PRIV-245 | 4/17/2003 | J. Perracchio | T. Heed; S. Montealegre | | E-mail | AC | Correspondence with in-house counsel seeking legal review of display language and related issues |

# PROSKAUER ROSE LLP

One International Place
22nd Floor
Boston, MA 02110
Telephone 617-526-9600
Fax 617-526-9899

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

**Kimberly A. Mottley**
Direct Dial: 617-526-9616
Email: kmottley@proskauer.com

March 31, 2006

*Via Electronic Mail*

Craig D. Leavell, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois  60601

Re:　　<u>MIT v. Harman International Industries, Inc.</u>, No. 05-10990 DPW (D. Mass.)

Dear Craig:

　　　　I write in response to your March 30, 2006 letter concerning the scope of Harman's privilege waiver, with respect to the Brinks Hofer subpoenas, and also with respect to Harman's amended privilege log we received last night.

　　　　With respect to the Brinks Hofer subpoenas, please confirm that Harman will agree to instruct its counsel to produce documents including the following (and instruct Ms. Addy to testify to the same nature of information), based on Harman's waiver of privilege both by reliance on advice of counsel, and by production of the 100 privileged documents in January:

1.　　　　All documents and information communicated either between Harman and any Brinks Hofer attorney, or between Harman's trial counsel and any Brinks Hofer attorney, relating to the issue of whether Harman infringed U.S. Patent No. 5,177,685, including whether that patent is invalid or unenforceable;

2.　　　　All documents and information considered, reviewed, prepared, or relied upon by any Brinks Hofer attorney, or relating to the factual basis of any opinion or advice rendered by any Brinks Hofer attorney to Harman, concerning the issue of whether Harman infringed U.S. Patent No. 5,177,685, including whether that patent is invalid or unenforceable.  This would include any such attorney's mental impressions, thought processes, legal theories, and internal documents, to the extent that they were considered, reviewed, prepared, or relied upon by that attorney in rendering an opinion, or related to the factual basis of the opinion, regardless of whether such information or documents were communicated to Harman or its trial counsel; and

3.　　　　The scope of this discovery shall not be restricted to pre-suit information or documents.

*　　　　　　*　　　　　　*

**PROSKAUER ROSE LLP**

Craig D. Leavell, Esq.
March 31, 2006
Page 2

It appears that Harman has also improperly withheld documents from its own production.

Harman continues to withhold communications between opinion counsel and Harman, even where no trial counsel is involved (see, e.g., Entry Nos. 36-38, 42-48, 50-51, 53, and 61-67). (Notably, this is an even narrower view than Brinks Hofer takes in its motion to quash.) Of course, Harman's waivers also extend to communications between Harman and opinion counsel when Harman's trial counsel were also party to the communication, and yet Harman has withheld those types of documents as well (see, e.g., Entry Nos. 17, 31, 34-35, 39, 49, 57-60).

Harman's log also contains entries identifying redactions (Entry Nos. 17, 39, 57-59). These entries were listed on Harman's log at the time of our last exchange (while not described as redactions), and yet you confirmed for me since that last exchange that no redactions were within Harman's production. Please explain why these entries are listed as redactions, and if they do reflect redactions, identify the Bates numbers of the documents from which such information was redacted.

Also, Entry Nos. 188 and 200 are described as involving outside counsel, although no outside attorney is identified in those entries. Please let us know which outside attorney authored or received these communications.

Finally, you informed me during our conversation earlier this week that Harman's log would contain the documents Harman has withheld from its supplemental productions received earlier this week. Based on Ms. Garlington's email, it appears that Harman did not include such documents. Please let us know what set of documents you are still holding for logging, and when we can expect receipt of that updated log.

The documents and information Harman, and its opinion counsel, are withholding are especially relevant to MIT's case for willful infringement, given that Harman has reserved its right to call Ms. Addy as a trial witness.

*        *        *

PROSKAUER ROSE LLP

Craig D. Leavell, Esq.
March 31, 2006
Page 3

I look forward to discussing these issues with you on our call today at 2:00 p.m. EST.  If we can not reach agreement as to these issues then, we will file a motion with the district court here in Boston, asking that the Court compel Harman to produce the requested discovery, and to instruct its opinion counsel to do the same.  To the extent you think Mr. Remus should be on the call, feel free to invite him to participate.

Sincerely,

Kimberly A. Mottley