UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **MASSACHUSETTS INSTITUTE OF TECHNOLOGY,** )<br>)<br>)<br>Plaintiff, )<br>v. )<br>)<br>**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED,** )<br>A Delaware Corporation, )<br>)<br>Defendant. )<br>) | **Case No. 05-10990  DPW**<br>Hon. Douglas P. Woodlock<br>Magistrate Judge Judith G. Dein |

**HARMAN'S MOTION TO COMPEL MIT'S RESPONSES TO
HARMAN'S INTERROGATORIES NOS. 9, 10 AND 16 AND
COMPLIANCE WITH HARMAN'S RULE 30(b)(6) DEPOSITION NOTICE**

Pursuant to Rules 33 and 37 of the Federal Rules of Civil Procedure and Local Rules 33.1 and 37.1, Defendant Harman International Industries, Inc. ("Harman") hereby moves for an order compelling Plaintiff Massachusetts Institute of Technology ("MIT") to respond to Harman's Interrogatory Nos. 9, 10 and 16 and to provide a witness to testify as to topics 1, 5, 6 and 7 of Harman's Rule 30(b)(6) Notice of Deposition of MIT.

**NATURE OF THE CASE AND RELEVANT FACTS**

For nearly three years Harman has been telling MIT that its patent-at-issue is not infringed by Harman, is invalid, and is unenforceable. Harman has repeatedly provided MIT with *prima facie* evidence of non-infringement and invalidity, and MIT has never been able to provide any rebuttal whatsoever to Harman's evidence. During pre-litigation negotiations, MIT refused to provide a claim-by-claim and limitation-by-limitation response to Harman's evidence. Throughout the long discovery period in this case, MIT continues to refuse to respond to Harman's detailed evidence of invalidity – evidence that MIT requested in a contention interrogatory that MIT served on Harman, and to which Harman responded under the assumption

that discovery was going to be a two-way street that would require similar responses from MIT on the issue of MIT's allegations of validity.

MIT's refusal to provide Harman with its positions is particularly problematic in light of MIT's recent amended Complaint, which adds new allegations of willful infringement. Harman fails to see how MIT can possibly maintain a claim for willful infringement, when MIT continues to refuse to provide any meaningful response to Harman's *prima facie* evidence of invalidity and unenforceability. Assuming MIT conducted the necessary pre-filing investigation into its allegations against Harman, as required by Rule 11 of the Federal Rules of Civil Procedure, then MIT possesses the requested information, but is inappropriately disregarding Harman's discovery requests in an attempt to gain a tactical advantage through "surprise litigation." If MIT truly has no information as to the alleged validity and enforceability of its patent, then MIT should admit that it failed to conduct a proper pre-filing investigation or that the pre-filing investigation was deficient.

Fact discovery is nearly over, and expert reports are due soon. Without knowledge of MIT's positions on important issues in this case, Harman is prejudiced in its ability to obtain discovery relevant to its defenses and necessary for its experts' analyses. Harman therefore respectfully requests the assistance of this Court in ordering MIT to fully respond to Harman's Interrogatories Nos. 9, 10, and 16 and to provide a deponent on topics 1, 5, 6 and 7 of Harman's Rule 30(b)(6) Notice of Deposition of MIT.

## ARGUMENT

Federal Rule of Civil Procedure 33 requires that "[e]ach interrogatory shall be answered separately and fully in writing and under oath" and, that, where objections are raised, the objecting party "shall answer to the extent the interrogatory is not objectionable." Fed. R. Civ.

P. 33(b)(1).  MIT has not met its obligations under Rule 33.  Instead, MIT continues to withhold

discovery responsive to Harman's Interrogatory Nos. 9, 10 and 16, while at the same time

refusing to comply with Harman's Rule 30(b)(6) notice of deposition which also addresses issues

regarding MIT's invalidity positions.

     The scope of permissible discovery is limited only by relevance and burdensomeness.

*Rich v. Martin Marietta Corp.*, 522 F.2d 333, 343 (10th Cir. 1975).  Where, as here, the

information sought is particularly relevant to a party's claim or defense, the party opposing

discovery bears the burden of demonstrating that the interrogatory is objectionable.  *Id.*  MIT's

objections to Interrogatory Nos. 9, 10 and 16 are improper and violate Rule 33 because responses

to such interrogatories may not be deferred.  Moreover, Harman is also entitled to a Rule

30(b)(6) deposition on the same topics.  Accordingly, Harman submits this Motion to Compel

under Rule 37, which provides for a court order if "a corporation or other entity fails to make a

designation under Rule 30(b)(6) . . .or a party fails to answer an interrogatory submitted under

Rule 33. . ."  Fed. R. Civ. P. 37(a)(2)(B).

**I.**    **MIT's Refusal to Respond to Harman's Interrogatories Nos. 9, 10 and 16 is Improper.**

     MIT served a contention interrogatory on Harman seeking Harman's positions as to the

invalidity of the patent-at-issue.  Harman provided its current understanding on that issue in a

detailed response dated March 22, 2006.  *See* Harman's Supplemental Response to MIT's

Interrogatory No. 5 (attached as Exh. A).  Harman then served mirror-image interrogatories on

MIT seeking MIT's positions in response to Harman's invalidity positions.  In particular,

Harman served the following interrogatories, to which MIT objected, as indicated:

| | |
|---|---|
| **Harman's**<br>**Interrogatory No. 9:** | To the extent that MIT disagrees with any of the invalidity positions set forth in Harman's latest supplemental response to MIT's Interrogatory No. 5, served herewith, explain in detail all bases for MIT's |

disagreement. MIT's response should include, *inter alia*, a detailed explanation of any disagreement MIT has with any of the information, statements, or positions set forth in the claim charts included with Harman's supplemental response.

MIT's Objection:    MIT objects to this Interrogatory because MIT has not yet completed its factual and legal analysis with regard to Harman's invalidity contentions and thus contention interrogatories regarding validity are premature at this stage of the litigation. MIT further objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges or immunities. MIT further objects to this Interrogatory because it calls for a legal conclusion with respect to validity.

Subject to and without waiving the foregoing general and specific objections, MIT states that it will timely submit the report(s) of its expert(s) with respect to validity, and thus intends to supplement this Interrogatory in a timely manner, after completion of any such report(s).

**Harman's Interrogatory No. 10:**    To the extent that MIT disagrees with any of the information and positions taken in Meredith Addy's invalidity opinion (HAR 089895-089954, including the claim charts attached thereto), explain in detail all bases for MIT's disagreement.

MIT's Objection:    MIT objects to this Interrogatory because MIT has not yet completed its factual and legal analysis with regard to Harman's invalidity contentions and thus contention interrogatories regarding validity are premature at this stage of the litigation. MIT further objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges or immunities. MIT further objects to this Interrogatory because it calls for a legal conclusion with respect to validity. Finally, MIT objects because Ms. Addy has not yet been deposed.

Subject to and without waiving the foregoing general and specific objections, MIT states that it will timely submit the report(s) of its expert(s) with respect to validity, and thus intends to supplement this

Interrogatory in a timely manner, after completion of any such report(s).

**Harman's Interrogatory No. 16:** To the extent that MIT contends any of these asserted claims of U.S. Patent No. 5,177,685 are not rendered obvious by the combination of Schmandt and Davis, "Synthetic Speech for Real Time Direction-Giving" (MIT 01101-02) in light of the Direction assistance display that was in public use at the Computer Museum in Boston on or before August 8, 1989 (noted in Davis' deposition), explain in detail each and every basis for all such contentions. In particular, identify the limitation(s) of each claim (including dependent claims) that are allegedly not present in the combination, and include an explanation as to why what is present in the combination does not fall within the scope of the limitation.

**MIT's Objection:** MIT objects to this Interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. MIT further objects to this Interrogatory because it calls for a legal conclusion with respect to obviousness and/or non-obviousness. MIT further objects to this Interrogatory to the extent that it mischaracterizes the legal standard for combining references. MIT further objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges or immunities.

Subject to and without waiving the foregoing general and specific objections, MIT states that it will timely submit the report(s) of its expert(s) with respect to validity, and thus intends to supplement this Interrogatory in a timely manner, after completion of any such report(s). MIT further incorporates by reference the deposition testimony of Dr. James R. Davis, Ph.D. and Christopher M. Schmandt in response to this Interrogatory.

*See* MIT's Response to Harman's Second Set of Interrogatories (Nos. 8-20) (attached as Exh. B).

## A.    MIT Cannot Defer its Response as to Interrogatories Regarding Validity

MIT has subsequently confirmed, through the meet and confer process, its refusal to provide any substantive response to Harman's Interrogatory Nos. 9, 10 and 16, and continues to

assert that it need not provide substantive interrogatory responses until it provides its expert reports. This is incorrect and improper. To the extent that MIT has any basis for responding to the *prima facie* evidence of invalidity, Harman is entitled to understand any such bases ***prior*** to the expert discovery phase of this litigation.

Interrogatories seeking information relating to prior art may not be deferred. *B. Braun Med'l., Inc. v. Abbott Labs.*, 155 F.R.D. 525, 527 (E.D. Pa. 1994); *see also ADC Telecommunications, Inc. v. Thomas & Betts Corp.*, No. 98CV2055, 2001 WL 1381098, at *3 (D. Minn. Oct. 18, 2001) (citing *B. Braun* to demonstrate that interrogatories relating to prior art should not be deferred) (attached as Exh. F). As the court in *B. Braun Medical* stated:

> Prior art must be compared with the patent in suit to determine if a combination produced a new or different function which was patentable. Prior art is also relevant to [an]"obviousness" claim. The prior art interrogatories will serve to clarify the issues and narrow the scope of the dispute. Thus, even if they seek Defendant's contentions, they should not be deferred."

*B. Braun Med'l., Inc.*, 155 F.R.D. at 527.

Throughout the parties' discussions, Harman has been telling MIT for several years that its patent is invalid, and has repeatedly come forward with detailed evidence of invalidity. MIT has never responded with any evidence or position to the contrary. If MIT currently has no basis upon which to rebut the *prima facie* evidence of invalidity and to assert the validity of its claims, then MIT filed this suit knowing that its patent was invalid and without any evidence to rebut that invalidity. *See Pellegrini v. Analog Devices, Inc.*, No. Civ. A. 02-11562RWZ, 2006 WL 83472, at *1 (D. Mass Jan. 11, 2006) (all allegations and factual contentions must have evidentiary support) (attached as Exh. F); *see also Imperial Chem. Indus., PLC v. Danbury Pharmacal, Inc.*, 777 F. Supp. 330, 368 (D. Del. 1991) (once party challenging validity has established *prima facie* case of invalidity, patentee may present evidence to rebut invalidity).

MIT cannot wait until the expert discovery phase to use its experts' anticipated analysis to justify the claims filed in this suit. At this point in the litigation, Harman is entitled to require that MIT demonstrate why it believes that its patent is not invalid. *Pellegrini*, 2006 WL 83472, at *2 ("the patent holder, if challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim, that it had a reasonable chance of proving infringement.") (attached as Exh. F).

Accordingly, any delay in MIT's disclosure of its position on validity and prior art prejudices Harman's counterclaim of invalidity. There is no reason why MIT cannot and should not respond to Harman's interrogatories on such issues now.

### B.    MIT's Objection that Harman's Interrogatories Require a Legal Conclusion is Improper

Under Rule 33(c), interrogatories are "not necessarily objectionable merely because an answer to the interrogatory involves an opinion or contention that relates to fact or the application of law to fact." *B. Braun*, 155 F.R.D. at 527. Instead, the party seeking to compel response to interrogatories must show that early answers will "contribute meaningfully to clarifying the issues in the case, narrowing the scope of the dispute, or setting up early settlement discussions, or that such answers are likely to expose a substantial basis for a motion under Rule 11 or Rule 56." *Id.*

Because Harman and its opinion counsel have presented MIT with *prima facie* demonstrations of invalidity, Harman's Interrogatory Nos. 9, 10 and 16, seeking MIT's position on invalidity, are designed to narrow the scope of the dispute and to clarify the issues in this case. Harman's interrogatory is therefore not objectionable merely because an answer to the interrogatory involves an opinion or contention that relates to fact or the application of law to fact.

## II.    MIT Should Be Ordered to Provide a Deponent for 30(b)(6) Deposition Topics Nos. 1, 5, 6 and 7.

On March 22, 2006, Harman served its Notice of Harman's First Rule 30(b)(6) Deposition of MIT concerning seven (7) separate topics. *See* Harman's First Rule 30(b)(6) Deposition Notice (attached as Exh. C). On April 13, 2006, MIT's counsel stated its objections in letter form to Harman's Rule 30(b)(6) Notice and further agreed to "produce Chris Schmandt to provide testimony on MIT's behalf as to the non-objectionable portions of Topics 2, 3, 4 and 7 on May 2, 2006, at Proskauer's Boston Office." *See* April 13, 2006 K. Mottley letter to C. Leavell at 2 (attached as Exh. D). On April 27, 2006, in response to letters by Harman's counsel, MIT further stated that it specifically objects to Topics 1, 6 and 7 because they seek legal contentions. *See* April 27, 2006 K. Mottley letter to C. Leavell (attached as Exh. E). On April 28, 2006, Harman and MIT met and conferred, as required under Local Rule 37.1, regarding, *inter alia*, MIT's refusal to produce a witness for certain topics by listed in Harman's 30(b)(6) depositions notice. MIT re-iterated that it will not produce a 30(b)(6) witnesses for Topics 1, 5, 6 and 7 of Harman's Notice.

Rule 30(b)(6) of the Federal Rules of Civil procedure provides that "[a] party may in [its] notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested." Fed. R. Civ. P. 30(b)(6). Where a party has served such a notice, "the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. . . " *Id.*

MIT objects to producing a 30(b)(6) witness for Harman's topics 1, 5, 6 and 7 to the extent that they seek legal conclusions, and objects to Topic 5 because it seeks information

protected by the attorney-client privilege and work product doctrines. Harman addresses each of MIT's objections below.

A.    **MIT Should be Ordered to Produce a 30(b)(6) Witness on Harman's Topics 1, 6 and 7, Which Seek MIT's Validity Contentions (And Its Related Contentions Regarding Claim Construction).**

Topics 1, 6 and 7, as noticed by Harman, and MIT's corresponding objections are as follows:

**Harman's Topic 1:**    MIT's understanding of the proper construction of each limitation of each claim of U.S. Patent No. 5,177,685 that MIT contends may be infringed by any Harman product, and any intrinsic and extrinsic evidence that MIT believes supports each such construction. *See* Exh. C.

**MIT's Objection:**    MIT specifically objects to Topic 1 as seeking legal conclusion testimony on which fact depositions are inappropriate. MIT will brief its positions on claim construction when requested by the Court. *See* Exh. D.

**Harman's Topic 6:**    MIT's understanding of the validity of the asserted claims of U.S. Patent No. 5,177,685 in light of the prior art and invalidity positions identified in (a) Meredith Addy's opinion letter (HAR 089895-089954, including the claim charges attached thereto); and (b) Harman's March 22, 2006 supplemental response to MIT's Interrogatory No. 5 (including, *inter alia*, the claim charts attached thereto). *See* Exh. C.

**MIT's Objection:**    MIT specifically objects to Topic 6 as seeking legal conclusion testimony on which fact depositions are inappropriate. MIT may rely upon expert testimony as to the issues included within Topic 6, and Harman will get the chance to depose MIT's experts on those issues, to the extent such issues are within the scope of their expert reports. *See* Exh. D.

**Harman's Topic 7:**    The Schmandt and Davis, "Synthetic Speech for Real Time Direction-Giving" publication (MIT 01101) identifies "field trials" of the Back Seat Drive, which occurred more than 1 year before the filing date of U.S. Patent No. 5,177,685, as does Mr. Davis' thesis (see page 3). For each asserted claim of United States Patent No. 5,177,685, the identification of each and every limitation of the claim that

9

was not embodied in a field trial prior to August 9, 1989, and the identification of any evidence relating hereto. *See* Exh. C.

MIT's Objection:    MIT specifically objects to Topic 7 to the extent that it calls for legal conclusion testimony on which fact depositions are inappropriate. *See* Exh. D.

30(b)(6) depositions are a proper discovery tool in requesting the opposing party's contentions, including in patent cases. *See B&H Mfg. Inc. v. Foster-Forbes Glass Co.*, 23 U.S.P.Q.2d 1396, 1399 (N.D. Ind. 1992) (noting that court in patent case granted plaintiff's motion to compel a 30(b)(6) deposition seeking opposing party's contentions); *see also Eaton Corp. v. ZF Meritor LLC*, No. 03-74844, 2006 WL 587833, *1 (ED. Mich. March 10, 2006) (granting defendants' motion to compel plaintiff to produce a 30(b)(6) witness regarding, *inter alia*, topics on infringement and pre-filing investigation) (attached as Exh. F).

Where courts have, on occasion, expressed preference for contention interrogatories over 30(b)(6) depositions, *see, e.g., McCormick-Morgan*, 134 F.R.D. at 286; *see also Exxon*, 44 Fed.Cl. at 602, MIT refuses here to provide responses to Harman's contention interrogatories. Moreover, the preference for contention interrogatories over depositions is not a *per se* rule. Whether a 30(b)(6) deposition or contention interrogatories are more appropriate is decided on the facts of each case. *See United States v. Taylor*, 166 F.R.D. 356, 362 n.7 (M.D.N.C. 1996). Furthermore, district courts including *McCormick-Morgan* and *Exxon* have noted that where contention interrogatories – *including in patent cases* – have proven unsuccessful and yielded little information, a Rule 30(b)(6) deposition is an appropriate discovery tool. *See Exxon*, 44 Fed.Cl. at 603 (citing *McCormick-Morgan*, 134 F.R.D. at 287) ("if the contention interrogatories do not give the United States the requested information [regarding claim construction], then it may need to resort to a Rule 30(b)(6) deposition. . . ."); *see also BB&T Corp. v. United States*, 233 F.R.D. 447, 449 (M.D.N.C. 2006) (stating that a party may seek to use depositions for

contention discovery if it shows that the interrogatory process has not been successful). Because Harman's attempts to obtain MIT's validity contentions through properly served contention interrogatories have proved ineffective, and because Harman was forced to file this motion, this Court should order MIT to both respond to Harman's interrogatories and provide a 30(b)(6) deponent on the related topics. *See BB&T Corp. v. United States*, 233 F.R.D. 447, 449 (M.D.N.C. 2006), *Exxon*, 44 Fed.Cl. at 603; *McCormick-Morgan*, 134 F.R.D. at 287.

Moreover, MIT never sought to move for a protective order from this Court, which is the required procedure if MIT seeks to withhold a 30(b)(6) deponent. As the court stated in *Marker v. Union Fidelity Life Ins. Co.*, 125 F.R.D. 121 (M.D.N.C. 1989):

> "Nothing in the Federal Rules of Civil Procedure gives a party the right to not respond or inadequately respond to a Rule 30(b)(6) deposition notice or subpoena request and elect to supply the answers in a written response to an interrogatory. An attempt to so limit a Rule 30(b)(6) deposition is not warranted. Because of its nature, the deposition process provides a means to obtain more complete information and is, therefore, favored. Even if the Court were to consider approving such a procedure, defendant must first obtain a protective order pursuant to Rule 26(c), Fed.R.Civ.P., which it has not done."

125 F.R.D. at 126.

Accordingly, Harman respectfully requests that this Court order MIT to produce a 30(b)(6) witness on Topics 1, 6 and 7, which relate to the alleged validity of the patent-at-issue, as well as the closely related issue of claim construction.

### B.  MIT Should be Ordered to Produce a 30(b)(6) Witness on Harman's Topic 5.

Topics 5, as noticed by Harman, and MIT's objection are as follows:

**Harman's Topic 5:**  The steps, if any, taken by MIT prior to filing of this suit in order to determine whether any Harman products fall within the scope of any properly construed claim of U.S. Patent No. 5,177,685. *See* Exh. C.

**MIT's Objection:**  MIT specifically objects to Topic 5 as it seeks information protected by the attorney-client and work product doctrines. *See* Exh. D.

11

MIT further objects to producing a 30(b)(6) witness to Topic 5 on the grounds that it seeks information protected by the attorney-client and work product doctrines. Topic 5 asks for "[t]he steps, if any, taken by MIT prior to filing of this suit in order to determine whether any Harman products fall within the scope of any properly construed claim of U.S. Patent No. 5,177,685." *See* Exh. C. MIT cannot properly object to this topic because Harman seeks to depose MIT on facts, and not information protected by privilege. In particular, Harman does not seek any communications between MIT and its attorneys or MIT's attorneys' mental impressions.

Harman is, however, entitled to know whether MIT performed a pre-filing investigation, as required by Rule 11, prior to filing this suit. In bringing a claim of infringement, the patent holder, if challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim that it had a reasonable chance of proving infringement." *View Eng'g, Inc. v. Robotic Vision Sys., Inc.,* 208 F.3d at 986. Rule 11 and the Federal Circuit require MIT to have construed its claims ***before ever filing suit*** against Harman and before discovery in this case began. *Antonious v. Spalding & Evenflo Co.,* 275 F.3d 1066, 1072 (Fed. Cir. 2002) (citations omitted) ("This court has construed Rule 11, in the context of patent infringement actions, to require that an attorney interpret the pertinent claims of the patent in issue before filing a complaint alleging patent infringement."). Thus, in patent infringement cases, Rule 11 requires that "an attorney interpret the pertinent claims of the patent in issue before filing a complaint alleging patent infringement." *Id.* (citations omitted); *see also Q-Pharma, Inc. v. Andrew Jergens Co.,* 360 F.3d 1295, 1300-01 (Fed. Cir. 2004) (Federal Circuit requires a plaintiff in a patent infringement suit to, "at a minimum … interpret the asserted patent claims and compare the accused device with those claims before filing a claim alleging

infringement."). "Although the attorney may consult with the client, Rule 11 requires that the attorney not rely solely on the client's claim interpretation, but instead perform an independent claim analysis." *Antonious,* 275 F.3d at 1072. (citation omitted).

For years, since MIT first asserted infringement against Harman, Harman has been asking MIT for the underlying bases of its infringement, validity, and unenforceability claims. MIT's refusal to provide Harman with an analysis of the basis of its infringement claims, including its claim construction, means that Harman is not only entitled to know MIT's detailed grounds of infringement at this point in the case, but also the related facts as to whether MIT complied with its obligations to perform a Rule 11 investigation prior to this suit. For example, Harman is entitled to inquire about the ***facts*** of whether MIT examined any of Harman's products in detail, whether MIT attempted to reverse-engineer or perform tests on any of Harman's products, or whether MIT compared any of Harman's products on a claim by claim and element by element basis. *See Monster Cable Prods, Inc. v. The Quest* Group, No. C 04-0005 MHP, 2005 WL 2596451, *4 (N.D. Cal. Oct. 13, 2005) (citing *Network Caching Tech. LLC v. Novell Inc.*, No. C-01-2079-VRW, 2002 WL 32126128 (N.D. Cal. Aug. 13, 2002) (Rule 11 requires that a plaintiff compare an accused product to its patent on a claim by claim, element by element basis for at least one of each defendant's products) (attached as Exh. F). Even MIT's own representatives could not identify in their depositions any Harman navigation products or navigation software that they had reverse-engineered, examined, or observed prior to MIT's assertion of infringement against Harman. *See* Swartz Dep. 81:21-82:11, 83:1-23, 85:3-86:6, 105:11-18, Feb. 7, 2006 (submitted separately under Motion to Impound); Schmandt Dep. 24:1-11, Feb. 8, 2006 (submitted separately under Motion to Impound).

13

Harman's Topic No. 5 is further relevant to Harman's defense of MIT's claim for willful infringement. Specifically, it is Harman's position that MIT repeatedly refused to provide any detailed information whatsoever as to the alleged infringement, validity, and enforceability of MIT's patents in response to Harman's extensive and detailed evidence of non-infringement, invalidity, and unenforceability. As a result, MIT's claim of willful infringement is without merit – if MIT itself cannot explain with any detail how its patent is valid, enforceable, and infringed, then how can Harman be liable as a willful infringer?

Finally, Harman's Topic No. 5 is relevant to Harman's claim for costs due to the frivolity of MIT's suit. If MIT, prior to filing suit, did not undertake a thorough pre-filing investigation into the invalidity, non-infringement, and unenforceability issues raised by Harman during the pre-suit negotiations, then this further supports Harman's claim for costs.

Accordingly, Harman respectfully requests that this Court order MIT to produce a 30(b)(6) witness on Topic 5.

### III.    Harman is Entitled to Attorney's Fees for This Motion.

As early as December of 2003, Harman presented MIT with *prima facie* evidence of invalidity and unenforceability and made numerous requests to MIT to rebut such evidence. After the commencement of this suit, Harman made further requests to MIT rebut Harman's *prima facie* evidence. MIT has refused to provide such a rebuttal, and therefore fees are appropriate here. Courts award the prevailing party reasonable expenses, including attorney's fees incurred in connection with a motion to compel interrogatory responses, unless the conduct of the losing party was substantially justified or awarding fees would be unjust. *Doe v. Lexington-Fayette Urban County Gov't*, Nos. 03-6261, 03-6490, 03-6517, 03-6560, 2005 WL 1036114, at *9 (6th Cir. May 5, 2005) (attached as Exh. F). Furthermore, sanctions are

14

appropriate where a party files no response to an interrogatory except objections.  *David v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981).

MIT itself served contention interrogatories on Harman on the issue of invalidity. Harman responded to those interrogatories in detail.  Now, when faced with reciprocal discovery, MIT flatly refuses to comply, and did not even file a motion for a protective order seeking permission to refuse to respond to Harman's discovery.  Under controlling case law, Harman is entitled to know MIT's positions, and such positions are proper topics for contention interrogatories and a 30(b)(6) deposition.  MIT's continued failure to provide the discovery properly sought by Harman, and necessary to Harman's defense, prejudices Harman in this matter.

## IV.    CONCLUSION

For these reasons, the Harman respectfully requests that this Court grant Harman's Motion to Compel MIT's Responses to Harman's Interrogatories Nos. 1, 9-16 and order MIT to comply with Harman's 30(b)(6) notice.

### Compliance with Local Rules 7.1 and 37.1

Harman's counsel discussed the matters raised herein in conversations on April 28, 2006, and in correspondence on April 24, 2006, in a good faith attempt to resolve these issues.  As the disputes remain unresolved, Harman now seeks this Court's assistance.

Dated:  May 12, 2006                    Respectfully submitted,

  /s/ Craig D. Leavell_____
Robert J. Muldoon, Jr., BBO# 359480
James W. Matthews, BBO# 560560
Edward S. Cheng, BBO# 634063
Courtney A. Clark, BBO# 651381
**SHERIN AND LODGEN, LLP**
101 Federal Street
Boston, MA 02110

William A. Streff Jr., P.C.
Michelle A. H. Francis
Craig D. Leavell
Ann H. Chen
Colleen M. Garlington
**KIRKLAND & ELLIS LLP**
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000 (phone)
(312) 861-2200 (fax)

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing DEFENDANT HARMAN'S MOTION TO
COMPEL MIT'S RESPONSES TO HARMAN'S INTERROGATORIES NOS. 9, 10 AND 16
AND COMPLIANCE WITH HARMAN'S RULE 30(b)(6) DEPOSITION NOTICE was sent by
electronic-mail this 12th day of May, 2006, addressed to counsel for MIT as follows:

> Steven M Bauer
> Kimberly A. Mottley
> Proskauer Rose LLP
> One International Place, 22nd Floor
> Boston, MA  02110-2600
> Email: sbauer@proskauer.com
>         kmottley@proskauer.com
>
> *Counsel for Plaintiff MIT*

/s/      Ann H. Chen
One of the Attorneys for Harman

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY, )<br><br>Plaintiff, )<br><br>v. )<br><br>HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, )<br><br>Defendant. ) | Civil Action No. 05-10990-DPW |

## HARMAN'S SUPPLEMENTAL RESPONSE TO MIT'S INTERROGATORY NO. 5

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, defendant Harman International Industries Inc. ("Harman") submits the following supplemental responses and objections to plaintiff Massachusetts Institute of Technology's ("MIT") Interrogatory No. 5.

## GENERAL OBJECTIONS

Harman incorporates its General Objections to MIT's First Set of Requests For the Production of Documents and Things (1-26) as if fully set forth herein.

## Interrogatory No. 5

If Harman contends that the '685 Patent is invalid, state the basis for such a contention, and identify all prior art Harman contends supports that contention.

## Supplemental Response to Interrogatory No. 5 [counted with subparts as No. 7]

In its latest claim charts, MIT purports to assert (or reserve its right to assert) the following claims: 1, 2, 7-21, 23 and 27-56. Accordingly, Harman limits its response to this interrogatory to those asserted claims. Harman objects to MIT's assertion of claims 2-6, 8-9, 12, 14-18, 21, 29-34, 36, 38-39, 41-47, 50-52, 55 and 56, which MIT failed to assert (or in the case

00107697.DOC /

of claims 38-39, 50, and 55 even reserve any right to assert) in its preliminary infringement contentions. Harman further objects to MIT's assertion of claims 16-18, 30-31, 36, 38-39, 51 and 55 for which MIT still has come forward with no purported evidence of infringement for any Harman device, even in its latest infringement contentions. Harman further objects to this interrogatory as premature because responsive information is the subject of ongoing discovery and investigation, and will be the subject of expert analysis and testimony. Further, the Court has not provided its construction of disputed terms of the asserted claims. Accordingly, Harman reserves the right to supplement its responses to this interrogatory under Rule 26(e) of the Federal Rules of Civil Procedure after sufficient time for fact and expert discovery, once MIT finalizes its infringement and claim construction contentions, and, as necessary, upon the discovery of additional facts or construction by the Court.

Subject to its asserted objections, Harman refers MIT to (i) Harman's Preliminary Invalidity Contentions; (ii) Meredith Addy's August 24, 2004 invalidity opinion and (iii) documents Harman has provided pursuant to Rule 33(d) of the Federal Rules of Civil Procedure in response to this interrogatory, including without limitation documents bates numbered: HAR 000192-229; HAR 006160-66; HAR 090436-524; HAR 000272-742; HAR 091048-145; HAR 093225-095204; HAR 095573-097503; HAR 100739-101083; HAR 101285-101913.

Harman further responds that the claims of the '685 patent are invalid over the prior art, as demonstrated in the attached claim charts.

Harman further responds that the claims of the '685 patent are invalid because the claimed inventions were in public use more than one year before the filing of the '685 patent application by virtue of the field trials noted in Mr. Davis' thesis paper (*see, e.g.* HAR 001479)

2

and Schmandt and Davis, "Synthetic Speech for Real Time Direction-Giving" (June 1989) (MIT 01101-02).

Harman further responds that the claims of the '685 patent are invalid over the combination of Schmandt and Davis, "Synthetic Speech for Real Time Direction-Giving" (June 1989) (MIT 01101-02) and the Direction Assistance display that was publicly used at the Computer Museum in Boston more than one year before the filing of the '685 patent application.

Dated: March 22, 2006                     Respectfully submitted,

Robert J. Muldoon, Jr., BBO# 359480
James W. Matthews, BBO# 560560
Edward S. Cheng, BBO# 634063
Courtney A. Clark, BBO# 651381
**SHERIN AND LODGEN, LLP**
101 Federal Street
Boston, MA  02110

William A. Streff Jr., P.C.
Craig D. Leavell
Michelle A.H. Francis
Ann H. Chen
**KIRKLAND & ELLIS LLP**
200 E. Randolph Dr.
Chicago, IL  60601
(312) 861-2000 (phone)
(312) 861-2200 (fax)

*Attorneys for Defendant*

00107697.DOC /

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing **HARMAN'S SUPPLEMENTAL**

**RESPONSE TO MIT'S INTERROGATORY NO. 5** was hand delivered this 22nd day of

March, 2006, to counsel for MIT as follows:

> Steven M. Bauer
> David J. Cerveny
> Kimberly A. Mottley
> Proskauer Rose LLP
> One International Place, 14th Floor
> Boston, MA 02110-2600

# EXHIBIT A

| '685 Patent | The Claims of the '685 Patent Are Invalid In Light of Schmandt, alone or (as indicated) in combination with other prior art. |
|---|---|
| 1. An automobile navigation system which produces spoken instructions to direct a driver of an automobile to a destination in real time comprising: | Schmandt and Davis, "Synthetic Speech for Real Time Direction-Giving" (June 1989) ("Schmandt") (MIT 01101-01102) discloses the "Back Seat Driver," which is such a system. (Abstract, "System" section) |
| computing apparatus for running and coordinating system processes, | Schmandt discloses a Symbolics Lisp Machine for running and coordinating system processes. (System) |
| driver input means functionally connected to said computing apparatus for entering data into said computing apparatus, said data including a desired destination, | Schmandt discloses a cellular phone with a keypad through which a driver selects the destination. (System) |
| a map database functionally connected to said computing apparatus which distinguishes between physical and legal connectivity, | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation is disclosed in Schmandt, which discloses a "Geographic Database" based on the DIME files, which indicate physical connectivity, which is extended to explicitly represent legal connectivity. (Geographic Database)<br><br>In addition, Davis and Trobaugh, "Direction Assistance" (1987 or 1988) ("Davis") (Davis Dep. Exh. 73) also discloses additional details for how to achieve such a distinction on p.3.  One of skill in the art would have been motivated to combine Schmandt and Davis because the Schmandt article expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| position sensing apparatus installed in the automobile and functionally connected to said computing apparatus for providing said computing apparatus data for determining the automobile's current position, | Schmandt discloses a localization unit built by NEC Home Electronics, Ltd. that is a dead reckoning position keeping system which uses speed and direction sensors.  (System) |
| a location system functionally connected to said computing apparatus for accepting data from said position sensing apparatus, for consulting said map database, and for determining the automobile's current position relative to the map database, | Schmandt discloses that the on board navigation hardware transmits position and velocity via modem and cellular phone to the base station, which does all route planning and discourse generation, and which is connected to the map database installed thereon (via CD ROM).  The system uses map matching on the map database stored on CD ROM to compensate for location error (i.e., relative to the database).  (System; Figure 2) |
| a route-finder functionally connected to said computing apparatus, for accepting the desired destination from said driver input means and the current position from said location system, for consulting said map database, and for computing a route to the destination, | Schmandt discloses that the Symbolics Lisp Machine also does all route planning.  The Lisp machine is connected to both the computing apparatus (on the machine itself), the cellular phone keypad, and the CD ROM map database (System; Figure 2) |
| a discourse generator functionally connected to said computing apparatus for accepting the current position from said location system and the route from said route finder, for consulting said map database, and for composing discourse including instructions and other messages for directing the driver to the destination from the current position, | Schmandt discloses that the Lisp machine is also a discourse generator.  The Lisp machine is connected to the computing apparatus (the computer itself), the location sensors, the route finder program (on the machine itself), and the CD ROM map database, and it uses these items to compose instructions that are natural and detailed, and which include a rich taxonomy of driving verbs, as well as cues such as speed and difficulty to provide instructions at the proper place and in a timely manner.  The system can also anticipate possible mistakes and give warnings to avoid them.  Additional detail regarding the discourse is also provided.  (Discourse Strategies; Figure 2) |
| a speech generator functionally connected to said | Schmandt discloses a Dectalk text-to-speech synthesizer cabled to the Lisp Machine. (System; Figure 2) |

| | |
|---|---|
| discourse generator for generating speech from said discourse provided by said discourse generator, and voice apparatus functionally connected to said speech generator for communicating said speech provided by said speech generator to said driver. | Schmandt discloses a speaker phone in the car, to which synthesized instructions are relayed via cellular link. (System) |
| 2. The automobile navigation system of claim 1 wherein said map database comprises a set of straight line segments and a set of nodes, each endpoint of each segment being a pointer to a node representing the coordinates of the endpoint and the set of other segments which are physically and legally  connected to that endpoint. | Schmandt discloses such a database, which is based on the DIME database consisting of straight line segments with end points (nodes), extended to indicate legal connectivity, as well. (Geographic Database) |
| 7. The automobile navigation system of claim 1 wherein said map database comprises a three-dimensional representation of street topology. | The use of three-dimensions in a map database for use in vehicle navigation was well-known prior to the critical date of the Davis patent. This claim is obvious in light of the combination of Schmandt with any number of prior art references that teach such a map database, including Thoone, U.S. Patent No. 4,758,959 (HAR 6442-64) (see Col. 7, lines 12-18; Fig. 1(a); Col. 8, lines 51-59); Benning, Digital Maps on Compact Disc SAE 860125 (HAR 093821-29) (see p. 118); Neukircher, Digital Map Data Bases for Autonomous Vehicle Navigation Systems (HAR 03841-45) (see p. 321) |
| 8. The automobile navigation system of claim 1 wherein said map database includes measures of street quality. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation is disclosed in Schmandt, which discloses that, since some streets are better than others, the database includes a measure of quality, which is taken to be a largely subjective measure of the ease of locating and following a street. (Geographic Database) |
| 9. The automobile navigation system of claim 1 wherein said map database distinguishes divided streets. | Davis teaches the use of a map database that distinguishes divided streets. (p. 10) One of skill in the art would have been motivated to combine Schmandt and Davis because the Schmandt article expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 10. The automobile navigation system of claim 1 wherein said map database includes landmarks such as signs, traffic lights, stop signs and buildings. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation is disclosed in Schmandt because Schmandt discloses a map database that includes landmarks, including traffic lights. (Geographic Database) |
| 14. The automobile navigation system of claim 1 wherein said map database includes time-dependent legal connectivity. | Davis teaches the use of a map database that includes time-dependent legal connectivity/restrictions. (p. 14, Section 5.1) One of skill in the art would have been motivated to combine Schmandt and Davis because the Schmandt article expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 15. The automobile navigation system of claim 1 wherein said map database includes turn difficulty. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation is disclosed in Schmandt because Schmandt discloses that the route finding considers (and thus the database includes) difficulty of driving maneuvers (such as left turns against traffic). (Discourse Strategies) |
| 16. The automobile navigation system of claim 1 wherein said map database includes vehicle street, lane, and height restrictions. | Davis teaches the use of a map database that includes restriction of height, weight, and prohibition of commercial vehicles. (p. 14, Section 5.1) One of skill in the art would have been motivated to combine Schmandt and Davis because the Schmandt article expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |

| | |
|---|---|
| 19. The automobile navigation system of claim 1 wherein said map database includes a database of service locations. | Davis teaches a map database with landmarks such as gas stations. (p. 14, Section 5.1) One of skill in the art would have been motivated to combine Schmandt and Davis because the Schmandt article expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 20. The automobile navigation system of claim 1 wherein said map database includes a listing of famous places by name. | Davis teaches a map database with a listing of famous places (e.g., businesses, online Yellow Pages) at p. 14. One of skill in the art would have been motivated to combine Schmandt and Davis because the Schmandt article expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 21. The automobile navigation system of claim 1 further comprising means for updating said map database. | Davis teaches a system that allows accurate and timely corrections to the database, for example, when streets are built and removed, or when they change names or directions (p. 14). One of skill in the art would have been motivated to combine Schmandt and Davis because the Schmandt article expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 27. The automobile navigation system of claim 1 wherein said route finder is adapted to find a best route according to any one of three cost metrics: distance, speed, simplicity. | To the extent MITI contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation is disclosed in Schmandt because Davis discloses a route finder subject to constraints of being easy to follow and reasonably short (p. 6) One of skill in the art would have been motivated to combine Schmandt and Davis because the Schmandt article expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 28. The automobile navigation system of claim 1 wherein said route finder is adapted to calculate a new route if the driver or vehicle navigation system makes an error or if the route is unnavigable due to unforeseen circumstances, wherein said new route does not simply backtrack to the point of the error if a better route from the current location exists. | To the extent MITI contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation is disclosed in Schmandt because Schmandt disclose that if the driver does make a wrong turn, or misses a turn, the Back Seat Driver describes the error and then incrementally calculates a new route, rather than simply back-tracking to the point of the error. (Discourse Strategies) |
| 32. The automobile navigation system of claim 1 wherein said location system is a position-keeping (dead-reckoning) system. | Schmandt discloses a localization unit built by NEC Home Electronics, Ltd. that is a dead reckoning position keeping system which uses speed and direction sensors. (System) |
| 33. The automobile navigation system of claim 1 wherein said location system is a hybrid of position-keeping and position-finding systems. | Schmandt discloses the use of such a hybrid system by referencing the Ono paper (CD-ROM Assisted Navigation System, reference number 3 in the Schmandt paper) (HAR 093766-67) ("Ono") as showing the details of the navigation system sensors. (System)    Ono discloses the use, in a single system, of both a dead-reckoning (position keeping) location system and a GPS (position-finding) location system. (Navigation System; Figure 1; Figure 2)

In addition, to the extent Schmandt itself does not anticipate, one of skill in the art would have been motivated to combine Schmandt and Ono because Schmandt expressly cites Ono for the physical system that can be used, including the sensors and/or to combine all three of Schmandt, Davis, and Ono, because Schmandt also expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 34. The automobile navigation system of claim 1 wherein said location system employs map matching. | Schmandt discloses that the system uses map matching on the map database stored on CD ROM to compensate for location error (i.e., relative to the database). (System) |

3

| Claim | Analysis |
|---|---|
| 35. The automobile navigation system of claim 1 wherein said position sensing apparatus comprises displacement and direction sensors installed in the automobile. | Schmandt discloses a localization built by NBC Home Electronics, Ltd. that is a dead reckoning position keeping system which uses speed and direction sensors. (System) |
| 36. The automobile navigation system of claim 1 wherein said position sensing apparatus measures displacement with an odometer. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation is disclosed in Schmandt because Schmandt discloses the use of an odometer by referencing the Ono paper (reference number 3 in the Schmandt paper) as showing the details of the navigation system sensors. (System) Ono discloses the use of wheel sensors, which is an example of an odometer. (Navigation System)<br><br>In addition, to the extent Schmandt itself does not anticipate, one of skill in the art would have been motivated to combine Schmandt and Ono because Schmandt expressly cites Ono for the physical system that can be used, including the sensors and/or to combine all three of Schmandt, Davis, and Ono, because Schmandt also expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 37. The automobile navigation system of claim 1 wherein said position sensing apparatus measures direction with a magnetic compass. | Schmandt discloses the use of a magnetic compass by referencing the Ono paper (reference number 3 in the Schmandt paper) as showing the details of the navigation system sensors. (System) Ono discloses the use of a magnetic sensor for the Earth's magnetic field/terrestrial magnetic sensor (Navigation System; Figure 2), i.e., a magnetic compass.<br><br>In addition, to the extent Schmandt itself does not anticipate, one of skill in the art would have been motivated to combine Schmandt and Ono because Schmandt expressly cites Ono for the physical system that can be used, including the sensors and/or to combine all three of Schmandt, Davis, and Ono, because Schmandt also expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 40. The automobile navigation system of claim 1 wherein said position sensing apparatus measures direction with a gyroscope. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation is disclosed in Schmandt because Schmandt discloses the use of a gyroscope by referencing the Ono paper (reference number 3 in the Schmandt paper) as showing the details of the navigation system sensors. (System) Ono discloses the use of an internal gyro/inertia sensor. (Navigation System; Figure 1; Figure 2)<br><br>In addition, to the extent Schmandt itself does not anticipate, one of skill in the art would have been motivated to combine Schmandt and Ono because Schmandt expressly cites Ono for the physical system that can be used, including the sensors and/or to combine all three of Schmandt, Davis, and Ono, because Schmandt also expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 42. The automobile navigation system of claim 1 wherein each intersection in a route is classified into one type in a taxonomy of intersection types, and the disclosure generated in relation to each said intersection depends on its type. | Davis discloses the use of such a taxonomy and the generation of discourse in relation to such taxonomy. (Section 4.1 Acts, pp. 8-10) One of skill in the art would have been motivated to combine Schmandt and Davis because the Schmandt article expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 43. The automobile navigation system of claim 42 wherein said taxonomy of intersection types includes continue, | Davis discloses a taxonomy with continue (straight), forced-turn (merge, end of a road), U-turn, enter, exit, rotary, fork, turn, and stop. (Section 4.1 Acts, pp. 8-10; Section 4.2 Cues, p.10 (forced-turn)) Davis also |

4

| | |
|---|---|
| forced-turn, U-turn, enter, exit, onto-rotary, stay-on-rotary, exit-rotary, fork, turn, and stop. | discloses details of a rotary taxonomy that includes onto, stay-on, and exit the rotary. (Figure 10; Figure 6) One of skill in the art would have been motivated to combine Schmandt and Davis because the Schmandt article expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 44. The automobile navigation system of claim 42 wherein said discourse generated further depends on a description function for each intersection type which generates a description given the length and tense of the desired description and the position along the route from which an instruction is to be given. | Davis discloses such a discourse on pp. 7-8. One of skill in the art would have been motivated to combine Schmandt and Davis because the Schmandt article expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 45. The automobile navigation system of claim 1 wherein said discourse generated comprises a long description of an act given substantially before the act is to be performed and a short description given at the time the act is to be performed. | Davis discloses such a discourse on pp. 7-8. One of skill in the art would have been motivated to combine Schmandt and Davis because the Schmandt article expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 46. The automobile navigation system of claim 45 wherein said long descriptions includes cues. | Davis discloses the use of cues in the generated discourse. (Section 4.2 Cues, pp. 10-11) One of skill in the art would have been motivated to combine Schmandt and Davis because the Schmandt article expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 47. The automobile navigation system of claim 46 wherein said cue is a landmark. | Davis discloses the use of landmarks (street names, major streets, railroads, underpass) as cues. (Section 4.2 Cues, pp. 10-11) One of skill in the art would have been motivated to combine Schmandt and Davis because the Schmandt article expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |
| 48. The automobile navigation system of claim 1 wherein said driver input means includes means for said driver to demand immediate instructions, or clarification or repetition of instructions already provided. | Schmandt discloses a cellular phone with a keypad through which a driver requests repeats of spoken information and access to other services of the Back Seat Driver. (System) |
| 49. The automobile navigation system of claim 1 wherein said driver input means includes means for said driver to indicate to said automobile navigation system that a given instruction provided by said system is impossible to be complete for some reason and that a new route must be calculated. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this claim is invalid as obvious. Prior to the critical date of the Davis patent, it was well known within the art of vehicle navigation systems to include a key that could be pressed to cause the system to calculate a new route. It would have been obvious to combine Schmandt with any of the references that disclose such an input device, including Nimura, U.S. Pat. No. 4,992,947 (HAR 095157-88) (see Col. 9, line 39 to Col. 11, line 24); Wootton, UKPA 2 079 453 A (MIT 03570-82) (see 4:12-40, 5:24-28, 7:1-6); Zeevi, U.S. Pat. No. 4,878,170 (Davis Dep. Exh. 83) (see Col. 8, lines 42-49); Cartographic Database Requirements for Land Vehicle Navigation (1984 IEEE) (see p. 26) |
| 50. The automobile navigation system of claim 1 wherein said driver input means comprises a voice recognition system to allow at least some driver input to be spoken. | The use voice input for use in vehicle navigation was well-known prior to the critical date of the Davis patent. This claim is obvious in light of the combination of Schmandt with any number of prior art references that teach such use of speech input, including Wootton, G.B. 2 079 453 A (MIT 03570-82) at 2:39-40; Benning, Digital Maps on Compact Disc SAE 860125 (HAR 09321-29) at 117 (discussing desirability of speech recognition, but at lower cost and higher reliability than that which was commercially available in February 1986); Savage, U.S. Patent No. 4,954,958 (HAR 093473-95) at Fig. 11 and Col. 3, line 15. See also, French, Mobile Information Systems Impact Study (HAR094602-855) at Exhibit 13 (Features of Current [as of 1988] Systems (identify |

| | systems that include voice recognition (VR) input, including Chrysler's CLASS system, Ford's Trip Monitor system) and p. 94. |
|---|---|
| 52. The automobile navigation system of claim 1 wherein said automobile navigation system warns drivers of dangers inferred from knowledge of the road network. | Schmandt discloses that the system can anticipate some of the driver's possible mistakes and give warnings to avoid them. (Discourse Strategies) |
| 53. The automobile navigation system of claim 1 wherein said automobile navigation system informs a driver if an error has been made as detected by the location system. | Schmandt discloses that if the driver does make a wrong turn, or misses a turn, the Back Seat Driver describes the error. (Discourse Strategies) |
| 55. The automobile navigation system of claim 1 wherein said speech generator is a speech synthesizer. | Schmandt discloses a Dectalk text-to-speech synthesizer cabled to the Lisp Machine as the speech generator. (System; Figure 2) |
| 56. The automobile navigation system of claim 1 wherein said speech generator uses digitized speech. | Schmandt discloses the use of a digitized speech by referencing the Ono paper (reference number 3 in the Schmandt paper) as showing the details of the navigation system, including the CDROM storage. (System) Ono discloses the use of digitized speech stored on a CD ROM. (CD ROM; Figure 2). |
| | In addition, to the extent Schmandt itself does not anticipate, one of skill in the art would have been motivated to combine Schmandt and Ono because Schmandt expressly cites Ono for the physical system that can be used, including the CDROM storage and/or to combine all three of Schmandt, Davis, and Ono, because Schmandt also expressly references the Davis article and because the Davis article discusses ETAK's in-car Navigator system and notes that it could "surely" be made to supply driving directions. |

6

| '685 Patent | The Claims of the '685 Patent Are Invalid In Light of Silverman alone, or (as indicated) in combination with other art |
|---|---|
| 1. An automobile navigation system which produces spoken instructions to direct a driver of an automobile to a destination in real time comprising: | The ROGUE system disclosed in the Silverman article (Silverman, An Expert System for In-Vehicle Route Guidance, SAE 881177, August, 1988) (HAR 102367-82) (hereinafter, ROGUE system or Silverman article) provides in-vehicle navigation assistance for day-to-day driving situations. Guidance is presented at the specific time and location where turns or other such actions are needed. *See* Abstract, p. 1. |
| computing apparatus for running and coordinating system processes, | *See* Silverman, Figure 2 (showing CPU); A microcomputer system executes the ROGUE software; "Computer System" section, p. 3 |
| driver input means functionally connected to said computing apparatus for entering data into said computing apparatus, said data including a desired destination, | The driver may specify a destination by entering it directly with the keyboard. Silverman, "Selecting a destination with the keyboard" section, p. 7. |
| a map database functionally connected to said computing apparatus which distinguishes between physical and legal connectivity, | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation also covers the ROGUE system, too, because the ROGUE system is aware of one-way streets, U-turn restrictions, etc. and will not employ illegal or impossible actions. (Silverman, p. 8) Driving restrictions such as one-way streets, turn restrictions, and dead ends are stored in the database to prevent illegal directions. Silverman, Database Features, p. 12. |
| position sensing apparatus installed in the automobile and functionally connected to said computing apparatus for providing said computing apparatus data for determining the automobile's current position, | *See* Silverman, Figures 1 and 2 (showing Sensor Hardware and Sensors connected to the software and CPU). The ROGUE system obtains information on the direction and distance traveled during driving from sensors mounted on the vehicle. The types of sensors that can be used with the ROGUE system include (for distance) odometer, wheel sensors, accelerometer and (for direction) differential odometer, steering sensors, and electronic compass. Silverman, "Sensors" section, p. 5. |
| a location system functionally connected to said computing apparatus for accepting data from said position sensing apparatus, for consulting said map database, and for determining the automobile's current position relative to the map database, | *See* Silverman, Figures 1 and 2 (showing the software and CPU connected to the ROGUE database, RAM and Database). The ROGUE system obtains information on the direction and distance traveled during driving from sensors mounted on the vehicle. The types of sensors that can be used with the ROGUE system include (for distance) odometer, wheel sensors, accelerometer and (for direction) differential odometer, steering sensors, and electronic compass. Silverman, "Sensors" section, p. 5. The technology used in the ROGUE software to track vehicle location is dead reckoning with map matching. As ROGUE is monitoring sensor data and updating the vehicle's position from this information, it is constantly comparing this calculated position to the street network stored in its database. Silverman, "Positioning" section, pp. 11-12 |
| a route-finder functionally connected to said computing apparatus, for accepting the desired destination from said driver input means and the current position from said location system, for consulting said map database, and for computing a route to the destination, | The ROGUE route planning function involves specification of a destination by the driver or passenger and the definition of a route from the vehicle's current location to that destination by the ROGUE software. Silverman, Route Planning, p. 6. The route generation software of the ROGUE software incorporates a sophisticated strategy, combining computational techniques with human intuitions about vehicle routing, designed to produce routes that will be not only accurate but also efficient and reasonable in the judgment of the driver. *See* Silverman, Route Generation, pp. 7-9 (which also includes additional detail regarding the consultation of the map database during route finding). |
| a discourse generator functionally connected to said computing apparatus for accepting the current position from said location system and the route from said route finder, for consulting said map database, and for composing discourse including instructions and other messages for directing the driver to the destination from | The ROGUE software provides to the driver an analog of a knowledgeable passenger giving driving directions both through the use of spoken instructions and in giving its guidance when and where driving actions are needed. (Silverman, p.2) ROGUE's textual directions focus on turns and are designed to mimic a good navigator sitting next to the driver. For simple turns the distances between turns, the street to turn onto and the direction of turn is given. Entries and exits from limited access roads and tricky intersections are clarified with more detailed information such as street sign text. Textual directions are in the form of simple English sentences |

| | |
|---|---|
| the current position. | each of which describes a driving action to be taken. A sample set of textual directions for a trip to a grocery store is shown in figure 6. Silverman, Textual directions section, p. 6. The ROGUE software uses its vehicle sensors to track the progress of the vehicle along a route. This information allows the presentation of navigation guidance to follow the progress of travel. ROGUE offers four types of guidance to assist the driver in following a route, including spoken navigation guidance during travel. Silverman, Route Guidance, p. 9. ROGUE can also provide its textual directions verbally. The textual portion of the screen is spoken by the ROGUE speech synthesis hardware. The direction for the turn is spoken to the driver. Silverman, Guidance during travel, p. 10. Silverman, Figure 6 (showing an example of the discourse that is displayed on the screen and spoken to the driver). The system provides "other messages" in the form of error alerts by which the driver is notified of an error. (Silverman, p. 3) |
| a speech generator functionally connected to said discourse generator for generating speech from said discourse provided by said discourse generator, and | ROGUE offers four types of guidance to assist the driver in following a route, including spoken guidance during travel. Silverman, Route Guidance, p. 9. ROGUE can also provide its textual directions verbally. The textual portion of the screen is spoken by the ROGUE speech synthesis hardware. The direction for the turn is spoken to the driver. Silverman, Guidance during travel, p. 10. |
| voice apparatus functionally connected to said speech generator for communicating said speech provided by said speech generator to said driver. | ROGUE offers four types of guidance to assist the driver in following a route, including spoken guidance during travel. Silverman, Route Guidance, p. 9. ROGUE can also provide its textual directions verbally. The textual portion of the screen is spoken by the ROGUE speech synthesis hardware. The direction for the turn is spoken to the driver. Silverman, Guidance during travel, p. 10. |
| 2. The automobile navigation system of claim 1 wherein said map database comprises a set of straight line segments and a set of nodes, each endpoint of each segment being a pointer to a node representing the coordinates of the endpoint and the set of other segments which are physically and legally connected to that endpoint. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation also covers the ROGUE system, too, because the ROGUE system (which was created by Navtech, Harman's U.S. database supplier) contains full longitude/latitude coordinates for all arteries, streets, on-ramps and off ramps. The coordinates also include altitude so that elevated roads and ramps and overlapping versus intersecting streets are known. The database encodes streets as series of segments which are straight portions of roadway. Driving restrictions such as one-way streets, turn restrictions, and dead ends are stored in the database to prevent illegal directions. Silverman, Street Network, p. 12.

In addition, a more detailed description of Navtech's map database segment/node arrangement in the 1988 time frame is disclosed in another article published in 1988 by Silverman entitled North American Street Maps, Developing a Navigable Database, presented at ISATA in 1988. (HAR 102335-49)

In addition, a segment/node/pointer arrangements for the map databases were well known prior to the critical date of the Davis patent, and it would have been obvious to those of skill in the automobile navigation art to arrange the database as recited in this claim. See e.g., DIME database; TIGER database; Menzilcioglu, CARGuide-on-board computer for automobile route guidance at p.702-04 (MIT 1901-03); Neukirchner, Digital Map Data Bases for Autonomous Vehicle Navigation Systems (HAR 03841-45) at pp. 321-22. |
| 7. The automobile navigation system of claim 1 wherein said map database comprises a three-dimensional representation of street topology. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation also covers the ROGUE system, too, because the ROGUE system (which was created by Navtech, Harman's U.S. database supplier) coordinates also include altitude so that elevated roads and ramps and overlapping versus intersecting streets are known. Silverman, Street Network, p. 12.

In addition, the use of three-dimensions in a map database for use in vehicle navigation was well-known prior to the critical date of the Davis patent. This claim is obvious in light of the combination of Silverman with any |

2

| Claim | Argument |
|---|---|
| | number of prior art references that teach such a map database, including Thoone, U.S. Patent No. 4,758,959 (HAR 6442-64) (see Col. 7, lines 12-18; Fig. 1(a); Col. 8, lines 51-59); Benning, Digital Maps on Compact Disc SAE 860125 (HAR 093821-29) (see p. 118); Neukirchner, Digital Map Data Bases for Autonomous Vehicle Navigation Systems (HAR 03841-45) (see p. 321) |
| 8. The automobile navigation system of claim 1 wherein said map database includes measures of street quality. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation also covers the ROGUE system, too, because the ROGUE system (which was created by Navtech, Harman's U.S. database supplier) divides streets into several classes: major arteries, minor arteries, and surface streets. (Silverman, p. 3) |
| 9. The automobile navigation system of claim 1 wherein said map database distinguishes divided streets. | The ROGUE map database distinguishes divided streets.  (Silverman, p.6) |
| 10. The automobile navigation system of claim 1 wherein said map database includes landmarks such as signs, traffic lights, stop signs and buildings. | The ROGUE map database includes traffic signals, stop lights, stop signs, road sign text, business locations, tourist attractions, and several types of landmarks. (Silverman, pp. 5-6, 8-9, 12-13) |
| 11. The automobile navigation system of claim 1 wherein said map database includes lane information. | The ROGUE map database includes lane information, such as Chemical lane, Explosive lane, Car pool lane, Truck lane, Bus lane. (Silverman, p. 12) |
| 12. The automobile navigation system of claim 1 wherein said map database includes speed limits. | The ROGUE map database includes speed limits.  (Silverman, p. 5) |
| 13. The automobile navigation system of claim 1 wherein said map database includes expected rate of travel. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation also covers the ROGUE system, too, because the ROGUE map database includes expected traffic patterns in connection with distance and speed limits (Silverman, pp. 5-6); see also, Silverman, p. 8 ("ROGUE's database contains information on traffic patterns and, based on the day and time maintained by its real clock, ROGUE will pick a route that is efficient for the day and time of travel."); Silverman, p. 12 ("Speed limit information is included for all arteries and streets for precise estimates of travel time.") |
| 14. The automobile navigation system of claim 1 wherein said map database includes time-dependent legal connectivity. | The ROGUE map database includes time-dependent legal connectivity, including information that can be "flagged as always true or conditional on dates and/or times," including lane restrictions, road closed, bridge closed, barriers, private road. (Silverman, p. 12)  The ROGUE map database also includes "time of day restrictions." (Silverman, p. 6) |
| 15. The automobile navigation system of claim 1 wherein said map database includes turn difficulty. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation also covers the ROGUE system, too, because in the ROGUE map database left turns are penalized versus right turns as they are both difficult and dangerous. (Silverman, p. 8) |
| 16. The automobile navigation system of claim 1 wherein said map database includes vehicle street, lane, and height restrictions. | The ROGUE map database includes street and lane restrictions. (Silverman, p. 13)  By disclosing truck restrictions (Silverman, p. 6), the ROGUE map database also includes height restrictions. |
| 17. The automobile navigation system of claim 1 wherein said map database includes traffic light cycles. | ROGUE is aware of street lights and other traffic flow information.  (Silverman, pp. 8-9) |
| 18. The automobile navigation system of claim 1 wherein said map database distinguishes where right turn on red is allowed. | ROGUE is aware of street lights and other traffic flow information.  (Silverman, pp. 8-9)  This include turn restrictions (Silverman, p. 12), including time-based restrictions (Silverman, p. 12). |
| 19. The automobile navigation system of claim 1 wherein said map database includes a database of service locations. | The ROGUE map database includes service locations. (Silverman, p. 13) |
| 20. The automobile navigation system of claim 1 wherein | The ROGUE map database includes famous places by name (Silverman, p. 13) |

3

| | |
|---|---|
| said map database includes a listing of famous places by name. | |
| 21. The automobile navigation system of claim 1 further comprising means for updating said map database. | The ROGUE map database is designed to be useable with a broadcast database update that is an interface to the cellular telephone or FM radio broadcasts for real time updates to the ROGUE database. (Silverman, p. 13) |
| 23. The automobile navigation system of claim 1 wherein the map has minimum accuracy of 10 meters. | Although the ROGUE article does not expressly address accuracy, another 102(b) reference, also published by Navtech, notes that a navigational map database must be accurate to within 10 meters. Cass, Digital Databases for Vehicle Navigation: A Review of the State of the Art, presented at Florence, Italy conference, May, 1989! (HAR 102355-66) That same reference discloses that this accuracy can be achieved by dead-reckoning with map matching, which is the same approach disclosed in the ROGUE article. The Cass article establishes that this technique for achieving accuracy was well-known by those of skill in the art (and by Navtech) prior to the critical date of the Davis patent. See also, Cartographic Database Requirements for Land Vehicle Navigation (1984 IEEE) at 28. Thus, to the extent that MIT contends that this claim covers systems in which the map database accuracy is augmented with other technology (such as GPS or map matching, as MIT apparently contends in its infringement claim chart) to achieve an overall accuracy for the system of 10 meters, then this claim is obvious over the combination of Silverman with either of these two articles.

In addition, vehicle navigation map databases with accuracies of 2.5 meters were known prior to the critical date of the Davis patent, and it would have been obvious to those of skill in the automobile navigation art to have such accuracy. See e.g., Neukirchner, Digital Map Data Bases for Autonomous Vehicle Navigation Systems (HAR 03841-45) at p. 320 (Noting requirement of 2.5 meter database accuracy and noting that the Deutsche Grundkarte DGKS is preferable to acheieve such accuracy for German roads) |
| 27. The automobile navigation system of claim 1 wherein said route finder is adapted to find a best route according to any one of three cost metrics: distance, speed, simplicity. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation also covers the ROGUE system, too, because the choice of the route may also be dependent on the driver's interest in minimizing time or distance or in taking a scenic route (Silverman, p.2), and arteries and streets are selected to minimize the combination of time and distance required for the trip under current traffic conditions and employing a reasonably small number of turns. (Silverman, p. 8) |
| 28. The automobile navigation system of claim 1 wherein said route finder is adapted to calculate a new route if the driver or vehicle navigation system makes an error or if the route is unnavigable due to unforeseen circumstances, wherein said new route does not simply backtrack to the point of the error if a better route from the current location exists. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation also covers the ROGUE system, too, because in the ROGUE system driving errors are automatically detected and revised directions are prepared (Silverman, p-1). In the ROGUE system, missed turns, wrong turns and other driving errors are detected and guidance is providing for correcting them. The ROGUE software constantly monitors vehicle location relative to the database and the route being traveled. Any deviations from a planned route are immediately detected by the system, the driver is notified of the error, and new directions are prepared for reaching the destination. (Silverman, pp. 2-3) The ROGUE software handles driver errors by providing an alert through the speech synthesis unit and directions to return to correct path when the driver deviates from a planned route. As ROGUE is always aware of the vehicles' current location, through its road sensors, detection of a driving error is immediate and directions are instantly recalculated. Silverman, |

4

1 20th International Symposium on Automotive Technology & Automation, Florence, Italy, 29th May - 2nd June 1989. See HAR 102354, which cites to the Cass article and includes the entire citation.

| Claim | Reference |
|---|---|
| | Recovery from driving errors, pp. 10-11. |
| 29. The automobile navigation system of claim 1 wherein said route finder is adapted to calculate a new route while the automobile is in motion, wherein said new route will begin from the location of the automobile at the time the calculation of the new route is completed. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation also covers the ROGUE system, too, because as ROGUE is always aware of the vehicles' current location, through its road sensors, detection of a driving error is immediate and directions are instantly recalculated. Silverman, Recovery from driving errors, pp. 10-11. |
| 30. The automobile navigation system of claim 29 wherein an estimated time to find a new route is multiplied by the velocity of the automobile to calculate the position from which the new route should start. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation also covers the ROGUE system, too, because as ROGUE is always aware of the vehicles' current location, through its road sensors, detection of a driving error is immediate and directions are instantly recalculated. Silverman, Recovery from driving errors, pp. 10-11. |
| 32. The automobile navigation system of claim 1 wherein said location system is a position-keeping (dead-reckoning) system. | The technology used in the ROGUE software to track vehicle location is dead reckoning with map matching. Silverman, Positioning, p.11. |
| 33. The automobile navigation system of claim 1 wherein said location system is a hybrid of position-keeping and position-finding systems. | The ROGUE article discloses that GPS could be used, as well, but that GPS was not chosen for the preferred embodiment due to economic considerations. (Silverman, pp. 3, 5) The use of GPS systems or hybrid GPS/dead reckoning navigational systems were well known prior to the critical date of the Davis patent. To the extent that Silverman itself does not anticipate this claim, then this claim is obvious in light of the combination of Silverman with any number of prior art references that teach a hybrid GPS/dead reckoning system. *See e.g.,* Thoone, USPN 4,758,959 (HAR 6442-64) (Col. 7, line 62-Col. 8, line 9 and Col. 24, lines 35-43); Navigation Systems Using GPS for Vehicles SAE 861360 (HAR 093884-99) (Abstract); Digital Maps on Compact Disc - SAE 860125 (HAR 09321-29) (Introduction, p. 15); French, The Evolving Roles of Vehicular Navigation (MIT02422-36) (pp. 216-17, discussing the Navstar GPS combined with dead-reckoning); Wootton, G.B. 2 079 453 A (MIT 03570-82) at 4:1-9; Thoone, The Car Information and Navigation System CARIN and the Use of Compact Disc Interactive SAE 870139 at MIT 00055-56; Maps, Optical Discs, and Vehicle Navigation at MIT 3470; Cartographic Database Requirements for Land Vehicle Navigation (1984 IEEE) at 26; New Navigation System, MAPIX-III (HAR 095056-74) at 2-3, 5, 11-12, 17. *See also,* Davis thesis HAR 001476-1642) at pp. 140-141 (identifying five prior-art hybrid systems). |
| 34. The automobile navigation system of claim 1 wherein said location system employs map matching. | Silverman discloses map matching. Through the use of vehicle mounted sensor hardware, the ROGUE software monitors progress during travel and is aware of vehicle location relative to the database and the rote being driven. (Silverman, p. 1) "Tracking vehicle position relative to the database," (Silverman, p. 5); The technology used in the ROGUE software to track vehicle location is dead reckoning with map matching. (Silverman, Positioning Section. p.11) |
| 35. The automobile navigation system of claim 1 wherein said position sensing apparatus comprises displacement and direction sensors installed in the automobile. | The ROGUE article discloses the use of such sensors (odometer, wheel sensors, accelerometer, differential odometer, steering sensors, electronic compass). (Silverman, p.5) |
| 36. The automobile navigation system of claim 1 wherein said position sensing apparatus measures displacement with an odometer. | The ROGUE article discloses the use of an odometer to measure displacement. (Silverman, p.5) |
| 37. The automobile navigation system of claim 1 wherein said position sensing apparatus measures direction with a magnetic compass. | The ROGUE article discloses the use of an electronic compass to measure direction. (Silverman, p. 5) |
| 38. The automobile navigation system of claim 1 wherein | The ROGUE article discloses the use of a steering sensors to measure direction. (Silverman, p. 5) |

5

| | |
|---|---|
| said position sensing apparatus measures direction by monitoring the turning of the steering wheel. | |
| 39. The automobile navigation system of claim 1 wherein said position sensing apparatus measures direction with a differential odometer. | The ROGUE article discloses the use of a differential odometer to measure direction. (Silverman, p. 5) |
| 40. The automobile navigation system of claim 1 wherein said position sensing apparatus measures direction with a gyroscope. | It was well known prior to the critical date of the Davis patent to use a gyroscope for such purpose in a vehicle navigation system. To the extent that Silverman itself does not render this claim obvious, then this claim is obvious in light of the combination of Silverman with any number of prior art references that teach such use of a gyroscope. *See e.g.*, Cooke, Maps, Optical Discs, and Vehicle Navigation at MIT 3467; Wootton, G.B. 2 079 453 A (MIT 03570-82) at 2:53, 8:20; CARGuide-on-board computer for automobile route guidance (MIT 1894-1905) at p. 697; Digital Maps on Compact Disc, SAE 860125 (HAR 0932 1-29) (Introduction, p. 115); Yokoyama, US Patent No. 5,043,902 (HAR 093571-85) at Col. 1, line 24 (also PCT Publ. WO/89/06342) (HAR 097412-42); Ono, CD-ROM Assisted Navigation System (HAR 093766-67) at Figs 1-2, p. 118. |
| 41. The automobile navigation system of claim 1 wherein said discourse generator is based on an object-oriented programming methodology. | Prior to the critical date of the Davis patent, it was well known within the art of vehicle navigation systems that an object-oriented programming language, such as C++, could be used to program navigation software, including a discourse generator. The C++ language has been around since the early to mid 1980's. *See e.g.*, Bjarne Stroustrup: The C++ Programming Language. Addison-Wesley, Reading, MA. 1986. ISBN 0-201-12078; http://www.httml.com/programming/cpp/cppHistory.html. |
| 42. The automobile navigation system of claim 1 wherein each intersection in a route is classified into one type in a taxonomy of intersection types, and the discourse generated in relation to each said intersection depends on its type. | For simple turns the distances between turns, the street to turn onto and the direction of turn is given. Entries and exits from limited access roads and tricky intersections are clarified with more detailed information such as street sign text. Silverman, Textual directions section, p. 9. The map database includes classifications of intersections, such as freeway exits and entrances. (Silverman, pp. 5-6) Silverman, Figure 6 shows that the discourse generated depends on the intersection type (e.g. right, exit, merge). |
| 44. The automobile navigation system of claim 42 wherein said discourse generated further depends on a description function for each intersection type which generates a description given the length and tense of the desired description and the position along the route from which an instruction is to be given. | For simple turns the distances between turns, the street to turn onto and the direction of turn is given. Entries and exits from limited access roads and tricky intersections are clarified with more detailed information such as street sign text. Silverman, Textual directions section, p. 9. The map database includes classifications of intersections, such as freeway exits and entrances. (Silverman, pp. 5-6) Silverman, Figure 6 shows that the discourse generated depends on the intersection type (e.g., right, exit, merge) and takes into account the position along the route from which an instruction is to be given.

The ROGUE software provides to the driver an analog of a knowledgeable passenger giving driving directions both through the use of spoken instructions and in giving its guidance when and where driving actions are needed. (Silverman, p.2) ROGUE's textual directions focus on turns and are designed to mimic a good navigator sitting next to the driver. The ROGUE software uses its vehicle sensors to track the progress of the vehicle along a route. This information allows the presentation of navigation guidance to follow the progress of travel. ROGUE offers four types of guidance to assist the driver in following a route, including spoken guidance during travel. Silverman, Route Guidance, p. 9. ROGUE can also provide its textual directions verbally. The textual portion of the screen is spoken by the ROGUE speech synthesis hardware. The direction for the turn is spoken to the driver. Silverman, Guidance during travel, p. 10. |
| 45. The automobile navigation system of claim 1 wherein said discourse generated comprises a long description of | The ROGUE system first speaks the (longer) textual instructions. As the distance displayed for an instruction approaches 0.0 miles and ROGUE detects that the vehicle is approaching a turn, the (shorter) direction for the |

6

| | |
|---|---|
| an act given substantially before the act is to be performed and a short description given at the time the act is to be performed. | turn is spoken to the driver. Silverman, p. 10. |
| 46. The automobile navigation system of claim 45 wherein said long descriptions includes cues. | Silverman discloses the use of cues in the (long) textual descriptions that are spoken to the driver. Silverman, p. 10 (disclosing the use of cues in the form of street names).<br><br>In addition, prior to the critical date of the Davis patent, it was well known within the art of vehicle navigation systems to include a cues for route description, including landmarks. *See e.g.* Streeter, How to tell people where to go: comparing navigational aids at p. 552-54. (HAR 006292-306) |
| 47. The automobile navigation system of claim 46 wherein said cue is a landmark. | Prior to the critical date of the Davis patent, it was well known within the art of vehicle navigation systems to include a cues for route description, including landmarks. *See e.g.* Streeter, How to tell people where to go: comparing navigational aids at p. 552-54. (HAR 006292-306) |
| 48. The automobile navigation system of claim 1 wherein said driver input means includes means for said driver to demand immediate instruction, or clarification or repetition of instructions already provided. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this claim is invalid as obvious. Prior to the critical date of the Davis patent, it was well known within the art of vehicle navigation systems to include a key that could be pressed to cause the system to repeat an instruction or to provide immediate instructions. It would have been obvious to combine Silverman with any of the references that disclose such an input device, including Wootton, UKPA 2 079 453 A (MIT 03570-82) (4:12-40, 5:24-28, 7:1-6 and 29-33); Nimura, U.S. Pat. No. 4,992,947 (HAR 095157-88) (*see* Col. 9, line 39 to Col. 11, line 24). |
| 49. The automobile navigation system of claim 1 wherein said driver input means includes means for said driver to indicate to said automobile navigation system that a given instruction provided by said system is impossible to complete for some reason and that a new route must be calculated. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this claim is invalid as obvious. Prior to the critical date of the Davis patent, it was well known within the art of vehicle navigation systems to include a key that could be pressed to cause the system to calculate a new route. It would have been obvious to combine Silverman with any of the references that disclose such an input device, including Nimura, U.S. Pat. No. 4,992,947 (HAR 095157-88) (*see* Col. 9, line 39 to Col. 11, line 24); Wootton, UKPA 2 079 453 A (MIT 03570-82) (*see* 4:12-40, 5:24-28, 7:1-6); Zeevi, U.S. Pat. No. 4,878,170 (Davis Dep. Exh. 83) (*see* Col. 8, lines 42-49); Cartographic Database Requirements for Land Vehicle Navigation (1984 IEEE) (*see* p. 20) |
| 50. The automobile navigation system of claim 1 wherein said driver input means comprises a voice recognition system to allow at least some driver input to be spoken. | Silverman discloses the use of "voice recognition hardware to allow verbal command of the software while driving." (p.13) In addition, the use of such hardware and voice input for use in vehicle navigation was well-known prior to the critical date of the Davis patent. To the extent the disclosure of Silverman itself does not render this claim invalid as anticipated or obvious, then this claim is obvious in light of the combination of Silverman with any number of prior art references that teach such use of speech input, including Wootton, G.B. 2 079 453 A (MIT 03570-82) at 2:39-40; Benning, Digital Maps on Compact Disc SAE 860125 (HAR 09321-29) at 117 (discussing desirability of speech recognition, but at lower cost and higher reliability than that which was commercially available in February 1986); Savage, U.S. Patent No. 4,954,958 (HAR 093473-95) at Fig. 11 and Col. 3, line 15. *See also,* French, Mobile Information Systems Impact Study (HAR094602-855) at Exhibit 13 (Features of Current [as of 1988] Systems (identify systems that include voice recognition (VR) input, including Chrysler's CLASS system, Ford's Trip Monitor system) and p. 94. |
| 51. The automobile navigation system of claim 1 wherein said automobile navigation system records a history of the route and the discourse already generated and uses this knowledge to generate cues for future discourse and make | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation also covers the ROUGE system, too, because the dialogue generated in the ROUGE system uses earlier directions to generate future directions that include cues (such as, for example, street names or business locations). Silverman, Fig. 6. |

| | |
|---|---|
| future discourse more understandable. | |
| 52. The automobile navigation system of claim 1 wherein said automobile navigation system warns drivers of dangers inferred from knowledge of the road network. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this limitation also covers the ROGUE system, too, because Silverman discloses the use of information that can be stored where appropriate and used to navigate routes, including warnings such as construction, obstruction, road closed, bridge closed, falling rock zone, deer crossing, and draw bridge, for example. Silverman, p. 12.<br><br>In addition, it was well known to those of skill in the art to provide such a feature in a vehicle navigation system, and it would have been obvious to combine Silverman with any reference that discloses a vehicle navigation system with such a warning feature, including, for example, Neukirchner, Digital Map Data Bases for Autonomous Vehicle Navigation Systems (HAR 03841-45) at p. 322 (noting Warning attributes in order to warn drivers in advance) |
| 53. The automobile navigation system of claim 1 wherein said automobile navigation system informs a driver if an error has been made as detected by the location system. | Any deviations from a planned route are immediately detected by the system, the driver is notified of the error, and new directions are prepared for reaching the destination. (pp. 2-3) The ROGUE software handles driver errors by providing an alert through the speech synthesis unit. Silverman, Recovery from driving errors, pp. 10-11. |
| 54. The automobile navigation system of claim 1 wherein said discourse generator is responsive to a user-model stored in said computing apparatus to customize discourse to the requirements and preferences of said driver. | To the extent MIT contends that this limitation should be broadly construed so as to cover the Harman system, then this claim is invalid as obvious. The use of optional languages or voices (*e.g.*, male or female) in a vehicle navigation system was well known to those of skill in the art prior to the critical date of the Davis patent, and it would have been obvious to combine Silverman with such knowledge. *See e.g.*, Tsugawa, Route Guidance System for Automobile Drivers by Speech Synthesis (MIT 01906-11). |
| 55. The automobile navigation system of claim 1 wherein said speech generator is a speech synthesizer. | The textual portion of the screen is spoken by the ROGUE speech synthesis hardware. The direction for the turn is spoken to the driver. Silverman, Guidance during travel, p. 10; Figure 2. |
| 56. The automobile navigation system of claim 1 wherein said speech generator uses digitized speech. | The use of digitized speech was well known to those of skill in the art for use in vehicle navigation systems prior to the critical date of the Davis patent. To the extent that Silverman itself does not render this claim anticipated or obvious, then this claim is obvious in light of the combination of Silverman with any number of prior art references that teach such use of digitized speech. *See e.g.*, Tsugawa, Route Guidance System for Automobile Drivers by Speech Synthesis (MIT 01906-11) (speech data ROM, Abstract, Figure 4, and p. 311); Wootton, G.B. 2 079 453 A (MIT 03570-82) at 3:61-63; Ono, CD-ROM Assisted Navigation System (HAR 093766-67) at Figs. 1-3 and p. 119. |

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**MASSACHUSETTS INSTITUTE OF TECHNOLOGY,**

<div style="text-align:center">Plaintiff,</div>

v.

**HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED,**

<div style="text-align:center">Defendant.</div>

**Case No: 05-10990 DPW**
**Hon. Douglas P. Woodlock**

## MIT'S RESPONSE TO HARMAN'S
## SECOND SET OF INTERROGATORIES (Nos. 8-20)

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff, Massachusetts Institute of Technology ("MIT") submits the following responses and objections to Harman International Industries, Incorporated's ("Harman's") Second Set of Interrogatories (Nos. 8-20) (the "Interrogatories").

## GENERAL OBJECTIONS

The following general statements and objections are incorporated into each of MIT's responses, as set forth there in full, even if not repeated therein:

1.    MIT objects to Harman's method of counting, but under Harman's counting method, Harman has served sixty-one (61) interrogatories, and thus has exceeded the twenty-five (25) permitted by Rule 33 of the Federal Rules of Civil Procedure.  Upon mutual agreement of counsel as to method of counting the parties' respective interrogatories, MIT will provide additional appropriate responses, if necessary.

2.    MIT objects to the Interrogatories to the extent they call for disclosure of information protected by the attorney-client privilege, work-product doctrine, and/or any other privilege or immunity.  In the event that any response given by MIT contains privileged or protected information, its disclosure is inadvertent and shall not constitute a waiver of any privilege or protection with respect to the divulged information or any other information.

3.    MIT objects to the Interrogatories to the extent they attempt or purport to impose obligations on MIT beyond those required by the Federal Rules of Civil Procedure 26 and 33, or the Local Rules of Practice of the United States District Court for the District of Massachusetts.

4.    MIT objects to the Interrogatories to the extent that they seek information already in Harman's possession, equally available to Harman, and/or publicly available.

5.    MIT objects to the Interrogatories to the extent that they seek information not in the possession, custody, or control of MIT, information not owned or belonging to MIT, or information that is subject to a non-disclosure obligation pursuant to a confidentiality agreement with a third-party.

6.    MIT objects to the Interrogatories to the extent that they are vague, ambiguous, and/or confusing, incomprehensible and/or unanswerable because of undefined or ill-defined terms and/or confusing syntax, or they fail to describe with reasonable particularity the information sought.

7.    MIT objects to the Interrogatories to the extent that they are overly broad, unduly burdensome, oppressive, and/or designed solely to harass MIT.

8.    MIT objects to the Interrogatories to the extent that they seek information not relevant to the subject matter of the present lawsuit and/or are not reasonably calculated to lead to the discovery of admissible evidence.

2

9.    The information supplied in MIT's responses may not be based solely upon the knowledge of the executing parties, but may include the knowledge of MIT's agents, representatives, and attorney(s), unless privileged.

10.    MIT expressly reserves all objections as to relevance and/or admissibility of any information disclosed in its objections and/or responses.

11.    MIT's willingness to provide responses to any of the Interrogatories is not a concession that the subject matter of the particular Interrogatory is discoverable, relevant to this action, or admissible as evidence.

12.    To the extent MIT adopts any terms used by Harman in its Interrogatories, such adoption is specifically limited to the objection and responses herein, and does not constitute an admission of law or fact by MIT.

13.    The presence or absence of any general or specific objection does not mean that MIT does not object on any other grounds.

14.    MIT has responded to the Interrogatories as it interprets and understands each Interrogatory made therein.  If Harman subsequently asserts an interpretation of any Interrogatory that differs from the understanding of MIT, MIT reserves the right to supplement its objections and responses.

15.    MIT incorporates its General Objections to Harman's First and Second Sets of Requests for the Production of Documents and Things (Nos. 1-29; 30-61) as if fully set forth herein.

16.    The responses set forth below are based on information presently known to MIT.  MIT expressly reserves the right to complete its investigation and discovery of the facts and to rely, at the time of trial or in other proceedings, upon documents and evidence in addition to the information provided regardless of whether such information is newly discovered or currently in

existence. MIT may, in the future, obtain or locate additional information responsive to these Interrogatories. Further, a complete response to certain Interrogatories depends in part upon information to be adduced from Harman or third parties during discovery. MIT, therefore, reserves its right, at any time, to revise, amend, correct, supplement, modify, or clarify its responses, on a timely basis, in accordance with Federal Rules of Civil Procedure 26 and 33.

## SPECIFIC OBJECTIONS AND RESPONSES

### INTERROGATORY NO. 8

Describe in detail the nature and total dollar amount of the "damages" that MIT has allegedly suffered due to Harman's alleged infringement, including a description of any "reasonable royalty" damages, the applicable royalty rate, the amount and type of Harman's sales or other activity to which the royalty rate should be applied, and the identification of all evidence that MIT contends supports any such alleged damages, rates, and amounts.

### RESPONSE TO INTERROGATORY NO. 8

MIT objects to this Interrogatory as premature, because MIT has not yet completed its factual and legal analysis with regard to damages. MIT further objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges or immunities.

Subject to and without waiving the foregoing general and specific objections, MIT states that it will timely submit the report(s) of its expert(s) with respect to damages, and thus intends to supplement this Interrogatory in a timely manner, after completion of any such report(s).

4

**INTERROGATORY NO. 9**

To the extent that MIT disagrees with any of the invalidity positions set forth in the

Harman's latest supplemental response to MIT's Interrogatory No. 5, served herewith, explain in

detail all bases for MIT's disagreement. MIT's response should include, *inter alia*, a detailed

explanation of any disagreement MIT has with any of the information, statements, or positions

set forth in the claim charts included with Harman's supplemental response.

**RESPONSE TO INTERROGATORY NO. 9**

MIT objects to this Interrogatory because MIT has not yet completed its factual and legal

analysis with regard to Harman's invalidity contentions and thus contention interrogatories

regarding validity are premature at this stage of the litigation. MIT further objects to this

Interrogatory because it seeks information protected by the attorney-client privilege, work

product doctrine, and/or other applicable privileges or immunities. MIT further objects to this

Interrogatory because it calls for a legal conclusion with respect to validity.

Subject to and without waiving the foregoing general and specific objections, MIT states

that it will timely submit the report(s) of its expert(s) with respect to validity, and thus intends to

supplement this Interrogatory in a timely manner, after completion of any such report(s).

**INTERROGATORY NO. 10**

To the extent that MIT disagrees with any of the information and positions taken in

Meredith Addy's invalidity opinion (HAR 089895-089954, including the claim charts attached

thereto), explain in detail all bases for MIT's disagreement.

**RESPONSE TO INTERROGATORY NO. 10**

MIT objects to this Interrogatory because MIT has not yet completed its factual and legal

analysis with regard to Harman's invalidity contentions and thus contention interrogatories

regarding validity are premature at this stage of the litigation. MIT further objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges or immunities. MIT further objects to this Interrogatory because it calls for a legal conclusion with respect to validity. Finally, MIT objects because Ms. Addy has not yet been deposed.

Subject to and without waiving the foregoing general and specific objections, MIT states that it will timely submit the report(s) of its expert(s) with respect to validity, and thus intends to supplement this Interrogatory in a timely manner, after completion of any such report(s).

**INTERROGATORY NO. 11**

The Schmandt and Davis, "Synthetic Speech for Real Time Direction-Giving" publication (MIT 01101-02) notes "field trials" of the Back Seat Driver that occurred more than 1 year before the filing date of U.S. Patent No. 5,177,685. Mr. Davis' thesis (*see* HAR 001479) also notes that the Back Seat Driver had been used more than 1 year before the filing date of U.S. Patent No. 5,177,685. For each asserted claim of United States Patent No. 5,177,685, identify each and every limitation of the claim that MIT contends was not embodied in a field trial prior to August 9, 1989, and explain in detail all bases for any contention by MIT that such field trials do not render each asserted claim of the '685 patent invalid under 35 U.S.C. § 102(b).

**RESPONSE TO INTERROGATORY NO. 11**

MIT objects to this Interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. MIT further objects to this Interrogatory because it calls for a legal conclusion with respect to validity. MIT further objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges or immunities.

6

Subject to and without waiving the foregoing general and specific objections, MIT states that the field trials do not constitute invalidating prior art under 35 U.S.C. § 102; but to the extent Harman contends they do relate to prior art, MIT will timely submit the report(s) of its expert(s) with respect to validity, and thus intends to supplement this Interrogatory in a timely manner, after completion of any such report(s). MIT further incorporates by reference the deposition testimony of Dr. James R. Davis, Ph.D. and Christopher M. Schmandt in response to this Interrogatory, where questions related to this line of interrogatory were answered.

**INTERROGATORY NO. 12**

To the extent MIT contends there exist any secondary considerations or indicia that support a finding of non-obviousness of any claim(s) of U.S. Patent No. 5,177,685, identify all alleged bases for any such contention and all documents or other materials that support MIT's contention.

**RESPONSE TO INTERROGATORY NO. 12**

MIT objects to this Interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. MIT further objects to this Interrogatory because it calls for a legal conclusion with respect to obviousness, non-obviousness and/or secondary considerations. MIT further objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges or immunities.

Subject to and without waiving the foregoing general and specific objections, MIT states that it will timely submit the report(s) of its expert(s) with respect to validity, and thus intends to supplement this Interrogatory in a timely manner, after completion of any such report(s). At this time, it appears that there are numerous objective indicia of non-obviousness, discussed in detail

7

in the several depositions taken to date, including long felt, but un-met need as expressed by, for example, various prophetic articles cited by Harman, which describe the wishes of many for a working product, but which singularly or in combination fail to disclose or suggest a working embodiment of the claimed invention as well as commercial success by the accused infringer.

**INTERROGATORY NO. 13**

For each claim of U.S. Patent No. 5,177,685, identify the date(s) on which the subject matter recited therein was first completely conceived, and identify by Bates number all documents or other material that evidence all such date(s) in any way.

**RESPONSE TO INTERROGATORY NO. 13**

MIT objects to this Interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. MIT further objects to this Interrogatory as premature to the extent that it calls for a legal conclusion with respect to conception. MIT further objects to this Interrogatory to the extent that it mischaracterizes the legal standard for conception. MIT further objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges or immunities.

Subject to and without waiving the foregoing general and specific objections, MIT objects to the phrase "completely conceived", but states that the subject matter of the '685 patent was conceived before the filing date of the application on which the '685 patent issued. The details of the conception were fully described in answer to numerous questions to the inventors propounded during the deposition testimony of Dr. James R. Davis, Ph.D. and Christopher M. Schmandt and in response to this Interrogatory, and those answers are herein incorporated by reference.

**INTERROGATORY NO. 14**

For each claim of U.S. Patent No. 5,177,685, identify the earliest date(s), if any, on which the subject matter recited therein was first actually reduced to practice, and identify by Bates number all documents or other material that supported all such date(s).

**RESPONSE TO INTERROGATORY NO. 14**

MIT objects to this Interrogatory as premature to the extent that it calls for a legal conclusion with respect to reduction to practice. MIT further objects to this Interrogatory to the extent that it mischaracterizes the legal standard for reduction to practice. MIT further objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges or immunities.

Subject to and without waiving the foregoing general and specific objections, MIT states that the subject matter of the '685 patent was reduced to practice before the filing date of the application on which the '685 patent issued. The details of the reduction to practice were fully described in answer to numerous questions to the inventors propounded during the deposition testimony of Dr. James R. Davis, Ph.D. and Christopher M. Schmandt and in response to this Interrogatory, those answers are herein incorporated by reference.

**INTERROGATORY NO. 15**

For each claim of U.S. Patent No. 5,177,685, explain in detail (including an identification by Bates number of all documents that evidence in any way) all alleged diligence by or on behalf of Mr. Davis and/or Mr. Schmandt in reducing to practice the subject matter recited in the claim.

**RESPONSE TO INTERROGATORY NO. 15**

MIT objects to this Interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. MIT further objects to this

Interrogatory as premature to the extent that it calls for a legal conclusion with respect to

diligence and/or reduction to practice.  MIT further objects to this Interrogatory to the extent that

it mischaracterizes the legal standard for diligence and/or reduction to practice.  MIT further

objects to this Interrogatory because it seeks information protected by the attorney-client

privilege, work product doctrine, and/or other applicable privileges or immunities.

Subject to and without waiving the foregoing general and specific objections, the details

of the diligence towards reduction to practice were fully described in answer to numerous

questions to the inventors propounded during the deposition testimony of Dr. James R. Davis,

Ph.D. and Christopher M. Schmandt and in response to this Interrogatory, those answers are

herein incorporated by reference.

## INTERROGATORY NO. 16

To the extent that MIT contends any of these asserted claims of U.S. Patent No.

5,177,685 are not rendered obvious by the combination of Schmandt and Davis, "Synthetic

Speech for Real Time Direction-Giving" (MIT 01101-02) in light of the Direction assistance

display that was in public use at the Computer Museum in Boston on or before August 8, 1989

(noted in Davis' deposition), explain in detail each and every basis for all such contentions.  In

particular, identify the limitation(s) of each claim (including dependent claims) that are allegedly

not present in the combination, and include an explanation as to why what is present in the

combination does not fall within the scope of the limitation.

## RESPONSE TO INTERROGATORY NO. 16

MIT objects to this Interrogatory as overly broad, unduly burdensome, and not

reasonably calculated to lead to the discovery of admissible evidence.  MIT further objects to this

Interrogatory because it calls for a legal conclusion with respect to obviousness and/or non-

obviousness. MIT further objects to this Interrogatory to the extent that it mischaracterizes the legal standard for combining references. MIT further objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges or immunities.

Subject to and without waiving the foregoing general and specific objections, MIT states that it will timely submit the report(s) of its expert(s) with respect to validity, and thus intends to supplement this Interrogatory in a timely manner, after completion of any such report(s). MIT further incorporates by reference the deposition testimony of Dr. James R. Davis, Ph.D. and Christopher M. Schmandt in response to this Interrogatory.

## INTERROGATORY NO. 17

For each individual who participated in the preparation and/or prosecution of U.S. Patent No. 5,177,685, provide that person's name and describe in detail that person's role or responsibility in such preparation and/or prosecution.

## RESPONSE TO INTERROGATORY NO. 17

MIT objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges or immunities.

Subject to and without waiving the foregoing general and specific objections, Dr. Samuel "Bo" Pasternack, Ph.D., Diane Gaylor, Dr. James R. Davis, Ph.D., and Christopher M. Schmandt participated in some manner in portions of the preparation and prosecution of the patent application.

## INTERROGATORY NO. 18

Explain in detail why the following references or information were not provided to the Examiner during the prosecution of U.S. Patent No. 5,177,685:

- Davis and Trobaugh, "Direction Assistance" article (Davis Dep. Exh. 73);

- Information about the public use in the Computer Museum in Boston of the Direction Assistance display more than one year before the filing date of the application for the '685 patent;

- Each of the references that were not provided to the Examiner even though they were identified in the September, 1990 Information Disclosure Statement (and/or the Form PTO-1449 provided therewith) that was submitted to the U.S. Patent and Trademark Office in connection with the prosecution of the application for U.S. Patent No. 5,177,685.

**RESPONSE TO INTERROGATORY NO. 18**

MIT objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges or immunities. Notwithstanding the objection, if the information Harman contends herein was not in fact provided to the Patent Office and/or was not readily available to the Examiner, it was not provided because no rule, regulation or statute required its production, it was neither material nor relevant to the allowability of the claims of the patent application, and MIT met and/or exceeded all of its disclosure obligations.

**INTERROGATORY NO. 19**

Identify each witness that MIT plans to call to testify at trial in this case or in any hearing before the Court in this case.

**RESPONSE TO INTERROGATORY NO. 19**

MIT objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges or immunities. MIT further objects to this Interrogatory as premature because discovery is ongoing in this litigation. MIT will identify such witnesses when required by the Court (currently set for October 6, 2006).

**INTERROGATORY NO. 20**

Describe in detail all steps, if any, taken by MIT prior to filing of this suit in order to determine whether any Harman products fall within the scope of any properly construed claim of U.S. Patent No. 5,177,685, including an identification of all documents or other materials that evidence all such steps.

**RESPONSE TO INTERROGATORY NO. 20**

MIT objects to this Interrogatory because it seeks information protected by the attorney-client privilege, work product doctrine, and/or other applicable privileges or immunities. MIT further objects to this Interrogatory as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Dated: April 21, 2006

Respectfully submitted,

Massachusetts Institute of Technology,

By its Attorneys,

/s/ John W. Pint
Steven M. Bauer (BBO# 542531)
Kimberly A. Mottley (BBO# 651190)
John W. Pint (BBO# 660548)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110-2600
Phone: 617-526-9600
Fax:    617-526-9899

## CERTIFICATION

I, the undersigned, have reviewed MIT's Responses to Harman's Second Set of Interrogatories (Nos. 8-20). The responses set forth herein, subject to inadvertent or undiscovered errors or omissions, are based on and therefore necessarily limited by the records and information still in existence, presently recollected, thus far discovered in the course of preparation of the responses, and currently available to MIT. Consequently, MIT reserves the right to make any changes in or additions to any of these responses if it appears at any time that errors or omissions have been made therein or that more accurate or complete information has become available. Subject to the limitations set forth herein, said responses are true to the best of my present knowledge, information and belief.

I hereby certify under penalty of perjury that the foregoing is true and correct.

Executed on this __th day of April, 2006.


_____
John H. Turner, Jr.
Associate Director, Technology Licensing Office
On behalf of Massachusetts Institute of Technology

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 21, 2006, I caused a true and correct copy of MIT's

RESPONSES TO HARMAN'S SECOND SET OF INTERROGATORIES (NOS. 8-20) to be

served on the following counsel of record via email:

Robert J. Muldoon, Jr.
**SHERIN AND LODGEN, LLP**
101 Federal Street
Boston, MA  02110

William A. Streff Jr., P.C.
Michelle A. H. Francis
Craig D. Leavell
Ann H. Chen
Colleen M. Garlington
**KIRKLAND & ELLIS LLP**
200 East Randolph Drive
Chicago, IL  60601
(312) 861-2000 (phone)
(312) 861-2200 (fax)


By:     /s/ John W. Pint_____
        John W. Pint

15

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Civil Action No.: 05-10990 DPW |
| HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, | ) ) ) |
| Defendant. | ) ) ) ) |

## NOTICE OF HARMAN'S FIRST RULE 30(b)(6) DEPOSITION OF MIT

In accordance with the provisions of Rules 26 and 30 of the Federal Rules of Civil Procedure, Harman hereby provides notice that commencing at 9:00 a.m. on April 18, 2006, at Sherin and Lodgen LLP, 101 Federal Street, Boston, MA 02110, or at such other place and time as may be mutually agreed upon the parties, Harman will take the deposition of Massachusetts Institute of Technology (MIT) by oral examination of witness(es) designated by MIT to testify on its behalf as the person(s) most competent to testify concerning the topics listed below. Pursuant to Federal Rule of Civil Procedure 30(b)(6), the person(s) designated by MIT should be prepared to testify as to such matters known or reasonably available to MIT.

MIT is requested to provide counsel for Harman, one week prior to the agreed commencement of the instant deposition, a written designation of the names and positions of the persons who are most competent to testify concerning the matters set forth below, and, for each person designated, the matters on which he or she will testify.

The depositions will be taken upon oral examination before an official authorized by law to administer oaths and will continue from day to day until completed. Pursuant to Rule

30(b)(2), testimony of the witness(es) may be recorded by both stenographic means and sound-and-visual means.

## TOPICS

1.  MIT's understanding of the proper construction of each limitation of each claim of U.S. Patent No. 5,177,685 that MIT contends may be infringed by any Harman product, and any intrinsic and extrinsic evidence that MIT believes supports each such construction.

2.  The date(s) on which each of the following (or other versions or drafts of the same) were published, cataloged (as in, for example, in a MIT library or other collection), made available to the public, or otherwise shared with anyone outside of MIT before August 9, 1989:

    - Mr. Davis' thesis paper (HAR 001476-1642)

    - "A voice interface to a direction giving program" by James R. Davis, Technical Report 2, MIT Media Laboratory Speech Group.

    - "Direction Assistance" by J.R. Davis et al., Technical Report 1, MIT Media Laboratory Speech Group.

3.  Any evidence that any of the items identified in category no. 2 above (or drafts of the same) were the subject of any steps to preserve their confidentiality during the time period prior to August 9, 1989.

4.  MIT's normal operating procedures, in the late 1980's to early 1990's time frame with respect to the cataloging and/or publication of materials such as those identified in category no. 2 above.

5.  The steps, if any, taken by MIT prior to filing of this suit in order to determine whether any Harman products fall within the scope of any properly construed claim of U.S. Patent No. 5,177,685.

6.  MIT's understanding of the validity of the asserted claims of U.S. Patent No. 5,177,685 in light of the prior art and invalidity positions identified in (a) Meredith Addy's opinion letter (HAR 089895-089954, including the claim charts attached thereto); and (b) Harman's March 22, 2006 supplemental response to MIT's Interrogatory No. 5 (including, *inter alia*, the claim charts attached thereto).

7.  The Schmandt and Davis, "Synthetic Speech for Real Time Direction-Giving" publication (MIT 01101) identifies "field trials" of the Back Seat Driver, which occurred more than 1 year before the filing date of U.S. Patent No. 5,177,685, as does Mr. Davis' thesis (see page 3). For each asserted claim of United States Patent No. 5,177,685, the identification of each and every limitation of the claim that was not embodied in a field trial prior to August 9, 1989, and the identification of any evidence relating thereto.

2

00107702.DOC /

Dated: March 22, 2006                    Respectfully submitted,

                                         Robert J. Muldoon, Jr., BBO# 359480
                                         James W. Matthews, BBO# 560560
                                         Edward S. Cheng, BBO# 634063
                                         Courtney A. Clark, BBO# 651381
                                         **SHERIN AND LODGEN, LLP**
                                         101 Federal Street
                                         Boston, MA 02110

                                         William A. Streff Jr., P.C.
                                         Craig D. Leavell
                                         Michelle A.H. Francis
                                         Ann H. Chen
                                         **KIRKLAND & ELLIS LLP**
                                         200 E. Randolph Dr.
                                         Chicago, IL 60601
                                         (312) 861-2000 (phone)
                                         (312) 861-2200 (fax)

                                         *Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **NOTICE OF HARMAN'S FIRST RULE**

**30(b)(6) DEPOSITION OF MIT** was hand delivered this 22nd day of March, 2006, to counsel

for MIT as follows:

> Steven M. Bauer
> David J. Cerveny
> Kimberly A. Mottley
> Proskauer Rose LLP
> One International Place, 14th Floor
> Boston, MA 02110-2600

00107702.DOC /

4

# EXHIBIT D

# PROSKAUER ROSE LLP

One International Place
22nd Floor
Boston, MA 02110
Telephone 617-526-9600
Fax 617-526-9899

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

**Kimberly A. Mottley**
Direct Dial: 617-526-9616
Email: kmottley@proskauer.com

April 13, 2006

***Via Electronic Mail***

Craig D. Leavell, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois  60601

Re:     <u>MIT v. Harman International Industries, Inc.</u>, No. 05-10990 DPW (D. Mass.)

Dear Craig:

We are in receipt of Harman's March 22, 2006 Notice of Rule 30(b)(6) Deposition of MIT (the "Notice") in connection with the above-captioned lawsuit.

Pursuant to Fed. R. Civ. P. 26 and 30, MIT hereby objects to the Notice on the following grounds.  MIT's General Objections, as stated in its Responses to Harman's First Set of Requests for the Production of Documents and Things (Nos. 1-29) are incorporated herein by reference.  MIT further objects on the following grounds:

1.     MIT specifically objects to Topic 1 as seeking legal conclusion testimony on which fact depositions are inappropriate.  MIT will brief its positions on claim construction when requested by the Court.

2.     MIT specifically objects to Topic 2 as it presumes facts not in evidence, is overly broad and unduly burdensome, and to the extent that it seeks information subject to the attorney client privilege and/or work product doctrines.

3.     MIT specifically objects to Topic 3 as it is overly broad and unduly burdensome, and to the extent that it seeks information subject to the attorney client privilege and/or work product doctrines.

4.     MIT specifically objects to Topic 4 as it presumes facts not in evidence, is ambiguous as to the time frame, and is overly broad and unduly burdensome.

5.     MIT specifically objects to Topic 5 as it seeks information protected by the attorney-client privilege and work product doctrines.

**PROSKAUER ROSE LLP**

Craig D. Leavell, Esq.
April 13, 2006
Page 2

6.    MIT specifically objects to Topic 6 as seeking legal conclusion testimony on which fact depositions are inappropriate.  MIT may rely upon expert testimony as to the issues included within Topic 6, and Harman will get the chance to depose MIT's experts on those issues, to the extent such issues are within the scope of their expert reports.

7.    MIT specifically objects to Topic 7 to the extent that it calls for legal conclusion testimony on which fact depositions are inappropriate.

                          *              *              *

Subject to, and notwithstanding the above-listed objections, MIT is willing to produce Chris Schmandt to provide testimony on MIT's behalf as to the non-objectionable portions of Topics 2, 3, 4 and 7 on May 2, 2006, at Proskauer's Boston Office.

                                        Sincerely,

                                        Kimberly A. Mottley

# EXHIBIT E

**PROSKAUER ROSE LLP**

One International Place
22nd Floor
Boston, MA 02110
Telephone 617-526-9600
Fax 617-526-9899

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

**Kimberly A. Mottley**
Direct Dial: 617-526-9616
Email: kmottley@proskauer.com

April 27, 2006

*Via Electronic Mail*

Craig D. Leavell, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

Re:    MIT v. Harman International Industries, Inc., No. 05-10990 DPW (D. Mass.)

Dear Craig:

I write in response to your April 24 and 25 letters concerning MIT's 30(b)(6) deposition and recent interrogatory responses, and in response to Ms. Garlington's April 26 letter concerning the depositions of Mr. Call and Dr. Pasternack. This letter is meant briefly to address the issues raised therein, although I am happy to discuss these issues further with you on tomorrow's 2:00 p.m. call.

Harman has requested from MIT contention 30(b)(6) deposition testimony (Topics 1 and 6, and 7 to the extent that it calls for legal conclusions as to claim limitations), and contention interrogatory responses (9, 10, 12, 16, and 11 to the extent that it calls for legal conclusions as to claim limitations and invalidity contentions). Contentions are not appropriate topics for fact discovery. As MIT stated in its objections to Harman's requests, MIT will provide its validity and damages contentions through its expert reports and the depositions of its experts.

However, having exchanged our preliminary claim constructions, we think it makes sense to start discussions about where we might be able to reach agreement, and to narrow and clearly identify any disputes that we may not be able to resolve. Please let us know when you are available next week to start these discussions.

Also, enclosed herewith are supplemental responses to Interrogatories 11-15.

**PROSKAUER ROSE LLP**

Craig D. Leavell, Esq.
April 25, 2006
Page 2

<p align="center">*          *          *</p>

Finally, we will agree to reschedule the depositions of Mr. Call to May 11, Dr. Pasternack to May 12, and MIT's 30(b)(6) deponent to May 19, in Proskauer's Boston office, as a courtesy to Harman.

Sincerely,

*Kimberly A. Mottley*

Kimberly A. Mottley

Enclosure

# EXHIBIT F

Not Reported in F.Supp.2d                                                  **Page   1**
Not Reported in F.Supp.2d, 2001 WL 1381098 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d)**
**H**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.
ADC TELECOMMUNICATIONS, INC., Plaintiff,
v.
THOMAS & BETTS CORPORATION and
AUGAT COMMUNICATIONS PRODUCTS,
INC., Defendants.
No. 98CV2055.

Oct. 18, 2001.

Timothy Lindquist, Esq., Philip Caspers, Esq., and
Alan Carlson, Esq., Merchant & Gould,
Minneapolis, appeared on behalf of Plaintiff.
Paul J. Hayes, Esq., and Eugene Feher, Esq., Mintz
Levin Cohn Ferris Glovsky & Popeo, Boston, MA
02111, counsel for Defendants.

MEMORANDUM OPINION AND ORDER

FRANK, J.

Introduction

**\*1** The above-entitled matter came on for hearing
before the undersigned United States District Judge
on October 12, 2001, pursuant to Plaintiff's motion
*in limine* to limit certain evidence on the issue of
patent invalidity, Plaintiff's motion for summary
judgment of validity with respect to the '600 patent,
and Defendant's motion for summary judgment of
invalidity with respect to the '600 patent. For the
reasons stated, Plaintiff's motion for summary
judgment is denied; Defendants' motion for
summary judgment is denied; and Plaintiff's motion
*in limine* is granted in part and denied in part.

Background

The '600 patent at issue in this litigation relates to
high-density distribution bays used in the
telecommunications industry. These bays, and the
individual panels which comprise them, are made up
of many segments of "pins" from which individual
wires extend; horizontal troughs which run beneath
the segments of pins and which serve as conduits for
the wires in a horizontal direction; and vertical
troughs which divide banks of pin-segments and
which serve as conduits for the wires in a vertical

direction. According to Plaintiff, the prior art
generally provided no clear and accessible way for
wires to travel horizontally from panel to panel
because wires passing between horizontal troughs
would have to pass through vertical troughs filled
with wires and would thus become entangled; the
prior art did have "express horizontal troughs" at the
top and bottom of each panel, but there were only
two such troughs and wires had to travel extensive
and unnecessary vertical distances to use these
express troughs.

The '600 patent allows technicians to utilize the
horizontal trays as intermediate express troughs. It
does this by moving the vertical troughs out of the
way, setting them off from the midplane of the bay.
As a result, jumper wires can run horizontally from
one bay to the next without interference. The
vertical wires run in a space behind the horizontal
trays. The '600 patent describes this invention.

In an earlier Markman hearing, this Court was asked
to interpret the word "offset" as it is used in the
'600 patent. Claims 1 and 9 of the '600 patent
describes a "second trough defining means for
defining a substantially vertical trough extending the
height of said panel ... said vertical trough disposed
offset from said horizontal trough defining means
and located proximate said horizontal trough rear
portion." Similarly, Claim 11 describes a "means
for defining a vertical trough ... said vertical
trough-defining means lying in a plane parallel to
and spaced apart from said horizontal trough-
defining means ...." The Court concluded that the
terms "offset" and "spaced apart" did not require
that there be no overlap between the intermediate
horizontal and vertical troughs, but only that the
troughs be positioned so that their center planes
were not aligned and "so that there is some measure
of unrestricted passage between horizontal troughs
of different bays."

**\*2** The matter is now before the Court on the issue
of the validity of the '600 patent. Defendants assert
that claims 1 and 11 of the '600 patent are invalid
under 35 U.S.C. § 102 because they are anticipated
by U.S. Patent No. 4,630,886 ("the '886 patent").
Defendants further assert that claims 1, 9, and 11 of
the '600 patent are invalid under 35 U.S.C. § 103
because they are obvious in light of the '886 patent,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

U.S. Patent No. 4,737,985 ("the '985 patent"), and U.S. Patent No. 4,002,856 ("the '856 patent").

The matter is also before the Court on Plaintiff's motion *in limine* to limit Defendants' arguments on invalidity to those arguments and prior art disclosed in "timely" responses to Plaintiff's contention interrogatories. Plaintiff contends that the last timely supplementation to Defendants' responses to Plaintiff's contention interrogatories took place on May 14, 1999. In that supplementation, Defendants challenged the validity of claims 1, 9, and 11 of the '600 patent, and made reference to the following prior art: the Freedom Frame Model 700, the '273 patent, the '856 patent, the '039 patent, and the '057 patent.FN1 Defendants further challenged the validity of claims 1, 7, 8-12, and 15 of the '968 patent, and made reference to a single prior art reference, the '997 patent.

FN1. In the interests of clarity and brevity, the Court references the prior art patents only by the last three digits of the actual patent numbers. The full references can be found in the documentation submitted by the parties.

In his supplemental report dated April 24, 2000, Defendants' expert Walter Roehr further challenged the validity of the '600 and '968 patents. Specifically, Mr. Roehr challenged claims 1-6 and 9-11 of the '600 patent, and made reference to the following *additional* prior art: a variety of AT & T frames, a Porta Systems frame, the '546 patent, the '236 patent, the '427 patent, the '321 patent, and the '910 patent. Similarly, Mr. Roehr challenged the validity of the '968 patent on the basis of one additional prior art reference, the '747 patent.

On April 23, 2001, Mr. Roehr again supplemented his expert testimony, in light of the Court's ruling on claim interpretation. With respect to the '600 patent, Mr. Roehr cited the following additional prior art references: several training manuals (two editions of *American Telephone Practice* and *ABC of the Telephone* ), the '424 patent, the '985 patent, and the '107 patent. Mr. Roehr cited no additional prior art references with respect to the '968 patent.

On August 9, 2001, Defendants served yet further supplemental answers to Plaintiff's contention interrogatories. In the August 9, 2001, supplement, Defendants cite additional prior art references with

respect to the '600 patent: the '590 patent; the '411 patent; the '886 patent; the '488 patent; U.S. Patent No. 4,260,856 FN2; Japan No. 63-114397; and a wide variety of manual diagrams, reference books, and sales brochures.

FN2. Not to be confused with the previously referenced '856 patent which is actually U.S. Patent No. 4,002,856.

Discussion

1. The Validity of the '600 Patent FN3

FN3. The Court considers the motions for summary judgment and the motion *in limine* independently; thus, for purposes of the motions for summary judgment, the Court will consider all those prior art references raised in the Defendants' briefs on the summary judgment issue regardless of whether those prior art references are subject to the Court's ruling on the motion *in limine.*

A patent issued by the Patent and Trademark Office is presumed to be valid. 35 U.S.C. § 282. The presumption of validity can only be overcome by clear and convincing evidence that the claim is invalid because it is not novel, 35 U.S.C. § 102, or because it is obvious in light of the prior art. 35 U.S.C. § 103.

**\*3** To prove that a patent claim is invalid under 35 U.S.C. § 102, a party must prove by clear and convincing evidence that the anticipating patent (here, the '886 patent) discloses every element recited in the allegedly invalid claims. In other words, a patent claim is only invalid under 35 U.S.C. § 102 if every element of the claim is disclosed in a single prior art reference. *See Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1327 (Fed.Cir.2001). The Defendants have not met that burden here.

Defendants rely heavily on the fact that the '886 patent discloses a high-density distribution bay with vertical troughs deeper than the horizontal troughs; as a result, although the forward surfaces of the horizontal and vertical troughs are aligned, the center planes of the troughs are not aligned and the vertical trough extends farther back than do the horizontal troughs. Defendants assert that this means the troughs are "offset" as that term was defined by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    **Page   3**
**(Cite as: Not Reported in F.Supp.2d)**

the Court in the Markman hearing. The Court found, however, that "offset," as used in the '600 patent, requires that the mid-planes of the troughs not be aligned *so that some portion of the horizontal troughs do not overlap with the vertical troughs.* The '886 patent discloses horizontal and vertical troughs, the mid-planes of which are not aligned, but it does not provide for any unrestricted passage between horizontal troughs; there are no portions of the horizontal troughs that do not overlap with the vertical troughs. As a result, the '886 patent does not describe offset horizontal and vertical troughs as that phrase is used in the '600 patent.

Even if there is no one patent which discloses every element of a patent claim, the patent claim may nevertheless be invalid pursuant to 35 U.S.C. § 103 if, at the time the patent was sought, a person with ordinary skill in the art to which the patent pertains, would have considered the patented subject matter obvious in light of the prior art. As the Eighth Circuit stated in *Span-Deck, Inc. v. Fab-Con, Inc.:*
It is well settled that the question of obviousness is a question of law. However, as has been often observed, the test for nonobviousness requires several underlying factual inquiries regarding: (1) scope and content of the prior art; (2) differences between the subject patent and the prior art; (3) the level of ordinary skill in the pertinent art at the time involved; and (4) certain secondary indicia of nonobviousness such as commercial success, long felt but unsolved needs, and failure of others.

677 F.2d 1237, 1241 (8th Cir.1982).

Defendants allege that, as a matter of law, the '600 patent is obvious in light of the '886 patent, the '985 patent, and the '856 patent. The Court does not agree. While the Defendants have presented argument which might persuade a jury, the Court does not find that the '600 patent is invalid as obvious as a matter of law. Similarly, however, the Court declines to grant Plaintiff's motion for summary judgment of validity. Although the Defendants have not demonstrated invalidity on the grounds of obviousness as a matter of law, the Court finds that sufficient questions of fact exist, particularly with respect to the "secondary indicia of nonobviousness," that a jury should determine the issue of validity.

2. Plaintiff's Motion *in Limine*

*4 Defendants offer a number of reasons why the Court should not limit them to invalidity arguments and prior art proffered in timely responses to Plaintiff's contention interrogatories. Some of these arguments are more persuasive than others.

First, Defendants contend that Defendants' sole obligation to disclose the prior art on which they intend to rely is embodied in 35 U.S.C. § 282. Section 282 disclosures are not due until 30 days before trial; thus, according to Defendants, any time beyond that 30 days is a gift to the Plaintiff. The Court does not agree. As the Federal Circuit determined in *ATD Corp. v. Lydall, Inc.,* 159 F.3d 534, 551 (Fed.Cir.1998), "although § 282 sets a minimum period for the identification of prior art to be introduced as evidence of anticipation, a specific judicial directive for the timing of discovery establishes the procedures to which the parties are bound." Despite Defendants' claims to the contrary, patent law litigation is not so very different from other types of complex civil litigation, and scheduling orders must mean something if the parties and the court are ever to achieve some sort of finality.

Second, Defendants assert repeatedly that it is the "preferred practice" to "supplement answers to contention interrogatories at the end of discovery and after completion of discovery of the other party's position." Defendants' Memorandum of Law in Opposition to ADC's Motion *in Limine* to Limit Evidence at Trial on Invalidity, at 8. For that proposition, Defendants cite, repeatedly, to a case out of the Eastern District of Pennsylvania, *Braun Medical, Inc. v.. Abbott Laboratories,* 155 F.R.D. 525, 527 (E.D.Pa.1994). However, a close reading of *Braun Medical* reveals that this case does not support Defendants' position at all.

In *Braun Medical,* the plaintiff sought to compel the defendant to answer a variety of interrogatories early in the discovery process. The court held that certain contention interrogatories were properly deferred until the end of discovery. The court did not hold that such interrogatories should be deferred until long after the close of discovery.FN4 Moreover, the Braun Medical court went on to note that some of the plaintiff's interrogatories related to prior art, and, because the "prior art interrogatories [would] serve to clarify the issues and narrow the scope of the dispute .... they should not be deferred." *Id.* at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

527.

FN4. The Defendants suggest that discovery did not actually close until the Court issued its order on claim interpretation (in April of 2001) and Defendants deposed Plaintiff's experts (in July of 2001). Without addressing the issue of whether Plaintiff was dilatory in producing its experts for deposition, the Court notes that Defendants have not offered any evidence or argument at all to suggest that the *Markman* ruling or the deposition testimony of Plaintiff's experts had some effect on the scope of applicable prior art. Indeed, in Defendants' most recent supplemental answers to the contention interrogatories, Defendants note that "[t]he only aspect of the asserted claims of the '600 patent which is alleged to have been invented in the '600 patent is the particular manner in which the structure provides separate troughs for the horizontal and vertical runs of the cross-connect jumper wires, *i.e.,* the "offset" or "spaced apart" relationship recited in claims 1 and 9 or claim 11, respectively.'' This has always been the case, and it is difficult to conceive how anything in the *Markman* ruling or the deposition testimony of the experts could have changed what prior art is relevant and what is not. Moreover, with respect to Defendants' assertion that Plaintiff was dilatory in producing its experts for deposition, assuming that to be the case, Defendants cannot simply rely on Plaintiff's bad conduct to justify their own without some demonstration-apart from bald assertions-that they were prejudiced in their ability to comply with court orders by virtue of Plaintiff's delay.

Defendants further argue that Defendants were not obligated to supplement their interrogatory responses where the information had been otherwise disclosed to the Plaintiff; Defendants then go on to suggest that all of the information in the contention interrogatories had been provided to the Plaintiff in other ways. Indeed, the supplemental reports of Mr. Roehr do disclose Defendants' intent to challenge the validity of various dependent claims in the '600 patent and a number of additional prior art references related to both the '600 patent and the '968 patent. However, there are six patents and a variety of other materials referenced in the final supplemental responses which are not mentioned in Mr. Roehr's April 2001 report; with respect to these prior art references, the Court cannot find any mention in the record of these references ever being

disclosed at all, much less being disclosed as relevant to the issue of validity. Finally, Defendants suggest that Plaintiff has not been prejudiced by Defendants' late disclosure of prior art and invalidity theories. The Court cannot entirely agree. With respect to Mr. Roehr's April 2001 expert report, the Plaintiff has had adequate time to incorporate that information into their trial preparation and strategy and to request any additional discovery that might be necessary to formulate a response. However, with respect to the disclosures made in August of 2001, that information comes far too late in the game for Plaintiff to formulate an adequate response. The Court finds that, if scheduling orders are to serve any meaningful purpose, it is a proper exercise of its discretion to prevent trial by ambush and to ensure that all parties have an ample opportunity to prepare their case for the scheduled trial date. Responsible case management by a Court requires no less. The Court, therefore, exercises its discretion to exclude references raised for the first time in August of 2001.

*5 The Court would therefore grant in part and deny in part Plaintiff's motion *in limine.* To the extent that Plaintiff asserts that Defendants should be precluded from challenging the validity of the dependent claims of the two patents-in-suit, the Court will deny the motion, because the April 2001 expert report of Mr. Roehr makes clear that Defendants intended to challenge the validity of the dependent claims and because that report was disclosed in time for Plaintiff to respond adequately. Similarly, the Court will allow all prior art references disclosed prior to or in Mr. Roehr's April 2001 expert report. However, any prior art reference disclosed for the first time in the August 2001 supplemental responses to Plaintiff's interrogatories will be excluded.

For the reasons stated, IT IS HEREBY ORDERED:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 259) is DENIED;

2. Defendants' Motion for Summary Judgment (Doc. No. 247) is DENIED;

3. Plaintiff's Motion *in Limine* (Doc. No. 260) is GRANTED IN PART and DENIED IN PART as described above.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    **Page   5**
**(Cite as: Not Reported in F.Supp.2d)**

D.Minn.,2001.
ADC Telecommunications, Inc. v. Thomas & Betts
Corp.
Not Reported in F.Supp.2d, 2001 WL 1381098
(D.Minn.)

Briefs and Other Related Documents (Back to top)

. 2001 WL 34829720 () Supplemental Expert Report
of Walt Roehr (Apr. 23, 2001)
. 2000 WL 34556728 () Supplemental and Rebuttal
Expert Report of Walt Roehr (Aug. 24, 2000)
. 2000 WL 34556727 () (Report or Affidavit) (Apr.
24, 2000)
. 2000 WL 34556726 () Expert Report Of Walt
Roehr (Apr. 3, 2000)
. 2000 WL 34556725 () (Report or Affidavit) (Mar.
26, 2000)
. 1999 WL 33972984 (Trial Motion, Memorandum
and Affidavit) Adc's Surreply Brief in Opposition to
Defendants' Motion for Partial Summary Judgment
(Nov. 1, 1999)
. 1999 WL 33972982 (Trial Motion, Memorandum
and Affidavit) Adc's Memorandum of Law in
Response to Defendants' Motion for Partial
Summary Judgment (Oct. 22, 1999)
. 1999 WL 33972983 (Trial Motion, Memorandum
and Affidavit) Reply Brief in Support of
Defendants' Motion for Partial Summary Judgment
(Oct. 19, 1999)
. 1999 WL 33972981 (Trial Motion, Memorandum
and Affidavit) Memorandum of Law in Support of
Defendants' Motion for Partial Summary Judgment
(Sep. 15, 1999)
. 1998 WL 34360786 (Trial Pleading) Reply to
Counterclaims (Oct. 29, 1998)
. 1998 WL 34360785 (Trial Pleading) Defendants'
Answer and Counterclaims and Demand for Jury
Trial (Oct. 21, 1998)
. 1998 WL 34360784 (Trial Pleading) Complaint
(Sep. 11, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 83472 (D.Mass.)
**(Cite as: Slip Copy)**
H

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Massachusetts.
Gerald N. PELLEGRINI
v.
ANALOG DEVICES, INC.
No. Civ.A. 02-11562RWZ.

Jan. 11, 2006.

Thomas C. O'Konski, Cesari & McKenna, LLP, Boston, MA, for Gerald N. Pellegrini.
Wayne L. Stoner, Richard W. O'Neill, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, for Analog Devices, Inc.

*MEMORANDUM OF DECISION AND ORDER*
ZOBEL, J.
**\*1** Plaintiff Gerald N. Pellegrini filed suit against Analog Devices, Inc. ("Analog") in August 2002, asserting infringement of U.S. Patent No. 4,651,069 ("the '069 patent"), which claimed invention of a brushless motor with a motor control circuit, and which has since expired. Specifically, Pellegrini claimed that certain chips produced by Analog, known as "ADMC chips," infringe the '069 patent when combined with other components in a particular type of brushless motor. Pellegrini has never asserted that Analog itself infringes the '069 patent, but instead maintains that Analog induced its customers to use the ADMC chips to create infringing devices.

The parties agreed early in the case to resolve the threshold issue whether 35 U.S.C. § 271(f) barred any claims as to those ADMC chips manufactured and sold entirely outside of the United States, and they proceeded with limited discovery and cross-motions for partial summary judgment on this issue. At the time, it was clear to both parties and the court that any ADMC chips manufactured outside of the United States but sold to customers inside the United States-were minute in number and any possible recovery, even if infringement were proven, would be minuscule. Indeed, Pellegrini represented both to the court and to Analog that if Analog prevailed on the § 271(f) issue, he would voluntarily dismiss the remainder of the case.

In September 2003, I granted Analog's motion for

partial summary judgment, concluding that as to those ADMC chips manufactured and sold entirely extraterritorially, dismissal was required under 35 U.S.C. § 271(f). (*See* Mem. and Order of May 7, 2003). Final judgment was entered in September 2003, and the remaining claims were stayed pending appeal. (*See* Order of Sept. 24, 2003). In July 2004, the Federal Circuit affirmed. *See Pellegrini v. Analog Devices, Inc.,* 375 F.3d 1113, 1119 (Fed.Cir.2004). Plaintiff then returned to this court, but instead of voluntarily dismissing the remainder of his claims, he unsuccessfully sought leave to amend his complaint. In response to Analog's concerns-raised at a status conference in January 2005-that Pellegrini lacked a good faith basis for proceeding with the litigation, the parties agreed to a schedule under which Pellegrini was required by March 1, 2005 to "provide evidentiary support underlying the good faith basis for his remaining allegations of patent infringement." (Docket No. 54). Dissatisfied with the responses it received, Analog filed a motion for sanctions pursuant to Fed.R.Civ.P. 11(b)(3) on March 3, 2005.

*I. Rule 11(b)(3) Analysis*

Rule 11(b)(3) requires that all allegations and factual contentions have "evidentiary support." *See Antonious v. Finnegan, Henderson, Farabow, Garrett & Dunner, LLP,* 275 F.3d 1066, 1074 (Fed.Cir.2002). Analog argues that Pellegrini "lacked a good faith basis to assert an inducement claim against Analog when [he filed] his complaint," and that he "still lacks a good faith basis to assert such a claim today, even after nearly three years of litigation." (Def.'s Mot. for Sanctions, at 1). Analog's assertion is based on Pellegrini's failure to offer any evidence of direct infringement by an Analog customer in the United States, a prerequisite of an inducement action. *See Linear Tech. Corp. v. Impala Linear Corp.,* 379 F.3d 1311, 1326 (Fed.Cir.2004).

**\*2** Pellegrini objects to Analog's characterization of the law.FN1 He spends much energy, for example, arguing that he is not required to prove direct infringement before he has conducted discovery FN2 or before the case goes to the jury. The Federal Circuit has made clear, however, that "[i]n bringing a claim of infringement, the patent holder, if

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim that it had a reasonable chance of proving infringement." *View Eng'g, Inc. v. Robotic Vision Sys., Inc.,* 208 F.3d 981, 986 (Fed.Cir.2000). Pellegrini cites *Q-Pharma, Inc. v. Andrew Jergens Co.,* 360 F.3d 1295 (Fed.Cir.2004), for the proposition that "the key factor in determining whether a patentee [has] performed a reasonable pre-filing inquiry is the presence of an infringement analysis," and that "an infringement analysis can simply consist of a good faith, informed comparison of the claims of a patent against the accused subject matter." *Id.* at 1302. Pellegrini is correct as to the standard enunciated in *Q-Pharma,* but he has failed to meet it.

FN1. Indeed, although Pellegrini has not filed a Rule 11 motion against Analog, his opposition clearly invites the imposition of such sanctions. (Pl.'s Opp., at 1 ("Analog's Motion for Sanctions is itself in violation of Fed.R.Civ.P. Rules 11(b)(2) and 11(b)(3).")). Because none of Analog's papers could form the basis for a Rule 11 sanction, the invitation is declined.

FN2. The parties did conduct limited discovery for six months as to ADMC chips manufactured and sold entirely outside of the United States.

In fact, the infringement analysis contained in the claim chart prepared by Pellegrini consists entirely of comparisons between limitations of the '069 patent FN3 and various elements described in a paper by Analog scientists. (Pl.'s Opp., at 6 ("The claim charts specifically identify claim elements ... with structures contained in Analog's article."); *id.,* Ex. A). That paper, however, nowhere discusses the accused ADMC chips, nor does it mention any Analog customer. (*See id.,* Ex. E). It is, as Analog notes, "devoid of any reference to a brushless D.C. motor made, used, sold, offered for sale, or imported in the United States by one of Analog's customers," let alone any indication that such a motor was manufactured using Analog's ADMC chips. Comparing the '069 patent to the descriptions contained in the article is thus useless because the article is completely silent as to "the accused subject matter" against which the patent must be compared. *Q-Pharma,* 360 F.3d at 1302.

FN3. The claims of the '069 patent were construed

by Judge Gorton in a separate matter, *see Pellegrini v. Texas Instruments, Inc.,* No. 99-12378 (Mem. & Order July 9, 2001), and Pellegrini reasonably relies on that construction. Judge Gorton's claim construction, however, is not itself an infringement analysis, but rather only one element of such analysis.

Pellegrini also cites an affidavit and supplemental affidavit of Dr. Bradley Lehman, an expert employed by Pellegrini in another case. (Pl.'s Opp., at 10-11; *id.,* Ex. H). Dr. Lehman, a former Analog researcher, explains in his affidavits that he previously told Pellegrini that he had worked on a project in which the ADMC chip was used in developing motor controllers for brushless DC motors, and that such motor controllers had been used in Sanyo refrigerators and possibly also Electrolux refrigerators. (Pl.'s Opp., Ex. H; Lehman Supp. Aff.). Lehman further states that he "showed [Pellegrini] a picture of a refrigerator that contained the motor controller, taken from an advertisement from Sanyo." (Lehman Supp. Aff.). For several reasons, however, these statements were not sufficient evidence of direct infringement by Analog customers in the United States; relying on them thus did not satisfy Pellegrini's pre-filing inquiry obligation.

**\*3** First, advertisements alone are generally insufficient evidence of infringement. *See View Eng'g,* 208 F.3d at 985 (no factual basis for infringement claim where patentee had relied solely on its knowledge of its own patent and defendant's advertising statements); *cf. Q-Pharma,* 360 F.3d at 1302 (patentee conducted sufficient infringement analysis to avoid Rule 11 sanctions where it did not rely solely on defendant's advertising, but additionally compared asserted claims with sample of accused product). In this case, there is no suggestion that the alleged picture of a Sanyo refrigerator in any way indicated that it contained a brushless motor using an ADMC chip. Second, although Lehman purports to have told Pellegrini that Sanyo and Electrolux used the ADMC chip, nowhere in his affidavits does Lehman suggest that Sanyo and Electrolux sold refrigerators containing infringing brushless motors in the United States. Indeed, Pellegrini himself is only able to speculate that there was a "possibility that some of Sanyo's refrigerators may have been brought into the United States." (Pl.'s Opp., at 12). As to Electrolux,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Pellegrini is only able to note that Electrolux purchased "large volume[s]" of ADMC chips and that Electrolux has "significant sales in the United States." (*Id.* at 12-13).FN4 Such broad facts cannot form a good faith evidentiary basis for bringing a claim of infringement.

FN4. Pellegrini makes the identical argument as to Emerson, another Analog customer. For the same reasons, it fails.

Nor is Pellegrini able to muster sufficient evidence of direct infringement by two other Analog customers he names-Omnirel and Amirix. Pellegrini notes that Omnirel and Amirix both claim to have developed a brushless motor control algorithm for use with Analog's ADMC chips. (Pl.'s Opp., at 11; *id.,* Exs. I & J). Neither company, however, claims to have developed a brushless motor itself, but rather represents only that it has developed an algorithm for controlling such motors. Such an algorithm could not infringe either claim 7 or claim 15 or the '069 patent, which require a complete brushless motor including multiple components, including a motor control circuit.

To mitigate his clear lack of evidence, Pellegrini suggests that his pro se status, as well as the timeliness of Analog's Rule 11 motion should be taken into account. Courts "never impose sanctions lightly, and are particularly cautious as to pro se litigant[s]," *Constant v. United States,* 929 F.2d 654, 658 (Fed.Cir.1991), but even pro se litigants are required to follow procedural rules. Pellegrini is, moreover, amply experienced in litigation, having previously sued Texas Instruments for infringement of the '069 patent. *See id.* (taking into account pro se plaintiff's previous litigation experience). Although Pellegrini may be appearing pro se, he has apparently received assistance from law firms throughout the litigation. (*See* Appearance of Thomas C. O'Konski, Esq., Docket No. 63, June 22, 2005; Def.'s Mot., at 7 n. 4). As to the timeliness of Analog's motion, Rule 11 itself imposes no time limits. More importantly, Analog's motion was entirely timely. Analog had no reason to challenge the good-faith basis of Pellegrini's pending claims while the extraterritorial infringement claims were being separately litigated and appealed, since Pellegrini maintained throughout that he would voluntarily dismiss the pending claims if Analog prevailed. Not until

January 2005 did Analog receive notice that Pellegrini intended instead to pursue the pending claims. The parties then agreed that Pellegrini had until March 1, 2005 to demonstrate an evidentiary basis for pursuing his claims, and when he failed to do so, Analog immediately filed its motion.

**\*4** Because Pellegrini has failed to demonstrate any factual basis upon which to claim direct infringement of the '069 by Analog customers in the United States, and because the record demonstrates that Pellegrini failed to conduct a sufficiently reasonable pre-filing inquiry, I find that he has violated Fed.R.Civ.P. 11(b)(3) and that Analog is therefore entitled to sanctions.

## II. *Rule 11(c) Sanctions*

Rule 11(c)(2) directs the court to impose sanctions "sufficient to deter repetition of such conduct." Analog has requested dismissal and reasonable attorneys' fees and costs. Dismissal is clearly warranted, since Pellegrini lacks any factual basis upon which to proceed with the remaining claims. As for monetary relief, I treat Analog's request as limited to those attorneys' fees and costs accrued since January 2005, the time at which Pellegrini indicated he intended to pursue these claims. Although Analog has argued that Pellegrini had no adequate basis upon which to initially file these claims, it is clear from the history of this case that Pellegrini's intent to pursue these claims (and the need for Analog to defend against them) really only surfaced in January 2005. In this case, Pellegrini, a plaintiff who, while pro se, had prior patent litigation experience as well as the assistance of legal counsel, repeatedly represented both to the defendant and to the court that he would voluntarily dismiss his remaining claims were he to lose on the other portion of the case. He failed to do so, and instead pursued those claims, without any good faith evidentiary basis upon which to do so, and despite discussion in conferences before the court about the need for him to demonstrate such an evidentiary basis or to face possible sanctions. In light of this history, Analog is entitled to recover a reasonable share of its fees and costs. Analog should submit a bill of its fees and costs, from which an appropriate award will be determined.

## III. *Conclusion*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
**(Cite as: Slip Copy)**

Page    4

Defendant's motion for sanctions (# 58 on the Docket) is allowed. Plaintiff's remaining claims are dismissed, and defendant shall submit a bill of reasonable attorneys' fees and costs accrued since January 2005.

D.Mass.,2006.
Pellegrini v. Analog Devices, Inc.
Slip Copy, 2006 WL 83472 (D.Mass.)

Briefs and Other Related Documents (Back to top)

. 1:02cv11562 (Docket) (Aug. 01, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    **Page  1**
Slip Copy, 2006 WL 587833 (E.D.Mich.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Michigan,
Southern Division.
EATON CORPORATION, Plaintiff,
v.
ZF MERITOR LLC., Arvinmeritor Inc., and ZF
Friedrichshafen AG, Defendants.
No. 03-74844.

March 10, 2006.

Alan C. Harnisch, Lawrence S. Gadd, Strobl,
Cunningham, Bloomfield Hills, MI, John F. Rabena
, William H. Mandir, Sughrue, Mion, Washington,
DC, Keith P. Schoeneberger, Michael H. King,
Spencer R. Wood, Leboeuf, Lamb, Chicago, IL, for
Plaintiff.
David D. Murray, Raymond J. Vivacqua, James K.
Cleland, Brinks, Hofer, Ann Arbor, MI, Gary M.
Ropski, Laura B. Miller, Thomas J. Filarski,
Brinks, Hofer, Chicago, IL, for Defendants.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO
COMPEL DISCOVERY
WHALEN, Magistrate J.
**\*1** Before the Court is Defendants' Motion to
Compel Plaintiff's Discovery Responses [Docket #
36], which has been referred for hearing and
determination pursuant to 28 U.S.C. § 636(b)(1)(A)
. For the reasons and under the terms stated on the
record on March 7, 2006, the Motion is GRANTED
IN PART AND DENIED IN PART, as follows:

1. The motion to produce responses to Defendants'
Interrogatories 1 and 3 is DENIED. However, the
motion for Plaintiff to produce a 30(b)(6) FN1
witness regarding infringement (Category 13) is
GRANTED.

FN1. Fed.R.Civ.P. 30(b)(6).

2. As to Defendants' Interrogatory No. 5, the
motion is DENIED. As to Defendant's Document
Requests 1 and 2, the motion is GRANTED. If
Plaintiff has already produced documents from any
other proceeding, including the prior proceeding
before the International Trade Commission (ITC),
Plaintiff will specifically identify, by Bates number
or otherwise, where the responsive documents will

be found.

3. As to Defendants' Interrogatory No. 7, the
motion is GRANTED. As to Interrogatory No. 8,
the motion is DENIED AS MOOT on Plaintiff's
representation that it has already responded with
documents, as provided for in Fed.R.Civ.P. 33(d).
However, Plaintiff will specifically identify, by
Bates number or otherwise, where the responsive
documents will be found.

As to Document Request No. 49, the motion is
DENIED.

Plaintiff will provide a 30(b)(6) witness as to
Categories 9 and 10, directed at prior art searching.

4. As to Interrogatories 10, 12 and 14, the motion to
compel supplemental responses is DENIED.
However, as to material the Plaintiff has already
provided in response to these interrogatories,
pursuant to Rule 33(d), Plaintiff shall specifically
identify, by Bates number or otherwise, where the
responsive documents will be found.

5. As to Interrogatory No. 17, the motion is
DENIED. However, Plaintiff will provide a
30(b)(6) witness as to Category 19 (communications
with AMT purchasers relative to the patents in suit).

6. As to Document Request No. 4, the motion is
GRANTED. If documents from other proceedings,
including the ITC proceeding, are or have been
produced in response, Plaintiff will specifically
identify, by Bates Number or otherwise, where the
responsive documents will be found. Plaintiff will
include any responsive material as to which the ITC
ruled attorney-client or work product privilege was
waived. As to any other material for which Plaintiff
claims privilege, Plaintiff will provide a privilege
log.

Plaintiff will also provide a 30(b)(6) witness
regarding Categories 12 and 20 (Plaintiff's pre-filing
investigation).

7. As to Document Requests 77-80 and 85-86, the
motion is GRANTED. If documents from other
proceedings, including the ITC proceeding, are or
have been produced in response, Plaintiff will
specifically identify, by Bates Number or otherwise,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    **Page    2**
**(Cite as: Slip Copy)**

where the responsive documents will be found.

Plaintiff shall provide a 30(b)(6) witness as to Categories 23-26, 29-35 and 38 (Plaintiff's sales, financials, pricing and marketing of Plaintiff's patented AMTs).

**\*2** 8. As to Document Requests 83 and 84, the motion is GRANTED as to the time periods both before and after the commencement of the lawsuit.

SO ORDERED.

E.D.Mich.,2006.
Eaton Corp. v. ZF Meritor LLC.
Slip Copy, 2006 WL 587833 (E.D.Mich.)

Briefs and Other Related Documents (Back to top)

. 2006 WL 1035590 (Trial Motion, Memorandum and Affidavit) Plaintiff Eaton Corporation's Reply in Further Support of its Motion to Dismiss Certain Infringement Claims Without Prejudice and for Leave to Assert Certain Other Infringement Claims (Mar. 17, 2006)
. 2005 WL 2142010 (Trial Pleading) Reply to Counterclaims of Counter-Plaintiffs (Jul. 21, 2005)
. 2005 WL 2142008 (Trial Pleading) Answer, Affirmative Defenses and Counterclaims of ZF Meritor, Llc, Arvinmeritor, Inc. and ZF Friedrichshafen AG to Complaint of Eaton Corporation (Jul. 11, 2005)
. 2005 WL 1476205 (Trial Pleading) First Amended Complaint (May 23, 2005)
. 2003 WL 23852268 (Trial Pleading) Complaint (Dec. 2, 2003)
. 2:03cv74844 (Docket) (Dec. 02, 2003)
. 2003 WL 23145622 (Trial Pleading) Complaint (Dec. 01, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2596451 (N.D.Cal.)
**(Cite as: Slip Copy)**
**H**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
MONSTER CABLE PRODUCTS, INC., Plaintiff,
v.
THE QUEST GROUP d/b/a/ Audioquest,
Defendants.
No. C 04-0005 MHP.

Oct. 13, 2005.

Ian N. Feinberg, Michael A. Molano, Joshua M. Masur, Mayer Brown Rowe & Maw LLP, Palo Alto, CA, for Plaintiff.
Michael D. Lisi, Christopher T. Holland, Krieg Keller Sloan Reilley & Roman, San Francisco, CA, for Defendant.

*MEMORANDUM AND ORDER*
PATEL, J.

Re: Motion for Attorneys' Fees

**\*1** Plaintiff Monster Cable Products, Inc. filed this patent infringement action against defendant The Quest Group, d/b/a/ AudioQuest ("AudioQuest"). The complaint alleges infringement of United States Patent No. 5,307,416 ("the '416 Patent"), which relates to audio cable technology. The court entered final judgment for defendant on August 8, 2005. Now before the court is defendant's motion for attorneys' fees in the amount of $592,002.14. Having fully considered the parties' arguments and submissions and for the reasons set forth below, the court enters the following memorandum and order.

*BACKGROUND* FN1

FN1. Unless otherwise noted, background facts are taken from the declarations accompanying the parties' briefs.

Both plaintiff Monster Cable and defendant AudioQuest are manufacturers of connecting cables for audio equipment. Monster Cable is the assignee of the '416 Patent, which relates generally to coaxial cables that make use of a biased conductive shield to reduce electromagnetic interference with the transmitted signal. In January, 2004, Monster Cable filed the instant lawsuit, alleging that AudioQuest's

audio cables infringe claims of the '416 Patent. The court resolved the lawsuit in AudioQuest's favor by granting summary judgment of noninfringement on August 8, 2005. Having prevailed on the merits, AudioQuest now seeks to recover in full the attorneys' fees incurred in defending this lawsuit. In support of its motion, AudioQuest alleges a host of abuses beginning with the investigation leading up to the lawsuit, continuing through discovery and claim construction, and culminating in Monster Cable's cross-motion for summary judgment of infringement.

The parties offer different explanations for the motivation behind this lawsuit. According to AudioQuest, Monster Cable hastily filed the lawsuit in response to AudioQuest's growing success in the marketplace. Specifically, approximately at the same time the lawsuit was filed, a national vendor of home theater systems decided to cease selling Monster Cable's products and entered into an exclusive arrangement with AudioQuest. For its part, Monster Cable claims that it was alerted in the fall of 2003 that AudioQuest's products were similar to the invention claimed in the '416 Patent, that it investigated whether AudioQuest's products likely infringed the '416 Patent, and that as a result of the investigation it filed this lawsuit.

The extent of Monster Cable's prefiling investigation is the principal issue underlying this motion. Prior to filing the complaint in this lawsuit, Monster Cable performed a physical investigation of one of AudioQuest's products-a one-meter "Jaguar" cable-and prepared a claim chart comparing the Jaguar cable to claim 2 of the '416 Patent. Monster Cable did not perform physical evaluations of AudioQuest's other products. Instead, relying on publicly available specifications for AudioQuest's other biased cable products, Monster Cable accused all such products in its complaint.

Following fact and expert discovery, the court held a Markman hearing on March 15, 2005, in which it construed six terms used in claim 2 of the '416 Patent. *See* March 18, 2005 Claim Construction Order. Relevant to the current motion, the court construed the term "coaxial cable" as a "cable with two conductors that share an axis." This construction was unfavorable to Monster Cable, as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
(Cite as: Slip Copy)

none of AudioQuest's products has a simple coaxial structure.

*2 On May 4, 2005, Monster Cable filed a motion seeking leave to request reconsideration of the Markman ruling, citing particular language in an intervening Federal Circuit opinion, *Gillette Co. v. Energizer Holdings, Inc.,* 405 F.3d 1367 (Fed.Cir.2005). The language in *Gillette,* read in isolation, might have supported a broader claim construction. The court denied Monster Cable's motion because when read in context the language did not suggest any change in the law. *See* Order of May 18, 2005.

After the court issued its Markman ruling, Monster Cable served an interrogatory requesting that AudioQuest provide updated noninfringement contentions. AudioQuest ultimately agreed to provide updated contentions no later than May 12, 2005. On April 25, 2005, while Monster Cable's request was still pending, the parties attended a case management conference at which AudioQuest expressed an intent to file a motion for summary judgment of noninfringement. Allegedly in response to AudioQuest's stated intention, on April 26, 2005 Monster Cable served AudioQuest with 785 requests for admission seeking infringement-related information about the accused products.

The parties disagree as to the motivation behind and the propriety of the requests for admission. Monster Cable asserts that they were served to allow Monster Cable to prepare for AudioQuest's motion for summary judgment. As Monster Cable had not received AudioQuest's interrogatory response, Monster Cable argues that the requests for admission were necessary insurance. AudioQuest, on the other hand, characterizes the requests for admission as wholly duplicative of the interrogatory and needlessly burdensome.

On May 12, 2005 AudioQuest served its response to Monster Cable's infringement interrogatory, which consisted of a cursory citation to documents produced during fact discovery and to AudioQuest's forthcoming motion for summary judgment. *See* Masur Dec., Exh. R. Despite the lack of useful information in the response, Monster Cable subsequently withdrew its requests for admission relating to infringement.

On May 16, 2005, AudioQuest filed a motion for summary judgment of noninfringement of the '416 Patent with respect to all of the AudioQuest products at issue, or in the alternative, for summary adjudication of noninfringement of the asserted claims of the '416 Patent with respect to certain products. Monster Cable opposed this motion and cross-moved for summary judgment of infringement with respect to all claim limitations.

AudioQuest argued for noninfringement on the basis of five claim elements, three of which appear in the preamble of claim 2 of the '416 Patent. Monster Cable's cross motion alleged that the accused products met all limitations in the *body* of claim 2 and that the language in the preamble did not impose additional limitations. In the alternative, Monster Cable argued that each disputed limit in the preamble was met literally as well as under the doctrine of equivalents. At oral argument, Monster Cable effectively conceded its literal infringement argument but maintained its argument under the doctrine of equivalents.

*3 In the midst of the summary judgment briefing process, Monster Cable filed a motion to preclude untimely produced evidence and to strike references thereto, alleging that certain documents relied upon by AudioQuest had not previously been produced in discovery. Monster Cable was in error, as all but one of the documents had already been produced. The court denied the motion to preclude and noted that Monster Cable's failure to identify the earlier produced documents bordered on sanctionable misconduct. The court, however, chose not to award sanctions *sua sponte.*

The court granted AudioQuest's motion for summary judgment and denied Monster Cable's cross motion on August 8, 2005. In denying Monster Cable's motion, the court held that the language of the preamble was inherently intertwined with the body of the claim, and therefore that the elements of the preamble imposed additional limitations on the claim. The court also held that Monster Cable's literal infringement arguments had no merit, and that the accused AudioQuest products were not equivalent to the claimed invention because they achieved electromagnetic isolation in a substantially different way.

AudioQuest now seeks an award of its attorneys'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fees for the entire lawsuit based on Monster Cable's allegedly inadequate prefiling investigation. In the alternative, AudioQuest seeks attorneys' fees incurred in connection with Monster Cable's motion to seek reconsideration of the court's *Markman* ruling, Monster Cable's requests for admission, and Monster Cable's motion to preclude untimely produced evidence.

### LEGAL STANDARD

Pursuant to Rule 11, a court may sanction an attorney or party who makes improper representations to the court, such as through the filing of papers for an "improper purpose" or which contain "allegations and other factual contentions ... [that have no] evidentiary support." *See* Fed. R. Civ. Pro. 11(b)(2)-(3).

Under the Patent Act, a court "in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. Misconduct during litigation, vexatious or unjustified litigation, and frivolous suits are among the circumstances which may make a case "exceptional" under section 285. *See Amsted Indus., Inc. v. Buckeye Steel Castings Co.,* 23 F.3d 374, 376 (Fed.Cir.1994) (quoting *Beckman Instruments, Inc. v. LKB Produkter AB,* 892 F.2d 1547, 1551 (Fed.Cir.1989)); *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.,* 279 F.3d 1022, 1034 (Fed.Cir.2002) ("[l]itigation misconduct and unprofessional behavior are relevant to the award of attorney [sic] fees, and may suffice, by themselves, to make a case exceptional"). A frivolous suit for infringement is one in which the patentee knew or should have known that the suit was baseless. *See Automated Bus. Cos., Inc. v. NEC Am., Inc.,* 202 F.3d 1353, 1354 (Fed.Cir.2000); *Haynes Int'l, Inc. v. Jessop Steel Co.,* 8 F.3d 1573, 1579 (Fed.Cir.1993), *modified by* 15 F.3d 1076 (Fed.Cir.1994). The party seeking attorneys' fees must prove that the case is exceptional by clear and convincing evidence. *Interspiro USA, Inc. v. Figgie Intern. Inc.,* 18 F.3d 927, 933 (Fed.Cir.1994).

**\*4** Additionally, 28 U.S.C. section 1927 provides authority for the imposition of sanctions against attorneys. It states in relevant part that "any attorney ... who so multiplies the proceedings ... unreasonably and vexatiously may be required [to pay the] excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *See*

28 U.S.C. § 1927. In order to impose sanctions under section 1927, there must be a showing of subjective bad faith on the part of the attorney. *See Salstrom, et al., v. Citicorp Credit Servs., Inc.,* 74 F.3d 183 (9th Cir.1995), *cert. denied sub nom Webb v. Citicorp Credit Servs., Inc.,* 519 U.S. 813, 117 S.Ct. 60, 136 L.Ed.2d 23 (1996) (quoting *MGIC Indem. Corp. v. Moore,* 952 F.2d 1120, 1122 (9th Cir.1991)). Knowing or reckless behavior is sufficient to establish a finding of bad faith. *New Alaska Dev. Corp. v. Guetschow,* 869 F.2d 1298, 1306 (9th Cir.1989).

### DISCUSSION

#### I. Adequacy of Monster Cable's Pre-Filing Investigation

In order to obtain fees associated with the entire lawsuit, AudioQuest must prove by clear and convincing evidence that Monster Cable conducted an inadequate pre-filing investigation. AudioQuest offers four bases for this assertion.

#### A. Two Opinions of Counsel

First, AudioQuest claims that obtaining two separate opinions of counsel prior to filing a lawsuit is suspicious, and suggests that the first opinion may not have concluded that AudioQuest's products infringe. Following oral argument for this motion, the court reviewed the two opinions of counsel *in camera.* Based on this review, AudioQuest's insinuation is without merit. Both opinions found a reasonable probability of infringement.

#### B. Reverse Engineering

Second, AudioQuest contends that Monster Cable's limited investigation of the accused products is inadequate as a matter of law because Monster Cable did not reverse engineer each of the accused products and perform an element-by-element comparison against the asserted claims. Monster Cable counters that it was only required to perform the reverse engineering analysis for a single accused product and compare that product against each of the asserted claims. For the remaining products, according to Monster Cable, it was sufficient to review AudioQuest's publicly available data sheets. Both parties cite *Network Caching Technology LLC v. Novell Inc.,* No. C-01-2079-VRW, 2002 WL

Slip Copy
(Cite as: Slip Copy)

32126128 (N.D. Cal. Aug 13, 2002) (Walker, J.) in support of their arguments. The court in *Network Caching Technology* held that Rule 11 requires "that a plaintiff compare *an accused product* to its patents on a claim by claim, element by element basis for *at least one* of each defendant's products." *Id.* at *5 (emphasis added). The quoted language plainly requires Monster Cable to investigate only a single accused product in detail.

AudioQuest's argument that Monster Cable was required to reverse engineer every accused product depends on the linguistically untenable position that "each defendant's products" actually means "each *of* defendant's products." To the contrary, *Network Caching Technology* involved multiple defendants; the plaintiff was required to establish a reasonable infringement position with respect to each of them. *Id.* at *1. In this lawsuit there is a single defendant. Thus, in order to comply with the requirement set forth in *Network Caching Technology,* Monster Cable was required at a minimum to reverse engineer a single accused product-here, the Jaguar one-meter cable-and perform an element-by-element analysis against the asserted claims.

**\*5** Reverse engineering a single product will not be adequate in all cases, of course. Where the accused products differ materially from each other, simply reviewing data sheets for the other products may not be enough. Here, the accused products have cross sections with varying geometries, but all make use in some form or another of a conductive shield surrounding a center conductor. Under Monster Cable's broad construction of the claims, this common characteristic may have been sufficient to support a finding of infringement. The court subsequently found Monster Cable's construction to be erroneous, but not so objectively unreasonable as to warrant imposing sanctions.

AudioQuest also points out that the evidence of Monster Cable's pre-filing investigation of the accused products (other than the Jaguar cable) is very sparse. Neither of Monster Cable's opinions of counsel mentions an investigation of the other accused products, and there is no contemporaneous record of that investigation currently before the court. However, along with its opposition to this motion Monster Cable filed a declaration from the attorney who performed the investigation, which states that he had reviewed the publicly available

product specifications and had performed an element-by-element comparison with claim 2. In addition, Monster Cable's preliminary infringement contentions, filed after the commencement of the lawsuit, ·reflect a product-by-product, element-by-element analysis. In combination, these two pieces of evidence support Monster Cable's contention that it investigated each accused product prior to filing the lawsuit. AudioQuest has not proved by clear and convincing evidence that Monster Cable failed to do so.

### C. Infringement Analysis Underlying Monster Cable's Motion for Summary Judgment

Third, AudioQuest argues that Monster Cable failed to include a complete element-by-element analysis in its cross-motion for summary judgment of infringement, as is required to carry its burden of proof. Monster Cable's moving papers focused on the five disputed elements that were also the subject of AudioQuest's motion for summary judgment of noninfringement: "coaxial cable," "center conductor," "conductive shield," "means for applying the electrical signal," and "bias means."

AudioQuest does not dispute that it included with its own motion for summary judgment Monster Cable's Patent Local Rule 3-1(c) infringement charts, which purport to provide facts in support of infringement for each element of the body of claim 2, or that Monster Cable addressed each element of the body of claim 2 as well as the disputed elements of the preamble-"coaxial cable," "center conductor," and "conductive shield"-in its motion. Nor does AudioQuest identify a particular element of the preamble that Monster Cable failed to address. AudioQuest also ignores the nature of Monster Cable's argument, which was that the preamble of claim 2 did not impart additional limitations on the claimed invention. Although the court rejected Monster Cable's legal argument, Monster Cable's factual proffer was adequate under its mistaken view of the law.

### D. Assertion of Claim 1

**\*6** Fourth, AudioQuest contends that Monster Cable improperly asserted claim 1 of the '416 Patent, or refused to clarify that claim 1 was not asserted, despite the lack of any reasonable basis for finding infringement. Claim 1 requires "digital gates" which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are indisputably not present in AudioQuest's products. Monster Cable replies that the complaint does not (and is not required to) assert any individual claims, and that Monster Cable's infringement contentions, served on AudioQuest on September 9, 2004, do not include allegations of infringement of claim 1. At oral argument AudioQuest was unable to identify any authority requiring Monster Cable to disclose its detailed infringement contentions any earlier than required by Patent Local Rule 3-1. Without some coherent argument as to why Monster Cable's disclosure of its infringement contentions was untimely, the court cannot award attorneys' fees on this theory.

The court has certainly harbored substantial concerns about the merits of this lawsuit from early on. Monster Cable has repeatedly engaged in tactics and advanced arguments that demonstrate, viewed charitably, a certain lack of attention to detail; some of these tactics and arguments are discussed below. It does not improve the court's opinion that at oral argument for this motion Monster Cable represented that its attorneys had reverse engineered two products prior to filing the lawsuit, one for each opinion of counsel that Monster Cable obtained. In fact, Monster Cable's lawyers apparently reverse engineered the very same product-the Jaguar cable-both times. This sort of dissembling and shading of the truth is disrespectful of the court and comes perilously close to the threshold for sanctionable conduct.

That said, the burden placed on the party seeking attorneys' fees is heavy. Monster Cable has provided evidence that it performed the bare minimum analysis necessary to file the complaint in this action, and AudioQuest has failed to establish objectively unreasonable behavior on Monster Cable's part by clear and convincing evidence. Thus a blanket award of attorneys' fees spanning the entire action is unwarranted.

## II. Discovery and Motion Practice Abuses

AudioQuest's remaining contentions pertain to two of Monster Cable's motions and one of Monster Cable's written discovery requests. AudioQuest argues that Monster Cable's Motion for Leave to File Motion for Reconsideration of Claim Construction Order (filed on May 4, 2005), and Motion to Preclude Untimely Produced Evidence

and to Strike References Thereto (filed on June 20, 2005) were objectively frivolous. AudioQuest also argues that Monster Cable's decision to serve 785 requests for admission on the day after a case management conference was unreasonable and in bad faith. The court considers each alleged abuse in turn.

### A. Motion Seeking Reconsideration

The sole basis for Monster Cable's motion seeking reconsideration of the court's claim construction order was a single sentence in *Gillette Co. v. Energizer Holdings, Inc.,* stating generally that "[t]he word 'comprising' transitioning from the preamble to the body signals that the entire claim is presumptively open-ended." 405 F.3d at 1371. *Gillette* simply restates a common convention of claim interpretation and says nothing at all about the effect of the word "comprising" on elements in the preamble, as opposed to the body. The court has already found that Monster Cable "willfully [misread]" both the Markman order in this case and *Gillette,* noting that Monster Cable's argument "defies grammar and logic." Given the lack of any reasonable basis for Monster Cable's motion, it is appropriate to award attorneys' fees in the amount claimed by AudioQuest, $1,510.

### B. Motion to Preclude

**\*7** This court has already, *sua sponte* considered whether Monster Cable was unreasonable in moving to preclude certain evidence AudioQuest used in support of its motion for summary judgment. *See* Order of August 8, 2005 at n. 4. Although Monster Cable was not particularly diligent in filing its motion, the court accepted the explanation that Monster Cable had inadvertently confused two documents. Nothing in the current motion provides a reason to revise this conclusion, and AudioQuest's request for fees in connection with the motion to preclude is denied.

### C. Requests for Admission

It is difficult to imagine how filing 785 requests for admission-prepared in advance, by Monster Cable's own admission-the day after a case management conference could be viewed as reasonable. Monster Cable asserts, in effect, that the requests were a preemptive strike in anticipation of AudioQuest's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

deficient response to Monster Cable's outstanding contention interrogatory. Discovery, however, is not a game of tit-for-tat. Monster Cable's act of self-help-the litigation equivalent of vigilante justice-was entirely inappropriate for two reasons. First, Monster Cable had an obligation to confer with AudioQuest in an attempt to obtain the discovery it needed. Second, Monster Cable had ample opportunity to raise any discovery issues related to summary judgment motions with the court. Monster Cable's failure to do so is inexcusable, particularly in light of the case management conference that took place *one day prior* to the date of the requests for admission.

The fact that AudioQuest's response to Monster Cable's interrogatory was so shoddy does not give the court great comfort; it is arguably appropriate to invoke the doctrine of *maledicta sunt duo dom -us vestri* and deny any award of fees altogether. Strictly speaking, however, the adequacy of AudioQuest's response is irrelevant to the propriety of the requests for admission, which were served over two weeks earlier. AudioQuest's motion for attorneys' fees in the amount of $6,405 is therefore granted.

### III. Subjective Bad Faith

Although AudioQuest identifies several instances of poor judgment, two of which rise to the level of sanctionable conduct, the court does not find that Monster Cable acted with subjective bad faith in this lawsuit. An award of fees under 28 U.S.C. section 1927 is therefore inappropriate.

### CONCLUSION

For the above reasons the court hereby GRANTS IN PART and DENIES IN PART defendant's motion for attorneys' fees. Monster Cable is ordered to make payment of $7,915 to AudioQuest within 30 days of this order.

IT IS SO ORDERED.

N.D.Cal.,2005.
Monster Cable Products, Inc. v. The Quest Group
Slip Copy, 2005 WL 2596451 (N.D.Cal.)

Briefs and Other Related Documents (Back to top)

. 2005 WL 3782850 () Declaration of BARRY A.

BLESSER, Ph.D. in Support of Plaintiff Monster Cable Products, Inc.'s Reply in Support of its Cross-Motion for Summary Adjudication of Infringement (Jul. 5, 2005)
. 2005 WL 2414383 () (Report or Affidavit) (Jun. 7, 2005)
. 2005 WL 3782911 () Declaration of Barry A. Blesser, Ph.D., in Support of (1) Plaintiff Monster Cable Products, Inc.'s Cross-Motion for Summary Adjudication of Infringement; and (2) Opposition to Audioquest's Motion for Summary Judgment (Jun. 7, 2005)
. 2005 WL 2414382 () Declaration of Barry A. Blesser, PH.D., In Support of Plaintiff Monster Cable Products, Inc.'s Reply Brief On Claim Construction (Mar. 1, 2005)
. 2005 WL 3782852 () Declaration of BARRY A. BLESSER, Ph.D., in Support of Plaintiff Monster Cable Products, Inc.'s Reply Brief on Claim Construction (Mar. 1, 2005)
. 2005 WL 2414381 () Declaration of John D. Villasenor, Ph.D. in Support of Audioquest's Responsive Brief On Claim Construction (Feb. 21, 2005)
. 2005 WL 3782851 () Declaration of JOHN D. VILLASENOR, Ph.D. in Support of Audioquest's Responsive Brief on Claim Construction (Feb. 21, 2005)
. 2005 WL 3782853 () Declaration of JOHN D. VILLASENOR, Ph.D. in Support of Audioquest's Responsive Brief on Claim Construction (Feb. 21, 2005)
. 2005 WL 2414384 () Declaration of Barry A. Blesser, Ph.D., In Support of Plaintiff Monster Cable Products, Inc.'s Opening Brief On Claim Construction (Feb. 7, 2005)
. 2004 WL 3577561 (Trial Pleading) Complaint for Patent Infringement (Jan. 5, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.3d 755
407 F.3d 755, 2005 Fed.App. 0206P
**(Cite as: 407 F.3d 755)**
**H**

Briefs and Other Related Documents
2005 FED. App. 0206P

United States Court of Appeals,Sixth Circuit.
John DOE et al., Plaintiffs-Appellants,
v.
LEXINGTON-FAYETTE URBAN COUNTY
GOVERNMENT, et al., Defendants-Appellees.
John Doe et al., Plaintiffs-Appellants,
v.
Pam Miller et al., Defendants-Appellees.
Keith Rene Guy, Sr. et al. Plaintiffs-Appellants,
v.
Lexington-Fayette Urban County Government,
Defendant-Appellee.
Nos. 03-6261, 03-6490, 03-6517, 03-6560.

Argued:  March 16, 2005.
Decided and Filed:  May 5, 2005.
Rehearing and Rehearing En Banc Denied Aug. 12,
2005.

**Background:**  Former participants in summer program for disadvantaged youth, which was partially funded by county, brought putative class actions against county seeking damages for sexual abuse that allegedly occurred during their participation in program. The United States District Court for the Eastern District of Kentucky, Karl S. Forester, Chief Judge, and Joseph M. Hood, Chief District Judge, dismissed two actions pursuant to settlements without giving notice to putative class members and, in separate, subsequent action, denied new plaintiffs' motion to intervene in earlier cases. Participants appealed.

**Holdings:**  The Court of Appeals, Gilman, Circuit Judge, held that:

6(1) district court should have given notice of settlement to putative class members;

13(2) district court did not abuse its discretion in denying plaintiffs' request for extension of discovery deadline; but

16(3) county was not entitled to attorney fees for successfully opposing plaintiffs' motion to compel discovery.

Reversed and remanded in part; appeal dismissed in

part.

See also 57 Fed.Appx. 217.

West Headnotes

[1] Federal Courts 170B ☞ 829

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk829 k. Amendment, Vacation, or Relief from Judgment. Most Cited Cases
Court of Appeals will review the denial of a motion for relief from judgment under the abuse of discretion standard, whereby, in order to find an abuse of discretion, Court of Appeals must have a definite and firm conviction that the trial court committed a clear error of judgment.  Fed.Rules Civ.Proc.Rule 60(b), 28 U.S.C.A.

[2] Federal Civil Procedure 170A ☞ 2641

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(G) Relief from Judgment
            170Ak2641 k. In General. Most Cited Cases
Relief under rule governing motions for relief from judgment is circumscribed by public policy favoring finality of judgments and termination of litigation.  Fed.Rules Civ.Proc.Rule 60(b), 28 U.S.C.A.

[3] Federal Courts 170B ☞ 820

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk820 k. Depositions and Discovery. Most Cited Cases
Because the scope of discovery is within the sound discretion of the trial court, Court of Appeals will not reverse a district court's discovery ruling unless the district has abused its discretion.

[4] Federal Courts 170B ☞ 830

170B Federal Courts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.3d 755
**(Cite as: 407 F.3d 755)**

Page   2

170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
        170Bk830 k. Costs, Attorney's Fees
and Other Allowances. Most Cited Cases
Abuse of discretion standard of review applies to a
district court's decision regarding an award of
attorney fees.

[5] Federal Courts 170B ⬅➡ 817

170B Federal Courts
    170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
        170BVIII(K)4 Discretion of Lower Court
          170Bk817 k. Parties; Pleading. Most
Cited Cases
Court of Appeals reviews for abuse of discretion
decisions about whether to certify a class.

[6] Compromise and Settlement 89 ⬅➡ 68

89 Compromise and Settlement
    89II Judicial Approval
      89k66 Proceedings
        89k68 k. Notice and Communications.
Most Cited Cases

  Federal Civil Procedure 170A ⬅➡ 1708

170A Federal Civil Procedure
    170AXI Dismissal
      170AXI(A) Voluntary Dismissal
        170Ak1708 k. Notice. Most Cited Cases

  Federal Civil Procedure 170A ⬅➡ 2651.1

170A Federal Civil Procedure
    170AXVII Judgment
      170AXVII(G) Relief from Judgment
        170Ak2651 Grounds
          170Ak2651.1 k. In General. Most
Cited Cases
District court that dismissed putative class action
brought against county by former youth program
participants who were allegedly sexually assaulted
during program should have given notice of
settlement and dismissal to putative class members,
and group of putative class members were thus
entitled to relief from void judgment, in view of
extensive publicity devoted to abuse and resulting
lawsuits, presumably leading putative class members

to believe their rights were adequately represented,
and district court's faulty assumption that not many
program participants would come forward with
allegations of abuse. Fed.Rules Civ.Proc.Rules
23(e)(1)(B), 60(b)(4) 28 U.S.C.A.

[7] Federal Civil Procedure 170A ⬅➡ 2392

170A Federal Civil Procedure
    170AXVII Judgment
      170AXVII(A) In General
        170Ak2392 k. Requisites and Validity.
Most Cited Cases

  Federal Civil Procedure 170A ⬅➡ 2393

170A Federal Civil Procedure
    170AXVII Judgment
      170AXVII(A) In General
        170Ak2393 k. Jurisdiction to Sustain
Judgment. Most Cited Cases
A judgment is void, for purpose of rule permitting
relief from judgment, if the court that rendered it
lacked jurisdiction of the subject matter, or of the
parties, or if it acted in a manner inconsistent with
due process of law. U.S.C.A. Const.Amend. 5;
Fed.Rules Civ.Proc.Rule 60(b)(4), 28 U.S.C.A.

[8] Compromise and Settlement 89 ⬅➡ 68

89 Compromise and Settlement
    89II Judicial Approval
      89k66 Proceedings
        89k68 k. Notice and Communications.
Most Cited Cases

  Federal Civil Procedure 170A ⬅➡ 177.1

170A Federal Civil Procedure
    170AII Parties
      170AII(D) Class Actions
        170AII(D)2 Proceedings
          170Ak177 Notice and
Communications
            170Ak177.1 k. In General. Most
Cited Cases

  Federal Civil Procedure 170A ⬅➡ 1708

170A Federal Civil Procedure
    170AXI Dismissal
      170AXI(A) Voluntary Dismissal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.3d 755
**(Cite as: 407 F.3d 755)**

170Ak1708 k. Notice. Most Cited Cases
If, upon examination, the district court finds that putative class members are likely to be prejudiced on account of a settlement or dismissal of an action that was begun as class action but settled prior to class certification or after denial of class certification, the district court should provide notice of the settlement or dismissal to putative class members pursuant to class action rule. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

[9] Compromise and Settlement 89 ⬥⟿ 68

89 Compromise and Settlement
    89II Judicial Approval
        89k66 Proceedings
            89k68 k. Notice and Communications. Most Cited Cases

Federal Civil Procedure 170A ⬥⟿ 177.1

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)2 Proceedings
                170Ak177 Notice and Communications
                    170Ak177.1 k. In General. Most Cited Cases
Amount of publicity that a case has received is one factor among others that a district court should take into account when considering whether putative class members are likely to be prejudiced by a settlement, and thus whether putative class members are entitled to notice of settlement pursuant to class action rule. Fed.Rules Civ.Proc.Rule 23(e), 28 U.S.C.A.

[10] Federal Civil Procedure 170A ⬥⟿ 2651.1

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(G) Relief from Judgment
            170Ak2651 Grounds
                170Ak2651.1 k. In General. Most Cited Cases
Although district court's failure to order notice to putative class members upon settlement of second class action brought against county by former youth program participants who were allegedly sexually assaulted during program was questionable, under rule that notice is warranted where putative class

members may be prejudiced by dismissal, district court's order would not be vacated, on motion for relief from judgment, where settlement between named plaintiffs and county was contingent upon dismissal of class action, such that vacating of order would disturb settlement, and appellate court's vacating of similar order in first class action arising from same circumstances reached equitable result of allowing a class action to go forward. Fed.Rules Civ.Proc.Rules 23(e), 60(b)(4), 28 U.S.C.A.

[11] Limitation of Actions 241 ⬥⟿ 126.5

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(H) Commencement of Proceeding; Relation Back
            241k126.5 k. Class Actions, Matters Peculiar To. Most Cited Cases
Where class action brought against county by former youth program participants who were allegedly sexually assaulted during program was reopened pursuant to motion for relief from judgment, based on district court's failure to give pre-dismissal notice to putative class members upon settlement, various applicable statutes of limitation would be considered as tolled from and after filing of original class action. Fed.Rules Civ.Proc.Rules 23(e), 60(b)(4), 28 U.S.C.A.

[12] Federal Courts 170B ⬥⟿ 820

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk820 k. Depositions and Discovery. Most Cited Cases

Federal Courts 170B ⬥⟿ 895

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)6 Harmless Error
                170Bk895 k. Pretrial Proceedings; Discovery and Depositions. Most Cited Cases
A district court's decision to limit discovery will generally be upheld unless the decision is deemed to be an abuse of discretion resulting in substantial prejudice.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.3d 755
**(Cite as: 407 F.3d 755)**

**Page 4**

[13] Federal Civil Procedure 170A ☞ 1261

170A Federal Civil Procedure
   170AX Depositions and Discovery
     170AX(A) In General
       170Ak1261 k. In General. Most Cited Cases
District court did not abuse its discretion in denying plaintiffs' request for extension of time beyond the 30 days of discovery it granted on issue of whether action was barred by statute of limitations, as loss of any evidence due to denial of extension was in part due to plaintiffs' own lack of diligence, in view of plaintiffs' decision, during 30-day period, not to depose certain parties out of "professional courtesy."

[14] Federal Civil Procedure 170A ☞ 1278

170A Federal Civil Procedure
   170AX Depositions and Discovery
     170AX(A) In General
       170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases
A motion to compel discovery is "substantially justified," as would preclude award of attorney fees to successful opponent of motion, if motion raises an issue about which there is a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action. Fed.Rules Civ.Proc.Rule 37(a)(4)(B), 28 U.S.C.A.

[15] Federal Civil Procedure 170A ☞ 1278

170A Federal Civil Procedure
   170AX Depositions and Discovery
     170AX(A) In General
       170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases
Whether a district court's decision to impose discovery sanction amounts to an abuse of discretion is governed by four-factor test, which looks at (1) whether party's failure to cooperate in discovery is due to willfulness, bad faith, or fault, (2) whether the adversary was prejudiced by the party's failure to cooperate in discovery, (3) whether the party was warned that failure to cooperate could lead to the sanction, and (4) in regard to dismissal, whether less drastic sanctions were first imposed or considered. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

[16] Federal Civil Procedure 170A ☞ 1278

170A Federal Civil Procedure
   170AX Depositions and Discovery
     170AX(A) In General
       170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases
Defendant county was not entitled to attorney fees for successfully opposing plaintiffs' motion to compel discovery, in class action brought by former youth program participants who were allegedly sexually assaulted during program, because motion to compel raised issue about which reasonable people could differ, county could not have been prejudiced by plaintiffs' failure to cooperate in discovery if motion was substantially justified, plaintiffs were not warned that motion could result in assessment of attorney fees against them, and district court's rejection of case cited by plaintiffs in support of their motion as "not germane in any way" was overbroad. Fed.Rules Civ.Proc.Rule 37, 28 U.S.C.A.

**\*757 ARGUED:** James M. Morris, Morris & Morris, Lexington, Kentucky, for Appellants. Sheryl G. Snyder, Frost, Brown & Todd, Louisville, Kentucky, for Appellees. ON BRIEF: James M. Morris, Sharon K. Morris, Morris & Morris, Lexington, Kentucky, for Appellants. Sheryl G. Snyder, David S. Kaplan, Frost, Brown & Todd, Louisville, Kentucky, Michael Harris Baker, Baker, Kriz, Jenkins & Prewitt, Lexington, Kentucky, Leslye M. Bowman, Lexington-Fayette Urban County Government Department of Law, Lexington, Kentucky, for Appellees.

Before: COLE and GILMAN, Circuit Judges; POLSTER, District Judge. FN*

FN* The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

**\*758 OPINION**
GILMAN, Circuit Judge.
In 1969, Ronald Berry founded a summer program for disadvantaged youth called Micro-City Government. This program was funded in part by the Lexington-Fayette Urban County Government (LFUCG). Numerous former teenagers who participated in Micro-City Government now claim that LFUCG continued to support the program even after learning that Berry was sexually molesting them, and that LFUCG knowingly concealed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.3d 755
**(Cite as: 407 F.3d 755)**

**Page 5**

Berry's conduct for political reasons.

These appeals arise from the plaintiffs' attempt to maintain a class-action lawsuit against LFUCG. Although several procedural issues are raised, the key issue is whether to vacate two orders dismissing earlier class-action lawsuits brought by Berry's victims. For the reasons set forth below, we REVERSE the judgment of the district court in *Guy et al. v. LFUCG*, No. 98-431-KSF, and REMAND the case for further proceedings consistent with this opinion.

### I. BACKGROUND

#### A. Factual background

From 1969 until 2000, LFUCG provided funding for Micro-City Government, a summer program founded by Ronald Berry. The purpose of the program was to provide part-time summer employment for disadvantaged area youth. According to many of the program's participants, however, Berry physically, mentally, and sexually abused them, with the latest acts of abuse occurring in May of 1995. Berry was subsequently convicted on 12 counts of sodomy and abuse of minors in criminal proceedings brought by the Commonwealth of Kentucky.

The plaintiffs in the present case, 96 former Micro-City Government participants, claim that LFUCG knowingly concealed and facilitated the abuse. Specifically, they allege that LFUCG officials were informed of the abuse on a number of occasions, and that at least one LFUCG official actually witnessed "one of Berry's sexual outings." Nevertheless, LFUCG continued to fund Micro-City Government and is alleged to have actively concealed Berry's behavior. The plaintiffs further allege that LFUCG retained Berry as the director of the program even after LFUCG officials were aware of the abuse, and that at least one Mayor of Lexington refused to cut off funding or expose Berry because doing so would not have been "politically sustainable."

#### B. Procedural background

##### 1. Guy

On October 15, 1998, the four victims who initiated the criminal charges against Berry (Keith Rene Guy

Sr., Barry Lynn Demus Jr., Octavius Gillis, and Christopher Andrew Williams) filed a class action lawsuit against LFUCG, alleging that it had been both aware of and deliberately indifferent to the abuse. (This suit, *Guy et al. v. LFUCG*, No. 98-431-KSF, is hereinafter referred to as *Guy*.) But in January of 2000, before any determination was made as to the certification of the class, the *Guy* plaintiffs (with the exception of Guy himself) settled with LFUCG and joined in the defense motion to dismiss the case. On January 12, 2000, Craig Johnson and David Jones, two victims who were not among the *Guy* plaintiffs, moved to have notice of the dismissal provided to the putative class members pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. This request for notice was rejected by the district court in an April 4, 2000 order that provides the following rationale:

**\*759** Four named plaintiffs brought the instant case and Jones and Johnson moved to intervene. Considering that this lawsuit was filed in October 1998 and that there has been an enormous amount of publicity about the case, the Court believes that it is unlikely that many more alleged victims will come forward. Accordingly, the Court finds that the class is not so numerous that joinder is impracticable. Since the class fails to meet the prerequisites of Rule 23(a), notice to putative class members is not warranted.

As demonstrated by the later filings related to this case, however, the district court's reasoning was based on faulty assumptions. Nearly 100 putative class members came forward within two years after the district court's April 4, 2000 *Guy* order that dismissed the case. Guy, Johnson, and Jones all appealed.

As discussed in greater detail below, Johnson and Jones eventually settled. Guy's appeal, however, was considered by a prior panel of this court in *Guy v. Lexington-Fayette Urban County Gov't*, Nos. 00-5434 & 00-5569, 2003 WL 133037 (6th Cir. Jan.15, 2003) (unpublished). The panel concluded that Guy lacked standing to pursue the claim with respect to the notice requirement. Similarly, the panel concluded that the district court did not abuse its discretion in holding Guy to his earlier agreement to settle his case. It therefore affirmed the judgment of the district court in *Guy*.

##### 2. Doe I

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.3d 755
(Cite as: 407 F.3d 755)

On May 3, 2000, Johnson, Jones, and seven other "John Does" filed a second class-action complaint that contained the same allegations as in *Guy*. (This action, *Doe v. LFUCG*, No. 00-166-KSF, is hereinafter referred to as *Doe I*.) *Doe I* was settled some two years later, on June 28, 2002. The district court again failed to provide any notice to putative class members when the parties settled, and the case was dismissed. No one, however, requested that notice be provided, and there is nothing in the record to demonstrate that the district court even considered the applicability of Rule 23(e) . Johnson, Jones, and LFUCG subsequently filed a joint motion to dismiss Johnson's and Jones's outstanding appeal in *Guy*. The motion was granted by this court in January of 2003.

### 3. Doe II

On September 25, 2002, 38 John Does (who are included in the present appeal) filed a third class action case, making the same allegations as in *Guy* and *Doe I*, as well as various claims under federal racketeering laws. (This action, *Doe # 1-33 v. LFUCG*, No. 02-436-JMH, is hereinafter referred to as *Doe II*.) The district court, on April 23, 2003, dismissed *Doe II* as being barred by the applicable statute of limitations.

### 4. Discovery and attorney fees

At a scheduling conference in *Doe II*, the district court gave both parties 30 days to conduct discovery on the issue of whether the case was barred by the applicable statute of limitations. Although the Does did not initially object to the 30-day deadline, and even failed to depose certain parties "out of professional courtesy," they subsequently moved for an extension of time to conduct more discovery on LFUCG's alleged concealment of Berry's abuse. The district court denied the motion, noting that extensive discovery had already been conducted on the concealment issue and chastising the Does for "permit [ing] the opportunity to depose the desired parties to slip through their fingers even as they held that opportunity in their hands."

**\*760** After successfully opposing the Does' motion to compel during this discovery period, LFUCG moved to recover its attorney fees on that motion. The district court held that the Does' motion to compel had not been "substantially justified," and

thus awarded LFUCG $5,841.80 in attorney fees.

### 5. Doe III

On the same date that *Doe II* was dismissed, 58 new John Does (who are also included in the present appeal) filed still another class-action case, again repeating the same allegations as in *Guy*, *Doe I*, and *Doe II*. (This action, *Doe # 1-44 v. LFUCG*, No. 03-12-JMH, is hereinafter referred to as *Doe III*.) *Doe III* was dismissed over a year later by the district court on November 21, 2003 as being time-barred by the applicable statute of limitations.

### 6. Doe v. Miller

The 58 new Does also filed a separate action, *Doe v. Miller*, No. 00-166-KSF, in which they moved to intervene in the earlier *Guy* and *Doe I* cases pursuant to Rule 60(b)(4) of the Federal Rules of Civil Procedure. They contend that the lack of notice to the putative class members violated their right to the due process of law, making the judgments in those cases void. The Does' claims in *Doe v. Miller* were rejected by the district court in an order entered on October 7, 2002.

Three related appeals have arisen from this procedural morass. *Doe v. Miller* has been consolidated with *Guy v. LFUCG*. The third appeal is *Doe v. LFUCG*.

## II. ANALYSIS

### A. Standard of review

#### 1. Summary judgment

The district court's grant of summary judgment is reviewed de novo. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir.2002). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The central issue is "whether the evidence presents a sufficient disagreement to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.3d 755
**(Cite as: 407 F.3d 755)**

Page   7

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### 2. Rule 60(b) claims

[1][2] This court will review the denial of a Rule 60(b) motion under the "abuse of discretion" standard. *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 355 F.3d 574, 583 (6th Cir.2004). In order to find an abuse of discretion, we must have "a definite and firm conviction that the trial court committed a clear error of judgment." *Davis v. Jellico Comm. Hosp., Inc.*, 912 F.2d 129, 133 (6th Cir.1990) (citation omitted). Relief under Rule 60(b), moreover, is "circumscribed by public policy favoring finality of judgments and termination of litigation." *Waifersong Ltd. v. Classic Music Vending*, 976 F.2d 290, 292 (6th Cir.1992).

### 3. Discovery, attorney fees, and class certification

[3][4][5] Because "the scope of discovery is within the sound discretion of the trial court," *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir.1981), this *761 court will not reverse the district court's decision unless the district has abused its discretion. *Lott v. Coyle*, 261 F.3d 594, 602 (6th Cir.2001). The same standard applies to a district court's decision regarding an award of attorney fees. *Purtle v. Eldridge Auto Sales, Inc.*, 91 F.3d 797, 799 (6th Cir.1996). Likewise, "[w]e review decisions [about] whether to certify a class under an 'abuse of discretion' standard." *Mayer v. Mylod*, 988 F.2d 635, 640 (6th Cir.1993).

### B. The Does' motion under Rule 60(b)(4) with respect to their Rule 23(e) notice claims

[6][7] By failing to provide notice to the putative class members in *Guy* and *Doe I*, the district court is alleged to have acted inconsistently with both the Rules of Civil Procedure and with basic notions of due process. The Does therefore request that this court vacate the *Guy* and *Doe I* judgments pursuant to Rule 60(b)(4) of the Federal Rules of Civil Procedure, which allows us to grant relief when an earlier "judgment is void." "A judgment is void under 60(b)(4) 'if the court that rendered it lacked

jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law.' " *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 108 (6th Cir.1995) (quoting *In re Edwards*, 962 F.2d 641, 644 (7th Cir.1992)).

Rule 23(e)(1)(B) of the Federal Rules of Civil Procedure regulates the dismissal or settlement of class actions. That subsection, as it applies to the facts of this case in its formulation prior to amendment in December of 2003, provided that a "class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such maner as the court directs." Fed.R.Civ.P. 23(e) 2003. As many commentators have noted, "[t]he purpose of the rule is to discourage the use of the class action device by the individual representative plaintiff to secure an unjust private settlement and to protect the absent class members against the prejudice of discontinuance." Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 8:18 (4th ed.2002).

Most courts have found that Rule 23(e)'s notice requirement applies to *putative* class members as well as to *certified* class members. *See Culver v. City of Milwaukee*, 277 F.3d 908, 914-15 (7th Cir.2002) ("[T]he context in which 'class' is used in Rule 23(e) indicates that it is not limited to a certified class. Even cases that refuse to apply Rule 23(e) to putative class actions require notice to the members of the putative class if it seems clear that otherwise their interests would be harmed."); *see also Birmingham Steel Corp. v. TVA*, 353 F.3d 1331, 1339 (11th Cir.2003) (holding that "once a district court has decertified a class, it must ensure that notification of this action be sent to the class members, in order that the latter can be alerted that the statute of limitations has begun to run again on their individual claims"); *Crawford v. F. Hoffman-La Roche Ltd.*, 267 F.3d 760, 764-65 (8th Cir.2001) (finding that Rule 23(e) is applicable even if "a class has not yet been certified," and that "in deciding whether to allow dismissal or issue notice, the district court must consider, among other things, the possibility that potential members of the class would be prejudiced"); *Diaz v. Trust Territory of the Pac. Islands*, 876 F.2d 1401, 1408, 1409 (9th Cir.1989) (adopting "the majority approach … that Rule 23(e) applies before certification," and noting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.3d 755
**(Cite as: 407 F.3d 755)**

that "notice of dismissal protects the class from prejudice it would otherwise suffer if class members have refrained from filing suit because of knowledge of the pending class action").

Even the circuits that have not required notice to putative class members as a general rule have warned that failure to provide notice is justified only in instances free of prejudice and collusion. *See Shelton*762 v. Pargo, Inc.,* 582 F.2d 1298, 1315 (4th Cir.1978) ("[I]n the pre-certification settlement context of an action begun as a class action, a District Court is not automatically obligated to order notice to all putative class members under the terms of 23(e) but should, after proper inquiry, determine whether the proposed settlement and dismissal are tainted by collusion or will prejudice absent putative members with a reasonable 'reliance' expectation of the maintenance of the action for the protection of their interests."); *cf. Pearson v. Skydell,* 522 F.2d 171, 177 (5th Cir.1975) ("[W]here a court has ruled under Rule 23(c)(1) that an action cannot properly be maintained as a class action[,] the notice requirements of Rule 23(e) do not apply, at least where the dismissal and settlement of the action do not directly affect adversely the rights of individuals not before the court.").

[8] Ultimately, the general rule adopted by most federal courts that have addressed the topic is the one articulated in Newberg:
[M]ost requests for voluntary dismissals of representative suits are made before there has been any class ruling. Whether a voluntary dismissal in these circumstances is sought in connection with a proposed settlement of claims of the individual plaintiff only or in a nonsettlement context, most courts have stressed the need under Rule 23(e) to examine *whether any prejudice to the class will result if the dismissal of the action is allowed without class notice.*

Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11:72 (4th ed.2002) (footnotes omitted) (emphasis added); *see also Simer v. Rios,* 661 F.2d 655, 666 (7th Cir.1981) ("[W]e believe that there are serious shortcomings with a rule that would require that Rule 23(e) be applied to all settled class actions which have not been certified.... Therefore, rather than setting down an absolute rule[,] we choose to place discretion in the district court to assess the *prejudice to absent class members*

*caused by the settlement,* the institutional costs of notice and a certification hearing, as well as other factors relevant to this determination.") (emphasis added).    If, upon examination, the district court should find that the putative class members are likely to be prejudiced on account of a settlement or dismissal, the district court should provide Rule 23(e) notice.

LFUCG, however, argues that the "precedents from the pre-certification context do not apply because class certification was expressly denied in *Guy* and *Doe I.*" This position, however, is not supported by the relevant caselaw.    The Seventh Circuit, for example, explicitly considered and rejected the argument that notice is not required when class certification has been denied in the case of *Culver v. City of Milwaukee,* 277 F.3d 908 (7th Cir.2002). In *Culver,* a group of white males brought a class action on behalf of themselves and others, claiming that they had been discriminated against by the Milwaukee police department.    The district court granted the city's motion to decertify the class action on the merits.    It did not, however, issue a notice of dismissal to the putative class members.

On appeal, the Seventh Circuit determined that the class action had been correctly dismissed. Nonetheless, the court found that the district court had erred in failing to give notice to the putative class members pursuant to Rule 23(e).    It noted that an important justification for the application of Rule 23(e) was that "[t]he filing of a class action suit tolls the statute of limitations for all the members of the class, but when the suit is dismissed without prejudice or when class certification is *763 denied [,] the statute resumes running for the class members." *Id.* at 914 (citations omitted).    The court further concluded that, in the present case, "the statute of limitations on [the class members'] claims will run without their knowing it until it is too late." *Id.* Applying the rule that "[t]he judge's duty is to order notice unless the risk of prejudice to absent class members is nil," *id.* at 915, the court remanded the case to the district court for compliance with Rule 23(e), even though, as here, the district court had already rejected class certification. *Id.; see also Birmingham Steel Corp. v. TVA,* 353 F.3d 1331, 1339 (11th Cir.2003) (adopting the rule in *Culver* ).

Consistent with the above caselaw, the Does argue

that prejudice can be inferred from the great publicity surrounding the underlying facts of this case. They point to a line of cases standing for the proposition that prejudice can be inferred where the litigation has received widespread publicity, which increases the likelihood that putative class members have relied on the lawsuit in question. *See, e.g., In re Cardizem CD Antitrust Litig.,* No. 99-MD-1278, 2000 WL 33180833, at *6-7 (E.D.Mich. Sept.21, 2001) (unpublished) (observing that a "reliance interest can become a danger when the filing of a class action complaint receives attention by the news media," and finding that putative class members were prejudiced in part because "[t]hese consolidated actions have received publicity, both nationally and in the areas where the suits were initially filed") (quoting *Anderberg v. Masonite Corp.,* 176 F.R.D. 682, 690 (N.D.Ga.1997)); *cf. Sikes v. American Telephone and Telegraph Co.,* 841 F.Supp. 1572, 1579-80 (S.D.Ga.1993) (finding that a lack of publicity indicates that "any absent unnotified proposed class members are not likely to have developed a 'reliance interest' in the proposed class action," and that, "[i]f no reliance interest were likely to have developed, then it would seem unnecessary" to provide notice).

[9] Rather than adopt a per se rule, most courts considering the issue have found the level of publicity to be one of several factors appropriately considered when examining whether putative class members are likely to be prejudiced if the class-action case is dismissed without notice. *See In re Cardizem CD Antitrust Litig.,* 2000 WL 33180833, at *7 (weighing a variety of factors, including the substantial press coverage of the class-action lawsuit, in finding prejudice to the putative class to exist); *Anderberg,* 176 F.R.D. at 690 (noting that "[o]nce absent class members know of a pending litigation involving their rights, they may act in reliance upon the class action and not file their own individual suits," but also finding that the low level of publicity combined with other factors counseled against ordering notice in the case before it). We therefore decline the Does' invitation to declare that all cases where there is widespread publicity require notice to the putative class members. Instead, we adopt the general principle that the amount of publicity is simply one factor among others that a district court should take into account when considering whether putative class members are likely to be prejudiced by a settlement.

Consistent with the majority rule that a district court should order Rule 23(e) notice where the putative class is likely to be prejudiced by the dismissal or settlement of a class-action suit, we conclude that the district court below abused its discretion in not providing notice in both *Guy* and *Doe I.* One key factor supporting our conclusion is that once the abusive activity at the Micro-City Government program was thrust into the open, the local media devoted substantial coverage to the abuse. **\*764** included coverage of the *Guy* and *Doe I* lawsuits. Such public attention presumably led putative class-action members to believe that their rights were being adequately represented by the *Guy* and *Doe I* plaintiffs. Without notice that these actions had been dismissed, the putative class members were likely lulled into believing that their claims continued to be preserved.

The other significant consideration in our evaluation was that the district court in *Guy* relied on a faulty assumption in denying the notice request. The Micro-City Government program was popular and long-lasting, with thousands of participants during its 30-year lifetime. There is, moreover, evidence demonstrating that Berry had been abusing many of the participating youths throughout the length of the program. (The Does even allege that one of Berry's primary motivations in establishing the program was to give him sexual access to children.) In light of these facts, which were known at the time of *Guy,* the district court's conclusion that "it is unlikely that many more alleged victims will come forward" was objectively unreasonable. There was in fact substantial reason to believe that many more victims would come forward, as in fact actually occurred with the filing of the *Doe II* and *Doe III* lawsuits.

[10] We therefore adopt the view of the majority of the circuits that Rule 23(e) applies in a precertification context where putative class members are likely to be prejudiced. Moreover, because of the public policy considerations involved, we further adopt the reasoning articulated by the Seventh Circuit in *Culver* that Rule 23(e) may be applied where the district court has already rejected class certification. Under this standard, the district court in *Guy* erred in failing to provide notice to the putative class members because they were clearly prejudiced by the dismissal of that case. We decline, however, to vacate the district court's order in *Doe I.* Although the majority rule discussed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.3d 755
**(Cite as: 407 F.3d 755)**

above also renders questionable the district court's failure in *Doe I* to order notice to putative class members, the *Doe I* settlement between the named plaintiffs and LFUCG was contingent upon the dismissal of the class action.    An action by this court vacating the district court's order in *Doe I* would therefore disturb the settlement.    On the other hand, vacating the *Guy* order reaches the equitable result of allowing the Does to go forward with their case while preserving the settlement reached by the *Doe I* parties.

C. Statutes of limitation (discovery rule and equitable-tolling analysis)

[11] Statutes of limitation that cover the acts alleged by the Does range from one year to six years. Because *Guy* will be reopened, however, the various statutes of limitation will be considered as tolled from and after the filing of *Guy. See Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 353-54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983) ("[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.") (citation omitted).   We therefore need not address the discovery-rule and equitable-tolling arguments presented by the Does.

D. The Rule 60(b)(2) and (3) motions with respect to *Guy* and *Doe I*

The Does further claim that LFUCG and the plaintiffs' counsel in *Guy* and *Doe I* took actions that constituted fraud, collusion, misrepresentation, and misconduct, meriting relief under Rules 60(b)(2) and 60(b)(3) of the Federal Rules of Civil Procedure**765** .   Because *Guy* will be reopened on the basis of Rule 60(b)(4), however, we have no need to address these alternative claims for relief.

E. Whether the statutes of limitation were tolled by *Doe I*

LFUCG contends that "*Crown Cork* tolling applies only to the first class action," and therefore argues that the various statutes of limitation were not tolled when *Doe I* was filed.   Because the *Guy* class action will be reopened for the reasons set forth in Part II.B. above, we need not address the question of whether the statutes of limitation for *Doe II* and *Doe*

*III* were tolled by the filing of *Doe I.*

F. 30-day discovery period

[12][13]   A district court's decision to limit discovery will generally be upheld unless the decision is deemed to be "an abuse of discretion resulting in substantial prejudice."   *Hahn v. Star Bank,* 190 F.3d 708, 719 (6th Cir.1999).    The circumstances surrounding the district court's decision here to deny an extension of time beyond the 30 days of discovery it granted for the statute-of-limitation issue suggest that the district court did not abuse its discretion.    Most tellingly, a portion of the evidence that the Does claim to have been denied the opportunity to introduce was lost because of their own lack of diligence.    As the court noted, "the Plaintiffs' counsel's failure to procure the depositions of certain parties out of their own perceived 'professional courtesy' in the face of a deadline of which all parties were aware … [is] the Plaintiffs' own loss."    The district court's decision not to reward the Does for "permit[ting] the opportunity to depose the desired parties to slip through their fingers even as they held that opportunity in their hands" was well within the "broad discretion" that a district court has over the scope of discovery.   *See Bush v. Dictaphone Corp.,* 161 F.3d 363, 367 (6th Cir.1998).    Even if this were not the case, the reopening of *Guy* makes this issue moot.    We therefore decline to hold that the district court abused its discretion by limiting discovery on this issue to 30 days.

G. Attorney fees relating to the Does' motion to compel

*1. Whether the motion was substantially justified*

[14] Rule 37(a)(4)(B) of the Federal Rules of Civil Procedure provides that if a motion to compel discovery is denied,
the court … shall, after affording an opportunity to be heard, require the moving party or the attorney filing the motion or both of them to pay to the party or deponent who opposed the motion the reasonable expenses incurred in opposing the motion, including attorney's fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.3d 755
(Cite as: 407 F.3d 755)

A motion is "substantially justified" if it raises an issue about which "there is a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action." *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (citations and quotation marks omitted). As noted by the Supreme Court, "the one [connotation] most naturally conveyed by the phrase before us here ["substantially justified"] is not 'justified to a high degree,' but rather 'justified in substance or in the main'-that is, justified to a degree that could satisfy a reasonable person." *Id.*

[15][16] This circuit has adopted a four-factor test to determine whether a district court's decision to impose sanctions *766 under Rule 37 amounts to an abuse of discretion:
The first factor is whether the party's failure to cooperate in discovery is due to willfulness, bad faith, or fault; the second factor is whether the adversary was prejudiced by the party's failure to cooperate in discovery; the third factor is whether the party was warned that failure to cooperate could lead to the sanction; and the fourth factor in regard to a dismissal is whether less drastic sanctions were first imposed or considered.

*Freeland v. Amigo,* 103 F.3d 1271, 1277 (6th Cir.1997). The first *Freeland* factor appears to cut in the Does' favor because the motion to compel raised an issue about which reasonable people could differ. As noted by the Does, LFUCG produced thousands of pages of the documents requested by the motion between the time that the motion was filed and the time that the district court granted attorney fees to LFUCG. This strongly suggests that the Does' request for these documents was plausible on its face.

Likewise, LFUCG could not have been "prejudiced by the [Does'] failure to cooperate in discovery," *Freeland,* 103 F.3d at 1277, if the motion was substantially justified. The third factor also weighs in the Does' favor, because the district court did not warn them that a motion to compel could result in attorney fees being assessed against them. *See id.* Finally, because the district court did not dismiss the case, the fourth *Freeland* factor is not applicable to the present circumstances. *See id.*

*2. The Does' citation of Harding v. Dana Transport*

Central to the district court's imposition of sanctions was its discussion of the deficiencies in the Does' argument for the discovery of materials that LFUCG claimed were protected by the attorney-client privilege. Although the Does may have been wrong on this issue, the district court's sweeping statement that the authority cited by the Does "was not germane in any way to the issue before the Court" was overbroad. The case cited by the Does, *Harding v. Dana Transport, Inc.,* 914 F.Supp. 1084 (D.N.J.1996), involved the scope of the attorney-client privilege in the context of discovery, and ultimately held that the privilege had been waived with regard to the information at issue. *Id.* at 1103.

Regardless of whether the ultimate issue addressed in *Harding* was identical to the issue raised by the Does, *Harding* clearly provides support for a party seeking to compel discovery of information that the opposing party claims is protected by the attorney-client privilege. *See id.* at 1089-90, 1102 (holding that "[a] party or person seeking to obtain a protective order on the basis of an asserted privilege bears the burden of establishing the applicability of a privilege to the information sought," and noting that "there is no general prohibition against obtaining the deposition of adverse counsel regarding relevant, non-privileged information") (citation omitted).

In sum, we conclude that the district court abused its discretion by granting attorney fees in regard to a motion that, even if properly denied, was substantially justified. We therefore vacate the district court's order awarding attorney fees to LFUCG.

### H. Class certification

The district court's denial of class certification was based on its holding that the denial of certification in *Doe I* collaterally estopped consideration of this issue in *Doe II* and *Doe III. See Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 *767 L.Ed.2d 210 (1979) (holding that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation"); *Hammer v. INS,* 195 F.3d 836, 840 (6th Cir.1999) (applying a five-factor test to determine whether collateral estoppel applies, with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

407 F.3d 755
**(Cite as: 407 F.3d 755)**

one of the requirements being that "the issue was actually litigated and decided in the prior action"). Because *Guy* is being reopened, however, there is no longer a final judgment determining the issue of class certification. We therefore remand the issue of class certification to the district court for reconsideration on the merits.

### III. CONCLUSION

For all of the reasons set forth above, we REVERSE the judgment of the district court with respect to *Guy* and the award of attorney fees to LFUCG in *Doe II,* and REMAND the case for further proceedings consistent with this opinion. The remaining issues in these consolidated appeals are DISMISSED as moot.

C.A.6 (Ky.),2005.
Doe   v.   Lexington-Fayette   Urban   County Government
407 F.3d 755, 2005 Fed.App. 0206P

Briefs and Other Related Documents (Back to top)

. 03-6560 (Docket) (Dec. 10, 2003)
. 03-6517 (Docket) (Dec. 02, 2003)
. 03-6490 (Docket) (Nov. 19, 2003)
. 03-6261 (Docket) (Oct. 06, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.