UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY,<br><br>                Plaintiff,<br>v.<br><br>HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED,<br>A Delaware Corporation,<br><br>                Defendant. | Case No. 05-10990 DPW<br>Hon. Douglas P. Woodlock<br>Magistrate Judge Judith G. Dein |

### HARMAN'S NOTICE OF FILING EXHIBITS
### IN SUPPORT OF ITS MOTION TO COMPEL

PLEASE TAKE NOTICE that Defendant Harman International Industries, Inc. ("Harman") hereby files Exhibits G and H attached, in support of its May 12, 2006 Motion to Compel MIT's Responses to Harman's Interrogatories Nos. 9, 10 and 16 and Compliance with Harman's Rule 30(b)(6) Deposition Notice (Docket Entry 73).

Exhibit G consists of pages 81-86 and 105 from the deposition transcript of Mr. Robert Swartz. Exhibit H consists of pages 23-24 from the deposition transcript of Christopher Schmandt. These deposition excerpts were cited by Harman on page 13 of its Motion to Compel (Docket Entry 73). Plaintiff Massachusetts Institute of Technology ("MIT") has agreed that Harman need not file Exhibits G and H under seal. Accordingly, Harman hereby files Exhibits G and H in support of its Motion to Compel.

Dated: May 16, 2006

Respectfully submitted,

/s/ Ann H. Chen
Robert J. Muldoon, Jr., BBO# 359480
James W. Matthews, BBO# 560560
Edward S. Cheng, BBO# 634063

Courtney A. Clark, BBO# 651381
**SHERIN AND LODGEN, LLP**
101 Federal Street
Boston, MA 02110

William A. Streff Jr., P.C.
Michelle A. H. Francis
Craig D. Leavell
Ann H. Chen
Colleen M. Garlington
**KIRKLAND & ELLIS LLP**
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000 (phone)
(312) 861-2200 (fax)
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing DEFENDANT HARMAN'S NOTICE OF FILING EXHIBITS IN SUPPORT OF HARMAN'S MOTION TO COMPEL was sent this 16th day of May, 2006, to MIT's counsel of record by electronic means using the Court's ECF system

 

                                /s/     Ann H. Chen
                              One of the Attorneys for Harman

# EXHIBIT G

CONFIDENTIAL: Pursuant to Protective Order
Robert D. Swartz   February 7, 2006

Page 81

1   A.   There may have been someone.
2   Q.   Were you required to seek approval from
3 anyone before you sent Defendant's Exhibit 3?
4   A.   I don't believe so.
5   Q.   Did you, in fact, seek approval from anyone
6 before you sent Defendant's Exhibit 3 as to the
7 language in Exhibit 3?
8   A.   I don't recall.
9   Q.   You told me that you investigated products
10 regarding the letters that were sent like
11 Defendant's Exhibit 3.  Do you recall that
12 testimony?
13   A.   Yes.
14  *Q.   How did you identify which products to
15 investigate?
16         THE WITNESS:  Could you repeat that
17 question?
18         *(Question read)
19   A.   Well, I tried to understand who was selling
20 auto navigation systems.
21  *Q.   Any other -- any other steps that you took
22 to identify which products to investigate?
23         THE WITNESS:  Could you repeat that
24 again?

CONFIDENTIAL: Pursuant to Protective Order
Robert D. Swartz   February 7, 2006

Page 82

1      *(Question read)
2      A.   There may have been, but generally I -- you know, it was an investigation to understand the auto navigation market and who was using and or selling these kinds of products.
6      Q.   Did you obtain any sample products?
7      A.   Yes, I did.
8      Q.   Which ones?
9      A.   The Garmin.
10     Q.   Any others?
11     A.   No.
12     Q.   Which Garmin product?
13     A.   I don't recall the exact model number.
14     Q.   Did you review any product demonstrations in-store and the, you know, car lots of any navigation system products as part of your investigation?
18     A.   Yes, I certainly visited stores, and I have visited automobile dealerships.
20     Q.   Which products did you --
21     A.   And I guess the answer is -- I mean, this is perhaps being a little more expansive, but I think I've seen auto -- I've seen auto navigation systems in various vehicles being in those vehicles.

CONFIDENTIAL: Pursuant to Protective Order
Robert D. Swartz   February 7, 2006

Page 83

1   Q. Have you seen the Porsche Communication
2   Management product?
3   A. I'm not sure. I may have.
4   Q. In -- on or before March 24, 2003 have you
5   ever touched a Porsche Communication Management
6   product?
7   A. I don't believe so, but I'm not absolutely
8   certain.
9   Q. As of March 24, 2003 what information had
10  you collected as part of your investigation for the
11  Porsche Communication Management product?
12  A. I believe primarily I looked at materials
13  which Porsche provided through various means.
14  Q. What materials?
15  A. Well, primarily I believe their website and
16  also looked at -- there are a number of places that
17  review and collect information about various
18  navigation products. I believe I looked at those
19  also -- some of those also.
20  Q. Other than the Porsche website, what other
21  places review and collect information on navigation
22  system products?
23  A. I don't recall the sites in particular.
24  Q. Do you have any record of the searches that

CONFIDENTIAL: Pursuant to Protective Order
Robert D. Swartz   February 7, 2006

Page 84

1  you did, the site searches that you accessed?
2      A.  Other than the occasional printout of some
3  of the material, I don't believe so.
4      Q.  Do you still have printouts of the other
5  navigation system sites that you can't recall right
6  now?
7      A.  To the extent that I printed them out and
8  those documents were maintained, I still have them.
9      Q.  Did you discard printouts after March 2003?
10     A.  I may have.
11     Q.  Do you recall as you sit here today
12 whether -- what documents you discarded after March
13 2003?
14     A.  In terms of -- I mean, that's a very broad
15 question.  I know --
16     Q.  Okay.  Let me narrow it down.  Fair enough.
17     A.  -- I threw -- I threw away newspapers.
18     Q.  What documents related to the Porsche
19 Communication Management investigation that you did
20 did you discard after March 2003?
21     A.  I have no recollection of discarding any
22 Porsche documents, although it's possible that I
23 could have.
24     Q.  Which version of the Porsche Communication

CONFIDENTIAL: Pursuant to Protective Order
Robert D. Swartz   February 7, 2006

Page 85

1   Management product did you investigate?
2        A.   I really don't recall at this point.
3        Q.   Did you attempt in any way to obtain a
4   sample of the Porsche Communication Management
5   product?
6        A.   No, I did not.
7        Q.   Did you visit it in a showroom?
8        A.   I don't believe so.
9        Q.   Did you visit it in a store?
10       A.   I don't believe so.
11       Q.   Have you ever touched it?
12       A.   I'm not sure.  I may have.  I don't think
13  so.
14       Q.   Do you have any -- you don't think so?
15       A.   I don't think so.
16       Q.   At the time that you drafted Defendant's
17  Exhibit 3 --
18       A.   Actually, let me -- I think I have a friend
19  who has a Porsche, and he may have had one of these
20  products in his car, and I know I've driven in his
21  car, so it's possible that I saw it in that context.
22       Q.   As you sit here today do you recall ever
23  touching a Porsche Communication Management product
24  before March 24, 2003?

CONFIDENTIAL: Pursuant to Protective Order
Robert D. Swartz   February 7, 2006

Page 86

1    A.   As I said, in that context I may have.
2    Q.   And my question is, do you recall
3  specifically having touched the Porsche
4  Communication Management product before March 24,
5  2003?
6    A.   I'm not certain.
7   *Q.   At the time that you drafted Defendant's
8  Exhibit 3 did you believe that Porsche needed a
9  license to the two patents cited in Defendant's
10 Exhibit 3?
11           MR. BAUER:  Objection, work product.  I
12 guess he can answer that yes or no, but -- without
13 you claiming that that's a waiver and you get into
14 any detail behind that, I'm okay with letting him
15 answer that question, Ms. Francis.
16           MS. FRANCIS:  I asked him as to his
17 belief, so I don't think there's a waiver.
18   Q.  Go ahead.
19   A.  Could you repeat the question?
20   Q.  Sure.
21           MS. FRANCIS:  Would you be so kind as to
22 read it back, please.
23           *(Question read)
24   A.  It certainly appeared to me that they did.

CONFIDENTIAL: Pursuant to Protective Order
Robert D. Swartz   February 7, 2006

Page 105

1    Q.   Is she an attorney?
2    A.   No.
3    Q.   Is she a registered patent agent?
4    A.   No.
5    Q.   Does she have any specific qualifications
6  related to patents?
7    A.   She's smart.
8    Q.   Other than being smart, does she have any
9  specific qualifications relating to patents?
10   A.   I don't believe so.
11   Q.   Did you make any attempt to reverse-engineer
12  the Porsche Communication Management before March
13  24, 2003?
14   A.   When you say "reverse-engineer," what do you
15  mean?
16   Q.   Sure, did you try to take one apart and
17  rebuild it or try to recreate it?
18   A.   No, I did not.
19        MS. FRANCIS:  I'm going to hand you a
20  series of exhibits, and it's going to be a little
21  cumbersome because I have to read some of the
22  numbers into the record, but bear with me.
23        The first is Defendant's Exhibit 4,
24  which bears Bates Nos. MIT 34 through 38.

# EXHIBIT H

Christopher M. Schmandt     February 8, 2006

Page 23

1  or not the '685 patent is valid or invalid?
2      A.   Yes.  I think so.
3      Q.   Do you consider yourself to have
4  sufficient expertise to render opinions as to how the
5  claims of the '685 patent should be construed?
6      A.   To the extent that that doesn't involve
7  legal opinions and case law, yes.
8      Q.   Have you con -- have you reached an
9  opinion as to whether or not Harman infringes the '685
10 patent?
11     A.   I haven't been particularly involved in
12 that analysis.
13     Q.   Is that a yes or a no?
14     A.   I believe that the Harman device infringes
15 the patent, because I don't think that you can do what
16 it does without infringing the patent.  I have not had
17 the chance to analyze its operation to be able to
18 identify what structures or components actually match
19 the elements of each of the claims.
20     Q.   What is your belief that Harman practices
21 the patent based on, other than your belief that you
22 can't do it without infringing the patent?
23     A.   Giving realtime spoken driving directions
24 which actually gets somebody to their destination.

LegaLink Chicago
1-800-868-0061   www.legalink.com

e5b51316-1416-4611-b76e-dc9fa366957f

Christopher M. Schmandt        February 8, 2006

Page 24

1  Q. You haven't look at any Harman device
2  personally, have you?
3  A. I have not.
4  Q. You haven't looked at any Harman software
5  personally, have you?
6  A. I have not seen any Harman software, no.
7  Q. Have you ever personally even witnessed a
8  Harman navigation system in operation?
9  A. I have witnessed navigation systems in
10 operation. I don't know whether they were Harman
11 systems or not.
12 Q. How many different navigation systems that
13 have been installed in an automobile have you
14 personally witnessed?
15 A. Several. Probably two.
16 Q. I'm sorry?
17 A. Two.
18 Q. Two. What kind of cars were those in?
19 A. I can't remember. They were rental cars.
20 Q. Do you remember whether they were American
21 cars, German cars, Japanese cars?
22 A. I have no recollection.
23 Q. Do you know what rental car companies you
24 rented them from?