## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-10990-DPW |
| HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, | ) ) ) | Magistrate Judge Judith Dein |
| Defendant. | ) ) | **ORAL ARGUMENT REQUESTED** |

## HARMAN'S OPPOSITION TO MIT'S MOTION TO COMPEL DOCUMENTS FROM HARMAN'S TECHNICAL EXPERT ROBERT FRENCH

With this latest motion, MIT has again disregarded the applicable law by cherry-picking those rules MIT *wants* to follow while deliberately ignoring the rest. This time, MIT contends that Rule 45 and not Rule 26 applies to its untimely subpoena of Harman's technical expert Mr. Robert French. Even though MIT concedes that Mr. French is Harman's "technical expert," MIT's subpoena admittedly contravenes Rule 26, which, *even according to the case law MIT cites*, governs and limits the scope of "expert" discovery. *See* MIT's Motion at 4-5 (citing *Quaile v. Carol Cable Co.*, 1992 WL 277981, *2 (E.D. Pa. 1992) ("a subpoena under FED. R. CIV. P. 45, with respect to experts expected to be called at trial, *is limited by FED. R. CIV. P. 26.*") (emphasis added), *also citing, Marsh v. Jackson*, 141 F.R.D. 431 (W.D. Va. 1992) (quashing subpoena issued to expert)). Even though Harman agreed to reconsider a narrowed subpoena, MIT nonetheless persists with its improper subpoena seeking documents that MIT concedes Mr. French neither reviewed, considered nor relied upon in forming any of his expert

opinions offered in this case,[1] contrary to Rule 26(b)(4). Most telling, however, is MIT's selective application even of Rule 45. While MIT contends Rule 45 entitles it to the requested documents, MIT simultaneously refuses to comply with Rule 45(c)(1) and Rule 26(b)(4)(C) which require MIT to avoid imposing undue burden and expense upon Mr. French and to compensate him for his time spent in searching for these old "historic"[2] documents. MIT cannot have it both ways.

To make matters worse, MIT prematurely and unilaterally ended the meet and confer process by filing this motion without consulting again with Harman, despite: (1) Harman's open-ended discussions with MIT, (2) Harman's written citations to applicable case law, and (3) Harman's offer to reconsider a properly narrowed subpoena.

Ultimately, the documents MIT seek are not relevant to any issue in this patent litigation. Instead, MIT's subpoena at best seeks cumulative evidence that is not relevant to either invalidity or non-infringement, which are the only issues about which Mr. French opines. *First,* MIT misrepresents that Mr. French testified that he considered Davis' and Schmandt's 1989 VNIS paper to be "fresh" and "different"[3]; when, in fact, Mr. French testified, that "[t]here was nothing different about it," other than presenting information in "audio only" (which is not a claimed feature of the '685 patent and is not at issue in this case). *See* e.g., Ex. C. at 111:8-10; 111:14-15. The relevant portion of Mr. French's testimony is as follows:

> Q:    All right. Now going back to your report, on page 3, in your footnote, in 1989 when you saw the abstract, you said that you saw something fresh in it.
> What was -- what did you see that was fresh in it –
> A.    Well, --

---

[1] *See* MIT's Motion at 3, Ex. A. and Ex. B at 2-3.

[2] MIT's Motion at 3.

[3] *See* MIT's Motion at 1. Curiously, MIT failed to cite to any pages of Mr. French's deposition to support these statements.

Q.      - that allowed you to publish it?

A.      The thing --

Q.      Or that allowed you to put them in commerce?

A.      Well, yeah.  **The thing that was different, that caught my attention, was** *relying only on audible instructions, relying, relying only on that.* **The others I had seen, generally used voice in conjunction with some sort of display.**

Q.      And **what was it that made it fresh in your mind,** *that they took out the display and just did voice*?  What was clever about that?

MR. LEAVELL: Objection, compound.  Also misstates.

A.      Fresh?  Different.  Different.  *That aspect* **was** --

Q.      (By Mr. Bauer)  All right.  What was the --

A.      **-- certainly different from current, systems that were currently under development.**  There were lots of them under development at that time, and some of them were actually on the market.

Q.      But this was different than what you had seen?

A       **There was** *nothing different about it* **so far as the positioning, and -- those aspects are concerned.**

Q.      But **in terms of presenting the information to the driver, it was different than what you had seen**?

A.      Well, **in terms of presenting it** *[in] audio only*.

***

Q.      (By Mr. Bauer)  Let me rephrase the question.  **What was it that was the standard under which the program committee decided whether to allow things into this conference**?

A.      Well, the **driving overall consideration there was whether the work presented would be** *useful to others attending the conference*.  People go there to get information.

Q.      What do you mean by useful?  That, was it a requirement that it look different than what other people had already published?

A.      Uh, that's part of the overall picture that's emerging, and there were others like myself, more for their own internal purposes than I, who were trying to stay abreast of new developments and proposed developments, and so on.

So **every paper accepted needed to be what we felt to be relevant in some way to the expected attendees at the conference.**  *That doesn't always mean that it has to be something totally different from previous work*.  For example, in some cases there may have been formulations going on for years.  And maybe in implementing the system, new information was developed, or information was developed on the actual performance of it.

Q       But the goal of the committee is to present new information to the attendees.

A.      I would say *useful information as opposed to new*.  *Information of interest to them*, yes.

French Dep. Tr. at 109:24 – 113:6 (emphasis added).

To serve its purposes today, however, MIT speciously and selectively took words from several pages of Mr. French's deposition (pages 94 – 210), to make it *appear* as though Mr. French said the Davis/Schmandt paper was "fresh" and "different," when his full testimony is quite to the contrary. *Second*, whether something is "fresh" or "different," is not even relevant to any issue of patentability; the standards set forth for patentability in the Patent Act are far more complex and mention neither of those words. *See* 35 U.S.C. §§ 101-103. *Finally*, Mr. French's testimony shows that he doesn't even recall "paying particular attention to the paper back then," that his contact with the paper and its admission to the VNIS conference was "limited to the abstract" and that he only recently read the paper "in the context of this litigation." Ex. C at 209. Consequently, MIT's request for documents to show Mr. French's pre-litigation exposure concerning the paper and its admission to the VNIS conference is not reasonably calculated to lead to the discovery of admissible evidence. FED. R. CIV. P. 26(b)(1). Nonetheless, Mr. French's deposition provides sufficient evidence concerning his earlier exposure to the Davis/Schmandt paper and the standards for admission to the VNIS conference — and those standards fall far short of the patentability standard because "the driving overall consideration [for admission to the VNIS conference] was whether the work presented would be useful to others attending the conference [because] [p]eople go there to get information." *See* Ex. C at 111-12.

As shown below, MIT's subpoena is untimely, exceeds the scope of expert discovery and fails to comply with the protections against abuse provided in Rules 45 and 26. For at least these reasons, MIT's motion should be denied.

## I.  MIT REFUSES TO COMPLY WITH RULE 26.

MIT's subpoena seeks untimely fact discovery in violation of this Court's discovery schedule, and seeks documents that are beyond the scope of expert discovery.  And MIT refuses to correct this error.  *See* Ex. A and MIT's Motion at 3-5.

### A.  MIT's Subpoena Violates This Court's Schedule.

MIT has inexplicably attempted to cast Mr. French as a fact witness and belatedly seeks fact discovery with its September 29th subpoena, even though **fact discovery closed on September 27, 2006.**[4]  Even though MIT concedes that Mr. French is Harman's "technical expert," MIT's subpoena is admittedly not seeking information from Mr. French as an "expert."  MIT's Motion at 5.  Instead, "MIT is seeking information in Mr. French's possession by virtue of his *factual experience* with the '685 patent prior to his retention by Harman, gathered and kept by him *outside of his role as an expert in this case*."  *Id* (emphasis added).  Regardless of how MIT wishes to view him, Mr. French is a testifying expert, not a fact witness, and Rule 26(b)(4) does not authorize discovery of "historic fact-related documents," merely because he has them "in his possession."  *See* MIT's Motion at 3.  And even if these materials were subject to fact discovery, MIT's September 29th subpoena is untimely since fact discovery closed on September 27, 2006.

Putting aside MIT's many contradictions, MIT's motion reveals its true motives.  MIT does not genuinely need these documents.  MIT has known the requested documents exist for nearly 17 years since MIT's own Jim Davis and Christopher Schmandt presented their paper before Mr. French[5] and countless others.  Yet, MIT never requested these documents from

---

[4]  The original close of fact discovery was extended to September 27, 2006 by order of this Court, after agreement of the parties.

[5]  MIT no doubt knew Mr. French was vice chairman of the VNIS conference selection committee since at least 1989.

anyone, until now.   Instead, MIT served its subpoena on Mr. French on September 27th in retaliation for Harman's earlier, timely subpoena served upon MIT's expert Dr. Lynn Streeter on September 25, 2006.[6]   Apparently, MIT now regrets its decision to waive its objections by producing those damaging documents.   Still, that does not oblige Harman to reciprocate, particularly since MIT is seeking fact discovery, after fact discovery has closed.   MIT's motion should be denied for this reason alone.

### B.  MIT's Subpoena Exceeds the Scope of Expert Discovery.

MIT's selective application of the discovery rules and other laws presents yet another reason for this Court to deny MIT's motion and to sanction MIT for filing another improper discovery motion.

Even though Rules 26(a)(2)(B) and (b)(4) have been clearly construed to limit the scope of expert discovery, *see Burkybile v. Mitsubishe Motors Corp.*, 2006 WL 2325506, at *4 (N.D. Ill. 2006) ("the scope of discovery allowable under the rule does not go beyond the scope of material considered by the testifying expert") MIT contends that those rules do not apply. While a "narrowly–tailored Rule 45 subpoena" is in some instances an appropriate discovery mechanism to seek discovery from an expert, "[r]ule 26(b)(4) remains a limitation on the right of access by an opposing party to the evidence of experts who have been retained to testify in the case." *Marsh v. Jackson*, 141 F.R.D. 431, 432 (W.D. Va. 1992) (a case cited by MIT).  To stop precisely the kind of abuse MIT attempts here, Rules 26(b)(4) and 30 were amended to "operate as a control or brake . . . on the potential runaway use of the subpoena duces tecum to compel the production of evidence of experts retained by a party to testify at trial." *Ambrose v. Southworth*

---

[6]   In addition to giving MIT advance notice on September 21 after Dr. Streeter's deposition, Harman subpoenaed Dr. Streeter on September 25, 2006 (before the close of fact discovery), seeking a copy of the non-confidential advance copy of Jim Davis' thesis Dr. Streeter testified she received and reviewed perhaps as early as May 1989, contrary to MIT's claims to the Patent Office and this Court that the thesis was not disclosed to the public until September 1989.

*Prods. Corp.*, 1997 WL 470359, at *1 (W.D. Va. 1997).  Recent decisions are in accord.  *See Synthes Spine Co., L.P. v. Walden*, 232 F.R.D. 460, 463-64 (E.D. Pa. 2005) (experts must disclose "all information, whether privileged or not, that a testifying expert generates, reviews, reflects upon, reads, and/or uses in connection with the formulation of his opinions, even if the testifying expert ultimately rejects the information"); *Colindres v. Quietflex Mfg.*, 228 F.R.D. 567, 571 (S.D. Tex. 2005) (requiring production of only "information that the expert creates or reviews related to his or her role as a testifying expert" even when materials are privileged); *Amway Corp. v. Procter & Gamble Co.*, 2001 WL 1877268, at *1 (W.D. Mich. 2001) ("documents supplied to testifying expert, but not read, reviewed, or considered in forming opinions, are not discoverable").

MIT's excerpted, self-serving citations to the *Marsh*, *Expeditors* and *Quaile* cases are further telling of MIT's true motives of abuse and waste.  Each of those cases supports, rather than contradicts, Harman's position.  For example: contrary to MIT's claim that Rule 26 does not apply, the *Quaile* court wrote that "a subpoena under FED. R. CIV. P. 45, with respect to experts expected to be called at trial, *is limited by FED. R. CIV. P. 26*."  *Quaile v. Carol Cable Co.*, 1992 WL 277981, *2  (E.D. Pa. 1992) (emphasis added) (citing *Marsh v. Jackson*, 141 F.R.D. 431 (W.D. Va. 1992) (quashing subpoena issued to expert) (also cited by MIT)).  *Marsh* holds that "Rule 26(b)(4) remains a limitation on the right of access by an opposing party to the evidence of experts who have been retained to testify in the case, and that *the discovery of the facts and opinions of those experts cannot obtain solely under Rule 45* where, as here, a bare subpoena *duces tecum* has issued for the experts' files."  *Id.* at 432 (emphasis added).  And the *Quaile* court very narrowly allowed discovery concerning only "documents on matters specifically mentioned in [the expert's] deposition as being related to his opinion in the current case."  *Id.*

Yet, the documents MIT requested are not related to Mr. French's expert opinions; indeed, MIT concedes that Mr. French did not even consider these documents in forming his opinions.[7] Furthermore, in *Expeditors International of Washington, Inc. v. Vastera, Inc.,* 2004 WL 406999 (N.D. Ill. 2004), the court recognized the limiting effect of Rule 26, and narrowly allowed discovery "regarding [the expert's] damages opinions in his ***prior trade secret and patent cases***." *Id.* at *3 (emphasis added). MIT, however, is not seeking discovery concerning Mr. French's work on prior patent cases.

*Finally*, even the case law MIT cites shows that MIT's reliance on the Advisory Committee Note to Rule 26 is misplaced. *See* MIT's Motion at 5-4. As the case law discussed above makes clear, Rule 26 is intended to limit expert discovery. MIT's bald statement that "this *must* be the law" is simply wrong. Rule 26 limits expert discovery in this situation because, given their extensive involvement in the field, experts necessarily will have large amounts of factually relevant documents in any case they are retained in — participating in peer review of publications is, after all, part of what makes them experts. To treat an expert as a fact witness flouts both the letter and spirit of Rule 26. MIT's motion should be therefore be denied for at least these reasons.

---

[7]  *See* MIT's Motion at 4; *see also* Ex. A. Instead, MIT states that it is entitled to any "historic fact-related documents" Mr. French "has in his possession." MIT's Motion at 3. MIT fails to establish that these documents are relevant for any permissible purpose related to Mr. French's expert opinions. The standards applicable to the VNIS conference are not the same as the standards Congress established for patentability in Sections 101, 102 and 103 of the Patent Act, and thus any documents related to the VNIS conference would not be relevant or helpful in this case. Instead, MIT merely states that "the subpoena requests an [allegedly] small set of documents relevant to the case" for some unknown purpose *Id.* at 4. Obviously, as an expert in the field, Mr. French has many documents that might be relevant to this case — that is not, however, the standard for expert discovery. *See* FED. R. CIV. P. 26(a)(2)(B) and (b)(4). Indeed, MIT concedes that these documents are not relevant to Mr. French's *expert opinions*, because the subpoena seeks information "in Mr. French's possession by virtue of his *factual experience* with the '685 Patent ... gathered and kept by him outside is role as an expert in this case." MIT's motion at 5 (emphasis added).

## II. MIT'S SUBPOENA IS A RETALIATORY MECHANISM DESIGNED TO HARASS HARMAN AND MR. FRENCH.

As discussed above, MIT served its subpoena on Mr. French as a retaliatory mechanism in response to Harman's earlier, timely subpoena issued to MIT's expert Dr. Streeter. Aside from the improper scope of MIT's subpoena, MIT refuses to comply with Rule 45(c)(1) and Rule 26(b)(4)(C), which require MIT to avoid imposing undue burden and expense upon Mr. French and to compensate him for his time spent in searching for these old "historic"[8] documents, which neither MIT nor Mr. French are sure he still has. *See* MIT's Motion at 2 (noting that Mr. French "*might* still have relevant papers … in his 'archives'").

Even MIT must concede that searching an expert's archive for documents received "18 years ago," is a daunting task. MIT is well aware that Mr. French has literally thousands of documents, comprising perhaps millions of pages, concerning navigation systems. And MIT is well aware that Mr. French is of advanced age. As a result, such a search will surely impose an undue burden and expense on Mr. French, in violation of Rule 45(c)(1). This undue burden is particularly onerous given that MIT could have asked for these documents at the very beginning of this case, since MIT's own Jim Davis and Christopher Schmandt were active participants in the VNIS conference at issue. MIT could have also subpoenaed these documents from the Institute of Electrical and Electronics Engineers, Inc. ("IEEE"), who presented the VNIS conference. Yet, MIT did not seek *any* of these documents during fact discovery from ***anyone***.

MIT unreasonably demands that Mr. French spend hours looking for these 18 year-old "historic" documents, yet MIT again refuses to comply with Rule 26's requirement that the party seeking discovery "pay the expert a reasonable fee for time spent in responding to

---

[8] MIT's Motion at 3.

discovery...." FED. R. CIV. P. 26(b)(4)(C).[9]  MIT cannot selectively apply the law.  Rule 26(b)(4)(C) requires a party to pay for the discovery it seeks (and the parties have also reached the same by agreement) and Rule 45(c)(1) requires a party to minimize the burden and expense when requesting discovery from third parties.  MIT's refusal to pay is thus a direct violation of applicable law and MIT's motion should be denied for this reason alone.

## III. HARMAN IS ENTITLED TO ITS ATTORNEYS' FEES AND EXPENSES IN RESPONDING TO THIS MOTION.

Harman was reasonable and willing to compromise with MIT on this issue and should not be required to incur additional expenses responding to this premature and wasteful discovery motion.  Harman asserted Rule 26 in its initial objections, and during the October 16, 2006 teleconference.  Despite Harman's request, MIT refused to research the issue or cite any authority to support its position.  *See* Ex. B at 2.  And even after Harman researched the issue for MIT and provided MIT with solid applicable case law to support Harman's position, MIT refused to discuss the issue further with Harman, despite Harman's offer to consider a revised subpoena.  *See* Ex. B at 2-3.  Additionally, even the case law MIT cited to this Court is unavailing, and shows instead that Harman's Rule 26 objection was proper and worthy of further discussion.  Instead of engaging the meet and confer process as this Court has admonished the parties to do, MIT unilaterally and prematurely terminated the meet and confer process and raced

---

[9]    Contrary to MIT's claim that Harman's objection in this regard is "new" (MIT's Motion at 6) Harman timely objected to MIT's subpoena because it was overly broad and outside the scope of expert discovery.  During the October 16th teleconference, counsel for Harman sought to clarify MIT's intentions concerning payment (in the event the subpoena was brought into compliance with Rule 26) since none was tendered and there was no practical way to confirm that MIT would pay from the subpoena alone.  Harman did not assume that MIT would not comply with a federal rule, merely because of the absence of an express statement on the subpoena.  Instead, Harman expected that MIT would comply with the applicable rules and would pay after Harman confirmed the number of hours required to search for the requested documents.  Harman attempted to confirm this during the October 16th teleconference, which led to Harman's follow-up objection on October 23.  As a result, MIT's apparent claim that Harman has waived this objection is illogical under the circumstances.  MIT's attempt to misuse this misunderstanding, and Harman's good faith assumption that MIT would comply with the law.  In any event, MIT's complaints concerning its production from Dr. Streeter are moot because MIT decidedly produced the documents and waived any objections they might have had.

to the courthouse to file this motion. MIT's decision to race to the courthouse shows that MIT is picking fights, rather than trying to resolve them. Harman should not be required to bear the expense of MIT's precipitous and wasteful motion, which is obviously MIT's purpose in filing it.

By needlessly and prematurely filing this motion, which is neither supported in law or fact, MIT violated Local Rule 37.1(a) and this Court's express instructions to work toward agreement. Accordingly, Harman respectfully request that this Court order MIT to pay Harman's fees and expenses in responding to this motion.

## CONCLUSION

For the reasons discussed above, MIT's motion should be denied, MIT's subpoena should be quashed and Harman should be awarded its fees and expenses in responding to this motion.

## **REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 7.1, Harman respectfully requests an oral argument in conjunction with MIT's Motion to Compel, if the Court believes argument will be helpful or informative in resolving this motion.

Date:   November 8, 2006                    Respectfully submitted,

                                            /s/ Jamal M. Edwards.

                                            Robert J. Muldoon, Jr., BBO# 359480
                                            James W. Matthews, BBO# 560560
                                            Edward S. Cheng, BBO# 634063
                                            Courtney A. Clark, BBO# 651381
                                            **SHERIN AND LODGEN, LLP**
                                            101 Federal Street
                                            Boston, MA  02110

                                            William A. Streff Jr., P.C.
                                            Craig D. Leavell
                                            Michelle A.H. Francis
                                            Jamal M. Edwards
                                            Colleen M Garlington
                                            Joanna Belle Gunderson
                                            **KIRKLAND & ELLIS LLP**
                                            200 E. Randolph Dr.
                                            Chicago, IL  60601
                                            (312) 861-2000 (phone)
                                            (312) 861-2200 (fax)

                                            *Attorneys for Defendant*
                                            ***Harman International Industries,***
                                            ***Incorporated***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that a copy of the foregoing **HARMAN'S**

**OPPOSITION TO MIT'S MOTION TO COMPEL DISCOVERY FROM HARMAN'S**

**TECHNICAL EXPERT** was delivered by electronic means this 8th day of November, 2006, to

counsel for MIT as follows:

> Steven M. Bauer
> Jacob Baron
> Kimberly A. Mottley
> John Pint
> Proskauer Rose LLP
> One International Place, 14th Floor
> Boston, MA 02110-2600
> sbauer@proskauer.com
> kmottley@proskauer.com

> /s/ Courtney A. Clark

**EXHIBIT A**

**PROSKAUER ROSE LLP**

One International Place
22ⁿᵈ Floor
Boston, MA 02110
Telephone 617-526-9600
Fax 617-526-9899

LOS ANGELES
WASHINGTON
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

Kimberly A. Mottley
Direct Dial: 617-526-9616
Email: kmottley@proskauer.com

October 16, 2006

<u>Via Email</u>

Jamal M. Edwards, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601

> Re:     MIT v. Harman International Industries, Inc.,
>          Civil Action No. 05-10990 DPW, U.S.D.C. Mass.

Dear Jamal:

I write to memorialize and follow-up on our conversation this afternoon concerning Mr. French's refusal to produce any documents in response to the subpoena we properly served on him on September 29, 2006.

To be clear, the documents MIT requested in its subpoena are being requested of Mr. French as a third-party under the requirements of Fed. R. Civ. P. 45. The subpoena was timely and duly issued, and is narrow in scope and effort. Just like the requests Harman made in its subpoena of Dr. Streeter as a third-party, our requests are not limited to documents Mr. French considered, relied upon or reviewed in arriving at his expert opinion, nor need they be. Rather, they are potentially relevant documents identified for the first time by the witness during his deposition, and are documents solely within his possession and relate directly to the scope of his expert opinions.

The document requests are narrowly tailored to documents concerning the submission and selection of papers from the 1989 VNIS conference, which Mr. French testified he organized, ran and for which he decided to select the Back Seat Driver paper because it was "fresh" and "different." His testimony on this topic, and the subpoenaed documents which inform that testimony, are directly relevant to his opinions on validity of the '685 Patent. He further testified that he had an archive he could search for such documents.

**PROSKAUER ROSE LLP**

Jamal M. Edwards
October 16, 2006
Page 2

During our call, you stated that you hadn't "understood our position" until the call, and that you needed additional time to "research the issue" and "discuss it with your client." You also stated that you would not agree to any date on which to get back to us or by which we could expect an answer.

Unfortunately, it appears that once again we will need to file a motion to compel to get you to take a firm position on whether or not you will produce the documents. However, to avoid the expense and the burden on the Court, we will wait until October 19 to see if we can resolve this. Of course, if you need an extra day or so, and ask for it, we will consider it, but we simply can not wait indefinitely to hear back from you. We are being reasonable in waiting to allow you to "assess" whether you're willing to produce such documents.

I will call you before the close of business on Thursday, October 19, to see whether you will agree to produce the documents absent a court order.

Yours truly,

Kimberly A. Mottley

# EXHIBIT B

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Jamal M. Edwards
To Call Writer Directly:
312.861.3143
jedwards@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200
Dir. Fax: 312.660.0616

October 23, 2006

**<u>Via Electronic Mail</u>**

Kimberly A. Mottley, Esq.
Proskauer Rose LLP
One International Place
Boston, MA 02110-2600

Re:    *MIT v. Harman Int'l Indus., Inc.*, Case No. 05-10990-DPW (D. Mass.)

Dear Kim,

This letter responds to your October 16 letter regarding MIT's subpoena of Harman's expert, Mr. French, which seeks "all calls for papers, acceptance letters, internal reviews, and selection criteria" regarding the VNIS Conference. Harman has already produced all of the documents concerning the VNIS conference proceedings, to which MIT is entitled pursuant to the applicable rules. Furthermore, as discussed in more detail here, the remainder of the documents requested — ancillary documents that were neither considered, reviewed nor relied upon by Mr. French — are not subject to discovery in this case, and will not be produced. In fact, these documents are not even responsive to any document request served by MIT prior to the close of fact discovery, and MIT has made no assertions to the contrary.

As we told you during our teleconference, Harman stands by its objections to producing any documents from its experts that were not reviewed, considered or relied upon in forming the experts' opinion. During our October 16th call, you agreed that neither Mr. French's report nor his testimony show that he reviewed, relied upon or considered the documents MIT now requests. Indeed your October 16 letter reveals MIT's true purpose in subpoenaing documents from Mr. French: MIT's subpoena is a pretext to harass Mr. French by seeking documents "just like the request Harman made in its subpoena of Dr. Streeter." Aside from MIT's questionable motives, the fact that Harman sought documents from Dr. Streeter does not oblige Harman to respond favorably to MIT's reciprocal request of Mr. French. As we understand it, MIT responded to Harman's subpoena of Dr. Streeter by providing only the discovery to which Harman is entitled. Our position concerning Mr. French's documents is no different: Harman has produced all of the responsive documents to which MIT is entitled.

London        Los Angeles        Munich        New York        San Francisco        Washington, D.C.

# KIRKLAND & ELLIS LLP

Kimberly Mottley, Esq.
October 23, 2006
Page 2

To be clear, MIT is simply not entitled to the documents that it subpoenaed from Mr. French under the applicable rules. The scope of expert discovery is clearly defined by Fed. R. Civ. P. 26(b)(4), which limits discovery to those documents and things an expert "reviewed, considered or relied upon" in forming his opinions. You've already conceded that Mr. French neither reviewed, considered nor relied upon any of the documents MIT now seeks. And your October 16 letter posits, as you did during our October 16th call, that MIT is entitled to these documents merely because Mr. French is a "third-party" or because they are "*potentially relevant*" or because they are allegedly "solely in his possession ... in his archive." These are not valid bases for expert discovery.

Despite our repeated requests, you've refused to cite any authority for MIT's position, leaving us to research the issue for you. Despite the arbitrary and capricious deadline you attempted to impose (requiring us to do your research for you *and* respond within three days), we have nonetheless researched the issue and confirmed the case law supports Harman's position.

Rule 26, not Rule 45, governs and *limits the scope of discovery from experts,* allowing discovery of only those documents an expert considered, reviewed or relied upon in forming his opinions. *See* Fed. R. Civ. P. 26 (a)(2)(B) and (b)(4); *Burkybile v. Mitsubishe Motors Corp.*, 2006 WL 2325506, at *4 (N.D. Ill. 2006) ("the scope of discovery allowable under the rule does not go beyond the scope of material considered by the testifying expert"); *Ambrose v. Southworth Prods. Corp.*, 1197 WL 470359, at *1 (W.D. Va. 1997) (stating that Rules 26(b)(4) and 30 "operate as a control or brake . . . on the potential runaway use of the subpoena duces tecum to compel the production of evidence of experts retained by a party to testify at trial"); *Marsh v. Jackson*, 141 F.R.D. 431, 432 (W.D. Va. 1992) (stating that "[r]ule 26(b)(4) remains a limitation on the right of access by an opposing party to the evidence of experts who have been retained to testify in the case"). Consequently, Harman respectfully declines MIT's attempts to improperly and unnecessarily expand the scope of expert discovery.

Finally, MIT's subpoena is objectionable for yet another reason: MIT failed to comply with Rule 26 by confirming its agreement to pay Mr. French a reasonable fee to search for and produce these documents. *See* Fed. R. Civ. P. 26(b)(4)(C). As you know, Mr. French's regular rate for non-testimonial work is $400 per hour. MIT's agreement to compensate Mr. French is necessary *before* Harman could even consider engaging any search of Mr. French's archives.

## KIRKLAND & ELLIS LLP

Kimberly Mottley, Esq.
October 23, 2006
Page 3


   Contrary to your threat to file a motion to compel, Harman remains willing to entertain a proper subpoena. Should MIT decided to bring it subpoena into compliance with Rule 26, Harman will gladly reconsider its objections.

                                    Very truly yours,



                                    Jamal M. Edwards

cc:    Robert J. Muldoon, Esq.

**EXHIBIT C**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MASSACHUSETTS INSTITUTE
OF TECHNOLOGY,

        Plaintiff,

vs.                        No. 05-10990 DPW

HARMAN INTERNATIONAL
INDUSTRIES, INCORPORATED,

        Defendant.


    Deposition of:

    ROBERT L. FRENCH
    (VIDEOTAPED)
    Taken on behalf of the Plaintiff

1 drivers.  Human factors aspects.  And it was in

2 that context the paper seemed to be of

3 interest.  Not, not as an overall navigation

4 system.  The more I learned about it, the less

5 it seemed to be original in that regard.

6 Q.     But as it related to what information

7 to convey and how to convey it, it seemed

8 original to you at the time?

9 A.     Um, I like different anyway.  By that

10 time I had seen some systems that used voice.

11 I knew of others in development or described in

12 the literature, some of which had been, you

13 know, demonstrated.

14 Q.     But if you believed this offered

15 nothing new over that other stuff, you wouldn't

16 have authorized it for publication.

17 A.     It had to have at least something that

18 was relatively fresh.

19 Q.     Now, sir, on the bottom of page 3 you

20 talk about the level of ordinary skill in the

21 art.

22      Before I get there, in terms of this

23 report, did you type this report?

24 A.     Some parts of it I did.

25 Q.     Tell me how the report itself was

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MASSACHUSETTS INSTITUTE
OF TECHNOLOGY,

      Plaintiff,

vs.               No. 05-10990 DPW

HARMAN INTERNATIONAL
INDUSTRIES, INCORPORATED,

      Defendant.


     Deposition of:

     ROBERT L. FRENCH
     (VIDEOTAPED)
     Taken on behalf of the Plaintiff

1 generated.

2        VIDEOGRAPHER:  I'm sorry.  We're going

3 to have to stop again.

4        It's 10:17.  We're pausing the tape.

5 Going off the record.

6 (Respite.)

7        VIDEOGRAPHER:  Coming back on the

8 record, the time is 10:18.  Tape number 2.

9 Q.    (By Mr. Bauer)  Sir, I was trying to

10 ask how was this report physically created,

11 French 1?

12 A.    Oh, yes.  I was provided, to begin

13 with, with a starter graph, which had a bunch

14 of what I would call boilerplate information

15 there, and an overall structure for it.  This

16 was after we had identified and discussed

17 various pieces of prior art that would be

18 relevant here.  And in some cases I enter it on

19 the keyboard myself, material, and in other

20 cases, which were predominant, I identified

21 citations, pieces of material from the prior

22 publications, to insert at appropriate places,

23 and so I didn't.  A lot of the keyboarding of

24 course I did not do myself.  That was

25 boilerplate, the starter graph, and not as a

Page 96

1 routine practice, depending on the

2 circumstances, if something I was doing at

3 home, at my home office, yes, and there were

4 cases there.  But I spent quite a bit of time

5 visiting at the K and E offices in Chicago

6 where staff was able to work in realtime to

7 process information as I picked it out and

8 provided it.

9 Q.    All right.  So now looking at the, on

10 page 3 where it talks about the level of

11 ordinary skill.

12 A.    Yes.

13 Q.    Was that one of the boilerplate

14 paragraphs given to you?

15 A.    Not the content of it, but that there

16 needed to be such, a statement.

17 Q.    So was this your opinion, did someone

18 from Kirkland ask you who -- what was the level

19 of skill in '88-89, or did they say to you,

20 This is what we want to propose and do you

21 agree with it?

22 A.    No, sir.  I, I constructed that myself.

23 Q.    All right.  And --

24 A.    In fact, that's probably one of the

25 pieces that I didn't do the keyboarding.

1 Q.     Okay.  So it was your view that in 1989

2 the typical person working in this industry had

3 five years' experience?

4 A.     Or more.  Or more.

5 Q.     Okay.  You can't say that's true about

6 anybody at NavTech.

7 A.     Not at the beginning of that period.

8 Q.     Oh, even by 1989 you couldn't say they

9 had five years' experience in navigation and

10 route guidance systems?

11 A.     Not from personal knowledge.

12 Q.     All right.  How about at Philips,

13 what -- when you went to -- how many times did

14 you visit Philips in Eindhoven?

15 A.     Oh, probably at least two, maybe three

16 times.  They became a client as well, so I

17 formed --

18 Q.     They were a client from when to when?

19 A.     Rather than being a client for the

20 monthly letter report and the standard package

21 I was offering to a lot of other clients, I was

22 engaged by Philips to do specific studies and

23 provide reports.

24 Q.     All right.  From when to when?

25 A.     I delivered a report in I believe it

1 was January of '87.  Could have been '89 -- I

2 mean '88, I would have to confirm it, but I

3 believe it was '87.  This was a report that I

4 developed over a period of several months and

5 then submitted to them.

6 Q.     All right.  And so was it just the one

7 time -- well, you said you first went there in

8 1986.

9 A.     Yes.

10 Q.     So was that the beginning of your

11 retention by Philips?  Was that your --

12 A.     Not the beginning, but an initial step

13 that led to it.

14 Q.     All right.  And as a result of that

15 meeting in '86 and other work you generated a

16 report in 1987?

17 A.     I turned the report in in January, and

18 I believe it was in '87 -- it would be logical

19 that work I did in '86 after having visited

20 there, but I have not looked at those documents

21 in a long time and I don't trust my memory that

22 well between two years that were 20 years ago.

23 Q.     Right.  Then did you more work for them

24 after that, or was it the one-time report and

25 thank you very much?

1 A.     It was the one-time report, but it

2 wasn't thank you very much.

3        I had significant follow-up contact

4 with Philips.

5        One of my assignments at NavTech, or

6 the incidental consulting that went along with

7 the monthly letter reports, was to help them

8 develop appropriate contacts, not only in the

9 meter industry, I may have already mentioned

10 that, but with European parties that were

11 pursuing this field, and as well as Japanese.

12       And one of my subsequent activities

13 with Philips was arranging for a visit there by

14 one of their executives, on a visit, of course

15 they were in the map database requirements in

16 each area as well, and it was in conjunction

17 with that.  I think NavTech met most of their

18 original European contacts, and so were the

19 Japanese.

20 Q.     Who were your primary contacts at

21 Philips?

22 A.     Well, of course Martin Thoone was one

23 of them, and primary in the sense that was my

24 motivation to go there and talk to him about

25 his work and try his system.

1        But the business follow-up was with

2 other parties.

3 Q.      Okay.  Was he the most senior or most

4 experienced person on the team?

5        Certainly he was the lead investigator.

6 A.      Right.  And that's the only basis I

7 would have for saying he was the most

8 experienced.  I can't really say he was the

9 most experienced.

10 Q.      All right.  What was his experience

11 level?

12 A.      I can't really say.

13 Q.      Do you know if he had had five years of

14 experience in automobile navigation and route

15 guidance systems in 1987?

16 A.      I don't know exactly when he started

17 his work, but I knew of many others that did.

18 Q.      At Philips CARIN?

19 A.      I don't have specific knowledge of the

20 background timewise at Philips.

21 Q.      All right.  How about on the

22 Blaupunkt EV -- is it Blaupunkt EVA, that's one

23 project we are talking about; right?

24 A.      Right.

25 Q.      And you went to Hildesheim in Germany?

1 A.      Um-hum.

2 Q.      Who was your primary contact person

3 there?

4 A.      Dr. Wolf Zechnall.

5 Q.      What's his last name?

6 A.      Zechnall, Z-e-c-h-n-a-l-l or e-l-l.

7 Q.      Okay.  And who was he?

8 A.      He was, I would describe -- I forget

9 his official title, but essentially one of the

10 lead people associated with the EVA project.

11 Met others, but he seemed to be or had the

12 technical background, more involved with the

13 overall system.  I met others, for example,

14 chief database guy.  And -- but then there are

15 other people at Blaupunkt that go back into the

16 Seventies that were aware of this project.  I

17 don't know if they had a personal role in it.

18        Ah, I can give you a name on that, but

19 that escapes me right, right now.

20 Q.      What was the period you worked for --

21 you worked for Blaupunkt, or you just saw the

22 system?

23 A.      In -- I worked for them for, hmm, at

24 least five years or more.

25 Q.      From when to when?

1 A.      From Nineteen Eighty- -- it was spring

2 of '86, I believe, when I first went there, to

3 Hildesheim.  I had met Zechnall in January of

4 '9 -- of '86, and sometime later, after my

5 visit at Eindhoven in 1986, had a consulting

6 arrangement start with Blaupunkt pretty much on

7 the parallel of what I was doing for the

8 others.

9 Q.      All right.  And how long did you

10 continue to consult for Blaupunkt?

11 A.      Probably into the Nineties, and

12 probably -- well, I'd guess to give a specific

13 year.

14 Q.      Now when you say today that you know

15 you met Zechnall in January '86, do you have a

16 memory of that or did you go back to your log

17 before today's deposition to verify that?

18 A.      Oh, that's something, I have a clear

19 memory of that.  I don't have to go back to the

20 log.

21 Q.      Okay.  It's just a long time.  How do

22 you have a clear memory of January of '86?

23 A.      Well, in January of this year, I had

24 been active with the transportation research

25 board, and on one of their committees that

1 related to car navigation.

2          Starting in 1983, and one of my

3 responsibilities as a person on the committee

4 that served on a transportation research board

5 was to occasionally arrange sessions to be,

6 paper sessions to be held at their annual

7 meeting, always in Washington, always in

8 January.  And I arranged a session for the

9 January meeting, one of three sessions,

10 relating to car navigation and related

11 technologies, and sought out people around the

12 world to come report on their work, and that's

13 how I was first in touch with Zechnall, first

14 meeting at the conference.

15 Q.     Did anybody from, when you started

16 working at -- with Blaupunkt in 1986, did

17 anyone there have five years of experience in

18 vehicle navigation and route guidance systems?

19 A.     Some of their senior people certainly

20 did, involved with the Ali -- Ali Scott -- Ali

21 program it was called at the time, late, late

22 Seventies.

23 Q.     A-1-1 --

24 A.     Brakus.  Brakus is his name.

25 Q.     So there was one person there who had

1 five years experience?  At least one person?

2 A.      At least one, yes.

3 Q.      All right.  Can you say what the

4 standard level of education was for the group

5 there, the typical level of education in 1986

6 or '87?

7 A.      Um, not with -- I can give you an

8 impression, but I can't tell you as a factual

9 matter.

10 Q.     Okay.  What was your impression of the

11 typical level of experience at Blaupunkt in

12 1987 with respect to automobile navigation

13 systems?  The typical engineer you were meeting

14 there.

15 A.     Well, my impression was that they knew

16 very well what they were doing, and had been

17 doing somewhat original work on that.  I do

18 know that they were all degreed engineers or

19 physicists or significant technical

20 backgrounds, to the extend that I learned their

21 individual backgrounds, but I didn't make a

22 specific study of that.

23 Q.     No, I understand.  But to the extent

24 you learned, you understood that they had all

25 engineering degrees of some sort?

1 A.     Or -- that's what I said was my

2 impression.

3 Q.     Did you have any sense of how many

4 years of experience they had in automobile

5 navigation systems?

6 A.     Ah, not specifically.

7        But I knew the company had been

8 pursuing it since back in the Seventies, and I

9 knew other senior people were involved in that.

10 And I -- these people I met in Hildesheim at

11 that time, I don't know whether some of them

12 were involved in the earlier work in the

13 Seventies or --

14 Q.     Okay.  What are you talking about?

15 When you say you know Blaupunkt was working on

16 automobile navigation systems in the Seventies,

17 can you tell me what they were working on?

18 A.     Yes, sir.  Back in the Seventies there

19 were government programs underway, in Europe

20 and Japan, to promote the development of

21 technologies for -- they didn't particularly

22 refer to it as car information, car navigation

23 as much at the time, but information systems

24 with the objective of managing traffic better.

25 Q.     Um-hum.

1 A.      Congestion issues, and so on.

2        That was the excuse for public sector

3 organizations like the Federal Highway

4 Administration here, Ministry of Instruction,

5 National Police Agency, and some others in

6 Japan.

7        The Transport Department in Germany and

8 so on.  Sponsoring projects.  They were

9 usually, hmm, not totally sponsored and paid

10 for by the government, but the infrastructure

11 aspects of the framework where individual firms

12 could develop products to try to fit into

13 that.

14 Q.      Um-hum.

15 A.      Not all of which they were paid for at

16 the time.  Some of it's an investment.

17        But to explain what they were doing in

18 Germany in the latter part of the Seventies,

19 there -- really need to go back to sort of the

20 beginning of this public sector activity and

21 interest, which indeed was in the United States

22 in 1968, 1969, at which time there it was

23 formulated and researched, something called

24 ERGS, acronym for Electronic Route Guidance

25 System, which indeed amounted to a route

1 guidance or navigation system, but largely

2 infrastructure based.  There is not much

3 intelligence on board the vehicle.  It was a

4 bit early to be putting computers and such

5 there.

6        Well, that program was cancelled,

7 mandated that it be cancelled by Congress in

8 the early Seventies, because Congress, in their

9 wisdom, said navigate airplanes and ships and

10 such, but you don't navigate cars.  They just

11 drive on roads.

12 Q.    Um-hum.

13 A.    So the funding went away.

14        But in the Seventies, though, soon

15 thereafter, Japan established continuation of

16 essentially the same program, same approaches,

17 and so on, and that resulted in them developing

18 probably more people who knew the ins and outs

19 on car navigation than anywhere else in the

20 world.  Europe a little bit behind that.

21 Q.    Um-hum.

22 A.    But still walked way off ahead of the

23 United States as a result of that.  One upshot

24 of the Japanese program is that Toyota, Nissan,

25 Honda, all introduced navigation systems on at

Page 108

1 least one model of their cars, domestic cars,

2 in 1981.

3      These were fairly simple navigation

4 systems, they did not have a map database.

5 They were based on dead reckoning.

6      Though none had a map database, per se,

7 the Honda system did have a map.  Their

8 approach was to, through dead reckoning, define

9 the path, trace of a vehicle as it's driven,

10 and display that on a CRT screen with a

11 transparent map overlay, which if you have got

12 a proper illustration, would show you what

13 roads you're on, show where you have been.  If

14 you know where you're going, if you keep going

15 in that...

16 Q.    Is it fair to say that through 1987

17 people had been working continuously on trying

18 to develop a practical automobile navigation

19 system?

20 A.    Oh, yes.  Yes, very serious work going

21 on in Japan, most than anywhere else.

22 Q.    When I say 1987, even through 1990.

23 Let's not cut off.  Through 1990 people were

24 working on developing automobile navigation

25 systems?

1 A.     Yes, sir.

2 Q.     It was an active research community?

3 A.     It was more than just research by '89,

4 but yes, it was active research, and

5 occasionally a product would be put on the

6 market.

7 Q.     And people saw commercial value in

8 having an automobile navigation system for

9 in-car navigation?

10 A.     Uh, by people, you mean the buying

11 public or --

12 Q.     Well, the industry.

13 A.     Yes.  Yes.

14 Q.     People weren't doing the research just

15 for fun?

16 A.     No.  No, they recognized that it had

17 been --

18 Q.     The first person who could make a

19 commercially good in-vehicle navigation system

20 could sell it?

21 A.     Well, there would ultimately be markets

22 for it, and everybody would like to have a head

23 start.

24 Q.     All right.  Now going back to your

25 report, on page 3, in your footnote, in 1989

1 when you saw the abstract, you said that you

2 saw something fresh in it.

3        What was -- what did you see that was

4 fresh in it --

5 A.      Well, --

6 Q.      -- that allowed you to publish it?

7 A.      The thing --

8 Q.      Or that allowed you to put them in

9 commerce?

10 A.     Well, yeah.  The thing that was

11 different, that caught my attention, was

12 relying only on audible instructions, relying,

13 relying only on that.

14        The others I had seen, generally used

15 voice in conjunction with some sort of

16 display.

17 Q.     And what was it that made it fresh in

18 your mind, that they took out the display and

19 just did voice?  What was clever about that?

20        MR. LEAVELL:  Objection, compound.

21        Also misstates.

22 A.     Fresh?  Different.  Different.  That

23 aspect was --

24 Q.     (By Mr. Bauer)  All right.  What was

25 the --

1 A.     -- certainly different from current,

2 systems that were currently under development.

3 There were lots of them under development at

4 that time, and some of them were actually on

5 the market.

6 Q.     But this was different than what you

7 had seen?

8 A.     There was nothing different about it so

9 far as the positioning, and -- those aspects

10 are concerned.

11 Q.     But in terms of presenting the

12 information to the driver, it was different

13 than what you had seen?

14 A.     Well, in terms of presenting it audio

15 only.

16 Q.     What was the standard that you applied

17 in deciding whether to let something enter the

18 conference and not?  You said earlier not

19 anybody could just show up and say, I want to

20 be at the conference.  Was there some level of

21 novelty that you expected to see?

22      MR. LEAVELL:  Objection, form;

23 compound, misstates.

24 Q.     (By Mr. Bauer)  Let me rephrase the

25 question.

Page 112

1        What was it that was the standard under

2 which the program committee decided whether to

3 allow things into this conference?

4 A.     Well, the driving overall consideration

5 there was whether the work presented would be

6 useful to others attending the conference.

7 People go there to get information.

8 Q.     What do you mean by useful?  That, was

9 it a requirement that it look different than

10 what other people had already published?

11 A.     Uh, that's part of the overall picture

12 that's emerging, and there were others like

13 myself, more for their own internal purposes

14 than I, who were trying to stay abreast of new

15 developments and proposed developments, and so

16 on.

17        So every paper accepted needed to be

18 what we felt to be relevant in some way to the

19 expected attendees at the conference.  That

20 doesn't always mean that it has to be something

21 totally different from previous work.  For

22 example, in some cases there may have been

23 formulations going on for years.  And maybe in

24 implementing the system, new information was

25 developed, or information was developed on the

1 actual performance of it.

2 Q.    But the goal of the committee is to

3 present new information to the attendees.

4 A.    I would say useful information as

5 opposed to new.

6         Information of interest to them, yes.

7 Q.    Were there other people on the program

8 committee besides you making the decision

9 whether to allow this in, or were you the sole

10 gatekeeper?

11 A.    No.  There were multiple reviews of

12 each submission.

13 Q.    And so how many people were -- how many

14 people had to sign off on something being in

15 this conference in 1989?

16 A.    Without going back to my archives, I

17 would say that customarily such committees

18 usually have five to 10 members.  But that

19 doesn't necessarily mean every one of them

20 reviews every submission.  Typically the

21 submissions are divided up into broad

22 categories and people are selected from the

23 committee to review papers in particular

24 categories that they may have, you know,

25 special expertise in themselves.

Page 114

1 Q.    So in the case of this product, I'm

2 sorry, this paper, the Back Seat Driver paper,

3 were you the one who signed off on it being in

4 the conference?

5 A.    Well, was giving a final okay.

6 Q.    So somebody else had signed off before

7 it got to you -- so that's -- that's why I'm --

8 you're saying there's multiple levels.  Were

9 you the first one signing off on the Back Seat

10 Driver abstract, or the final approval?

11 A.    Well, the final before going to the

12 general chairman, the overall management

13 structure of the organization.

14      There are issues of there being slots

15 available of all the papers selected, and

16 things like that, that have to be taken into

17 account that the program committee does not

18 address.

19 Q.    So before you approved it, somebody

20 else had approved it as having useful,

21 different information --

22      MR. LEAVELL:  Objection, vague.

23 Q.    (By Mr. Bauer)  -- that should be

24 presented?

25      MR. LEAVELL:  Objection, misleading.

1 Misstates.

2 A.    I would say rather than using those

3 descriptors, I would say there were others who

4 felt it would be appropriate to include it in

5 the conference, but that doesn't necessarily

6 have to be unanimous.  Often it's not

7 unanimous.  Doesn't have to be.

8 Q.    (By Mr. Bauer)  You can't say today

9 whether it was unanimously approved for

10 committee or not?

11 A.    Ah, I, I can't say that.  I would say

12 I, I doubt it.  I think there were --

13 well, this is sort of a guess, but --

14 Q.    Yeah, let's not guess.  You have no

15 memory at all?

16 A.    I do have archives that I could

17 probably go back to and --

18 Q.    That has the votes for passing an

19 abstract through?

20 A.    That has the committee identification

21 guidelines for its operation.

22 Q.    But do you have the committee -- the

23 notes of the reviewers as to whether this would

24 be something appropriate for the committee, for

25 the conference?

1 A.     There were no notes.

2 Q.     So there wasn't a cover page that would

3 go on it where somebody would write and say --

4 A.     No.

5 Q.     -- this is a good idea?  Or -- No?

6 A.     No.

7 Q.     Or vote sheet approved, --

8 A.     No.

9 Q.     -- not approved?

10 A.     No.

11 Q.     So how would it, when the abstract was

12 submitted, how would the abstract be processed

13 to decide whether to be presented at the

14 conference or not?

15 A.     It would be distributed in this case, I

16 don't remember whether it was directly to

17 members of the program committee or to myself,

18 and a co-chair who was helping on this.  And --

19 well, in fact, yes, one other person and I were

20 largely responsible, as I recall, for directing

21 abstracts to particular committee members for a

22 more detailed review.  Everybody was free to

23 take a look.  But we looked to selected people

24 for making a more definitive opinion as to

25 whether it was appropriate.

1 Q.    I'm just trying to understand.  So you

2 saw the abstract before it was given to the

3 person who had to make the decision to let it

4 in the conference?  Or you saw it after someone

5 else had said this one should be in the

6 conference?

7 A.    I would say at the same time.

8 Q.    Okay.

9 A.    At the same time.  I was one of the

10 reviewers as well.

11 Q.    Okay.  And there are conference

12 guidelines, there's published guidelines, as to

13 what should be entered into the conference and

14 what would not be appropriate?

15 A.    That's generally the case with

16 technical conferences.

17       Guidelines of somewhat along those

18 lines are often part of the call for papers, so

19 that people considering submitting something

20 would have an idea of maybe what kind of

21 criteria to expect to be applied.

22 Q.    Are those guidelines just such subject

23 matter, something that says any paper involving

24 automobile navigation systems, or does it

25 actually tell what standard is necessary to be

1 approved?

2         So, for example, is there a paragraph

3 that says, This work needs to be A, B or C, or

4 are you only talking about subject matter

5 saying this is a conference for engineers, and

6 therefore it needs to be engineering?  You

7 know, that sort of thing.

8 A.      Um-hum.  Well, even in a series of

9 conferences like this, the Venus

10 conference, since that was the first one, but

11 it was continued for a while.  But on each

12 event the general chair and the key people

13 working with the conferences had considerable

14 leeway in how to carry, carry it out.

15        I can't say -- I have copies of the

16 Gault paper, and papers on what it said, but I

17 wouldn't attempt to recall without going back

18 and looking.

19 Q.      But you believe you may have the

20 guidelines for that committee as to what would

21 be acceptable and unacceptable?

22 A.      I don't recall there being written

23 guidelines for the committee.

24 Q.      Now this was the first conference

25 devoted exclusively to topics relating to

1 vehicle navigation?

2 A.    Yes, sir.  Well, first major

3 conference.

4 Q.    Were you an organizer of this

5 conference?

6 A.    Yes, sir.

7 Q.    Meaning you were part of the group that

8 said, Wouldn't it be great to have a

9 conference?

10 A.    I worked very closely with Ryan Case, a

11 Canadian colleague of mine.  He was a

12 ringleader in getting the conference

13 established.  But I was probably about the

14 number 2 person in trying to get the conference

15 set up.  I was a very active member of the

16 IEEE, vehicle technology society, which we

17 figured would be a logical sponsor for the

18 conference, and I was instrumental in getting

19 that approval.

20 Q.    Was it a successful conference?

21 A.    Yes, indeed.

22 Q.    How many people attended?

23 A.    Um, it's a matter of record.  Perhaps,

24 just to give you a feel for it, perhaps two,

25 three hundred.

1 Q.      How many papers were published?

2 A.      Well, there are probably more than

3 that.

4 Q.      Hmm?

5 A.      How many papers?  I don't know.

6 Q.      Ballpark.  More than 10?

7 A.      More than 10.

8 Q.      More than a hundred?

9 A.      Probably more than a hundred.

10 Q.     More than 200?

11 A.     Um, I doubt that it was more than 200.

12 Q.     How many papers were received for

13 publication at that conference?

14 A.      I'd have to go back to the records on

15 that.  Of course not all were accepted.

16 Q.     You didn't accept all papers that

17 were --

18 A.      No.

19 Q.     -- submitted?

20 A.      No.

21 Q.     You accept the majority of papers that

22 were submitted?

23 A.      In this conference --

24 Q.     In other words, is it easy to get

25 through the screening?

1 A.      Yeah.   In this conference there is,

2 majority were typically accepted, and the

3 decisions on that were not based entirely just

4 on the content or proposed content of

5 individual papers but, rather, on the

6 logistical constraints of the conference, the

7 conference rooms, time slots, and so on.

8 Q.      So you even rejected some qualified

9 papers just because you didn't have space for

10 them?

11 A.      I don't know about that particular

12 conference, but that occurred, yes.

13 Q.      It's not atypical to reject some

14 qualified papers if there's too many good

15 papers being submitted?

16 A.      That's right.

17 Q.      So you try to select the best papers

18 you can for conferences; correct?

19 A.      Right.

20         The papers of most interest to the

21 expected attendees.  The ones thought to meet

22 that condition.  When you say best, it refers

23 to -- don't know how that's defined.

24 Q.      Let's turn in your report to page 15.

25         And on page 15 you refer to, in 1989,

1 Mazda announced that it had planned to

2 introduce the first automobile navigation

3 system on the Japanese market, to include a GPS

4 receiver, in the spring of 1990; correct?

5 A.    Right.

6 Q.    Was that the first announcement of that

7 commercial product anywhere in the world?

8 A.    Um, --

9 Q.    Because you refer to it as being on the

10 Japanese market.  So are we focused on Japan or

11 would it be the first system in the world to

12 have included a receiver?

13 A.    Well, that was the first anywhere in

14 the world --

15 Q.    Okay.

16 A.    -- on the market --

17 Q.    All right.

18 A.    -- with a GPS receiver.

19 Q.    All right.  And did that product come

20 to market?

21 A.    I don't know how it did in the market.

22 It was premature, in my view, but --

23 Q.    Did it come to market?

24 A.    Yes, sir.

25 Q.    It did?

1 A.      Yes.

2 Q.      Did that give spoken directions?

3 A.      I know little about that.

4         In fact, --

5 Q.      I'm sorry.  You don't know or --

6 A.      I don't know.  I don't know.  In fact,

7 I would, without double-checking, I would know

8 with a high degree of certainty whether it was

9 a navigation system, not a route guidance

10 system.

11 Q.      I'm sorry.  I missed that.  You don't

12 know that that was navigation system?

13 A.      No.  I don't know that it gave route

14 guidance.  I know that there was a navigation

15 system.

16 Q.      Okay.  So you don't know that this

17 first product even gave any route guidance.

18 A.      Say again.

19 Q.      Let alone direction -- provided route

20 guidance, whether orally or not.

21 A.      No, sir, I don't know for a fact

22 whether it did or did not.

23         I say, though, I am inclined to believe

24 that it wasn't the earliest Japanese system on

25 the market that gave route guidance; came along

Page 124

1 I believe a year or so later, the Toyota

2 system.

3 Q.     And when you say the earliest Japanese

4 system, again you're saying Japan, but it's the

5 earliest system in the world that gave route

6 guidance commercially was a year later.

7 A.     Well, as I say, Japan was far ahead of

8 what was going on in the US, and Europe as

9 well, so -- as far as putting things on the, on

10 the market.

11 Q.     So Japan and Europe were ahead of the

12 US?

13 A.     Oh, yes.

14 Q.     What is the difference?  You're

15 separating between navigation and route

16 guidance.  What's the difference?

17 A.     Well, in terms of automobile

18 navigation -- the minimum requirement to be

19 called a navigation system is to be able to let

20 you know where you are.  And beyond that, where

21 you are relative to a destination, so you can

22 specify.  But not necessarily any information

23 at all how to get from where you are to the

24 specified destination.  Have to figure that out

25 for yourself if you're a driver.

Page 125

1 Q.      So going back to the experience level,

2 in 1986, when you saw the Blaupunkt system, --

3 A.      Um-hum.

4 Q.      -- and you said those people were

5 working on navigation systems for some time;

6 correct?

7 A.      Right.  Well, I'd say route guidance.

8 Q.      How were they working on route guidance

9 systems?

10 A.      Route guidance systems is a system the

11 company was involved with.  The Seventies was a

12 route guidance system.

13 Q.      Was it combined with a navigation

14 system or separately?

15         It was a route guidance system that

16 rather than being based on, built on top of a

17 navigation system, which is the way it's

18 typically done these days, it was based on

19 infrastructure support as a counterpart to

20 that; that being that route calculations and

21 such were done offboard.  Simple equipment only

22 in the vehicle for issuing instructions based

23 on guidance information communicated to keep --

24         THE REPORTER:  To keep...  I'm sorry?

25         THE WITNESS:  Based on guidance

Page 126

1 information communicated over some wireless

2 connection.

3 Q.    (By Mr. Bauer)  Let's turn to page 16

4 of your report.  Under Realtime Spoken

5 Directions.

6      What is your understanding of what a

7 realtime spoken direction is?

8 A.    Realtime would mean instructions or

9 information provided at the time it is needed

10 and useful.

11 Q.    How -- can you -- when you say given at

12 the time needed, is there a plus or minus from

13 when the turn needs to be made or do you mean

14 instantaneously -- obviously you don't mean

15 instantaneously when you're at the corner;

16 correct?

17 A.    Right.  No.  That's what I mean by

18 appropriate time, depending on speed and other

19 factors, it can vary.  In fact in the system I

20 developed in 1971, not only speed of the

21 vehicle -- or not only the distance from the

22 action point, but the speed vehicle was taken

23 into account.

24 Q.    All right.  So when you say an

25 instruction given at the time needed, you don't

1 mean precisely -- it's not turn now, quick,

2 instant; you've got to give some warning;

3 correct?

4 A.     Right.   Sufficient lead time to do what

5 you're told to.

6 Q.     And is giving an instruction 10 miles

7 before the turn giving it an appropriate time,

8 or is that too far in advance, in your opinion?

9 A.     Ah, in my opinion, there's a bit sooner

10 than needed.

11       There are some systems that, somewhat

12 independent, or have been at least, somewhat

13 independent of how far it is from the next

14 action point.  Maybe tell what the next

15 instruction is after you've made the last

16 maneuver.  They're there just for information

17 purposes, not for --

18 Q.     So you wouldn't call that realtime?

19 A.     I would not call that -- well, realtime

20 has a broad, a broader meaning, I think, than

21 that its realtime in the sense that that's when

22 the vehicle system is on the road at that

23 particular point.   That's real.

24 Q.     Um-hum.

25 A.     At the time it's there.

1        If you narrow it realtime to the exact

2 time you make the maneuver, that narrows the

3 definition of realtime, but they are all kinds

4 of things in between.

5 Q.     No, I understand.  Now --

6 A.     They're still referred to generally as

7 realtime.

8 Q.     That's why I'm trying to get your

9 understanding.

10        You would agree that the term

11 "realtime" in a vacuum is very broad and that

12 you need to see it in context to know what

13 people mean by it?

14 A.     Just the term by itself, you know, I

15 don't know whether this is a dictionary

16 definition or not, but the term "realtime" by

17 itself to me would mean, yeah, right then.

18 Not necessarily talking about guidance, but

19 something --

20 Q.     All right.

21 A.     -- that is measured in realtime, for

22 example.

23 Q.     But would you agree that, for you to

24 understand what realtime spoken instructions

25 mean, or directions mean, you need to put it in

1 the context of the system that we're talking

2 about.

3 A.     Of the, of the application of the

4 realtime information, yes, sir.

5 Q.     All right.  And, and you used the term

6 realtime spoken directions in your

7 report; right?

8 A.     (Nodding yes.)

9 Q.     Right?

10 A.     Yes, sir.

11 Q.     And you had an understanding of what

12 you meant in the context of your report when

13 you said realtime spoken directions?

14 A.     Yes, sir.

15 Q.     And your understanding is that when you

16 said realtime spoken directions, you meant

17 giving the directions at the time needed and

18 appropriate?

19 A.     At the time appropriate.  At the time

20 needed, which of course would be before you are

21 actually on the point where you have got to

22 execute the instruction.

23 Q.     But at a time relatively close to when

24 the turn is supposed to be made?

25 A.     I think that's a preferable way you

1 could do it, but adequate time, though, to

2 prepare for it, to be in the proper lane, that

3 kind of thing.

4 Q.    Adequate time being a hundred feet, a

5 hundred yards, something, as you're getting

6 close to give the normal user --

7 A.    Ah, the exact, the exact time distance,

8 depending on several factors:  The road itself,

9 the amount of time that might be needed to

10 prepare.

11 Q.    In other words, taking human factors

12 into account, what would be the -- right?

13 That's what you're saying.  You need to take

14 into account the type of road, the type of

15 intersection and the fact that humans need some

16 time to prepare for the turn.

17 A.    I understand about type of

18 intersection.  I've referred to a maneuver,

19 which could be dependent of course on whether

20 it's an intersection or whatever the situation.

21 Q.    But in your view, if as soon as you

22 make a turn it then says, Five miles from now,

23 turn right, that would not be realtime as

24 you're using it in your report.

25 A.    In the broad sense, it would be.

1 Q.      I understand the broad sense.  But in

2 the context that you're using it in your

3 report -- I'm sorry.  Let's go back.

4       I thought I heard you saying that

5 realtime in the context of an automobile

6 navigation system is giving the instruction at

7 the appropriate time so that the driver can

8 make the turn, would follow the instruction;

9 correct?

10      MR. LEAVELL:  Objection, misstates.

11 Q.    (By Mr. Bauer)  Well, let me -- I don't

12 want to misstate.  I want to understand your

13 testimony.  This is like before, I want to make

14 sure we get it right and not misstate it.

15      What does, in your view, in context of

16 an automobile navigation system, what does it

17 mean to talk about realtime spoken directions?

18 Those are your words in your report.

19      MR. LEAVELL:  Objection.

20 Q.    (By Mr. Bauer)  So when you're sitting

21 down with your peers and your peers are talking

22 about having realtime spoken directions, what

23 would you understand them to be meaning?

24      MR. LEAVELL:  Objection, asked and

25 answered.  Compound.

1 A.      At, at one extreme of plausible

2 definitions there, I would say that the

3 issuance of what's coming up next, even though

4 it would be 10 miles off, after you've

5 completed a maneuver, in a broad sense that

6 would still be considered realtime because it's

7 the actual time that the vehicle is at that

8 point rather than some other time, and in that

9 case, if it's far, far from the actual

10 maneuver, it's just information for the driver,

11 nothing to do.  But a few systems, a few

12 systems do that.

13 Q.      (By Mr. Bauer)  Um-hum.  Now you said

14 in the broad sentence that's what you would

15 think.  What would you think in the narrow

16 sense?  Again, if you're sitting there talking

17 with your peers --

18 A.      Um-hum.

19 Q.      -- and they say I have a system that

20 does realtime spoken directions, what would

21 you, with your experience, take it to mean that

22 they were referring to?

23      MR. LEAVELL:  Objection, asked and

24 answered.

25 A.      Well, referring to an appropriate

Page 133

1 location, an appropriate point in time to give

2 the information.

3 Q.     (By Mr. Bauer)  And what do you mean

4 when you say -- what would you understand, when

5 you say appropriate location, what does that

6 mean to you?

7 A.     Well, considering what the command is,

8 given at a point and at a time such that it

9 will guide the driver, provide a basis for the

10 driver continuing on to his destination based

11 on the instructions, the most appropriate time

12 would be the most effective time for doing it,

13 which allows time to act on it.

14        And, and not given a great distance for

15 time before that, unless there is a reminder as

16 you approach closer to an action point.

17        VIDEOGRAPHER:  Five minutes.

18 A.     All of it's realtime.

19        MR. BAUER:  All right.  So we'll wrap

20 up in two minutes again, so...

21 Q.     (By Mr. Bauer)  This is a nice day for

22 you because he always gives you warning for the

23 break.

24        So -- you know, other witnesses don't

25 not have any idea.

1          MR. LEAVELL:  It's your videographer.

2          MR. BAUER:  That's fine by me.

3 Q.     (By Mr. Bauer)  So I asked you if you

4 were talking with your peers what would you

5 understand.  Let me go back and say, in 1989 or

6 1990, when you were talking with your peers and

7 they said they were realtime spoken directions,

8 would that -- your understanding be the same as

9 you just described it now?

10 A.     Ah, yes, it would.  And the reason

11 being, particularly back then, issues such as

12 this were a matter of research and discussion.

13 There were research projects going on just on

14 the human factors aspect of it.

15          And this was something in the process

16 of evolution, I would say.  Trial and error,

17 what's most effective?

18 Q.     And trial and error in terms of what

19 would be the appropriate location, the

20 appropriate point in time to give the

21 direction?

22 A.     Um, through field testing, actually

23 trying it.

24 Q.     And you understand that's one of the

25 things Davis's patent discusses a lot about,

1 what would be the appropriate time and

2 appropriate instruction?

3 A.    Ah, right.

4 Q.    And that was one of the things that at

5 the time you thought, and back in '89 that you

6 thought was different than what you had seen

7 before?

8 A.    Well, at the time I looked at the

9 abstract there wasn't that much information in

10 the abstract, not much information there.  Just

11 enough to indicate there was a focus on using

12 voice and voice exclusively.  But the abstract

13 had few details to that level, as I recall.

14 Q.    And as you sat back in 1989-1990, if

15 someone had told you, one of your peers, that

16 they had a system that provided realtime spoken

17 directions, you would not, "you" would not have

18 thought that they meant a system that read a

19 direction 10 miles before the turn?

20 A.    That would be information, not

21 directions.

22      MR. BAUER:  All right.  Good time for

23 the break.

24      VIDEOGRAPHER:  Okay.  We're going off

25 the record.  This concludes tape number 2.  The

1 time is 11:06.

2 (Recess.)

3          VIDEOGRAPHER:  Coming back on the

4 record now.  The time is 11:16.  This begins

5 tape Number 3, 11:16 on tape Number 3.  This is

6 the beginning.

7          Counselor, please proceed.

8 BY MR. BAUER:

9 Q.     Mr. French, at the break did you talk

10 with Mr. Leavell at all about --

11 A.     No.

12 Q.     -- about what's gone on?

13 A.     No, sir.

14 Q.     All right.  Just one follow-up for what

15 we were doing and then we'll move ahead.

16          You talked about you approved the Davis

17 paper based on the abstract that you saw.

18 A.     Right.

19 Q.     When you finally saw the paper, were

20 you disappointed or did you think you made a

21 mistake letting that paper into the conference?

22 A.     I -- it was a done deal then.  I don't

23 recall looking at it in that aspect actually.

24 Q.     On page 17 of your report you talk

25 about reported and digitized speech; right?

Page 137

1 A.      Right.

2 Q.      Now all of those references that are

3 listed there, were those all references you

4 found yourself or were some of those provided

5 to you by counsel?

6 A.      Identify all of these with the possible

7 exception of, ah, Ono.  I had not seen that

8 paper before, or that was one of the underlying

9 papers, of course, related to the patent, and I

10 was not aware of Ono until I saw it in that

11 context.

12 Q.     You were familiar with the Wootton

13 patent?

14 A.      Oh, yes.  I visited Wootton also and

15 learned about that about the mid Eighties.

16 Q.      I understand you visited Wootton.  Were

17 you aware of the Wootton publication?

18 A.      Ah, yes, I was.

19 Q.      How did you see the Wootton --

20 A.      Ah, the Wootton patent, I don't recall

21 that I had a, uh -- certain whether I had a

22 copy of that myself, but I had the other papers

23 I had been provided.  Well, I found in the

24 compilations I had, I had been provided them,

25 but they were included in, for example, one was

1 in the proceedings of a conference I attended

2 in London in 1986, which referred back to the

3 work he was doing earlier for the small part.

4 A brief description of a so-called MicroPilot.

5 Q.    Okay.  Now you say at the beginning

6 of -- right in the middle of page 17 you say

7 there are several examples of navigation known

8 in the prior art that used digitized speech.

9 How do you know that all those references in

10 that list used digitized speech as opposed to

11 recorded speech?

12 A.    Because  of the use of the word

13 "digitized" in the documents is my

14 recollection.

15 Q.    Your recollection is every one of these

16 actually expressly says it uses digitized

17 speech?

18 A.    I can't say for certain that there

19 might not have been other sources of

20 information, rated information I had, but my

21 recollection is that all, practically all, if

22 not all, made mention of that in the document

23 itself.

24 Q.    If it doesn't make mention of digitized

25 speech, is there any way to tell whether it's

1 digitized speech versus recorded speech?

2 A.     On -- in some instances there may be a

3 diagram, system diagram, that lists speech

4 synthesizer even though it may not be called

5 explicitly synthesized speech in the text.

6 Q.     On page 18 you refer to customizable

7 speech.  What do you mean by the term

8 "customizable speech"?

9 A.     Ah, a selection of language, selection

10 of type voice, male, female, that kind of

11 thing, is the -- my first definition of

12 customizable speech.

13 Q.     What about -- so it's not the issue of

14 the speech changing in realtime.  What you're

15 talking about is the output format of the

16 speech, whether it's in English or French or a

17 male or female, and the user's ability to

18 switch between those?

19 A.     That's my first definition, yes.

20 Q.     Is there a second definition?

21 A.     Um, the sequence of words, say, in a

22 small fixed vocabulary, the sequence of words

23 selected for issuing a voice guidance

24 instruction would be a symbol, I guess you

25 would call it, I don't ever see the term used,

1 but I guess you would call it customizable

2 because it has to be assembled in an

3 appropriate sequence for the particular

4 maneuvers to be instructed.

5 Q.    But it would be fair to say that you

6 would not typically call that customized

7 speech, in the industry.

8 A.    Ah, that's -- that's debatable.  That

9 depends on how narrow or how broad a definition

10 one uses for customizable.

11 Q.    In 1990 you were speaking with your

12 peers --

13 A.    Um-hum.

14 Q.    -- and your peer says, "I have a system

15 that provides customized speech."  What would

16 you have understood them to mean in that

17 context?

18 A.    That the speech was capable of being

19 varied according to the driver's desire.

20 That's the first definition we discuss, and so

21 far as assembling a particular sequence of

22 basically the same words or from the same

23 subset of the set of words.  That's really the

24 information the speech conveys as customizable,

25 so I would say that some -- that's debatable as

1 to whether you call it customizable or not.

2 Within the broad sense that's one thing I

3 see...

4          MR. BAUER:  Did you get the last word

5 that time?

6          THE REPORTER:  I didn't know what it

7 was.  I heard -- dashes.

8          THE WITNESS:  I'm sorry.

9          MR. BAUER:  Okay.  Well, you said

10 "debatable."  Can you read back the last

11 sentence?

12          THE REPORTER:  "So I would say that

13 some -- it's debatable when you call it

14 customizable or not.  But in the broad sense

15 that's one thing I see that would," and then

16 dashes.

17 A.     Okay.  I believe I was referring to

18 customizing a sequence of words to more fully

19 describe an upcoming maneuver.

20 Q.     (By Mr. Bauer)  What definition are you

21 using in your report?

22 A.     Those two.

23 Q.     (By Mr. Bauer)  Both definitions?

24 A.     Yes.

25 Q.     Is the question of customizing -- in

1 the first instance it's the user that

2 customizes but in the second instance it's the

3 machine that does the customizing?

4 A.      Yes, sir.

5 Q.      (By Mr. Bauer)  And so is it fair to

6 say that when you talk about customized speech

7 you need to know who it is that is the actor to

8 know whether -- what definition is being

9 implied?

10 A.      To pin it down, yes.  Yes.

11 Q.      How many of the references, if you

12 looked at page 18, under customizable speech,

13 how many of those did you know before you were

14 retained here, and how many did you learn

15 after?

16 A.      The ones I can't be certain of are the

17 three.

18 Q.      (By Mr. Bauer)  And on page 19, same

19 question, which of those did you know before

20 you were retained in this lawsuit?

21 A.      I would have to ask, on the Bates

22 number, what the Wootton item is there.

23 Q.      (By Mr. Bauer)  It's the patent.

24 A.      It's the patent?

25         I said earlier I don't specifically

Page 143

1 recall having had the patent in my possession

2 at the time.  Just some publications.  I'm

3 inclined to think I do have that, did have it

4 in my files.  But I'd have to verify from the

5 files themselves whether there was original

6 material there.  I didn't have occasion -- if I

7 had it I didn't have occasion to pay much

8 attention to it until the time.

9 Q.    Okay.  On page 31 of your report, in

10 the middle paragraph where you talk about the

11 NavTech product.

12 A.    Yes.

13 Q.    (By Mr. Bauer)  And we already went

14 through the fact that it was a 1989 Oldsmobile,

15 but in fact you didn't see it until May of

16 1990; correct?

17 A.    Correct.

18 Q.    (By Mr. Bauer)  The sentence before

19 that says, The Rogue concept was first

20 implemented under the name NavMate.  When was

21 the Rogue concept first implemented?  Was it in

22 1990?

23 A.    It started, I was told, about one year

24 before I saw the demonstration, and of course I

25 was well aware of the development of the rogue

Page 144

1 concept.

2       Well, from the beginning I had an

3 opportunity to review each document put out on

4 it from the beginning as part of my consulting

5 assignment.  And I believe I've also mentioned

6 earlier that I was aware of and had seen

7 demonstrations of at least one other element of

8 the system, that being a route finding, an

9 improved route finding scheme that was under

10 development.

11 Q.     But you say the rogue concept was first

12 implemented under the name NavMate in a joint

13 program with Zexel.

14 A.     Correct.

15 Q.     And I'm asking when it was first

16 implemented?

17 A.     During a one-year period, starting

18 about May of 1989.

19 Q.     And what do you mean by implemented?

20 That that's when they first began working on

21 the product or the project?

22       MR. LEAVELL:  Objection.  Vague as to

23 project.  Which project?

24 A.     Ah, my personal view would be to say it

25 was implemented when it is completed to the

1 point it could be -- its performance could be

2 evaluated, tested, demonstrated.

3 Q.      (By Mr. Bauer)   And you were told it

4 was at that stage by May of 1989?

5 A.      Yes, sir.

6 Q.      (By Mr. Bauer)   And who told you --

7 A.      Actually, actually at that time it was

8 still very much, you know, an experimental or

9 prototype system.  It was still being tweaked

10 in many ways and it wasn't quite perfected at

11 that time.

12 Q.      (By Mr. Bauer)   Who told you that it

13 was implemented a year before you saw it in May

14 1990?

15 A.      This would have been the Diesel Kiki

16 people that I was visiting with at the time.

17 Actually, at the NavTech offices they were

18 working closely enough together that Diesel

19 Kiki had some personnel, I believe, actually

20 working out of the NavTech location for a

21 while.  Because they had to work real closely

22 together to bring the hardware and the

23 software.

24 Q.      (By Mr. Bauer)   Was this work that they

25 were working on told to you under some sort of

1 confidentiality agreement?

2 A.      Not to my recollection.  And I would

3 say that indications that it was not because I

4 disseminated the information on it soon

5 thereafter.

6 Q.      (By Mr. Bauer)  Soon thereafter being

7 in '89 or -- let's go -- or are you talking

8 about after --

9 A.      Well, --

10 Q.      -- you saw the car in 1990?

11 A.      That's when I disseminated information

12 specifically on what was called NavMate, a

13 prototype system.

14 Q.      Of NavMate?

15 A.      NavMate, yes.

16 Q.      So you disseminated that after May

17 1990?

18 A.      Right.

19 Q.      All right.  Before May 1990 had you

20 seen any of the implementation of that NavMate

21 product in the prior year?

22 A.      Certainly no hardware and, as I say,

23 had seen demonstrations of some of the

24 software.

25 Q.      You had?

1 A.    Yes, sir.

2 Q.    (By Mr. Bauer)  What you had seen was

3 demonstration of the route finding software?

4 A.    Right.

5 Q.    (By Mr. Bauer)  But that NavMate

6 product, as far as you recall, didn't give

7 spoken directions?

8 A.    I don't specifically recall that it

9 did, or at least at that point.  It was, as I

10 say, a process of -- still in the stage of

11 evolution.

12 Q.    (By Mr. Bauer)  Right.  But you knew

13 about the research before you sat in the car in

14 May 1990?

15 A.    I -- the research on putting together

16 the hardware system?

17 Q.    (By Mr. Bauer)  Yes.

18 A.    I'm confident that with my close

19 relationship with NavTech, and I was receiving

20 some confidential information, that I was made

21 aware that this was under development.  I had

22 occasion to visit with the Diesel Kiki people

23 during that period or get any specific details

24 from NavTech.

25 Q.    So you can't say when they first had a

1 prototype that was in operation of the NavMate

2 system?

3 A.    I can't say when it was other than

4 within a one-year period of about May of '89

5 until May of 1990.

6 Q.    (By Mr. Bauer)  Was it your

7 understanding when they said they had been

8 working on it for a year, was it your

9 understanding that they had begun working on it

10 a year before, or that they had been working

11 prototype for about a year?

12 A.    That -- and I'll answer this in the

13 context of Diesel Kiki, not NavTech.  They have

14 done a lot of formation study work in finding

15 the overall concept there, but from what Diesel

16 Kiki personnel told me, it was my understanding

17 that they had started hardware development a

18 year before.

19 Q.    (By Mr. Bauer)  Just begun the hardware

20 development a year before?

21 A.    Yes.

22 Q.    And it's -- and with your expertise and

23 your knowledge, you would assume that it would

24 take some months before they would have a

25 working prototype?

1 A.      Some months, but there were some

2 shortcuts available.  For example, the Trofeo

3 came with a CRT screen built in.

4 Q.      (By Mr. Bauer)  And you don't have any

5 more knowledge today as to where after that

6 development they actually, in time, they

7 actually had a working prototype?

8 A.      Well, I think I outlined in the report

9 here, their involvement with the rental car

10 industry, working arrangement with Avis to sort

11 of be a test bid for them, and a growing number

12 of systems were provided to rental car

13 companies early on there for, for a number of

14 reasons actually.

15 Q.      (By Mr. Bauer)  But that was in,

16 according to your report, in 1992.

17 A.      Ah, yes.  That would be dictated, I

18 would assume, by, yeah, when the sufficiently

19 refined version was available, but more

20 important than that, when they could work an

21 agreement with the rental company.

22 Q.      All right.  So just to summarize your

23 understanding, is that what someone told you,

24 that they began working on a NavMate

25 implementation in the middle of 1989?

Page 150

1 A.      Spring of '89.

2 Q.      And that you don't know where, after

3 that, they had a working prototype.

4 A.      So far as the hardware implementation

5 is concerned I did not have occasion to follow

6 it between that point and the point that a more

7 finished system showed up in the rent car

8 trials.

9 Q.      Except that you actually saw one in May

10 1990?

11 A.      Yes.

12 Q.      And your understanding is that what you

13 knew -- strike that.

14          You saw it in May 1990.  Had you seen

15 any of the implementation work that went on

16 between 1989 and 1990, or was it simply that

17 you were being told orally that such work was

18 happening?

19 A.      Um, I did not -- I can't say with

20 certainty exactly at what point I saw the route

21 finding demonstration.  It could have been in

22 that period or it could have even been earlier.

23 They were, of course, working on route finding

24 from the beginning.  Had to, for the desktop --

25 Q.      Um-hum.

1 A.      -- product first.

2 Q.      But other than the route finding -- the

3 NavMate system did more than route finding;

4 correct?

5 A.      Yes, sir.

6 Q.      (By Mr. Bauer)  It did maps matching?

7 A.      Um-hum.

8 Q.      Yes?

9 A.      Yes.

10 Q.      (By Mr. Bauer)  It did -- and it

11 displayed the directions on a video screen?

12 A.      That's my, that's my recollection.

13 Q.      (By Mr. Bauer)  And were those

14 directions displayed in realtime in terms of

15 the way we discussed it before, where they were

16 displayed at the time you needed to make the

17 turn, or were they just displayed one

18 instruction after the other after you made a

19 turn?

20 A.      I would only say that they were

21 displayed in realtime in the -- using the

22 interpretation of displayed in real time, and

23 that application to mean at an appropriate, an

24 appropriate time.  But clearly things like that

25 were still being experimented with and tweaked

1 at the time.

2 Q.     (By Mr. Bauer)  Well, when you say at

3 the appropriate time, so within some number of

4 seconds of making the turn the instructions

5 were displayed?

6 A.     I have no information on exactly what

7 points or conditions had to be met before that

8 was, that was done.  I could only say that at

9 that time it's probably the best guess as to

10 which would be the most effective time.

11 Q.     (By Mr. Bauer)  Well, and when you saw

12 the prototype, did you see the instructions

13 being displayed on the screen?

14 A.     Yes, sir.

15 Q.     (By Mr. Bauer)  Were those instructions

16 being displayed generally coincident with when

17 the turn needed to be made or were those

18 instructions being displayed generally

19 coincident with after the previous turn had

20 been made?

21      MR. LEAVELL:  Objection.  Vague;

22 entirely inconsistent.

23 A.     Yes.  I don't remember that detail.

24 Q.     (By Mr. Bauer)  Okay.  But do you

25 understand what I am saying, that there are

1 some systems that you make a turn and then the

2 next instruction comes right up?

3 A.      Right.  But I have no recollection of

4 whether that was a feature of that system.

5 Q.      Okay.  So you can't say today whether,

6 after you made the turn, the next instruction

7 came up or if it didn't come up until it was

8 time to make the next turn?

9 A.      Well, I'd simply say I can't, I can't

10 say when it came up --

11 Q.      All right.

12 A.      -- at what point it came up.

13 Q.      (By Mr. Bauer)  That's fine.  And what

14 you did know about the NavMate development you

15 believe you learned under confidentiality

16 obligations?

17 A.      There was a constraint there.  That was

18 the case with all my work with NavTech.  If it

19 wasn't real clear from precedent and what they

20 had agreed with and what they haven't, I always

21 sought confirmation that it was okay to pass

22 information on.  I had to be very careful about

23 that.

24 Q.      (By Mr. Bauer)  In this litigation have

25 you contacted NavTech to determine if it was

Page 154

1 okay for you to talk about what you learned in

2 1989 and 1990?

3 A.     Um, not what we talked about.  There

4 was one contact with NavTech counsel, and that

5 was simply to seek permission to release two or

6 three documents from that early time period, I

7 believe one of which was actually marked

8 confidential and one or two others were perhaps

9 a little bit ambiguous, but, as I say, that's

10 something I have been very careful about, so I

11 sought their permission to produce those

12 documents.

13 Q.     (By Mr. Bauer)  Did you believe that

14 the documents that you had received from

15 NavTech back then were given to you

16 confidentially and that you weren't free to

17 publicly disclose them?

18 A.     I recall --

19       MR. LEAVELL:  Objection.  Compound.

20 A.     I recall being specifically informed if

21 they gave me knowledge of matters they

22 considered too sensitive for me to pass on to

23 other clients at the moment.  If I had any

24 question at all, I clarified that before doing

25 so.

1 Q.      (By Mr. Bauer)  You're saying back

2 then --

3 A.      Yes.

4 Q.      -- if it was something confidential

5 they would say to you expressly, By the way,

6 Mr. French, this is confidential stuff.

7 A.      If it was marked confidential, they

8 didn't have to say anything.

9 Q.      (By Mr. Bauer)  Right.  But in terms of

10 meetings with them, it was your understanding

11 that they would specifically point out things

12 that they wanted you to treat confidentially

13 and if they didn't point it out it wasn't meant

14 to be treated confidentially?

15 A.      That -- I would say that was more true

16 of business type information as opposed to

17 technical information.

18      Overall, NavTech indeed was quite,

19 quite open with what they were doing, and I

20 think the reason for that is, is obvious.  It

21 was a marketing consideration.  They were one

22 of only -- well, in fact they were the only,

23 they were the only map database development

24 firm in the country at that time, in the, in

25 the mid to late Eighties, that was developing

Page 156

1 what they termed navigable map database, which

2 meant the map database included all information

3 in it necessary to, by algorithm, devise a

4 driveable route, meaning that it's legal and

5 safe and so on.

6 Q.      All right.  On page 34 of your report,

7 you have a number of paragraphs -- page 34 and

8 35 -- a number of paragraphs where you say you

9 understand, and you talk about the law.

10       How did you receive -- you say I have

11 been informed that a patent -- right, in these

12 paragraphs -- who informed you of the law?

13 A.      Most likely the status of that most

14 likely would have been conveyed by Colleen

15 Gardington.  She was my principal point of

16 contact for most of the time after I really

17 started into the project.

18 Q.      (By Mr. Bauer)  She's a lawyer at

19 Kirkland?

20 A.      Ah, right.

21 Q.      (By Mr. Bauer)  And so your

22 understanding of the patent law, as you

23 describe it on pages 33 through 35, is largely

24 informed by what Kirkland & Ellis attorneys

25 have told you the law is?

1 A.     Ah, though I have been involved in

2 other cases where there were considerations

3 like this, what I think of is the ground rules

4 for, for dealing with claims and etcetera.  My

5 recollection is that, as I've stated here, I

6 have been informed, been informed in various

7 ways.  Sometimes they will serve a little

8 lecture for a little while but, yes, that was

9 by K and E personnel and principally Colleen

10 Gardington, I believe.

11 Q.     You would agree you're not a patent law

12 expert?

13 A.     I would agree.

14 Q.     (By Mr. Bauer)  And you would agree

15 that, in fact, other than maybe just common

16 reading, you've had very little understanding

17 of the patent law?

18         MR. LEAVELL:  Objection.  Vague.

19 A.     Hmm, I --

20 Q.     (By Mr. Bauer)  Or do you believe you

21 have gained some experience, significant

22 experience over time?

23 A.     Well, I -- yes, in dealing with my own

24 patent and being involved with increasing

25 number of cases over the years, recent years in

1 particular, I'm certainly gaining a feel for

2 that compared to where I started from.

3       But I would stop short of passing

4 myself off as any kind of an expert on patent

5 formats and law and so on.  There is no way.

6 Q.    (By Mr. Bauer)  So you wouldn't hold

7 yourself out as being able to explain to a jury

8 what the patent law is or the rules of patent

9 construction?

10 A.    Ah, that's a question that I can say

11 it's a responsibility I would prefer not to

12 have.  I wouldn't say I couldn't do it with

13 tutoring and reviewing material I already have,

14 and so on, but it's not the, it's not the sort

15 of thing I would ordinarily do at all.

16 Q.    Would you say that for you to be able

17 to explain to a jury patent law and patent

18 construction, Kirkland & Ellis attorneys would

19 need to give you some tutoring and bring you up

20 to speed?

21 A.    Well, it depends on at what level we're

22 speaking of here.

23       I have a certain level of familiarity

24 with those details.  But so far as explaining

25 all of them to a jury is concerned, I certainly

Page 159

1 would want to do some strong reviewing.  Maybe

2 be informed of additional details.

3 Q.     (By Mr. Bauer)  Turning to page 36 of

4 your report.  You have there the opinion that

5 this long list of claims are invalid in view of

6 Wootton, either alone or in combination with

7 other prior art.  That's what the title

8 says; right?

9 A.     Right.

10 Q.     (By Mr. Bauer)  Where do you address,

11 for example, claims  -- Claim 12.  Let's

12 just -- see the title says Claims 11 to 13?

13 A.     Um-hum.

14 Q.     All right.  Where do you find Claim 12

15 invalid?

16 A.     Well, that's in the last paragraph on

17 page 36, about four lines down, Claim 12, and

18 others.

19 Q.     Oh, I'm sorry, it's there.  Okay.  Not

20 meant to be a test.  I didn't see it there.

21 A.     Well, I'm sure your eyesight is better

22 than mine.  I'm having cataract surgery in the

23 first week October.  I'm looking forward to

24 having it so I can see better.

25         I didn't bring my magnifying glasses.

Page 160

1 I didn't think I would use them.

2 Q.     (By Mr. Bauer)  Okay.  Well, I'm not

3 going to give you too much small stuff.

4        MR. LEAVELL:  You passed that test so

5 he's not going to give you any more of those.

6        MR. BAUER:  Right.

7 Q.     (By Mr. Bauer)  Turn to page 47 of your

8 report.  Did -- how did you become aware of the

9 CARguide, Carnegie Mellon reference?

10        MR. LEAVELL:  Objection.  Vague as to

11 which reference.

12 Q.     (By Mr. Bauer)  Well, the one that's in

13 the title here.  It says, ...the CARGuide,

14 Carnegie Mellon, reference.  I'm asking, how

15 did you become aware of that reference?

16 A.     Ah, I can't tell you when I acquired

17 the document.  My recollection is that it is

18 one of the ones that I came across while

19 looking for material in my archives.

20 Q.     From your archives?

21 A.     Yes, sir.  That's my recollection.

22 Q.     (By Mr. Bauer)  How are your archives

23 organized?  Are these just piles and piles of

24 boxes, or do you keep indexes of some sort or

25 log them in a database?

1 A.    All of the above.

2 Q.    Do you have a database that you have

3 created?

4 A.    No, not a formal database.  There is

5 such a variety of material that I have not had,

6 maybe, the time and incentive to try to come up

7 with a totally uniform common thing.  I, ah --

8 a great deal of my material is in

9 chronological, filed in chronological order.

10    I have about a dozen four-drawer filing

11 cabinets filled with material, most of which is

12 arranged in alphabetical order.  I attended

13 many many meetings and conferences over the

14 years, and when I would do a project with

15 someone I would put the indications based on

16 that in a folder in chronological order.  There

17 are other materials that aren't -- it's not too

18 convenient to do them that way.  Bulky

19 materials, for example.  I have several

20 bookshelves full of bigger documents, and there

21 it's a matter of memory, generally speaking, to

22 where I go look in the bookcases.

23    Now, in the storage boxes, that's still

24 another matter.  They're -- it's not quite a

25 blind search, but it's a -- I can't target it

Page 162

1 quite as well either.

2 Q.      (By Mr. Bauer)  Had you ever seen the

3 Davis Ph.D. thesis before you were retained in

4 this lawsuit?

5 A.      Ah, no, sir.  I'm quite sure I don't

6 recall, haven't seen it before.

7 Q.      (By Mr. Bauer)  Now, I put in front of

8 you French 4.  That's the patent itself.

9 You've read this patent; right?

10 A.      Ah, yes, sir.

11 Q.      (By Mr. Bauer)  When was the last time

12 you read it?

13 A.      Ah, the last time I read it cover to

14 cover, I would say I literally read it cover to

15 cover once.

16          I have been back reviewing particular

17 parts of it many many, many many times.

18 Q.      Even yesterday?  Did you go through it?

19 A.      Ah, didn't actually go through it.

20 Looked at some of the claims.

21 Q.      (By Mr. Bauer)  Did you sit down with

22 Mr. Leavell yesterday and go through the claim

23 element by element?

24 A.      I would say rather than element by

25 element, selectively.

1 Q.      Not every element you mean?

2 A.      No, sir.

3 Q.      (By Mr. Bauer)  You didn't?  Okay.  For

4 Claim 1 you didn't sit down with Mr. Leavell

5 yesterday and go through each element of Claim

6 1 and talk about it?

7 A.      Have to refresh my memory on it.

8 Q.      (By Mr. Bauer)  It's column 29.

9 A.      Not, not each and every element, as I

10 recall.

11 Q.      Was there some elements -- as you go

12 through it, were there some elements you didn't

13 talk about yesterday with Mr. Leavell?  Just in

14 Claim 1 we're talking about.

15 A.      Um-hum.  I don't remember discussing

16 competing apparatus for any uncoordinated

17 system processes.

18        Don't recall specifically driver input

19 means.  Map database element, yes.

20        Voice apparatus.

21 Q.      (By Mr. Bauer)  You did talk about

22 voice apparatus or you did not?

23 A.      We did.

24 Q.      (By Mr. Bauer)  You did.  And the other

25 elements, you skipped a whole bunch, so I

Page 164

1 thought you were going through this element by

2 element to tell me whether you spoke about it

3 with Mr. Leavell yesterday or not.

4 A.      Well, there are other claims but so far

5 as Claim 1 is concerned, we did speak briefly

6 of positioning, but I can't say right now

7 whether it was in the context of some of the

8 pending claims or this element on line 5 of

9 column 30 that we discussed.  There was no

10 lengthy discussion on that, certainly.

11      Route Finder.  I remember it being

12 mentioned in a little bit different context

13 there.  We talked about whether there were

14 certain documents that I had made notes on that

15 he might not be aware of, and I mentioned the

16 Scout document as one I felt quite sure, so I

17 probably made some notation on that.

18 Q.    (By Mr. Bauer)  Um-hum.

19 A.      And likewise, the Positioning and

20 Assort document.  That, I most likely had some

21 notes on that.  And possibly the, my copy of

22 the XAC database document, but I checked that

23 and found that I did not have any, any of my

24 notes on that.

25      I did find one or two others I brought

1 in this morning that I, at least, put PostIt

2 notes on or maybe some minor markings.

3        The documents that I made the most

4 extensive notes on were -- tended to be the

5 depositions, and in that case the purpose of my

6 notes was really more of in the nature of a

7 table of contents or an index to where certain

8 things could be found as opposed to any

9 conclusions or things like that from the

10 contents.

11 Q.    (By Mr. Bauer)  Did you talk about the

12 discourse generator element with Mr. Leavell

13 yesterday?

14 A.    That was a topic of some discussion

15 relating to the expert report of Dr. Grosz.  I

16 don't remember specifically the context of the

17 claim element.  Of course, that was an area

18 that you focused on and --

19 Q.    (By Mr. Bauer)  Yeah.  What did Mr.

20 Leavell tell you?

21 A.    I don't recall him telling me anything

22 about it.  I can remember giving him my

23 impressions from looking at their expert

24 report.

25 Q.    (By Mr. Bauer)  What were your

Page 166

1 impressions that you told Mr. Leavell

2 yesterday?

3 A.    Um, one was the focus on that, and

4 there is something else that I would need --

5 I'm a little bit uncertain now between the

6 Grosz report and the Elizabeth Cannon report.

7 There were -- I think there were some commen --

8 comments there, but I would need to check that,

9 see which one is --

10 Q.    Okay.  Do you want --

11 A.    Which --

12 Q.    -- your version?  Do you have notes on

13 yours?  Is that what you want to see?  Or do

14 you just need to see a blank report?

15 A.    It would probably be helpful if I could

16 see mine.

17 Q.    Okay.  We'll see if we can find those

18 for you.

19      MR. BAUER:  All right.  I will mark as

20 French 5 the document coming from your box that

21 appears to be your notes of the Gross Report.

22 (French Exhibit 5 marked.)

23 Q.    (By Mr. Bauer)  And for the record, can

24 you tell me what Exhibit 5 is?

25 A.    Expert report of Barbara J. Gross.

1 Q.    But this is the version that came from

2 your box; correct?  With your notes?

3 A.    Yes, it is.

4 Q.    All right.  And let me mark Exhibit 6

5 which appears to be a document coming from your

6 box relating to Dr. Cannon.

7 (French Exhibit 6 marked.)

8 Q.    (By Mr. Bauer)  And, if you can, tell

9 me if that's what Exhibit 6 is.

10 A.    It is.  But, I'm sorry, I believe I was

11 referring to their rebuttal reports.

12 Q.    (By Mr. Bauer)  Oh, okay.  Well, one

13 second then.

14 (Discussion off the record.)

15    MR. LEAVELL:  May I have it?  There

16 were some version, some copies of the reports

17 that he didn't make any notes on.  So it would

18 be --

19    THE WITNESS:  I believe that was.

20    MR. LEAVELL:  The stack was big enough

21 that I gave clean copies, but...

22    MR. BAUER:  But it sounds like the

23 reason he wants to see it is because he thinks

24 he has one with notes on it.

25    THE WITNESS:  Well, to juggle my

Page 168

1 memory.

2         MR. BAUER:  Well, we'll just look to

3 see if it's...

4         MR. PINT:  I don't think it's in there.

5         MR. BAUER:  Give me a clean one then.

6         MR. PINT:  Hmm?

7         MR. BAUER:  Give me a clean one.

8 Q.     (By Mr. Bauer)  Okay.  So we don't see

9 in your box.

10 A.     I did not have notes on all of them.

11 Q.     So you didn't put notes on those but

12 you would like to see the report now so you can

13 tell us what you talked about yesterday?

14 A.     Right.

15 Q.     (By Mr. Bauer)  Okay.  While we're

16 waiting, let me ask a few other questions.

17 We'll find that in a few minutes.

18         Have you ever, yourself, designed an

19 automobile navigation system which produces

20 spoken instructions?

21 A.     Um, in two senses, my original system

22 was spoken directions, the early Seventies.

23 Other than that, it would depend on exactly how

24 we define design.  I have designed systems to

25 the point of being sufficiently detailed to

1 approach a prospective sponsor of development,

2 use of such systems.  But it's without saying

3 that that does not include every detail.

4 Q.     Okay.  So these were contextual

5 designs.  They weren't designs down to the

6 engineering level --

7        MR. LEAVELL:  Objection.

8 Q.     -- were they?

9        MR. LEAVELL:  Vague and compound.

10 A.     Right.  They were systems level

11 designs.

12 Q.     (By Mr. Bauer)  And they were

13 automobile navigation systems intended to

14 produce spoken instructions?

15 A.     I would have to examine some of them to

16 be highly specific on that.  The reason that

17 it's difficult for me to be specific is because

18 at the time I did  -- I used voice originally.

19 Q.     I'm sorry.

20 A.     At the time I used voice originally.

21 Q.     Um-hum.

22 A.     I did that because, primarily because

23 it was the most doable thing at that time,

24 using analog voice recordings.  As far as an

25 option of a display with map detail and such,

Page 170

1  there just wasn't appropriate items available

2  to work with on that.  But I did design a -- in

3  fact, we built a second version of the original

4  Back Seat Driver system.  That was in 1992.

5  The second version.

6  Q.     (By Mr. Bauer)  1992?

7  A.     '72.

8  Q.     Okay.

9  A.     '72.

10        The -- one of the principal differences

11  between that system and the original system was

12  using a display for conveying textual

13  directions and graphics.  And the way that was

14  done was not with a conventional CRT, but we

15  had available, at that time, a dot matrix

16  display, plasma panel displays, that you could

17  form shapes and characters on.  And that was

18  because it was so awkward to do the voice

19  guidance.  In particular you have to have

20  appropriate recordings on hand and built in and

21  means for calling them up at the right time,

22  whereas it's a lot more flexible in displaying

23  information visually.

24  Q.     The thing you built in 1970, was that a

25  navigation system?

1 A.      It was a route guidance system.  A

2 route guidance system.

3 Q.      In other words, it gave you directions.

4 A.      It gave you directions, yes, for

5 covering a route that was actually a commercial

6 delivery route, dealing with fixed routes,

7 routes that could be defined in advance.

8 Q.      (By Mr. Bauer)  Now, I asked you

9 earlier the difference between a navigation

10 system and a route guidance system.  Do you

11 remember we talked about there was a

12 difference?

13 A.      Right.  Right.

14 Q.      So would you say the thing that you

15 built in 1971 and '72 was an automobile

16 navigation system?

17 A.      Ah, in a broad sense, it was.  In a

18 broad sense.  But not one that shows you where

19 you are on a map or that sort of thing.  It

20 provides no useful information on navigation to

21 the driver.  The only information provided to

22 the driver is route guidance information.

23 Q.      (By Mr. Bauer)  Between 1980 and

24 1994 -- you retired in 1994, is that...

25 A.      No.  1999.

Page 172

1 Q.      (By Mr. Bauer)  1999.

2        Between 1980 and 1999, had you ever

3 designed, to an engineering level, an

4 automobile navigation system?

5 A.      No.  I, I don't do that kind -- I'm a

6 systems engineer, if you are going to think of

7 me as an engineer, probably a design engineer,

8 a systems engineer.  My specialty is, uh, yeah,

9 determining how systems could be made to

10 interact, talk to one another.  To accomplish

11 some overall complicated functions, you can't

12 do but one system alone.

13 Q.      (By Mr. Bauer)  Between 1980 and 1999,

14 have you ever been part of a design team

15 building or designing an automobile navigation

16 system?

17 A.      No.

18 Q.      (By Mr. Bauer)  Do you know how to

19 program microprocessors?

20 A.      Ah, no.

21 Q.      (By Mr. Bauer)  Do you know how to

22 write in C++?

23 A.      No.

24 Q.      (By Mr. Bauer)  Can you read C++ source

25 code?

Page 173

1  A.      No.

2  Q.      (By Mr. Bauer)  Do you know how to

3  program a computer to speech -- to speak text?

4  A.      No.  No.

5  Q.      (By Mr. Bauer)  Do you know how to

6  design a computer to create a route?

7  A.      Design a computer or design software?

8  Q.      Do you know how to design software to

9  create a route?

10  A.      Ah, would you clarify when you say

11  design software?  Are you referring to

12  designing route generation software from

13  scratch or are you referring to programming,

14  implementing an algorithm of a route finding

15  approach that's already defined by someone

16  else?

17  Q.      (By Mr. Bauer)  Well, let's take both.

18  Can you write a program implementing a route

19  finding algorithm implemented by somebody else?

20  A.      I don't know.

21  Q.      And have you ever been able to do that?

22  A.      I quit doing hands-on programming even

23  before I developed my first system.  I was

24  responsible for and did a fair amount of

25  programming in Fortran prior to that, but

1 that's not particularly useful in the --

2 Q.    Before 1972 -- Excuse me.  You're

3 saying you stopped doing programming before

4 1972?

5 A.    To be more specific, I stopped managing

6 programming.  So far as doing programming

7 personally, other than doing enough to learn

8 sufficient ins and outs so that I could manage

9 people who are handling the details, but that

10 was back when I was working in another field,

11 scientific calculations, so that I can make

12 great use of Fortran, and I did learn that

13 program in Fortran and I supervised development

14 of a lot of Fortran programming.

15 Q.    (By Mr. Bauer)  Do you have any

16 expertise in the actual implementation of a

17 position sensing device for an automobile?

18 A.    Yes, sir.

19 Q.    (By Mr. Bauer)  Have you had any such

20 expertise since 1980?

21 A.    So far as implementing things are

22 concerned --

23        MR. LEAVELL:  Objection.  You asked

24 expertise.  Did you mean experience?  Sorry.

25        MR. BAUER:  I think he was about to

1 answer a question, and we'll see if he can

2 answer it.

3 Q.     (By Mr. Bauer)  Do you have any

4 expertise or experience in position sensing

5 devices for automobiles that you have gained

6 since 1980?

7 A.     I would say I certainly have knowledge

8 that I have gained since then, because starting

9 about 1980, I started spending a great deal of

10 my time doing literature research and trying to

11 find out exactly what all had been done in the

12 area of vehicle positioning and navigation.

13 And I came across things I had not been aware

14 of before.  For example, an optical, an optical

15 odometer.

16 Q.     (By Mr. Bauer)  After 1980 were you

17 ever part of a development or design team which

18 was tasked with implementing a position sensing

19 device in an automobile navigation system?

20 A.     Not with implementing.  Only in

21 teaching others about it.

22 Q.     What do you mean, teaching others about

23 it?

24 A.     Well, explaining to clients how various

25 things could be done.

Page 176

1 Q.      (By Mr. Bauer)   Conceptually?

2 A.      Well, --

3 Q.      I mean, have you ever sat down and

4 told --

5 A.      I have never sat down and put one

6 together as a demonstration.

7 Q.      You have or you have not?

8 A.      No.

9 Q.      You have not?

10 A.      I have not.   Not as a demonstration,

11 but I became quite well versed in some of those

12 fundamentals.   And, of course, I had to be, to

13 be teaching, starting in '86, occasional

14 seminars, short courses on the topic.

15 Q.      (By Mr. Bauer)   So what you understood

16 was what was on the market relating to position

17 sensing apparatus for use in an automobile

18 system in the late Eighties?

19 A.      In fact, generally speaking, in fact in

20 my workbooks that I developed and provided to

21 each attendee at one of these courses, there

22 would be sometimes a sheet of information on

23 products offered by a particular vender, say

24 particular type of sensors, that kind of thing.

25        So I did try to maintain an awareness

Page 177

1 of, you know, real world stuff as opposed to

2 something totally theoretical.

3 Q.    Okay.  But in the late 1980s, between

4 1985-1990, what your job was to -- what your --

5 what you were doing was just learning what

6 other people were doing and implementing in the

7 automobile navigation system?

8 A.    Um, not -- not just that.  We've only

9 focused on route guides and automobile

10 navigation systems, but over those periods I

11 was doing a lot of related work, individual

12 research projects.  I gave you one example

13 earlier.  The one I did for Philips.

14 Q.    Give me a clue.  What was that?

15 A.    Just -- a research -- well, in that

16 case it was more, more akin to a market study.

17 In this case they were interested in what could

18 be done with the CARIN system in the commercial

19 world and --

20 Q.    Okay.  Is it fair to say in the 1985 to

21 1990 time period of your job you weren't out

22 inventing new systems or new implementations

23 but, instead, teaching people what others were

24 doing in the field?

25 A.    In a broad sense, I would describe that

Page 178

1 work as a combination of journalism and

2 teaching.

3 Q.      (By Mr. Bauer)  As opposed to

4 innovating and --

5 A.      As opposed to building things.

6 Q.      All right.  Had you ever heard the term

7 discourse before you were retained in this

8 litigation?

9 A.      Um, not to my knowledge.

10 Q.      (By Mr. Bauer)  In the course of

11 this -- so until you read the Davis patent, you

12 don't have any recollection of ever -- ever

13 heard the word discourse?

14 A.      Well, it certainly didn't stick in my

15 mind until this morning.

16 Q.      Certainly you had never seen it in the

17 context of an automobile navigation system?

18 A.      I don't recall seeing the term used in

19 the literature, I would say.

20 Q.      When you read the Davis patent you saw

21 the word discourse used?

22 A.      Yes, sir.

23 Q.      It's used a lot?

24 A.      Um-hum.

25 Q.      (By Mr. Bauer)  Correct?

Page 179

1 A.      Right.

2 Q.      (By Mr. Bauer)  Did you understand what

3 he was referring to when you read the patent?

4 A.      Uh, --

5 Q.      Or did you say, I don't know what this

6 word means.

7 A.      I looked at some of the reference

8 materials trying to gain a better understanding

9 of what it means.  No.  At the outset, in a

10 formal sense and examples of it, and so on, no.

11 That was basically new to me.

12 Q.      After you read the Davis patent, did

13 you understand what he was referring to when he

14 discussed discourse?

15 A.      Um, to a certain extent.  I would say

16 that it's still hard for me to distinguish

17 between discourse and what I would call common

18 sense pragmatic utterances of what to do.  Seat

19 of the pants as opposed to going through a

20 discourse theory and deriving from that.

21 Q.      So when you read through the patent it

22 was hard for you to understand the difference

23 between discourse and just spoken instructions?

24          MR. LEAVELL:  Objection.  Assumes facts

25 not in evidence.  Undefined term.  Misleading.

1 Q.    (By Mr. Bauer)  Well, let me ask -- let

2 me withdraw.

3       When you read the patent, what

4 references -- you said you went and looked at

5 some of the references.  What references did

6 you turn to right after you read the patent to

7 help you understand discourse?

8 A.    This wouldn't have been immediately

9 after I read the patent.  There was a lot of --

10 number of things to look into, but my

11 recollection is starting with the references

12 the patent gives.

13 Q.    (By Mr. Bauer)  No, I'm

14 understanding --

15       VIDEOGRAPHER:  Counselor, we are out of

16 time.

17       MR. BAUER:  Okay.

18       VIDEOGRAPHER:  We are going off the

19 record.  This concludes tape Number 3.  The

20 time is 12:16.  Conclusion of tape Number 3.

21       MR. LEAVELL:  Take a half hour, 45-

22 minute lunch?

23       MR. BAUER:  You know, I'd like to get

24 the video and go about 10 more minutes and then

25 take the lunch, 12:30.

Page 181

1        Let the record reflect Mr. Leavell is

2 walking out while in the middle of a line of

3 questioning.  But as long as you don't talk to

4 the witness about this line of questioning,

5 that's fine.

6 (Discussion off the record.)

7        MR. LEAVELL:  Okay.  Did you say it's

8 improper to talk to the witness about the line

9 of questioning?

10        MR. BAUER:  I think if you walk out in

11 the middle of a line of questioning, it's a

12 question.

13        MR. LEAVELL:  You think that's improper

14 to do that?  To talk to him now about what you

15 were just talking about on the record?

16        MR. BAUER:  Not as long as I can ask

17 him what you talked about.

18        MR. LEAVELL:  So you're saying it is

19 proper for me?

20        MR. BAUER:  Are we on or off the

21 record?

22        MR. LEAVELL:  I think we're still on

23 the record.

24        So is it proper or improper for me to

25 do that, is what I am asking you.

Page 182

1          MR. BAUER:  I'm asking you not to talk

2  to him about a line of questioning in the

3  middle of a line of questioning just as you're

4  walking out.

5          MR. LEAVELL:  Like you did with Dr.

6  Grosz, you mean?

7          MR. BAUER:  I never walked out of a

8  deposition in the middle of a line of

9  questioning without you being able to question

10  the witness on what we talked about.

11          MR. LEAVELL:  Right.  But is it proper

12  or improper for me to do so?  I want to know

13  your position now.

14          MR. BAUER:  You've got your own ethics.

15  You deal with your own ethics.

16          MR. LEAVELL:  All right.  We can go off

17  the record.

18          VIDEOGRAPHER:  Gentlemen, I was not

19  recording any of that.

20          MR. BAUER:  That's fine.

21          THE REPORTER:  That's why we are

22  mutually exclusive sometimes.

23          MR. LEAVELL:  Okay.

24  (Lunch recess.)

25          VIDEOGRAPHER:  Okay.  Here we go.

Page 183

1        This marks the beginning of tape number

2 4 in the videotape deposition of Robert L.

3 French.  The time on the monitor is 1307  Tape

4 Number 4, 1307, Robert French.

5        Please proceed.

6 Q.    (By Mr. Bauer)  All right.  Mr. French,

7 during lunch did you talk with Mr. Leavell

8 about the deposition?

9 A.    Um, no, sir.  Not about the deposition.

10 The only thing relating to that is that I was

11 reminded that, regarding my reports, if I have

12 any question in my mind about what is there, to

13 be sure I got it right.  Don't hesitate to

14 check it.

15 Q.    Didn't talk about a single thing you

16 would have said earlier today?

17 A.    (Nodding no.)

18 Q.    No?

19        And he didn't tell you a single thing

20 about what you might want to answer differently

21 or how to answer things this afternoon?

22 A.    No.

23 (French Exhibit 7 marked.)

24 Q.    I'm going to hand you what I am marking

25 as  French Exhibit 7, which was just given to

1 us today.  Bates number 701678 through 685, and

2 then it jumps to 701708 through 727.

3          MR. BAUER:  I assume you have a copy,

4 correct?

5          MR. LEAVELL:  I don't, actually.

6          I can look over his shoulder.

7          MR. BAUER:  You can look over his

8 shoulder.

9 Q.    (By Mr. Bauer)  Sir, is what I have

10 just marked as French 7 the invoices you have

11 been sending to Kirkland?

12 A.    Well, the top one is.  Let's see where

13 it begins.

14        Well, they aren't in order, are they?

15 Q.    That's the way they were produced to

16 us.

17          MR. LEAVELL:  Objection, vague.  Are

18 you asking him whether these are all the

19 invoices and only the invoices or  --

20 Q.    (By Mr. Bauer)  What is French

21 Exhibit 7?  What are those documents that came

22 from you?

23 A.    Yes, these are the invoices, and in

24 some cases a small amount of information

25 relating to them.  There is an error on one of

1 them.  And one concerning a future visit.  I

2 don't know why it's on the invoices.

3 Q.    Okay.  Somehow according to these

4 invoices, if you look at the first page of it,

5 701 678?  Remember I asked you when you first

6 got contacted by Kirkland whether they sent you

7 anything?  Does this reflect that after your

8 initial consultation they sent you 44 prior art

9 documents?

10 A.    Um, yes, it does.

11 Q.    Any idea which  -- any way to see which

12 those 44 were?

13 A.    They are primarily in a real big

14 binder, and as indicated here, prior art.  This

15 included the Davis thesis.  It included quite a

16 bit of material that I already had familiarity

17 with, such as, for example, CARIN EVA material,

18 and it included a number of, of patents, I

19 can't say exactly which ones those were now.

20       And there was quite a bit of material

21 on, well, one particularly big document on the

22 GBF work in Europe toward developing a standard

23 for databases -- map databases.

24 Q.    Did they give to you the Davis patent?

25 A.    Ah, I'm sure they did.

1 Q.    And this first -- I mean I don't see it

2 on the bill.  It says initial consultation and

3 then browsed 44 prior art documents.

4       Do you believe you got the patent at

5 the same time, at or about that time?

6 A.    Yes, I don't recall whether I brought

7 it back with me from the initial meeting or

8 whether it was in that box.

9 Q.    Now the initial meeting with them, when

10 was that?  Was it around that time, and is that

11 December 7th, that initial consultation?

12 A.    That was the first face-to-face contact

13 on the matter.  I had had a previous phone

14 call --

15 Q.    All right.

16 A.    -- exchange before with Edwards.

17 Q.    That day was a day trip to Chicago?

18 A.    Ah, well, to spend basically one day

19 there.

20 Q.    Okay.

21 A.    Indicated eight hours.

22 Q.    And  --

23 A.    But I returned -- I did spend a night

24 there.  I can't remember whether it was on the

25 front end or on the, the tail end.

1 Q.      And during that meeting Mr. Edwards

2 told you that Harman wanted to retain you to

3 give an opinion on the invalidity of the Davis

4 patent?  You understood that's what you were

5 being retained for?

6 A.      Yeah, I'm not --

7         MR. LEAVELL:  Objection, compound.

8 A.      I'm not certain what he said to me

9 about that at that time.  My impression was

10 that this meeting the 7th of December was at

11 least in part a get-acquainted session, and I

12 would assume that Jamal was interested in

13 finding out a bit more about me and whether it

14 would be appropriate or not.  My assumption is

15 that so far as being retained to follow

16 through, that that would depend on concurrence

17 by the client and such.

18 Q.      (By Mr. Bauer)  Well, if he gave you at

19 that meeting 44 prior art documents to take

20 with you, didn't you?  Take back with you.

21 A.      No, sir.  Those were sent to me

22 subsequently.

23 Q.      Right after that meeting.  Okay.

24 A.      (Nodding yes.)  As I recall, probably

25 along with a retainer agreement.

Page 188

1 Q.    Now, on January 10th you say you worked

2 on the claim construction.  So you made another

3 trip back to Chicago the first week -- the

4 second week in January?

5 A.    Ah, yes, I was there again.

6 Q.    And you spent the day in Chicago

7 working on claim construction with the Harman

8 attorneys?

9 A.    I didn't meet with the Harman

10 attorneys.  I simply met them very briefly.

11 Q.    So you went out to Chicago and spent a

12 day working there, but you were not with the

13 Harman attorneys that day?  It was just a quick

14 meeting with them?

15 A.    Just a quick meeting.  In fact, just an

16 introduction.  In fact  --

17 Q.    So why in Chicago?  So what did you do?

18 You flew out and sat in a conference room all

19 day by yourself?

20 A.    Much of the day.

21 Q.    All right.

22 A.    Much of the day.

23 Q.    And you say you worked on the claim

24 construction.  What did you do?

25 A.    Reviewing the claim construction as it

1 appeared at that time.  By work I don't mean

2 generally claims construction myself.

3 Q.      Then what were you doing?  It says here

4 worked on claims construction.  What did you

5 do?

6 A.      I was reviewing the information that

7 was presented to me at that time and other

8 information related to the case, I'm pretty

9 sure.

10 Q.      So did Harman's attorneys give you

11 their claim construction at that meeting?

12 A.      Nothing was exchanged directly with the

13 Harman attorneys, no.

14 Q.      Well, did they tell you the claim

15 construction Harman was going to advocate at

16 that meeting?

17 A.      You say Harman attorneys.

18 Q.      Well, it says here, Meet Harman

19 attorneys.  You mean Kirkland & Ellis; right?

20 A.      No, sir.  No, sir.

21      I mean Mr. Hart, for one, and there

22 were I believe two or three, perhaps two

23 other --

24 Q.      Okay.

25 A.      -- attorneys.

1 Q.      Then it may be my mistake.  When you

2 refer to meet Harman attorneys, you're meaning,

3 you refer to --

4 A.      Literally introduced to.

5 Q.      Okay.

6 A.      As opposed to meeting with.

7 Q.      Okay.  So on that day were you at

8 Kirkland & Ellis or did you go to Harman that

9 day?

10 A.      Kirkland & Ellis.  I have never been to

11 Harman.

12 Q.      All right.  So you went to Kirkland &

13 Ellis that day and you wrote that you worked on

14 a claim construction for eight hours.

15 A.      Ah, yes.  But to recall or observe that

16 most all of these entries are one lines.  And

17 that doesn't mean worked only on that but

18 rather than that write a paragraph on all the

19 details, that was the main thought.

20 Q.      On that day what did you do with

21 respect to claim construction?  Were you trying

22 to create your own?

23 A.      No, sir.  No.

24 Q.      Did the Kirkland & Ellis attorneys tell

25 you what they were going to advocate for a

Page 191

1 claim construction?

2 A.     My recollection would be that I was

3 shown what had been developed up to that point.

4 Q.     As their claim construction?

5 A.     I forget whether there was claim

6 construction from MIT as part of that.  Claim

7 construction is all I can say right now based

8 on this record.

9 Q.     Okay.  Now, with respect to the patent,

10 French Exhibit 4, right before we broke for

11 lunch I asked you when you read the patent you

12 saw that it referred to a discourse generator;

13 correct?

14 A.     Yes, sir.

15 Q.     And before you read the patent, you had

16 no meaning [sic] what discourse meant in the

17 context of automobile navigation systems;

18 correct?

19 A.     Um, not, not specifically.

20 Q.     Okay.

21 A.     Not specifically.

22 Q.     And so you said you read the patent and

23 then you then went to look at some of the

24 references in the patent to better understand

25 discourse?

Page 192

1  A.    I requested, obtained copies of two

2  references.

3  Q.    Which references?

4  A.    Listed above the abstract, the Grosz

5  and Sidner --

6  Q.    Right.

7  A.    -- report, I believe.

8  Q.    Right.  And what else?

9  A.    And the Inton --

10 Q.    Intonational Structuring of Discourse

11 by J. Hirschberg?

12 A.    I believe that was one of them.

13 Q.    And did you get those through Kirkland

14 or did you get them from the library?

15 A.    Through Kirkland.

16 Q.    So you called Kirkland and said, Can

17 you send me these two references so I can

18 better understand what discourse means?

19 A.    In effect.

20 Q.    And then did they send it to you?

21 A.    Yes, they did.

22 Q.    All right.  And after you read that did

23 you then have an understanding as to what

24 discourse meant?

25 A.    Not to my total satisfaction, no, sir.

Page 193

1 Q.     What did you still not understand or

2  what were you unsatisfied about?

3 A.     The distinction between what in a

4 formal sense, academic sense, is called

5 discourse versus ordinary speaking.

6 Q.     And what was the dissatisfaction?

7 Where was the disconnect in your mind?

8 A.     I didn't quite understand the necessity

9 of approaching that from a theoretical model

10 basis as opposed to just simply doing it.

11 Q.     What, what didn't you understand?  Did

12 you not understand what he was describing in

13 the patent?

14 A.     I think I understood that better than

15 what was described in these papers that I

16 partially read.  I didn't read all of both of

17 them.

18 Q.     Turn to column 3 of the patent.  Column

19 3, down around line 36.  Where it says the

20 discourse generator composes driving

21 instructions and other messages according to a

22 discourse model in realtime as they are needed.

23      Do you see that sentence?

24 A.     Yes, sir.

25 Q.     Did you understand that sentence when

Page 194

1 you read this patent?

2 A.    I understand the driving instructions

3 and other messages and the as needed part of

4 it.  That is all on realtime, as it says.

5        The discourse generator part, no, I

6 couldn't claim to have gained a full

7 understanding of that.

8 Q.    All right.  And that's why you asked to

9 see this Sidner reference, to help you get a

10 better understanding of that?

11 A.    Well, yes.  There were so many

12 references to discourse in, in the patent that

13 I wanted to try to look into that myself.

14 Q.    And when you read the patent it was

15 clear to you that a good place to look were the

16 references within the patent?

17 A.    Well, that was my first acquaintance

18 with this terminology.  I certainly wasn't

19 aware of publications that might focus on it,

20 define it better, elaborate on it.

21        I found the two references not to be

22 all that useful in gaining an understanding.

23 Q.    Because they were more theoretical --

24 A.    Yes.

25 Q.    -- than your experience allowed you to

1 understand?

2 A.     Right.  And they generally were not

3 specific in the context of automobile

4 navigation, which didn't help either.

5 Q.     Is it fair to say that until you read

6 this patent with all of your experience in the

7 industry, you hadn't seen anybody publish and

8 discuss the use of discourse in an automobile

9 navigation system?

10     MR. LEAVELL:  Objection, vague as to

11 the meaning of discourse.  Undefined term.

12 Subject to claims construction.

13 A.     Not that stuck in my mind.  If I had

14 seen incidental use of the term like many other

15 terms I see incidental use of, unless I had

16 some reason to focus on it earlier, it wouldn't

17 necessarily stick in my mind.  But I can't say

18 I have never seen the word before, certainly.

19 Q.     All right.

20 A.     But I don't recall examples.

21 Q.     (By Mr. Bauer)  When you went to

22 Kirkland in January 2006, what did they tell

23 you discourse meant?

24     MR. LEAVELL:  Objection:  Assumes facts

25 not in evidence.

1 A.      I don't recall them telling me anything

2 about it.

3 Q.      (By Mr. Bauer)  Well, you spent time

4 working on claim construction on January 10th.

5 Did anybody tell you what they -- did anybody

6 at Kirkland tell you what they thought a

7 discourse generator meant in the context of

8 this patent?

9 A.      Not that I recall.  As you speculated

10 earlier, I was indeed in that conference room

11 by myself a good part of the day.

12 Q.      You didn't ask anybody -- you read the

13 patent by then; right?

14 A.      Yes.

15 Q.      You had looked at the claims by

16 then; right?

17 A.      Right.

18 Q.      You didn't ask anybody at Kirkland,

19 what does discourse mean?

20 A.      I asked for these references.  I didn't

21 ask them if they knew and would explain it to

22 me, as I recall.

23 Q.      So you went out to Kirkland, you didn't

24 understand discourse well and you didn't ask

25 the attorneys to help you understand what

Page 197

1 discourse was?

2 A.    I asked them to supply me with some

3 references to study it.

4 Q.    You understood at the time that this

5 was going to be a big issue in the case, didn't

6 you?  What discourse was and whether the prior

7 art showed discourse?

8 A.    I think initially there wasn't all that

9 much focus and emphasis on that.

10 Q.    Did anybody at Kirkland tell you that

11 Harman contended discourse meant verbal

12 expression?

13 A.    I don't think anybody had to tell me it

14 meant verbal expression.  Verbal expression is

15 a common thing.  As I say, I have seen many

16 examples of it in earlier route guidance

17 systems.

18 Q.    Had verbal expression?

19 A.    Yes.

20 Q.    Right.  But has anybody told you that

21 verbal expression is the same thing as

22 discourse?

23 A.    Not that I recall specifically.

24 Q.    Do you believe verbal expression is the

25 same thing as discourse as you sit here today?

1 A.     It's my impression that discourse means

2 something more than just verbal expression.

3 Q.     Okay.  What is your impression as you

4 sit here today as to what discourse refers to?

5 A.     Ah, that it refers to, ah, a more

6 extensive not dialog but monolog, since there's

7 only one party involved in it, and this is

8 based more on some of the examples given in the

9 Davis patent than on the references I looked at

10 where they got into, Davis got into quite

11 lengthy expressions in some cases and some of

12 which were simply commentary as opposed to

13 route guidance.

14 Q.     Are you aware of anybody who had

15 implemented a system before 1990 that provided

16 commentary during navigation as opposed to

17 simply directions?

18         MR. LEAVELL:  Objection, vague as to

19 what you mean by implemented.

20 A.     Hmm.  I would say more things

21 pertaining to calling errors to the driver's

22 attention, that kind of thing.  I can't say

23 offhand whether that -- that I was aware of it

24 at the time.  It was primarily presented

25 visually or in an audible manner but I was not

1 familiar with lengthy expressions like some of

2 the examples that Davis gave.

3 Q.    (By Mr. Bauer)  Look at Claim 45 of the

4 patent.  As you sit here today, having done all

5 your investigation and based on all of your

6 knowledge, are you aware of any system made

7 before 1990 or published before 1990 in which

8 the words "spoken" included a long description

9 of an act substantially before the act followed

10 by a short description at the time of the act?

11 A.    Ah, let me say that I need to look at

12 my material to give you a more specific answer,

13 but let me observe to begin with, though, that

14 what is long?  And what is short?  It's all

15 sort of relative, really.  But I would need to

16 look at the examples that I gave and see what

17 they may have been.

18 Q.    The examples in the prior art chart in

19 your report?

20 A.    Ah, yes.

21 Q.    All right.  So as you sit here right

22 now, having prepared for this deposition, you

23 have no reference in mind, no prior art

24 reference in mind in which there was a first

25 longer instruction followed by a second shorter

1 instruction?

2        MR. LEAVELL:  Objection, it's not a

3 memory test.

4 A.      Yeah, no, not a specific one.  As I

5 say, these reports were prepared weeks ago.

6 I have done a lot of other things since then,

7 and it would be foolish of me to rely totally

8 on my memory as to what went in there.  If you

9 care to, I would be happy to study my report.

10 Q.      (By Mr. Bauer)  Well, take your report,

11 it's in front of you, French Exhibit 1, and

12 please show me a single reference that you cite

13 to which has a first instruction that is longer

14 than a second description relating to the same

15 direction instruction.

16 A.      May I use my own copy?  This is

17 assembled in an odd way.

18 Q.      Oh, sure.

19 A.      It makes it hard to look at.

20 Q.      Sure.  Sure.  No, that's fine.

21 A.      I've been through here.  It's a lot

22 easier to open up and find something.

23 Q.      Oh, that's fine.  Do you have notes or

24 color tabs to help you in there or something?

25 It's just --

Page 201

1 A.      Unh-unh.

2 Q.      Just easier for you to work with?

3 A.      Right.

4 Q.      Okay.

5 A.      Yeah, that tab simply indicates that

6 Claim 12 is on this page where the dispute is.

7 Q.      Okay.  But I'm asking about Claim 45.

8 A.      No, that's the only thing I see in the

9 way of marking as to a point.

10 Q.      Okay.  That's fine.

11 A.      45.  I'll start looking at the claims

12 again.

13          Examples are about the same length in

14 the case of Wootton.

15 Q.      I'm sorry?

16 A.      I say in the case of the Wootton --

17 Q.      The examples are all about the same

18 length?  The instructions are?

19 A.      About the same length.

20 Q.      Okay.

21 A.      The example under tab E, based on the

22 Rogue system, gives an example of a longer

23 instruction, drive 1.2 miles on Merrow to

24 Summit Avenue.  Take Summit, east exit, and

25 merge onto Summit.

1       It's not spelled out here as to exactly

2 what separation or pause there might be between

3 those.  But again those are about similar,

4 similar in length.

5       And the next one, the EVA system --

6 Q.    Before we go there, just to finish with

7 what --

8       MR. LEAVELL:  Objection.  Don't

9 interrupt him.

10      MR. BAUER:  I'm not.  Before we go to

11 EVA, let me finish on the one you just asked,

12 talked about.

13      MR. LEAVELL:  I object.  If you want to

14 withdraw the question, go ahead.

15 Q.   (By Mr. Bauer)  Talking about the one

16 you just talked about, that example you just

17 talked about?

18 A.     Right.

19 Q.     Are those separate acts?  Each one of

20 those is a separates act, isn't it?

21 A.     Ah, yes, but I noted that without going

22 back to the original source material, I can't

23 say what there may have been in the way of a

24 pause or time between them.

25 Q.     All Right.  Okay.  Now we can go back

Page 203

1 to EVA and continue.

2 A.     But the implication certainly is that

3 there is some time in between.   The first one

4 says, Drive 1.2 miles.   And the second part,

5 well, that is to reach Summit Avenue.

6      The second part tells you to take

7 Summit east exit.

8 Q.     That's referring to a different act,

9 isn't it?   Than the one before?

10 A.     That's my interpretation.   The longer

11 part sets up for what you're going to do.   It

12 directs you to the point to where it will be

13 done.

14      And the second one would be closer to

15 the actual action point.   So you could go ahead

16 and perhaps act about that moment.   To go

17 beyond that, I will need to take a look at the

18 document, that statement.

19 Q.     We're talking about Rogue there; right?

20 A.     Right.

21 Q.     When did you see a Rogue system that

22 actually did this?

23 A.     I'm referring to the documentation of

24 the Rogue overall system design.

25 Q.     So that doesn't give you any

Page 204

1 information about the time in between

2 instructions, does it?

3       MR. LEAVELL:  Objection, misstates.

4 Misrepresents.

5 A.      Well, I can't confirm that, again,

6 without looking at the report.

7 Q.      (BY MR. BAUER)  Okay.  Go on to the

8 next one.

9 A.      Let's see on this.  EVA.

10       Well, one of the instructions there is

11 given earlier than the other one by virtue of

12 the statement saying that it does so with

13 sufficient lead time to enable lane changes,

14 etcetera, positioning the vehicle, positioning

15 the vehicle to make the required turns.

16       Instructions such as turn right at the

17 next corner or stay in the right lane are

18 audibly delivered to the driver.

19 Q.      Does that show you a long description

20 given substantially before the act is to be

21 performed and a short description given at the

22 time the act is to be performed?

23       MR. LEAVELL:  Objection, vague,

24 undefined.

25 A.      Well, again I will need to check the

1 source document, but the level of detail given

2 in that document is such that I couldn't state

3 with any certainty that --

4 Q.    Well, this is a --

5        MR. LEAVELL:  You're cutting him off.

6 Q.    (By Mr. Bauer)  I'm sorry.  I didn't

7 mean to cut you off.

8        MR. BAUER:  Did you get the end of his

9 question?

10       THE REPORTER:  Of course not.

11 Q.    (By Mr. Bauer)  All right.  I didn't

12 mean to cut you off.  If you could finish the

13 sentence?

14 A.    What was the first part of it?  What

15 was I saying?

16       THE REPORTER:  I couldn't state with

17 any certainty that...

18       THE WITNESS:  Any time in between these

19 instructions, without checking the report and,

20 well, that's all I can say about it.

21 Q.    (By Mr. Bauer)  At least -- did you

22 create these claim charts?

23 A.    I created or located and provided the

24 prior art material going with each one.

25 Q.    So the example that's in the right

1 column is information you identified and gave

2 to Kirkland as the example to put into this

3 element?

4 A.      Right.

5 Q.      Is it your view that turn right at the

6 next corner and stay in the right lane relate

7 to different acts or the same act?

8       MR. LEAVELL:  Objection, vague.

9 A.      Without confirming my memories, I would

10 be inclined to question whether there was any

11 length of time in between the two.

12 Q.      (By Mr. Bauer)  Are they referring to

13 the same acts or different acts?

14 A.      These are just examples given in the

15 report.  I'm not sure if the context was really

16 elaborated upon that much.

17 Q.      How about the CARguide system?

18 A.      Well, in this case there apparently was

19 not a -- I don't believe that issue was

20 addressed in the CARguide paper.  As we have in

21 often cases, we show how other aspects of it

22 could be supplemented by material from other

23 descriptions, such as, in this case, EVA,

24 Rogue, and so on, and clearly in each such case

25 we inserted the, what seemed to be the most

Page 207

1 applicable material in the reference material.

2 Q.     What about the CARIN system, tab H?

3 A.     The example given there is not from a

4 CARIN publication but more of a popular press

5 type piece, as I recall.  But gives only what I

6 would call an incomplete example.

7 Q.     And is that example showing long

8 description of an act given substantially

9 before the act and then a short description at

10 the time of the act?

11        MR. LEAVELL:  Objection, vague.

12 Undefined term.

13 A.     I believe the motorway is the next

14 exit -- I would say that is a modestly long

15 statement.  Take the first turn left is a

16 shorter one, but it's not delineated, exact

17 time or distance relationship between them.

18 Q.     (By Mr. Bauer)  And aren't those

19 separate acts?

20        MR. LEAVELL:  Objection, misstates.

21 A.     I can't tell for certain from this.

22 But --

23 Q.     (By Mr. Bauer)  In your opinion are

24 they relating to separate acts?

25 A.     Describing separate acts, yes.

1 Q.      Now when you read the Davis abstract

2 and paper back in 1989 and you thought that

3 there was something fresh in it because he was

4 the first one to have only oral directions --

5        MR. LEAVELL:  Objection, misstates.

6 Mischaracterizes the testimony.

7 Q.      (By Mr. Bauer) What was it, what was it

8 that allowed him to do something different and

9 be successful at it, --

10        MR. LEAVELL:  Same objection?

11 Q.      (By Mr. Bauer)  In your opinion?

12        MR. LEAVELL:  Same objection.

13 Misstates, mischaracterizes, assumes facts not

14 in evidence.

15 A.      It wasn't apparent how he did it from

16 the abstract.

17 Q.      (By Mr. Bauer)  But then you saw his

18 paper in 1989; right?

19 A.      I can't say that I read the paper at

20 that time.

21 Q.      Okay.

22 A.      There was a whole book of papers and...

23 Q.      So you have a vivid memory today, 17

24 years later, of seeing the abstract but you

25 have no memory today of having seen this paper

1 then?

2 A.    I don't recall paying particular

3 attention to the paper back then, because when

4 the paper became available, when the

5 proceedings were published, that was at the

6 time of the conference.

7        My recollection, rather than being

8 something about studying the paper in the

9 proceedings of the conference, was that I sat

10 in for at least part of his presentation.

11 There were many simultaneous sessions going on,

12 and I had to do some time sharing.  As for

13 studying the paper in the proceedings at that

14 time, I was very, very busy with all kinds of

15 activities, and just out of curiosity I

16 couldn't very well afford to take the time to

17 make a comprehensive study of the paper itself

18 at that time.  And I had no, no real incentive

19 to, frankly, at the time.

20 Q.    Have you read the paper in the context

21 of this litigation?

22 A.    Ah, yes, early on I did read it, since

23 I did have this early contact with the work,

24 limited to the abstract, essentially.

25 Q.    But in the course of preparing your

Page 210

1 opinions you went back and reread that paper?

2 A.     I believe so.  Early on.

3 Q.     And having read that paper, did you

4 reach a conclusion as to whether there was

5 something in fact fresh in what he was

6 describing in terms of being the person -- Yes.

7 The idea of playing down the balance of the

8 system as he did, using something off the shelf

9 as opposed to developing an overall system

10 himself.  That was one thing that stood out.

11       The other was that they depended solely

12 upon voice data as opposed to using a display

13 as well.

14 Q.     And was the --

15 A.     Some of the jerryrigging approach I

16 guess to the demonstration apparatus, sort of

17 unusual.

18 Q.     And what was it that he did that

19 allowed him to provide directions orally only

20 that made it an effective system?

21       MR. LEAVELL:  Objection:  Assumes facts

22 not in evidence.

23 A.     I'm sorry.  Could you state that again?

24 Q.     (By Mr. Bauer)  Well, simply taking the

25 computer screen out would normally be -- I

1 mean, that would be easy; right?

2 A.      Right.

3 Q.      Just taking the -- right?

4 A.      Right.

5 Q.      Just don't connect it.

6 A.      Um-hum.

7 Q.      Right?

8 A.      Right.

9 Q.      So he must have done something more

10 than just turn off a computer screen.

11 A.      Well, the -- it's hard for me to

12 delineate between what I have read in the

13 patent, what I have done in the thesis and what

14 I have read in the Venus paper of 1989.

15       But in general, longer and more

16 detailed descriptions, definitions of

17 instruction were part of what he did, and, as

18 you would expect, is going to rely only on

19 those instructions.

20 Q.      And that was something you hadn't seen

21 before in 1989 in any of the other works people

22 were doing.

23 A.      Not about the work on that scale.   I

24 think it's quite a bit of an experimental work

25 done.

**EXHIBIT D**

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 1877268 (W.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents

Amway Corp. v. Procter & Gamble Co.W.D.Mich.,2001.Only the Westlaw citation is currently available.

United States District Court, W.D. Michigan.

AMWAY CORPORATION, Plaintiff,

v.

THE PROCTER & GAMBLE CO., et al., Defendants.

**No. 1:98CV726.**

April 17, 2001.

*MEMORANDUM OPINION*

SCOVILLE, Magistrate J.

**\*1** This matter is before the court on plaintiff's motion to compel production of four documents allegedly reviewed by two expert witnesses for defendant Procter & Gamble (docket # 477). Plaintiff relies upon the provisions of Fed.R.Civ.P. 26(a)(2)(B), which require testifying expert witnesses to provide a report including, among other things, "the data or other information considered by the witness in forming the opinions." In other contexts during the course of this litigation, I have expressed my agreement with those courts holding that Rule 26(a)(2) requires disclosure of any document considered by a testifying expert, whether or not the document is otherwise privileged and regardless of whether the expert expressly relies upon the document in formulating his or her opinion. *See, e.g., Simon Property Group L. v. mySimon, Inc.,* 194 F.R.D. 644, 646-47 (S.D.Ind.2000); *Johnson v. Gmeinder,* 191 F.R.D. 638, 645-47 (D.Kan.2000); *accord Suskind v. Home Depot Corp.,* No. 99-10575, 2001 WL 92183 (D.Mass. Jan. 2, 2001). There is a sizable minority position to the contrary. *See Haworth, Inc. v. Herman Miller, Inc.,* 162 F.R.D. 289 (W.D.Mich.1995) (Enslen, C.J.).

In the present case, however, it is not necessary to apply the rule. Procter & Gamble has presented the court with affidavits and deposition testimony clearly establishing that the testifying expert witnesses never read, reviewed or considered the subject documents in forming their opinions. In such circumstances, the rationale for a broad reading of the disclosure requirements of Rule 26(a)(2) disappears. If an expert witness has read a document provided by the client, effective cross-examination is guaranteed by finding a waiver of privilege, even if the testifying expert eschews any formal "reliance" on the document. Where, however, the witness clearly did not read or review the document, the purpose for the rule in favor of waiver vanishes. *See Johnson,* 191 F.R.D. at 648 ("Without proving disclosure, Plaintiffs cannot prove waiver.").

Plaintiff has failed to establish a factual foundation for the relief it seeks. Plaintiff's motion to compel will therefore be denied.

*ORDER*

In accordance with the memorandum opinion issued this date:

IT IS ORDERED that plaintiff's motion to compel production of documents provided by Procter & Gamble to testifying expert witnesses (docket # 477) be and hereby is DENIED.

W.D.Mich.,2001.
Amway Corp. v. Procter & Gamble Co.
Not Reported in F.Supp.2d, 2001 WL 1877268 (W.D.Mich.)

Briefs and Other Related Documents (Back to top)

• 1:98CV00726 (Docket) (Oct. 13, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.