IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY,<br><br>Plaintiff,<br><br>v.<br><br>HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED,<br><br>Defendant. | Civil Action No. 05-10990-DPW<br><br>**ORAL ARGUMENT REQUESTED** |

**HARMAN'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS
SUPPORTING ITS MOTION FOR SUMMARY JUDGMENT OF
UNENFORCEABILITY DUE TO MIT'S INEQUITABLE CONDUCT**

1. In the late 1980's, Jim Davis was a graduate student at MIT working within the Speech Research Group of the MIT Media Lab under his faculty advisor, Chris Schmandt, who also served as Director of that Group. Ex. 14 at 29:10-21, 286:23-287:1.

2. By early 1988, Davis and Schmandt were working on a project called the Back Seat Driver that involved automobile navigation using spoken directions. *See* Ex. 10 ("MIT [] states that claims 1-4, 7-10, 14, 16, 19, 24, 27, 28, 42-44, 48, 55, and 57-58 were conceived at least as early as April 1988.")

3. The Back Seat Driver became Davis' thesis for his doctorate degree and eventually led to the patent application that issued as the '685 Patent. Ex. 14 at 82:9-15; Ex. 2 at 111-276; *see also* Ex. 14 at 49:6-13 ([[REDACTED]]); Ex. 1; Ex. 12 at 57:24-58:4 ([[REDACTED]])

4. A subsidiary of the large, Japanese corporation NEC funded the project. Ex. 2 at 116; Ex. 17.

5. [[REDACTED]] Ex. 15 at 115:9-13 ([[REDACTED]])

6. On [[REDACTED]], Davis and Schmandt sent a copy of the completed thesis ("certified by Nicholas P. Negroponte," the then Director of the MIT Media Lab) to a Mr. Rittmueller, an NEC employee at the time. Ex. 2 at 111; Ex. 19 at 172 ([[REDACTED]]); Ex. 3 at 187.

7. The copy of Davis' thesis sent to Rittmueller was not marked confidential in any way. Ex. 3 at 187; *see also* Ex. 13 at 302:23-303:2 ([[REDACTED]]), 306:16-21 ([[REDACTED]])

8. Davis himself sent another copy of his thesis (unsigned but bearing an August 4, 1989 date for Davis' signature) to a Bell Labs employee, Lynn Streeter, without any confidentiality designation and without any restrictions on her use of it. Ex. 4; *see also* Ex. 16 at 115:12 ([[REDACTED]]), 119:3-5; Ex. 4 at 52-53 (Dr. Streeter then forwarded Davis' Thesis to third parties "I need a copy of [the Davis thesis] sent to Karen Lochbaum Aiken Computation Lab . . .").

9. **[[REDACTED]]** Ex. 16 at 115:23-25; Ex. 5.

10. **[[REDACTED]]** Ex. 23.

11. The words, lines, and pages of the copies sent to Dr. Streeter and Mr. Rittmueller are identical to the copy that MIT later submitted to the PTO; only the signature on the Rittmueller copy differs. *See* Ex. 2 at 111-276 (PTO); Ex. 3 at 187 (Rittmueller); Ex. 4 at 53 (Streeter).

12. By May 26, 1989, Davis was prepared to defend his thesis and invited the public to attend. Ex. 5.

13. **[[REDACTED]]**. *See, e.g.,* Ex. 11 at 101:1-11 ([[REDACTED]]"); Ex. 24; *see also* Ex. 11 at 105:10-16 ([[REDACTED]])

14. Davis signed and submitted his thesis on August 4, 1989. Ex. 2 at 111.

15. On August 9, 1990 MIT filed a patent application, based on Davis' thesis, that became the '685 Patent. *See* Ex. 1.

16. MIT had more than 800 U.S. patents already issued in its name by the August 9, 1990 filing date of the '685 application. (a diligent search of the PTO website, www.uspto.gov, shows 836 patent records, and 1091 applications, for issued patents assigned to MIT by August 9, 1990).

17. **[[REDACTED]]** Ex. 6 at 7388 ([[REDACTED]]).

18. **[[REDACTED]]** Ex. 6 at 7387 ([[REDACTED]]).

19. **[[REDACTED]]** Ex. 6 at 7388 ([[REDACTED]]).

20. **[[REDACTED]]** See Ex. 8 at 7392.

21. On November 8, 1991, the PTO rejected each and every pending claim because the Davis thesis was publicly available more than one year before MIT filed the patent application. November 4, 1991, Office Action, Ex. 2 at 442 ("First Office Action").

22. **[[REDACTED]]** Ex. 7 at 7389 ([[REDACTED]]).

23. MIT expressly acknowledged to the PTO that it clearly understood the Examiner's reasons for rejection. MIT's May 5, 1992 Response, Ex. 2 at 803 ("Response to the First Office Action").

24. In its Response to the First Office Action, MIT did not challenge the materiality of Davis' thesis or the Examiner's determination that the thesis anticipated each claim. Ex. 2 at 799-803.

25. In its Response to the First Office Action, MIT submitted a new title page for the thesis that was stamped by MIT's library. Ex. 2 at 803.

26. In its Response to the First Office Action, MIT told the PTO that Davis' thesis "did not become available to the public more than a year before the filing date of the present application." Ex. 2 at 803.

27. In its Response to the First Office Action, MIT led the PTO to believe that the only access to Davis' thesis was through the MIT library. Ex. 2 at 803 ("August 4, 1989 is the data the thesis was signed, and not the date on which the thesis became available to the public. M.I.T. does not generally catalog and shelve theses until several months after the official date of submission.")

28. When MIT submitted its Response to the First Office Action, MIT knew **[[REDACTED]]**  Ex. 15 at 115:9-13 ([[REDACTED]]); Ex. 11 at 165:2-5 ([[REDACTED]])

29. When MIT submitted its Response to the First Office Action, MIT knew that Davis had actually distributed his thesis and that he did so more than once. *See* Ex. 3; Ex. 4; Ex. 19 at 172; Ex. 15 at 115:9-13; Ex. 11 at 165:2-5.

30. When MIT submitted its Response to the First Office Action, MIT knew that Davis publicly defended his thesis. *See* Ex. 5.

31. When disclosing information that MIT did "want to be considered and made of record," in an IDS received by the PTO on September 4, 1990, MIT said nothing about the availability of Davis' thesis. MIT's September 4, 1990 IDS, Ex. 2 at pg. 75-98 ("MIT's First IDS") (citing the absence of this information).

32. The PTO issued a Notice of Allowance for the '685 patent on June 30, 1992. *See* Ex. 2 at 808.

33. **[[REDACTED]]** Ex. 9 at 7404 (**[[REDACTED]]**).

34. MIT asserted privilege and forced Harman to move to compel the documents (MIT 07377-07406) showing **[[REDACTED]]**. *See* Ex. 28 (forcing MIT to produce the NEC documents later Bates Nos. MIT 07377-07406).

35. Documents bearing Bates Nos. STREETER 52-729 were produced from Dr. Streeter's files in response to a subpoena that Harman served on Dr. Streeter. Litigation counsel representing MIT in this matter represented Dr. Streeter in regard to the subpoena.

36. Documents bearing Bates Nos. RITTMUELLER 1-351 were produced from Mr. Rittmueller's files in response to a subpoena that Harman served on Mr. Rittmueller. Litigation counsel representing MIT in this matter represented Mr. Rittmueller in regard to the subpoena.

37. Documents bearing Bates Nos. HAR 709859-710072 were produced by Harman after learning about them from a corporate partner in its counsel's law firm who happened to work on the Back Seat Driver while an undergraduate student at MIT.

38. MIT had an "eye toward litigation" extending back to 1989 giving rise to privilege and thus triggering its continuing obligation to preserve documents.

39. **[[REDACTED]]**. Ex. 18 at 108.

40. **[[REDACTED]]**. Ex. 18 at 108, 112.

41.  **[[REDACTED]]**. Ex. 19 at 173.

42.  Among the subjects who used the Back Seat Driver were **[[REDACTED]]**, and several General Motors' employees, none of whom signed any type of confidentiality agreement or were bound by any confidentiality obligation. *See* Ex. 11 at 32:7-9 ([[REDACTED]]); Ex. 13 at 57:13-58:1, 58:11-24, 61:11-12 ([[REDACTED]]); Ex. 14 at 88:16-18 ([[REDACTED]]), 97:21-24 ([[REDACTED]]); Ex. 16 at 116:11-23, 118:10-18 ([[REDACTED]]); Ex. 22 (General Motors' employees).

43.  Not a single confidentiality agreement for any use or demonstration of the Back Seat Driver prototype has been produced in this litigation. *See* Ex. 25 Nos. 1, 6-11, 21, 23 pgs. 1, 7-10, 15-16; Ex. 26 Nos. 32-33 pgs. 8-9 ("MIT states that it has already produced or logged on its privilege log any documents in its possession, custody, or control responsive to this Request.")

44.  MIT openly used the Back Seat Driver all over Boston and stored it in a public garage. Ex. 14 at 161:1 ([[REDACTED]]); Ex. 2 at 114 ([[REDACTED]]); Ex. 20 at 933; Ex. 21 at 1101; Ex. 13 at 331:5-18 ([[REDACTED]])

45.  MIT never told the PTO about the **[[REDACTED]]** who used the Back Seat Driver to navigate the public streets of Boston more than a year before MIT filed the patent application. *See* Ex. 2 (citing the absence of this information).

46.  In MIT's First IDS it withheld information about the 50 public uses of the Back Seat Driver. Ex. 2 at pg. 75-98 (citing the absence of this information).

47. MIT never told the PTO that it reduced to practice the sole independent claim and 22 dependent claims "at least as early as June of 1989." *See* Ex. 2 (citing the absence of this information); Ex. 10 at No. 14 pg. 16.

48. (32) MIT never told the PTO that is reduced to practice 23 more dependent claims "at least as early as August 4, 1989." *See* Ex. 2 (citing the absence of this information); Ex. 5 at No. 14 pg. 16.

49. MIT never told the PTO that public uses continued after the claimed subject matter was reduced to practice. *See* Ex. 2 (citing the absence of this information).

50. MIT never told the PTO anything about the timing of the public uses. *See* Ex. 2 (citing the absence of this information).

51. MIT never told the PTO anything about the extent of the public uses. *See* Ex. 2 (citing the absence of this information).

52. MIT never told the PTO anything about the details surrounding the public uses. *See* Ex. 2 (citing the absence of this information).

53. MIT never told the PTO anything about the lack of confidentiality regarding the public uses. *See* Ex. 2 (citing the absence of this information).

54. MIT only disclosed to the PTO that "An actual working prototype of the Back Seat Driver has been implemented. It has successfully guided drivers unfamiliar with Cambridge, Mass. to their destinations. It is easy to foresee a practical implementation in the future." Ex. 1 at 3:4-8; Ex. 2 at 9.

55. MIT's patent prosecution attorney [[REDACTED]]  Ex. 12 at 69:13-16 ([[REDACTED]])

56. MIT's prosecuting attorney [[REDACTED]]. Ex. 12 79:17-19 [[REDACTED]])

57. During prosecution of the '685 Patent, Davis knew [[REDACTED]]. Ex. 19 at 173; *see also* Ex. 11 at 167:20-24 ([[REDACTED]])

58. During prosecution of the '685 Patent, Davis knew [[REDACTED]]. Ex. 11 at 168:19-22 ([[REDACTED]])

59. During prosecution of the '685 Patent, Schmandt knew [[REDACTED]]. Ex. 19 at 173; *see also* Ex. 14 at 95:10-22 ([[REDACTED]])


Date:  April 11, 2007

Respectfully submitted,

/s/ Courtney A. Clark
Robert J. Muldoon, Jr., BBO# 359480
James W. Matthews, BBO# 560560
Courtney A. Clark, BBO# 651381
SHERIN AND LODGEN, LLP
101 Federal Street
Boston, MA  02110

William A. Streff Jr., P.C.
Michelle A.H. Francis
Joanna Belle Gunderson
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000 (phone)
(312) 861-2200 (fax)

*Attorneys for Defendant
Harman International Industries, Incorporated*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on April 11, 2007.

                         /s/ Courtney A. Clark
                         Courtney A. Clark