**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY, | |
|       Plaintiff, | Civil Action No.: 05-10990 DPW |
| v. | Magistrate Judge Judith G. Dein |
| HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, | |
|       Defendant. | |

**MIT'S MEMORANDUM IN
OPPOSITION TO HARMAN'S MOTION FOR
<u>SUMMARY JUDGMENT OF UNENFORCEABILITY</u>**

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

ARGUMENT ..............................................................................................................................3

    A.     Harman's Allegations of Inequitable Conduct Are Empty ....................................3

           1.     To Succeed, Harman Must Show That There Is *No* Question of Fact. .......3

           2.     Harman Has Failed to Provide *Any* Evidence, Let Alone "Clear or Convincing" Evidence Not Subject  to Dispute, That The Alleged Omissions or Were "Material" ................................................................4

           3.     Harman Has Failed To Provide *Any* Evidence, Let Alone "Clear or Convincing" Evidence Not Subject to Dispute, That MIT Intended to Deceive the Patent Office ........................................................5

    B.     As a Matter of Law, Information About MIT Student Jim Davis' Field Trials Was Not "Material" ........................................................................6

           1.     The Field Trials Were Not Public Uses, and Therefore, Were Not Material to Patentability ..........................................................6

           2.     Additional Information About the Field Trials Would Have Been Cumulative ....................................................................11

    C.     As a Matter of Law, Davis' Thesis Drafts and Thesis Defense Were Not Publications or Public Disclosures, and Therefore, Not "Material" To the Patentability of the Patent. ...............................................................14

    D.     There Is No Evidence Of Intent To Deceive .....................................................18

CONCLUSION............................................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*,
 265 F.3d 1294 (Fed. Cir. 2001)......................................................................5

*Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys.*,
 96 F. Supp. 2d 1006 (N.D. Cal. 2000).............................................................3

*In re Bayer*,
 568 F.2d 1357 (C.C.P.A. 1978).....................................................................16

*Bernhardt, LLC v. Collezione Europa USA, Inc.*,
 386 F.3d 1371 (Fed. Cir. 2004)....................................................................8, 9

*Braun, Inc., v. Dynamics Corp. of America*,
 975 F.2d 815 (Fed. Cir. 1992)....................................................................3, 19

*Burlington Indus., Inc. v. Dayco Corp.*,
 849 F.2d 1418 (Fed. Cir. 1988).......................................................................2

*In re Cronyn*,
 890 F.2d 1158 (Fed. Cir. 1989).....................................................................16

*Egbert v. Lippmann*,
 104 U.S. 333 (1881) .....................................................................................11

*In re Epstein*,
 32 F.3d 1559 (Fed. Cir. 1994)........................................................................11

*Fiskars, Inc. v. Hunt Mfg. Co.*,
 221 F.3d 1318 (Fed. Cir. 2000) .....................................................................13

*FMC Corp. v. Manitowoc Co.*,
 835 F.2d 1411 (Fed. Cir. 1987).......................................................................4

*Hall v. Macneale*,
 107 U.S. 90 (1883) .......................................................................................10

*Halliburton Co. v. Schlumberger Technology Corp.*,
 925 F.2d 1435 (Fed. Cir. 1991)...........................................................4, 13, 20

*In re Hayes Microcomputer Prods., Inc. Patent Litig.*,
 982 F.2d 1527 (Fed. Cir. 1992).....................................................................19

*Hebert v. Lisle Corp.*,
    99 F.3d 1109 (Fed. Cir. 1996)................................................................5

*Invitrogen Corp. v. BioCrest Mfg., L.P.*,
    424 F.3d 1374 (Fed. Cir. 2005).......................................................8, 9, 10

*Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*,
    973 F.2d 911 (Fed. Cir. 1992)................................................................5

*Kingsdown Med. Consultants, Ltd., v. Hollister Inc.*,
    863 F.2d 867 (Fed. Cir. 1988)................................................................3

*In re Klopfenstein*,
    380 F.3d 1345 (Fed. Cir. 2004)...........................................................16

*Kolmes v. World Fibers Corp.*,
    107 F.3d 1534 (Fed. Cir. 1997)..............................................................3

*Life Techs. Inc. v. Clontech Labs., Inc.*,
    224 F.3d 1320 (Fed. Cir. 2000)..............................................................4

*Lough v. Brunswick Corp.*,
    86 F.3d 1113 (Fed. Cir. 1996)..............................................................11

*Molins PLC v. Textron, Inc.*,
    48 F.3d 1172 (Fed. Cir. 1995) (<u>citing</u> Black's Law Dictionary at 810 (6th ed. 1990)........5

*Monon Corp. v. Stoughton Trailers, Inc.*,
    239 F.3d 1253 (Fed. Cir. 2001)..............................................................5

*Mont-Bell Co. v. Mountain Hardwear, Inc.*,
    44 U.S.P.Q.2d 1568 (N.D. Cal. 1997) ....................................................3

*New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*,
    298 F.3d 1290 (Fed. Cir. 2002)............................................................11

*Northern Telecom, Inc. v. Datapoint Corp.*,
    908 F.2d 931 (Fed. Cir. 1990).....................................................5, 13, 19

*Sys. Mgmt. Arts, Inc. v. Avesta Techs., Inc.*,
    87 F. Supp. 2d 258 (S.D.N.Y. 2000) ....................................................11

## <u>Constitutional and Statutory Provisions</u>

35 U.S.C. § 102................................................................................8, 15, 16

## <u>Administrative Regulations</u>

37 C.F.R. § 1.56.................................................................................................................4, 13

Manual of Patent Examining Procedure, § 2001.05 ...................................................................4

## I.     **INTRODUCTION**

By its motion (Docket Entry 132), Harman asks this Court to find, as a matter of law, that there is clear and convincing evidence not subject to factual dispute that MIT research scientist Chris Schmandt, MIT graduate student James R. Davis, Ph.D., and Choate Hall & Stewart partner Bo Pasternack, intended to deceive the U.S. Patent and Trademark Office ("the Patent Office") in the procurement of U.S. Patent No. 5,177,685 ("the '685 patent").  For Harman to prevail here, it must show that there is clear and convincing evidence not subject to factual dispute that these three good people are liars, and that MIT fostered an environment of deception, not only with respect to the Patent Office, but also to the rest of academia.

Harman's motion is based on its attorneys' wild speculation that the MIT inventors hid information from the Patent Office about the field trials of a research prototype being worked on by the inventor, and made material false statements about the public availability of Davis' Ph.D. thesis, to preserve a non-exclusive license with a sponsor, and to allow Dr. Davis' thesis to be granted.  In cobbling together this story, Harman ignores any fact that doesn't fit into the story, such as the fact that MIT _did_ disclose information about the field trials to the Patent Office, and that every statement given to the Patent Office about Davis' thesis was true.

Allegations of inequitable conduct are the bane of patent litigation.  They are made in every patent case, and are used as ways to make _ad hominem_ attacks and smear good people.  The Federal Circuit has decried charges of inequitable conduct as an "absolute plague" that is clogging up the federal court docket:

> [T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague.  Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest grounds, to represent their client's interests adequately, perhaps.  They get anywhere with the accusation in but a small percentage of the cases, but such charges are not inconsequential on that account.  They destroy the respect for one another's

integrity, for being fellow members of an honorable profession, that used to make the bar a valuable help to the courts in making a sound disposition of their cases, and to sustain the good name of the bar itself. A patent litigant should be made to feel, therefore, that an unsupported charge of 'inequitable conduct in the Patent Office' is a negative contribution to the rightful administration of justice. The charge was formerly known as 'fraud on the Patent Office,' a more pejorative term, but the change of name does not make the thing itself smell any sweeter. Even after complete testimony the court should find inequitable conduct only if shown by clear and convincing evidence. *A summary judgment that a reputable attorney has been guilty of inequitable conduct, over his denials, ought to be, and can properly be, rare indeed*."

*Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988) (emphasis added).

The fact that a summary judgment that a reputable attorney has been guilty of inequitable conduct "ought to be, and can properly be, rare indeed," does not seem to stop defendants from making the allegations. *Id.* The fact that there is *no* evidence that anything was intentionally and deceptively withheld does not seem to faze Harman here. The fact that cumulative information about test drives or field trials of the Back Seat Driver research prototype and information about the limited, controlled distribution of Jim Davis' thesis to a few colleagues are factually irrelevant to the patentability of the invention did not seem to affect the timing of Harman's motion.

The fact that Harman suggests it may file yet another motion after this one is denied, on other alleged failures to disclose, points to this motion being filed for improper purpose.[1] On this record, this motion must be denied.

---

[1]    Harman's motion is predicated on Count II of Harman's counterclaims as set forth in "Harman's Second Amended Answer, Counterclaims & Reliance on Jury Demand/Jury Demand." (Docket Entry 143). Harman's unenforceability counterclaim lists _seven_ alleged instances in which MIT committed inequitable conduct (*Id.* at 10-11, ¶¶ 24-30) but the present motion only addresses two of those instances. Harman suggests it might file another summary judgment on the other elements, after this motion is denied. Of course, Harman is not entitled to serial motions on the same count, and MIT therefore respectfully requests the Court's Order to deny summary judgment on all of Count II of Harman's counterclaims.

## ARGUMENT

**A.    Harman's Allegations of Inequitable Conduct Are Empty.**

Inequitable conduct requires <u>clear</u>, <u>unequivocal</u>, and <u>convincing</u> proof that the persons involved in the prosecution of a patent application failed to disclose *material* information to the PTO with the *intent* to deceive the PTO. *See Kolmes v. World Fibers Corp.*, 107 F.3d 1534, 1541-42 (Fed. Cir. 1997); *Braun, Inc., v. Dynamics Corp. of America*, 975 F.2d 815, 821-22 (Fed. Cir. 1992); *Kingsdown Med. Consultants, Ltd., v. Hollister Inc.*, 863 F.2d 867, 872 (Fed. Cir. 1988).

**1.    To Succeed, Harman Must Show That There Is *No* Question of Fact.**

For Harman to get summary judgment on this issue, it must show that there is no question of fact. In order to defeat Harman's motion for summary judgment of inequitable conduct, MIT needs only to point to questions of fact as to either (1) a material misrepresentation or omission, <u>or</u> (2) intent. *See, e.g., Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys.*, 96 F. Supp. 2d 1006, 1016 (N.D. Cal. 2000) (granting plaintiff's motion for summary judgment of no inequitable conduct because defendant failed to adduce evidence of materiality); *Mont-Bell Co. v. Mountain Hardwear, Inc.*, 44 U.S.P.Q.2d 1568, 1575 (N.D. Cal. 1997) (granting plaintiff's motion for summary judgment as to no inequitable conduct because defendant failed to produce any "genuine evidence" of materiality or intent).

Harman has no evidence, let alone clear and convincing evidence not subject to dispute, that the persons involved in the prosecution of the '685 patent breached their duty of candor to the Patent Office by making material omissions or misrepresentations, or intended to lie, deceive or mislead it.

## 2. Harman Has Failed To Provide *Any* Evidence, Let Alone "Clear or Convincing" Evidence Not Subject To Dispute That The Alleged Omissions Were "Material."

There is always *something* that has not been disclosed to the Patent Office. Otherwise, the Patent Office would be buried with irrelevant or cumulative disclosures that relate in even the most remote way to the claimed invention. Because of this, in order for a patent to be unenforceable due to inequitable conduct, a defendant needs to show more than that something wasn't disclosed to the Patent Office -- the defendant must show that the applicant failed to disclose *material* information to the Patent Office, and then, with an *intent* to deceive the Patent Office. *Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1439-40 (Fed. Cir. 1991).

"If information is not material, there is no duty to disclose the information to the [Patent] Office." Manual of Patent Examining Procedure, § 2001.05 (emphasis added); *accord* 37 C.F.R. § 1.56(a) ("There is no duty to submit information which is not material to the patentability of any existing claim."). There is also no duty to disclose information to the PTO if the information is "cumulative" of information already before the Examiner. 37 C.F.R. § 1.56(b) ("Under this section, information is material to patentability when it is not cumulative to information already of record").

Importantly, "materiality" to the Patent Office is not the same thing as "relevance" within the meaning of the federal rules of evidence. Not everything that is "relevant" is "material." Allegations of inequitable conduct are not "established upon a mere showing that art or information having some degree of materiality was not disclosed." *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed. Cir. 1987). Rather, information is only material when there is a substantial likelihood that a reasonable Examiner would have considered the information important in deciding whether to allow the application to issue as a patent. *See Life Techs. Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000).

4

3.   **Harman Has Failed To Provide** *Any* **Evidence, Let Alone "Clear or Convincing" Evidence Not Subject to Dispute, That MIT Intended To Deceive The Patent Office.**

To succeed here, Harman must also show that there is no question of act, and indeed, that there is clear and convincing evidence, that the inventors or their attorney *intended* to deceive the Patent Office. *See Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 918 (Fed. Cir. 1992). Intent means, "[d]esign, resolve, or determination with which [a] person acts[; a] state of mind in which a person seeks to accomplish a given result through a course of action." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180 (Fed. Cir. 1995) (citing Black's Law Dictionary at 810 (6th ed. 1990)).

Given the "ease with which a relatively routine act of patent prosecution can be portrayed as intended to mislead or deceive, clear and convincing evidence of conduct sufficient to support an inference of culpable intent is required." *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990); *see also Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1306 (Fed. Cir. 2001) (affirming summary judgment of no inequitable conduct); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1263 (Fed. Cir. 2001) (affirming the district court's finding that "Stoughton had failed to prove the requisite intent to deceive the PTO."). A finding of deceptive intent cannot be based on mere inference of negligence. *See Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996) (reversing judgment of inequitable conduct).

To kick-off its tale of a vast conspiracy at MIT to deceive the Patent Office into granting this patent, Harman points to one letter from the Back Seat Driver research sponsor, NEC, to the MIT Technology Licensing Office, in which NEC, a Japanese company, expressed concern about the potential loss of *foreign* patent rights based on the publication of a June 1989 abstract

about the Back Seat Driver -- an abstract that, in fact, *was* disclosed to the Patent Office. Harman suggests (without evidence) that because of NEC's concern about foreign patent rights, MIT abandoned all academic scruples and integrity to secure a U.S. patent for NEC to license *non*-exclusively.

A story like this without evidentiary support cannot rise to the level of clear and convincing evidence, and certainly not for summary judgment.

**B.      As a Matter of Law, Information About MIT Student Jim Davis' Field Trials Was Not "Material".**

First, Harman argues that the MIT inventors and patent attorney improperly withheld detailed information about field trials of a research prototype built during Jim Davis' Back Seat Driver doctoral research. For this argument to succeed, Harman must show that there is no question of fact that the field trials were invalidating public uses of the claimed invention. MIT believes that the evidence below clearly shows that the field trials were *not* invalidating public uses, but if the Court disagrees, there clearly is then a genuine issue of material fact with respect to the field trials and the information given to the Patent Examiner.

**1.      The Field Trials Were Not Public Uses, and Therefore, Were Not Material to Patentability.**

The information Harman points to as improperly withheld was not *material* to the prosecution of the '685 patent because 1) the field trials did not constitute prior art within the meaning of the statute, making them not material; and 2) the information would have been cumulative to what MIT *had* already presented to the Patent Office. Harman's position seems to be that the fact that undergraduate students under the direction of the inventor, Jim Davis, drove

a test car on public streets during the course of and as part of his research, constitutes a "public use" of the invention.[2]

As is typical throughout Harman's papers as it argues as though there is no question of fact here, Harman relegates any evidence that doesn't fit its view to a footnote, Harman Mem. at 17 n. 7, and even then, fails to point out that elements of the "invention" were *inside* the car and entirely out of view of the public, or that the experiment was designed to test the user interface by observing the test subjects' reactions to the spoken directions and to selecting a destination.

There is no question that Jim Davis and Chris Schmandt conducted field trials with undergraduate students in the summer of 1989 to evaluate how drivers would respond to spoken instructions provided by the Back Seat Driver prototype, and to test the durability of cellular phone connections for data and speech transmission.  SOF ¶¶ 6-7, 10.[3]  There is no question that Jim Davis and Chris Schmandt were, at the time, working on perfecting the spoken output of the Back Seat Driver, a key feature of the invention.  SOF ¶ 10.  There is no question that a problem that Jim Davis and Chris Schmandt were studying in the field trials was the effect on the driver of a loss of a cellular phone signal between the car and the computer that was remotely operating at the Media Lab.  *See* SOF ¶ 7.  There is no question that the purpose of the field trials was not to offer the Back Seat Driver for sale or otherwise commercially exploit it.  SOF ¶ 12.  There is no question that the field trials primarily involved undergraduate test subjects who volunteered for the trials, or who were subject to MIT's rules on using students for experimental purposes. SOF ¶¶ 12-13.  There is no question that before and after the field trials, the Back Seat Driver

---

[2]    The field trials were addressed at length in the Rebuttal Expert Report of Stephen G. Kunin, MIT's patent law expert.  Exh. A at ¶¶ 70-80 (attached hereto).

[3]    "SOF" refers to "MIT's Counter-Statement of Facts Pursuant to Local Rule 56.1 In Opposition to Harman's Motion for Summary Judgment of Unenforceability of the '685 Patent," submitted concurrently with this brief.

prototype was stored in a private MIT garage that had limited card access, SOF ¶ 11, or that the Back Seat Driver prototype could only be driven around Cambridge or Boston if Jim Davis or Chris Schmandt were in the car supervising.  *See* SOF ¶¶ 8-9.

The policy behind the public use bar is "discouraging removal of inventions from the public domain *which the public justifiably comes to believe are freely available*, prohibiting an extension of the period for exploiting the invention, and favoring prompt and widespread disclosure of inventions."  *Bernhardt LLC v. Collezione Europa USA, Inc.*, 386 F.3d 1371, 1379 (Fed. Cir. 2004).  MIT suggests that on this *undisputed* evidence, there is no conclusion other than that the field trials conducted by Davis and Schmandt did *not* represent a "public use" under the Patent Statute.  A public use invalidates a patent under 35 U.S.C. § 102(b) only when the act satisfies a two-prong test: (1) the purported use must be public so as to disclose the invention to the public, *and* (2) the invention must be ready for patenting.  *See Invitrogen Corp. v. BioCrest Mfg., L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005).  Under the test set forth in *Invitrogen*, whether a purported use is "public" within the first prong of the test requires an inquiry into all of the circumstances to determine whether the purported use was (1) "accessible to the public" or (2) "commercially exploited."  424 F.3d at 1380.  The fact that the alleged uses of the invention were for purposes of experimentation is relevant in determining whether the invention was "accessible to the public."  *Id.; see also Bernhardt*, 386 F.3d at 1379.  The consideration of experimental circumstances for the "accessible to the public" inquiry is distinct from and in addition to the inquiry regarding whether the invention was also "ready for patenting." *Invitrogen*, 424 F.3d at 1380.

As the court in *Invitrogen* explained:

[T]he test for the public use prong includes the consideration of evidence relevant to experimentation, as well as, *inter alia*, the nature of the activity that occurred in

> public; public access to the use; confidentiality obligations imposed on the members of the public who observed the use; and commercial exploitation…That evidence is relevant to discern whether the use was a public use that could raise a bar to patentability, but *it is distinct from evidence relevant to the ready for patenting component* of *Pfaff's* two-part test, another necessary requirement of a public use bar.

*Id.* (internal citation omitted) (emphasis added).[4]   See also, *Bernhardt*, 386 F.3d at 1381. ("Additional factors a court must consider and weigh in determining whether the use was "public" under § 102(b) include, *inter alia,* 'the nature of the activity that occurred in public; the public access to and knowledge of the public use; [and] whether there was any confidentiality obligation imposed on persons who observed the use'… [and t]he presence or absence of a confidentiality agreement is not dispositive of the public use issue, but 'is one factor to be considered in assessing all the evidence.'").

Harman argues that "there is no evidence that any of the 50 people who were shown the Back Seat Driver ever pledged any confidentiality at all."  Harman's Brief at 3.  The public use inquiry is *not* whether formal confidentiality agreements are in place, however.  *Bernhardt*, 386 F.3d at 1381 ("the district court's conclusion seemingly overlooks the evidence [the patentee] presented to show that in the circumstances of this case, confidentiality agreements were unnecessary").  The issue is whether the test subjects of Jim Davis' and Chris Schmandt's field trials might have believed they were being shown how the Back Seat Driver prototype worked, so that they could themselves publicly disclose or use the information.   Confidentiality

---

[4]     Harman's Brief suggests that because the '685 patent was "reduced to practice" as early as June 1989, that the test drives somehow constituted "public use" of the invention.  However, Harman's Brief misapplies the law on this point and fails to acknowledge that "reduction to practice" is only one consideration in the two-prong test that determines whether an inventor's actions constitute an invalidating public use as clearly set forth in *Invitrogen*.  Moreover, inventors are not generally required to tell the Patent Office when an invention was reduced to practice.  SOF ¶ 14.

agreements were not necessary here because complete operation of the Back Seat Driver system was never demonstrated to the test subjects (nor pedestrians). There is simply no evidence here that the public would believe that the Back Seat Driver was freely available.

None of the activity that was subject to the field trials occurred in public or was at all accessible to the public. To be sure, the vehicle was sometimes driven on public streets, but the patentable invention was occurring entirely within the cabin of the vehicle, from the perspective of the driver. SOF ¶¶ 23-26. To an outside observer, *i.e.*, a pedestrian or other driver, nothing about the invention was visible from outside of the car, so there was no way for such an observer to have access to the invention or knowledge of it merely from the test drives. Additionally, at least six elements of the claimed invention were operating at the MIT Media Lab, remote from and not accessible to the test subject.

None of the students who test drove the car (and who signed an informed consent before agreeing to the experiment) obtained any "benefit" from driving the car, commercial or otherwise. SOF ¶12. MIT was not attempting to make a sale of the Back Seat Driver system to the test subjects or any other drivers on the road. There was no "commercial exploitation" of the invention to support Harman's argument that the test drives were "public uses." *Invitrogen*, 424 F.3d at 1380.

The cases that Harman cites to support its argument that MIT used the Back Seat Driver invention publicly miss the mark. For example, Harman cites *Hall v. Macneale*, 107 U.S. 90 (1883), which involved a patent on conical or tapering arbors that had screw threads on them for use in constructing safes. Harman Brief at 17, n. 7. However, here is what the Court in *Hall* said, "The construction and arrangement and purpose and mode of operation and use of the bolts

in the safes were _necessarily known_ to the workmen who put them in." 107 U.S. at 96.[5]  The

same is decidedly not true of A) the student drivers who were at the wheel during the test drives;

or B) casual observers on the street.  At least six elements of the ultimately claimed invention

were concealed from view of the drivers and pedestrians when the research prototype was used,

and were thus not "necessarily known."

 

       2.      **Additional Information About the Field
                Trials Would Have Been Cumulative.**

      Harman's motion argues "MIT committed inequitable conduct when it disclosed nothing

about the 50 subjects who drove the Back Seat Driver, very little information about any uses of

the Back Seat Driver, and did so only in a very cursory fashion."  Harman Mem. at 16.  What

Harman ignores in arguing that there was some wholesale failure to disclose, is that MIT _told_ the

Patent Office working prototypes had been used by drivers, and the Examiner actually

considered the field trials during prosecution of the '685 patent:

> An actual working prototype of the Back Seat Driver has been implemented. It has successfully guided drivers unfamiliar with Cambridge, Mass. to their destinations. It is easy to foresee a practical implementation in the future.

---

[5]     None of the other cases cited by Harman address inventions similar to the Back Seat Driver either or facts similar to the ones at bar.  _See New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co._, 298 F.3d 1290 (Fed. Cir. 2002) (involving a method for drilling); _Lough v. Brunswick Corp._, 86 F.3d 1113 (Fed. Cir. 1996) (inventor gave seal assemblies to his friends to install on their boats, and the inventor did not retain control or ever ask for comments); _Egbert v. Lippmann_, 104 U.S. 333 (1881) (inventor gave corset with internal springs to a girlfriend without any restrictions on her use); _Sys. Mgmt. Arts, Inc. v. Avesta Techs., Inc._, 87 F. Supp. 2d 258 (S.D.N.Y. 2000) (denying summary judgment to exclude a reference as possible prior art because triable issues existed); _In re Epstein_, 32 F.3d 1559 (Fed. Cir. 1994) (addressing evidentiary issues about whether a document can be used to infer how a third party's product worked when the document is not related to a specific product).  Harman Brief at 17, n.7.

SOF ¶ 14.

> The system has been running in prototype form since April 1989. It has been successfully used by drivers who have never driven in Boston. A somewhat longer description of the system appears in [4]. A complete description of the system appears in [1].

SOF at ¶¶ 19-20. April 1989 is before the "critical" date of the patent.

### Abstract

The Back Seat Driver is a research prototype of a system to use speech synthesis as a navigational aid for an automobile equipped with localization equipment. We are evaluating the user interface by field trials. As this is work in progress, this paper will primarily give an overview of the system and describe its components. Included will be discussion of the map database, route finding algorithm, repair strategies, and the discourse generator.

SOF ¶¶ 15-16.

### Abstract

The Back Seat Driver is a research prototype of a system to use speech synthesis as a naviga- tional aid for an automobile equipped with localiza- tion equipment. We are evaluating the user interface by field trials. As this is work in progress, this pa- per will primarily give an overview of the system and describe its components. Included will be discussion of the map database, route finding algorithm, repair strategies, and the discourse generator.

SOF at ¶¶ 17-18.

The Back Seat Driver is an actual working prototype. It has successfully guided drivers unfamiliar with Cambridge to their destinations. Although much work remains, it is easy to foresee a practical implementation in the future.

SOF at ¶¶ 21-22.

Thus, although Harman argues as though the Patent Office knew nothing about these field trials, the facts are to the contrary. Certainly, these facts lead to the conclusion that MIT was not hiding anything.

Under 37 C.F.R. § 1.56(b), "information is material to patentability when it is not cumulative to information already of record or being made of record… ." "[A] patentee has no obligation to disclose an otherwise material reference if the reference is cumulative or less material than those already before the Examiner." *Halliburton*, 925 F.2d at 1440. Because additional information about the field trials was at least cumulative with the five prior references to the field trials made of record in the '685 patent prosecution, MIT had no legal obligation to disclose any additional information about the field trials to the Patent Office Examiner.

Harman would have the Court believe that the duty of candor imposed by 37 C.F.R. § 1.56 ("Rule 56") required MIT to provide the Patent Office with every detail about the test drives of the Back Seat Driver. As a matter of law, the field trials were not material prior art that needed to be disclosed. Nevertheless, MIT made no secret of the fact that drivers had driven a car equipped with the Back Seat Driver interface. Pointing out additional instances of test drives would not have changed the outcome of the patent application process. Such additional information would have been "merely cumulative."

"Any doubt about whether the examiner lapsed in his duty does not increase the burden on the applicant. Nor does the applicant's obligation of candor replace the examiner's duty to examine the claims." *Northern Telecom*, 908 F.2d at 938. *See Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1327 ("An applicant is not required to tell the PTO twice about the same prior art, on pain of loss of the patent for inequitable conduct"). Rule 56 requires MIT to tell the truth to the Examiner during prosecution, and that is just what MIT did.

The field trials were neither material nor relevant. Harman's motion for a judgment of unenforceability due to inequitable conduct based on the field trials should be rejected.

**C.     As a Matter of Law, Davis' Thesis Drafts and Thesis Defense Were Not Publications or Public Disclosures, and Therefore, Not "Material" To the Patentability of the Patent**

With respect to Jim Davis' thesis, Harman's motion makes it sound like Jim Davis was standing on a street corner passing out drafts of his Ph.D. thesis to anyone willing to take it. Harman argues that Jim Davis' thesis was a "printed publication" and that MIT gave the Patent Office materially false information by stating that:

> August 4 [1989] is the date that the thesis was signed, and not the date on which the thesis became available to the public. M.I.T. does not generally catalog and shelve theses until several months after the official date of submission. Enclosed is a copy of the title page of the M.I.T. library's copy of the thesis, which bears a date of February 27, 1990. Therefore, the thesis did not become available to the public more than a year before the filing date of the present application, and is therefore not 102 art with respect to the present application.

Taken singularly and together, each sentence of the above passage is *true*. SOF ¶¶ 33-34, 40, 47, 51, 52. To succeed, Harman must prove, by clear and convincing evidence, that drafts of Jim Davis' thesis and Jim Davis' thesis defense predating the "critical date" of the '685 patent, August 9, 1989 (one year before the August 9, 1990 filing date of the '685 patent), were "printed publications" that were "publicly available," and that MIT intentionally deceived the patent office in making the above statement.[6]

Jim Davis' thesis and drafts of the thesis are material to patentability only if they were "publicly available" before August 4, 1989 or if they were "printed publications" under 35

---

[6]     Mr. Kunin addressed Harman's public availability argument in his Supplemental Rebuttal Expert Report. Exh. B at ¶¶ 1-7 (attached hereto).

U.S.C. § 102(b). There is no question that Jim Davis was drafting his thesis in early 1989, because the Back Seat Driver was nearing completion but still had some significant technical issues to work out. *See* SOF ¶¶ 6, 8, 9, 31, 37, 38, 39. There is no question that in the spring of 1989, Jim hoped he might be able to finish his thesis and graduate in June 1989 (*i.e.*, before the summer term). SOF ¶¶ 37-39. But there is also no question that, because Jim's thesis was based on an actual prototype automobile navigation system, delays with the prototype led to delays in the thesis and the thesis was not ready in time for Jim to graduate in June 1989. SOF ¶ 31. There is no question that Jim worked on the prototype and his thesis over the summer of 1989 to perfect the system (*i.e.*, via the field trials discussed above). SOF ¶ 31.

As part of preparation of his thesis, Jim Davis may have shown non-public drafts of the thesis to members of his thesis committee under normal graduate student practice to receive feedback and constructive criticism, but that does not raise to the level of public disclosure, any more than sending a paper for publication to a peer reviewed journal constitutes public disclosure before the publication. SOF ¶¶ 32, 34, 48-52. The people who saw drafts were Jim Davis' close colleagues and advisors who understood they had an obligation not to publish the drafts. SOF ¶ 48-52. This is the normal process for writing any thesis. Sometime during the fall of 1989, Jim Davis defended his thesis in the MIT Media Lab. SOF ¶ 31. After Jim Davis defended his thesis in the fall of 1989, a copy of the thesis was submitted to the MIT library for publication and shelving, a process that typically took several months. SOF ¶ 33-34. The thesis was eventually shelved in February 1990. SOF ¶ 33.

The hallmark of a "printed publication" is "dissemination and public accessibility" *before the critical date*. *In re Klopfenstein*, 380 F.3d 1345, 1348 (Fed. Cir. 2004). A limited dissemination to professional colleagues does not make a thesis draft a "printed publication"

where "professional and behavioral norms entitle a party to a reasonable expectation that the information…will not be copied." *Id.* at 1351. In a case raising similar issues to those raised by Harman, the Federal Circuit held that a master's thesis was not a "printed publication" under 35 U.S.C. § 102(b):

> [W]e are unconvinced that appellant's thesis defense before the graduate committee in its official capacity as arbiter of appellant's entitlement to a master's degree was somehow transmuted into a patent-defeating publication merely by depositing the thesis in the university library where it remained uncatalogued and unshelved as of the critical date in question.

*In re Cronyn*, 890 F.2d 1158, 1160 (Fed. Cir. 1989) (quoting *In re Bayer*, 568 F.2d 1357, 1362 (C.C.P.A. 1978)).

In fact, the only people who saw drafts of Jim Davis' thesis were close colleagues and his thesis advisors. For example, Jim Davis provided a copy of his thesis, after the critical date, to Phil Rittmueller, a representative of his research sponsor NEC. SOF ¶¶ 43-46. Jim Davis provided a copy of his thesis to a member of his thesis committee, Mike Lesk. Lesk worked at Bell Laboratories and shared a draft with a fellow academic and earlier collaborator of Jim Davis, Lynn Streeter. SOF ¶ 48.

What is Harman's evidence?

(1)    Testimony by Chris Schmandt that Jim Davis "could" print a copy of the thesis and distribute. Of course, Schmandt did *not* testify that Jim Davis *did* print and distribute drafts of his thesis. CSOF ¶ 5.[7] Drafts of Jim's thesis resided on a password-protected computer in the MIT Media Lab in a keypad-locked room, and only Jim Davis and Chris Schmandt had the computer password, SOF ¶¶ 28-29;

---

[7]    MIT's Statement of Facts includes a section titled "MIT's Counter-Statement to Harman's Statement of Facts." SOF at pp. 7-21. MIT has numbered the paragraphs in this section to correspond to the paragraph numbering in Harman's Statement of Facts (Docket Entry 134), and MIT cites to paragraphs from this section as "CSOF."

(2)    A *draft* of a poster announcing Jim Davis' defense of his thesis on May 26, 1989.
First, Harman has no evidence authenticating this document. It was not produced by MIT, but
apparently was "found" late in the case in some box of a Kirkland & Ellis partner who,
coincidentally, worked with Jim Davis years ago at MIT. (Harman has represented that this
Kirkland partner will not testify at trial to explain this document.)

What is beyond question -- and Harman doesn't question it -- is that the thesis defense
did not occur on the day shown in the flyer. SOF ¶¶ 37-38. Harman reproduces in its brief a
copy of the flyer so small that the Court cannot see the typos and handwritten corrections which
are evidence of its non-final form. Harman Brief at 4. In pushing this point, Harman ignores
that the poster itself is unsubstantiated by *any* testimony; that the title of Davis' thesis changed
between the May 26, 1989 date and the August 4, 1989 date on the thesis (SOF ¶ 35); or that the
date on the actual, submitted thesis is August 4, 1989, almost two and a half months *after* the
May 26, 1989 date (SOF ¶¶ 33, 35) If Davis had in fact defended his thesis in May of 1989, he
would have been graduated in June 1989 under MIT's academic calendar. SOF ¶ 39, CSOF ¶
12. In fact, Davis graduated in September 1989, after defending his thesis in August 1989 (SOF
¶ 31; CSOF ¶ 12);

(3)    An email from a University of Minnesota student dated May 1, 1989 saying that
she could "wait a couple of weeks" to see Jim's thesis and asking to see Jim's thesis proposal.
Contrary to Harman's hopes, this does not show: (a) that Davis' thesis was completed or ready
within "a couple of weeks," or (b) that Davis ever sent the thesis proposal, drafts or the final
thesis to the student (CSOF ¶ 10);

(4)    Phil Rittmueller, a representative of Jim's research sponsor NEC, produced from
his files a copy of Jim Davis' thesis and a "Final Report" to NEC dated July 31, 1989. However,

Harman omits Rittmueller's testimony that he received Jim Davis' thesis (and possibly the Final Report) *after* the thesis was shelved in the MIT library.  SOF ¶¶ 43-45; CSOF ¶¶ 6-7.  Phil Rittmueller further testified that he understood NEC's sponsored research was confidential and "close to the vest" even without a formal confidentiality designation (SOF ¶ 46); and

(5)      Lynn Streeter, a professional colleague of one of Jim Davis' thesis advisors (Mike Lesk), produced from her files a copy of Jim Davis' thesis.  Harman omits testimony from Lynn Streeter that although she could not recall the exact date she received a copy of the thesis, it occurred *after the thesis was defended*.  CSOF ¶¶ 8-9.  Harman cannot show that Streeter received a draft of Davis' thesis before August 9, 1989.  Harman is not entitled to a presumption that because Streeter had Jim Davis' thesis in her files that, *ipso facto*, she received a copy before the critical date.

MIT has challenged all of the alleged "facts" on which Harman bases this ground of fraud on the Patent Office.  SOF (pages 7-21).  Harman has failed to show by clear and convincing evidence, other than mere conjecture, that Jim Davis' thesis and drafts of it were publicly available more than a year before the filing date of the '685 patent.


D.      **There Is No Evidence Of Intent To Deceive.**

Before this Court can find that MIT committed fraud on the Patent Office as a matter of law, Harman must demonstrate by clear and convincing evidence that MIT gave false material statements with the intent to *deceive* the Patent Office.

As clearly stated by the Federal Circuit:

Intent to deceive should be determined in light of the realities of patent practice, and not as a matter of strict liability whatever the nature of the action before the PTO…Given the ease with which a relatively routine act of patent prosecution

> can be portrayed as intended to mislead or deceive, clear and convincing evidence
> of conduct sufficient to support an inference of culpable intent is required.

*Northern Telecom*, 908 F.2d at 939.

The "facts" that Harman points to in support of its theory of "intent" fail to show by any evidence, let alone clear and convincing evidence, that the inventors or their representatives had the requisite intent to deceive the Patent Office.  Harman argues as though the disjointed "facts" that it points to somehow support an inference of intent.  Harman speculates, without a shred of evidence, that MIT intended to deceive the Patent Office to satisfy or placate NEC, which sponsored the Back Seat Driver project.  Of course, "[c]onjecture alone is not sufficient to show an intent to deceive to support the defense of inequitable conduct."  *In re Hayes Microcomputer Prods., Inc. Patent Litig.*, 982 F.2d 1527, 1542 (Fed. Cir. 1992).

Harman can offer no evidence, circumstantial or otherwise, that the inventors or their representatives acted with an intent to deceive when they properly withheld cumulative information about the field trials after disclosing the fact of those trials, and especially when the field trials were not relevant in the first place.  A failure to disclose alone is <u>not</u> enough to infer intent.  *See Braun*, 975 F.2d at 822.  Likewise, allegations of materiality of information cannot be in and of itself determinative of intent.  *Halliburton*, 925 F.2d at 1442.  Harman simply cannot show that MIT intended to deceive the Patent Office about the field trials when MIT actually told the Patent Office about the field trials.

Similarly, Harman can offer no evidence that MIT or its attorneys acted with an intent to deceive when they told the Patent Office that Jim Davis' thesis was not publicly available more than a year before the filing date of the '685 patent.  Stated plainly, the fact that MIT and its patent counsel told the Patent Office *<u>the truth</u>* about the non-public nature of the thesis drafts eliminates any possible intent to deceive the Patent Office.

## <u>CONCLUSION</u>

Harman must overcome a high bar before it is entitled to summary judgment that the '685 patent is unenforceable because of inequitable conduct. Harman has failed to show by clear and convincing evidence that MIT withheld material information or made material misstatements during prosecution of the '685 patent with intent to deceive the Patent Office. Therefore, Harman's motion should be denied.

May 25, 2007                                    Respectfully Submitted,

                                               Massachusetts Institute of Technology,
                                               By its Attorneys,

                                               */s/ Steven M. Bauer*
                                               Steven M. Bauer (BBO# 542531)
                                               Jacob K. Baron (BBO# 652568)
                                               Kimberly A. Mottley (BBO# 651190)
                                               John W. Pint (BBO# 660548)
                                               PROSKAUER ROSE LLP
                                               One International Place
                                               Boston, Massachusetts 02110-2600
                                               Phone: 617-526-9600
                                               Fax:    617-526-9899

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 25, 2007, I caused a copy of the forgoing document to be served upon counsel of record for Harman International Industries by electronic mail and Federal Express overnight delivery.

<u>*/s/ Steven M. Bauer*_____</u>
Steven M. Bauer