# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **MASSACHUSETTS INSTITUTE OF TECHNOLOGY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.: 05-10990 DPW** |
| ) | **ORAL ARGUMENT REQUESTED** |
| **HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED,** ) | |
| ) | |
| **Defendant.** ) | |

## HARMAN'S RESPONSES TO MIT'S STATEMENTS OF FACT AND REPLIES TO MIT'S RESPONSES TO HARMAN'S STATEMENTS OF FACT SUPPORTING HARMAN'S MOTION FOR SUMMARY JUDGMENT OF UNENFORCEABILITY DUE TO INEQUITABLE CONDUCT

## I.    HARMAN'S RESPONSES TO MIT'S STATEMENTS OF FACT

### MIT'S STATEMENT OF FACT NO. 1:

The Massachusetts Institute of Technology ("MIT") is the owner of U.S. Patent No. 5,177,685 ("the '685 patent") that was duly issued on January 5, 1993 from U.S. Patent Application No. 565,274, which was filed on August 9, 1990. Exh. 1.

### HARMAN'S RESPONSE:

Denied in part, but no genuine issue of material fact relevant to Harman's motion. Harman does not dispute that the '685 patent issued on January 5, 1993 from U.S. Patent Application No. 565,274, which was filed on August 9, 1990. MIT's Statement of Fact No. 1 cites to no evidence supporting that it owns the patent, but the issue of ownership is irrelevant to unenforceability. This statement of fact also does not provide any support for the contention that the patent was "duly" issued. For the reasons set forth in Harman's motion (as well as other reasons for unenforceability and invalidity, as set forth in, for example, Harman's discovery responses and expert reports) the patent was not "duly" issued, but was instead incorrectly issued and should have never been allowed. *See* Harman's SOF 11, 27, 29, 41, 45-53.

### MIT'S STATEMENT OF FACT NO. 2:

The '685 patent is presumed valid. 35 U.S.C. § 282.

### HARMAN'S RESPONSE:

Objected to, but no genuine issue of material fact relevant to Harman's motion. Harman objects to this statement of fact as setting forth a legal conclusion rather than a fact. Harman admits that 35 U.S.C. § 282 reads, in part, that "A patent shall be presumed valid." Section 282 deals with the statutory presumption of validity, whereas Harman's motion deals with unenforceability due to inequitable conduct. Moreover, the statutory presumption is entitled to less weight in circumstances, such as this one, in which the Examiner was not aware of key prior art, particularly when that lack of awareness if the result of the applicants' lack of good faith and candor. *Aktiebolaget Karlstads Mekaniska Werkstad v. U.S. Int'l. Trade Comm'n*, 705 F.2d 1565, 1577 (Fed. Cir. 1983) (rebuttal of presumption more easily achieved in reliance on prior art not before the Examiner.) In any event, there is no presumption of enforceability or lack of inequitable conduct.

### MIT'S STATEMENT OF FACT NO. 3:

The '685 patent resulted from doctoral research conducted by James R. Davis and Christopher M. Schmandt at the MIT Media Laboratory ("Media Lab") titled the "Back Seat Driver."

**HARMAN'S RESPONSE:**

Admitted in part, but no genuine issue of material fact relevant to Harman's motion. Harman does not dispute that the '685 patent resulted, at least in part, from such doctoral research, but denies that the entirety of the patent was the result of such research. Specifically, several claims and claim limitations are directed to subject matter that was never the subject of any such research (*see, e.g.*, Ex. 35[1] at 28:21-24 ([[**REDACTED**]]); 29:7-11 ([[**REDACTED**]]); 51:6-23 ([[**REDACTED**]]); 73:6-10 ([[**REDACTED**]]); 79:1-4 ([[**REDACTED**]])), that was simply provided to MIT by third-parties (Ex. 36 at 151:19-153:20; Ex. 21 at System ("a localization unit built by NEC"); Ex. 32 at 93:21-94:22 ([[**REDACTED**]]); Ex. 32 at 93:12-94:1), and that was well-known in the prior art as a result of the earlier work by Mr. Davis on Direction Assistance and other prior art (Ex. 14 at 29:10-21; Ex. 47 at 219; *see also* Ex. 41 at ABSTRACT).

**MIT'S STATEMENT OF FACT NO. 4:**

The Back Seat Driver project lasted from about April 1988 through early 1991.

**HARMAN'S RESPONSE:**

Disputed in part, Objected to, but no genuine issue of material fact relevant to Harman's motion. Harman objects to this statement as vague. With respect to the subject matters of claims 1, 2-4, 7-10, 14, 16, 19, 24, 27, 28, 43-44, 55, and 57-58, MIT conceived of that subject matter at least as early as April 1988; and for claims 5-6, 11-13, 15, 17-18, 20-23, 25-26, 29-41, 46-47, 49-54, 56 MIT conceived of that subject matter at least as early as June 1989. Ex. 10. With respect to the subject matters of claims 1, 2-4, 7-9, 21, 23-25, 32-37, 40, 41, 53, 55, 57-58 MIT reduced to practice such subject matter at least as early as June 1989; and for claims 10-12, 15, 19-20, 26-31, 43-44, 46-49, 51-52, 54, MIT reduced to practice such subject matter at least as early as August 4, 1989. Ex. 10; Harman's SOF 48. With respect to everything disclosed in Davis' Thesis, that Thesis was completed and finalized at least as early as August 4, 1989. Harman's SOF 14. It is therefore irrelevant what else, if anything, MIT was doing on any subsequent dates.

**MIT'S STATEMENT OF FACT NO. 5:**

The Back Seat Driver was an automobile-based navigation system that provided spoken directions, like a "back seat driver."

**HARMAN'S RESPONSE:**

Objected to, but no genuine issue of material fact relevant to Harman's motion. Harman objects to this statement as vague and ambiguous with respect to the meaning of the phrase "like a 'back seat driver.'" Harman does not dispute that "the Back Seat Driver was an automobile-based navigation system that provided spoken directions." Harman

---

[1] Harman Exhibits ("Ex.") 1-29 were included with Harman's April 11, 2007 Opening Brief. Exhibits 30-46 are filed with this reply brief.

lacks sufficient information to understand what is meant by the phrase "like a 'back seat driver'" (a phrase that is not present in any claim of the '685 patent), and therefore denies that portion of this statement of fact. Harman further responds that whatever that phrase means, the directions provided by the Back Seat Driver were present in the pre-critical-date and post-reduction-to-practice uses, and were also described in Davis' thesis. *See* Harman's SOF 41; MIT's Response to Harman's SOF 39; *see also* Harman's SOF 49.

## MIT'S STATEMENT OF FACT NO. 6:

During their research, a prototype system was used on test drives and field trials by Davis and Schmandt. Exh. 12 at 1101; Exh. 20 at 2-6; Exh. 21 at 118.

### HARMAN'S RESPONSE:

Disputed in part, Admitted in part, but no genuine issue of material fact relevant to Harman's motion. Harman agrees that a system was used, and agrees that MIT Exh. 12 refers to "field trials", but is unable to find anywhere in that Exhibit in which the uses are referred to as "test drives." MIT Exh. 20 is simply MIT's own interrogatory response (which is inadmissible hearsay evidence and unavailable for use by MIT), and MIT Exh. 21 is simply MIT's own expert's report (which is also inadmissible hearsay and unavailable for use by MIT), and that expert does not have personal knowledge of the facts. Nonetheless, regardless of what words are used to describe the various systems and uses, it is undisputed that pre-critical-date and post-reduction-to-practice uses took place with respect to the subject matter of at least claim 1 of the '685 patent (*see* Harman's SOF 41), meaning that such uses were not for purposes of experimentation with respect to at least claim 1.

## MIT'S STATEMENT NO. 7:

During the test drives or field trials, the driver-system interface was tested by a driver using a cellular telephone keypad to select a destination and then reacting to driving instructions provided by cellular telephone after the route was planned by a computer operating at the Media Lab. Exh. 18 at 6763; Exh. 19 at 6765; Exh. 21 at 118-119.

### HARMAN'S RESPONSE:

Disputed in part, but no genuine issue of material fact relevant to Harman's motion. Regardless of what words are used to describe the various systems and uses, it is undisputed that pre-critical-date and post-reduction-to-practice uses took place with respect to the subject matter of at least claim 1 of the '685 patent (*see* Harman's SOF 41), meaning that such uses were not for purposes of experimentation with respect to at least claim 1. MIT Exh. 18 at 6763 is an unsigned consent form that (even if signed) does not support MIT's statement of fact in any way. Moreover, MIT has never produced any evidence that anyone ever signed this form. Indeed, item 6 on MIT Exh. 18 notes only 14 subjects have been used, meaning the remaining 36 of the 50 individuals who used the Back Seat Driver in 1989 prior to the critical date are unaccounted for. MIT Exh. 19 at 6765 is dated December 22, 1988 and discusses plans for future uses, and does purport to document what actually occurred with respect to the pre-critical-date and post-reduction-

to-practice uses, it appears, as explained with respect to MIT Exh. 18, that the protocol was not followed. MIT Exh. 21 is simply MIT's own expert's report (which is inadmissible hearsay unavailable for use by MIT), and she does not have personal knowledge of the facts.

In addition, the location of the route finding computer being at the MIT Media Lab, if true, would be irrelevant, as the location of the "use" of a system that includes components located in multiple locations is deemed, as a matter of law, to take place at the location in which the benefit of the system occurs (here, on the public streets of Boston). *See NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005) ("The use of a claimed system under section 271(a) is the place at which the system as a whole is put into service, i.e., the place where control of the system is exercised and beneficial use of the system obtained."). Accordingly, the system was being used in public, even if one or more components were located at the Media Lab.

## MIT'S STATEMENT OF FACT NO. 8:

During the field trials, either Jim Davis or Chris Schmandt was in the car with the research prototype. Exh. 18 at 6763; Exh. 19 at 6765.

### HARMAN'S RESPONSE:

Disputed, but no genuine issue of material fact relevant to Harman's motion. The experimental use exception is unavailable with respect to pre-critical-date but post-reduction-to-practice uses. The "public use" bar to patentability applies whether the use is by the inventor or someone else. *See, e.g.*, *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1325 (Fed. Cir. 2002) (affirming the district court's holding that an inventor's demonstration of a prototype was invalidating public use); *accord Harrington Mfg. Co., Inc. v. Powell Mfg.*, 815 F.2d 1478, 1482 (Fed. Cir. 1986).

In addition, MIT Exh. 18 at 6763 is an unsigned consent form that (even if signed) does not support MIT's statement that either Jim Davis or Chris Schmandt were in the car (it only mentions "a research team member"), and MIT has never produced any evidence that anyone ever signed this form. Indeed, item 6 on MIT Exh. 18 notes only 14 subjects have been used, meaning the remaining 36 of the 50 individuals who used the Back Seat Driver in 1989 are unaccounted for. MIT Exh. 19 at 6765 is dated December 22, 1988 and discusses plans for future uses, but does purport to document what actually occurred with respect to the pre-critical-date and post-reduction-to-practice uses, and, as explained with respect to MIT Exh. 18, it is apparent that the protocol was not followed.

## MIT'S STATEMENT OF FACT NO. 9:

During the field trials, either Jim Davis or Chris Schmandt maintained control over who used the car with the research prototype as required by the MIT Committee on the Use of Humans as Experimental Subjects. Exh. 5 at 8; Exh. 18 at 6763; Exh. 19 at 6764-65.

4

**HARMAN'S RESPONSE:**

Disputed, but no genuine issue of material fact relevant to Harman's motion.  MIT Exh. 5 (Davis's declaration) contradicts Davis's deposition testimony, in which he testified that **[[REDACTED]]**. Ex. 32 at 74:23-75:12, 76:9-16, Ex. 10 at 167:15-19.  In addition, MIT Exh. 18 at 6763 is an unsigned consent form that (even if signed) does not support MIT's statement that either Jim Davis or Chris Schmandt was in the car (it only mentions "a research team member"), and MIT has never produced any evidence that anyone ever signed this form.  Indeed, item 6 on MIT Exh. 18 notes only 14 subjects have been used, meaning the remaining 36 of the 50 individuals who used the Back Seat Driver in 1989 are unaccounted for.  MIT Exh. 19 at 6765 is dated December 22, 1988 and discusses plans for future uses, but does purport to document what actually occurred with respect to the pre-critical-date and post-reduction-to-practice uses, and, as explained with respect to MIT Exh. 18, it is apparent that the protocol was not followed.

Regardless, the "public use" bar to patentability applies whether the use is by the inventor or someone else.   *See, e.g.*, *Netscape Commc'ns Corp. v. Konrad*, 295 F.3d 1315, 1325 (Fed. Cir. 2002) (affirming the district court's holding that an inventor's demonstration of a prototype was invalidating public use.); *accord Harrington Mfg. Co., Inc. v. Powell Mfg.*, 815 F.2d 1478, 1482 (Fed. Cir. 1986).

**MIT'S STATEMENT OF FACT NO. 10:**

Drivers of the Back Seat Driver research prototype were testing and reacting to the supplied spoken directions of the system, but they were not shown how the Back Seat Driver prototype worked. Exh. 5 at ¶ 9; Exh. 21 at ¶ 119; *see also* Exh. 11 at 169:4-11.

**HARMAN'S RESPONSE:**

Disputed, Objected to, but no genuine issue of material fact relevant to Harman's motion.  Harman objects to this statement as vague with respect to timeframe.  Anyone who drove a vehicle with a Back Seat Driver necessarily learned something about how the system worked, as they themselves interacted with the system interface and heard and followed instructions.  In any event, the "public use" bar of Section 102(b) does not require the invalidating use to enable the users, or the public, in general, to understand how the system worked.  *See Sys. Mgmt. Arts Inc. v. Avesta Techs., Inc.*, 87 F. Supp. 2d 258, 270 (S.D.N.Y. 2000); *see also See Egbert v. Lippmann*, 104 U.S. 333, 336 (1881) (holding that a corset worn openly was in public use even though the invention was concealed within the corset); *Hall v. Macneale*, 107 U.S. 90 (1883) (holding that a safe mechanism was in public use even though the invention could not be seen without destroying the safe).  MIT Exh. 21 is simply MIT's own expert's report (which is inadmissible hearsay unavailable for use by MIT), and she does not have personal knowledge of the facts.  MIT Exh. 11 at 169:4-11, which is Davis' deposition testimony, is directed to when he was first confident that the system worked, and is unrelated to this statement of fact.  MIT Exh. 5 is Davis' declaration, which contradicts his deposition testimony that he **[[REDACTED]]**.  Ex. 32 at 75:18-19; 76:12-21.

Regardless, there is no dispute that the subject matter of at least claim 1 was already reduced to practice at the time of the pre-critical-date uses, meaning the uses were not experimental, as a matter of law. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1354 (Fed. Cir. 2002).

## MIT'S STATEMENT OF FACT NO. 11:

The vehicle with the Back Seat Driver prototype was stored in a private MIT garage that had card access. Exh. 24 at 160:22-161:2.

### HARMAN'S RESPONSE:

Denied in part, but no genuine issue of material fact relevant to Harman's motion. MIT Exh. 24, which is Mr. Schmandt's deposition testimony, makes no mention of the MIT garage being "private." In any event, it is undisputed that pre-critical-date and post-reduction-to-practice uses took place on the public streets in and around Boston that embodied the subject matter of at least claim 1 of the '685 patent (*see* Harman's SOF 41), meaning it is irrelevant whether the garage in which it was stored has card access. In addition, card access may prevent unauthorized cars from entering and parking, but would not necessarily limit others from having access to the garage by foot.

## MIT'S STATEMENT OF FACT NO. 12:

The subjects of the field trials did not receive compensation for their participation, nor were Jim Davis and Chris Schmandt conducting the field trials with a view to commercially exploiting the Back Seat Driver. Exh. 18 at 6763.

### HARMAN'S RESPONSE:

Disputed in part, but no genuine issue of material fact relevant to Harman's motion. Harman does not contend that the subjects who used the system prior to the critical date were paid for their participation. MIT Exh. 18 is an unsigned consent form, but even if signed, it does not support MIT's SOF 12, particularly with respect to whether Jim Davis and/or Chris Schmandt were eyeing a commercial exploitation of the Back Seat Driver. Indeed, they were. *See* Ex. 39, Ex. 40 ([[**REDACTED**]]); Ex. 38 ([[**REDACTED**]]); *see also* Ex. 37 at 16:17-19:6 (discussing Back Seat Driver reports and including [[**REDACTED**]]); Ex. 43 (for Fiscal Year 2006, "Sponsored research" accounted for 47.5% of MIT's "Operating Expenditures," or $1.03 billion). In any event, the "on-sale" bar of Section 102(b) is separate and distinct from the "public use" bar of Section 102(b).

## MIT'S STATEMENT OF FACT NO. 13:

The drivers were subject to MIT's policy on human experimentation. Exh. 19 at 6764-65.

**HARMAN'S RESPONSE:**

Disputed in part, but no genuine issue of material fact relevant to Harman's motion. Harman disputes this statement with respect to at least some of the 50 users. Item 6 on MIT Exh. 18 reports only 14 subjects have been used through December 19, 1989, meaning the remaining 36 of the 50 individuals who used the Back Seat Driver in May, June and July 1989 are unaccounted for, and there is no evidence that those 36 users were subject to MIT's policy. In addition, there is no evidence that any of the 50 users actually signed the consent form shown in MIT Exh. 18. In any event, whether the users signed a legal waiver in order to perform the uses is irrelevant, particularly in light of the fact that the consent form and MIT's policy on human experimentation contains no confidentiality obligation, there is no evidence of any confidentiality agreements (Harman's SOF 43), and MIT's policies at the time favored open and free exchange of information. (Harman's SOF 13)

**MIT'S STATEMENT OF FACT NO. 14:**

MIT did not withhold material information about the field trials and indeed, disclosed the field trials to the Patent Office at least five times. Exh. 1 at 3:4-8; Exh.12 at 1101; Exh. 13 at 933; Exh. 14 at 459; Exh. 15 at 938. MIT was not required to inform the Patent Office of any dates on which the subject matter of the '685 patent was reduced to practice under the rules of Patent Practice. Exh. 6 at ¶ 11; *see also* MANUAL OF PATENT EXAMINING PROCEDURE ("MPEP") § 2138.05 ("Thus the inventor need not provide evidence of either conception or reduction to practice when relying on the content of the patent application").

**HARMAN'S RESPONSE:**

Disputed, but no genuine issue of material fact relevant to Harman's motion. One of the most key, material facts that should have been disclosed to the Examiner was the fact that pre-critical-date uses (*i.e.*, uses before August 20, 1989) could not, as a matter of law, have been for purposes of experimentation because they were conducted after the reduction to practice. The fact that the Manual of Patent Examining Procedure § 2138.05 does not require disclosure of the date of reduction to practice in all cases does not mean that the Examiner would not have wanted to know about it here. Indeed, the MPEP separately counsels that information of this kind should, in fact, be disclosed "even if it appears that they may have been experimental, not involve the specifically claimed invention, or not encompass a completed invention." MPEP 2004 ¶ 11 (5th Ed. 1983) (attached as Ex. 44).

In addition, MIT Exh. 1 was filed in August, 1990, and does not say when the uses occurred, gives the Examiner no reason to suspect any pre-critical date uses, does not inform the Examiner that claimed subject matter was already reduced to practice at the time of pre-critical date uses, does not inform the Examiner that 50 persons other than the inventors used the system, and incorrectly implies that the uses were not a "practical implementation" by stating that "It is easy to foresee a practical implementation in the future", thereby leading the Examiner away from the conclusion that the uses could not

have been for purposes of experimentation with respect to the already reduced-to-practice subject matter.

MIT Exh. 12 does not explicitly inform the Examiner that claimed subject matter was already reduced to practice at the time of pre-critical date uses, and does not inform the Examiner that 50 persons other than the inventors used the system prior to the critical date. In addition, in the IDS (Ex. 2 at 76), MIT only told the Examiner that the article "is an abstract describing the goals of the research which resulted in the present invention", thereby incorrectly implying that the system was not reduced to practice at the time, and neglecting to draw the Examiner's attention to the pre-critical-date uses.

In the IDS, MIT told the Examiner that MIT Exh. 13 was merely an "expansion of [MIT Exh. 12] into a paper." MIT also drew the Examiner's attention away from this reference by stating "Kindly note that the publication date for this issue was September 8, 1989" indicating that the publication was not prior art. Ex. 2 at 76. MIT Exh. 13 also does not explicitly tell the Examiner that claimed subject matter was already reduced to practice at the time of pre-critical date uses, and does not inform the Examiner that 50 persons other than the inventors used the system prior to the critical date. Indeed, this article does not inform the Examiner that anyone other than the inventors used the system prior to the critical date.

MIT Exh. 14 does not inform the Examiner that claimed subject matter was already reduced to practice at the time of pre-critical date uses, and does not inform the Examiner that 50 persons other than the inventors used the system prior to the critical date. MIT also drew the Examiner's attention away from the Thesis as a source of prior art by incorrectly telling the Examiner that the Thesis was not available until after the critical date. Ex. 2 at 803.

MIT Exh. 15 does not inform the Examiner that claimed subject matter was already reduced to practice at the time of pre-critical date uses, and does not inform the Examiner that 50 persons other than the inventors used the system prior to the critical date. In describing the article to the Examiner in the IDS, MIT drew the Examiner's attention away from this article by noting that it was not published until September 1989, implying it was not prior art, and merely stated that the article "describes the strategies employed by the present invention to successfully use speech" without noting the reference to uses. Ex. 2 at 76.

## MIT'S STATEMENT OF FACT NO. 15:

An abstract titled "Synthetic Speech for Real Time Direction-Giving" was authored by Jim Davis and Chris Schmandt and was submitted to the Institute of Electrical and Electronics Engineers ("IEEE") in June 1989 ("the June 1989 abstract"). The June 1989 abstract disclosed the field trials. Exh. 12 at 1101.

## HARMAN'S RESPONSE:

Admitted in part, Disputed in part, but no genuine issue of material fact relevant to Harman's motion. Harman does not dispute that an article "Synthetic Speech for Real

Time Direction-Giving" was authored by Jim Davis and Chris Schmandt and was published by the Institute of Electrical and Electronics Engineers ("IEEE") in June 1989. Harman disputes that the article was submitted in June 1989, and contends that the article was submitted earlier than June, but published in June 1989. A footer on the article has the numbers "3/89" which may indicate a submission in March 1989. Nonetheless, any dispute over the actual submission date is irrelevant, as the parties agree it was published in June 1989. Harman also does not dispute that the article noted "field trials," but disputes that the number, timing, extent, and lack of confidentiality surrounding of those "field trials" were disclosed. Harman does not understand what MIT means by referring to this as an "Abstract" rather than an article, but any dispute over whether this is an Abstract or an article is irrelevant.

## MIT'S STATEMENT OF FACT NO. 16:

The June 1989 abstract was cited and provided to the Patent Office in an Information Disclosure Statement filed on September 4, 1990, was considered by Examiner Pipala, and appears on the face of and was incorporated by reference in the '685 patent. Exh. 1 at cover page & 3:57-66; Exh. 2 at 336, 345; Exh. 12 at 1101-1102.

### HARMAN'S RESPONSE:

Admitted in part, Disputed in part, but no genuine issue of material fact relevant to Harman's motion. Harman does not dispute that an article "Synthetic Speech for Real Time Direction-Giving" was authored by Jim Davis and Chris Schmandt and was published by the Institute of Electrical and Electronics Engineers ("IEEE") in June 1989 and is listed on MIT's Sept. 4, 1990 IDS. Harman also does not dispute that the IDS entry including this article was later initialed by the Examiner. Whether MIT cited this article to the PTO and the Examiner subsequently considered this article is irrelevant to the question of unenforceability. This article did not disclose the number—50—of subjects that had used the prototype, the timing of those uses (in that they occurred after reduction to practice of 23 of the claims), nor the lack of confidentiality surrounding those uses.

## MIT'S STATEMENT OF FACT NO. 17:

An article related to the June 1989 abstract titled "Synthetic Speech for Real Time Direction-Giving" was authored by Jim Davis and Chris Schmandt and was submitted to the IEEE in August 1989 and published September 8, 1989 ("the September IEEE paper"). The September IEEE paper disclosed the field trials. Exh. 13 at 933-937.

### HARMAN'S RESPONSE:

Admitted in part, Disputed in part, Objected to, but no genuine issue of material fact relevant to Harman's motion. Harman does not dispute that an article titled "Synthetic Speech for Real Time Direction-Giving" was authored by Jim Davis and Chris Schmandt and published on September 8, 1989 ("the September IEEE paper"). Harman does not dispute that the September IEEE paper noted "field trials." Harman objects to the phrase "related to the June 1989 abstract" as vague, but any dispute over any relationship

between these two articles is irrelevant.  Harman disputes the timing of the submission of the article to the IEEE.  MIT's statement says (without support) that the article was submitted in August 1989, but the face of the article itself says "Manuscript received June 9, 1989."  Harman objects to the use of the phrase "*the* field trials" in MIT's statement, and disputes that the article discloses all of "*the* field trials."  It does not.  Harman also objects to the use of the term "disclosed" because this article did not disclose information about the number—50—of subjects that had used the prototype, the timing of those uses (in that they occurred after reduction to practice of 23 of the claims), nor the lack of confidentiality surrounding those uses.

## MIT'S STATEMENT OF FACT NO. 18:

The September IEEE paper was cited and provided to the Patent Office in an Information Disclosure Statement filed on September 4, 1990, was considered by Examiner Pipala, and appears on the face of and was incorporated by reference in the '685 patent. Exh. 1 at cover page, 3:57-62, & 3:67-4:2; Exh. 2 at 336, 345; Exh. 13 at 933-937.

### HARMAN'S RESPONSE:

Admitted in part, Disputed in part, but no genuine issue of material fact relevant to Harman's motion.  Harman does not dispute that an article titled "Synthetic Speech for Real Time Direction-Giving" was authored by Jim Davis and Chris Schmandt and published on September 8, 1989 and is listed on MIT's Sept. 4, 1990 IDS.  Harman also does not dispute that the IDS entry including this article was later initialed by the Examiner.  Whether MIT cited this article to the PTO and the Examiner subsequently considered this article is irrelevant to the question of unenforceability.  This article did not disclose the number—50—of subjects that had used the prototype, the timing of those uses (in that they occurred after reduction to practice of 23 of the claims), nor the lack of confidentiality surrounding those uses.

## MIT'S STATEMENT OF FACT NO. 19:

An article titled "The Back Seat Driver: Real Time Spoken Driving Instructions" was authored by Jim Davis and Chris Schmandt and was submitted to Harman's navigation expert Robert L. French, who was "Vice-Chairman" of the "Technical Program Committee" and in charge of selecting interesting papers for the first-ever Vehicle Navigation & Information Systems Conference, held in September 1989 in Toronto, Canada ("the VNIS '89 paper"). The VNIS '89 paper disclosed the field trials. Exh. 16 at 278710-719; Exh. 15 at 938-942.

### HARMAN'S RESPONSE:

Admitted in part, Disputed in part, Objected to, but no genuine issue of material fact relevant to Harman's motion.  Harman does not dispute that an article titled "The Back Seat Driver: Real Time Spoken Driving Instructions" was authored by Jim Davis and Chris Schmandt and was submitted to the Vehicle Navigation & Information Systems Conference, held in September 1989 in Toronto, Canada.  Harman also does not dispute that its technical expert, Robert L. French, was the "Vice-Chairman" of the "Technical

Program Committee" for this conference. Harman does not dispute that the September IEEE paper noted that the system had been running in prototype form since April 1989. Harman objects to the phrases "submitted to" and "in charge" as vague. The papers were submitted to the conference for inclusion, Mr. French was part of a selection committee, and the process for selecting papers involved more than one person. Ex. 33 at 92:9-18, 113:7-12.

Regardless, any dispute over how and by whom this article was selected for inclusion in the conference is irrelevant. Harman also objects to the use of the phrase "*the* field trials" in MIT's statement, and disputes that the article discloses all of "*the* field trials." It does not. Harman also objects to the use of the term "disclosed" because this article did not disclose information about the number—50—of subjects that had used the prototype, the timing of those uses (in that they occurred after reduction to practice of 23 of the claims), nor the lack of confidentiality surrounding those uses.

## MIT'S STATEMENT OF FACT NO. 20:

The VNIS '89 paper was cited and provided to the Patent Office in an Information Disclosure Statement filed on September 4, 1990, was considered by Examiner Pipala, and appears on the face of and was incorporated by reference in the '685 patent. Exh. 1 at cover page, 3:57-62, & 4:3-7; Exh. 2 at 336, 345; Exh. 15 at 938-942.

### HARMAN'S RESPONSE:

Admitted in part, Disputed in part, but no genuine issue of material fact relevant to Harman's motion. Harman does not dispute that an article titled "The Back Seat Driver: Real Time Spoken Driving Instructions" was authored by Jim Davis and Chris Schmandt and was submitted to the Vehicle Navigation & Information Systems Conference, held in September 1989 in Toronto, Canada, and is listed on MIT's Sept. 4, 1990 IDS. Harman also does not dispute that the IDS entry including this article was later initialed by the Examiner. Whether MIT cited this article to the PTO and the Examiner subsequently considered this article is irrelevant to the question of unenforceability. This article did not disclose the number—50—of subjects that had used the prototype, the timing of those uses (in that they occurred after reduction to practice of 23 of the claims), nor the lack of confidentiality surrounding those uses.

## MIT'S STATEMENT OF FACT NO. 21:

Jim Davis' thesis, titled "Back Seat Driver: voice assisted automobile navigation system," was submitted in the fall of 1989 and became publicly available in February 1990. The thesis disclosed the field trials. Exh. 14 at 457; *see also* Exh. 3 at 712-713; Exh. 17 at 1302.

### HARMAN'S RESPONSE:

Admitted in part, Disputed in part, but no genuine issue of material fact relevant to Harman's motion. Harman does not dispute that Jim Davis' thesis was entitled "Back Seat Driver: voice assisted automobile navigation system." Harman also does not dispute

that Davis signed and submitted his thesis on August 4, 1989. Harman does not dispute that Davis' thesis notes that there was an actual working prototype. Harman disputes that Davis' thesis did not become publicly available until February 1990. While the MIT library's copy of Davis' thesis does bear a date of February 27, 1990, the undisputed evidence shows that the MIT library was not the only way to get a copy of Davis' thesis. Indeed, Streeter, Rittmueller, Lesk, and the PTO all received non-MIT library copies. *See* Harman's SOF 6, 8, 11. In addition, MIT admits that "Davis controlled availability of his thesis." *See* MIT's Response to Harman's SOF 5.

The undisputed evidence shows that at least Streeter, Rittmueller and other "close colleagues or advisors" received copies of Davis' thesis prior to February 27, 1990. *See* Harman's SOF 6, 9; MIT Response to Harman's SOF 29. Harman also objects to the use of the phrase "*the* field trials" in MIT's statement, and disputes that the article discloses all of "*the* field trials." It does not. Harman also objects to the use of the term "disclosed" because this article did not disclose information about the number—50—of subjects that had used the prototype, the timing of those uses (in that they occurred after reduction to practice of 23 of the claims), nor the lack of confidentiality surrounding those uses.

## MIT'S STATEMENT OF FACT NO. 22:

Jim Davis' thesis was cited and provided to the Patent Office in an Information Disclosure Statement filed on September 4, 1990, was considered by Examiner Pipala, and appears on the face of and was incorporated by reference in the '685 patent. Exh. 1 at cover page, 3:57-62, & 4:8-10; Exh. 2 at 336, 346.

### HARMAN'S RESPONSE:

Admitted in part, Disputed in part, but no genuine issue of material fact relevant to Harman's motion. Harman does not dispute that Jim Davis' thesis was entitled "Back Seat Driver: voice assisted automobile navigation system," and is listed on MIT's Sept. 4, 1990 IDS. Harman also does not dispute that the IDS entry including this article was later initialed by the Examiner. Whether MIT cited the thesis to the PTO and the Examiner subsequently considered this article is irrelevant to the question of unenforceability. Davis' thesis did not disclose the number—50—of subjects that had used the prototype, the timing of those uses (in that they occurred after reduction to practice of 23 of the claims), nor the lack of confidentiality surrounding those uses.

## MIT'S STATEMENT OF FACT NO. 23:

MIT's navigation expert, Dr. Elizabeth Cannon, provided an expert opinion on the materiality of the field trials. Exh. 21 at ¶¶ 118-120.

### HARMAN'S RESPONSE:

Objected to. Harman objects to the use of Dr. Cannon's report as valid support for MIT's assertions in this motion. Dr. Cannon has no personal knowledge about the facts in this matter, and her report is inadmissible hearsay. Dr. Cannon also lacks any expertise in

patent law and Patent Office procedures, and lacks any foundation to opine on what an Examiner would have wanted to have known. An inadmissible hearsay opinion on a legal conclusion by an unqualified witness cannot create a genuine issue of material fact. *See* FED. R. CIV. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant it competent to testify to the matters stated therein.")

## MIT'S STATEMENT OF FACT NO. 24:

Harman has offered no opinion from any technical expert. Harman's patent law expert, Lawrence M. Sung, provided an opinion on the materiality of the field trials. Exh. 22 at 18-20. However, Mr. Sung is neither a technical expert nor person of ordinary skill in the art under either MIT or Harman's proposed definition, Exh. 22 at 3-5; Exh. 23 at ¶¶ 36-37, and is not technically qualified to render independent opinions on the materiality of information he has relied upon. Exh. 23 at ¶ 36.

### HARMAN'S RESPONSE:

Disputed, but no genuine issue of material fact relevant to Harman's motion. Lawrence Sung has relevant expertise in patent law, patent prosecution, and Patent Office procedures, and is qualified to render his opinions that the '685 patent is unenforceable due to inequitable conduct.

## MIT'S STATEMENT OF FACT NO. 25:

The opinion of MIT's navigation expert, Dr. Cannon, stands unrebutted on the issue of the materiality of the field trials.

### HARMAN'S RESPONSE:

Disputed, but no genuine issue of material fact relevant to Harman's motion. The undisputed facts are that the system was used in public prior to the critical date and after reduction to practice of at least some claimed subject matters. Harman's SOF 41. Dr. Cannon has no personal knowledge about the facts in this matter, and her report is inadmissible hearsay. Dr. Cannon also lacks any expertise in patent law and Patent Office procedures, and lacks any foundation to opine on what an Examiner would have wanted to have known. An inadmissible hearsay opinion on a legal conclusion by an unqualified witness cannot create a genuine issue of material fact. *See* FED. R. CIV. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant it competent to testify to the matters stated therein.")

## MIT'S STATEMENT OF FACT NO. 26:

The field trials or test drives did not constitute public use of the Back Seat Driver. Exh. 6 at ¶ 13; Exh. 21 at ¶ 120.

**HARMAN'S RESPONSE:**

Disputed, but no genuine issue of material fact relevant to Harman's motion.  This is a legal conclusion, and the declaration of MIT's patent attorney (who does not have personal knowledge of the uses) and the (inadmissible, hearsay) report from MIT's expert (who also does not have personal knowledge of the uses) cannot create a genuine issue of fact.  *See* FED. R. CIV. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant it competent to testify to the matters stated therein.")  The undisputed facts are that the system was used in public before the critical date and after reduction to practice of at least some claimed subject matters.  Harman's SOF 41.

**MIT'S STATEMENT OF FACT NO. 27:**

Drafts of Jim Davis' Ph.D. thesis were not publicly distributed. Exh. 8 at 116:23-117:7; *see also* Exh. 4 at ¶ 6; Exh. 5 at ¶ 7.

**HARMAN'S RESPONSE:**

Disputed, Objected to.  Harman objects to the phrase "publicly distributed" as a legal conclusion.  Regardless, the undisputed evidence shows that the MIT library was not the only way to get a copy of Davis' thesis.  Indeed, Streeter, Rittmueller and the PTO all received non-MIT library copies.  *See* Harman's SOF 6, 8, 11.  In addition, MIT admits that "Davis controlled availability of his thesis."  *See* MIT's Response to Harman's SOF 5.  Finally, the undisputed evidence shows that at least Streeter, Rittmueller, Lesk, and other "close colleagues or advisors" received copies of Davis' thesis prior to February 27, 1990.  *See* Harman's SOF 29; MIT Response to Harman's SOF 29.  Harman objects to the term "publicly distributed" as vague because MIT does not define this term.  It is unclear who MIT considers to be within the "public" and whether it includes Streeter, Rittmueller, or "close colleagues or advisors."

In addition, it is unclear whether MIT would include distribution absent confidentiality agreements within this term.  Regardless, Davis admits that at least "members of [his] thesis committee or colleagues acting in an academic advisory capacity" received "drafts or finalized versions" of his thesis "in 1989."  MIT Exh. 5 at ¶ 7.  The excerpt of Schmandt's 30(b)(6) deposition (MIT Exh. 8), and Schmandt's declaration (MIT Exh. 4 at ¶ 6) cited by MIT are irrelevant.  Schmandt's deposition testimony deals with general university policies related to drafts—not the undisputed facts of this case.  MIT Exh. 8.  Moreover, Schmandt's declaration at ¶ 6 deals only with the (lack of) confidentiality associated with the Rittmueller copy of Davis' thesis.  MIT Exh. 4 at ¶ 6.  Regardless, drafts are not the issue here because the undisputed evidence shows that both Streeter and Rittmueller received finalized and otherwise publishable non-library versions of Davis' thesis.  Harman's SOF 11.

14

**MIT'S STATEMENT OF FACT NO. 28:**

Only Jim Davis and Chris Schmandt had the password to the computer that was storing drafts of Jim Davis' thesis at the MIT Media Lab. Exh. 8 at 113:15-23; Exh. 4 at ¶ 3.

**HARMAN'S RESPONSE:**

No genuine issue of material fact relevant to Harman's motion. It does not matter than only Davis and Schmandt had access to the thesis on the computer. The undisputed facts show that "Davis controlled availability of his thesis." *See* MIT's Response to Harman's SOF 5. Moreover, Davis "could print a copy [of it] whenever he wanted and give that to anybody that he wanted to." Ex. 35 at 115:9-13; *see also* 115:14-116:3 ([[**REDACTED**]])

**MIT'S STATEMENT OF FACT NO. 29:**

The computer that stored drafts of Jim Davis' thesis was secured in a locked room that had keypad access. Exh. 8 at 113:20-23; Exh. 4 at ¶ 4.

**HARMAN'S RESPONSE:**

No genuine issue of material fact relevant to Harman's motion. It does not matter than only Davis and Schmandt had access to the thesis on the computer. The undisputed facts show that "Davis controlled availability of his thesis." *See* MIT's Response to Harman's SOF 5. Moreover, Davis "could print a copy [of it] whenever he wanted and give that to anybody that he wanted to." Ex. 35 at 115:9-13; *see also* 115:14-116:3 ([[**REDACTED**]]).

**MIT'S STATEMENT OF FACT NO.30:**

Jim Davis did not print copies of his thesis or drafts and give them to the general public. Exh. 5 at ¶ 2; Exh. 8 at 116:23-117:7; *see also* Exh. 4 at ¶ 3.

**HARMAN'S RESPONSE:**

Disputed, Objected to, but no genuine issue of material fact relevant to Harman's motion. Harman objects to the phrase "general public" as vague because MIT has not defined this term. It is unclear who MIT considers to be within the "general public" and whether it includes Streeter, Rittmueller, Lesk, or "close colleagues or advisors." In addition, it is unclear whether MIT would include distribution absent confidentiality agreements within this term. The undisputed evidence shows that Streeter, Rittmueller, Lesk, and "close colleagues and advisors" did receive copies of Davis' thesis before February 27, 1990 and those copies did not issue from the MIT library. Harman's SOF 6, 8, 11. Moreover, the evidence that MIT cites does not support its statement. First, Davis only declared that "it was not [his] normal practice to print copies of [his] draft thesis and give it to the general public . . . ." MIT Exh. 5 ¶ 2. Similarly, the excerpt of Schmandt's 30(b)(6) deposition (MIT Exh. 8), and Schmandt's declaration (MIT Exh. 4 ¶ 3) cited by MIT only deal with drafts. Drafts are not the issue here, and MIT cites no evidence to support

the remainder of its statement that "Jim Davis did not print copies of his thesis . . . and give them to the general public." Moreover, this portion of MIT's statement is contrary to the undisputed evidence which shows that both Streeter and Rittmueller received finalized and otherwise publishable non-library versions of Davis' thesis before February 27, 1990 when the thesis became available from MIT's library. Harman's SOF 6, 8, 11.

## MIT'S STATEMENT OF FACT NO. 31:

Jim Davis defended his thesis sometime in the fall of 1989 after continued development and field trials conducted in the summer of 1989. Exh. 4 at ¶ 7; Exh. 5 at 6.

### HARMAN'S RESPONSE:

Disputed. MIT has come forward with no evidence to show the actual date and time of Davis' thesis defense. Indeed, all that Davis and Schmandt declare is that the thesis defense did not occur as shown in the flyer produced by Harman. *See* MIT Exh. 4 at ¶ 7; MIT Exh. 5 at ¶ 6. At best, Davis and Schmandt declare, without any supporting evidence, that the thesis defense occurred sometime "in the fall" or "late summer of 1989." *See* MIT Exh. 4 at ¶ 7; MIT Exh. 5 at ¶ 6. This does not rise to the level of "specific facts showing that there is a genuine issue for trial," since MIT has produced no evidence of exactly where and when the thesis defense did occur to rebut Harman's evidence. *See Avia Group Int'l, Inc. v, L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1560 (Fed. Cir. 1988) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986))); FED. R. CIV. P. 56(e) ("an adverse party . . . must set forth specific facts showing that there is a genuine issue for trial."). Even as such, this issue does not create a genuine issue for trial because no one disputes that the defense occurred before February 27, 1990 which is when MIT told the PTO Davis' thesis became available to the public. *See* Ex. 2 at 803.

## MIT'S STATEMENT OF FACT NO. 32:

Jim Davis' defense of his thesis to a limited audience and at which copies of Jim Davis' thesis were not distributed do not constitute a patentability bar. Exh. 6 at ¶ 10.

### HARMAN'S RESPONSE:

Disputed, but no genuine issue of material fact relevant to Harman's motion. First, MIT cites no evidence to support the assertion that "Jim Davis' defense of his thesis [was] to a limited audience at which copies of Jim Davis' thesis were no distributed . . . ." Not only are these details absent from the record, but neither Davis nor Schmandt go this far in their respective declarations. *See* MIT Exh. 4; MIT Exh. 5. Indeed, Schmandt actually declares that "[w]hile [he does] not remember the exact room in which the thesis defense took place, [he does] remember that the thesis defense did not take place in the room identified on the draft flyer, namely E15-283a of the Media Lab, because Jim defended his thesis in a larger room." MIT Exh. 4 at ¶ 7. This statement alone is contrary to what MIT has asserted here, that the thesis defense was "to a limited audience."

Regardless, this statement does not create a genuine issue for trial. In addition, Pasternack's self-serving declaration that "[he is] of the opinion that a limited public

thesis defense would not, in and of itself, be a bar to patentability" does not address any issue in Harman's motion. *See* MIT Exh. 6 at ¶ 10. This pure opinion testimony is not tied to any of the undisputed facts of this case. Indeed, the undisputed facts show that there was not only a public thesis defense, but distribution of the thesis and demonstration of the prototype to third parties. *See* Harman's SOF 11, 41. As such, Pasternack's opinion testimony is irrelevant to the matter at hand and does not create a genuine issue of fact for trial.

## MIT'S STATEMENT OF FACT NO. 33:

After Davis completed his thesis in August 1989, the thesis was sent to the MIT library for cataloging, and the thesis was shelved in February 1990, less than one year before the filing date of the '685 patent. Exh. 8 at 113:4-12; Exh. 2 at 376; Exh. 3 at 712-713.

### HARMAN'S RESPONSE:

Not Disputed, but irrelevant to Harman's motion. This statement is irrelevant to Harman's motion because the evidence shows that the thesis was otherwise distributed, contrary to what MIT told the Patent Office. *See* Harman's SOF 6, 8, 11.

## MIT'S STATEMENT OF FACT NO. 34:

Prior to its publication in the MIT library, the only people who would have received drafts or a finalized version of Jim Davis' thesis would have been actual members of Jim Davis' thesis committee or colleagues acting in an academic advisory capacity. Exh. 5 at ¶ 7.

### HARMAN'S RESPONSE:

Disputed in part, Objected to. Harman does not dispute that the members of Davis' thesis committee and other non-member colleagues received copies of Davis' thesis "[p]rior to its publication in the MIT library." However, Harman does dispute that these were "the only people" who received such copies before February 27, 1990 when the thesis became available from the library. Indeed, the undisputed evidence shows that Rittmueller received a copy of Davis' thesis before this time, as did Streeter and Lesk. Harman also objects to the phrase "colleagues acting in an academic advisory capacity" as vague and undefined. Regardless, the idea that either Rittmueller or Streeter could be considered a "colleague acting in an academic advisory capacity" is belied by their testimony regarding the confidentiality of the Back Seat Driver project. *See* Ex. 34 at 306:6-307:3; Ex. 16 at 119:3-5; *see also* Reply Brief at I.B.

## MIT'S STATEMENT OF FACT NO. 35:

The "flyer" Harman relies on to "show" that Jim Davis defended his thesis on May 26, 1989 is a draft, Exh. 5 at ¶ 6:

Thesis Defense:
Telling You Where To Go
Jim Davis
Friday 26 May 1989
4 PM E15-283a

Different title than final thesis

Typo and handwritten corrections

: about the design and construction of a machine that does some-
a new way. The task is to help people people find their way by
ce to another within a city. This a task is both useful and needy
. The United States federal Highway Administration estimates
dollars are wasted each year in the U.S. becau
uses including being lost, stuck in traffic, or choosing bad routes.

Typo and handwritten corrections

**HARMAN'S RESPONSE:**

No genuine issue of material fact relevant to Harman's motion. MIT's assertion that this
is a "draft" is belied by the fact that at least Mr. Grove received a copy of this flyer. *See*
Harman's SOF 37.

**MIT'S STATEMENT OF FACT NO. 36:**

Jim Davis' thesis defense did not occur in Room E15-283a. MIT Exh. 4 at ¶ 7.

**HARMAN'S RESPONSE:**

No genuine issue of material fact relevant to Harman's motion. MIT cites no evidence to
show where and when the thesis defense actually did occur. *See* MIT Exh. 4 at ¶ 7.

**MIT'S STATEMENT OF FACT NO. 37:**

Jim Davis did not defend his thesis on May 26, 1989. Exh. 4 at ¶ 7; Exh. 5 at ¶ 6.

**HARMAN'S RESPONSE:**

No genuine issue of material fact relevant to Harman's motion. MIT has come forward
with no evidence to show the actual date and time of Davis' thesis defense. *See* MIT
Exh. 4 at ¶ 7; MIT Exh. 5 at ¶ 6. Indeed, all that Davis and Schmandt declare is that the
thesis defense did not occur as shown in the flyer produced by Harman. *See* MIT Exh. 4
at ¶ 7; MIT Exh. 5 at ¶ 6. At best, Davis and Schmandt declare, without any supporting
evidence, that the thesis defense occurred sometime "in the fall" or "late summer of
1989." *See* MIT Exh. 4 at ¶ 7; MIT Exh. 5 at ¶ 6. Surely Davis would have defended his
thesis before he signed it and submitted it to the library on August 4, 1989, putting that
defense before the critical date. *See* Harman's SOF 14. However, to avoid this fact MIT

refuses to pinpoint the details in order to argue inferences to the contrary. Even as such, this issue does not create a genuine issue for trial because at best, the defense occurred before February 27, 1990 which is when MIT told the PTO Davis' thesis became available to the public. *See* Ex. 2 at 803.

## MIT'S STATEMENT OF FACT NO. 38:

Jim Davis was not ready to defend his thesis in May of 1989. Exh. 5 at ¶ 6.

### HARMAN'S RESPONSE:

No genuine issue of material fact relevant to Harman's motion. Indeed, MIT's assertion that this is a "draft" is belied by the fact that Mr. Grove received a copy of this flyer. *See* Harman's SOF 37. MIT has come forward with no evidence to show the actual date and time of Davis' thesis defense. Indeed, all that Davis and Schmandt declare is that the thesis defense did not occur as shown in the flyer produced by Harman. *See* MIT Exh. 4 at ¶ 7; MIT Exh. 5 at ¶ 6. At best, Davis and Schmandt declare, without any supporting evidence, that the thesis defense occurred sometime "in the fall" or "late summer of 1989." *See* MIT Exh. 4 at ¶ 7; MIT Exh. 5 at ¶ 6. Surely Davis would have defended his thesis before he signed it and submitted it to the library on August 4, 1989, putting that defense before the critical date. *See* Harman's SOF 14. However, to avoid this fact MIT refuses to pinpoint the details in order to argue inferences to the contrary. Even as such, this issue does not create a genuine issue for trial because at best, the defense occurred before February 27, 1990 which is when MIT told the PTO Davis' thesis became available to the public. *See* Ex. 2 at 803.

## MIT'S STATEMENT OF FACT NO. 39:

The May 26, 1989 draft was created at a time when Jim Davis thought he might be able to graduate in June of 1989. Exh. 5 at ¶ 6.

### HARMAN'S RESPONSE:

Disputed, but no genuine issue of material fact relevant to Harman's motion. Indeed, MIT's assertion that this is a "draft" is belied by the fact that at least one member of the public, Mr. Grove, received a copy of this flyer. *See* Harman's SOF 37. MIT has come forward with no evidence to show the actual date and time of Davis' thesis defense. Indeed, all that Davis and Schmandt declare is that the thesis defense did not occur as shown in the flyer produced by Harman. *See* MIT Exh. 4 at ¶ 7; MIT Exh. 5 at ¶ 6. At best, Davis and Schmandt declare, without any supporting evidence, that the thesis defense occurred sometime "in the fall" or "late summer of 1989." *See* MIT Exh. 4 at ¶ 7; MIT Exh. 5 at ¶ 6. Surely Davis would have defended his thesis before he signed it and submitted it to the library on August 4, 1989, putting that defense before the critical date. *See* Harman's SOF 14. However, to avoid this fact MIT refuses to pinpoint the details in order to argue inferences to the contrary. Even as such, this issue does not create a genuine issue for trial because at best, the defense occurred before February 27, 1990 which is when MIT told the PTO Davis' thesis became available to the public. *See*

Ex. 2 at 803.  In addition, this statement authenticates the flyer produced by Harman, as MIT now admits it was created by Davis.  *See* Harman's Reply to SOF 37.

## MIT'S STATEMENT OF FACT NO. 40:

Because Jim Davis' thesis was not a "printed publication" or "publicly available" before the critical date of the '685 patent, the thesis could not "anticipate" the claims of the '685 patent. Exh. 6 at ¶ 6; Exh. 2 at 376.

### HARMAN'S RESPONSE:

Disputed, Objected to, but no genuine issue of material fact relevant to Harman's motion. Harman objects to this statement as calling for a legal conclusion.  The information about the availability of the thesis was material, and need not be invalidating to be material.  In addition, the evidence demonstrates that the thesis was printed and distributed, making the conclusion of whether it "anticipated" a legal conclusion for the Court and the Patent Office, not a conclusion that MIT and its patent attorneys were entitled to make and then use as a reason not to disclose the information to the Patent Office.  Indeed, the law counsels otherwise.  *See Cargill Inc. v. Canabra Foods Ltd.*, 476 F.3d 1359, 1367 (Fed. Cir. 2007) (*quoting LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992) (any doubts as to materiality must be "resolved in favor of disclosure")).

## MIT'S STATEMENT OF FACT NO. 41:

NEC did not have any expectation of patent rights in the Back Seat Driver beyond those provided by MIT's standard licensing policy. Exh. 9 at 40:17-21.

### HARMAN'S RESPONSE:

Not disputed, no genuine issue of material fact relevant to Harman's motion.  NEC's expectation of the patent rights that it expected provided MIT with the motive to commit inequitable conduct.

## MIT'S STATEMENT OF FACT NO. 42:

NEC received a non-exclusive license to the '685 patent under standard MIT policy. Exh. 4 at ¶ 6; Exh. 9 at 251:7-13.

### HARMAN'S RESPONSE:

Not disputed, but no genuine issue of material fact relevant to Harman's motion.  NEC's expectation of the patent rights that it expected provided MIT with the motive to commit inequitable conduct, and received such rights as a result.

**MIT'S STATEMENT OF FACT NO. 43:**

Phil Rittmueller did not receive a copy of the "Back Seat Driver Final Report," which bore a date of July 31, 1989, and attachments thereto, until after Jim Davis' thesis was completed. Exh. 9 at 149:4-16, 150:24-154:21; Exh. 5 at ¶ 3.

**HARMAN'S RESPONSE:**

Disputed in part. Harman does not dispute that Rittmueller received a finished copy of Davis' thesis along with the July 31, 1989 Final Report. Harman also does not dispute that Davis "signed and submitted his thesis" on August 4, 1989. However, MIT has presented no evidence to show when, exactly, Rittmueller did receive a copy of the thesis. Regardless, the undisputed evidence shows that Rittmueller received a non-library issued copy of Davis' thesis before February 27, 1990. *See* Ex. 34 at 149:2-16, 151:5-10.

**MIT'S STATEMENT OF FACT NO. 44:**

Phil Rittmueller did not receive a copy of Jim Davis' thesis before Jim Davis finished the thesis. Exh. 9 at 64:13-65:19.

**HARMAN'S RESPONSE:**

Not Disputed. Harman does not dispute that Rittmueller received a *finished* copy of Davis' thesis along with the July 31, 1989 Final Report. Harman also does not dispute that Davis "signed and submitted his thesis" on August 4, 1989, after it was finished. Even though Rittmueller received a *finished* copy of Davis' thesis, there is no evidence that he did not receive that copy before the critical date, and at the very least it was received before February 27, 1990 when it was shelved in the MIT library.

**MIT'S STATEMENT OF FACT NO. 45:**

Phil Rittmueller did not receive a copy of Jim Davis' thesis until after the thesis was available in MIT's library. Exh. 9 at 153:24-154:21; Exh. 4 at ¶ 5.

**HARMAN'S RESPONSE:**

Disputed. Schmandt's declaration that Rittmueller did not receive Davis' thesis until it was shelved in the MIT library on February 27, 1990 is contrary to the undisputed facts. *See* Ex. 34 at 149:2-16, 151:5-10. Moreover, the portion of Rittmueller's testimony that MIT cites says only that Rittmueller does not recall receiving Davis' thesis until it was submitted to the library on ***August 4, 1989***. *See* Exh. 9 at 153:24-154:21.

**MIT'S STATEMENT OF FACT NO. 46:**

Phil Rittmueller understood that communications with Jim Davis and Chris Schmandt were confidential or "close to the vest." Exh. 9 at 303:3-12, 305:23-306:5; Exh. 4 at ¶ 6.

21

**HARMAN'S RESPONSE:**

Disputed, Objected to, but no genuine issue of material fact relevant to Harman's motion. Harman objects to this statement because Mr. Schmandt lacks any basis or foundation to declare what Rittmueller understood. Moreover, Schmandt's declaration is contrary to the undisputed evidence. MIT's written policy at the time favored open sharing of information. Harman's SOF 13. In addition, Mr. Rittmueller's deposition testimony confirms that there was no real understanding of confidentiality. Ex. 34 at 306:6-307:3.

**MIT'S STATEMENT OF FACT NO. 47:**

The public did not have access to copies of Jim Davis' thesis until the thesis was shelved in MIT's library. Exh. 4 at ¶ 8; Exh. 8 at 113: 5-12.

**HARMAN'S RESPONSE:**

Disputed, but no genuine issue of material fact relevant to Harman's motion. Mr. Schmandt's deposition and declaration are contrary to and cannot refute the contemporaneous documents and other evidence that demonstrates that Davis' thesis was distributed before it "was shelved in MIT's library" on February 27, 1990. *See* Harman's SOF 5, 6, 8, 10. Moreover, the undisputed evidence shows that relevant members of the interested public did receive copies of Davis' thesis before it was shelved in the library. *See* Harman's SOF 6, 8, 11.

**MIT'S STATEMENT OF FACT NO. 48:**

Any copies of Jim Davis' thesis that were sent to Lynn Streeter were done so with a view towards obtaining feedback from a professional colleague in an advisory role. Exh. 5 at 4.

**HARMAN'S RESPONSE:**

Disputed, but no genuine issue of material fact relevant to Harman's motion. Davis' after-the-fact declaration cannot create an issue for trial because it contradicts Streeter's earlier deposition testimony, in which she testified that **[[REDACTED]]**. Ex. 16 at 119:3-5; Ex. 37 at 117:1-11. Moreover, MIT cites no evidence and indeed has no personal knowledge to explain why Lesk, who MIT contends gave Streeter her copy of Davis' thesis, was under the impression that Streeter would provide "feedback [as] a professional colleague in an advisory role." *See* Ex. 37 at 37:9-14 (**[[REDACTED]]**).

**MIT'S STATEMENT OF FACT NO. 49:**

Lynn Streeter recognized academic and ethical obligations kept Jim Davis' thesis from being publicly available. Exh. 7 at ¶¶ 3, 7.

**HARMAN'S RESPONSE:**

Disputed, but no genuine issue of material fact relevant to Harman's motion. Streeter's after-the-fact declaration can not create an issue for trial because it contradicts her earlier deposition testimony, in which she testified that **[[REDACTED]]**. Ex. 16 at 119:3-5; Ex. 37 at 117:1-11; *see also* Ex. 37 at 37:9-14 (**[[REDACTED]]**).

**MIT'S STATEMENT OF FACT NO. 50:**

Formal "restrictions" regarding confidentiality were not necessary because Lynn Streeter was a colleague of Jim Davis and Chris Schmandt. Exh. 5 at ¶ 4.

**HARMAN'S RESPONSE:**

Disputed, Objected to, but no genuine issue of material fact relevant to Harman's motion. Harman objects to this statement as it is a legal conclusion, not a fact. There is no implied confidentiality for colleagues for purposes of 102(b) invalidity, but in any event, any such legal arguments should have been made to the Examiner after full disclosure of the facts. Regardless, Streeter was a colleague of Lesk at Bell Labs, not Davis and Schmandt. Indeed, Davis' declaration, which is the only evidence MIT has cited to show that Streeter was his colleague, is belied by Streeter's own sworn testimony that she had no personable knowledge about anything Davis and Schmandt were doing with the Back Seat Driver project. *See* Ex. 37 at 117:1-11; *see also* Ex. 37 at 37:9-14 (**[[REDACTED]]**).

**MIT'S STATEMENT OF FACT NO. 51:**

A limited distribution of Jim Davis' thesis to close colleagues does not make the thesis "publicly available," a "publication," or otherwise bar patentability. Exh. 6 at ¶ 9.

**HARMAN'S RESPONSE:**

Disputed, Objected to, but no genuine issue of material fact relevant to Harman's motion. Harman objects to this statement as it is a legal conclusion, not a fact. The opinion of MIT's prosecution counsel as to this issue of law does not create a genuine issue for trial. The issue of whether that distribution constitutes a "public" distribution and/or a "printed publication" was an issue of law for the Examiner to determine, not something that MIT was entitled to hide from the Examiner though deceptive misrepresentations. Indeed, the law counsels otherwise. *See Cargill Inc. v. Canabra Foods Ltd.*, 476 F.3d 1359, 1367 (Fed. Cir. 2007) (*quoting LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992) (any doubts as to materiality must be "resolved in favor of disclosure")). In addition, the information need not be invalidating to be material, particularly when the information contradicts a statement made to the Examiner in order to gain allowance. *See Li Second Family Ltd. P'ship v. Toshiba Corp.*, 231 F.3d 1373, 1380 (Fed. Cir. 2000) (finding materiality when "a reasonable examiner would have considered the information important, not whether the information would conclusively decide the issue of patentability"). The law is clear that such disclosures may, indeed, be a bar to patentability. *See Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1380 (Fed. Cir.

23

2006) (affirming D. Mass. Court's grant of summary judgment that withholding a reference directly adverse to patentee's arguments for patentability constituted inequitable conduct).

## MIT'S STATEMENT OF FACT NO. 52:

Drafts of Jim Davis' thesis were not available or distributed publicly. Exh. 8 at 113:13-21, 116:23-117:7; Exh. 4 at ¶ 3.

### HARMAN'S RESPONSE:

Disputed, Objected to, but no genuine issue of material fact relevant to Harman's motion. Harman objects to this statement as it is a legal conclusion, not a fact. Schmandt and Davis's self-serving testimony and declaration cannot dispute the contemporaneous documentation and third-party testimony, which establishes that copies of Davis' thesis were, in fact, distributed. Harman's SOF 6, 8, 11. The issue of whether that distribution constitutes a "public" distribution and/or a "printed publication" was an issue of law for the Examiner to determine, not something that MIT was entitled to hide from the Examiner though deceptive misrepresentations. Indeed, the law counsels otherwise. *See Cargill Inc. v. Canabra Foods Ltd.*, 476 F.3d 1359, 1367 (Fed. Cir. 2007) (*quoting LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992) (any doubts as to materiality must be "resolved in favor of disclosure")). In addition, the information need not be invalidating to be material, particular when the information contradicts a statement made to the Examiner in order to gain allowance. *See Li Second Family Ltd. P'ship v. Toshiba Corp.*, 231 F.3d 1373, 1380 (Fed. Cir. 2000) (finding materiality when "a reasonable examiner would have considered the information important, not whether the information would conclusively decide the issue of patentability"). The law is clear that such disclosures may, indeed, be a bar to patentability. *See Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1380 (Fed. Cir. 2006) (affirming D. Mass. Court's grant of summary judgment that withholding a reference directly adverse to patentee's arguments for patentability constituted inequitable conduct).

## II.    HARMAN'S STATEMENTS OF FACT

### HARMAN STATEMENT OF FACT NO. 1:

In the late 1980's, Jim Davis was a graduate student at MIT working within the Speech Resources Group of the MIT Media Lab under his faculty advisor, Chris Schmandt, who also served as the Director of that Group.  Ex. 14 at 29:10-21, 286:23-287:1.

### MIT'S RESPONSE TO HARMAN FACT NO. 1:

MIT does not dispute this.

### HARMAN STATEMENT OF FACT NO. 2:

By early 1988, Davis and Schmandt were working on a project called the Back Seat Driver that involved automobile navigation using spoken instructions.  *See* Ex. 10 ("MIT [] states that claims 1-4, 7-10, 14, 16, 19, 24, 27, 28, 42-44, 48, 55, and 57-58 were conceived at least as early as April 1988.")

### MIT'S RESPONSE TO HARMAN FACT NO. 2:

MIT does not dispute this.

### HARMAN STATEMENT OF FACT NO. 3:

The Back Seat Driver became Davis' thesis for his doctorate degree and eventually led to the patent application that issued as the '685 Patent.  Ex. 14 at 82:9-15; Ex. 2 at 111-276; *see also* Ex. 14 at 49:6-13 ("The text in here is largely from [Davis'] thesis document."); Ex. 1; Ex. 12 at 57:24-58:4 ("a lot of this may have been lifted from Dr. Davis' thesis.")

### MIT'S RESPONSE TO HARMAN FACT NO. 3:

MIT does not dispute this.

### HARMAN STATEMENT OF FACT NO. 4:

A subsidiary of the large, Japanese corporation NEC funded the project.  Ex. 2 at 116; Ex. 17.

### MIT'S RESPONSE TO HARMAN FACT NO. 4:

MIT does not dispute that a subsidiary of NEC funded the Back Seat Driver research.

## HARMAN STATEMENT OF FACT NO. 5:

Schmandt testified that while Davis was working on his thesis, and even after he finished drafting it, Davis "could print a copy [of it] whenever he wanted and give that to anybody that he wanted to." Ex. 15 at 115:9-13 ("Q. So there were copies of the thesis that existed other than on that password protected computer, correct?  A. Jim could print a copy whenever he wanted and give that to anybody that he wanted to.")

### MIT'S RESPONSE TO HARMAN FACT NO. 5:

MIT disagrees with Harman's characterization of Chris Schmandt's testimony. All Schmandt testified to was the fact that Davis controlled availability of his thesis. Chris Schmandt did not testify that Jim Davis actually *did* print and distribute drafts of his thesis. Schmandt further testified that MIT's policy was not to distribute thesis drafts publicly. Exh. 4 at ¶ 3; Exh. 5 at ¶ 2.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 5:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. Harman's SOF 5 is a direct quote from Schmandt's 30(b)(6) deposition testimony, and MIT does not dispute the actual fact recited.  Indeed, MIT agrees that this statement shows that "Davis controlled availability of this thesis."  In addition, the evidence establishes that Mr. Davis did, indeed, circulate copies of his thesis. *See* Harman's SOF 6, 8.

## HARMAN STATEMENT OF FACT NO. 6:

On July 31, 1989, Davis and Schmandt sent a copy of the completed thesis ("certified by Nicholas P. Negroponte," the then Director of the MIT Media Lab) to a Mr. Rittmueller, an NEC employee at the time.  Ex. 2 at 111;  Ex. 19 at 172 (enclosing "[a] copy of 'Back Seat Driver: voice assisted automobile navigation,' the doctoral thesis"); Ex. 3 at 187.

### MIT'S RESPONSE TO HARMAN FACT NO. 6:

MIT disputes this statement. There is no evidence that a copy of Jim Davis' thesis was sent to Mr. Phil Rittmueller on July 31, 1989. In fact, the evidence is that Phil Rittmueller did not receive a copy of Jim Davis' thesis until after it was shelved in the MIT library. Exh. 9 at 153:24-154:21; Exh. 4 at ¶ 5; Exh. 5 at ¶ 3.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 6:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute the fact that Rittmueller received a copy of the completed thesis ("certified by Nicholas P. Negroponte," the then Director of the MIT Media Lab).  In addition, the undisputed evidence explicitly establishes that Rittmueller received his copy of the thesis along with the "Back Seat Driver Final Report," which is dated July 31, 1989.  Ex. 34 at 151:5-10 ("Q. I believe it was your testimony that you received this

report after the thesis was submitted; is that correct?  A. It was all put together like this. Q. Are you sure about that?  A. Positive.").

The only support for MIT's assertion that "Phil Rittmueller did not receive a copy of Jim Davis' thesis until after it was shelved (on February 27, 1990) in the MIT library" is the after-the-fact declaration of Schmandt, which is inconsistent with both the testimony of Rittmueller and Davis' declaration.  *See* Ex. 34 149:10-16 ("Q. Do you recall when you received it?  A. I received it sometime after.  Q. Sometime after?  How much later?  A. I don't know exactly.  It was probably sometime in the fall after the thesis had been completed.  When this one was written, the thesis wasn't completed.  This is the final report."), 154:10-13 ("Q. And it is your testimony today that you did not receive this until after ***the thesis was submitted*** to the library?  A. Yes, that's my recollection." (emphasis added)); MIT Exh. 5 at ¶ 3 ("I do not recall sending a copy of my thesis to Mr. Rittmueller before it was ***published***." (emphasis added)).

## HARMAN STATEMENT OF FACT NO. 7:

The copy of Davis' thesis sent to Rittmueller was not marked confidential in any way. Ex. 3 at 187; *see also* Ex. 13 at 302:23-303:2 ("Q. Do you recall executing a confidentiality agreement with . . . MIT?  A. No, I don't."), 306:16-21 ("Q. If you had decided to share MIT's information with a third party, do you believe that MIT would have had any recourse against NEC?  A. Any direct recourse?  Q. Yeah.  A. Probably not.")

### MIT'S RESPONSE TO HARMAN FACT NO. 7:

MIT does not dispute that the copy of Jim Davis' thesis produced from Phil Rittmueller's file was not marked confidential. MIT disputes the inferences Harman seeks to have drawn from this fact. The thesis would not have been stamped confidential, because Mr. Rittmueller did not receive a copy of the thesis until after it was published. Exh. 9 at 64:13-65:19, 153:24-154:21; Exh. 4 at ¶ 5. Additionally, explicit confidentiality markings were not necessary between MIT and NEC because NEC sponsored the Back Seat Driver research, and correspondence between MIT and NEC was not public. Exh. 9 at 302:23-303:12, 305:22-306:5; Exh. 4 at ¶ 6.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 7:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT admits this fact.  MIT's additional commentary is irrelevant, first because the evidence shows that at the latest Rittmueller received the thesis was in the Fall of 1989 (*see* SOF 6) which is before the thesis was available from the MIT library (February 27, 1990). Second, there is no implied confidentiality between inventor and project sponsor that avoids application of 35 U.S.C. § 102(b).  Moreover, MIT admits that any expectation of confidentiality would have lapsed once "the documents, like Jim's thesis, were finalized" which occurred on August 4, 1989 when Davis "signed and submitted his thesis."  *See* Schmandt Decl. ¶ 6; Harman's SOF 14.  Even so, at best Rittmueller understood the Back Seat Driver Project to the "confidential-ish" or "closely held-ish." Ex. 34 at 305:22-306:5 ("Q Do you understand -- strike that. Did you have any

understanding that the information that you were receiving from MIT was confidential? MS. MOTTLEY: Objection, vague. BY THE WITNESS: A. Confidential -- confidential-ish, closely held-ish, that's how we considered it.")

## HARMAN STATEMENT OF FACT NO. 8:

Davis himself sent another copy of his thesis (unsigned but bearing an August 4, 1989 date for Davis' signature) to a Bell Labs employee, Lynn Streeter, without any confidentiality designation and without any restrictions on her use of it. Ex. 4; *see also* Ex. 16 at 115:12 ("Q. How did you get a copy of the thesis? A. I think Jim Davis sent it to me."), 119:3-5; Ex. 4 at 52-53 (Dr. Streeter then forwarded Davis' Thesis to third parties "I need a copy of [the Davis thesis] sent to Karen Lochbaum Aiken Computation Lab . . .").

### MIT'S RESPONSE TO HARMAN FACT NO. 8:

MIT disputes the statement. Lynn Streeter believes she did not receive the thesis until the thesis was defended and the thesis was made public. Exh. 7 at ¶ 8. In addition, while no written agreement was provided to Lynn Streeter, none was necessary because she was an academic colleague, and thus, formal confidentiality agreements were unnecessary. Exh. 7 at ¶¶ 7-8. Davis would have provided a copy to Lynn Streeter based on the understanding that he was doing so as an academic colleague and not for publication, so formal confidentiality markings were unnecessary. Exh. 5 at ¶ 8.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 8:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute the actual statement of fact.  MIT's additional commentary is irrelevant.  MIT does not dispute that Streeter received a copy of Davis' thesis in 1989, before it was shelved at the MIT library on February 27, 1990.  In addition, there is no implied confidentiality between inventor and academic colleagues that avoids application of 35 U.S.C. § 102(b).

Moreover, Streeter's declaration, which MIT relies on to support its claims of confidentiality, contradicts her earlier, sworn deposition testimony and therefore cannot create a genuine issue of fact.  *See* Ex. 16 at 119:3-5 ([[**REDACTED**]]); Ex. 37 at 117:1-15 ([[**REDACTED**]]).  Moreover, Davis' assertion that "I would have considered Lynn bound by the ethical obligations regarding my thesis to not publish it as her own or otherwise freely distribute it, so no written 'restrictions' were necessary." is belied by his inability to recall whether he even sent Streeter a copy of his thesis.  MIT Exh. 5 at ¶ 4 (" . . . I do not recall sending a copy of my thesis to Lynn Streeter before I defended my thesis. Streeter was a professional and academic colleague who, if she had received a copy of my thesis from me . . .")

## HARMAN STATEMENT OF FACT NO. 9:

Dr. Streeter recalls receiving it "the day it was published," which she further recalls was when her Bell Labs' co-worker who also served on Davis' thesis committee "[had] actually gone up

for the defense [of the Davis thesis] or something and I know I got the thesis just about the same time." Ex. 16 at 115:23-25; Ex. 5.

### MIT'S RESPONSE TO HARMAN FACT NO. 9:

MIT disputes this statement. Lynn Streeter did not testify that she received a copy of the thesis the "day it was published" but instead "about the same time" as the thesis defense. Exh. 10 at 7:23-8:21; 115:21-25.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 9:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. Harman's SOF 9 is a direct quote from Streeter's deposition testimony, and MIT does not dispute that Streeter received Davis' thesis in 1989 (before it was shelved at the MIT library on February 27, 1990). Ex. 37 at 7:25-8:5 ("A. Well, the person that I worked with, Michael Leske at Bell Laboratories and Bellcore made frequent visits to MIT and was quite familiar with Jim's work and so would come back and tell us about it and also *we got, you know, his thesis the day it was published basically*." (emphasis added))

## HARMAN STATEMENT OF FACT NO. 10:

In May 1989, after requesting from Davis a copy of "any papers [Davis had] written about [the Back Seat Driver]," a University of Minnesota student responded to Davis that she could "wait a couple weeks to see [Davis' T]hesis." Ex. 23.

### MIT'S RESPONSE TO HARMAN FACT NO. 10:

MIT disputes the inference Harman seeks to draw here. Jim Davis did not send a copy of his thesis to this student in May 1989. Exh. 5 at ¶ 5.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 10:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute the actual statement of fact. Moreover, Davis' declaration, which MIT relies on to support that no copy of the thesis was sent to Ms. Stuck, contradicts his earlier, sworn deposition testimony, **[[REDACTED]]**. *See* Ex. 32 at 69:22-70:3 ([[**REDACTED**]])

## HARMAN STATEMENT OF FACT NO. 11:

The words, lines, and pages of the copies of sent to Dr. Streeter and Mr. Rittmueller are identical to the copy that MIT later submitted to the PTO; only the signature on the Rittmueller copy differs. *See* Ex. 2 at 111-276 (PTO); Ex. 3 at 187 (Rittmueller); Ex. 4 at 53 (Streeter).

### MIT'S RESPONSE TO HARMAN FACT NO. 11:

MIT does not dispute this.

## HARMAN STATEMENT OF FACT NO. 12:

By May 26, 1989, Davis was prepared to defend his thesis and invited the public to attend. Ex. 5.

### MIT'S RESPONSE TO HARMAN FACT NO. 12:

MIT disputes this. There is no evidence in support of this statement. In, fact, Jim Davis was not prepared to defend his thesis on May 26, 1989. Exh. 4 at 7; Exh. 5 at ¶ 6. Jim Davis' thesis was not ready for defense until fall 1989 and Jim Davis worked on the thesis and research prototypes through the summer of 1989. Exh. 4 at 7; Exh. 5 at ¶ 6.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 12:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute that Davis defended his thesis in 1989. Moreover, while both Davis and Schmandt are certain that the thesis defense did not occur as described in the flyer, neither provides any detail about where and when the defense did in fact occur. *See* MIT Exh. 4 (Schmandt Decl.) at ¶ 7 ("Jim actually defended his thesis in late summer of 1989 . . . While I do not remember the exact room in which the thesis defense took place, I do remember that the thesis defense did not take place in the room identified on the draft flyer, namely E15-283a of the Media Lab, because Jim defended his thesis in a larger room."); MIT Exh. 5 (Davis Decl.) at ¶ 6 ("my thesis defense and graduation [occurred] in the Fall of 1989.") Surely Davis would have defended his thesis before he signed it and submitted it to the library on August 4, 1989, putting that defense before the critical date. However, to avoid this fact MIT refuses to pinpoint the details in order to argue inferences to the contrary. Even as such, this issue does not create a genuine issue for trial because at best, the defense occurred before February 27, 1990 which is when MIT told the PTO Davis' thesis became available to the public. *See* Ex. 2 at 803.

## HARMAN STATEMENT OF FACT NO. 13:

MIT had a policy forbidding secrecy and encouraging the free sharing of information in 1989. *See, e.g.*, Ex. 11 at 101:1-11 ("So obviously 'The Back Seat Driver,'. . . . It's not weapons research. It wasn't classified. It wasn't a national secret. We didn't have restrictions about foreign faculty, foreign students, and such. So this certainly does seem to generally characterize the feeling of the lab with regard to government-imposed secrecy. There certainly wasn't any that I was aware of at the time."); Ex. 24; *see also* Ex. 11 at 105:10-16 ("Q. I'm getting at anything. Is there anything that you did to ensure people weren't observing or listening or watching what you were doing? A. It wasn't necessary. Q. So you didn't do it? MR. BAUER: Objection. A. No.")

### MIT'S RESPONSE TO HARMAN FACT NO. 13:

MIT disputes this statement, and the inferences Harman seeks to draw from the role of a university to disseminate information. There are academic and integrity reasons why drafts of theses are not public documents or other documents not ready for public

distribution. The general public did not have access to Jim Davis' thesis until it was shelved in the MIT library. Exh. 4 at ¶ 8; Exh. 8 at 113:5-12, 117:4-7.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 13:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute the actual facts recited.  Harman's statement is directed to the general policies in place at MIT at the relevant time frame, and MIT does not dispute that such policies were as stated in Harman's statement of fact.  MIT's additional commentary is irrelevant.  MIT's general (unsupported) statement regarding "drafts of theses are not public documents or other documents not ready for public distribution" as well as MIT's assertion that "general public did not have access to Jim Davis' thesis until it was shelved" are contradicted by the evidence which shows that at least Lesk, Streeter and Rittmueller received copies of Davis' thesis in 1989.  Harman's SOF 6, 8; MIT's Opposition Brief ("Opp.") at 16.

## HARMAN STATEMENT OF FACT NO. 14:

Davis signed and submitted his thesis on August 4, 1989.  Ex. 2 at 111.

### MIT'S RESPONSE TO HARMAN FACT NO. 14:

MIT does not dispute this.

## HARMAN STATEMENT OF FACT NO. 15:

On August 9, 1990 MIT filed a patent application, based on Davis' thesis, that became the '685 Patent.  *See* Ex. 1.

### MIT'S RESPONSE TO HARMAN FACT NO. 15:

MIT does not dispute this.

## HARMAN STATEMENT OF FACT NO. 16:

MIT had more than 800 U.S. patents already issued in its name by the August 9, 1990 filing date of the '685 application. (a diligent search of the PTO website, www.uspto.gov, shows 836 patent records, and 1091 applications, for issued patents assigned to MIT by August 9, 1990).

### MIT'S RESPONSE TO HARMAN FACT NO. 16:

MIT does not dispute this, but believes the fact is irrelevant.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 16:

This undisputed fact is relevant because it shows that MIT's actions were intentional and not the result of an inexperienced patentee that did not know any better.

31

**HARMAN STATEMENT OF FACT NO. 17:**

On August 16, 1991, NEC raised concerns about MIT's prosecution of the '685 Patent.  Ex. 6 at 7388 (August 16, 1991 letter Rittmueller to MIT at pg. 2).

> **MIT'S RESPONSE TO HARMAN FACT NO. 17:**
>
> MIT agrees that Phil Rittmueller on behalf of NEC wrote a letter dated August 16, 1991 discussing the prosecution of the Back Seat Driver patent.
>
> **HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 17:**
>
> The NEC letter speaks for itself, and MIT does not deny that the letter raised concerns about the prosecution of the '685 patent.

**HARMAN STATEMENT OF FACT NO. 18:**

NEC was upset and unhappy that MIT's publicity of the Back Seat Driver had caused NEC to waste considerable time and effort only to lose any foreign patent rights it may have had.  Ex. 6 at 7387 (August 16, 1991 letter Rittmueller to MIT at pg. 2).

> **MIT'S RESPONSE TO HARMAN FACT NO. 18:**
>
> MIT disputes this statement of fact, and the inferences Harman seeks to draw from the correspondence. In fact, NEC was not unhappy with MIT and continued to sponsor MIT after the Back Seat Driver patent was granted. Exh. 4 at ¶ 9.
>
> **HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 18:**
>
> MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. The NEC letter speaks for itself, as does the subsequent internal MIT memorandum, which notes that NEC was an "unhappy customer." *See* Harman's SOF 20.  Harman submits that Schmandt's declaration, which is 15 years after the fact and for purposes of litigation, is insufficient to create a genuine issue of material fact for trial.  Even so, the fact that NEC continued to sponsor the MIT Media Lab after the Back Seat Driver patent was granted squarely supports Harman's theory that MIT acted with intent to deceive the PTO and thereby gained issuance of the patent and was thereby able to placate NEC to ensure future NEC sponsorship funds.

**HARMAN STATEMENT OF FACT NO. 19:**

NEC wanted its outside patent counsel to monitor and participate in the prosecution.  Ex. 6 at 7388 (August 16, 1991 letter Rittmueller to MIT at pg. 2).

> **MIT'S RESPONSE TO HARMAN FACT NO. 19:**
>
> MIT does not dispute that there is a document in which NEC made this statement. MIT disputes that any inferences relevant to this matter can be drawn from this document.

00168179.DOC /

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 19:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute this statement of fact, nor set forth any contradictory evidence in response. This undisputed fact is relevant because it shows the state of the relationship between MIT and NEC and thus is circumstantial proof that MIT acted with intent to deceive the PTO in order to placate its sponsor, NEC.

## HARMAN STATEMENT OF FACT NO. 20:

MIT (via the same Nicholas Negroponte who certified Davis' thesis in 1989) expressed concerns internally about NEC being an "unhappy customer" who had been "particularly generous with MIT." *See* Ex. 8 at 7392.

### MIT'S RESPONSE TO HARMAN FACT NO. 20:

MIT does not dispute that there is a document in which Professor Negroponte made these statements. MIT disputes that any inferences relevant to this matter can be drawn from this document.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 20:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute this statement of fact, nor does MIT set forth any contradictory evidence in response. This undisputed fact is relevant because it shows the state of the relationship between MIT and NEC and thus is circumstantial proof that MIT acted with intent to deceive the PTO in order to placate its sponsor, NEC.

## HARMAN STATEMENT OF FACT NO. 21:

On November 8, 1991, the PTO rejected each and every pending claim because the thesis was publicly available more than one year before MIT filed the patent application. November 4, 1991, Office Action, Ex. 2 at 442 ("First Office Action").

### MIT'S RESPONSE TO HARMAN FACT NO. 21:

MIT disputes this statement. In fact, the Patent Examiner erroneously believed that Jim Davis' thesis was available more than one year before the filing date of the '685 patent, and the rejection was based on that erroneous belief. MIT subsequently corrected the Examiner's erroneous belief. Exh. 2 at 376.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 21:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute the actual statement of fact, and, regardless, the Patent Office rejection speaks for itself. MIT does not dispute that the Examiner did, indeed, reject each and every pending claim because (he understood at the time) that the thesis was publicly available more than one year before MIT filed the patent application. *See* Ex. 2

at 442. MIT's additional commentary merely support's Harman's theory, which is that MIT's false statements were material because they directly led to the Examiner withdrawing his (proper) rejection and (wrongly) allowing the patent to issue.

## HARMAN STATEMENT OF FACT NO. 22:

MIT told NEC that they had an opportunity to alleviate NEC's concerns. Ex. 7 at 7389 (February 20, 1992 letter Hynes to Rittmueller).

### MIT'S RESPONSE TO HARMAN FACT NO. 22:

MIT disputes this statement of fact. MIT never offered to "alleviate" NEC's concerns, which connotes acting unethically to do so.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 22:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. The letter (Ex. 7) speaks for itself, and has been fairly and accurately characterized.

## HARMAN STATEMENT OF FACT NO. 23:

MIT expressly acknowledged to the PTO that it clearly understood the Examiner's reasons for rejection. MIT's May 5, 1992 Response, Ex. 2 at 803 ("Response to the First Office Action").

### MIT'S RESPONSE TO HARMAN FACT NO. 23:

MIT disputes this statement of fact. MIT did not expressly acknowledge or concede the correctness of the Examiner's reasons for rejecting the '685 patent. Exh. 6 at ¶ 7.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 23:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT's May 5, 1992 response to the Patent Office speaks for itself, supports Harman's statement of fact, and cannot be contradicted by the after-the-fact declaration by Pasternak. Harman's statement of fact does not state that MIT conceded the correctness of the Examiner's rejection, only that MIT understood it, thereby demonstrating that MIT's false and misleading response was intentional, and not a negligent response due to a lack of understanding. Regardless, MIT admits it understood the substance of the Examiner's rejection in its response to Harman's SOF 21 ("the Patent Examiner erroneously believed that Jim Davis' thesis was available more than one year before the filing date of the '685 patent").

## HARMAN STATEMENT OF FACT NO. 24:

In its Response to the First Office Action, MIT did not challenge the materiality of Davis' thesis or the Examiner's determination that the thesis anticipated each claim.  Ex. 2 at 799-803.

### MIT'S RESPONSE TO HARMAN FACT NO. 24:

MIT disputes this statement of fact. In fact, MIT challenged the materiality of the thesis on its face and presented evidence that the thesis was not prior art under 35 U.S.C. § 102 -- meaning it was not material. Exh. 6 at ¶ 6.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 24:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. The point of this statement of fact is that MIT did not (nor can it) dispute that Davis' thesis contained in it each and every limitation of at least one pending claim (if not all pending claims), meaning it was therefore material in the sense of the substantive subject matter that it contained.  MIT's May 5, 1992 response to the Patent Office speaks for itself.  Ex. 2 at 799-803.  There is no dispute that MIT represented to the Examiner that Davis' thesis did not qualify as prior art because of its date.  There is also no dispute that, assuming Davis' thesis is "prior art," it is material from the viewpoint of the subject matter that it contains as compared to the pending and issued claims.  *See* Ex. 2 at 799-803.

## HARMAN STATEMENT OF FACT NO. 25:

In its Response to the First Office Action, MIT submitted a new title page for the thesis that was stamped by MIT's library.  Ex. 2 at 803.

### MIT'S RESPONSE TO HARMAN FACT NO.25:

MIT does not dispute that it submitted the title page with the MIT library stamp. MIT disputes any inference Harman seeks to draw from the reference to the title page being "new."

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 25:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute this statement of fact.  Point is: prior to May 5, 1992 MIT had ***not*** submitted a library-stamped copy of the title page bearing the date February 27, 1990 for Davis' thesis.

## HARMAN STATEMENT OF FACT NO. 26:

In its Response to the First Office Action, MIT told the PTO that Davis' thesis "did not become available to the public more than a year before the filing date of the present application." Ex. 2 at 803.

### MIT'S RESPONSE TO HARMAN FACT NO. 26:

MIT does not dispute this.

## HARMAN STATEMENT OF FACT NO. 27:

In its Response to the First Office Action, MIT led the PTO to believe that the only access to Davis' thesis was through the MIT library. Ex. 2 at 803 ("August 4, 1989 is the data the thesis was signed, and not the date on which the thesis became available to the public. M.I.T. does not generally catalog and shelve theses until several months after the official date of submission.")

### MIT'S RESPONSE TO HARMAN FACT NO. 27:

MIT disputes this statement of fact. MIT did not state that the only access was through the library. MIT stated that the thesis did not become publicly available on August 4, 1989 and that the MIT library generally did not catalog and shelve theses for several months after the theses were received. Exh. 6 at ¶ 8. MIT disputes any inference Harman seeks to bring suggesting that MIT mislead the Patent Office into believing that no one other than Dr. Davis had seen the thesis before the library catalogued it.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 27:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT's Response to the First Office Action speaks for itself, and MIT does not deny that it submitted that Response. Ex. 2 at 799-803. MIT's additional commentary simply proves the calculated deception that MIT orchestrated at the Patent Office and has continued to pursue during this litigation. It appears from MIT's response to SOF 27 that MIT believes it is perfectly fine to use deception and half-truths (at best) in explaining to the Examiner the availability of Davis' thesis. This does nothing but leave the Examiner with the false impression, namely that the circulated versions of the Thesis was subject to some type of confidentiality, when, in truth, it was being circulated. *See* Harman's SOF 29. It was not MIT's right to determine for itself what constitutes a "printed publication" under the law. Instead, MIT was obligated to tell the Examiner what it knew, and allow the Examiner to determine whether the circulated versions of Davis' thesis constituted an invalidating printed publication. *See Cargill Inc. v. Canabra Foods Ltd.*, 476 F.3d 1359, 1367 (Fed. Cir. 2007) (quoting *LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992) (any doubts as to materiality must be "resolved in favor of disclosure")).

**HARMAN STATEMENT OF FACT NO. 28:**

When MIT submitted its Response to the First Office Action, MIT knew that Davis "could print a copy whenever he wanted and give that to anybody that he wanted to."  Ex. 15 at 115:9-13 ("Jim could print a copy whenever he wanted and give that to anybody that he wanted to."); Ex. 11 at 165:2-5 ([[REDACTED]])

> **MIT'S RESPONSE TO HARMAN FACT NO. 28:**
>
> MIT disputes this statement of fact to the extent it seeks to draw an inference of improper or misleading statements. The fact that Dr. Davis legally could give the thesis to anyone does not lead to an inference that he actually did.
>
> **HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 28:**
>
> MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute the actual statement of fact.  Davis did, indeed, provide copies of his thesis to whomever he wanted, and did so without any confidentiality.  Harman's SOF 6, 8.  Indeed, MIT admits "Davis controlled availability of his thesis."  *See* Harman's SOF 29; MIT's Response to Harman's SOF 5.  MIT's continued attempts to hide these facts only further bolster a finding that MIT intended to deceive the Patent Office.

**HARMAN STATEMENT OF FACT NO. 29:**

When MIT submitted its Response to the First Office Action, MIT knew that Davis had actually distributed his thesis and that he did so more than once.  *See* Ex. 3; Ex. 4; Ex. 19 at 172; Ex. 15 at 115:9-13; Ex. 11 at 165:2-5.

> **MIT'S RESPONSE TO HARMAN FACT NO. 29:**
>
> MIT disputes this statement of fact. If "distributed" is intended to imply that Dr. Davis made his thesis freely and publicly available, then the statement is false. Jim Davis provided a copy only to close colleagues or advisors, like those on his thesis committee. Exh. 5 at ¶ 7. A limited distribution to close colleagues and advisors does not constitute a patentability bar. Exh. 6 at ¶ 9.
>
> **HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 29:**
>
> MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute this statement of fact.  MIT's additional commentary does not refute the statement of fact or provide any evidence to contradict it.  Indeed MIT's commentary admits that Davis had actually distributed his thesis and done so more than once.  MIT's response simply compounds the evidence of MIT's intent to deceive the Patent Office, because the issue is not whether the circulation of Davis' thesis conclusively establishes a patentability bar.  The issue is whether a reasonable Examiner would have wanted to whole truth, which MIT hid.  MIT was not entitled to make a legal determination itself and then withhold information from the Examiner based on that

determination. *See Cargill Inc. v. Canabra Foods Ltd.*, 476 F.3d 1359, 1367 (Fed. Cir. 2007).

## HARMAN STATEMENT OF FACT NO. 30:

When MIT submitted its Response to the First Office Action, MIT knew that Davis publicly defended his thesis. *See* Ex. 5.

### MIT'S RESPONSE TO HARMAN FACT NO. 30:

MIT does not dispute the statement of fact, but disputes the inference that Harman seeks to suggest that something improper was withheld. Jim Davis' defense of his thesis does not constitute a patentability bar. Exh. 6 at ¶ 10.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 30:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute this statement of fact.  MIT's additional commentary further indicates why the information should have been disclosed.  It is not for Pasternak or MIT to decide any perceived "gray areas" of the law in their favor, and to then withhold information from the Patent Office. *See Cargill Inc. v. Canabra Foods Ltd.*, 476 F.3d 1359, 1367 (Fed. Cir. 2007) (*quoting LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992) (any doubts as to materiality must be "resolved in favor of disclosure")).  A thesis defense is certainly something the Examiner would have liked to have known about.  For one reason, it provides further evidence as to whether the pre-critical-date uses involved subject matter that was reduced to practice.  Moreover, a thesis defense that includes a handout can constitute an invalidating printed publication. *In re Klopfenstein*, 380 F.3d 1345, 1352 (Fed. Cir. 2004) (finding a presentation that was presented but not handed out or otherwise copied to be a printed publication); *Mass. Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1108-10 (Fed. Cir. 1985) (finding a paper delivered orally with six copies distributed at the presentation to be a printed publication).

## HARMAN STATEMENT OF FACT NO. 31:

When disclosing information that MIT did "want to be considered and made of record," in an IDS received by the PTO on September 4, 1990, MIT said nothing about the availability of Davis' thesis.  MIT's September 4, 1990 IDS, Ex. 2 at pg. 75-98 ("MIT's First IDS") (citing the absence of this information).

### MIT'S RESPONSE TO HARMAN FACT NO. 31:

MIT disputes this statement of fact as misleading. MIT provided the Patent Office with a copy of Jim Davis' thesis in the September 4, 1990 IDS. Exh. 2 at 346.

00168179.DOC /

**HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 31:**

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute this fact. The IDS speaks for itself, and makes no mention of the pre-critical-date availability of Davis' thesis. *See* Ex. 2 at pg. 75-98.

**HARMAN STATEMENT OF FACT NO. 32:**

The PTO issued a Notice of Allowance for the '685 patent on June 30, 1992. *See* Ex. 2 at 808.

**MIT'S RESPONSE TO HARMAN FACT NO. 32:**

MIT does not dispute this.

**HARMAN STATEMENT OF FACT NO. 33:**

MIT told NEC on July 13, 1992 that "it was MIT's pleasure to inform [NEC]…that the patent application on the [Back Seat Driver] case has been allowed." Ex. 9 at 7404 (July 13, 1992 letter Baranski-Walker to Hoshino).

**MIT'S RESPONSE TO HARMAN FACT NO. 33:**

MIT does not dispute this.

**HARMAN STATEMENT OF FACT NO. 34:**

MIT asserted privilege and forced Harman to move to compel the documents (MIT07377-07406) showing NEC's concerns over the Back Seat Driver patent application. Ex. 9 at 7404 (July 13, 1992 letter Baranski-Walker to Hoshino).

**MIT'S RESPONSE TO HARMAN FACT NO. 34:**

MIT does not dispute that documents MIT07377-07406 were produced in response to a Court order. MIT disputes the characterization of the motion or the documents.

**HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 34:**

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. Harman's Motion to Compel (Docket Entry 84) speaks for itself. The fact that MIT does not take responsibility for its actions in this litigation is further circumstantial evidence of MIT's continued effort to hide the truth about its intentional breach of its duty of candor at the Patent Office.

**HARMAN STATEMENT OF FACT NO. 35:**

Documents bearing Bates Nos. STREETER 52-729 were produced from Dr. Streeter's files in response to a subpoena that Harman served on Dr. Streeter. Litigation counsel for MIT representing MIT in this matter represented Dr. Streeter in regard to the subpoena.

**MIT'S RESPONSE TO HARMAN FACT NO. 35:**

MIT does not dispute this.

**HARMAN STATEMENT OF FACT NO. 36:**

Documents bearing Bates Nos. RITTMUELLER 1-351 were produced from Mr. Rittmueller's files in response to a subpoena that Harman served on Mr. Rittmueller. Litigation counsel for MIT representing MIT in this matter represented Mr. Rittmueller in regard to the subpoena.

**MIT'S RESPONSE TO HARMAN FACT NO. 36:**

MIT does not dispute this.

**HARMAN STATEMENT OF FACT NO. 37:**

Documents bearing Bates Nos. HAR 709859-710072 were produced by Harman after learning about them from a corporate partner in its counsel's law firm who happened to work on the Back Seat Driver while an undergraduate student at MIT.

**MIT'S RESPONSE TO HARMAN FACT NO. 37:**

MIT has no basis to confirm or deny this statement. Harman has represented that it will not call this Kirkland partner to testify, and therefore, any evidence relating to his private files is inadmissible and hearsay.

**HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 37:**

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute this statement. MIT's failure to preserve and provide this evidence to Harman in a timely manner is the reason that neither Davis nor Schmandt authenticated this document during their deposition testimony. Nonetheless, in light of Davis' admission that he created the document, and Davis and Schmandt's further authentication of the document as a "draft flyer," in their sworn declarations, the document is now admissible and not hearsay. *See* MIT Exh. 4 at ¶ 7; MIT Exh. 5 at ¶ 6; *see also* FED. R. EVID. 801(d)(2)(A)(statement of a party opponent).

## HARMAN STATEMENT OF FACT NO. 38:

MIT had an "eye toward litigation" extending back to 1989 giving rise to privilege and thus triggering its continuing obligation to preserve documents.

### MIT'S RESPONSE TO HARMAN FACT NO. 38:

This is purely legal argument that MIT need not respond to in a statement of facts. Nevertheless, MIT believes it has fully complied with all of its discovery obligations.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 38:

MIT does not dispute this fact.

## HARMAN STATEMENT OF FACT NO. 39:

By April 30, 1989, "[t]he Back Seat Driver [was] working, and working well" and had "made dozens of successful trips" on the public streets around the Boston area. Ex. 18 at 108.

### MIT'S RESPONSE TO HARMAN FACT NO. 39:

MIT disagrees that this statement shows that the Back Seat Driver was perfected, bugfree, and fully operational. At best, the statement shows that the inventors were "confident" that the system would work well enough for Dr. Davis' thesis. Exh. 11 at 169:4-11.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 39:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. The Back Seat Driver quarterly report speaks for itself, and MIT does not dispute it. MIT's additional commentary is irrelevant, as MIT already admitted that the subject matters of claims 1, 2-4, 7-9, 21, 23-25, 32-37, 40, 41, 53, 55, 57-58 were reduced to practice at least as early as June 1989 and the subject matters of claims 10-12, 15, 19-20, 26-31, 43-44, 46-49, 51, 52, 54 were reduced to practice as least as early as August 4, 1989. Ex. 10. Indeed, MIT's commentary shows that such statements and similar statements (*see* MIT's response to Harman's SOF 27) may have been subject to differing interpretations. As such, MIT had even more of a duty to expressly and separately inform the Examiner about the details and extent of those uses. *See Cargill Inc. v. Canabra Foods Ltd.*, 476 F.3d 1359, 1367 (Fed. Cir. 2007) (*quoting LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992) (any doubts as to materiality must be "resolved in favor of disclosure")).

**HARMAN STATEMENT OF FACT NO. 40:**

By April 30, 1989, Davis and Schmandt were "eager to demonstrate it" and had already done so many times.  Ex. 18 at 108, 112.

> **MIT'S RESPONSE TO HARMAN FACT NO. 40:**
>
> MIT disputes the statement of fact, to the extent it seeks to imply widespread public disclosure.
>
> **HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 40:**
>
> MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not cite any evidence to dispute this statement of fact.  The Back Seat Driver quarterly report (Ex. 18) speaks for itself regarding the extent of the disclosure, noting **[[REDACTED]]**  Ex. 18 at RITTMUELLER 108 (page 1 of the Exhibit).

**HARMAN STATEMENT OF FACT NO. 41:**

Between May 1 and July 31, 1989, at least "50 subjects" used the Back Seat Driver to navigate the public streets of Boston.  Ex. 19 at 173.

> **MIT'S RESPONSE TO HARMAN FACT NO. 41:**
>
> MIT does not dispute that students were used to help develop the system. MIT objects to the inference that these field trials were demonstrations to the public, or that they amounted to "use" of the Back Seat Driver within the meaning of the patent statute. Exh. 21 at ¶¶ 118-120.
>
> **HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 41:**
>
> MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. The Back Seat Driver quarterly report (Ex. 18) speaks for itself, and MIT does not dispute this.  MIT cites no support for its attempt to limit the scope of the "50 subjects" to only students.  Indeed, there is no evidence that all of the 50 subjects were students.  At best, MIT has produced documents to show that 14 of the 50 subjects were "volunteers from the Media Lab."  MIT Exh. 18.  However, for the remaining 36 subjects, MIT has produced no evidence as to their identity, or whether they were under any confidentiality obligation.  MIT's additional commentary is irrelevant.  MIT's reliance on its expert's report (MIT Exh. 21) to support its assertion that the "field trials" were not used within the meaning of the patent statute, is misplaced.  MIT's expert has no personal knowledge of the facts and her report is inadmissible hearsay.  *See* FED. R. CIV. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant it competent to testify to the matters stated therein.")
>
> Regardless, MIT was not entitled to make unilateral legal determinations about the law of "public use" and withhold information about potential public uses under its own

interpretations. That was an issue for the Examiner to decide with all of the facts before him. *See Cargill Inc. v. Canabra Foods Ltd.*, 476 F.3d 1359, 1367 (Fed. Cir. 2007) (*quoting LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992) (any doubts as to materiality must be "resolved in favor of disclosure")). Indeed, the patent office practice guidelines in effect at the time the patent application was filed, and which Pasternack would have relied upon, counsel that "It may be desirable to submit information about prior uses and sales even if it appears that they may have been experimental not involve the specifically claimed invention, or not encompass a completed invention." MPEP 2004 ¶ 11 (Ex. 44). In any event, these uses were invalidating public uses. *See* Reply Brief at II.A.**.**

## HARMAN STATEMENT OF FACT NO. 42:

Among the subjects who used the Back Seat Driver were a Bell Labs employee, one or more NEC employees, two MIT undergraduate students, and several General Motors' employees none of whom signed any type of confidentiality agreement or were bound by any confidentiality obligation. *See* Ex. 11 at 32:7-9 (General Motors' employees); Ex. 13 at 57:13-58:1, 58:11-24, 61:11-12 (NEC employees); Ex. 14 at 88:16-18 (MIT undergraduate students), 97:21-24 (Bell Labs employee); Ex. 16 at 116:11-23, 118:10-18 (Bell Labs' employee); Ex. 22 (General Motors' employees).

### MIT'S RESPONSE TO HARMAN FACT NO. 42:

MIT disputes the statement of fact. The people who took test drives were obligated by ethical and academic considerations regarding the field trials. In any event, since field trials and test drives do not constitute public use of the invention, confidentiality agreements were not necessary. Exh. 21 at ¶¶ 118-120; Exh. 18 at 6763, Exh. 19 at 6765.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 42:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute this statement of fact. Moreover, MIT's additional commentary is without merit. First, MIT Exh. 21 is the technical report of MIT's expert who has no personal knowledge of the facts or legal understanding of the statutory bar of Section 102(b), and regardless, her report is inadmissible hearsay. *See* FED. R. CIV. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant it competent to testify to the matters stated therein.") MIT Exh. 18 and Exh. 19 only relate to those subjects who used the system as approved by the Committee on the Use of Humans as Experimental Subjects, and only covers at best 14 of the at least 50 subjects who used the system prior to the critical date.

In addition, there is no legal support for MIT's assertion that unspecified (and unwritten) ethical or academic considerations give rise to an implied confidentiality or suffice for purposes of Section 102(b), and, indeed the law says otherwise. *See Bernhardt, LLC v. Collezione Europa USA, Inc.*, 386 F.3d 1371, 1379 (Fed. Cir. 2004) (taking into account many factors to determine the level of confidentiality surrounding the alleged public use).

Tellingly, MIT Exh. 18 and Exh. 19 make no mention of confidentiality or "ethical and academic considerations." MIT's misinterpretation of the law further demonstrates why MIT had a duty to disclose this specific, detailed information to the Examiner, so that he could reach his own conclusion as to the public uses.

## HARMAN STATEMENT OF FACT NO. 43

Not a single confidentiality agreement for any use or demonstration of the Back Seat Driver prototype has been produced in this litigation. *See* Ex. 25 Nos. 1, 6-11, 21, 23 pgs. 1, 7-10, 15-16; Ex. 26 Nos. 32-33 pgs. 8-9 ("MIT states that it has already produced or logged on its privilege log any documents in its possession, custody, or control responsive to this Request.")

### MIT'S RESPONSE TO HARMAN FACT NO. 43:

MIT does not dispute this. MIT objects to the inference Harman seeks to draw that confidentiality agreements were somehow required. Confidentiality agreements are not controlling because field trials were not public uses of the invention.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 43:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute this statement of fact. MIT's additional commentary misinterprets the law and only further demonstrates why MIT had a duty to disclose this specific, detailed information to the Examiner, so that he could reach his own conclusion as to the public uses.

## HARMAN STATEMENT OF FACT NO. 44:

MIT openly used the Back Seat Driver all over Boston and stored it in a public garage. Ex. 14 at 161:1 ("A. It was parked in an MIT garage"); Ex. 2 at 114 ("[the Back Seat Driver] has successfully guided drivers unfamiliar with Cambridge to their destinations"); Ex. 20 at 933; Ex. 21 at 1101; Ex. 13 at 331:5-18 ("A. It was parked in a parking structure. . . Q. And do you have any reason to believe that the parking structure, where it was parked, had restricted access only for Mr. Davis or Mr. Schmandt or any of the people that you mentioned earlier? . . . A. No.")

### MIT'S RESPONSE TO HARMAN FACT NO. 44:

MIT disputes this statement of act. The evidence is that MIT stored the Back Seat Driver prototype in an MIT garage that had limited card-only access. Exh. 24 at 160:22-161:2. In addition, even when the car was on a public road, no one in the public would have noticed the invention, which was entirely internal to the vehicle. Exh. 21 at ¶¶ 118-120.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 44:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. There is no dispute that "MIT openly used the Back Seat Driver all over Boston." To the extent that there is a dispute over whether the prototype was stored "in a public garage," it is irrelevant. MIT has produced no evidence to show that the prototype was secured

such that no one other than the inventors had access to the car. Indeed, while MIT claims the prototype was kept in a garage with "limited card-only access." there is no explanation as to the scope of that limited access. Moreover, the testimony of one of the test drivers, Rittmueller, rebuts MIT's implication that the car was kept in a restricted garage. Ex. 13 at 331:9-18 ([[**REDACTED**]])

MIT's additional commentary is a misinterpretation of the applicable Federal Circuit public use law, and only further demonstrates why MIT had a duty to disclose this specific, detailed information to the Examiner, so that he could reach his own conclusion as to the public uses. It is irrelevant whether or not anyone watching the public use would have seen or understood the invention as a result of such use. *See Sys. Mgmt. Arts Inc. v. Avesta Techs., Inc.*, 87 F. Supp. 2d 258, 270 (S.D.N.Y. 2000); *see also See Egbert v. Lippmann*, 104 U.S. 333, 336 (1881) (holding that a corset worn openly was in public use even though the invention was concealed within the corset); *Hall v. Macneale*, 107 U.S. 90 (1883) (holding that a safe mechanism was in public use even though the invention could not be seen without destroying the safe).

## HARMAN STATEMENT OF FACT NO. 45:

MIT never told the PTO about the 50 subjects who used the Back Seat Driver to navigate the public streets of Boston more than a year before MIT filed the patent application. *See* Ex. 2 (citing the absence of this information).

### MIT'S RESPONSE TO HARMAN FACT NO. 45:

MIT disputes this statement of fact. MIT provided four references, in addition to the patent application itself, that mentioned field trials or test drives of the Back Seat Driver prototype to test the interface. Exh. 1 at cover page, 3:4-7; Exh. 12 at 1101; Exh. 13 at 933; Exh. 14 at 459; Exh. 15 at 938. In any event, MIT was not required to tell the Patent Office about the field trials because the field trials were not public uses of the invention. Exh. 6 at ¶¶ 12-13; Exh. 21 at ¶ 120.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 45:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT cites no evidence to support its assertion that the "50 subjects" were disclosed to the PTO. None of the four references that MIT cites to rebut this statement of fact disclose the number—50—of people who had used a working prototype. *See* MIT Exh. 1, 12, 13, 14, 15 (citing an absence of this information). Indeed, at best these articles "mentioned field trials" with little or no further detail. *See* MIT Exh. 1, 12, 13, 14, 15.

**HARMAN STATEMENT OF FACT NO. 46:**

In MIT's first IDS it withheld information about the 50 public uses of the Back Seat Driver.  Ex. 2 at pg. 75-98 (citing the absence of this information).

**MIT'S RESPONSE TO HARMAN FACT NO. 46:**

MIT disputes this statement of fact. MIT provided four references with the IDS that mentioned the field trials or test drives of the Back Seat Driver prototype. Exh. 12 at 1101; Exh. 13 at 933; Exh. 14 at 459; Exh. 15 at 938.

**HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 46:**

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT cites no evidence to support its assertion that the "50 public uses" were disclosed to the PTO.  None of the four references that MIT cites to rebut this statement of fact disclose the number—50—of people who had used a working prototype.  *See* MIT Exh. 1, 12, 13, 14, 15 (citing an absence of this information).  Indeed, at best these articles "mentioned the field trials" with little or no further detail.  *See* MIT Exh. 1, 12, 13, 14, 15.  Nor did MIT tell the Patent Office any details about what was used, and that the claimed subject matter was already reduced to practice at the time of the uses.

**HARMAN STATEMENT OF FACT NO. 47:**

MIT never told the PTO that it reduced to practice the sole independent claim and 22 dependent claims "at least as early as June of 1989." Ex. 10 at No. 14 pg. 16.

**MIT'S RESPONSE TO HARMAN FACT NO. 47:**

MIT was not required to tell the Patent Office when the claims were reduced to practice. Exh. 6 at ¶ 11.

**HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 47:**

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute this statement of fact.  The fact that claims were already reduced to practice at the time of the pre-critical-date uses eliminates any experimental use exception to the "public use" bar of Section 102(b), and the Examiner would have liked to have known that information.

## HARMAN STATEMENT OF FACT NO. 48:

MIT never told the PTO that [it] reduced to practice 23 more dependent claims "at least as early as August 4, 1989." *See* Ex. 2 (citing the absence of this information); Ex. 5 at No. 14 pg. 16.

### MIT'S RESPONSE TO HARMAN FACT NO. 48:

MIT was not required to tell the Patent Office when the claims were reduced to practice. Exh. 6 at ¶ 11.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 48:

MIT does not dispute this statement of fact. The fact that claims were already reduced to practice at the time of the pre-critical-date uses eliminates any experimental use exception to the "public use" bar of Section 102(b), and the Examiner would have liked to have known that information.

## HARMAN STATEMENT OF FACT NO. 49:

MIT never told the PTO that public uses continued after the claimed subject matter was reduced to practice. *See* Ex. 2 (citing the absence of this information).

### MIT'S RESPONSE TO HARMAN FACT NO. 49:

MIT disputes this statement of fact. There were no public uses to disclose to Patent Office. MIT was not required to tell the Patent Office about the field trials because the field trials were not public or public uses. Exh. 6 at ¶ 12-13; Exh. 21 at ¶¶ 118-120.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 49:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute the lack of any disclosure to the Patent Office, but instead re-characterizes the evidence, supported by only the after-the-fact declaration by Pasternak and a report by MIT's technical expert, both of whom lack personal knowledge of the facts. MIT's misinterpretation of the law further demonstrates why MIT had a duty to disclose this specific, detailed information to the Examiner, so that he could reach his own conclusion as to the public uses.

## HARMAN STATEMENT OF FACT NO. 50:

MIT never told the PTO anything about the timing of the public uses. *See* Ex. 2 (citing the absence of this information).

### MIT'S RESPONSE TO HARMAN FACT NO. 50:

MIT disputes this statement of fact. First, there were no public uses to disclose to the patent office. Second, MIT provided four references, in addition to the patent application itself, that mentioned field trials or test drives of the Back Seat Driver prototype to test

the interface, and MIT provided dates for the references. Exh. 1 at cover page, 3:4-7; Exh. 12 at 1101; Exh. 13 at 933; Exh. 14 at 459; Exh. 15 at 938.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 50:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute the lack of any disclosure to the Patent Office, but instead re-characterizes the evidence absent any support. Moreover, MIT cites no evidence to support its assertion that the timing of the public uses were disclosed to the PTO. None of the four references that MIT cites to rebut this statement of fact told the Patent Office that these uses occurred after the invention had been reduced to practice. *See* MIT Exh. 1, 12, 13, 14, 15 (citing an absence of this information). Indeed, at best these articles "mentioned field trials" with little or no further detail. *See* MIT Exh. 1, 12, 13, 14, 15.

## HARMAN STATEMENT OF FACT NO. 51:

MIT never told the PTO anything about the extent of the public uses. *See* Ex. 2 (citing the absence of this information).

### MIT'S RESPONSE TO HARMAN FACT NO. 51:

MIT disputes this statement of fact. First, there were no public uses to disclose to the patent office. Second, MIT provided four references, in addition to the patent application itself, that mentioned field trials or test drives of the Back Seat Driver prototype to test the interface, and MIT provided dates for the references. Exh. 1 at cover page, 3:4-7; Exh. 12 at 1101; Exh. 13 at 933; Exh. 14 at 459; Exh. 15 at 938.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 51:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute the lack of any disclosure to the Patent Office, but instead re-characterizes the evidence absent any support. Moreover, MIT cites no evidence to support its assertion that the extent of the public uses were disclosed to the PTO. None of the four references that MIT cites to rebut this statement of fact disclose the number—50—of people who had used a working prototype, that no confidentiality agreements were signed for those 50 people, or that these uses occurred after the invention had been reduced to practice. *See* MIT Exh. 1, 12, 13, 14, 15 (citing an absence of this information). Indeed, at best these articles "mentioned field trials" with little or no further detail. *See* MIT Exh. 1, 12, 13, 14, 15.

**HARMAN STATEMENT OF FACT NO. 52:**

MIT never told the PTO anything about the details surrounding the public uses.  *See* Ex. 2 (citing the absence of this information).

### MIT'S RESPONSE TO HARMAN FACT NO. 52:

MIT disputes this statement of fact. First, there were no public uses to disclose to the patent office. Second, MIT provided four references, in addition to the patent application itself, that mentioned field trials or test drives of the Back Seat Driver prototype to test the interface, and MIT provided dates for the references. Exh. 1 at cover page, 3:4-7; Exh. 12 at 1101; Exh. 13 at 933; Exh. 14 at 459; Exh. 15 at 938.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 52:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute the lack of any disclosure to the Patent Office, but instead re-characterizes the evidence absent any support.  Moreover, MIT cites no evidence to support its assertion that details surrounding the public uses were disclosed to the PTO. None of the four references that MIT cites to rebut this statement of fact disclose the number—50—of people who had used a working prototype, that no confidentiality agreements were signed for those 50 people, or that these uses occurred after the invention had been reduced to practice.  *See* MIT Exh. 1, 12, 13, 14, 15 (citing an absence of this information).  Indeed, at best these articles "mentioned field trials" with little or no further detail.  *See* MIT Exh. 1, 12, 13, 14, 15.

**HARMAN STATEMENT OF FACT NO. 53:**

MIT never told the PTO anything about the lack of confidentiality regarding the public uses.  *See* Ex. 2 (citing the absence of this information).

### MIT'S RESPONSE TO HARMAN FACT NO. 53:

MIT disputes this statement of fact. First, there were no public uses to disclose to the patent office. Second, MIT provided four references, in addition to the patent application itself, 20 that mentioned field trials or test drives of the Back Seat Driver prototype to test the interface, and MIT provided dates for the references. Exh. 1 at cover page, 3:4-7; Exh. 12 at 1101; Exh. 13 at 933; Exh. 14 at 459; Exh. 15 at 938.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 53:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute the lack of any disclosure to the Patent Office, but instead re-characterizes the evidence absent any support.  Moreover, MIT cites no evidence to support its assertion that the confidentiality of the public uses were disclosed to the PTO. None of the four references that MIT cites to rebut this statement of fact disclose that no confidentiality agreements were signed for the 50 subjects who used the Back Seat driver before the critical date.  *See* MIT Exh. 1, 12, 13, 14, 15 (citing an absence of this

information).  Indeed, at best these articles "mentioned field trials" with little or no further detail.  *See* MIT Exh. 1, 12, 13, 14, 15.

## HARMAN STATEMENT OF FACT NO. 54:

MIT only disclosed to the PTO that "An actual working prototype of the Back Seat Driver has been implemented. It has successfully guided drivers unfamiliar with Cambridge, Mass. to their destination. It is easy to foresee a practical implementation in the future." Ex. 1 at 3:4-8; Ex. 2 at 9.

### MIT'S RESPONSE TO HARMAN FACT NO. 54:

MIT disputes this statement of fact. MIT provided three additional references that mentioned field trials or test drives of the Back Seat Driver prototype to test the interface. Exh. 1 at cover page, 3:4-7; Exh. 12 at 1101; Exh. 13 at 933; Exh. 14 at 459; Exh. 15 at 938. The Patent Examiner considered these references. Exh. 2 at 375-76.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 54:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. None of the four references that MIT cites to rebut this statement of fact disclose the number—50—of people who had used a working prototype, that no confidentiality agreements were signed for those 50 people, or that these uses occurred after the invention had been reduced to practice.  *See* MIT Exh. 1, 12, 13, 14, 15 (citing an absence of this information).  While the exact language in each reference may differ, at best these articles "mentioned field trials" with little or no further detail.  *See* MIT Exh. 1, 12, 13, 14, 15.

## HARMAN STATEMENT OF FACT NO. 55:

MIT's patent prosecution attorney testified that if "[the Back Seat Driver] was in use more than one year prior to the date of the filing of the ['685] application, then [that use] would have been relevant to the PTO." Ex. 12 at 69:13-16 ("Q. So if it [Back Seat Driver] was in use more than one year prior to the date of the filing of the application, then it would be relevant to the PTO? A. Yes.")

### MIT'S RESPONSE TO HARMAN FACT NO. 55:

This passage is taken out of context and is not a concession that the Back Seat Driver field trials were invalidating public uses of the invention. Exh. 6 at ¶ 13.

### HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 55:

MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute this statement of fact.  Pasternak's deposition testimony speaks for itself, and an after-the-fact declaration cannot create a genuine issue of material fact by contradicting his earlier sworn deposition testimony.

**HARMAN STATEMENT OF FACT NO. 56:**

MIT's prosecuting attorney made no effort to investigate the public uses of the "prototypes" disclosed in the specification.  Ex. 12 79:17-19 ("Did you specifically search for documents related to the field trials?  A. No.")

> **MIT'S RESPONSE TO HARMAN FACT NO. 56:**
>
> MIT disputes this statement of fact. The statement Harman uses to support this "fact" comes from Mr. Pasternack's deposition testimony relating to his document production in connection with this litigation, not prosecution of the '685 patent. Exh. 6 at ¶ 14.
>
> **HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 56:**
>
> MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not cite to any evidence to dispute this statement of fact.  Pasternack's deposition testimony speaks for itself, and is relevant because it evidences MIT's continued attempt to hide information about the public uses, starting with the PTO, and continuing through this litigation.  If MIT truly disputes this fact, then that means that Pasternack made an effort to investigate the public uses of the prototypes disclosed in the specification, and was either (1) stonewalled by the inventors' failure to tell him about them, or (2) uncovered the true nature of the uses, but then chose not to disclose them to the Patent Office.  Either way, the '685 patent is unenforceable.

**HARMAN STATEMENT OF FACT NO. 57:**

During prosecution of the '685 Patent, Davis knew that 50 subjects had used the Back Seat Driver between May 1, 1989 and July 31, 1989 and after Davis knew the Back Seat Driver would work.  Ex. 19 at 173; *see also* Ex. 11 at 167:20-24 ("Q. But prior to August 4th of 1989, 'The Back Seat Driver' had actually been working and had been used successfully by multiple drivers in the Cambridge area; is that accurate?  A. It is accurate.")

> **MIT'S RESPONSE TO HARMAN FACT NO. 57:**
>
> Harman does not specify which version of the Back Seat Driver prototype Davis' testimony refers to. Jim Davis and Chris Schmandt continued to test the Back Seat Driver prototype to for durability, safety, and repeatability reasons.
>
> **HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 57:**
>
> MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute this statement of fact.  The statement is clear as to the pre-critical-date timing of the uses.  In addition, MIT's commentary is irrelevant, as MIT admits that claims 1, 2-4, 7-9, 21, 23-25, 32-37, 40-41, 53, 55, 57, 58 were reduced to practice at least as early as June 1989 and claims 10-12, 15, 19-20, 26-31, 43-44, 46-49, 51-52, 54 were reduced to practice at least as early as August 4, 1989. Ex. 10.  As such, regardless of the version, a working prototype which embodied at least the sole independent and twenty-two (22) dependent claims was used with 50 subjects.

**HARMAN STATEMENT OF FACT NO. 58:**

During prosecution of the '685 Patent, Davis knew that he had continued to use the Back Seat Driver with 50 subjects after he knew the invention would work. Ex. 11 at 168:19-22 ("Did you continue to use 'The Back Seat Driver' with other drivers after you knew it would work?  A. Yes.")

> **MIT'S RESPONSE TO HARMAN FACT NO. 58:**
>
> Harman mischaracterizes Jim Davis' testimony, in which he indicated that he was "confident" the prototype would work. Exh. 5 at ¶ 9; Exh. 11 at 169:4-11. The test subjects were not shown how the Back Seat Driver system worked. Exh. 5 at ¶ 9.
>
> **HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 58:**
>
> MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute this statement of fact, which is a direct quote from Davis' deposition.  The fact that users were not shown how the Back Seat Driver system worked is irrelevant.  *See Sys. Mgmt. Arts Inc. v. Avesta Techs., Inc.*, 87 F. Supp. 2d 258, 270 (S.D.N.Y. 2000); *see also See Egbert v. Lippmann*, 104 U.S. 333, 336 (1881) (holding that a corset worn openly was in public use even though the invention was concealed within the corset); *Hall v. Macneale*, 107 U.S. 90 (1883) (holding that a safe mechanism was in public use even though the invention could not be seen without destroying the safe).

**HARMAN STATEMENT OF FACT NO. 59:**

During prosecution of the '685 Patent, Schmandt knew that 50 subjects had used the Back Seat Driver between May 1, 1989 and July 31, 1989.  Ex. 19 at 173; *see also* Ex. 14 at 95:10-22 ("Q. Let's talk about people outside of MIT and the Media Lab learning about Back Seat Driver.  In some of the articles I've read that you've written or Mr. Davis have written, there are discussions of working prototypes being run in the June of '89 time frame.  Do you recall any occasion when anyone, who was not employed by MIT, witnessed the operation of the Back Seat Driver prior to 1990?  A. Certainly, but I can't tell you the dates.  Q. Are you certain it was before 1990?  A. Yes.  We had regular quarterly meetings with the sponsor.")

> **MIT'S RESPONSE TO HARMAN FACT NO. 59:**
>
> The field trials of the Back Seat Driver prototype were not public uses of the invention. Exh. 21 at ¶¶ 118-120.
>
> **HARMAN'S REPLY TO MIT'S RESPONSE TO HARMAN FACT NO. 59:**
>
> MIT does not raise a genuine issue of material fact that is relevant to Harman's motion. MIT does not dispute this statement of fact.  MIT's additional commentary is irrelevant, as MIT Exh. 21 is the report of its expert, who has no personal knowledge of the facts, is not an expert in applying the legal, statutory standard of Section 102(b), and is inadmissible hearsay.  *See* FED. R. CIV. P. 56(e) ("Supporting and opposing affidavits

shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant it competent to testify to the matters stated therein.")  Regardless, MIT does not dispute that "Schmandt knew that 50 subjects had used the Back Seat Driver between May 1, 1989 and July 31, 1989." Indeed, the Final Report (Ex. 19 at 173), authored in part by Schmandt, speaks for itself: **[[REDACTED]]**

Date:   June 29, 2007                    Respectfully submitted,


                                         /s/Courtney A. Clark
                                         Robert J. Muldoon, Jr., BBO# 359480
                                         Courtney A. Clark, BBO# 651381
                                         SHERIN AND LODGEN, LLP
                                         101 Federal Street
                                         Boston, MA  02110

                                         William A. Streff Jr., P.C.
                                         Craig D. Leavell
                                         Michelle A.H. Francis
                                         Jamal M. Edwards
                                         Colleen M. Garlington
                                         Joanna Belle Gunderson
                                         KIRKLAND & ELLIS LLP
                                         200 East Randolph Drive
                                         Chicago, Illinois 60601
                                         (312) 861-2000 (phone)
                                         (312) 861-2200 (fax)

                                         *Attorneys for Defendant*
                                         *Harman International Industries, Incorporated*



## CERTIFICATE OF SERVICE

        I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on June 29, 2007.


                                         /s/ Courtney A. Clark
                                         Courtney A. Clark

00168179.DOC /