**-IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| |
|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY, |
| |
|      Plaintiff, |
| |
| v. |
| |
| HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, |
| |
|      Defendant. |

Civil Action No.: 05-10990 DPW

Magistrate Judge Judith G. Dein

**MIT AND HARMAN'S CONSOLIDATED
STATEMENT REGARDING CLAIM CONSTRUCTION**

Plaintiff, Massachusetts Institute of Technology ("MIT") and Defendant, Harman International Industries, Inc. ("Harman") submit this consolidated statement setting forth in one document the parties' agreed constructions for terms in claims 1, 42 and 45 of U.S. Patent No. 5,177,685 ("the '685 patent"), the parties' new dispute as to the previously agreed-upon construction of the structure of the "driver input means" element, and the parties' remaining dispute regarding the "map database" element of claim 1.

On June 7, 2007, this Court convened a *Markman* hearing to hear argument concerning the proper construction of certain claim terms of the '685 Patent. Prior to the hearing, the parties met and conferred and narrowed their dispute concerning the proper construction of the '685 Patent to six disputed claim terms which were briefed for the Court. At the start of the *Markman* Hearing, MIT agreed to Harman's construction of two previously disputed claim terms, the function of the "driver input means … for entering data into said computing apparatus, said data including a desired destination" and "functionally connected." The Court then requested that the parties submit the agreed constructions to the Court. These claim terms are set forth below in Section I.

Also per this Court's direction, the parties have met and conferred regarding the proper construction of the element of claim 1 which recites: "a map database…which distinguishes between physical and legal connectivity."  Despite the parties' significant effort, including multiple teleconferences and exchange of numerous drafts, the parties have been unable to reach agreement.  The parties have, however, narrowed that dispute.  Further, there is now a dispute over the *structure* of the "driver input means" element.  These disputed constructions are set forth by each party in separate statements (filed as Exhibits A and B to this consolidated statement.)

## I.  JOINT STATEMENT OF AGREED CONSTRUCTIONS

| Claim 1 | Agreed Constructions |
|---|---|
| *functionally connected* | connected in a way that facilitates transmission of information; this need not be a physical connection. |
| *physical connectivity* | how pieces of pavement connect or whether two segments touch. |
| *legal connectivity* | whether one can legally drive onto a physically connected piece of pavement or whether it is legal to travel from one segment to another. |

Dated: August 1, 2007

Massachusetts Institute of Technology,

*By its attorneys,*


*/s/ Steven M. Bauer*
Steven M. Bauer, BBO# 542531
Kimberly A. Mottley, BBO# 651190
Jacob K. Baron, BBO# 652568
John W. Pint, BBO# 660548
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
(617) 526-9600

Respectfully submitted,

Harman Int'l Industries, Inc.,

*By its attorneys*,


*/s/ Jamal M. Edwards*
Robert J. Muldoon, BBO# 359480
Courtney A. Clark, BBO# 651381
SHERIN AND LODGEN LLP
101 Federal Street
Boston, MA 02110
(617) 646-2000


William A. Streff Jr., P.C.
Craig D. Leavell
Michelle A. H. Francis
Jamal M. Edwards
Colleen Garlington
Joanna Belle Gunderson
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000 (phone)
(312) 861-2200 (fax)

## CERTIFICATE OF SERVICE

I certify that on August 1, 2007, I caused a copy of the forgoing document to be served upon counsel of record for Harman International Industries by electronic means using the Court's ECF system.

*/s/ John W. Pint*
John W. Pint

# EXHIBIT A

NEW YORK
LOS ANGELES
WASHINGTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS
SÃO PAULO

One International Place
Boston, MA  02110-2600
Telephone 617.526.9600
Fax 617.526.9899

# PROSKAUER ROSE LLP

**Steven M. Bauer**
Member of the Firm

Direct Dial 617.526.9700
sbauer@proskauer.com

August 1, 2007

<u>**VIA ELECTRONIC FILING**</u>

The Honorable Judith G. Dein
United States District Court
District of Massachusetts
1 Courthouse Way
Boston, MA 02110

> Re:    *Massachusetts Institute of Technology v. Harman Int'l Indus., Inc.*, No. 05-10990
> (D. Mass.)

Your Honor:

In accordance with the Court's direction, the parties have been actively meeting and conferring since the claim construction hearing regarding whether they could agree on any of the claim terms previously submitted to the Court for resolution.  It appears that the parties remain unable to stipulate to definitions for "map database" and "driver input means."

### **Driver Input Means**

As for the term "driver input means," the parties have complete agreement on what the term refers to.  As the parties reported at the *Markman* Hearing, they agree that the term "driver input means" refers to:

> "A computer keyboard, telephone keypad, speech input and their equivalents for
> entering data into the computing apparatus, the data including a desired destination."

(Hearing Tr. at p. 59, l. 21- p. 60, l. 21; MIT presentation slide 46).

Harman, however, now refuses to "stipulate" to this definition in the joint statement.  The parties *disagreement* is whether the court should go beyond this agreed definition.  Harman now wants the court to add the word "structural" to the "equivalents" portion of the definition, and to add a sentence to this definition relating to something that the patent does *not* disclose (a predictive spelling algorithm).  Harman presses for this language presumably because it hopes

PROSKAUER ROSE LLP

The Honorable Judith G. Dein
August 1, 2007
Page 2

such language could lead the jury to believe that Harman's use of undisclosed technology means it does not infringe the claim.

Whether or not Harman uses a predictive spelling algorithm, and whether or not a predictive spelling algorithm is expressly disclosed in the patent, are not relevant to the construction of a claim term. The issue at trial will be whether Harman's accused product has a "driver input means," *or its equivalents*. Section 112 of the Patent Statute (35. U.S.C. 112) says that "means-plus-function" clauses "shall be construed to cover the corresponding structure, material or acts described in the specification *and equivalents thereof*." "Equivalents" is the word the parties told the Court they agreed to at the Markman Hearing. Harman now wants the phrase "structural equivalents" inserted instead.

In addition, Harman seeks to add a sentence as to what the patent does not disclose. That sentence goes beyond the parties agreement, and is an attempt to narrow the definition to only disclosed embodiments. There will be no issue at trial as to whether Harman uses a "predictive spelling algorithm," or whether a "predictive spelling algorithm" is disclosed in the patent. The issue Harman presses here is whether the Court should discuss Harman's technology in the claim construction of the patent.

The dispute at trial likely will be whether the data entry system Harman uses (which partially includes a predictive spelling algorithm) is *equivalent* to the patent's broad disclosure of telephone and computer keypads and speech input. Clearly, Harman hopes to confuse the jury by leading it to believe that a court instruction as to what is *not* disclosed in the patent, if given as part of the definition of this claim term, is an instruction meant to suggest that predictive spelling algorithms are not covered by the claim element.

Harman argues in its responsive brief (submitted simultaneously herewith) that MIT is "reneging" on an earlier agreement to include this additional language in the definition. The record, however, could not be any clearer to the contrary. *Before* the *Markman* Hearing, the parties had tried to reach agreement on the meaning of this claim term, and failed. They had been working towards a "two part" definition including separate definitions for both "structure" and "function," but could not reach agreement on both parts.

*At* the *Markman* Hearing, *MIT proposed a single sentence to define the term* -- a sentence it took from Harman's brief, and the parties pointed the Court to a slide with the exact language to which the parties agreed (Attached as Exhibit 1). Their agreement, expressed openly in court, clearly was intended to supersede the prior discussions, *because the sentence included* <u>both</u> *function and structure*. It was a combined sentence, that fully addressed the claim term's meaning. Indeed, today, the parties *still* agree that the language they agreed to at the Hearing is appropriate.

PROSKAUER ROSE LLP

The Honorable Judith G. Dein
August 1, 2007
Page 3

Harman, however, now tells the court that by agreeing to this sentence, Harman was only agreeing to the "functional" part of a two part definition. If that was true, the claim construction and, thus the *jury* instruction, that Harman says it agreed to regarding this element is the following:

Function: A computer keyboard, telephone keypad, speech input and their equivalents for entering data into the computing apparatus, the data including a desired destination..(Language agreed to in open court)

Structure: a computer keyboard, a cellular telephone keypad, speech input and structural equivalents. A predictive spelling algorithm is not a disclosed structure for this element. (Language agreed to in earlier negotiations)

Harman's construction does not make English sense, let alone legal sense. The Court should adopt the language the parties agreed to.

**"Map Database . . . Which Distinguishes Between Physical and Legal Connectivity"**

Next, MIT has proposed that the claim term "map database…which distinguishes between physical and legal connectivity" should be defined as:

"a map database that contains information on both physical and legal connectivity."

(During the claim construction hearing, at Harman's request, MIT agreed to delete from its original proposed construction the clause "and arranged so that the computing apparatus can gain access to this information.")

Between the *Markman* Hearing and the filing of this letter, Harman's proposed definition has been a moving target. After a number of iterations, it appears that Harman *now* asks that the term refer to:

"a database containing map information that includes separate but equal representations for physical and legal connectivity, so as to allow the route finder to consider only legal paths; this excludes a map database in which legal connectivity is represented as a link attribute"

While Harman now apparently concedes 1) that the data only needs to be in a form that *allows* a route finder to consider only legal paths, rather than *requiring* it, and 2) that there is a *single* database, rather than separate databases, Harman's new definition now adds limitations focused on the specific embodiment of the patent. Thus, Harman's definition improperly adds that the data representations should be "equal;" and that the patent expressly excludes legal connectivity information "represented as a link attribute."

PROSKAUER ROSE LLP

The Honorable Judith G. Dein
August 1, 2007
Page 4

The claim term is "a map database…which *distinguishes* between physical and legal connectivity." There is *nothing* in the claim to require the data be in any specific formats. The claim simply requires that the data be distinguished -- that is, *separately* identifiable.

MIT's proposed construction -- "a map database that contains information on both physical and legal connectivity" -- requires, as the patent does, a map database that *contains* two types of connectivity *information*, namely information about both physical connectivity and legal connectivity. The two types of connectivity information need to be distinguishable, and the parties have agreed they have distinct definitions. The proposed language makes clear that both types of connectivity information must be contained in the map database.

The fact that the MIT inventors did it one way, does not mean that the claim should be narrowly construed to limit the patent to the way the inventors did it. What the patent teaches in this regard is that as long as the data in the database is of a *form* that allows a system to consider only legal paths, the database element is met. If the database provides "explicit representations of legal connectivity," it is irrelevant to the invention what the precise form of that data is. The question is whether the data is in a form that the route finder *can* consider only legal paths, if the product designer so chooses.

Indeed, the patent makes clear that it was not a requirement of the invention that a system consider only legal paths. For example, when describing the route finder in the patent, the inventors noted:

> While [one possible algorithm] the breadth-first search is operating, it [the route finder] maintains a list of *all* possible partial routes and systematically examines *every* possible path from the end of every partial route to compile a new list of partial routes.

('685 patent at 8:34-38) (italics added). The inventors clearly contemplated situations in which non-legal paths would be considered -- "[the route finder] maintains a list of *all* possible partial routes and systematically examines *every* possible path from the end of every partial route to compile a new list of partial routes."

Notably, a week after the *Markman* hearing in this case, Judge Young issued a *Markman* Order in a case addressing nearly the same arguments Harman had been making here -- the issue was whether a certain process was "required" or "allowed" by a claim term. *Sky Techs., LLC v. Ariba, Inc.*, No. 06-11889 WGY, -- F. Supp. 2d --, 2007 WL 1705641 at *14 (D. Mass. June 14, 2007) (A copy of this decision is attached as Exhibit 2).

In *Sky Techs*, the defendant, Ariba, argued that the claim element "analyzing terms" *required* that a negotiation engine be "capable of analyzing each and every term" on a proposal form. Ariba's argument apparently was based on a diagram in the patent specification and on

PROSKAUER ROSE LLP

The Honorable Judith G. Dein
August 1, 2007
Page 5

statements made in the prosecution history.  Judge Young declined to read in a limitation to *require* a capability which was merely allowed for by the patent specification and prosecution history, noting that where an inventor did not use an "idiosyncratic term," the plain meaning "ought to be controlling."  *("*This is not a situation where an inventor used an idiosyncratic term or where the plain meaning of the term is difficult to divine." *Id.* (internal citation omitted)).

In fact, in entering his Order, Judge Young discussed claim construction in quite some detail in the *Sky Techs.* case, and warned of the "lack of clarity associated with the prosecution history as intrinsic evidence" and of the danger of "using prosecution history to limit the interpretation of disputed terms without borrowing principles of prosecution history estoppel." *Sky Techs.*, 2007 WL 1705641 at *6-9.  He noted that for the court to impose limitations on a claim based on language in the patent prosecution or file history, there must be "deliberate and express statements or disavowals" in the prosecution history.  *Id.* at *15-16; *see also Amgen, Inc. v. F. Hoffman-LaRoche, Ltd.*, No. 05-12237-WGY, -- F. Supp. 2d --, 2007 WL 1893058 at *36 (D. Mass. July 3, 2007) (Young, J.) (refusing to import a limitation from the prosecution history without a "clear and unequivocal admission[] by the patent holder").

In the present case, the plain language of the claim does not "require" the exclusion of any particular form of data in the database.  If there is an "explicit representation of legal connectivity" in the database that  "allows" only legal paths to be considered, the accused product meets this element.  Nothing in the claim, the specification or the prosecution history, relating to the map database or route finder,  justify an express exclusion -- as Harman seeks -- of various embodiments of the technology.

MIT believes that its proposed construction, "a map database that contains information on both physical and legal connectivity," properly describes exactly what the patentees intended when they described the database (and its role) in the patent.

Very truly yours,

Steven M. Bauer

EXHIBIT 1

# "driver input means" – broadly described

| **MIT's Proposed Construction** |
| --- |
| A computer keyboard, telephone keypad, speech input, and their equivalents for entering data into the computing apparatus, the data including a desired destination. |

# EXHIBIT 2

**Westlaw.**

**H**

Sky Technologies, LLC v. Ariba, Inc.
D.Mass.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Massachusetts.
SKY TECHNOLOGIES, LLC, Plaintiff,

v.

ARIBA, INC., Defendant.
**Civil Action No. 06-11889-WGY.**

June 14, 2007.

**Background:** Patent owner brought action against competitor alleging infringement of patents involving software to facilitate negotiations over network. Competitor filed counterclaims seeking declaratory judgments of non-infringement, invalidity, and unenforceability.

**Holding:** The District Court, Young, J., held that term "automated negotiations engine for analyzing terms" did not include limitation that "all the terms" be capable of being negotiated.

Ordered accordingly.

**[1] Patents 291 ⬤⟲314(5)**

291 Patents
   291XII Infringement
     291XII(C) Suits in Equity
      291k314 Hearing
       291k314(5) k. Questions of Law or Fact. Most Cited Cases
Claim construction is matter of law reserved exclusively for the judge.

**[2] Patents 291 ⬤⟲159**

291 Patents
   291IX Construction and Operation of Letters Patent
     291IX(A) In General
      291k159 k. Extrinsic Evidence in General. Most Cited Cases

**Patents 291 ⬤⟲165(3)**

291 Patents
   291IX Construction and Operation of Letters Patent
     291IX(B) Limitation of Claims
      291k165 Operation and Effect of Claims in General
       291k165(3) k. Construction of Language of Claims in General. Most Cited Cases

**Patents 291 ⬤⟲167(1)**

291 Patents
   291IX Construction and Operation of Letters Patent
     291IX(B) Limitation of Claims
      291k167 Specifications, Drawings, and Models
       291k167(1) k. In General. Most Cited Cases

**Patents 291 ⬤⟲168(2.1)**

291 Patents
   291IX Construction and Operation of Letters Patent
     291IX(B) Limitation of Claims
      291k168 Proceedings in Patent Office in General
       291k168(2) Rejection and Amendment of Claims
        291k168(2.1) k. In General. Most Cited Cases
In divining meaning of patent term, court must give more weight, perhaps even dispositive weight, to intrinsic evidence, which includes inferences drawn from patent's full context, specifications, and prosecution history, rather than to extrinsic evidence.

**[3] Patents 291 ⬤⟲168(2.1)**

291 Patents
   291IX Construction and Operation of Letters Patent
     291IX(B) Limitation of Claims

291k168 Proceedings in Patent Office in General

    291k168(2) Rejection and Amendment of Claims

      291k168(2.1) k. In General. Most Cited Cases

Prosecution history estoppel is applicable only to attempts by patent holders to recapture, through doctrine of equivalents, disclaimed or disavowed claim scope.

**[4] Patents 291 ⌾168(2.1)**

291 Patents

    291IX Construction and Operation of Letters Patent

    291IX(B) Limitation of Claims

    291k168 Proceedings in Patent Office in General

      291k168(2) Rejection and Amendment of Claims

      291k168(2.1) k. In General. Most Cited Cases

Prosecution history estoppel is irrelevant to interpretation of patent claims.

**[5] Patents 291 ⌾161**

291 Patents

    291IX Construction and Operation of Letters Patent

    291IX(A) In General

    291k161 k. State of the Art. Most Cited Cases

Patent claim construction seeks to give disputed term its plain meaning as understood by person of ordinary skill in art in question.

**[6] Patents 291 ⌾168(2.1)**

291 Patents

    291IX Construction and Operation of Letters Patent

    291IX(B) Limitation of Claims

    291k168 Proceedings in Patent Office in General

      291k168(2) Rejection and Amendment of Claims

      291k168(2.1) k. In General. Most Cited Cases

Prosecution history of patent, where relevant, informs specification and may, where specification is silent on disputed term, contain statements that directly inform term's meaning.

**[7] Patents 291 ⌾168(2.1)**

291 Patents

    291IX Construction and Operation of Letters Patent

    291IX(B) Limitation of Claims

    291k168 Proceedings in Patent Office in General

      291k168(2) Rejection and Amendment of Claims

      291k168(2.1) k. In General. Most Cited Cases

In order to use prosecution history to construe patent, arguments or disavowals in prosecution history must be deliberate, unambiguous, and explicit.

**[8] Patents 291 ⌾168(2.1)**

291 Patents

    291IX Construction and Operation of Letters Patent

    291IX(B) Limitation of Claims

    291k168 Proceedings in Patent Office in General

      291k168(2) Rejection and Amendment of Claims

      291k168(2.1) k. In General. Most Cited Cases

Only where evidence in prosecution history does not contradict language of patent claims is it proper for court to consider such evidence in determining correct interpretation.

**[9] Patents 291 ⌾168(3)**

291 Patents

    291IX Construction and Operation of Letters Patent

    291IX(B) Limitation of Claims

    291k168 Proceedings in Patent Office in General

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

291k168(3) k. Rejection and Amendment of Claims of Particular Patents. Most Cited Cases

Term "automated negotiations engine for analyzing terms," as used in patents involving software to facilitate negotiations over network, did not include limitation that "all the terms" be capable of being negotiated, even though Patent and Trademark Office originally rejected relevant claims because of prior art's teaching on negotiation software using "free-style dialog" box, where prosecution history revealed no deliberate and express statements or disavowals supporting interpretation of claim language "term" to mean "all terms," but rather made clear that key distinguishing factor was "automated" nature of patent's analysis of terms in contrast to "matching" nature of prior art.

**Patents 291 ⚖➞328(2)**

291 Patents
   291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
     291k328 Patents Enumerated
      291k328(2) k. Original Utility. Most Cited Cases
6,141,653, 7,149,724, 7,162,458. Construed.

Aimee M. Robert, Brian D. Melton, Lexie G. White, Max L. Tribble, Stephen D. Susman, Susman Godfrey L.L.P., Houston, TX, George M. Schwab, Law Offices of George M. Schwab, Mill Valley, CA, William L. Prickett, Erik W. Weibust, Seyfarth Shaw, LLP, Boston, MA, for Plaintiff. Annette L. Hurst, L.J. Chris Martiniak, Michael P. Wickey, Heller Ehrman LLP, San Francisco, CA, Brian D. Kaider, Heller Ehrman LLP, Washington, DC, Elizabeth S. Pehrson, Heller Ehrman L.L.P., Menlo Park, CA, Geri L. Haight, H. Joseph Hameline, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA, Wei-Drin Lee, Heller Ehrman LLP, Anchorage, AK, for Defendant.

*MEMORANDUM AND ORDER*
YOUNG, District Judge.

## I. INTRODUCTION

*1 Sky Technologies, LLC ("Sky") brings this cause of action against defendant Ariba, Inc. ("Ariba") alleging infringement of U.S. Patent No. 6,141,653 ("the 653 patent"), U.S. Patent No. 7,149,724 ("the 724 patent"), and U.S. Patent No. 7,162,458 ("the 458 patent").[FN1] Am. Compl. [Doc. No. 37] ¶¶ 16-40. The patents at issue generally involve software that facilitate negotiations over a network.

Ariba denies any infringement and asserts six affirmative defenses. Answer [Doc. No. 38] ¶¶ 16-40, 59-70. In addition, Ariba seeks declaratory judgments of non-infringement, invalidity, and unenforceability. Id. ¶¶ 71-84.

The dispute over infringement has been narrowed to focus on claims 1, 4, 20, and 23 of the 653 patent; claims 98, 119, 163, and 170 of the 724 patent; and claims 1 and 16 of the 458 patent. The parties sought claim construction for certain disputed terms. This Court held a Markman hearing on May 16, 2007 to construe the disputed terms. See Markman Hearing Tr., May 16, 2007 [Doc. No. 63] ("Tr."); see generally Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed.Cir.1995) (en banc), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). At the Markman Hearing, this Court construed all of the disputed terms, but took under advisement the single issue of the role the prosecution history must play in claim construction. This Memorandum and Order sets forth this Court's approach to the use of prosecution history in claim construction and then applies that analytical framework to the claim term that was taken under advisement.

## II. DISCUSSION

### A. The Analytic Framework

[1] Claim construction is the first step in a two-step process to adjudge whether patent infringement occurred. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed.Cir.1998) (en banc). Claim construction is matter of law reserved exclusively for the judge. Markman, 52 F.3d at 979. The Federal Circuit, in Phillips v. AWH Corp., 415 F.3d 1303

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(Cite as: --- F.Supp.2d ----)**

(Fed.Cir.2005) (en banc), *cert. denied*, --- U.S. ----, 126 S.Ct. 1332, 164 L.Ed.2d 49 (Feb. 21, 2006), provided an interpretative framework to assist a judge in discharging that role.

[2] In *Phillips,* the Federal Circuit began with a recital of the basic principle of claim construction, that "the words of a claim 'are generally given their ordinary and customary meaning.' " *Id.* at 1312 (citing *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996)). The ordinary and customary meaning is one that would be understood as such by "a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. In divining that meaning, a court may give more weight, perhaps even dispositive weight, to intrinsic evidence-which includes inferences drawn from the full context of the patent, the specifications, and the prosecution history-rather than to extrinsic evidence. *See id.* at 1313-14, 1317-18.

*2 The question raised in this case is not the relative weight of the two categories of evidence, but the weight that a court must accord the prosecution history within the ambit of intrinsic evidence. The court in *Phillips* touched on this question. *See id.* at 1317. While labeling prosecution history intrinsic evidence, the court went on to state that "because the prosecution history represents an ongoing negotiation between the Patent and Trademark Office ('PTO') and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* The prosecution history is most useful to "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* The prosecution history, therefore, may assist a court in the claim construction step of a patent infringement case. *See id.; see also PODS, Inc. v. Porta Stor, Inc.,* 484 F.3d 1359, 1366-67 (Fed.Cir.2007); *Vitronics, Corp.,* 90 F.3d at 1582.

There are two discernable problems with using prosecution history in claim construction. The first is

addressed in the *Phillips* decision itself in its discussion of the lack of clarity associated with prosecution history as intrinsic evidence. *Phillips,* 415 F.3d at 1317; *see Inverness Med. Switz. GmbH v. Warner Lambert Co.,* 309 F.3d 1373, 1382 (Fed.Cir.2002) (refusing to limit claims based on ambiguous prosecution history). The broader associated problem is that arguments made during the prosecution history need to be viewed in the context of the full negotiation with the PTO. *See Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1582 (Fed.Cir.1995) (discussing prosecution history estoppel). Every time prior art is distinguished, that distinction must be considered and understood in conjunction with all other distinctions. *See id.* This context is often lost in the surgical arguments made by counsel during claim construction.

The second problem is perhaps more fundamental. Claim construction is but a preliminary step in adjudicating a patent infringement claim. *See Cybor Corp.,* 138 F.3d at 1454. The court's role at this preliminary stage is solely to define disputed claim terms. *See Southwall Techs., Inc.,* 54 F.3d at 1578. Prosecution history may assist at this stage by illuminating a special or different meaning used by an inventor for a disputed term. *Vitronics, Corp.,* 90 F.3d at 1582. In *Southwall Technologies, Inc.,* the Federal Circuit also noted that prosecution history "limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." 54 F.3d at 1576.

[3][4] While this language is oft recited as part of the prosecution history's role in claim construction, *see Phillips,* 415 F.3d at 1317 (citing *Southwall Techs., Inc.),* the limiting context of this preliminary inquiry is often ignored, *see Southwall Techs., Inc.,* 54 F.3d at 1578. Specifically, courts often erroneously apply the principles of prosecution history estoppel to claim construction. *See id.* The Federal Circuit, in *Southwall Technologies, Inc.,* recognized such a distinction and held prosecution history estoppel applicable only to attempts by patent holders to recapture, through the doctrine of equivalents, disclaimed or disavowed claim scope. *See id.* "The limit on the range of equivalents that

--- F.Supp.2d ----
--- F.Supp.2d ----, 2007 WL 1705641 (D.Mass.)

(Cite as: --- F.Supp.2d ----)

may be accorded a claim due to prosecution history estoppel is simply irrelevant to the interpretation of those claims." *Id.* To do otherwise would give a defendant two bites of the apple, first by using prosecution history to limit the interpretation of disputed terms-thereby increasing the chance of undermining a literal infringement claim-and then, second, using the same prosecution history to restrict the scope of the doctrine of equivalents.

**\*3** While academically this appears clear cut, the practical application of using prosecution history to limit the interpretation of disputed terms without borrowing principles of prosecution history estoppel proves difficult. The difficulty, however, is overcome by focusing on the key role of prosecution history in claim construction, which is to "inform the meaning of the claim language." *See Phillips,* 415 F.3d at 1317.

[5] Claim construction seeks to give a disputed term its plain meaning as understood by a person of ordinary skill in the art in question. *Id.* at 1312-13. If that meaning is readily apparent from the intrinsic record, then the disputed term may be considered to have only one reasonable interpretation. *See id.* at 1314.

[6] In many cases, however, multiple interpretations of a disputed term are reasonable due to an idiosyncratic use of language. *Id.* The specification remains the most persuasive and reliable evidence of which interpretation is the one understood by a person with ordinary skill in the art. *See id.* at 1315. The prosecution history, where relevant, informs the specification and may, where the specification is silent on a disputed term, contain statements that directly inform the meaning of the term. *See id.* at 1317.

This use of prosecution history differs from the use of prosecution history estoppel because the inquiry is limited to arguments or disavowals made during prosecution regarding the meaning of the disputed claim term. *See Southwall Techs., Inc.,* 54 F.3d at 1576. The court is thus not concerned with the state or scope of the prior art. *See Wang Labs., Inc. v.*

*Mitsubishi Elecs. America, Inc.,* 103 F.3d 1571, 1577-78 (Fed.Cir.1997); *Cole v. Kimberly-Clark Corp.,* 102 F.3d 524, 527 (Fed.Cir.1996) (demonstrating how factual questions often arise in determining how one of ordinary skill in the art would view the distinguishing of prior art). The court is also not concerned with how far the patent or claims as a whole may extend in terms of breadth of subject matter. A court is concerned only with the interpretation of a disputed term.

[7][8] To this end, the arguments or disavowals in the prosecution history must be deliberate, unambiguous, and explicit. *See Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452 (Fed.Cir.1985) (requiring such statements to be express representations). As the Federal Circuit said in *Schwing GmbH v. Putzmeister Aktiengesellschaft,* "[a]lthough prosecution history can be a useful tool for interpreting claim terms, it cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter." 305 F.3d 1318, 1324 (Fed.Cir.2002). Additionally, the statements or disavowals must directly address the disputed term. Only where these conditions are met, and where the evidence in the prosecution history does not contradict the language of the claims, is it proper for the court to consider such evidence in determining the correct interpretation. If the locus of the argument does not center on the disputed term, a court will face an ambiguity as to whether the statement or disclaimer affects the inventor's belief in the scope of the disputed term.

**\*4** For example, in *Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.,* 438 F.3d 1123 (Fed.Cir.2006), the Federal Circuit reviewed a district court's claim construction of the term "controlled release." *Id.* at 1135-36. Although the term had properly been construed as to not contain a limitation regarding dosage, the district court had looked to the prosecution history and found a deliberate surrender of drug formulations outside of a prescribed dosage range. *Id.* at 1136. The Federal Circuit reversed, holding that the disclaimer did not

directly address an interpretation of the term "controlled release," but merely distinguished the prior art on the "discovery" of the prescribed dosage range. *See id.* Thus, the disavowal did not unambiguously limit the disputed term. *See id.* The district court erroneously broadened its consideration of the prosecution history past its preliminary task of interpreting specific claim language. *See id. at 1136-37* ("Without any specific claim language to interpret, however, the trial court impermissibly imported a limitation into the claims.").

In another case, *PODS, Inc. v. Porta Stor, Inc.,* the Federal Circuit held that a district court erred in not construing the claim term "carrier frame" as requiring a four-sided or rectangular shape. *484 F.3d at 1366-67.* In making that determination, the court relied upon a clear disavowal of contrary interpretations when the patent holder stated during the prosecution history that "the [prior art] reference clearly lacks the teachings of the singular *rectangular-shaped* frame." *Id. at 1368.* In that situation, the argument in the prosecution history directly distinguished the prior art due to the term "carrier frame." *See id.* That is, the inventor clearly and deliberately limited the scope of the claim term by this disavowal. *See id.*

### B. Applying the Analytic Framework

Analysis in the instant case thus looks to the prosecution history only for explicit statements or disclaimers directed at the meaning of disputed terms. The Court applies this analysis to the one term [FN2] that remains under advisement on this ground after this Court's *Markman* hearing. Specifically, this Court must determine whether its construction of the term "automated negotiations engine for analyzing terms" [FN3] ought to be modified to include a limitation that "all the terms" capable of being negotiated as a result of the prosecution history. *See* Tr. 12:14-17.

[9] Ariba's argument focuses on an interpretation of the term "analyzing terms." Def. Opening Claim Construction Brief [Doc. No. 44] ("Def.Br.") at 16. As an initial matter, the claim construction of this

term likely calls for no further description. *See Phillips,* 415 F.3d at 1312-13. This is not a situation where an inventor used an idiosyncratic term or where the plain meaning of the term is difficult to divine. *See id.* Instead, the choice by the inventor, with the PTO examiner's presumed approval, to use this term without the limiting word "all" ought be controlling for this preliminary step. Ariba attempts to refute this plain meaning by referencing Figure 15b in the 653 patent. Tr. 19:12-18, 20:3-4. Figure 15b, however, presents a typical proposal form for a buyer, but does not speak to a *requirement* that the automated negotiations engine must be capable of analyzing each and every term on that form. *See* Def. Br., Ex. A at Fig. 15b & col. 25, ll. 41-59. Instead, the description in the specification dealing with "iterative multivariate negotiations" supports an interpretation that the proposal form *allows* for the inclusion of all terms (those not specified in fields going into the open text box), but the language does not require analysis of every term. *See id.* at col. 25, ll. 41-59.

*5 Still, Ariba makes the argument that Sky explicitly disavowed any interpretation that fails to include an automated system that analyzes each and every term of the negotiation. *See* Def. Br. at 16; Tr. 17:20-20:7. Specifically, Ariba argues that Sky distinguished the Silverman patent on this basis. Tr. 18:19-3, 20:3-4. The PTO originally rejected the relevant claims in the 653 patent because of the Silverman patent's teaching on a negotiation software using, for example, a "free-style dialog" box. Affidavit of Wei-Drin Lee [Doc. No. 45] ("Lee Aff."), Ex. 4 at 4. The PTO cited to Figure 4 in the Silverman patent, which looks similar to Figure 15b of the 653 patent. *See id.;* Lee Aff., Ex. 5 ("the Silverman patent") at Fig.4.

Sky amended the claims in the 653 patent to distinguish the Silverman patent by adding the disputed claim language. *See* Lee Aff., Ex. 6 at 2, 33-34; Lee Aff., Ex. 7 at 16-17. The prosecution history reveals, however, no deliberate and express statements or disavowals that supports an interpretation of the claim language "term" to mean "all terms." *See* Lee Aff., Ex. 6 at 2, 33-34; Lee Aff., Ex. 7 at

16-17. Instead, the prosecution history makes clear that the key distinguishing factor was the "automated" nature of the Sky patent's analysis of terms in contrast to the "matching" nature of the Silverman's process. *See* Lee Aff., Ex. 6 at 2, 33-34; Lee Aff., Ex. 7 at 16-17. As a result, the prosecution history fails to counter the plain meaning of the claim language, and this Court's *Markman* hearing claim construction will stand.

### III. CLAIM CONSTRUCTION ORDER

To assist the parties going forward, and with express appreciation to Judge Folsom who has so skillfully ploughed this ground before, Claim Construction Order, *Sky Technologies, Inc. v. IBM, Inc.,* No. 03-00454 (E.D.Tex.) [Doc. No. 194, filed on Sept. 7, 2005], this Court summarizes the claim construction agreed upon or ordered at this Court's May 16, 2007 *Markman* hearing.

#### A. "multivariate negotiation system"

As to this term, this Court ordered the following claim construction:
A system of hardware and software that enables participants to perform multiple rounds of bargaining over multiple terms. The multiple rounds of bargaining (i.e., the "negotiation") must allow for an offer and multiple counteroffers between two participants where each round is related to prior rounds and is more than a simple bid submission system.

Tr. 26:11-23; 31:10-17.

#### B. "automated negotiations engine for analyzing terms"

As to this term, this Court ordered the following claim construction, which remains unchanged following this Court's analysis of the prosecution history:
Special purpose software that performs the functions necessary to implement multiple rounds of bargaining which allows for an offer and multiple counteroffers between two participants where each round is related to prior rounds without human in-

tervention.

**\*6** Tr. 14:20-15:4; 19:4-10.

#### C. "analysis of terms comprising understanding the purpose of the terms, formatting the terms according to the purpose, and placing them into user supplied context for use by a user"

As to this term, the parties agreed to the following claim construction:
Determining the relationship of terms entered by a user to the negotiation and classifying them accordingly, the automated negotiation engine understands to which category of terms a term entered by a user correlates, the automated negotiations engine arranges the terms according to their category as determined by the automated negotiations engine, the automated negotiations engine puts the formatted terms into a structure defined by or acceptable to the user.

Tr. 23:6-16; 25:23-24.

#### D. "during iterative processing"

As to this term, this Court ordered the following claim construction:
The claimed steps can be repeatedly performed by the automated negotiations engine while performing multiple rounds of bargaining involving an offer and multiple counteroffers between two participants where each round is related to prior rounds.

Tr. 26:24-27:8.

#### E. "recognizing any changes in the terms"

As to this term, the parties agreed to the following claim construction:
The automated negotiations engine perceives any changes one participant makes to the content or substance of the terms proposed by another participant and can prompt requests or actions in response to such changes if appropriate.

Tr. 5:23-6:10; 41:3-42:7.

#### F. "indicating any changes in the terms" /

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**"indicating changes in the terms by storing changed terms in the storage space until a set of terms is acted upon in a final manner by the deciding entity"**

As to this term, the parties agreed to the following claim construction:
The automated negotiations engine automatically points out to one participant what the changes are, if any, that have been made by another participant.

Tr. 32:6-33:6.

**G. "sponsorship software which enables the creation of a sponsored community with prescribed rules and procedures for participants"**

As to this term, this Court ordered the following claim construction:
Software that permits rules and procedures to be created by a user or a third-party sponsor, which are applicable to a group of participants and provides a facility to conduct negotiations.

Tr. 43:15-18; 44:7-45:9.

**H. "sponsored community with prescribed rules and procedures for participants"**

As to this term, this Court ordered the following claim construction:
A group defined by a user or a third-party sponsor, having a facility to conduct negotiations according to prescribed rules and procedures.

Tr. 45:16-20; 48:22-24.

**I. "process mining function for evaluating a process related to such a negotiation" / "evaluating a process related to such a negotiation by using a process mining function"**

**\*7** As to this term, the parties agreed to the following claim construction:
Software for extracting useful information from data collected about a negotiation.

Tr. 8:20-24.

**J. "automated system of record"**

As to this term, the parties agreed to the following claim construction:
A system that automatically stores each set of terms proposed at each iteration.

Tr. 9:1-4.

**K. "dynamic manager for transforming rules for governing negotiations into an active template"**

As to this term, the parties agreed to the following claim construction:
Software that automatically creates an active template whose fields are based on the set of rules that govern the negotiation.

Tr. 9:6-9.

**L. "active template containing terms for use during such a negotiation"**

As to this term, this Court ordered the following claim construction:
A set of predefined data fields for terms to be negotiated using the automated negotiations engine that is configured so that certain fields can be used automatically by other programs.

Tr. 49:5-11; 51:23-52:3.

SO ORDERED.

FN1. In its complaint, Sky alleged infringement of two additional patents-U.S. Patent No. 6,336,105 ("the 105 patent"), U.S. Patent No. 6,338,050 ("the 050 patent")-but chose not to pursue those claims. Am. Compl. ¶¶ 21-30.

FN2. Originally, the term "recognizing any changes in the terms" was also taken under advisement in light of the argument that the prosecution history added the limitation of "prompting." Tr. 34:1-16. The disputed issue was, however, subsequently resolved at the hearing by agreement of the parties. Id. at 41:3-42:8.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2007 WL 1705641 (D.Mass.)
**(Cite as: --- F.Supp.2d ----)**

> FN3. This Court construed the disputed term to be: "Special purpose software that performs the functions necessary to implement multiple rounds of bargaining which allows for an offer and multiple counteroffers between two participants where each round is related to prior rounds without human intervention." Tr. 14:20-15:4; 19:4-10.

D.Mass.,2007.

Sky Technologies, LLC v. Ariba, Inc.

--- F.Supp.2d ----, 2007 WL 1705641 (D.Mass.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois  60601

Jamal M. Edwards
To Call Writer Directly:
(312) 861-3143
jedwards@kirkland.com

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200
Dir. Fax: (312) 861-2200

August 1, 2007

**Via Electronic Filing**

The Honorable Judith G. Dein
United States District Court
District of Massachusetts
1 Courthouse Way
Boston, MA 02210

Re:    *MIT v. Harman International Industries, Inc.*, No. 05-10990 DPW

Your Honor,

As per this Court's direction at the June 7, 2007 *Markman* hearing, the parties have met and conferred regarding the proper construction of the element of claim 1 which recites: "a map database…which distinguishes between physical and legal connectivity."  Despite the parties' significant effort, including multiple teleconferences and exchange of numerous drafts, the parties have been unable to reach agreement.

Further, MIT has now created an additional issue for this Court.  Contrary to the parties' March 2007 agreements (and subsequent briefing before this Court), MIT now disputes the ***structure*** of the "driver input means" element.[1]  At the *Markman* hearing MIT agreed to accept Harman's construction of the function of the "driver input means" element with a one-word change ("said" to "the").  MIT memorialized this agreement in its oral argument at the *Markman* hearing. (Dkt. 151, Hearing Transcript at 59-60  ("we've spoken with Mr. Streff and we are in agreement with this language.  The only difference between this and their language was that we use the word 'the' instead of 'said.'")).  MIT now claims that this agreement included a new

---

[1]    The parties had previously reached agreement on the structure of this means-plus-function element. *See* 3/19/07 Gunderson letter to Pint identifying the agreed construction, Dkt. 127, Ex. E to Harman's Opening Brief on Claim Construction (attached); Dkt. 128, MIT's Opening Brief at p. 23, identifying the dispute as "function" performed by "driver input means"; Dkt. 127, Harman's Opening Brief at 9-10, identifying the dispute as one of the function of the driver input means; Dkt. 137, MIT Response Brief at p. 13, identifying the dispute as "The ***Function*** of the "Driver Input Means;" Dkt. 138, Harman's Response Brief at p. 8, noting that the parties "agree on the corresponding structures disclosed by the specification for the 'driver input means'" (emphasis removed).

August 1, 2007
Page 2

construction of the previously agreed-upon disclosed "driver input means" ***structure***.  This is simply untrue.

Because the parties were unable to reach agreement as to the "map database" element, and further because MIT now seeks to introduce a new construction of the ***structure*** of the "driver input means" element, each party proffers herein its own position statement.  This letter is intended to advise the Court as to Harman's positions in this regard.

## I.     The Structure of the "Driver Input Means" Element

As memorialized in correspondence dated March 19, 2007 (*see* Dkt 127, Ex. E to Harman's Opening Brief on Claim Construction) and the briefing currently before the Court, the parties had previously reached an agreement as to the disclosed ***structure*** of the means-plus-function[2] "driver input means" element in March, 2007, long before the *Markman* briefing and the June 7, 2007 hearing, namely: "[t]he parties further agree that the disclosed structures for the driver input means include: a computer keyboard, a cellular telephone keypad, speech input and structural equivalents thereof.  The parties further agree that a predictive spelling algorithm is not a disclosed structure for this element."  (*Id.*)  This agreement as to the structure acknowledged that the specification disclosed a computer keyboard, a cellular telephone keypad and speech input but did not disclose  "a predictive spelling algorithm."

On the morning of June 7, 2007, minutes before oral argument on the disputed function of this element, MIT approached Harman and stated that it did not intend to argue the ***function*** portion of this element and would agree to Harman's construction with only one change - the replacement of the word "said" with the word "the."  Mr. Bauer memorialized this agreement at the hearing: "***The only difference between this and their language was that we use the word 'the' instead of 'said.'***"  (*See* Dkt 151, Hearing Transcript at 59-60 (emphasis added)).  At the start of the hearing, the only dispute concerned the ***function*** of this element, and there was no reason for the parties to agree to a new construction of the disclosed structure at that time.  Nor was Harman aware that by agreeing to its construction for the ***function*** of the "driver input means," MIT intended to change the parties agreement with regard to the ***structure***.

In fact, throughout the meet and confer process that followed the June 7, 2007 hearing, the parties' discussions continued to comport with the parties' March 2007 agreement.  It was not until July 19, 2007 that MIT informed Harman of its change in position.  In doing so, MIT

---

[2]     The Patent Act provides that a means-plus-function claim "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  35 U.S.C. § 112 ¶ 6.  If a particular structure is not "described in the specification," the claim cannot be "construed to cover" it.

August 1, 2007
Page 3

creates a new dispute by interposing a new construction, which combines the structure and function, and contradicts the parties' prior agreement, ostensibly in an effort to broaden MIT's anticipated infringement argument.

Harman objects to MIT's attempt to create a new dispute concerning the **structure** of the "driver input means" and mischaracterizing the terms of the June 7, 2007 agreement as to the proper construction of the **function** of this element. Harman also objects to MIT's attempt to introduce a new claim construction issue in this process as contrary to the Court's instruction at the hearing that no new issues be introduced.[3] The disclosed structure for the "driver input means" is that previously agreed by the parties, acknowledging that a "predictive spelling algorithm" is not disclosed in the specification. MIT's raising a new dispute at this late date, particularly as to something that had been settled for so long, is both inappropriate and unduly prejudicial.

## II.    "A Map Database … Which Distinguishes Between Physical and Legal Connectivity"

MIT framed the issue here, during the June 7th *Markman* hearing, as "what does it mean to 'distinguish between physical and legal connectivity?'" (Dkt 151, Hearing Transcript at 20:7-8). Harman briefed and orally argued that "distinguishes between" means exactly what the patentee said it does in the specification and prosecution history:

> a database containing map information that includes separate but equal databases for representing each physical and legal connectivity, thereby causing the route-finder to consider only legal paths; this excludes a map database in which legal connectivity is represented as a link attribute

(*See* Dkt. 127 at 6, Harman's Opening Brief on Claim Construction). MIT criticized that construction at the *Markman* hearing, claiming that Harman (1) "require[s] two separate databases," (Dkt 151, Hearing Transcript at 39:1-3), i.e., "separate but equal databases" when the patentee said "separate but equal representations" (*Id*. at 44:23-45:3); and (2) "require[s]" instead of "**allows** the route-finder to consider only legal paths." (*Id*. at 40:23-41:1).

---

[3]    At the close of the June 7, 2007 hearing, the Court requested that the parties submit in correspondence the language agreed to on the two previously disputed issues (function of the driver input means and "functionally connected"). In response to Mr. Bauer's suggestion that the parties submit other agreed terms in a stipulated order, the Court directed this was acceptable "[a]s long as that doesn't bring in other issues." (Dkt 151, Hearing Transcript at p. 165).

August 1, 2007
Page 4


So, when Harman initiated the meet and confer process on June 13, 2007 per this Court's instruction, Harman offered an alternate proposed construction that specifically addressed the arguments MIT made at the *Markman* hearing.  MIT would not agree to that construction.

In the spirit of compromise, Harman then presented another alternate proposed construction even more directly aimed at addressing the issues MIT raised at the hearing:

> a database containing map information that includes separate but equal ~~databases~~ **representations** for ~~representing each~~ physical and legal connectivity, ~~**thereby causing**~~ **so as to allow** the route-finder to consider only legal paths; this excludes a map database in which legal connectivity is represented as a link attribute

(*See* 6/13/07 Edwards Letter to Baron (Attached)).  Still MIT would not agree to this construction either.

Harman's construction aligns with MIT's latest arguments that the map data must be "in a form that the route finder can consider only legal paths."  *See* Exhibit A (MIT's position paper).  MIT argues that "the patent teaches" a map database where "the data in the database is of a form that allows a system to consider only legal paths."  *See id.*

Harman's construction even comports with MIT's new argument, first raised during the parties' post-hearing meet and confer, regarding the breadth-first search described in the specification.  The part of the specification MIT references is (1) part of a discussion of a preferred embodiment; (2) used to ***distinguish*** the breadth-first search from the best-first search actually used by the preferred embodiment.  It is consistent with Harman's construction because when the claimed invention considers only *legal* routes, the "all possible paths" to which MIT points would, in fact, consist only of all possible *legal* paths.  (*See* '685 Patent specification at 8:29-48).

Most importantly, Harman's construction is verbatim what MIT claimed distinguished its map database from the prior art:

| Harman's Construction | What MIT Disclaimed |
|---|---|
| a database containing map information that includes | |
| separate but equal representations for physical and legal connectivity, | "The Back Seat Driver appears to be ***unique*** in maintaining **separate but equal representations for physical and legal topology**." IDS at 9 (emphasis added). |

August 1, 2007
Page 5

| | |
|---|---|
| so as to allow the route-finder to consider only legal paths; | An "explicit representation of legal connectivity…**allows the route finder to consider only legal paths**. To the inventor's knowledge, ***this has not been included in any other navigation system***." '685 Patent at 5:8-14 (emphasis added). |
| this excludes a map database in which legal connectivity is represented as a link attribute." | The Back Seat Driver map database differs from prior art map databases that "have some questionable design decisions on the representation of legal restrictions" since they **"represent[] legal topology…as a link attribute**…[where] the street network represents only physical topology, with the assumption that legal topology will be equivalent to the physical topology unless specially indicated." IDS at 9 (emphasis added). |

But MIT's construction—"a map database that contains information on both physical and legal connectivity"—includes within its scope the very prior art databases it disclaimed.

This Court requested that the parties "briefly address whether there is a remaining issue" as to the map database element (Dkt 151, Hearing Transcript at 165), on July 25, 2007. Yet, MIT presents additional case law and legal argument to which Harman must respond. *Sky Tech., LLC v. Ariba, Inc.*, No. 06-11889-WGY, 2007 WL 1705641 (D. Mass. June 14, 2007) (Young, D.J.); *Amgen, Inc. v. F. Hoffman-La Roche Ltd.*, No. 05-12237-WGY, 2007 WL 1893058 (D. Mass. July 3, 2007) (Young, D.J.). The cases MIT now cites add no new legal principles, address no new issues of fact relevant to this dispute, and are not even binding on this Court. *See Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 101 (1st Cir. 2002) ("District Court decisions do not establish the law of the circuit, nor, indeed, do they even establish the law of the district." (quoting *In re Executive Office of President*, 215 F.3d 20, 24 (D.C. Cir.2000)). As such, MIT's supplemental brief without leave of court is unnecessary and improper. *See* Local Rule 7.1(B)(3) ("All other papers . . . whether in the form of a reply brief or otherwise, may be submitted only with leave of the court."); *see also Mullin v. Raytheon Co.*, 171 F.3d 710, 710 (1st Cir. 1999) ("[T]he appellant did not advance this contention below. He did not advance it in his appellate briefs. He did not advance it at oral argument. He did not request leave, after oral argument, to file a supplemental brief. The point is, therefore, foreclosed.")

Notwithstanding this, Harman's proposed construction is consistent with these cases. The *Sky* Court explained that where the inventors had made an "argument in the prosecution

August 1, 2007
Page 6

history directly distinguishing the prior art" the inventor had "clearly and deliberately limited the scope of the claim term by this disavowal." *Sky*, 2007 WL 1705641 at *4 (analyzing *PODS, Inc. v. Porta Stor Inc.*, 484 F.3d 1359, 1367-68 (Fed. Cir. 2007)). There the statement from the prosecution history was "the [prior art] reference clearly lacks the teachings of the singular rectangular-shaped frame" from which the court read "rectangular-shaped frame" into the claim language. *Id.* MIT's distinctions over the prior art should lead to the same claim construction result here.

The parties therefore submit this dispute to the Court for its consideration in ruling on the claim construction issues before it.

Sincerely,

Jamal M. Edwards

# Dkt. 127, Exhibit E

# 03/19/2007 Letter Gunderson to Pint

# EXHIBIT E

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Joanna Belle Gunderson
To Call Writer Directly:
312 469-7024
jgunderson@kirkland.com

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200
Dir. Fax: 312 660-0613

March 19, 2007

Via Electronic Mail

John W. Pint
Proskauer Rose LLP
One International Place
Boston, MA 02110-2600

Re:    *MIT v. Harman Int'l Indus., Inc.*, Case No. 05-10990-DPW

Dear John,

I am writing to summarize our conversations with respect to claim construction, so as to make briefing these issues as clear as possible. I am glad that the parties have been able to successfully narrow the number of terms that will need to be submitted to the Court for construction. As we have not continued to circulate revised constructions in writing, I have done my best to present the parties' present construction below. Due to the impending deadline for opening *Markman* briefs, at the very latest please let me know of any issues with the following by 5PM CST tomorrow, Tuesday, March 20, 2007.

MIT agrees to only pursue claims 1, 42, and 45. MIT will not assert any other claims at trial. In addition, MIT agrees to drop all claims against the Harley Davidson product. MIT will not assert infringement by the Harley Davidson product with respect to any claims of the patent.

The parties further agree to the constructions of the following terms, as such, these terms also do not need to be submitted to the Court for construction:

| Term | Agreed Construction |
|------|---------------------|
| **CLAIM 1** | |
| Driver Input Means -- Structure | The parties agree that this is a § 112 ¶ 6 means-plus-function element. The parties further agree that the disclosed structures for the driver input means include: a computer keyboard, a cellular telephone keypad, speech input and structural equivalents thereof. The parties further agree that a predictive spelling |

John W. Pint
March 19, 2007
Page 2

| | |
|---|---|
| | algorithm is not a disclosed structure for this element. |
| Physical Connectivity | "how pieces of pavement connect or whether two segments touch." |
| Legal Connectivity | "whether one can legally drive onto a physically connected piece of pavement or whether it is legal to travel from one segment to another." |

The parties dispute the construction of the following terms and intend to submit these terms to the Court for construction:

| Term | Harman's Proposed Construction | MIT's Proposed Construction |
|---|---|---|
| **CLAIM 1** | | |
| Driver Input Means -- Function | "entering data into said computing apparatus, said data including a desired destination." | "entering data." |
| Functionally Connected | "connected in a way that facilitates transmission of information; this need not be a physical connection." | "connected in a way that facilitates transmission of information where said transmission of information may be bi-directional between system components; this need not be a direct physical connection." |
| Consulting Said Map Database | "for the purpose of seeking or requesting information from said map database." | "comparing the current position to the data in the map database." |
| "Which Distinguished | "a database containing map | "a map database that contains |

John W. Pint
March 19, 2007
Page 3

| Between Physical and Legal Connectivity." | information that includes separate but equal databases for representing each physical and legal connectivity, thereby causing the route-finder to consider only legal paths; this excludes a map database in which legal connectivity is represented as a link attribute." | information on both physical connectivity and legal connectivity and arranged so that the computing apparatus can gain access to this information." |
|---|---|---|
| Discourse/Discourse Generator | Harman intends to only ask the Court to construe the term: "discourse" as: "instructions and other messages." Instructions and Other Messages include those items described in the specification as such. The parties agree that silence is not considered to be either an "instruction" or an "other message." | MIT intends to ask the Court to construe the terms "discourse generator" as: "discourse according to a discourse model" where "discourse model" means "a way to provide information needed by a conversation participant in context to enable the conversation participant to determine why an utterance was provided and what the utterance means." |
| Speech Generator | "a text-to-speech synthesizer or similar device that receives input in the form of generated discourse (text) and creates speech based thereon." | "a system capable of receiving output from the discourse generator and converting the output into an electronic signal which will generate speech in the voice apparatus." |
| **CLAIM 45** | | |
| Long Description | Plain and Ordinary Meaning | "a long description includes other facts about the action, an expression indicating the distance or time until the act is to be performed, and possibly information about the next act." |

John W. Pint
March 19, 2007
Page 4

| Short Description | Plain and Ordinary Meaning | A "short description" is the same as a "brief description" and is typically an imperative and includes no more information than is necessary to complete the turn. In addition, the "short description" occurs at "the latest time that still permits the driver to act." |
|---|---|---|
| At The Time The Act Is To Be Performed | Plain and Ordinary Meaning | MIT intends to propose a constructions which contemplates user reaction time and gives the instruction some amount of time before the act is to be performed. |

The parties have agreed that Claim 42 does not need to be construed and should be given its plain and ordinary meaning. The parties have further agreed that the only terms which require construction are those listed above. All other terms in any claims of the patent in suit do not require construction and are to be given their plain and ordinary meaning.

Again, due to the impending deadline for opening *Markman* briefs, please let me know of any issues MIT has with the above by 5PM CST tomorrow Tuesday, March 20, 2007.

Best Regards,

Joanna Belle Gunderson

06/13/2007 Letter
Edwards to Baron

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Jamal M. Edwards
To Call Writer Directly:
312.861.3143
jedwards@kirkland.com

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200
Dir. Fax: 312.660.0616

June 13, 2007

**BY ELECTRONIC MAIL**

Jacob K. Baron, Esq.
Proskauer Rose LLP
One International Place
Boston, MA 02110-2600

Re:    *MIT v. Harman*, Case No. 05-10990-DPW

Dear Jake:

During the June 7th Markman hearing, the Court instructed us to meet and confer regarding the "map database which distinguishes between physical and legal connectivity" limitation of claim 1 of the '685 patent. I am writing to start those discussions.

Based on MIT's arguments at the hearing, we understand MIT contends that the "distinguishes between" claim term means that the "map database": (i) "contains information on both physical connectivity and legal connectivity," and (ii) "allows the route finder to consider only legal paths."

Please let us know if we correctly understand MIT's position. Also, please advise regarding MIT's availability to discuss this issue.

Best regards,

Jamal M. Edwards

cc:    Robert J. Muldoon, Esq.

Hong Kong        London        Los Angeles        Munich        New York        San Francisco        Washington, D.C.