## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-10990-DPW |
| HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, | ) ) ) | |
| Defendant. | ) ) | |

**HARMAN'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT THAT CLAIMS 1, 42 AND 45 OF THE '685 PATENT
ARE INVALID UNDER 35 U.S.C. § 102(B) DUE TO PUBLIC USE
AND
HARMAN'S OPPOSITION TO MIT'S CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT THAT CLAIMS 1, 42 AND 45 OF THE '685 PATENT ARE
NOT INVALID UNDER 35 U.S.C. § 102(b)**

## Table of Contents

**Page**

Table of Authorities .............................................................................. ii

I.  MIT's Admission of Reduction To Practice Is Fatal To Its Claim of
    Experimentation. ........................................................................... 3

II. MIT Cannot Escape The § 102(b) Bar With Its Factually Unsupported And
    Legally Insufficient Claim That The Inventors Retained Complete Control. .... 5
    A.  The Use Of The Back Seat Driver By 50 Members Of The Public,
        Including GM Employees, Invokes § 102(b). ................................... 8
    B.  MIT Set Forth No Specific Facts Showing Confidentiality Obligations For
        The 50 Members Of The Public, Including GM Employees, Who Used
        The Back Seat Driver. ........................................................... 9
    C.  The Commercial Purpose Of The NEC And GM Employees' Pre-Critical
        Date Uses Separately Satisfies § 102(b). ....................................11

III. MIT Cannot Escape The § 102(b) Bar With Its Legally Insufficient Claims That
     The Invention Was Not Disclosed When Known To Work Durably. ...............12

IV. The Davis Thesis Is § 102 Art That Invalidates The '685 Patent. ...............15

V.  Conclusion ...................................................................................20

## Table of Authorities

**Page(s)**

### Cases

*American Ceramicraft, Inc. v. Eisenbraun Reiss Inc.,*
1993 WL 498863 (D.N.J. June 16, 1993) ................................................................ 6

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................................................. 20

*Baker Oil Tools, Inc. v. Geo Vann, Inc.,*
828 F.2d 1558 (Fed. Cir. 1987),........................................................................... 15

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,*
731 F.2d 831 (Fed. Cir. 1984)............................................................................... 12

*Baxter Int'l, Inc. v. COBE Labs., Inc.,*
88 F.3d 1054 (Fed. Cir. 1996)................................................................................. 8

*C.R. Bard, Inc. v. M3 Sys., Inc.,*
157 F.3d 1340 (Fed. Cir. 1998)............................................................................... 7

*Constant v. Advanced Micro-Devices, Inc.,*
848 F.2d 1560 (Fed. Cir. 1988)............................................................................. 19

*Continental Plastic Containers v. Owens Brockway Plastic Prods., Inc.,*
141 F.3d 1073 (Fed. Cir. 1998)............................................................................. 15

*Egbert v. Lippman,*
104 U.S. 333 (1881) .............................................................................. 6, 16, 23

*Elan Corp., PLC v. Andrx Pharm., Inc.,*
366 F.3d 1336 (Fed. Cir. 2004)....................................................................... 13, 14

*Electromotive Div. of Gen. Motors Corp. v. Transp. Sys. Div. of Gen. Elec. Co.,*
417 F.3d 1203 (Fed. Cir. 2005)............................................................................ 6, 7

*Hall v. Macneale,*
107 U.S. 90 (1883) ................................................................................................. 6

*In re Cronyn,*
890 F.2d 1158 (Fed. Cir. 1989)............................................................................. 20

*In re Cygnus Telecommunications Tech.., LLC Patent Litigation,*
481 F. Supp. 2d 1029 (N.D. Cal. 2007) ................................................................ 4

ii

*In re Epstein,*
    32 F.3d 1559 (Fed. Cir. 1994)................................................................ 9

*In re Klopfenstein,*
    380 F.3d 1345 (Fed. Cir. 2004)....................................... 18, 19, 22, 23

*In re Smith,*
    714 F.2d 1127 (Fed. Cir. 1983)............................................................ 5

*Invitrogen Corp. v. Biocrest Mfg., L.P.,*
    424 F.3d 1374 (Fed. Cir. 2005).................................................. passim

*Kinzenbaw v. Deere & Co.,*
    741 F.2d 383 (Fed. Cir. 1984)..................................................... 12, 13

*Li Second Family Ltd. P'ship v. Toshiba Corp.,*
    231 F.3d 1373 (Fed. Cir. 2000)......................................................... 17

*Lough v. Brunswick Corp.,*
    86 F.3d 1113 (Fed. Cir. 1996)............................................. 6, 8, 9, 16

*Mannville Sales Corp. v. Paramount Sys., Inc.,*
    917 F.2d 544 (Fed. Cir. 1990)...................................................... 15, 16

*Mass. Inst. Tech. v. AB Fortia,*
    774 F.2d 1104 (Fed. Cir. 1985)................................................ 3, 20, 21

*Moleculon Research Corp. v. CBS, Inc.,*
    793 F.2d 1261 (Fed. Cir. 1986).......................................................... 7, 9

*Netscape Commc'ns. Corp. v. Konrad,*
    295 F.3d 1315 (Fed. Cir. 2002)...................................................... 10, 11

*New Railhead Mfg. v. Vermeer Mfg. Co.,*
    298 F.3d 1290 (Fed. Cir. 2002)..................................................... passim

*NTP, Inc. v. Research in Motion, Ltd.,*
    418 F.3d 1282 (Fed. Cir. 2005)........................................................... 17

*Pfaff v. Wells Elecs., Inc.,*
    525 U.S. 55 (1998)................................................................ 1, 4, 7, 15

*Provident Life and Accident Ins. Co. v. Goel,*
    274 F.3d 984, 1000 (5th Cir. 2001) ..................................................... 2

*Roger Edwards, LLC v. Fiddes & Sons, Ltd.,*
    387 F.3d 90 (1st Cir. 2004).............................................................. 12

iii

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
    215 F.3d 1246 (Fed. Cir. 2000) ............................................................................ 2

*Taskett v. Dentlinger*,
    344 F.3d 1337 (Fed. Cir. 2003) ............................................................................ 5

**Statutes**

35 U.S.C. § 102(b) ............................................................................................ passim

**Other Authorities**

D. Chisum, Patents (1983) ........................................................................................ 13

**Rules**

Fed. R. Civ. P. 56(e) ........................................................................................... 2, 12

iv

The undisputed evidence is that *after* MIT reduced to practice claims 1, 42, and 45 of the patent-in-suit and *before* the critical date, 50 members of the public, including General Motors ("GM") employees, used the Back Seat Driver for its intended purpose on the public streets of Boston, without any confidentiality obligation. Those facts, as a matter of law, establish that "before the critical date, the invention [was] in public use and ready for patenting," thus barring claims 1, 42, and 45 under 35 U.S.C. § 102(b). *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005).

MIT attempts to sidestep that inescapable legal conclusion with cases applying the totality of the circumstances test and its own arguments that the pre-critical-date uses in and by the public were permissible experimentation. However, the Supreme Court in 1998 eliminated the totality of the circumstances test used in the cases MIT trumpets. *See Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 66-67 (1998).

More importantly, MIT's entire experimentation argument fails because MIT admits claims 1, 42, and 45 were already reduced to practice by the time the pre-critical-date uses took place. Reduction to practice means, as a matter of law, that those claims were ready for patenting and that MIT "ha[d] an embodiment that meets every limitation [of the claims] and operates for its intended purpose." *Pfaff*, 525 U.S. at 67. In other words, claims 1, 42, and 45 were ready for patenting *and* embodied in the Back Seat Driver that the 50 members of the public, including GM employees, used before the critical date on public streets in and around Boston. Under both the public use and ready for patenting prongs of § 102(b), "experimental use, which means perfecting or completing an invention to the point of determining that it will work for its intended purpose, ends with an actual reduction to practice." *New Railhead Mfg. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1297-98 (Fed. Cir. 2002) (internal citations omitted).

MIT's other excuses for running afoul of § 102(b)—inventor control and disclosure through durability testing—are not enough to salvage its patent. As explained below, each of MIT's excuses is wholly unsupported by the record evidence, contradicts MIT's own 30(b)(6) testimony, interrogatory responses, and contemporaneous publications, and, in any event, is inadequate as a matter of law. MIT likewise cannot avoid summary judgment with hearsay statements from its expert's report. *See* Dkt. 159 (MIT's Opposition to Harman's Motion for Summary Judgment of Invalidity due to Public Use), at 6, Ex. A; FED. R. CIV. P. 56(e); *see also Provident Life and Accident Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001) ("Unsworn expert reports … do not qualify as affidavits or otherwise admissible evidence for [the] purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment."); *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1256 (Fed. Cir. 2000) (inadmissible hearsay is "incompetent evidence to oppose summary judgment"). Summary judgment of invalidity of claims 1, 42, and 45 under § 102(b) thus should be granted in Harman's favor.

Separately, MIT cross-moves "for summary judgment that claims 1, 42, and 45 of the '685 patent are not invalidated by Davis' thesis or his thesis defense," an issue that is moot if judgment for Harman on public use is entered. Dkt. 159 at 17. As it did when it argued the same point (albeit irrelevant then) in response to Harman's motion for summary judgment of inequitable conduct (*see* Dkt. 144 and 150), MIT once again disregards the most analogous precedent—indeed, a case in which it was a party—that compels denial of MIT's motion. *See Mass. Inst. Tech. v. AB Fortia*, 774 F.2d 1104, 1108-09 (Fed. Cir. 1985) (holding a reference to be a printed publication where inventor "orally presented" it and distributed copies of it "on request, without any restrictions … more than one year before the filing date of the … patents").

The *entire* '685 patent is invalid because the patent examiner already determined that all of the claims are "clearly anticipated by the Ph.D. thesis of James Raymond Davis" (Dkt. 160 (MIT's Counter-Statement of Material Fact in Opposition to Harman's Motion for Summary Judgment of Invalidity due to Public Use), Ex. 3 at MIT 376) and because of, in MIT's words, the "limited, controlled distribution of Jim Davis' thesis." Dkt. 144 (MIT's Opposition to Harman's Motion for Summary Judgment of Unenforceability), at 2. Therefore, MIT's cross-motion should be denied.

## I.    MIT'S ADMISSION OF REDUCTION TO PRACTICE IS FATAL TO ITS CLAIM OF EXPERIMENTATION.

According to MIT, "the only issue before the Court is whether the MIT inventors made their invention 'accessible to the public' more than a year before their filing date." Dkt. 159, at 3.[1] But Harman presented evidence under both parts of "[t]he proper test for the public use prong of the § 102(b) statutory bar [which] is whether the purported use:  (1) was accessible to the public; or (2) was commercially exploited." *Invitrogen,* 424 F.3d at 1380; *see also* Dkt. 154 (Harman's Opening Memorandum in Support of its Motion for Summary Judgment of Invalidity Due to Public Use) at 4-12.

To argue that the claimed subject matter was not "accessible to the public," MIT relies upon the experimental use exception, which is unavailable as a matter of law because MIT admitted reduction to practice by at least June, 1989. *See e.g. In re Cygnus Telecommunications Tech.., LLC Patent Litigation*, 481 F. Supp. 2d 1029 (N.D. Cal. 2007) (granting summary judgment despite claim of experimental use because the admission of reduction to practice "cut off the ability to claim any experimental use"). MIT nevertheless seems to argue that

---

[1]    Based on this statement, MIT apparently does not dispute that the "ready for patenting" prong of the *Pfaff* test was met through reduction to practice, as a matter of law.

experimental use vis-à-vis "ready for patenting" is somehow distinct from experimental use vis-à-vis "accessible to the public." *See* Dkt. 159, at p. 16. MIT cites no supporting caselaw, perhaps because the law is to the contrary.

Experimental use means "perfecting or completing an invention to the point of determining that it will work for its intended purpose." *New Railhead*, 298 F.3d at 1297 (discussing proof of experimentation adequate to negate the bar). Reduction to practice means that the patentee "constructed an embodiment ... that met all the limitations" *and* "determined that the invention would work for its intended purpose." *Taskett v. Dentlinger*, 344 F.3d 1337, 1340 (Fed. Cir. 2003).

Experimentation (*i.e.*, is it "capable of performing its intended purpose?") necessarily comes before, and ends with, reduction to practice (*i.e.*, it "work[s] for its intended purpose"). As a matter of law, "experimental use ... ends with an actual reduction to practice." *New Railhead*, 298 F.3d at 1297-98 ("the patented method had been reduced to practice .... [A]s a matter of law none of the subsequent uses of the method could be experimental"). *Invitrogen* did not alter this fundamental legal principle. *Invitrogen*, 424 F.3d 1374. Therefore, as a matter of law, MIT's attempt to characterize its post-reduction to practice uses as "experimentation" is without merit.

MIT's claim of experimentation also fails because MIT bases its defense on the inventors' declarations. However, "[i]n determining ... alleged experimental use .... [a]n inventor's subjective intent is generally of minimal value." *In re Smith*, 714 F.2d 1127, 1135 (Fed. Cir. 1983). Here, and as Harman explained in its Reply Memorandum in Support of its Motion for Summary Judgment of Unenforceability (*see* Dkt. 150 at pp. 7-9), the inventors' declarations are entitled no weight because they contradict the inventors' deposition testimony,

MIT's interrogatory responses, and their own contemporaneous publications authored in 1989. *See* Dkt. 149 (Harman's Responsive Statement of Facts in Response to MIT's Opposition to Harman's Motion for Summary Judgment of Unenforceability) at HCSOF[2] 9-10, 27, 30-31, 34-35, 37-39, 48-50.

The only remaining issue is whether the Back Seat Driver was used in public in its natural and intended way in July, 1989. *See* Ex. 42, *American Ceramicraft, Inc. v. Eisenbraun Reiss Inc.*, Civ. No. 92-2851, 1993 WL 498863, at *14 n. 14 (D.N.J. June 16, 1993) ("Demonstration of an invention at a trade show or convention is a public use, even if the invention is not offered for sale for several years thereafter. Furthermore, as quoted above, the invention need only be used 'in its natural and intended way.' That is, as long as the public use is natural, it need not disclose all the elements of every claim.") (internal citations omitted); *see also Hall v. Macneale*, 107 U.S. 90, 97 (1883) (safe mechanism held in public use although not visible); *Egbert v. Lippman*, 104 U.S. 333, 336 (1881) (found public use despite invention's concealment in corset). MIT admits that it was. Dkt. 160 at MSOF 30.

## II.  MIT CANNOT ESCAPE THE § 102(B) BAR WITH ITS FACTUALLY UNSUPPORTED AND LEGALLY INSUFFICIENT CLAIM THAT THE INVENTORS RETAINED COMPLETE CONTROL.

As a threshold matter, whether the inventors had exercised control over the use of, and dissemination of information about, the Back Seat Driver is irrelevant since "the extent of control the inventor maintained over the testing" is one factor in determining whether a use [was] 'experimental', not whether a use was public. *Lough v. Brunswick Corp.*, 86 F.3d 1113, 1120 (Fed. Cir. 1996) (finding no experimental use as a matter of law); *see also Electromotive Div. of*

---

[2]  For clarity, the following abbreviations are used: Harman's Statement of Facts ("HSOF"), MIT's Statement of Facts ("MSOF"), MIT's Counter-Statement of Facts ("MCSOF"), Harman's Counter-Statement of Facts ("HCSOF"), and Harman's Reply to MIT's Counter-Statement of Facts ("HRMCSOF").

*Gen. Motors Corp. v. Transp. Sys. Div. of Gen. Elec. Co.*, 417 F.3d 1203, 1213 (Fed. Cir. 2005) (describing inventor control as one "indicia of experimentation"). As discussed above, the experimental use exception is foreclosed to MIT.

MIT nonetheless incorrectly asserts "Harman must show that the MIT inventors engaged in an impermissible public use by ceding control over the invention to a third party or attempting to commercially exploit the invention." Dkt. 159, at 5. There is no requirement that MIT "ced[e] control over the invention" under the Supreme Court's *Pfaff* decision, or any applicable Federal Circuit decision. *Invitrogen*, 424 F.3d at 1380. Ceding control over the invention was not a requirement, even under the pre-*Pfaff* decision in *Moleculon*, upon which MIT relies. Dkt. 159, at pp. 5-8 (citing *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1266 (Fed. Cir. 1986).

Moreover, MIT did not exercise "complete control" during the 50 public uses. Dkt. 159, at 1 (emphasis removed); *see also Electromotive,* 417 F.3d at 1214-15 (holding that "control and customer awareness ordinarily must be proven if experimentation is to be found" (citing with approval Judge Bryson's concurrence in *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340 (Fed. Cir. 1998), in which he noted that "[c]ertain factors, such as the requirement that the inventor control the testing, that detailed progress records be kept, and that the purported testers know that testing is occurring, are critical to proving experimental purpose.")) MIT's attempt to equate presence in the car (Dkt. 159 at p. 8) with control is not even supported by the inventors' own (inadmissible) declarations. Particularly suspect is MIT's unsubstantiated allegation that the 50 users of the Back Seat Driver were "friends, colleagues and supporters … including Davis' now wife, his research sponsor NEC, members of his thesis committee, student test subjects, and entities that understood Media Lab sponsorship." Dkt. 160, at MSOF 42. MIT's so-called

evidence on this point is a single, unsigned consent form that applies to 14 (at most) of the 50 users (*see* HCSOF to MSOF 31), and the inventors' deposition testimony that they could not recall anything about the 50 users. *See, e.g.,* HRMCSOF 6.

Regardless of whether the inventors rode along in the car during some, or even all, of the 50 public uses, there is no dispute (and no reasonable jury could find) that MIT "controlled the dissemination" of information about the public uses. *See* Dkt. 155 at 5, 19-23, 42-48; *see also Lough v. Brunswick Corp.*, 86 F.3d 1113, 1120 (Fed. Cir. 1996). The undisputed evidence is that MIT freely and widely disseminated information about the Back Seat Driver, including the uses in May, June, and July of 1989.

Furthermore, MIT admits that <u>nobody</u> signed a confidentiality agreement. And yet, MIT expects this Court to deny summary judgment based on its unsubstantiated assertion that some of the users supposedly understood that they were not to take credit for Davis' work.

First, it is unreasonable to infer that these unidentified users would have felt obligated to keep quiet about their uses while they watched Davis and Schmandt publish papers about those same uses, present information about those uses at the IEEE conference, and disclose the subject matter of at least claim 1 in trade publications. Second, the Federal Circuit has squarely rejected such academic understandings as an excuse for otherwise invalidating public uses. *See Baxter Int'l, Inc. v. COBE Labs., Inc.*, 88 F.3d 1054, 1059 (Fed. Cir. 1996) (rejecting the patentee's argument that confidentiality should be implied because the use occurred under ethical obligations to refrain from taking credit for the work of others).

Even the decision MIT cites, *Moleculon*, makes Harman's point. *See Moleculon*, 793 F.2d at 1265-66 (the inventor "at all times retained control over its use *as well as over the distribution of information concerning it.*") (emphasis added). The complete lack of control over

confidentiality undermines MIT's flawed argument that "all of the cases Harman relies on …
involve the inventor ceding control over the invention to a third party *such that the inventor does
not control further dissemination about the invention*." Dkt. 159 at 2, fn 1 (emphasis added).
Indeed, the record evidence is inapposite. *See* Dkt. 155 at 5, 19-23, 42-48.

> **A.    The Use Of The Back Seat Driver By 50 Members Of The Public, Including
> GM Employees, Invokes § 102(b).**

MIT's "complete control" argument is not the only example of MIT attempting to hold
Harman to an artificially high burden.  MIT also asserts, incorrectly, that Harman must prove
"the inventors disclosed the workings of the Back Seat Driver prototype to either a driver or
anyone who happened to see the prototype driving down the road." Dkt. 159, at 6.  But public
*use* is just that—*use*—and whether the *use* "disclosed the workings" makes no difference.
*New Railhead*, 298 F.3d at 1297 (citing *Lough v. Brunswick Corp.*, 86 F.3d 1113, 1119 (Fed. Cir.
1996) (public use does not require use that is open and visible)); *see also In re Epstein*,
32 F.3d 1559, 1568 (Fed. Cir. 1994) (public use does not require a use that discloses the
invention to the public).  In any event, even MIT admits that members of the public using the
Back Seat Driver (*i.e.*, the driver) may "have known what was going on." *See* Dkt. 159, at 6,
fn 2.

MIT also confuses the *public* requirement of § 102(b) with the "*public* at large—those
who might have seen the car driving down the street." Dkt. 159, at 6, fn 2.  What the "public at
large" knew is not the test.  "Public use includes any use of [the claimed] invention *by a person
other than the inventor* who is under no limitation, restriction or obligation of secrecy to the
inventor." *Netscape Commc'ns. Corp. v. Konrad*, 295 F.3d 1315, 1320-21 (Fed. Cir. 2002)
(affirming invalidity based on the inventor's prior demonstration of the invention to two
employees at the University of California without any obligation of confidentiality) (emphasis

added).  MIT admits that more than 50 "person[s] other than the inventor" used the invention and

that some of them did so in July, 1989, which is after reduction to practice and before the critical

date.  *See* Docket 159, Ex. 14.  Any one of those 50 actual uses is sufficient to trigger § 102(b).

> **B.    MIT Set Forth No Specific Facts Showing Confidentiality Obligations For The 50 Members Of The Public, Including GM Employees, Who Used The Back Seat Driver.**

Saddled with the undeniable fact that the 50 public users of the Back Seat Driver "did not

execute written confidentiality agreements" (Dkt. 159 at 7), MIT erroneously contends Harman

must prove that "anyone who had access to the technology thought they had free rights to the

technology or to disclose it" (Dkt. 159 at 7-8 (emphasis removed)) and that "anyone thought they

were under anything other than an implied confidentiality obligation not to disclose research on

the Back Seat Driver."  Dkt. 159 at 8.  This is yet another high hurdle that § 102(b) does not

impose.

The applicable legal standard is whether the use occurred "under no limitation, restriction

or obligation of secrecy to the inventor."  *Netscape*, 295 F.3d at 1320 (Fed. Cir. 2002).  Harman

met its burden here where it presented evidence showing the undisputed lack of any express

confidentiality obligations with NEC, the GM employees or any other member of the public who

used the Back Seat Driver.  Dkt. 160 at MCSOF 50 (MIT's admission of no confidentiality

arrangement with NEC).

To overcome this, MIT baldly claims that the 50 public users recognized an "implied

confidentiality obligation" due to some understanding of academic ethical requirements that

theoretically prevented the users from taking credit for Davis' work.  *See* Dkt. 146, Ex. 4 (Decl.

of Schmandt) at ¶ 8 ("As an academic institution, MIT has ethical and integrity reasons for not

publishing research or other findings before the information is finalized or verified."); *see also*

HCSOF No. 42, HRMCSOF 8.  However, the testimony of MIT's own witnesses proves none

was under any "limitation, restriction or obligation of secrecy to the inventor." The primary

NEC liaison with MIT testified that he only understood the Back Seat Driver project to be

"confidential-ish" or "closely held-ish." *See* Rittmueller Dep. at 305:22-306:5, Dkt. 160, Ex. 22;

*see also* Dkt. 155 at HSOF 51. Tellingly, he also testified that if NEC had decided to share

MIT's information with a third party, MIT would have had no direct recourse against NEC and

that, indeed, NEC would have been within its rights to share the information with the public. *See*

Rittmueller Dep. at 306:16-21; Dkt. 160, Ex. 22; Dkt. 155 at HSOF 50-51.

Similarly, Lesk—an alleged member of Davis' thesis committee and an employee of

BellCore—visited the Media Lab "all the time" to discuss current projects at the Media Lab with

the MIT faculty. Dkt. 160 at HSOF 55. He would then return to Bellcore and freely share what

he had learned about the Back Seat Driver with others at Bellcore, including his colleague Lynn

Streeter, who had no affiliation with MIT then, but is MIT's expert now. Dkt. 160 at HSOF 56.

Streeter testified that she did not understand anything Lesk told her about the Back Seat Driver to

be secret. *See* Dkt. 154, Ex. 13 (Streeter Dep.) (Filed under Seal) at 119:3-5; Dkt. 155 at HSOF

56.

Likewise, there are no specific facts even leading to an inference that the other members

of the public, such as the GM employees, were under any "implied confidentiality obligation."

Dkt. 155 at HSOF 8-9, 50-51, 56-57; *see Roger Edwards, LLC v. Fiddes & Sons, Ltd.*, 387 F.3d

90, 94 (1st Cir. 2004) ("'Conjectural allegations, conclusory assertions and inconsequential

evidence' do not suffice to establish a genuine issue of fact.") There are no "specific facts

showing that there is a genuine issue for trial" that the uses were confidential.

FED. R. CIV. P. 56(e). MIT's general, unsupported denials do not create a triable fact issue. *See*

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835-36 (Fed. Cir. 1984) ("[T]he court may not simply accept a party's statement that a fact is challenged.")

### C.     The Commercial Purpose Of The NEC And GM Employees' Pre-Critical Date Uses Separately Satisfies § 102(b).

The record evidence showing that at least some of MIT's public uses were for commercial purposes is clear, convincing and, most importantly, undisputed.  MIT repeatedly made the invention available to "customers" for "commercial uses." *Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 390 (Fed. Cir. 1984) (affirming finding of public use because "[i]n using the machines to test them for Deere, the farmers served Deere's commercial purposes").  MIT admits to sending letters to its "customer," NEC, and admits that *both* NEC and GM employees participated in some of the public uses.  Dkt. 159 at p. 8; *see also* Dkt. 160 at HSOF 6-7.  And has MIT not denied that NEC was interested in the Back Seat Driver for commercial purposes or that GM was involved solely for commercial purposes.  HRMCSOF 60-61.  To be sure, MIT would have had the best evidence in its possession, custody, and control, but no such evidence has been produced here.

At least some of the 50 public uses indisputably related to the commercialization of the Back Seat Driver and to making money for MIT.  Dkt. 155 at HSOF 59-61.  *See Invitrogen*, 424 F.3d at 1380 ("Commercial exploitation is a clear indication of public use...").  "A commercial use is a public use even if it is kept secret." *Kinzenbaw,* 741 F.2d at 390 (citing 2 D. Chisum, Patents § 6.02[5], at 6-36 (1983) ("it is now well established that commercial exploitation by the inventor of a machine or process constitutes a public use even though the machine or process is held secret" (other citations omitted)).

MIT's sole rejoinder is a misplaced legal argument that "the Federal Circuit has held that seeking potential licensees or investors for an invention does not invoke the on-sale bar as long

as the product itself is not subject to a commercial offer for sale." Dkt. 159 at p. 9 (citing *Elan Corp., PLC v. Andrx Pharm., Inc.,* 366 F.3d 1336, 1341 (Fed. Cir. 2004)). But *Elan* holds that "[a]n offer to enter into a license under a patent for future sale of the invention covered by the patent when and if it has been developed, which is what the Lederle letter was, is not an offer to sell the patented invention that constitutes an on-sale bar." *Elan,* 366 F.3d at 1341 (citation omitted). Here, MIT demonstrated an admittedly working, fully-operational Back Seat Driver to a leading automotive supplier (NEC) and the biggest of the "BIG 3" automobile manufacturers (GM)—the intended and eventual purchasers of automotive navigation systems. There was no doubt as to "when" or "if" the Back Seat Driver would be "developed"–it was already "working and working well." Dkt. 154 at p. 4; Dkt. 155 at HSOF 4, 5.

Indeed, MIT's reliance on *Elan* demonstrates that MIT has totally missed the point. While MIT's activities *might* fall short of the *on-sale bar* of § 102(b), the commercial nature of MIT's activities shows that the use was "public" under the "public use" prong of § 102(b). Thus, by MIT's own admissions, the Back Seat Driver was *both* accessible to the public and commercially exploited. Either suffices to establish § 102(b) public use.

## III.    MIT CANNOT ESCAPE THE § 102(B) BAR WITH ITS LEGALLY INSUFFICIENT CLAIMS THAT THE INVENTION WAS NOT DISCLOSED WHEN KNOWN TO WORK DURABLY.

MIT claims "[t]he proper inquiry is not whether the invention used in public was operable, but whether the invention was *disclosed* to the public when known to work in its intended environment *durably.*" Dkt. 159 at 10 (emphasis in original). MIT also contends "Harman needs to prove that the [public] disclosure was not incidental during testing of the device." Dkt. 159 at 9. MIT is wrong on both counts.

To start, and as explained above, MIT admits that claims 1, 42, and 45 were reduced to practice and thus they were known to work in their intended environment. *See* Section IIA

12

*supra.* That includes durability testing. *See e.g. Mannville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 550-51 (Fed. Cir. 1990) (a pre-*Pfaff* case finding experimental use where, unlike the present case, there "was no basis for confidence by the inventor that the invention would perform as intended, and hence no proven invention to disclose"). Accordingly, there can be no experimentation that tolls § 102(b), whether for durability or otherwise, after reduction to practice. *See Continental Plastic Containers v. Owens Brockway Plastic Prods., Inc.,* 141 F.3d 1073, 1079 (Fed. Cir. 1998) ("experimental use can not occur after a reduction to practice."). MIT's legal authority, *Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558 (Fed. Cir. 1987), does not hold otherwise or lead to a different result. In *Baker Oil Tools,* the admitted reduction to practice was not of the claimed invention. *See e.g. id* at 1562 (the claims that were the subject of the admission of reduction to practice in a different proceeding had been cancelled and the claims at issue "were not the subject of an admission ..."). Here, the claims at issue, claims 1, 42, and 45 were reduced to practice at the time of the pre-critical date uses. Dkt. 155, 160 HSOF No. 15, 28-30, 36-38.

Besides, MIT has not established that it actually performed "durability testing." First, unlike *Mannville Sales* where "durability in an outdoor environment [was] inherent to the purpose of an invention," nothing about durability is express or inherent in claims 1, 42, or 45. *See Mannville,* 917 F.2d at 551. Nor is the claimed "invention" a new type of dock for use in a weather-beaten lake. *Id.* All of the hardware involved was admittedly well-known and available off-the-shelf at the time of invention. Dkt. 155, 160 at HSOF No. 69-74. MIT *admits* that everything about claims 1, 42, and 45, other than which words should be spoken, was already known in the art and in off-the-shelf products supplied by others. *Id.* Such admissions belie MIT's now-asserted need for durability testing, particularly in light of all of MIT's

13

contemporaneous publications, in which MIT told the scientific community that the system was "working" and "working well" in June of 1989. Dkt. 155, 160 HSOF No. 4 and 5.

Second, MIT's litigation-inspired durability excuse is suspect because even MIT is not sure whether the so-called testing was for durability. At times, MIT says "the inventors were trying to discover ... whether discourse worked for generating instructions." Dkt. 159 at 12. Other times, MIT says it was to "improve the quality of spoken instructions." Dkt. 159 at 11. Still other times, MIT claims "the inventors were trying to discover...whether the communications links would survive lengthy trips." Dkt. 159 at 12.

Regarding what was disclosed, the only relevant inquiry is whether the use by members of the public was in the manner intended, not whether the public saw each and every part of the invention. *See e.g. Egbert*, 104 U.S. at 336-37 ("some inventions are by their very character only capable of being used where they cannot be seen or observed by the public eye" and finding public use because "[t]he donee "of the steels used them for years for the purpose and in the manner designed by the inventor"). It thus makes no difference what parts of the invention were in the car or visible to the driver. *See e.g. New Railhead*, 298 F.3d at 1297 (discussing *Lough*, 86 F.3d at 1119 and *Egbert*, 104 U.S. at 336 and noting that "'public use' does not necessarily mean open and visible ..."); *see also* Dkt. 154 at 6. MIT cites no law that changes this, and the hearsay statements of its expert on this point are inadmissible. *See, e.g., discussion of Carr*, *supra.*

Use occurs where "control of the system is exercised and beneficial use of the system obtained." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005). That is exactly what MIT admits happened here.[3] The GM employees and other members of the public

---

[3]  Curiously, MIT now argues "the heart and guts of the invention were not in the car." (*See* Docket Entry No. 159 at 7) (emphasis removed). In its Opening Markman Brief, MIT argued that "[t]he use of a 'discourse

14

used the Back Seat Driver to enter the destination and receive spoken driving instructions, *i.e.*, in the manner intended. Dkt. 160 at MSOF 30.

## IV. THE DAVIS THESIS IS § 102 ART THAT INVALIDATES THE '685 PATENT.

Though it bears no relation, legally or factually, to the 50 public uses of the Back Seat Driver, MIT "cross-moves for summary judgment that claims 1, 42, and 45 of the '685 patent are not invalidated by Davis' thesis or his thesis defense." Dkt. 159 at 17. It is worth noting that the invalidity determination MIT seeks here has no bearing on Harman's Motion for Summary Judgment of Unenforceability. *See Li Second Family Ltd. P'ship v. Toshiba Corp.*, 231 F.3d 1373, 1380 (Fed. Cir. 2000) (finding materiality when "a reasonable examiner would have considered the information important, not whether the information would conclusively decide the issue of patentability").

MIT's cross-motion hinges on whether the Davis thesis is a "printed publication" within the meaning of § 102 (*i.e.*, is it § 102 art?). Dkt. 159, at 17. If the Davis thesis is § 102 art (and it certainly is), then the entire '685 patent is invalid. This is because MIT has never challenged the Examiner's determination, that the Davis thesis disclosed each limitation of each claim (*i.e.*, "anticipated" each claim):

> Claims 1-58 are rejected under 35 U.S.C. § 102(e) as being clearly anticipated by the Ph.D. thesis of James Raymond Davis.

November 4, 1991 Office Action, Dkt. 133, Ex. 2 at 442 and 803; Dkt. 134 at SOF 24, 26-27.

MIT argues that "Davis' thesis did not become a printed publication until it was catalogued and shelved in the MIT library" and that it "could not qualify as a 'printed

---

generator,' to generate the directions the user hears, is the heart of the invention and is what distinguishes the invention from anything done before." (Dkt. 128, p.3) MIT admits, in its SOF No. 30 (Dkt. 160) that the members of the public who used the Back Seat Driver heard and responded to driving instructions generated by the discourse generator.

publication' until [then]." Dkt. 159, at 17-18.  MIT is wrong.  The Federal Circuit (in a case that MIT cites) rejected MIT's "view that distribution and/or indexing is required for something to be considered a 'printed publication.'"  *In re Klopfenstein*, 380 F.3d 1345, 1348 (Fed. Cir. 2004) ("Even if the cases cited by the appellants relied on inquiries into distribution and indexing to reach their holdings, they do not limit this court to finding something to be a 'printed publication' *only* when there is distribution and/or indexing.") (emphasis in the original).

In that same case, the Federal Circuit stated that the "key inquiry" into whether something is considered § 102 art is "whether or not a reference has been made 'publicly accessible.'"  *Id.* ("The statutory phrase 'printed publication' [or § 102 art] has been interpreted to mean that before the critical date the reference must have been sufficiently accessible to the public interested in the art; dissemination and public accessibility are the keys to the legal determination whether a prior art reference was 'published.'").  *Id.*  Moreover, "there is no requirement to show that particular members of the public actually received the information" so long as "interested members of the relevant public could obtain the information if they wanted to."  *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988); *see Klopfenstein*, 380 F.3d. at 1348 (holding a slideshow was § 102 art because it was displayed (not distributed or copied) to the "pertinent part of the public" who could appreciate what was novel about the invention).

Here, the key facts, which MIT says the Court must assume are true (Dkt. 159 at 18), are:

- Before the critical date, Davis "could print a copy [of his thesis] whenever he wanted and give that to anybody that he wanted to." *See* Dkt. 134 at SOF No. 5; *see also* Dkt. 133, Ex. 15 at 115:9-13.  (Filed Under Seal)

- Before the critical date, MIT admits Davis performed a "limited, controlled distribution of [his] thesis" (*i.e.*, Davis actually distributed his thesis). Dkt. 144 at 2.

- Before the critical date, Davis offered to distribute his thesis to a member of the public. Dkt. 134 at HSOF 10; *see also* Ex. 23.  (Filed Under Seal)

16

- Davis publicly defended his thesis (the document says May 1989; MIT says "late summer of 1989;" MIT also says "Fall of 1989"). Dkt. 149, HSOF 12 and responses thereto.

On these facts, "interested members of the relevant public could obtain the information if they wanted to" simply by asking Davis. *Constant*, 848 F.2d at 1569. These admitted facts closely mirror, and compel the same result as a prior MIT case where the Federal Circuit held a reference was § 102 art because the inventor "orally presented" it once and distributed copies of it "on request, without any restrictions...more than one year before the filing date of the...patents." *AB Fortia*, 774 F.2d at 1108–09 (Fed. Cir. 1985). Any dispute as to these facts raises a genuine issue of material fact that precludes summary judgment here (but has no bearing on the co-pending unenforceability motion where the standard is materiality not invalidity). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (summary judgment is precluded where there is a genuine issue of material fact).

Further adding to its public availability, Davis also presented pertinent portions of his thesis before the critical date. "[T]he inventors published several papers" concerning the subject matter of the Davis thesis before the critical date. Dkt. 159 at 13. And, the July 17, 1989 issue of the trade publication *Automotive Electronic News* contained an article about the Back Seat Driver, with descriptions and a block diagram. Dkt. 160, at CSOF 48.

Still, MIT urges "[t]he *Cronyn* case is on all fours with the facts at issue here." Yet, *Cronyn* admittedly addressed only a "thesis defense before the [four member] graduate committee." Dkt. 159 at 17; *see also In re Cronyn*, 890 F.2d 1158, 1159-60 (Fed. Cir. 1989). And, *Cronyn* differs from the present case on nearly every significant fact, as shown below:

| *In re Cronyn*, 890 F.2d at 1159-60 | Davis Thesis |
|---|---|
| **Private** Thesis Defense to "four faculty members" | **Public** Thesis Defense<br>*See* Dkt. 146 (MIT's Counter-Statement of Facts in Opposition |

| | |
|---|---|
| | to Harman's Motion for Summary Judgment of Unenforceability), at MSOF No. 31; Dkt. 133, Ex. 5. |
| **No Other Presentation** of Thesis or "pertinent parts thereof" | **Wide Publication** of Portions of Thesis, including<br><br>• description of the overall function of the system<br><br>• a block diagram of the system<br><br>• examples of the spoken driving instructions<br><br>• interview comments from the inventors<br><br>• descriptions of the computing apparatus, the driver input means and function, the map database, the position sensing system, the location system, the route finder, discourse generator, speech generator and voice apparatus.<br><br>• Display at the Boston Computer Museum of aspects of the system derived from Direction Assistance.<br><br>*See* Docket No. 154 at 8-10; Dkt. 155 at SOF 43, 48 |
| **No Distribution** of Thesis | **"limited, controlled distribution** of Jim Davis' thesis"<br><br>*See* Dkt. 144 at 2; Dkt. 150 at 3 |

The case that really *is* "on all fours" here is *MIT. v. AB Fortia.* 774 F.2d 1104, 1108-09 (Fed. Cir. 1985).

Notwithstanding its earlier contrary admissions, MIT now argues that its "limited, controlled distribution of Jim Davis' thesis" and the thesis defense *may* have taken place after the critical date. Dkt. 159 at 17-19. In support of this eleventh-hour about face, MIT points to "facts" that are refuted by the documentary evidence and supported only by contradictory declarations of the inventors and MIT's expert (all of which should be disregarded here). *See* Dkt. 149 at HCSOF 9-10, 27, 30-31, 34-35, 37-39, 48-50; Dkt. 150 at pp. 7-9; *See* Dkt. 150, Ex. 30.

The evidence is that the "limited, controlled distribution of Jim Davis' thesis" took place before the critical date. Specifically, MIT admits that "Phil Rittmueller . . . produced from his files a copy of Jim Davis' thesis and a 'Final Report' to NEC dated July 31, 1989." Dkt. 150, at

8. That is a pre-critical date dissemination to Rittmueller. MIT now claims that Rittmueller "did not receive a copy of Davis' thesis until it was placed in the MIT library" (some six months after the "July 31, 1989" date on the Final Report that attached the thesis), Dkt. 159, at 19, although, Rittmueller is "positive" that he received the July 31 report with the attachments "all put together like this." Dkt. 150, p. 8, Docket 160, Ex. 22 at 149:2-16, 151:5-10. The only reasonable inference is that MIT sent the document dated July 31, 1989, which included the Davis thesis, to Rittmueller on that date.

Another pre-critical date dissemination occurred. Lynn Streeter, a Bell Labs' employee in 1989 and MIT's expert now (Dkt. 144 at 16; Dkt. 146 at HSOF 8), testified that she received the Davis thesis "the day it was published," which she further testified was when her Bell Labs' co-worker [Lesk] who also served on Davis' thesis committee "[had] actually gone up for the defense [of the Davis Thesis] or something and I know I got the thesis just about the same time." Dkt. 146, HSOF 9. This makes sense since, as MIT states, "Lesk worked at Bell Laboratories and shared a draft with . . . Lynn Streeter." Dkt. 144 at 16. Of course, Streeter's contradictory declaration is entitled no weight. *See* discussion at Section I, *supra*.

That Davis also offered to send his thesis to yet another interested party is telling. HCSOF 54. Whether Davis actually sent the University of Minnesota student a copy of his thesis is beside the point. The student's inquiry and Davis' offer to send demonstrates that the thesis was known to the public and available for the asking. Dkt. 134 at HSOF 10; *see also* Ex. 23. (Filed Under Seal)

MIT further contends that what MIT disseminated in the "limited, controlled distribution of Davis' thesis" was a "draft." Dkt. 159, at 17-19. Yet, the distributed copies match word-for-word, line-for-line the thesis that sits in MIT's library. Dkt. 150 at p. 9. They were not "drafts"

by any stretch of the imagination. Equally misleading is MIT's assertion that "one draft does not make it a printed publication" when *Klopfenstein* says otherwise. Dkt. 159 at p. 18; *In re Klopfenstein*, 380 F.3d at 1348 (holding that the correct legal inquiry is whether a reference has been made "publicly accessible.")

Regarding MIT's contention that the document evidencing Davis' May 26, 1989 thesis defense is wrong, MIT does not say *when* Davis defended his thesis or even that it happened after the critical date, though such information is exclusively within MIT's possession, custody or control. *See* Dkt. 150 at p. 10. The only reasonable inference is that Davis defended his thesis on May 26, 1989.

Any one of these pre-critical-date disseminations establishes that the Davis thesis is a printed publication within the meaning of § 102(b). *Egbert v. Lippmann*, 104 U.S. 333, 336 (1881) (noting that one case of such use is just as effective to bar the patent as many). As such, MIT's motion for summary judgment that Davis' thesis was not a printed publication should be denied.

## V.    CONCLUSION

For these reasons, there is no genuine issue of material fact for trial that any one of the 50 post-reduction, pre-critical-date public uses invalidates claims 1, 42 and 45 under 35 U.S.C. § 102(b). As such, Harman respectfully requests that this Court enter summary judgment in Harman's favor and dismiss this case in its entirety, with prejudice.

Separately, and for the reasons stated above, Harman respectfully requests that this Court deny MIT's cross-motion for summary judgment.

Date:   September 26, 2007                 Respectfully submitted,

                                           /s/ Courtney A. Clark
                                           Robert J. Muldoon, Jr., BBO# 359480
                                           Courtney A. Clark, BBO# 651381
                                           SHERIN AND LODGEN, LLP
                                           101 Federal Street
                                           Boston, MA  02110

                                           William A. Streff, Jr., P.C.
                                           Michelle A.H. Francis
                                           Craig D. Leavell
                                           Jamal M. Edwards
                                           Colleen M. Garlington
                                           Joanna Belle Gunderson
                                           KIRKLAND & ELLIS LLP
                                           200 East Randolph Drive
                                           Chicago, IL  60601
                                           (312) 861-2000 (phone)
                                           (312) 861-2200 (fax)

                                           *Attorneys for Defendant*
                                           *Harman International Industries, Incorporated*

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on September 26, 2007.

                                           /s/ Courtney A. Clark
                                           Courtney A. Clark

00179078.DOC /