UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MASSACHUSETTS INSTITUTE | ) | |
| OF TECHNOLOGY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) | NO. 05-10990-DPW |
| | ) | |
| HARMAN INTERNATIONAL | ) | |
| INDUSTRIES INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF UNENFORCEABILITY DUE TO MIT'S ALLEGEDLY INEQUITABLE CONDUCT

November 7, 2007

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, Massachusetts Institute of Technology ("MIT"), has brought this action against the defendant, Harman International Industries, Incorporated ("Harman"), alleging that Harman has infringed its U.S. Patent No. 5,177,685, entitled "Automobile Navigation System Using Real Time Spoken Driving Instructions" (the "'685 patent" or the "Back Seat Driver patent").  This matter is presently before the court on Harman's motion for summary judgment of unenforceability due to MIT's allegedly inequitable conduct (Docket No. 132).  Specifically, Harman asserts that the '685 patent is unenforceable because MIT (1) affirmatively misrepresented and concealed the availability of an inventor's thesis more than a year prior to the patent application, and (2) intentionally

withheld information and misled the Patent and Trademark Office ("PTO") regarding

public uses through test drivers using the Back Seat Driver system.  For the reasons

detailed herein, this court finds that there are material facts in dispute, as a result of

which this court recommends to the District Judge to whom this case is assigned that

Harman's motion for summary judgment be DENIED.

## II.  STATEMENT OF FACTS[1]

The following material facts are undisputed unless otherwise indicated.

In the late 1980s, Jim Davis, then a graduate student at MIT, worked in the MIT

Media Lab under his faculty advisor, Chris Schmandt.  (DF ¶ 1).  Beginning in approxi-

mately April 1988, Davis and Schmandt worked on a project called the Back Seat Driver,

which involved automobile navigation using spoken directions.  (DF ¶ 2; DPF ¶ 4).  This

work led to Davis' thesis for his doctorate degree, and eventually to the patent application

filed on August 9, 1990.  (PF ¶ 1; DF ¶ 3).  The '685 patent for the Back Seat Driver was

---

[1]  The facts are derived from the following materials: (1) Defendant Harman's Local Rule
56.1 Statement of Undisputed Facts Supporting its Motion for Summary Judgment of Unenforce-
ability Due to Plaintiff MIT's Inequitable Conduct (Docket No. 134) ("DF"); (2) Exhibits to
Defendant's Memorandum in Support of its Motion for Summary Judgment of Unenforceability
Due to MIT's Inequitable Conduct (Docket Nos. 133 and 150) ("Def.'s Ex. __"); (3) Plaintiff
MIT's Counter-Statement of Facts Pursuant to Local Rule 56.1 in Opposition to Defendant
Harman's Motion for Summary Judgment of Unenforceability of the '685 Patent (Docket
No. 146) ("PF"), which also includes replies to DF ("PDF"); (4) Exhibits to Plaintiff's Counter-
Statement of Facts in Opposition to Harman's Motion for Summary Judgment of Unenforceability
of the '685 Patent (Docket No. 146) ("Pl.'s Ex. __"); and (5) Defendant Harman's Responses to
Plaintiff MIT's Statements of Fact ("DPF") and Replies to MIT's Responses to Harman's
Statements of Fact Supporting Harman's Motion for Summary Judgment of Unenforceability due
to Inequitable Conduct ("DPDF") (both contained in Docket No. 149).

issued on January 5, 1993.  (PF ¶ 1).  This research for the Back Street Driver was funded by a subsidiary of NEC.  (DF ¶ 4).

### The "Back Seat Driver" Field Trials

The Back Seat Driver was an automobile-based navigation system that provided spoken directions.  (PF ¶ 5).  As part of the project, Davis and Schmandt conducted test drives and field trials in the Boston area with a prototype system in which a cellular telephone keypad was used for interaction between the driver, the system, and a computer operating at the Media Lab.  (PF ¶¶ 6-7).  Although there is some dispute, it appears that either Davis or Schmandt was present in the car and maintained control over who used the research prototype during each of these trials.  (See DPF ¶¶ 8-9).  Among the test drive subjects were MIT undergraduate students, a Bell Labs employee, one or more NEC employees, and several General Motors employees.  (See DF ¶ 42; PDF ¶ 42).  These drivers did not sign confidentiality agreements.  (DF ¶¶ 42-43).  MIT contends, and Harman denies, that no confidentiality agreements were warranted for a number of reasons, including because "[t]he people who took test drives were obligated by ethical and academic considerations regarding the field trials."  (See PDF ¶ 42; DPDF ¶ 42).

Drivers who tested and reacted to the system's spoken directions were not shown how the prototype worked other than what could be observed by sitting in the car.  (PF ¶ 10; DPF ¶ 10).  The invention was not visibly noticeable to members of the public outside of the car.  (PDF ¶ 44).  The drivers had no access to the MIT Media Lab, where parts of the claimed invention were operating.  (See MIT Mem. (Docket No. 144) at 10;

Pl.'s Ex. 5 at ¶ 9).  The test drivers were not compensated for their participation and there

was no expectation that the device would be available for personal use by the participants

at the end of their testing.  (See PF ¶ 12; DPF ¶ 12).  When not in use, the vehicle was

stored in an MIT garage with card access.  (PF ¶ 11).

In a quarterly report by Davis and Schmandt to NEC, dated April 30, 1989, the

authors stated that "The Back Seat Driver is working, and working well.  We have made

dozens of successful trips with it.  From our experience, we have a good idea of what

features should and should not be in the instructions."  (Def.'s Ex. 18 at 108).  In their

subsequent report to NEC covering the period May 1, 1989 - July 31, 1989, the inventors

reported:

> During this quarter we tested the Back Seat Driver on about 50
> subjects.  As a result of this testing we made many changes to the
> behavior of the Back Seat Driver.  We also added new features that
> people asked for, and we redefined old features.  We discovered new
> problems with cellular data transmissions, and made suggestions for
> how to overcome them.  At the very end of the quarter we began
> using the NEC Vehicle Navigation System.  It arrived so late that we
> have only a little experience with it.

(Def.'s Ex. 19 at 173).

At issue is whether these tests were sufficiently disclosed to the PTO.  Thus, it is

not disputed that the PTO had some knowledge of these test drives.  For example, the

patent itself discloses that test drives had taken place.  It provides:

> An actual working prototype of the Back Seat Driver has been
> implemented.  It has successfully guided drivers unfamiliar with
> Cambridge, Mass. to their destinations.  It is easy to foresee a
> practical implementation in the future.

(Pl.'s Ex. 1 at col. 3, ll. 4-8).  MIT had referred to these test drives in correspondence with the PTO as well.  (See Pl.'s Ex. 12 at 1101 ("We are evaluating the user interface by field trials"), Pl.'s Ex. 13 at 933 (". . . we have a working system on the road and are simultaneously conducting field trials. . ."), Pl.'s Ex. 14 at 459 and Pl.'s Ex. 15 at 938 ("The system has been running in prototype from since April 1989.")).  It is the adequacy of these disclosures to the PTO that is in dispute.

### Jim Davis' Thesis

The Back Seat Driver project was the subject of Jim Davis' doctoral thesis.  (DF ¶ 3; see Def.'s Ex. 2 at 111-276).  The thesis was dated August 4, 1989, and sent to the MIT library for cataloging, where it was shelved on February 27, 1990.  (DF ¶ 14; Pl.'s Ex. 8 at 113:5-9).  It is undisputed that once the thesis was shelved in the library, it became available for public dissemination.  (See DPF ¶ 47).  MIT filed a patent application for the Back Seat Driver on August 9, 1990.  (DF ¶ 15).

Copies of Davis' thesis were shared with certain individuals outside MIT before the patent application was submitted.  Harman contends, and MIT denies, that this dissemination constituted publication of the thesis.  Among the individuals who received copies of the thesis were Mr. Phillip Rittmueller, an NEC employee, and Dr. Lynn Streeter, a Bell Labs employee.  (See DF ¶¶ 6, 8).[2]  The dates on which these copies were

---

[2]  MIT also admits that Davis' thesis was distributed to Mike Lesk, a Bell Labs employee who served on Davis' thesis committee.  (See Harman's Reply Mem. (Docket No. 150) at 6 n.3).

sent are in dispute. For example, Harman asserts that MIT sent Mr. Rittmueller a copy

on July 31, 1989, citing a report bearing that date in which a copy of the thesis was

enclosed. (DF ¶ 6; see Def.'s Ex. 19 at 172). MIT contends that Mr. Rittmueller did not

receive the thesis until sometime after it was shelved at the MIT library, citing deposition

testimony by Mr. Rittmueller and testimony and a declaration made by Schmandt. (See

PDF ¶ 6; PF ¶¶ 43-45). Harman, citing to other portions of testimony, contends that

Mr. Rittmueller received the thesis prior to the date it was shelved. (DPF ¶¶ 43-45). The

parties also disagree as to the scope of the publication to Mr. Rittmueller. Thus, Harman

emphasizes the fact that the copy of the thesis sent to Mr. Rittmueller was not marked

confidential in any way. (DF ¶ 7). For its part, MIT contends, and Harman denies, that

Mr. Rittmueller understood that communications about the Back Seat Driver were

confidential. (PF ¶ 46; DPF ¶ 46). In support of their respective positions, the parties

point to different excerpts from depositions, apparently agreeing on the words used but

disagreeing as to their meaning.

The date Dr. Streeter received her copy of the thesis is also in dispute. Thus,

Harman cites to deposition testimony in which Dr. Streeter refers to receiving it "the day

it was published" or around the time of Davis' defense of his thesis. (DF ¶ 9). However,

the date of the thesis defense, as discussed below, is in dispute. As with Mr. Rittmueller,

it is also disputed as to whether Dr. Streeter understood that the thesis was to be kept

confidential, and whether the thesis was sent to her only to obtain feedback from a

professional colleague in an advisory role, or whether it was disseminated without any express or implied limitations on its use.  (<u>See</u>, <u>e.g.</u>, DF ¶ 9; PF ¶¶ 48-50; DPF ¶¶ 48-50).[3]

Finally, Harman points to May 1989 emails between a University of Minnesota student and Davis in which the student requested information about the Back Seat Driver project and, after receiving a communication from Davis which is not part of the record, wrote "I think I can wait a couple of weeks to see your thesis."  (DF ¶ 10; Def.'s Ex. 23).  As MIT argues, however, there is no evidence that the thesis was ever sent to the student, and Davis denies that it was sent.  (PDF ¶ 10).

On November 4, 1991, the PTO rejected the claims of MIT's August 9, 1990 patent application as being anticipated by Davis' thesis.  In so doing, the examiner apparently assumed that the thesis had been publicly available for over a year, as it bore the submission date of August 4, 1989.  (<u>See</u> Def.'s Ex. 2 at 442, 803).  In response, MIT submitted to the PTO examiner a copy of the title page from the MIT library copy of the thesis, which bore the date February 27, 1990, and explained that this was the date it was shelved and thereby became available to the public.  (Def.'s Ex. 2 at 803).  As MIT wrote to the PTO:

---

[3]  Harman contends that declarations filed by Dr. Streeter and Mr. Davis should be disregarded as being inconsistent with their deposition testimony.  (<u>See</u> Def.'s Exs. 30 & 31).  However, Harman has not moved to strike any of this evidence.  Given the lack of clarity in much of the deposition testimony, perhaps due to the passage of time between the events in question and the time of the depositions, this court will not disregard the declarations.  The full extent of the witnesses' memory of events should be explored at trial.

> The examiner has rejected claims 1-58 under 35 U.S.C. 102(e) as
> being anticipated by the PH.D. thesis of J.R. Davis.  During a
> telephone conversation with the examiner, the examiner stated that
> the reason for the rejection was that the title page of the thesis bears
> a submission date of August 4, 1989, more than one year before the
> filing date of the present application.  August 4 is the date that the
> thesis was signed, and not the date on which the thesis became
> available to the public.  M.I.T. does not generally catalog and shelve
> theses until several months after the official date of submission.
> Enclosed is a copy of the title page of the M.I.T. library's copy of
> the thesis, which bears a date of February 27, 1990.  <u>Therefore, the
> thesis did not become available to the public more than a year before
> the filing date of the present application</u>, and is therefore not 102 art
> with respect to the present application.

(Emphasis added).  Harman contends that this representation to the PTO was false, as the

thesis had been publicly available before then through its dissemination as described

above.  The patent was subsequently granted.  (Pl.'s Ex. 1).

### Davis' Thesis Defense

Jim Davis defended his thesis sometime in 1989, but the precise (or even approxi-

mate) date of the defense is in dispute.  MIT asserts that Davis defended his thesis

sometime in the late summer of 1989, shortly before his graduation in September 1989.

(<u>See</u> Schmandt Decl. (Pl.'s Ex. 4) at ¶ 7; Davis Decl. (Pl.'s Ex. 5) at ¶ 6).  His thesis

defense, according to Davis, occurred after work on additional prototypes and the

building and development of an operational system in the summer of 1989.

By contrast, Harman contends that Davis was prepared to defend his thesis by

May 26, 1989, and that he invited the public to attend the defense.  (DF ¶ 12).  As

evidence for this date, Harman points to a flyer describing the project and announcing

that the defense would be held on May 26, 1989, in room E15-283a.  (Def.'s Ex. 5).  In

response, MIT asserts that the flyer Harman refers to is merely a draft, and that Davis did

not actually defend his thesis either on that day or in the room indicated.  (PF ¶¶ 35-39).

Thus, in addition to disputing whether Davis' defense of his thesis rendered it publicly

available as a matter of law (see DPF ¶ 32), the parties disagree as to when the defense

took place.

     Additional factual details relevant to the court's analysis are described below.

### III.  ANALYSIS

#### A.    Standard of Review for Unenforceability
      Due to Inequitable Conduct

     Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c).  The mere existence of *some* alleged

factual dispute will not alone withstand an otherwise properly supported motion for

summary judgment; rather, there must be *genuine* issues of *material* fact in dispute to

defeat summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106

S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  Moreover, in connection with a motion for

summary judgment "[t]he evidence of the nonmovant is to be believed, and all justifiable

references are to be drawn in his favor."  Id. at 255, 106 S. Ct. at 2513.

Those applying for patents "are required to prosecute patent applications in the

PTO with candor, good faith, and honesty," and the breach of this duty may constitute

inequitable conduct. Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995).

Consequently, "a patent may be rendered unenforceable for inequitable conduct if an

applicant, with intent to mislead or deceive the examiner, fails to disclose material

information or submits materially false information to the PTO during prosecution."

Digital Control, Inc. v. Charles Mach. Works, 437 F.3d 1309, 1313 (Fed. Cir. 2006)

(citing Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1330-31 (Fed. Cir. 2004)). "Deter-

mining at summary judgment that a patent is unenforceable for inequitable conduct is

permissible, but uncommon." Digital Control, Inc., 437 F.3d at 1313. The party

asserting inequitable conduct must prove, by clear and convincing evidence, (1) that the

information was material, and (2) that the conduct in question was intentional. Id.; see

also Molins PLC, 48 F.3d at 1178. "Once threshold findings of materiality and intent are

established, the court must weigh them to determine whether the equities warrant a

conclusion that inequitable conduct occurred." Id. "The more material the omission, the

less evidence of intent will be required in order to find that inequitable conduct has

occurred." Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1327 (Fed. Cir. 1998). "In

light of all the circumstances, the court must then determine whether the applicant's

conduct is so culpable that the patent should be held unenforceable." Id.

As a general statement, information is considered material to the PTO if there is

"substantial likelihood that a reasonable examiner would consider it important in deciding

whether to allow the application to issue as a patent." 37 C.F.R. § 1.56 (1989).  See

Digital Control, Inc., 437 F.3d at 1315-16 (discussing various standards of materiality).

"However, a patentee has no obligation to disclose an otherwise material reference if the

reference is cumulative or less material than those already before the examiner."

Halliburton Co. v. Schlumberger Tech. Corp., 925 F.2d 1435, 1440 (Fed. Cir. 1991).

Accord Molins PLC, 48 F.3d at 1179 ("If the information allegedly withheld is not as

pertinent as that considered by the examiner or is merely cumulative to that considered by

the examiner, such information is not material.").  A reference is cumulative if it teaches

no more than what a reasonable examiner would consider to be taught by other references

already before the PTO.  Regents of the Univ. of Cal. v. Eli Lilly & Co., 119 F.3d 1559,

1575 (Fed. Cir. 1997).

 In determining whether conduct was intentional, "the involved conduct, viewed in

light of all the evidence, including evidence of good faith, must indicate sufficient

culpability to require a finding of intent to deceive."  Paragon Podiatry Lab., Inc. v. KLM

Labs, Inc., 984 F.2d 1182, 1189 (Fed. Cir. 1993) (internal quotation omitted).  "Intent

need not be shown by direct evidence, but may be inferred from the totality of the

evidence."  Digital Control, Inc., 437 F.3d at 1319.  Nevertheless, "although intent may

be inferred from circumstantial evidence, mere gross negligence is insufficient to justify

an inference of intent to deceive the PTO."  Baxter Int'l, Inc., 149 F.3d at 1329.  "In a

case involving an omission of a material reference to the PTO, there must be clear and

convincing evidence that the applicant made a deliberate decision to withhold a known

material reference." Id.

Applying these standards to the instant case compels the conclusion that Harman's

motion for summary judgment due to inequitable conduct should be denied.

### B.    Jim Davis' Thesis

Under 35 U.S.C. § 102(b), a patent cannot be granted if 'the invention was . . .

described in a printed publication in this . . . country . . . more than one year prior to the

date of the application for patent in the United States . . . ." In re Cronyn, 890 F.2d 1158,

1159 (Fed. Cir. 1989). "The statutory phrase 'printed publication' has been interpreted to

mean that before the critical date the reference must have been sufficiently accessible to

the public interested in the art; dissemination and public accessibility are the keys to the

legal determination whether a prior art reference was 'published.'" Id. at 1160 (internal

citations omitted). "The bar is grounded on the principle that once an invention is in the

public domain, it is no longer patentable by anyone." In re Hall, 781 F.2d 897, 898 (Fed.

Cir. 1986). Since the patent application in the instant case was filed on August 9, 1990,

the patent should not have been granted if it was described in a printed publication before

August 9, 1989.

Harman contends that "MIT committed inequitable conduct when it affirmatively

misrepresented and concealed the availability of Davis' thesis . . . after the PTO

Examiner expressly found it invalidated every claim of the '685 patent." (Harman Reply

Mem. at 1). Specifically, Harman challenges MIT's failure to disclose that the thesis was

"(i) distributed to third parties prior to the August 1989 critical date, and (ii) was publicly defended in the 'late summer of 1989.'"  (Id. at 2).  This court finds that material facts are in dispute precluding the entry of summary judgment on this issue.

　　　As an initial matter, however, some further discussion of Harman's argument is necessary.  Harman contends that it does not have to prove at this stage that the thesis constituted a "printed publication" or that it was "publicly available," only that "MIT made a material representation with intent to deceive the PTO."  (Id. at 3).  This court recognizes that, as a matter of law, "[i]nformation concealed from the PTO may be material even though it would not invalidate the patent."  Li Second Family Ltd. P'ship v. Toshiba Corp., 231 F.3d 1373, 1380 (Fed. Cir. 2000).  Thus, "the test for materiality is whether a reasonable examiner would have considered the information important, not whether the information would conclusively decide the issue of patentability."  Id. Nevertheless, this does not mean that every conceivable fact needs to be disclosed.  See Molins PLC, 48 F.3d at 1179.  In the instant case, Harman has not explained why the information concerning Davis' dissemination and defense of his thesis would be important to the Patent Examiner if it did not rise to the level of being a publicly available printed publication, and this court cannot envision such a scenario.  Under the facts of this case, the distinction between Harman having only to prove a failure to disclose material information and having to prove that the prior dissemination rendered the patent invalid under § 102(b) is a distinction without a difference.

Similarly, although Harman argues that it only has to prove that "MIT made a material misrepresentation with intent to deceive the PTO," the misrepresentation that Harman is relying on is MIT's representation to the PTO that "the thesis did not become available to the public more than a year before the filing date of the present application." (Harman Reply Mem. at 4 (quoting Def.'s Ex. 2 at 803)). For this statement to be a misrepresentation, as Harman contends, the thesis had to be a publicly available printed publication — otherwise, the statement is not false. Consequently, in connection with Harman's motion for summary judgment, this court needs to determine whether the undisputed facts establish that Davis' thesis was publicly available prior to August 1989. As detailed below, there are disputed facts which require that summary judgment on these grounds be denied.

It is undisputed that Davis' thesis itself was material. Indeed, the PTO initially rejected the patent application when the Examiner believed that the thesis had been made public on the date it was signed, August 4, 1989, more than one year before the patent application was filed on August 9, 1990. It is also undisputed that the thesis became publicly available under 35 U.S.C. § 102(b) by no later than February 1990, when it was catalogued and shelved at the MIT library. See In re Hall, 781 F.2d at 899-90 (where thesis was catalogued and available for review at the university library, it was publicly available under § 102(b)). Thus, the critical issue is whether Davis' thesis defense and the limited distribution of the thesis rendered it a publicly available printed publication. If so, these facts were material and should have been disclosed. See N. Telecom, Inc. v.

Datapoint Corp., 908 F.2d 931, 940 (Fed. Cir. 1990) (no inequitable conduct where applicant did not disclose a device which would not qualify as prior art: the device was therefore "not material to patentability" and "[a]bsent materiality, inequitable conduct for failure to disclose cannot lie").

As noted above, "the key inquiry is whether or not a reference has been made 'publicly accessible'" before the relevant date. In re Klopfenstein, 380 F.3d 1345, 1348 (Fed. Cir. 2004). As an initial matter, Harman has not established by clear and convincing evidence that Davis' defense of his thesis or his dissemination of the thesis occurred prior to August 9, 1989. As detailed above, the facts relating to these dates are clearly disputed.

Even assuming that these events took place before the relevant date, the undisputed facts do not establish that Davis' thesis was publicly accessible before it was shelved at the library. For example, it is commonly understood that a student's defense of his or her thesis before a faculty committee does not, in and of itself, reflect "an intent to make the result of his research available to the public." In re Cronyn, 890 F.2d at 1160. Thus, the defense of a thesis "before the graduate committee in its official capacity as arbiter of [an applicant's] entitlement to a [graduate] degree" does not constitute a "patent defeating publication [.]" Id. (internal quotation omitted). In the instant case, Harman has not put forward any facts relating to Davis' defense of his thesis which would require a different result as a matter of law.

Similarly, there are disputed facts as to the scope of dissemination of Davis' thesis. Again, dissemination to those involved in evaluating the thesis would not prevent its patentability. Id. While it appears undisputed that there were no signed confidentiality agreements, there is evidence that there was a cultural norm among those who received copies to keep them confidential. (See PF ¶¶ 32, 34, 48-52). As the court held in In re Klopfenstein:

> Where professional and behavioral norms entitle a party to a reasonable expectation that the information displayed will not be copied, we are more reluctant to find something a "printed publication." This reluctance helps preserve the incentive for inventors to participate in academic presentations or discussions.

380 F.3d at 1351. In the instant case, there is evidence that the dissemination both before and after the critical date was limited to colleagues or those involved in funding the research. There is certainly no clear and convincing evidence at this juncture that the circumstances were such that the recipients believed that they were free to further publicize or use the contents of the thesis. While Harman cites to some testimony to the effect that Davis could have printed and distributed copies of his thesis, there is no evidence that he did so. (See PDF ¶ 5). Rather, the evidence is that the thesis was in a password-protected computer that could only be accessed by Davis and Schmandt, indicating an intent to keep the thesis confidential. (See PF ¶¶ 28-29).

The instant case differs significantly from MIT v. AB Fortia, 774 F.2d 1104 (Fed. Cir. 1985), on which Harman heavily relies. At issue in that case was whether a paper presented by one of the patent applicants constituted prior art. The paper had been

-16-

presented at a conference attended by 50 to 500 individuals involved in the field.  Id. at

1108.  The attendees were told of the existence of the paper.  Id. at 1109.  A copy of the

paper was given to the head of the conference and copies were distributed on request,

without any restrictions.  Id. at 1108-09.  At least six people obtained copies.  Id.  Under

such circumstances, the court concluded that the paper had been publicly disseminated

and was prior art.  Id. at 1109.  In the instant case, however, there is no evidence

describing Davis' thesis defense and no evidence that his thesis was widely available.

Nor is there any evidence of an announcement at Davis' thesis defense, or elsewhere, that

his thesis was available for review by anyone who was interested.  In sum, Harman has

failed to establish by clear and convincing evidence that the information regarding Davis'

thesis defense and dissemination of his thesis rose to the level of publication or was

material to the patent decision.  Therefore, Harman has failed to establish that MIT

engaged in inequitable conduct as a matter of law, and the motion for summary judgment

should be denied.

### C.      Back Seat Driver Trials

Harman also contends that MIT's failure to disclose the circumstances surrounding

the 50 or so field trials to the PTO constituted inequitable conduct.  Such information

would be material to the PTO, Harman argues, because it shows that these were

invalidating public uses prior to the critical date as barred by 35 U.S.C. § 102(b), which

provides that a patent may not be obtained if the invention was "in public use or on sale"

more than one year prior to the patent application.  A "public use" for the purpose of

denial of a patent is "a use more than a year before the patent filing date, whereby a completed invention is used in public, without restriction and in circumstances other than substantially for the purposes of experiment."  Allied Colloids, Inc. v. Am. Cyanamid Co., 64 F.3d 1570, 1574 (Fed. Cir. 1995) (internal citation omitted).  See also Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1379-80 (Fed. Cir. 2005).  For its part, MIT argues that the field trials did not constitute public uses for the purposes of § 102(b).  In addition, MIT argues that this information is merely cumulative of disclosures it had made to the PTO, and, consequently, is not material.  Because, on the record before this court, it may be concluded that the non-disclosed evidence is cumulative, this court recommends that the motion for summary judgment be denied.

As an initial matter, this court notes that Harman has filed a second motion for summary judgment seeking to have various claims declared invalid due to the "public use" of the Back Seat Driver.  (Docket No. 153).  The record submitted by the parties in connection with this second motion for summary judgment is more comprehensive than the record presently before the court.  Consequently, and because a determination of public use is not necessary for the court's decision on the inequitable conduct claim, this court declines to address whether the facts establish that there was public use of the Back Seat Driver prior to August 9, 1989.  Even if such public use existed, the undisputed facts do not establish by clear and convincing evidence that MIT's failure to disclose additional facts regarding the field tests warrants the invalidation of the patent due to inequitable conduct.

It is undisputed that MIT disclosed the existence of the field tests to the PTO. Importantly, MIT disclosed the date of the earliest test trials, April 1989, which was well before the critical date. (Pl.'s Ex. 15 at 938). It also disclosed other relevant details, including that in addition to field trials there was "a working system on the road" (Pl.'s Ex. 13 at 933), and that an "actual working prototype" had "successfully guided drivers" unfamiliar with the roads. (Pl.'s Ex. 1 at col. 3, ll. 4-8). Harman has not established that the details withheld were more pertinent than the evidence provided, or that such evidence was anything other than cumulative. Under such circumstances, the information was not material and the failure to disclose does not warrant invalidating the patent. See Halliburton Co., 925 F.2d at 1440.

Moreover, it is well established that "[a]lthough lapse on the part of an examiner does not exculpate an applicant whose acts are intentionally deceptive, any doubt as to whether the examiner lapsed in his duty does not increase the burden on the applicant. Nor does the applicant's obligation of candor replace the examiner's duty to examine the claims." N. Telecom, 908 F.2d at 938 (internal citations omitted). In the instant case, given MIT's disclosures that the Back Seat Driver was being used in some form, it is reasonable to assume that the Examiner could have requested more evidence if needed. The motion for summary judgment based on the failure to disclose additional facts regarding the field trials should be denied.

### D.    Intent

-19-

For the reasons above, this court finds that Harman has not met its burden of proving that MIT failed to disclose material information or submitted materially false information to the PTO. For this reason alone, this court recommends that the motion for summary judgment be denied. If further inquiry is warranted, however, this court also recommends that the motion be denied as the undisputed facts do not establish that MIT acted with the requisite wrongful intent.

In determining whether summary judgment is appropriate on the issue of intent to deceive, the court must decide "whether the evidence respecting culpable intent makes the fact reasonably inferable either way, or whether the evidence is so one-sided that the factual issue of intent may be decided as a matter of law." Paragon Podiatry Lab., 984 F.2d at 1190. Thus, to prevail on its motion, Harman must establish, by clear and convincing evidence, a specific intent to mislead or deceive the PTO. Molins PLC, 48 F.3d at 1181. The fact that the undisputed information may be found to be material would not create a presumption of an intent to deceive. Halliburton Co., 925 F.2d at 1442. Rather, "there must be clear and convincing evidence that the applicant made a deliberate decision to withhold" the relevant information. Baxter Int'l, Inc., 149 F.3d at 1329. Harman has not established that the evidence is so "one-sided" that summary judgment on the issue of intent would be warranted.

In support of its contention that MIT acted with the requisite intent, Harman argues that the information it claims was wrongfully withheld was undeniably known to Davis, and that there is evidence that MIT was under pressure from its funding source,

NEC, to obtain the patent.  According to Harman, "MIT must have felt considerable pressure to see the Back Seat Driver issue as a patent in order to placate 'an unhappy customer' that had 'been particularly generous with MIT.'"  (Harman Mem. (Docket No. 133) at 15).  Even assuming this is true, it does not, as a matter of law, establish an intent to deceive the PTO about subjects which were otherwise voluntarily disclosed by MIT.[4]  The leap from pressure from a client to MIT putting its reputation on the line by intentionally lying to the PTO about these facts is too great a leap to make as a matter of law.  See In re Hayes Microcomputer Prods. Patent Litig., 982 F.2d 1527, 1546 (Fed. Cir. 1992) ("Conjecture alone is not sufficient to show an intent to deceive to support the defense of inequitable conduct.").

Harman also contends that MIT's wrongful intent can be established by its failure to produce certain documents in this case, including the draft notice of Davis' thesis defense and communications with Dr. Streeter and Mr. Rittmueller indicating that they had received copies of the thesis.  However, the failure to keep a draft notice or copies of correspondence over a decade old can be due to innocent reasons and do not lead inexorably to a sinister conclusion.  Similarly, the fact that MIT claimed a privilege for various documents does not compel a conclusion of wrongful intent to deceive.  Even

---

[4]  While Davis' defense of his thesis and dissemination of copies to colleagues were not disclosed, these are not unusual events which could not have been anticipated by the Patent Examiner.  Virtually all theses must be defended prior to issuance of an advanced degree.

though this court ultimately rejected the privilege claim, the documents were appropriately disclosed on the privilege log, and the claim of privilege was not frivolous.

Finally, Harman argues that MIT must have known that its conduct was wrongful because its patent had been declared invalid in the case of MIT v. A.B. Fortia, 774 F.2d 1104 (Fed. Cir. 1985), due, at least in part, to disclosures made in connection with a research paper.  As detailed above, however, the facts of that case differ significantly from the case presently before the court.

In sum, this court finds that Harman has failed to meet its burden of proving wrongful intent as a matter of law.  Therefore, this court recommends that Harman's motion for summary judgment be denied.

## IV.  CONCLUSION

For all of the reasons set forth above, this court recommends to the District Judge to whom this case is assigned that Harman's motion for summary judgment of unenforceability due to MIT's inequitable conduct (Docket No. 132) be denied.


     / s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge