IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY, <br><br> Plaintiff, <br><br> v. <br><br> HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED, <br><br> Defendant. | Civil Action No.: 05-10990 DPW |

**MIT'S RESPONSE TO HARMAN'S OBJECTION
TO THE REPORT AND RECOMMENDATION ON
<u>HARMAN'S MOTION FOR SUMMARY JUDGMENT OF UNENFORCEABILITY</u>**

Harman, in its Objections ("Objections") to the November 7, 2007 Report and Recommendation issued by Magistrate Judge G. Dein denying Harman's Motion for Summary Judgment of Unenforceability ("Report and Recommendation") (Docket No. 168), objects to six statements within the Report and Recommendation, without any argument that striking any or all of the statements about which it complains would affect the ultimate recommendation therein. Harman's objections to these specific statements are little more than repetition of the arguments Harman previously made in support of its Motion, arguments all duly considered, addressed, and rejected by Magistrate Judge Dein in her Report and Recommendation.

Count II of Harman's counterclaims requests a declaration that the '685 patent is unenforceable based on *seven* separate alleged misstatements or omissions. (Docket No. 140, at 10-11, Exh. A thereto.) Harman moved for partial summary judgment on two of these grounds – alleging that MIT's inventors lied to the Patent Office about the public availability of one of the inventor's, Jim Davis', Ph.D. thesis and thesis defense, and that the MIT inventors withheld material information about test drives of research prototypes of the invention. (Docket No. 132,

at 1). To succeed on its motion for summary judgment of inequitable conduct, Harman must show this Court that there is clear and convincing evidence not subject to factual dispute, proving: (1) MIT's inventors either failed to disclose information or made material misstatements to the Patent Office *and* (2) they did so with an intent to deceive the Patent Office. *See Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1421 (Fed. Cir. 1988).

MIT opposed Harman's motion by introducing evidence demonstrating that the MIT inventors told the Patent Office the truth about the thesis and field trials, that they disclosed what the law required, that to the extent some details were not provided, they were not material details, and the details were not withheld with any intent to deceive the Patent Office, and that Harman could not conceivably meet the "clear and convincing" evidence standard on any of these issues, let alone without encountering a material question of fact. (Docket No. 144).

Based on the full record before her, Judge Dein determined Harman had failed to demonstrate materiality of the thesis, the thesis defense, or the field trials. Importantly, Judge Dein also found -- and Harman does not challenge -- that Harman's evidence was unpersuasive that the MIT inventors had any intent to deceive the Patent Office. (Docket No. 168, at 19-22.) Harman, in its Objections does not appear to challenge the ultimate conclusion of the Report and Recommendation. It appears that Harman is limiting its challenge to six specific findings of fact as to the thesis, thesis defense, and field trials, and that Harman is asking that based on its challenge to these recommended findings the Report and Recommendation not be adopted. (Docket No. 170, at 11).

Harman has failed to demonstrate how changing the objected-to findings of fact changes Judge Dein's recommended denial of Harman's motion. Fed. R. Civ. P. 72(b). Because Judge Dein's Report and Recommendation was based on due consideration of the record evidence and

is supported by that evidence, MIT respectfully requests the Court adopt the Report and Recommendation without amendment.

1. **The Inventors *Were* In The Car During The Field Trials And *Did* Maintain Control Over Use Of The Research Prototype During The Field Trials.**

Harman takes issue with the following statement in the Report and Recommendation: "Although there is some dispute, it appears that either Davis or Schmandt was present in the car and maintained control over who used the research prototype during each of these trials." Docket No. 168 at 3. It is not clear how Harman can honestly take issue with this statement, however, because it is based on ample evidence, including the following:

- A February 8, 2006 Deposition transcript of inventor Chris Schmandt, in which he testified that the research prototype "was parked in an MIT garage, which had card access." (Docket No. 146-25, at 160:22-161:2.)

- A December 22, 1988 letter from inventor Chris Schmandt to the Chair of MIT's Committee on the Use of Humans as Experimental Subjects which stated that, "[w]hile testing the Back Seat Driver, the car will never be driven without a research team member along, for several reasons. Most important, of course, is that the whole point of doing road trials is to observe actually using the system. Secondly, any audio or video recording will be done by the observer in the car. Thirdly, the research team member will be required to operate the computer equipment and cellular telephones in the car." (Docket No. 146-20, at 3.)

- Inventor Jim Davis's Declaration submitted in support of MIT's opposition brief, stating that "[u]nder the experiment's protocol, one of us was always in the car for test drives. This was required by the MIT committee of the Use of Humans as Experimental Subjects." (Docket No. 146-6, at ¶ 8.)

Indeed, Harman's lead counsel conceded this point during the August 1, 2007 oral argument on this motion, stating:

> We've shown you via the facts here that MIT knew about it. They clearly were aware of these 50 uses. Why? *Each time Davis and Schmandt were in the car.* They're the inventors. They signed the application.

(Docket No. 161, Transcript of August 1, 2007 oral argument, at 21, lines 8-11 (emphasis added).)

3

Moreover, Harman's "dispute" of this statement is not based on any evidence of its own – rather, it simply reargues that MIT's evidence is insufficient. But, insufficient for what? All MIT needs to show at this stage is a dispute of fact. As "support" for *its* position, Harman points to what it calls contradictions in the inventors' testimony. And, apparently agreeing with Judge Dein that on this record, there is *at least* a conflict of evidence on this issue, in its Objection, Harman "moves" to strike certain paragraphs of the declarations of inventor Jim Davis and third-party Dr. Streeter submitted with MIT's opposition. As MIT discussed in its earlier briefing papers, however, and as Judge Dein found here, there is no clear contradiction that would justify ignoring the testimony for purposes of a summary judgment motion. (*See* Docket No. 146, at 8-10, 13-14.)[1]

The bottom line is that Harman has not offered *any* affirmative evidence to suggest that there was *any* field trial without at least one inventor present. Thus, Harman offers no good reason to suggest that this finding by Judge Dein should be overruled.

**2.    The Test Drivers' Expectations Concerning
        The Public Availability Of The Back Seat Driver Are Relevant.**

With respect to Judge Dein's finding in her Report and Recommendation that the research subjects were not compensated and had no expectations that the invention was available

---

[1]    Any motion to strike evidence proffered in opposition to Harman's motion should have been made before Judge Dein made any recommended finding, and thus, the time for such a motion has long since passed. Moreover, Judge Dein considered, *and rejected*, Harman's argument that the declarations should be disregarded absent a motion to strike, stating:

> Harman contends that declarations filed by Dr. Streeter and Mr. Davis should be disregarded as being inconsistent with their deposition testimony. … *However, Harman has not moved to strike any of this evidence.* Given the lack of clarity in much of the deposition testimony, perhaps due to the passage of time between the events in question and the time of the depositions, this court will not disregard the declarations. The full extent of the witnesses' memory of events should be explored at trial.

(Docket No. 168 at 7, fn. 3 (emphasis added).)

4

for public dissemination (Docket No. 168, at 4), Harman argues that the recommended finding was irrelevant to the decision on Harman's motion, or alternatively that the record does not support Judge Dein's finding.

Harman had argued in its motion for summary judgment of inequitable conduct, and argued again in a subsequent motion for summary judgment of patent invalidity, that the inventors' disclosure of any part of their invention to test subjects created an invalidating "public use" of the invention. The research subjects' expectations obtained during those tests are *central* to an inquiry as to whether that use was a "public use" which would invalidate the patent. *See Manville Sales*, 917 F.2d 544, 550 (Fed. Cir. 1990) ("We therefore conclude that there was no conduct by [the patentee] that would lead the 'public' to reasonably believe the invention was in the public domain. Nor is there any indication that the public had such a perception").

Harman argues in its Objection that the record is deficient to support Judge Dein's recommended finding. However, again Harman offers no *affirmative* evidence to support a contrary finding that the research subjects were compensated, or that they had an expectation that the invention was available for public dissemination because of their role in the field trials. Harman speculates that the research subjects might have thought that the invention was in the public domain because the inventors had published some general papers about their research, all of which were disclosed to the Patent Office. Harman fails, however, to show that any of the test subjects knew of the inventors' papers, or had any expectation other than what a university research subject might reasonably believe -- *that they were participating in research*. MIT's evidence on the record amply supports Judge Dein's finding. (Docket No. 144, at 7-10; Docket No. 146, at 2.)

5

Harman argues that MIT's evidence that the field trials were for non-commercial purposes, is not sufficient. However, *Harman* bears the burden of showing that the field trials were intended to commercially exploit the invention. Harman's only evidence on this issue is that a Japanese company, NEC, sponsored Davis' research. Of course, sponsored research does not amount to commercialization of the invention. *See Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1267 (Fed. Cir. 1986); *see also* Docket No. 159, at 8-9. Harman tries to bolster its claim that anything the MIT Media Lab does is for commercial purpose, by arguing that MIT and the Media Lab offered literature about seeking financial sponsorship. MIT produced affirmative evidence that the field trials were for noncommercial purposes, and Judge Dein credited MIT's proof in the Report and Recommendations. (Docket No. 168, at 3-4). Harman cannot credibly argue that to the extent it challenges MIT's evidence, that challenge does not create at least a question of fact precluding summary judgment.

3. **Dissemination And Defense Of Davis's Thesis Prior To The Critical Date Would Not Have Mattered To The Patent Examiner Unless The Thesis Constituted A Publicly Available Printed Publication.**

Harman objects to Judge Dein's finding that:

> Harman has not explained why the information concerning Davis' dissemination and defense of his thesis would be important to the Patent Examiner if it did not rise to the level of being a publicly available printed publication, and this court cannot envision such a scenario. Under the facts of this case, the distinction between Harman having only to prove a failure to disclose material information and having to prove that the prior dissemination rendered the patent invalid under § 102(b) is a distinction without a difference. (Docket No. 168, at 13.)

Harman now argues generally that because information concealed from the PTO *may* be material even though it would not invalidate the patent, Judge Dein erred when she recommended a finding that a disclosure to the Patent Office that there had been limited

6

dissemination of the thesis would not have mattered to the examiner in this case. Judge Dein properly focused on the context in which MIT made the statements to the Patent Office.

As discussed in MIT's opposition to the motion for summary judgment, the Patent Examiner initially rejected the '685 patent because he believed Davis' thesis was an invalidating "printed publication" based on the fact that Davis had *signed* his thesis on August 4, 1989, more than one year before MIT filed the '685 patent application. MIT responded to the examiner's rejection by submitting the title page of the thesis bearing a stamp of the MIT Library showing that the thesis had not been shelved more than a year before the patent filing. (Docket No. 144, at 14-16.) Within this context, Judge Dein's Report and Recommendations properly recognizes that Harman cannot show that MIT misled the Patent Office when MIT told the Patent Office that the thesis was not an invalidating "printed publication" (as that term has meaning under the patent law) unless the thesis was in fact "printed publication" (as that term has meaning under the patent law).

Judge Dein's Report and Recommendation states that while, "'the test for materiality is whether a reasonable examiner would have considered the information important, not whether the information would conclusively decide the issue of patentability'… this does not mean that every conceivable fact needs to be disclosed." (Docket No. 168, at 13 (internal citations omitted).) Again, as to this point, Harman comes forward with no evidence, but only speculation that, hypothetically, an examiner *might* have conducted further inquiry if MIT had disclosed all the facts of the inventor's narrow, private distribution of his thesis. Harman cannot credibly argue that such speculation is sufficient to justify a finding in support of Harman's motion for summary judgment.

7

Moreover, Harman misstates the facts when it argues here that members of the public *could* obtain the Davis thesis before it was shelved in the MIT library. In support of that argument, Harman points to an e-mail request from a University of Minnesota student for the thesis, which in fact shows nothing more than that a student at Minnesota knew that Jim Davis, a graduate student at MIT, was drafting a thesis. As discussed in detail in MIT's briefing, Harman has come forward with no evidence to even suggest the thesis was sent to the Minnesota student, and the direct evidence relating to this issue is the inventor's declaration to the contrary: "I do not believe I sent a copy of my thesis to this student in May 1989 or any time thereafter, and the email Harman points to does not show that I did. I earned my Ph.D. from MIT in September 1989, and my thesis was not ready for defense or distribution in May 1989." (Docket No. 146-6, Davis declaration, at ¶ 5; *see also* Docket No. 146-5, Schmandt declaration, at ¶ 8 ("Until the thesis was shelved in the MIT library, the general public did not have access to Jim's thesis.") and 146-7, Pasternack declaration, at ¶ 9 ("I was not aware at the time the Response to the Office Action was filed, nor am I informed today, that Davis' thesis was publicly distributed before the critical date.").)

4.  **Those Who Received Davis's Thesis Prior To The Critical Date *Did* Operate Under A Cultural Norm Of Confidentiality Of Such Documents.**

Judge Dein also found "there is evidence that there was a cultural norm among those who received copies [of Davis' thesis] to keep them confidential." (Docket No. 168, at 16.) Harman argues that because MIT has policies on openness, there cannot be any confidentiality at all within its academic environment. Of course, this is not the case, because if it were, it would undermine all of the patents on research coming out of MIT.

MIT's evidence is sufficient to support Judge Dein's recommended finding that this cultural norm existed, and Harman has come forward with *no* evidence that those who received

the thesis pre-critical date lacked such an understanding. As inventor Chris Schmandt stated in his declaration,

> MIT's policy does not absolutely forbid secrecy and encourage sharing of information before the information is ready to be shared. As an academic institution, MIT has ethical and integrity reasons for not publishing research or other findings before the information is finalized or verified. … As an MIT research scientist and graduate student advisor, I am bound by strict ethical obligations relating to academic research… .

(Docket No. 146-5, at ¶¶ 8 and 12.) Indeed, Judge Dein noted that "[t]here is certainly no clear and convincing evidence at this juncture that the circumstances were such that the recipients believed that they were free to further publicize or use the contents of the thesis." (Docket No. 168, at 16.)

Further, whether Dr. Streeter and Mr. Rittmueller understood the confidentiality of the thesis when they received it is beside the point, as they did not receive it until after the critical date which is discussed in detail in MIT's briefing. (Docket No. 144, at 16-18.)

5.  **There Is *No* Evidence Describing Davis's Thesis Defense As Occurring Before The Critical Date.**

Harman objects to Judge Dein's finding that "There is no evidence describing Davis' thesis defense." (Docket No. 168, at 7). One of Harman's most far-fetched positions here is that a *draft* flyer produced by a former MIT student *definitively* proves that Davis's thesis defense took place on the date listed therein, May 26, 1989 and that by pointing out deficiencies in Harman's argument and challenging this flyer, MIT has somehow "authenticated" the flyer and relieved Harman of its burden to do so. Ironically, the student who produced this draft flyer to Harman's counsel is now a partner at Harman's counsel's law firm at Kirkland & Ellis, yet Harman has not submitted *any* affidavit as to the source of the document or suggesting that the date on the flyer was in fact the date of the thesis defense. While Harman suggests now that MIT

9

must bear some negative consequences due to its inability to provide a precise date for a thesis defense that took place nearly twenty years ago, Harman ignores the affirmative evidence MIT has put forward demonstrating that the thesis defense did *not* occur on the date stated in the flyer, including:

- Inventor and thesis advisor Chris Schmandt's declaration, which states that, "Jim actually defended his thesis in late summer of 1989, and he graduated in September 1989. While I do not remember the exact room in which the thesis defense took place, I do remember that the thesis defense did not take place in the room identified on the draft flyer, namely E15-283a of the Media Lab, because Jim defended his thesis in a larger room." (Docket No. 146-5, at ¶ 7.)

- Inventor, and thesis author Jim Davis's declaration, which states that he "was not prepared to defend [his] thesis on May 26, 1989. The 'flyer' inviting the 'public' to attend was a draft, as can be seen from the handwritten corrections and various typos in the flyer. I may have thought at one time that my thesis would be ready to defend on May 26, 1989, but in fact, it was not ready to defend until sometime later in the summer. My original goal was to graduate in June of 1989, which explains why I would have wanted to defend my thesis in May. However, Chris Schmandt and I recognized that the Back Seat Driver project needed some additional work before I could get my degree, and so we worked on additional prototypes over the summer of 1989. As a result, we were able to build and test an operational system by the end of the summer, which resulted in my thesis defense and graduation in the fall of 1989." (Docket No. 146-6, at ¶ 6.)

6. **The PTO *Was* Told Of The Test Drives, And Additional Evidence *Would* Have Been Cumulative.**

Judge Dein recommended and Harman objects to portions of the following statements:

> Thus, it is not disputed that the PTO had some knowledge of these test drives…(Docket No. 168, at 4)

> Because, on the record before this court, it may be concluded that the non-disclosed evidence is cumulative, this court recommends that the motion for summary judgment be denied…(Docket No. 168, at 18)

> It is undisputed that MIT disclosed the existence of the field tests to the PTO. (Docket No. 168, at 19.)

There is no question that the patent examiner had knowledge of the test drives – they are disclosed directly in the patent application itself and discussed in the specification, which states,

10

"An actual working prototype of the Back Seat Driver has been implemented. It has successfully guided drivers unfamiliar with Cambridge, Mass. to their destinations." (Docket No. 146-2, at Col. 3:4-7.) Similar statements are included in other publications given to the examiner during the examination process, as is discussed more fully in MIT's briefing. (Docket No. 144, at 11-14; Docket No. 146, at 2-4; *see* Docket No. 146-13, at 1101 (Abstract); Docket No. 146-14, at 933 (Abstract); Docket No. 146-15, at 459; Docket No. 146-16, at 938.)

Harman has come forward with no evidence suggesting that the disclosure of additional information about these test drives (e.g., the number of test drives, the date of the test drives, and the dates of reduction to practice) would have resulted in rejection of the '685 patent application. The parties' positions as to whether the test drives were invalidating is fully briefed in Docket Nos. 153-155, 159-160, and 164-166. *See also* Docket No. 161.

Harman also ignores the fact that patent examiners always have the authority to request additional information from patent applicants before the patent issues. 35 U.S.C. § 131; *see also* 37 C.F.R. § 1.105 (codifying the inherent authority under 35 U.S.C. § 131 and promulgated after the '685 patent issued[2]). MIT provided the Patent Examiner with the information to make a patentability determination, and "[a]ny doubt about whether the examiner lapsed in his duty does not increase the burden on the applicant. Nor does the applicant's obligation of candor replace the examiner's duty to examine the claims." *N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 938 (Fed. Cir. 1990).

---

[2] Changes To Implement The Patent Business Goals, 65 Fed. Reg. 54,633 (Sept. 8, 2000) ("New § 1.105 is simply an explicit recitation of inherent authority that exists pursuant to 35 U.S.C. 131 and 132, and continues the practice of providing explicit authority to Office employees…").

**Conclusion**

For all the reasons stated herein, this Court should adopt Magistrate Judge Dein's Report and Recommendation in its entirety and without modification, denying Harman's Motion for Summary Judgment.

December 6, 2007

Respectfully Submitted,

Massachusetts Institute of Technology,
By its Attorneys,

*/s/ Steven M. Bauer*
Steven M. Bauer (BBO# 542531)
Jacob K. Baron (BBO# 652568)
Kimberly A. Mottley (BBO# 651190)
John W. Pint (BBO# 660548)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110-2600
Phone:  617-526-9600
Fax:     617-526-9899

## CERTIFICATE OF SERVICE

I certify that on December 6, 2007, I caused a copy of the forgoing document to be served upon counsel of record for Harman International Industries via the Court's ECF system.

/s/ Steven M. Bauer
Steven M. Bauer