IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY,<br><br>    Plaintiff,<br><br>v.<br><br>HARMAN INTERNATIONAL INDUSTRIES, INCORPORATED,<br><br>    Defendant. | Civil Action No.: 05-10990 DPW<br><br>Magistrate Judge Judith G. Dein |

**MIT'S OBJECTION TO MAGISTRATE JUDGE'S MARCH 26, 2008
REPORT AND RECOMMENDATION**

Pursuant to Federal Rule of Civil Procedure 72(b), MIT hereby objects to Magistrate Judge Dein's March 26, 2008 Report and Recommendation relating to Harman's Motion for Summary Judgment as to Invalidity based on Public Use ("the R&R"). (Docket No. 173.)

The question before the Court is whether an MIT student-inventor's use of test subjects (mostly undergraduate students) in limited, controlled, pre-critical date activities to refine his invention before submitting his Ph.D. thesis can be construed as a "public use" under the patent statute that invalidates the patent. The Magistrate Judge's statement of *underlying* facts is generally fair and uncontroversial, but she then takes just one of those facts -- the lack of a written confidentiality agreement with the test subjects -- and she then concludes: "MIT's failure to impose any obligation of confidentiality on the distribution of information about the Back Seat Driver is fatal to its patent." R&R p. 37.

The Federal Circuit, however, has made clear that "non-secret use is not *ipso facto* 'public use' activity," and that "the presence or absence of [a confidentiality agreement] is not

determinative of the public use issue. … *It is one factor to be considered* in assessing all the evidence."  TP Labs., Inc. v. Prof. Positioners, Inc., 724 F.2d 965, 972 (Fed. Cir. 1984); Moleculon Res. Corp. v. CBS, Inc., 793 F.2d 1261, 1266 (Fed. Cir. 1986) (emphasis added).

Simply put, the Magistrate Judge's key mistake was concluding that the lack of a "confidentiality agreement" with test subjects turned the tests into a "public use." The Magistrate Judge made a finding that should have been presented to a jury -- she found that the fact that MIT's inventor used test drivers who had no <u>legal</u> obligation to keep their test experience secret somehow would have led either the test drivers or the public-at-large to believe the invention had been dedicated to the public.

The Court should not adopt the Magistrate Judge's conclusion that U.S. Patent No. 5,177,685 (the "'685 Patent") is invalid based on public use for at least the following three reasons:

1)      First, the Magistrate Judge failed to properly apply the Federal Circuit's multi-factored test for whether an activity constitutes a public use under 35 U.S.C. § 102(b). Although the Magistrate Judge correctly notes that the Federal Circuit has identified five factors that are relevant to whether an activity is an invalidating "public use," and although she implicitly acknowledges that at least three of the factors weigh in MIT's favor here (experimentation, nature of public activity, and lack of commercial exploitation), the Magistrate Judge wrongly concluded that a fourth factor (confidentiality / public access to the use) is wholly determinative of the issue.

This Court should not adopt the recommendation because the Federal Circuit has made clear that "non-secret use is not *ipso facto* 'public use' activity," and that "the presence or absence of [a confidentiality agreement] is not determinative of the public use issue. … *It is one*

*factor to be considered* in assessing all the evidence." TP Labs., 724 F.2d at 972; Moleculon, 793 F.2d at 1266 (emphasis added). The Magistrate Judge's analysis weighs, *and then disregards*, the evidence of experimentation and the fact that the use was clearly not commercial, and relies on findings (not supported by *any* evidence) in *Harman's* favor concerning the relationship between the researchers and test subjects.

2) Second, the Magistrate Judge's decision cannot be reconciled with the two closest precedential cases -- the Federal Circuit's decisions in Moleculon and TP Labs. These two cases both involved limited, controlled, pre-critical date activities in which the subjects had no legal obligation to keep their experiences secret. Any fair reading of these cases will find that the Magistrate Judge needed to stretch to distinguish these cases on *implicit* relationships discussed therein (e.g., the "confidentiality" between a dentist and patient (which confidentiality, if it exists, might apply to the dentist, but would not apply to the patient); or the trusted relationship between professional colleagues and friends). The Magistrate Judge's summary conclusion that the nature of the relationship between an MIT graduate student / faculty researcher and undergraduate test subjects does not provide the same implicit level of confidentiality is a finding of fact improperly made in Harman's favor, and based on no record evidence. The relationship between graduate student and undergraduate test subject is a determination for the jury to make, and was inappropriate and premature for decision on summary judgment.

3) Finally, the Magistrate Judge's decision cannot find any basis in the policies underlying the public use bar: a) "to discourage the removal of inventions from the public domain which the public justifiably comes to believe are freely available"; b) "to prohibit an extension of the period for exploiting the invention"; and c) "to favor prompt and widespread disclosure of inventions." Am. Seating Co. v. USSC Group, Inc., 514 F.3d 1262, 1267 (Fed. Cir.

3

2008) (internal quotation marks and citations omitted); Trading Techs. Int'l, Inc. v. eSpeed, Inc., 507 F. Supp. 2d 883, 888 (N.D. Ill. 2007); see also R&R pp. 29-30 (Magistrate Judge citing Eli Lilly & Co. v. Zenith Godline Pharm., Inc., 471 F.3d 1369, 1380 (Fed. Cir. 2006) for importance of consideration of these policies in considering whether a particular use was "public use").

The Magistrate Judge recognized that there was no commercial exploitation of the invention here. Her decision to give that no weight, and her conclusion that there is no question of fact that the test drives using undergraduate students would have led the *public* to believe the inventions of the '685 Patent were freely available because of general policies of openness in academia and introductory publications by the inventors about their research (publications which were submitted to the Patent Office and found not to disclose sufficient information about the invention to bar patentability), misconstrues what is meant by placing the invention in the public domain. Because as many, if not most, of the "facts" on which she based her decision, weigh in MIT's favor, the Magistrate Judge erred in weighing those facts, ignoring some of them, and finding in Harman's favor on the ultimate issue.

In his recent concurrence in Atlanta Attachment Co. v. Leggett & Platt, Inc., Federal Circuit Judge Prost, joined by Federal Circuit Judge Dyk, noted the potential confusion in jurisprudence on this issue. 516 F.3d 1361, 1369 (Fed. Cir. 2008) (noting that "the experimental use doctrine *must* remain available after the stage [at which the invention is ready for patenting or reduced to practice]" and that "experimental use … represents the counterpoint to commercial sale or public use. Assuming a complete invention, ready for patenting, inventors should be able to continue to privately develop any claimed aspect of that invention without risking invalidation, if they conduct development activities in a way that is neither public nor simply commercial…" (emphasis added)).

4

For all these reasons, and those set out more fully in the discussions that follow, MIT respectfully objects to the Court's adoption of the recommendations in the R&R concerning invalidity of the '685 Patent based on public use.[1]

## BACKGROUND FACTS NOT IN DISPUTE

MIT does not dispute the bulk of the Magistrate Judge's underlying findings of fact, and enumerates here a summary of certain undisputed findings of fact from the R&R which are relevant to the discussion that follows:[2]

1. The Back Seat Driver project which lead to the issuance of the '685 Patent began as a research project at MIT by MIT Research Scientist Chris Schmandt and MIT graduate student Jim Davis, who used the Back Seat Driver project as support for his doctoral thesis. The Back Seat Driver involved automobile navigation using spoken directions. R&R p. 5.

2. The patent application resulting in issuance of the '685 Patent was filed on August 9, 1990, and thus the "critical date" for purposes of public use is August 9, 1989. Id.

3. Prior to the critical date, the MIT inventors conducted at least 50 field trials of the Back Seat Driver system. During those field trials, drivers (mostly undergraduate students) would react to driving instructions generated at the MIT Media Lab and sent to a cell phone in the car. (Because the computer generating the instructions was large, it was located in the Media Lab, and did not fit in the car). Only certain components of the system were located inside the

---

[1] MIT objects to adoption of the R&R only to the extent discussed herein with respect to the decision reached on invalidity of the '685 Patent based on public use. MIT does not object to that portion of the R&R which recommends granting MIT's cross-motion for partial summary judgment that claims 1, 42 and 45 of the '685 Patent are not invalid under 35 U.S.C. § 102(b).

[2] As the Magistrate Judge incorporates by reference the findings of fact from her November 7, 2007 Report and Recommendation (Docket No. 168), MIT similarly relies on certain findings of fact made therein for purposes of this summary.

car, and thus only a portion of the system could be viewed by those who drove or rode in the car. None of the drivers signed a written confidentiality agreement.[3] R&R pp. 6-19.

4.   In every identified pre-critical date instance, the drivers were driving under the direction and control of the inventors, who were always in the car themselves operating the system. In no instance was the car driven for commercial purposes. The tests were done so that the inventors could see the system in use, and could fine tune the directions-giving features. The inventors always maintained control of the system, were always present, always took detailed notes, and importantly, were *themselves* the "users" of the system, even though they had others doing the driving. There was no expectation by the test drivers that the device would be available for personal use by the participants after the testing, or that the invention was in the public domain. Docket No. 168, p. 4.

5.   The inventors published certain papers prior to the critical date generally describing the Back Seat Driver project. R&R pp. 20-22. These papers were cited to the U.S.

---

[3] In addition to its dispute of her decision on the ultimate issue of the public use bar, MIT also disputes two of the Magistrate Judge's findings of fact which, while not central to her analysis, need to be addressed here:

First, the Magistrate Judge states that the field trials at issue included General Motors personnel. R&R p. 14. In fact, while there is no evidence as to the actual date for such a drive, the facts support an inference that General Motors personnel drove the car *after* inventor Jim Davis signed his thesis and, therefore, after the critical date. See Docket No. 159 at 8-9, Docket No. 160 at 12 (MIT's SOF 58-60). Because General Motors was a Media Lab sponsor, the issue should be irrelevant to the decision here, but the facts do not support making General Motors a key fact in the analysis.

MIT also disputes the Magistrate Judge's statement that "[n]one of the claims at issue here relate to the source code." Although the source code is not *expressly* mentioned in the claims, the computer source code underlies the Back Seat Driver and was central to its operation and the claimed elements thereof. R&R p. 7.

Patent Office during prosecution of the '685 Patent, and the patent issued over the papers. There is no dispute that these papers were not enabling invalidating disclosures in their own right.[4]

## ARGUMENT

I. **MISAPPLICATION OF THE LAW ON PUBLIC USE TO THE FACTS.**

    A. **Harman's Burden to Prove Application of Public Use Bar.**

Every patent is entitled to a statutory presumption of validity pursuant to 35 U.S.C. § 282. R&R p. 28. A party challenging the validity of a patent (here, Harman) "must produce clear and convincing evidence of the patent's invalidity." R&R p. 28 (citing Articulate Sys. Inc. v. Apple Computer, Inc., 53 F. Supp. 2d 62, 64 (D. Mass. 1999)). In order to grant Harman's motion for summary judgment on public use, the Court must find that, "taking the facts in the light most favorable to MIT, no reasonable jury could disagree that Harman has established a barring prior public use under § 102(b) by clear and convincing evidence." R&R p. 30 (internal quotation marks and citations omitted).

The Magistrate Judge correctly noted that the Federal Circuit's Invitrogen decision sets forth a multi-factored analysis of whether activities constitute a barring "public use." Yet, after identifying the factors to consider, the Magistrate Judge then weighed the factors, giving no weight to three of the five factors that she found fall squarely in MIT's favor, *finding* facts in Harman's favor relating to the "general openness" at research universities trumping somehow implied or ethical obligations relating to research, and then unilaterally concluding that her weighing of the various factors rose to the level of "clear and convincing evidence."

---

[4] It is undisputed that the inventors provided the Patent Office with the publications they authored describing the invention, and the Patent Office issued the '685 patent over those publications. The references discussed in the R&R not authored by the inventors describing the invention are merely cumulative of the information already before the Patent Office (and less detailed than the inventors' own publications directly under its review). R&R pp. 21-22.

7

Invitrogen states that for determining a public use, the court must consider "[1] evidence relevant to experimentation, …, [2] the nature of the activity that occurred in public; [3] public access to the use; [4] confidentiality obligations imposed on members of the public who observed the use; and [5] commercial exploitation."  R&R p. 34 (internal quotation marks and citations omitted).  The Magistrate Judge found, at least implicitly, in MIT's favor on three of these: no commercial exploitation, that the nature of the activity exposed little to the public about the invention, and at least implicitly that the use was experimental in nature.  The Magistrate Judge simply made a mistake when she concluded that the lack of confidentiality *obligations* owed by the test subjects was fatal to MIT's case.

### B.        Confidentiality Is Not Determinative.

The Magistrate Judge clearly states the basis for her finding of public use: "MIT's failure to impose any obligation of confidentiality on the distribution of information about the Back Seat Driver is fatal to its patent."  R&R p. 37.  That is, she concluded that "the lack of restrictions on the dissemination of information gathered during the field trials is fatal to the patent's validity."  R&R p. 34.

The Federal Circuit, however, has made clear that "non-secret use is not *ipso facto* 'public use' activity," and that "the presence or absence of [a confidentiality agreement] is not determinative of the public use issue. … *It is one factor to be considered* in assessing all the evidence."  TP Labs., 724 F.2d at 972 (emphasis added); Moleculon, 793 F.2d at 1266.

The relevant inquiry must focus on whether the invention was placed in the public domain *and* whether the public had a justifiable belief that the invention was dedicated to the public.  It is undisputed that the field trial participants were exposed to very few components of the actual invention, because many components were not even in the car during the field trials.  It

8

is undisputed that during the field trials, the inventors did not disclose the workings of the Back Seat Driver prototype to either a driver or anyone who happened to see the prototype driving down the road. It is undisputed that at least *six* elements of claim 1 were not in the car and were never exposed to the driver, as they were all running at MIT's Media Lab, including the "computing apparatus," "map database," "location system," "route-finder," "discourse generator," and "speech generator." Docket No. 160 at 5-6 (MIT's SOF 28). If there was any public disclosure here at all, after a field trial, the driver could only tell others that she drove in a car that told her where to go. The driver could not, however, disclose how the car did so, or what the invention was, because the heart and guts of the invention *were not in the car*.

The MIT inventors protected the Back Seat Driver invention from becoming "publicly accessible" during the field trials by always riding in the car during the test drives, by always keeping the car in a private MIT garage with card access, and by never allowing the car to be driven without the inventors' permission. The precautions the inventors took during the field trials ensured that anyone involved in the field trials only had access to the bare minimum information about the Back Seat Driver prototypes while enabling the inventors to effectively test the invention and observe drivers' response to spoken instructions.

The Magistrate Judge does not question these facts. Rather, she seems to ignore them in "finding" that "MIT took no steps to limit or control the dissemination of information about the invention to participants in the field trials." R&R pp. 2, 14. This is an erroneous finding of fact, and certainly not one properly made on summary judgment. Clearly, nothing could be further from the truth.

The Magistrate Judge's finding of "public accessibility" seems to stem from on the fact that the inventors published some introductory material about the invention around the same time

9

as the field trials. The Magistrate Judge focuses on MIT's inventors' publications concerning the Back Seat Driver in publications in their field. However, what she fails to note is that the inventors' papers were submitted to the Patent Office during prosecution of the '685 Patent and were found *not* to disclose the invention. If they are not invalidating prior art references standing alone, how could these publications place the invention in the public domain in the context of a public use inquiry?

Publications of the inventors' activities during the summer of 1989 discussing *preliminary* findings about Back Seat Driver research prototypes, and their attendance at conferences where the Back Seat Driver was discussed among other developments in the linguistics and automobile navigation fields, do not change the fact that neither these publications or conferences (which the Patent Office knew about when issuing the patent), nor the test drivers' access to even less information than was contained in those publications, placed the invention in the public domain.[5]

### C. Experimentation Remains Relevant After Reduction to Practice.

Giving no weight to the clear experimental nature of the inventors' use here was the Magistrate Judge's second analytical error in her analysis of whether the public use bar applies.

In Invitrogen, the Federal Circuit clearly stated that "evidence of experimental use may negate *either* the 'ready for patenting' or 'public use' prong" of the two-part public use test under § 102(b). Invitrogen Corp. v. Biocrest Mfg., Inc., 424 F.3d 1374, 1379-80 (Fed. Cir. 2005 (emphasis added). The Magistrate Judge confuses the issue of whether the experimental nature of the use at issue can negate the public use bar entirely (as evidencing that the invention was not

---

[5] The Magistrate Judge also references a general policy of "openness" in MIT, and academia generally. Of course, it can not be the case that all experimentation undertaken by educational research institutions is public use, simply because they have a general policy of openness.

ready for patenting), and whether experimentation is relevant to the larger issue of whether there is a public use to begin with. MIT does not dispute that "once the invention is reduced to practice, there can be no experimental use negation." R&R p. 32. However, this only means that after reduction to practice, evidence of experimentation *alone* will not prohibit the use from being deemed a barring public use by showing the ready for patenting prong of <u>Invitrogen</u> has not been met. This does <u>*not*</u> mean that evidence of experimentation becomes irrelevant to the public use evaluation post-reduction to practice.

Put another way, prior to reduction to practice, evidence of experimentation is the only thing an inventor would need to show to overcome a public use challenge; post-reduction to practice, evidence of experimentation remains relevant, but is merely one factor in a multi-factored analysis of public use.[6]

There is no question, and no factual dispute, that the evidence of experimentation in this case is overwhelming, and has been detailed in the record which will not be restated here. <u>See</u> Docket No. 160 at 2-5, 7-10 (MIT's SOF 11-18, 22, 24-25, 36-38, 40-42, and 47). It was legal error to ignore this evidence when weighing the facts. This evidence supports a finding that the use at issue should not bar patentability here.

---

[6] The Federal Circuit has recognized potential confusion regarding the role of experimentation in a public use or on-sale inquiry post-reduction to practice. <u>Atlanta Attachment Co. v. Leggett & Platt, Inc.</u>, 516 F.3d 1361, 1369 (Fed. Cir. 2008) (Prost, J., concurring, joined by Dyk, J.) (noting that "the experimental use doctrine *must* remain available after the stage [at which the invention is ready for patenting or reduced to practice]" and that "experimental use … represents the counterpoint to commercial sale or public use. Assuming a complete invention, ready for patenting, inventors should be able to continue to privately develop any claimed aspect of that invention without risking invalidation, if they conduct development activities in a way that is neither public nor simply commercial…" (emphasis added)).

## II. RELEVANT CASE LAW SUPPORTS A FINDING OF NO PUBLIC USE ON THESE FACTS.

There is no way to square the Magistrate Judge's decision with the Federal Circuit's decision in <u>Moleculon</u> or <u>TP Labs</u>.

In <u>Moleculon</u>, the inventor's pre-critical date activity consisted of sharing his invention with a few close friends, including two roommates and a colleague in the chemistry department while he was a graduate student. <u>Moleculon</u>, 793 F.2d at 1263. In affirming the lower court's finding of no public use, the Federal Circuit noted the distinction here from other past cases which found public use -- the inventor "had not given over the invention for free and unrestricted use by another person," but rather "at all times retained control over the [prototype's] use and the distribution of information concerning it." <u>Id.</u> at 1266. Thus, in <u>Moleculon</u>, as is true here, the inventor retained control over the invention.

Also in <u>Moleculon</u>, as is true here, there was no confidentiality agreement. Indeed, and importantly, the <u>Moleculon</u> court stated that "the presence or absence of [a confidentiality agreement] *is not determinative of the public use issue. …* It is one factor to be considered in assessing all the evidence." <u>Id.</u> (emphasis added). Here, however, the Magistrate Judge found the lack of confidentiality agreement to be determinative.

Further, in <u>Moleculon</u>, the Court noted that the record was devoid of testimony from those that witnessed the use, and "[t]he simple answer is that [defendant] had the burden at trial to prove public use with facts supported by clear and convincing evidence," which it failed to do. *Here*, the record contains evidence from those who witnessed the trials. And that evidence shows that there was no public disclosure of the invention -- yet the Magistrate Judge made inferential findings in Harman's favor based on implicit beliefs not supported by the record.

Finally, the Court noted that the policies underlying the bar were not offended by a finding of no public use in these circumstances -- perhaps the lower court put it best, in noting that "[n]one of those participants had any basis for inferring that the puzzle was being given over by [the inventor] for their free and unrestricted use. Holding the public use bar inapplicable in these circumstances will not remove anything from the public domain." Id. at 1265-66. As discussed further in Section III below, the same is true here.

Similarly, in TP Labs, the Federal Circuit vacated the lower court's application of the public use bar in a case in which a dentist used his invention on at least three patients more than one year prior to the application date, where the users were under no limitation, restriction or obligation of secrecy to the inventor. The Federal Circuit begun its analysis in TP Labs with a cite to City of Elizabeth v. American Nicholson Pavement Co., an 1877 Supreme Court case which aptly noted that "[i]t is not public knowledge of his invention that precludes the inventor from obtaining a patent for it, but a public use or sale of it." 97 U.S. 126, 136 (1877). Again, the TP Labs Court made clear that "non-secret use is not *ipso facto* 'public use' activity." 724 F.2d at 972. The Court again looked to the policies underlying the use, and found that

> none of the policies which underlie the public use bar and which, in effect, define it have been shown to be violated. At most, the record shows that the uses were not secret, but when the evidence as to the facts of use by the inventor is considered as a whole, we conclude that appellees failed to prove that the inventor made a public use of the subject invention within the meaning of 35 U.S.C. § 102(b).

Id. at 973.

The fact that there might be a dentist-patient confidentiality relationship is irrelevant here, because any confidentiality in that relationship *would be imposed on the dentist, but not the patient.* There is no explainable reason why the result here should be any different than in the Moleculon and TP Labs cases -- limited, controlled experimental testing of one's invention

13

should not pose a public use bar, regardless of the absence of a confidentiality agreement, where no policies underlying the bar are implicated.

Even if, as the Magistrate Judge seemed to believe, a decision on this issue should turn on the nature of the relationships between the inventors and test subjects, at best, there is a factual issue here as to whether the relationship between an MIT graduate student and research scientist on the one hand, and undergraduate test subjects involved in experimentation on the other hand, is of the nature which would lead those test subjects to believe that the invention they were testing was in the public domain. That factual determination is one on which Harman has proffered no evidence whatsoever, and which the Magistrate Judge decided here based on her own personal opinions, unsupported by facts of record.

The Magistrate Judge correctly stated that for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in its favor" and that a court should not consider "conclusory allegations, improbable inferences, and unsupported speculation." R&R p. 28 (citing Anderson V. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) and Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004)). Bearing this standard in mind, at a minimum, this issue could not be decided on summary judgment, but only by a jury after weighing of the facts and evidence at trial.

### III.    THERE IS NO POLICY REASON TO FIND PUBLIC USE HERE.

The Magistrate Judge correctly stated that, "[i]n considering whether a particular use was 'public' within the meaning of section 102(b), [the] court considers the policies underlying the bar," and goes on to list the three purposes of the bar -- "to discourage the removal of inventions from the public domain which the public justifiably comes to believe are freely available"; "to prohibit an extension of the period for exploiting the invention"; and "to favor prompt and

widespread disclosure of inventions." R&R p. 29 (internal quotation marks and citations omitted). As discussed in Section II above, the Federal Circuit in the Moleculon and TP Labs cases looked for the presence of a public policy in support of a finding of public use, and found none. Here, while the Magistrate Judge accurately describing these policies, her analysis contains no explanation of how her finding is supported by any such policy and, in fact, there is no support in policy for her finding.

The Magistrate Judge concluded that Harman failed to meet its burden of showing commercial exploitation by the experimental activity under scrutiny here. No rational argument can be made that this activity in effect extended MIT's rights for exploiting the inventions claimed in the '685 Patent. Thus, a finding of public use here is not supported by the policy of prohibiting an extension of the exploitation period for the inventions.

Similarly, no reasonable argument can be made that MIT's activity for the three-month period preceding the critical date evidences activity depriving the public of prompt and widespread disclosure of inventions.

Finally, the policy of discouraging removal of inventions from the public domain which the public *justifiably* comes to believe are freely available does not support a finding of public use here. There simply is no support for a justified expectation in the public that the inventions in the Back Seat Driver were freely available or dedicated to the public, as discussed above. The detailed inner-workings of the invention were kept secret by MIT and the inventors. The public's expectations were not changed by the fact that the inventors published articles about the Back Seat Driver -- the Patent Office has already found those publications not to bar patentability under § 102. Further, from a practical perspective, there is nothing within those papers which lead the public to believe they had access to the inventions underlying the Back

15

Seat Driver, and Harman has failed to meet its burden to prove otherwise. Policies of openness in academia and non-invalidating papers do not lead the public to believe that all inventions referenced therein are in the public domain and freely available to the public. Thus, this policy similarly does not support the result of a finding of public use here.

## CONCLUSION

For the reasons stated herein, MIT respectfully requests that this Court reject the Magistrate Judge's recommendation as to Harman's Motion for Summary Judgment of Invalidity Based on Public Use, and instead issue a finding in MIT's favor, denying the motion in its entirety.

April 16, 2008

Respectfully Submitted,
Massachusetts Institute of Technology,
By its Attorneys,

*/s/ Steven M. Bauer*
Steven M. Bauer (BBO# 542531)
Jacob K. Baron (BBO# 652568)
Kimberly A. Mottley (BBO# 651190)
John W. Pint (BBO# 660548)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110-2600
Phone: 617-526-9600
Fax:    617-526-9899

## **CERTIFICATE OF SERVICE**

  I certify that on April 16, 2008, I caused a copy of the forgoing document to be served upon counsel of record for Harman International Industries by the Court's ECF system.

                */s/ Steven M. Bauer*
                Steven M. Bauer