1

1 - 63

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS


MASSACHUSETTS INSTITUTE OF      )
TECHNOLOGY,                     )
                   Plaintiff,  )
                                )
-V-                             )   CIVIL DOCKET NO.
                                )   05-10990-DPW
HARMAN INTERNATIONAL            )
INDUSTRIES, INC.,               )
                   Defendant.  )


MOTION HEARING
BEFORE THE HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE


November 16, 2007

Boston, Massachusetts


APPEARANCES:

On Page 2


Proceedings recorded by electronic sound recording,
transcript produced by Apex Reporting.

For the Plaintiff:

     STEVEN M. BAUER, ESQ.
     KIMBERLY ANN MOTTLEY, ESQ.
     JOHN PINT, ESQ.
     COURTNEY CLARK, ESQ.
     Proskauer Rose, LLP
     22nd Floor
     One International Place
     Boston, MA 02110
     617-526-9700

For the Defendant:

     WILLIAM STREFF, ESQ.
     CRAIG D LEAVELL, ESQ.
     JAMAL EDWARDS, ESQ.
     COLLEEN GARLINGTON, ESQ.
     Kirkland & Ellis
     200 East Randolph Dr.
     Chicago, IL 60601
     312-861-2000

3

1              P R O C E E D I N G S

2                                          (10:08 a.m.)

3              THE CLERK:  Please be seated.

4              United States District Court for the District of

5    Massachusetts is now in session, on August 3, 2006, in the

6    matter of MIT versus Harman, Civil Action No. 2005-10990.

7              Could counsel please identify themselves for the

8    record?

9              MR. BAUER:  Your Honor, Steve Bauer, from

10   Proskauer Rose, with me is John Pint and Kim Mottley.

11             MR. STREFF:  Good morning, your Honor.  Bill

12   Streff from Kirkland and Ellis, with me are Craig Leavell

13   and Jamal Edwards, Colleen Garlington.

14             THE COURT:  Okay.

15             MR. STREFF:  Also Courtney Clark and our client,

16   Mr. Robert Harman.

17             THE COURT:  Does anybody else want to introduce

18   themselves?

19             We're here on the motion for summary judgement on

20   the issue of public use.  Do you want to go?

21             MR. STREFF:  Thank you, your Honor.

22             First of all, your Honor, thank you very much for

23   allowing us to appear before you and to present this in oral

24   argument in addition to the briefing we've submitted, which

25   we do understand is an awful lot of paper.

4

1          THE COURT:  It is.  I do find the arguments

2  helpful.

3          MR. STREFF:  I hope you will continue to hold that

4  at the end of this one.

5          Your Honor, the key element here and the reason

6  we're here on summary judgement, is that MIT itself has

7  stipulated, admitted that Claim 1 being asserted against

8  Harman, was reduced to practice as of June of '89.  Now in

9  full disclosure, if this were not summary judgement, we

10  believe we could show that it's reduced to practice earlier

11  than that.  But they have stated that Claim 1 was reduced to

12  practice as of June of 1989.

13          Their issues with respect to claims 42 and 45,

14  we'll get to, but for purposes of this motion, they cannot

15  back away from this undisputed fact.

16          THE COURT:  Is there a specific reduced to

17  practice definition that you're all agreeing on?

18          MR. STREFF:  Yes, your Honor.

19          THE COURT:  I mean, they had an objection that it

20  called for a legal conclusion, I guess.

21          MR. STREFF:  Well, it is not a legal conclusion to

22  (unintelligible).

23          It is a fact that the elements of Claim 1 were

24  known to work for their intended purpose.  Indeed, reduction

25  to practice is different from ready for patenting.  It's a

5

1   concept of the patent law which is important because it's

2   different from conception.

3              I can think of something as I'm going down the

4   elevator, I conceived of that invention.  Reduction to

5   practice occurs two ways.  Actual reduction to practice, I

6   make one, it works for its intended purpose.  There's also

7   something called constructive reduction to practice which

8   mean, I file it in the Patent Office as a patent

9   application, what's in there has been constructively reduced

10  to practice.

11             THE COURT:  Is their admission relating ro an

12  earlier version?

13             MR. STREFF:  No, your Honor, not at all.

14             The version -- and here again, versions

15  themselves, are irrelevant.

16             THE COURT:  Okay.

17             MR. STREFF:  Version 1, 2, 3, you know, they can

18  change a word here and there.  It's the elements, the

19  features in the claim.  They admitted that the things in the

20  claim, the discourse generator, the speech generator, the

21  functional connectivity, have all been reduced to practice.

22  They knew it worked for its intended purpose.  Indeed, your

23  Honor, as the evidence shows unequivocally here, 50 times

24  they were driving around the streets of Boston in various

25  descriptions in various publications as early as June, state

6

1   that the system worked and it worked well and they were

2   telling their sponsor, NEC, they were eager to demonstrate.

3          So this reduction to practice, in and of itself,

4   establishes as of June of '89, a date they cannot back down

5   from.  There's no requirement that this Court reach a legal

6   conclusion of reduction to practice, they've admitted it

7   with respect to all the elements of Claim 1.  And your

8   Honor, they had to, all the documents, based on all of their

9   reports which we got from Mr. Ritmeuller which they had

10  failed to retain, indicate that they were driving around the

11  streets of Boston doing what the system was meant to do.

12  There'd be no reason to put a third party behind the wheel

13  if it didn't work.

14          And indeed, not only did it work, it worked well.

15  And by June, they pilgrimage to Rosemont outside of Chicago

16  for a three day conference on consumer electronics,

17  submitted a paper on June 9th, abstract of a paper and told

18  the world that it worked, it worked well.  Within that

19  particular paper of June 9th, and that's Exhibit 11, your

20  Honor, they even talked about multiple instructions, long

21  and short as required by Claim 45, as well as the use of

22  intersections a taxonomy of intersections.  You come to a

23  decision point, is it a rotary or is it a right-hand turn?

24  Those intersections had been around since direction

25  assistance, which was the earlier project that we showed

7

1  your Honor when we were here last time, which involved a guy

2  going to a phone booth and putting it in and --

3           THE COURT:  Right.

4           MR. STREFF:  So hard to believe they wouldn't

5  continue to use that and indeed, their June 9th paper,

6  Exhibit 11, says, we added some new intersections, we added

7  rotaries this time.  Okay, fine.  Adding a different kind of

8  intersection is not a different version.  Because what has

9  to be in public use is simply the elements of the claims.

10  If they change the claims, a different thing has to be in

11  public use.  But the fact that they may have one which is

12  more optimal than the other, they had a tweak here and

13  there.  They say, turn right, as opposed to, make a right

14  turn at the intersection ahead.

15           Those kinds of things don't change the claim

16  language, don't change the device.  And indeed, the actual

17  reduction to practice of June of '89 meant that each and

18  every one of the uses with people in the car, were public

19  uses, could not be experimentation.  As the law says, once

20  you have reduction to practice, that's why it's critical,

21  there can no longer be experimentation at all, done

22  completed, final.

23           Now your Honor, here again, there were 50 uses

24  that are admitted.  We'd like to focus for purposes of this

25  summary judgement motion on the month of July.  Why?

8

1  Because specifically, the documentation that MIT did

2  produce, indicates that their computer system had voice data

3  -- again, May 2nd, we would argue that public use began May

4  2nd and been reduction to practice on May 2nd in order to

5  get there.  All you have to get to here, is the example that

6  in July, on the 11th, 12th, 15th, 18th, 19th, 21st, 25th and

7  26th, based on their own computer records, there was a

8  person driving the car with the system enabled, that's what

9  this document states.  That is Exhibit 14 that's attached to

10  out motion.

11          And here again, your Honor, they don't back off of

12  this.  They admit that a person, a non-employee was in the

13  car each of these particular times.  They don't' have the

14  records of who was in the car, but we'll get to that in a

15  minute.  But admittedly, the device was used for its

16  intended purpose on the streets of Boston, in July, after

17  the admitted June reduction to practice and before the

18  critical day of August 9th.

19          As we discussed, your Honor, April 30, there's a

20  document that we got from Mr. Ritmeuller that he had

21  retained which indicated that the system was already working

22  quite well, eager to demonstrate it, we continue testing

23  with drivers.  Now, the testing is to see the driver's

24  reaction.  The system is working in accordance with its

25  intended purpose and is working well.  Thier words, their

9

1    admission, out of their documents sent to thier sponsor.

2            Indeed, the sponsor sent it over to Japan May 22nd

3    of 1998.  So we know that this document was out there.  It's

4    not one of those where, gee, it's got a date on it and we

5    forgot to send it until later.  It's admitted May 22nd of

6    '89, Mr. Ritmeuller was smart enough to inform his Japanese

7    colleagues, who were paying $400,000, of the success at that

8    time of the property.

9            So as early as April 30 in our time line, the

10   system is working and working well, indicating again, that

11   those July trips through the streets of Boston worked, and

12   worked well.

13           THE COURT:  So they can't be deemed

14   experimentation --

15           MR. STREFF:  Absolutely not, your Honor.

16           THE COURT:  -- because of the admission of

17   reduction to practice?

18           MR. STREFF:  Exactly.

19           THE COURT:  Okay.

20           MR. STREFF:  This is simply the June of '89 paper

21   that was published, again, working in prototype form, it

22   doesn't matter what you call it.  I mean, certainly not a

23   commercial form.  We're not saying they were offering it for

24   sale.  But it was working in its intended purpose.  And the

25   told June 9th, the entire IEEE that fact -- that's that

10

1    industry organization of electrical engineers that met in

2    Rosemont and Chicago.

3              Now July 31st, in another quarterly report, is the

4    admission that the Back Seat Driver was tested on 50

5    subjects.  Again, their own words, again, July 31st is well

6    ahead of August 9th.

7              They also, not wanting to be secret at all, gave

8    interviews resulting in trade publications for the prototype

9    guidance system that uses speech synthesis as a navigation

10   aid.  The source, MIT.  So here again, July 17th, the world

11   can easily in automotive news, what's going on.  No secrecy.

12             In addition, a manuscript submitted June 9th of

13   1998 says -- their words, your Honor, at the time of this

14   writing, June '89, with a working system on the road and are

15   simultaneously conducting field trials.  Now, calling it a

16   field trial does not make it experimental use because of the

17   admitted reduction to practice.

18             We would argue that they've been doing it since

19   April of '89.  For the purposes of this motion, we're

20   focusing on July because we specifically have those dates.

21   Successfully being used by drivers who have never driven in

22   Boston -- again, their own words -- not something that

23   didn't work, stopped in its tracks, made a wrong turn, it

24   was successful.  Even more than for its intended purpose.

25   All we have to prove is intended purpose, here they're

1  saying, success.

2            So we add that to out time line, we've got the

3  June papers.

4            Now let's talk about Claim 42.  Claim 42, your

5  Honor, is the one that adds the use of an intersection

6  taxonomy which drives the discourse model that tells you,

7  get on the rotary as opposed to, take a right at the

8  intersection.  It basically tells you the acts you're going

9  to perform will be different depending upon what you've

10 confronted at this intersection of two segments.

11           Now, this particular aspect, this feature, was

12 embodied in the papers we talked about (unintelligible).  It

13 was carried over from a direction assistance, they admitted

14 that, they cite to it.  And their own publications

15 demonstrate reduction to practice as early -- probably

16 earlier than -- June of '89.

17           Let me just summarize here how this comes up and

18 45 comes up.  All throughout discovery, indeed in response

19 to not one, but two interrogatory requests, MIT admitted

20 that they had reduced Claim 42 as on June of '89.  And so

21 your Honor saw that admission we had up there before, Claim

22 1, they've admitted 42 and 45.  Indeed, they cite to the

23 same -- the NIS paper and they completely understood they

24 had to.

25           So what happens?  Right up -- the end of

12

1    discovery, there's a deposition, a 30(b)(6) of Mr. Schmap.

2    He says, you know, I'm at this deposition, I don't have the

3    papers in front of me, so I really can't tell you if it was

4    reduced to practice.  They then file a supplemental, third

5    time, second supplemental interrogatory response backing

6    away from the stipulation with respect to reduction to

7    practice of Claim 42 as of June.

8              We submit to your Honor, they were right the first

9    time, they were right the second time.  The citations to

10   their own basis, their own documents -- that's right -- and

11   they cannot create a genuine issue of material fact by

12   simply citing to one of their indentures that goes to a

13   deposition, isn't well prepared and say, gee, without the

14   documents, I can't tell.  If that's all you need to respond

15   to a motion for summary judgement, then maybe I'm just

16   reading the cases or something.  But I don't know -- or as

17   Steve Martin used to say, I forgot -- doesn't cut it.  They

18   must come forward with some evidence that says, geez, we

19   just found the software code was missing from a particular

20   embodiment, that they couldn't really look at an

21   intersection and change what it was going to say based upon

22   the taxonomy applicable to that intersection.

23             And all that is, is the system itself sees the

24   connection between two segments, realizes one is a rotary,

25   one may be a bridge, one may be an on-ramp and uses

*APEX Reporting*
(617) 269-2900

13

1  different language to tell the driver what to do.  They've
2  been doing that since day one.

3          So we submit that in addition to Claim 1, Claim 42
4  is undisputedly reduction to practice as of June, therefore,
5  no experimentation.

6          Same is true of Claim 45.  To refresh your
7  recollection, your Honor, Claim 45 is the long and short
8  instruction.  Indeed, throughout the papers in June of '89,
9  it says that if there's time, we'd give a long instruction,
10  let the driver think about it, and then give an instruction
11  just in (unintelligible).  Always talked about it, always
12  said it, had been doing it from the beginning.  One of the
13  things they thought the Back Seat Driver did well, same
14  issue with respect to the absence of a stipulation as we sit
15  here today.

16          First interrogatory response, reduction to
17  practice June 1.  Supplemental response, reduction to
18  practice June 1.  Response supplementation filed right at
19  the end of discovery and -- so we can't ask anybody else
20  about it again -- says, gee, I didn't have the documents, I
21  really don't know.  One guy, Schmap, 30(b)(6), but all the
22  documentation that they submitted in response to the answers
23  to interrogatories the first two times, again established
24  undisputedly -- that is, there is no credible evidence to
25  create a genuine issue of material fact that long/short

14

1   instructions as claimed in Claim 45, were in the device, the
2   version was in the car, it was used at least on those July
3   dates.

4         Now, we kind of get lost in some of the responses
5   here about experiments on the field drives.  Public use is
6   simply, use in its natural and intended way of the elements
7   that are in the claim.  No one refutes that.  And 102(b) has
8   been around forever in one way or another in the patent act.
9   And here again, all the statute says is, the invention --
10  the invention that is what was claimed, 42 and 45, was in
11  use more than one year prior to the date of application for
12  the patent.

13        This is like a statute of limitations, it's not
14  one of these things you can fudge or have a
15  (unintelligible).  If you file your application a year and a
16  day after a single public use, you're not entitled to that
17  patent.  It may seem unfair, but what's being given here?  A
18  17 year -- or now 20 year, right to exclude others, a
19  monopoly.  Shouldn't be 20 years and a day.  Shouldn't be 20
20  years and three or four months.  It's 20 years.  So other
21  people can get around to providing new innovations, other
22  people can use the invention, because that's part of the
23  quid pro quo to have that.

24        So it's not unfair that they missed by a few
25  months, but they missed.  And therefore, those claims are

15

1  invalid for public use.

2           Now, other cases have hit similar situations and
3  have also found public use.  In the Beachcomber case, the
4  inventor held a party at her house, not unsimilar to
5  inviting somebody to drive in your car, 20-30 -- she didn't
6  jam 50 people in there, she only had 20 or 30 -- and she
7  personally demonstrated it to the guests for the purpose of
8  getting feedback on the device.  A lot of similarities here.
9  She made no efforts to conceal or to keep it secret.  When
10  they left the house, they could tell their friends, boy, did
11  I see a nifty device at that party last night .  The same
12  way all those 50 folks that were the subjects in the car,
13  and the one specifically in July between reduction to
14  practice and the critical date, had no restriction
15  whatsoever on telling everybody, you know, I just drove in a
16  car and it was great.  It was like having somebody that knew
17  the city telling me what to do, that Back Seat Driver is
18  just awesome.

19           We submit that like Beachcomber, the public use
20  exists here and there is no other conclusion legally, based
21  upon the undisputed facts.

22           I need to emphasize this one because, as you see
23  in the Beachcomber case, she only did it once in front of 20
24  or 30 people, any one of those uses is enough.  We think the
25  fact that there are so many that are admitted makes even a

16

1    stronger case here.

2         And this is the concept that the Court of Appeals

3    says many times, it encourages the prompt filing and just

4    sets an outer limit on the exclusivity, that you can exclude

5    others and see what we have left.

6         And again, another CAFC case, these are all cited

7    in our brief, I won't waste your time.

8         Now, there can be no experimental use once there

9    is actual reduction to practice.  Black letter law, your

10   Honor, focused on it before I got this (unintelligible).

11        However, even if there was an argument of

12   experimental use here, if for some reason you don't believe

13   the stipulation and there's some question on 42 and 45,

14   which there shouldn't be, they have the duty to come up with

15   evidence of an experimental use, and they failed to do so.

16   So even thought we say it's a full stop based on the law,

17   they can't come up and forward the evidence anyway, and

18   that's an additional argument we've hat that supports our

19   point that 102(b) should invalidate this patent.

20        And it's not just coming forward with some

21   evidence, gee, I kind of thought that they might not tell

22   anybody because we're in a university -- of course their

23   policy says otherwise -- but they have to come up with

24   convincing evidence to counter the showing of public use.

25        Well, were there detailed progress reports kept

17

1  here that you've seen in this courtroom or attached to the
2  briefs?  No.
3         Did the testers know the testing was occurring?
4  Anybody come and tell us that?  No.
5         Do we have anything here that suggests that these
6  were test subjects?  Well, there are no of any subjects
7  testing --
8         THE COURT:  But see, you're saying that the 50
9  drivers -- certainly the tone of the reports at that was,
10 we're learning from these field tests, we're modifying the
11 system.  I mean, if you don't have the reduced to practice,
12 if you don't have that, you don't thing there's sufficient
13 evidence to say that this was experimentation?
14         MR. STREFF:  Absolutely, your Honor.
15         It's insufficient for the following reasons.
16         The inventor's intent is irrelevant.  Different
17 from when we were here before you the last time.  If there's
18 no case law -- indeed, contrary case law, we'll get to, says
19 the inventor's intent is irrelevant.  And certainly, let's
20 assume that they're correct -- although the evidence is a
21 little sketchy -- that after a couple of test drives, they
22 decided to add another intersection taxonomy or they decided
23 to add an instruction that said, now instead of, in a minute
24 or they just changed or tweaked something.  It doesn't
25 change the invention.

18

1          I mean, if it was that detailed, we wouldn't be

2    here, it wouldn't infringe.  But in the context of what's

3    happened here, you look at what they're claiming, you can

4    tweak it all you want -- and it does say, we're looking for

5    optimal, we're listening to see what the subjects do, we're

6    going to learn something new, maybe to add an additional

7    intersection or an additional long instruction.  The

8    invention is still reduced to practice.

9          What does reduction to practice mean?  Works for

10   its intended purpose.  It successfully worked well for its

11   intended purpose.  They have to come back and say, well no,

12   now we thought we'd have to add a feature and we're going to

13   do it in claims.  Those features have always been in there.

14         So, just calling something a field trial doesn't

15   cut it, because there's no evidence.  Calling it a prototype

16   doesn't cut it.  What was the device and did it word for

17   its intended purpose?  Their own language says it worked, it

18   worked well, it was successful, can't wait to demonstrate

19   it.  And all these people who had never been to Boston

20   before -- no accidents, got back to their destination.  You

21   know, I think even Boston driving, that's pretty good.

22         And it's the test subjects, it's the people, it's

23   what steps are taken, what documents are signed -- I'm

24   sorry, we haven's seen any of those.  There are no signed

25   waiver forms here, your Honor, the waiver forms themselves

19

1  we'll see in a minute, don't even require confidentiality.

2  And no records of any identified experimental subjects.

3          They knew back in '89 who the subjects were.  They

4  could have kept records.  If they had wanted an experimental

5  use argument, I don't thing they felt they could have one

6  because they were already telling the world it was a

7  completed deal.  They could have kept records, they could

8  have retained those records.  They didn't, they made the

9  decision not to retain them or they never got them.  But

10  they have to come forward with that evidence and they

11  haven't.

12          And your Honor, it's the Electromotive case to

13  which I was referring, that the inventor's intent that it's

14  an experiment, cannot establish his activities are a patent

15  experiment.

16          Now, we've talked about this confidentiality

17  obligation.  Here again, we don't think you need it.  Let's

18  drill down on the evidence they've come forward with.  No

19  agreements.  They did talk about some human factors

20  agreement.  You know, you don't want to put people in a car

21  without having them say they're not going to sue you if you

22  crash or something.  But that's not a confidentiality

23  agreement, there's no mention of it, the subject said they

24  didn't waive any rights in it.  And indeed, they even

25  admitted that that waiver form only applied to 14 of the 50

20

1  people.

2          And here's the form, it's consent to be an

3  experimental subject.  They sign these things in

4  institutions just so that people know what they're doing.

5  Doesn't say, keep it confidential.  It says, I don't waive

6  any rights.  And we haven't seen a signed a signed copy of

7  any of these.  So it's kind of like saying, yeah, we're

8  covered because we had this form.  But the never showed us

9  who signed the form.  They don't have them.

10          And let's also remember, your Honor, that this is

11  1989, in response to that motion to compel that we had, they

12  claimed privilege because they anticipated litigation back

13  in 1989.  So they either didn't exist or they were not

14  retained, despite the belief -- the asserted belief to

15  protect documents from production, that they were in

16  anticipation at that time and under a duty to preserve.

17          Their argument is, well, in an academic

18  institution, you can't glom onto somebody else's thesis,

19  somebody else's work.  That's claiming another's

20  intellectual endeavor, that's just not right.

21          Okay, let them keep it confidential.  And the

22  Baxter case deals with this specifically.  In Baxter, the

23  Court found, unequivocally ain't enough.

24          And indeed, your Honor, having shown you the June

25  9th submission and having trumpeted the device in Rosemont

21

1    Illinois to the IEEE in June, one can understand why they
2    were not concerned -- at least in July, I would say not from
3    June to the end -- but keeping it confidential, on the
4    contrary, they were giving interviews about it on the news,
5    they want to create a big stir about it.  Therefore, it's
6    not surprising that there are no signed waiver forms, even
7    if those work, (unintelligible) don't and that there are no
8    confidentiality obligations.  They didn't tell the test
9    subject, don't tell anybody what a great ride you just had.

10            Indeed, undisputed fact, they talk about the human
11   subjects in their work, an intelligent way to go about it in
12   case somebody gets upset with you.  And here's the inventor
13   saying, we only have 14 of them.  So they wouldn't have even
14   applied the waiver form to the other 36 even though the
15   waiver form itself is (unintelligible).

16            The Baxter case, we summarize here, this is one
17   that was observed in the inventor's lab, the co-worker's
18   ethical obligation is not to steal what they saw in his lab
19   and say it was their own.  The Court held invalidity to the
20   public use despite the facts of that case, which had someone
21   seeing it in a laboratory.  Probably had to use a key card
22   to get in and everything.

23            The Netscape case, your Honor, this is the one
24   where the two people some in and see the computer system
25   that hooks into the remote computer system.  Again, your

22

1   Honor, the computer lab, passwords, the whole thing.  That

2   one single disclosure was enough for summary judgement in

3   that case because he didn't tell the user to keep it

4   confidential.

5           The Beachcombers case, this is the inventor who

6   had the party.  The court in there distinguished the

7   Moleculon case that our adversaries cite, because there was

8   just no control of the information.  Moleculon, there was

9   control.  Beachcomber, the lady loved to show it to

10   everybody and they all went out and potentially talked about

11   it, same thing here.  In July, there is no attempt to

12   control any information about what was happening in the car

13   on the streets of Boston, it's in the public use.

14           The 3M case is instructive, given that in this

15   case, the invention was distributed to employees within 3M.

16   One might posit, as it was argued in that case, that because

17   that the employees are employees of the same company, they

18   were under a duty to keep it secret.  Nope, not what the

19   Court found.  Failure to be specific in that regard was

20   enough for it to be public use even though it was inside a

21   corporation.

22           So even if every one of the uses had been driven

23   by another student or another professor or somebody within

24   the corporation of MIT, that wouldn't suffice either for

25   purposes of confidentiality.  Remember again, your Honor,

23

1  this whole issue of confidentiality doesn't even arise other

2  than they are arguing experimentation, which is precluded ny

3  the act of reduction to practice by -- gotta make sure we

4  get this --

5               THE COURT:  I've got it.

6               MR. STREFF:  If you looked at the circumstances

7  here and if you really understand the public access to the

8  knowledge, it is -- and I think your Honor, saw it from our

9  briefs -- with respect to the workings of the computer

10  system, that's not -- that doesn't have to be disclosed

11  publicly.

12               The corset case, lady is walking around and you

13  can see the (unintelligible) in the corset.  But more

14  particularly, public use is not something that passes out

15  source code to people.  It is use in public in the manner

16  intended.  Which is exactly what happened in July and other

17  dates.

18               After the actual reduction to practice -- and

19  admittedly well before the critical date here -- therefore,

20  Claims 1, 42 and 45, having been reduction to practice,

21  having been used on the streets of Boston by drivers under

22  no obligation of confidentiality at all -- it isn't even

23  relevant here, but there's no obligation of confidentiality

24  -- with a university that has submitted papers, subjected

25  themselves to public publicity via articles, has in essence

24

1    taken an prior (unintelligible), using it in a different

2    context, has done so and admittedly utilized intersection

3    taxonomy, short/long instructions.  Admits at least in Claim

4    1 it was reduction to practice, and all the evidence --

5    undisputed evidence shows that Claims 42 and 45 were

6    reduction to practice, therefore, those claims are invalid.

7    There's no genuine issue of material fact standing in the

8    way of their being held invalid under 102(b).

9              With that, unless your Honor has any questions,

10   I'll reserve time if we need to respond to their argument.

11   Thank you for your attention.

12             THE COURT:  Let me hear from the --

13             MR. BAUER:  Thank you, your Honor.

14             (Pause.)

15             MR. BAUER:  You Honor, what Mr. Streff has shown

16   without any question of fact is two things that we don't

17   dispute.  And I think that probably 20 minutes of his

18   argument were addressing the two things we don't dispute,

19   that there was no written confidentiality agreement, we

20   don't take issue to that, and that the product was driving

21   on roads in June and July of 1989, we don't take issue with

22   that.  But those fact don't invalidate the patent.

23             What Mr. Streff doesn't mention -- and there's a

24   few things to keep in mind -- in 2005 the Federal Circuit

25   wrote a decision in Invitrogen.  I don't think -- I may be

25

1   wrong -- I don't think I saw Invitrogen mentioned on those

2   slides.  It sets the case law.  And I believe -- I won't

3   swear to it -- but I believe every case cited by Mr. Streff

4   was a pre-2005 case.

5            The question here is not whether this thing was

6   driving on a street.  The question is, was there a public

7   use?  Public use within the meaning of the statute, section

8   102.  The case law is clear that non-secret use is not the

9   same as public use and I think that's where we go down the

10  wrong road.  Non-secrete use is not ipso facto public use

11  within the statute.

12           THE COURT:  Deal head on with the admission.

13  With, what does reduction to practice mean?

14           MR. BAUER:  So that takes me to the Invitrogen

15  case, your Honor.  Invitrogen says that the test for public

16  use, under the statute -- and it's following -- Invitrogen

17  is the case that follows on from the Supreme Court case that

18  was a non-sale case.  Same statute, 102(b).  The

19  (unintelligible) was on sale and then the second prong to

20  102(b) is public use.

21           Invitrogen says that the test for public use is

22  that there's two prongs, was the use public and was the

23  invention ready for patenting.  Those are the two prongs

24  that you need for public use.  Ready for patenting and

25  public use.

26

1            Ready for patenting -- some Courts say ready for

2    patenting is when it's reduced to practice, it's ready for

3    patenting and that's the prong that Mr. Streff is going

4    down.  That because we say that this thing was working on

5    the streets, it was "Ready for patenting."

6            The second prong though under Invitrogen is, was

7    there a public use of this thing.

8            THE COURT:  Is that where your debate is?  So does

9    it read, the ready for patenting prong is not in dispute,

10   that it was ready for patenting based on the --

11           MR. BAUER:  That's right, your Honor.  The issue

12   is --

13           THE COURT:  So that's out of it.

14           MR. BAUER:  That's right, that's what I'm saying.

15   They've proven it was ready -- it could have been patented.

16   There was a sufficient product in operation that if somebody

17   wanted to go to the patent attorney, the patent attorney

18   could have written a patent as early as June '89.

19           THE COURT:  Okay.

20           MR. BAUER:  There's that prong.

21           We're in the public use prong.  And Invitrogen

22   says, the test for public use includes consideration of

23   evidence relevant to experimentation.  Invitrogen says. a

24   bar arises when before the critical date, the invention is

25   in public use and ready for patenting.  Evidence of public

27

1  use may negate -- I'm sorry -- Evidence of experimentation

2  may negate the public use bar -- prong.  That's Invitrogen.

3             And then we go from there.  What are the tests of

4  experimentation according to Invitrogen?  The nature of the

5  activity that occurred in public --

6             THE COURT:  Go back though.  What about the case

7  law that says you can't have experimentation after it's been

8  reduction to practice?

9             MR. BAUER:  All of these are pre --

10            THE COURT:  Pre -- So that line doesn't --

11            MR. BAUER:  There are come cases that say that.

12 For all the cases that say that, there's other cases that

13 say, we've looked at it.  That's where fact came along and

14 talk about the on-sale side and Invitrogen talks about the

15 public use side.

16            THE COURT:  So in your view, that principle no

17 longer has an application?

18            MR. BAUER:  That's right, your Honor.

19            THE COURT:  All right.

20            MR. BAUER:  That Invitrogen says that

21 experimentation may negate public use and that that is a

22 separate prong from ready for patenting.

23            THE COURT:  Okay.

24            MR. BAUER:  And I don't think it it's been clear

25 with those words and then we get into -- well --

28

1            THE COURT:  God forbid.

2            MR. BAUER:  Invitrogen, I think, is an instructive

3 case.

4            THE COURT:  Yeah.

5            MR. BAUER:  So then the question becomes, the

6 nature of the activity that occurred in public, the

7 confidentiality obligations imposed, public access and

8 commercial exploitation.

9            Now your Honor, keep in mind that the point of all

10 this is, was something -- in terms of public use -- was

11 something put into the public, that the public has the right

12 to believe was being disclosed?  And that's the reason this

13 case law is out there and it's to say -- the Supreme Court

14 says in -- the Supreme Court in one of these cases.

15            Actually, it's the case that they rely on most

16 heavily, Baxter, which they cite to where the Court said,

17 one of the policies underlying experimental use is allowing

18 the inventor sufficient time to test the invention before

19 applying for a patent.  So that's why the reduction to

20 practice is a separate thing.  How can you possibly be

21 testing the product before applying for the patent?  That's

22 why they have to be separate paths, because you've got to

23 test it.  But just simply saying, because it's operating,

24 you no longer are allowed to test it, puts you into

25 conflict.

29

1              THE COURT:   I guess I don't understand why the

2    reduction to practice wouldn't be after the experimentation.

3              MR. BAUER:   Well, reduction to practice as a

4    definition -- reduction to practice is, when is it operating

5    or when is it at a state that the inventor has reasonable

6    expectation that it will operate.

7              So that's what the inventors were saying, in June

8    '89, they knew they had something here that could operate,

9    it was in the car, it was driving around, they knew it would

10   work.  But it wasn't ready to apply for a patent in the

11   sense that --

12             THE COURT:   No, I thought it was ready to apply

13   for the patent.

14             I mean, that's my problem here --

15             MR. BAUER:   That's -- they wanted to test it to

16   see if it was worth going ahead and applying for the patent.

17   So sure, they could have done it.  But there's the field

18   testing that's part of the process.  It allows -- again,

19   Baxter -- it allows the inventor to refine the invention and

20   assess its value relative to the time and expense of

21   prosecuting the patent application.  That's Baxter.

22             So yeah, you have this thing that the inventor

23   says, I think this thing's going to work.  In fact, our

24   inventors say, I've had a high level of confidence that it

25   would work.  I was putting people in the car, I saw it work.

30

1            So it's reduced to practice in that it's

2   operatable -- if that's the right -- it's able to operate.

3            THE COURT:  Okay.

4            MR. BAUER:  All right, it's reduced to practice.

5   But it's not public use.  You're got to have both.

6            Reduced to practice doesn't end it.  You're

7   allowed -- because if that ended it -- remember, your Honor,

8   if all it was is reduced to practice, then even the person

9   doing it entirely in his lab, entirely privately for a

10  couple of years, would lose the rights to get the patent.

11           THE COURT:  But you need to have these 50 road

12  tests, field tests, be deemed experimentation.  I mean --

13           MR. BAUER:  No, your Honor, the question is --

14           THE COURT:  Even these are, in and of themselves,

15  don't constitute public use.  Even if it's not part of an

16  experiment?

17           MR. BAUER:  That's right, your Honor.

18           The question is whether when this student is

19  driving it around on the streets, that is a public use?  And

20  the experimentation goes to the issue of whether that is a

21  public use.  And that goes back to the first thing I said,

22  your Honor, non-secret use is not the same as public use.

23           Public use is defined by the Courts as an

24  expectation given to the public that the invention is being

25  disclosed to the public.  That's what public use is, you've

31

1 | got to understand the --

2 | THE COURT: But how much of the invention has to

3 | be disclosed?

4 | I mean, clearly these drivers could say, hey, I

5 | went on this ride and it was really neat, you know, and the

6 | car talked to me.

7 | MR. BAUER: Right, that's all they knew.

8 | THE COURT: And that's not enough for it to be a

9 | public use?

10 | MR. BAUER: That's --

11 | THE COURT: You're saying that they have to

12 | understand how it works?

13 | MR. BAUER: They have understand what the -- the

14 | driver, the person who is learning the information, that the

15 | person -- the public, this is public use, whatever the

16 | public is, has to believe, be able or have a reasonable

17 | belief that you are publicly disclosing, divulging, giving

18 | up to society, the invention.

19 | THE COURT: And what is the invention?

20 | MR. BAUER: Well, in this case, your Honor, the

21 | invention is how it's working, the discourse generator.

22 | You know how we know this isn't public use or not

23 | sufficient? Because as Mr. Streff pointed out, there were

24 | publications in that June and July time period. There was

25 | an abstract, there was a conference that we went to -- that

*APEX Reporting*
(617) 269-2900

32

1  the inventors went to and that information was all disclosed

2  to the Patent Office, there were some limited publications

3  -- thin publications made about this before the critical

4  date.  Abstracts, not the technical detail of the thesis

5  that disclosed the invention.  Those publications were given

6  to the Patent Office and the Patent Office did not find

7  those publications a divulgation of the invention.  If those

8  publications were not a divulgation of the invention to the

9  public, well these students had no more information than

10 what was in those publications.

11            And that's why you need -- and again, the reason

12 you have the public use is because you're allowed to reduce

13 it to practice and test it in your lab all you want.  Nobody

14 challenges that aspect of it.  There's no law that says one

15 year you reduce to practice, you must apply for a patent.

16 No law that says that.

17            The law says, when you put it into public use.

18 And how do you start measuring public use?  Does the public

19 have access, is it publicly disclosed?  And there's four

20 things that the Court needs to look at to decide if this is

21 public use under Invitrogen, four things:  the nature of the

22 activity, confidentiality obligations on those who observe

23 the use, public access to the use and commercial

24 exploitation.

25            And now we look at the totality of that package to

33

1    reach a conclusion, was this use being disclosed to the

2    public as opposed to being on the street?

3            So if we look at those four.  Commercial

4    exploitation.  Easy, nobody questions it.  Mr. Streff said

5    that they don't question this being commercial.  So we take

6    that one right off.

7            Public access to the invention.  I don't think

8    there's anybody challenging that, that the students didn't

9    have access to the invention.  Six of the nine elements were

10   back at the lab, they were all running on the computer.

11   Just to remind your Honor just in case.  What was being

12   tested at the time, because at the time computers were so

13   big, the computer was sitting at the media lab, so all they

14   had in the car was a cell phone giving directions.  That's

15   all the students saw.

16           There was no offer to sale this.  There's an

17   argument in the brief that because they were hoping to raise

18   some investment money, but the case law is clear that that's

19   not a commercial exploitation, trying to get people to

20   invest.  This wasn't investing actually, this was research

21   sponsorship, even further removed.  But no allegation, I

22   think, of commercial exploitation.

23           Public access.  No issue that the people driving

24   it had no access at all to the invention.  The discourse

25   generator, the speech generator, the technology.

34

1           Confidentiality obligations.  Again, we don't
2    dispute, there was no written confidentiality obligation.
3    We don't need ten minutes of slides to prove that.  But the
4    case law is very clear that written confidentiality
5    agreements are not required.  And in fact, when you look at
6    the case law, the ones --
7           THE COURT:  Well, according to you, they had
8    nothing to disclose.  All they --
9           MR. BAUER:  That's right.
10          THE COURT:  All they knew was that this invention
11   existed but they didn't know the details of it, so what
12   could they disclose.  (Unintelligible) argument.
13          MR. BAUER:  That's right, I think the inventors --
14   why would anybody even have been thinking about
15   confidentiality obligations if they had nothing to disclose,
16   why would you impose on that?
17          But we have cases here, your Honor, one of the --
18   there's four cases that we think are -- I hate
19   (unintelligible) that cases are indistinguishable because
20   there's always something to distinguish them.  But the four
21   cases that we point to, we think are just so much closer
22   than the other cases.
23          But one of them, TP Labs, I use that as an
24   example.  TP Labs is a dentist putting retainers,
25   positioning apparatus in their patient's mouths.  And the

35

1    Court said, no confidentiality obligations with the

2    patients.  The Court found a dentist/patient relationship

3    equivalent to a vow of secrecy.

4           Well, that's a Federal Circuit decision --

5           THE COURT:  I'll have to read it.

6           MR. BAUER:  All right, that was the words.

7           Now, I can understand a dentist may have the

8    obligation, but I certainly don't think the patient has any

9    obligation.  But the Court found in that instance the

10   dentist/patient relationship, it's the circumstances.  The

11   circumstances would be in that case is the patients aren't

12   thinking, gee I can run off and disclose this.

13          In Moleculon -- so that's TP Labs, Federal Circuit

14   case.

15          In Moleculon, the Rubics Cube case.  He disclosed

16   it to people in his office.  No confidentiality obligation

17   at all.  And the Court finds that there was no need for an

18   express agreement, privacy -- it was never used without an

19   expectation of privacy and confidentiality.

20          Now, what we have here is in a research setting,

21   these are students coming in.  So remember, we're on summary

22   judgement here, so maybe, there's a good question of cast

23   whether the students and the researchers had an expectation

24   --

25          THE COURT:  But you're not suggesting that these

36

1  students were in any way prohibited from disclosing what

2  they were doing?  That they were going for these test

3  drives, they were --

4            MR. BAUER:  That's right.

5            THE COURT:  -- this is what they saw, this is what

6  they called -- I mean, there's nothing in the record that

7  says that's --

8            MR. BAUER:  No legal obligation.  Whether there

9  was an expectation that in a research setting -- well, there

10 was nothing disclosed about the invention to these students,

11 your Honor.

12           THE COURT:  I mean, I think you need to -- I would

13 need to find that that's a critical fact.  Because

14 otherwise, you have not gotten to the level -- even if you

15 say that there's some confidentiality in the academic

16 setting, I don't think it goes to, what did you do today, I

17 went for a test drive.

18           MR. BAUER:  Right.  That's right, your Honor.  Of

19 course, they could have said that, they could have said, I

20 got paid $5 to go and -- when I was at MIT, I put myself

21 through school as a human subject, that was my --

22           THE COURT:  More information than I needed.

23           (Laughter.)

24           MR. BAUER:  Okay.

25           But, your Honor, that's right.  And nobody ever --

37

1    you'd go and you go back, but you never knew what was the
2    invention on the other side, you knew you were being asked
3    to -- you always know that you're there being observed.  You
4    know that you're in a research environment.  And these
5    students, no question.  We submitted the document that they
6    signed.  That they were subject to the MIT standards on
7    human testing and the document is here -- not the signed
8    document, we don't have those -- but the document that they
9    were asked to sign.

10              THE COURT:  And it is only 14 or 16 of the
11    participants that --

12              MR. BAUER:  Your Honor, that's not in the
13    evidence.  What's in the evidence is that in one of the
14    documents, the inventor had said, we got 14 people that have
15    signed it recently.  And I don't think that anybody says
16    only 14 out of the 50 signed it, I think the evidence is
17    that he recalled or there's a document where --

18              THE COURT:  Do they all qualify to have signed it?
19    I mean, are they all the right kind of participants who
20    would -- Some weren't students, so --

21              MR. BAUER:  Of the 50, we don't have the details
22    of who the exact 50 are.  So whether there was a friend in
23    there or not, that's not in the record, your Honor.  I think
24    we're talking about 50 people who clearly knew -- and what's
25    clear in the record, clear -- that those 50 people, no one

38

1  was ever -- and the inventors say this -- no one was ever
2  given the keys to the car and said, go out and drive around
3  town.  These were people where the inventor always was in
4  the car operating the system, always taking note, always in
5  the context of this research.  A hundred percent of these
6  instances, according to the inventor, were in the context of
7  that research.

8              THE COURT:  Okay.

9              MR. BAUER:  With one exception, NEC, which was the
10 sponsor, which also got to ride in the car and I think
11 that's a separate issue.

12             So your Honor, none of the invention was ever
13 disclosed, TP Labs and Moleculon, the invention was
14 disclosed.  The Rubics Cube was handed to somebody, that was
15 the invention.  TP Labs, the retainer was put in the
16 person's mouth.

17             And then, your Honor, the best case is City of
18 Elizabeth, which is a Supreme Court case and sort of the
19 seminal case in this field even thought it's still 100 years
20 old.  But in this instance, it is really the best case.
21 It's extensively quoted in all the other cases.

22             The City of Elizabeth was paving bricks at a toll
23 booth where the Court says, the use of an invention by the
24 inventor or any other person under his direction by way of
25 experiment and in order to bring the invention to

1  perfection, has never been regarded as a public use.

2          And there was no question with reduced to

3  practice.  It was out there, it was in the road, these were

4  paving bricks.  It was done, it was sitting there, people

5  were driving over it.  There was no sign, confidentiality or

6  anything.  This was there, it was part of the road.  But

7  they wanted to see how well would it last , for how long.

8  It was durability testing.  Will these bricks withstand all

9  the -- whatever they were looking at back then, horse and

10  wagon, whatever.  But the Supreme Court said, that is not a

11  public use.  No confidentiality obligations, not commercial,

12  not -- well, accessible to the public, they see it.  But the

13  public needs to think that it's been dedicated to that.  But

14  again, there, the whole invention is disclosed.

15          The one case that Harman cites -- the one case

16  they put up was Egbert, the corset case.  When you look a

17  their cases, your Honor, whatever language is taken, is

18  snippets.

19          Every one of their cases, ever one is -- well, I

20  think every one is before Invitrogen, but I'm fairly certain

21  or highly certain that every one of their other cases has

22  one of two facts.  Either it was a commercial exploitation,

23  which goes to the policy issue or it was given to the person

24  without any restriction on their use.  That's the Egbert,

25  the corset case, very important on that decision.  The key

40

1    issue in that decision was that it was given to the donee

2    without limitation or restriction or injunction of secrecy.

3    Now in that case, the donee was the guy's girlfriend or

4    fiance, the Court said, no restriction.

5            I think in every case they cite, you'll see one of

6    those two things.  Given without restriction or cor

7    commercial exploitation.  When it's clearly in the context

8    of an experimentation, development, perfection of the

9    invention, I think it's always found to be a non-public use.

10   And again, it goes to, what did the public know?

11           The question, your Honor, is -- well, what's not

12   in this record is any evidence from anyone, any -- there's

13   no evidence because they haven't deposed any of the students

14   that were there.  By the way, your Honor, remember, one of

15   their partners at Kirkland was one of these students at the

16   time and they submitted evidence that he says that the

17   thesis was given.  If you remember, there's a draft --

18           THE COURT:  Right, I don't know that he was in the

19   car though.

20           MR. BAUER:  Well, I don't know if he was in the

21   car, we don't know that.  We don't have any record from

22   them.  But what we do know is that he was working on the

23   project and that that's where he got the document.  But no

24   affidavit from them.

25           So there's no evidence, your Honor, to suggest

41

1    that anybody thought that this invention was being disclosed

2    to the public.  They're jumping to the conclusion, they're

3    asking for an inference on this record.  A record that says,

4    50 students in a test system --

5              THE COURT:  Listening to both of you though, is

6    seems to me where the real distinction is what -- you're

7    distinguishing between what needs to be disclosed to make it

8    public disclosure, not the facts as to what was disclosed.

9              The overall picture is there.  These students or

10   whoever, rode around in the car, they used it.  It was ready

11   for patenting.

12             MR. STREFF:  Right.

13             THE COURT:  It was a functional -- if you want to

14   call it, prototype, whatever you want to call it.  But it

15   seems to me that where the distinction comes in both your

16   arguments is, is knowing about it enough to make it a public

17   use.

18             MR. STREFF:  Right.

19             THE COURT:  And nobody is suggesting that these

20   students could take it, bring it home, take it apart and go

21   figure out it worked, like a corset or anything like that.

22   So help me with that.

23             Your argument, I guess basically is, you have to

24   have access to the nuts and bolts of it, not just the

25   concept of it.  And I guess the defendant's argument is

42

1  more, once you know about the Back Seat Driver, in and of
2  itself, that's enough.

3  MR. BAUER:  Your Honor, what I would point to is
4  the students knew nothing more than what was being published
5  at the time.  And the Patent Office saw what was being
6  published at the time and didn't find it an invalidating
7  use.  Remember, what makes it invalidating is that the
8  invention is in the public.  That's what's invalidating.
9  Not that a car was driving around, but that the invention
10 has been disclosed to the public.

11 And the policy reason of that one year date, is to
12 keep you from putting it in the public and then taking it
13 back with a patent.  You're allowed to but it in the public
14 and then get your patent within a year, but you can't put it
15 in the public and then more than a year later, take it back.
16 That's the on sale -- Mr. Streff was right, the one year
17 date is rigid.  It's the most rigid rule in the Patent
18 Office.  If you sell one unit, commercially exploit it or
19 publicly disclose your invention more than a year before,
20 the public owns your invention.

21 Bot all they own is what you give in to them.  And
22 in this case, what we gave before the year, is no different
23 than what was published before the year.  All of which was
24 given to the patent office.

25 And if what was published didn't invalidate this,

43

1  certainly what the students knew couldn't invalidate it.  If
2  they didn't know anything about the invention other than, we
3  used the example -- it was Knight Rider, the TV show.  They
4  saw the car talking to them.  It could have been somebody's
5  mother in the back room giving directions.  That's all they
6  -- well.

7          But that's all they heard, was directions coming
8  over, your Honor.  And that's really -- you've got to focus
9  on what's the policy issue of the public use of this, not to
10 yank it back.  And that's what all the case law talks about.
11 I don't know if that helps.

12          And that's really the argument, your Honor.  I
13 think you've got to focus, and just to remind your Honor,
14 this is summary judgement, it's their burden to prove by
15 clear and convincing evidence, not just preponderance.
16 Their burden on this motion, clear and convincing evidence
17 that on this record, MIT publicly disclosed the invention
18 and publicly used it so that the public believed it was out
19 there.  And I think on this record, driving it on a street
20 doesn't do it.

21          Your Honor, we also had a cross motion on the
22 thesis, I don't know if you'd like me to roll into that
23 right now or --

24          THE COURT:  No, actually.  It'd like to hear the
25 response to this and then we'll get to the thesis.

44

1           MR. STREFF:  Thank you, your Honor, I'll try to be
2    brief and address the specific issues.

3           THE COURT:  Thank you.

4           MR. STREFF:  First of all, to the fact that the
5    computer wasn't in the trunk, it was back at the lab, I
6    direct your Honor's attention to page 14 of our reply brief
7    where we cite the NTP Research in Motion case, a 2005 case
8    by the way.  Where it held, use occurs where control of the
9    system is exercised and beneficial use of the system
10   obtained.  This was the Blackberry, your Honor, and all the
11   Blackberry stuff is somewhere else.

12           In addition, the Netscape case, the whole purpose
13   was to access a computer outside of the lab.  So the mere
14   fact that the LIS computer was at the lab, not in thr trunk,
15   has nothing to do and is irrelevant to the motion at hand.

16           Secondly, and more importantly, your Honor has, I
17   think somewhat again, been confused by patent concepts that
18   are being mis-applied here.  Reduction to practice is
19   exactly that, it works for its intended purpose.

20           Ready for patented means that you can take some
21   drawings and descriptions, send it to the Patent Office and
22   the Patent Office would say, you've filed enough, make it
23   ready for patent.  His case is, ready for patent.  They
24   haven't built it yet, so there could be experimentation.
25           Once you reduce it to practice, there can be no

45

1    experimentation and they loose.  And the case

2    (unintelligible) reply, we deal with Invitrogen, it was not

3    an earth shattering case, it did not overrule anything.

4    They have it (unintelligible) language, accessible to the

5    public.  We submit as a matter of law that the driver was a

6    member of the public in each of the 50 uses, he or she heard

7    the commands, he or she inputted the data, each of the claim

8    elements of Claims 1, 42 and 45 were experienced,

9    beneficially used out in the public for its intended purpose

10   by that public person.  Those facts are immutable, he's

11   admitted those, they cannot be changed.

12          And more specifically, experimental use.  It's not

13   putting the final tweak on the thing.  The new Railhead case

14   -- I believe another recent case -- says, experimental use

15   means perfecting or completing an invention to the point of

16   determining that it will work for its intended purpose.  Not

17   that it's great, not that it's commercial.

18          He tries to mull the issue of on sale, I'm not

19   arguing that.  Was there commercial stuff here?  Sure,

20   General Motors, the guys taking pictures of themselves in

21   the Acura Legend, yeah, we will get to that at trial, that

22   will be fine.  Hopefully not.

23          But would it work for its intended purpose?  The

24   50 subjects drove out, came back, survived.  It worked for

25   its intended purpose, it was reduced to practice.

46

1          It may have been ready for patenting a long time

2    ago.  I would submit that some of that April documentation

3    they have could have been sent off to the patent office,

4    ready for patenting.  And there may have been a time where

5    they were trying to figure it out.  Boy, (unintelligible).

6    That April 30 report I showed you, talks about it working,

7    working well, successful.  There can be no clearer or

8    convincing evidence that it worked for its intended purpose.

9          Therefore, both by the reduction to practice and

10   by the definition of what experimental use means in patent

11   law.  It does not work for them here and it cannot.  Because

12   that, with respect to which there could be experimentation,

13   had already been shown to work for its intended purpose.

14   Otherwise, the damn car would be sitting somewhere out on

15   the streets of Cambridge.

16          THE COURT:  What about his argument that all that

17   these drivers knew was what was included in the articles in

18   the --

19          MR. STREFF:  Well, here again, he cites no case

20   where the user's intent is important.  The case he cites

21   says, accessible to the public.

22          We submit to you, the great wealth of case law

23   here suggests that the lady using the corset didn't have to

24   know how it worked.  The Netscape case, the people using the

25   computer terminal to access the other remote terminal didn't

47

1  have to know how it worked.  The rim, NTP case, didn't have
2  to know how it worked.

3        The fact that you put it out there and it is in
4  the public and it's used in the public, is what the statute
5  prevents.  Not because you won't pull it back.  Because you
6  are commencing the disclosure process and it's your duty
7  under the patent law, within a year, to get the patent
8  application on file or forfeit your rights.  And your Honor,
9  they knew this, this is not a situation where they were
10  naive.

11        Exhibits 27 and 28 that we attach, have their
12  docket sheets from their patent application, both of which
13  cite the June 9th, '89 IEEE conference.  They knew they had
14  disclosed it.  We would argue, that was enough to actually
15  enable them but we're not arguing that here, we'll argue
16  that at trial.  It was out in the public, they knew they
17  should have filed their application, indeed prior to June.
18  So it's not a question of somebody sneaking up on them.

19        This is a question of having put into the public,
20  accessible to the public -- and it's not a person watching
21  the car.  Our point is, each of the 50 people, each person
22  was a member of the public.  The NEC guy, the GM guy, may
23  have been more public, but based on all the information we
24  have, they never took any steps with respect to any of the
25  students to make them anything other than public.  And they

48

1  admit the uses, they admit the uses in July.

2           And enablement of -- these papers that they

3  enable, not a question here, doesn't have to work.  Because

4  we know that there was a working embodiment that that was

5  driven around the streets.  Enablement by the papers only

6  goes to whether it's a publication, which is kind of the

7  next argument when I get tot he cross motion.

8           So specifically, your Honor, in the context of

9  this particular case, they do not deny, the 50 people who

10  didn't sign anything, drove this around and they admit that

11  it was rescued to practice.  And reduced to practice, I

12  submit to you, trumps ready for patenting.  Two different

13  concepts for two different reasons.

14          In the Supreme Court case, the ready for patenting

15  prong with respect to an on sale bar, was an attempt to

16  commercialize.  And the issue is, what are you

17  commercializing?  That which is ready for patent.  Here in

18  our context, we're talking about public use, having already

19  been reduced to practice, they knew, and the law requires

20  that we hold that it worked for its intended purpose.  Once

21  it did so, experimental use can't work because there can be

22  no additional experimentation.  Because experimentation

23  under patent law is to see if it works for its intended

24  purpose and they admit it did.

25          In addition, your Honor, asked about the 14 versus

49

1  36 subjects.  The report they submitted, which I think is

2  Exhibit 18, your Honor, Mr. (unintelligible), December 19th

3  of 1989, signed a document, requested by him from the

4  university, many subjects had been used since the last

5  approval -- which actually was back in January -- since the

6  start of this project --  which would be when they started

7  doing it -- he says 14.  So what about the other 36?  This

8  is his submission and he did it in December of '89.  So it

9  covers the whole time period.  So your Honor was right.

10          Unless you have any other questions?

11          THE COURT:  No.  As always, I understand the

12  issue.

13          MR. BAUER:  Your Honor, just two very short -- the

14  NTP case that they talk about is an infringement case, it

15  has nothing to do with validity.  So this NTP rim had to

16  with, do all the elements have to be in the United States?

17  And the Court said, one of the elements, if it's out of the

18  U.S., might still be an infringement.

19          Your Honor, one other case which I forgot to

20  mention, and it goes directly to the question you keep

21  asking me about, public use and what makes it public use.

22  And then I was able to pull it out while I sat down.  The

23  Manville case, Manville v. Paramount and it's at page 550,

24  this is a Federal Circuit case.

25          What this is is lights, parking lot lights.  So

50

1    they're on a stanchion in a parking lot, looking to -- you

2    know, shining on the lights -- out there working.  Just

3    again, another road kind of a thing.

4            Manville did nothing to lead the public to believe

5    that its invention was in the public domain -- Manville did

6    nothing to lead people to believe it was in the public

7    domain.  Although Manville did not advise anyone that its

8    use was experimental and was not intended to release its

9    invention into the public domain, the particular

10   circumstances made such efforts unnecessary.  The invention

11   was mounted atop a 150 foot tall pole in a rest area, closed

12   to the public, making it unlikely that the public would see

13   the new design.  So we're talking about the invention.  We

14   conclude that there was no conduct by Manville that would

15   lead "the public," in quotes, because that separates -- you

16   know, the students aren't the public, but we're talking

17   about the public society.

18           THE COURT:  Well, he says the students are in the

19   public.

20           MR. BAUER:  Well, your Honor, I think --

21           THE COURT:  I mean -- right?

22           MR. BAUER:  Well, I think their position is,

23   anybody who isn't employed by MIT is the public.  But the

24   policy is the public as a whole.  But here -- there was no

25   conduct that would lead the public to reasonably believe --

51

1  so when they say it's not our -- what is it we say, it's not
2  -- the inventor -- no conduct by Manville that would lead
3  the public to reasonably believe the invention was in the
4  public domain.  Nor is there any indication that the public
5  had such a perception.  And that was -- those are the
6  issues.

7  Was there anything here that would have lead those
8  50 students to believe that the invention was in the public
9  domain?  I think on this record, you can't find any that's
10  clear and convincing that we did lead them to believe it was
11  in the public domain.  And I think, as your Honor's noticed,
12  all the evidence here suggests that it wasn't in the public
13  domain.  It was not being disclosed to the public, but was
14  for testing purposes.  And whether these students at the
15  time, the MIT -- the PhD, the inventor, asked about a
16  confidentiality agreement, he didn't think about it, all
17  right.

18  Bit all the evidence suggests that there was no
19  effort to put it in the public domain and there is no
20  evidence that the public had that perception.  Those two
21  facts are completely missing in this case.

22  THE COURT:  Before you sit down, I gather that
23  there is no issue on the supplemental answer to the
24  interrogatory?

25  Mr. Streff, question:  the second supplemental

52

1   interrogatory response at the end of discovery?  I gather
2   that -- you're sticking with that it was reduced to practice
3   and --
4                 MR. STREFF:  We withdrew -- so what happened was,
5   the initial response said all these claims were reduced,
6   then the inventor said, I don't know when these two features
7   were actually added.  And so after that, we amended to
8   interrogatory to be consistent with the testimony.
9                 THE COURT:  But that relates to the Claim 42 and
10  45?
11                MR. STREFF:  That's right.
12                THE COURT:  Claim 1 is not an issue?
13                MR. STREFF:  Claim 1 is not an issue.  And your
14  Honor, the issue --
15                THE COURT:  Forty-two to forty-five is just the
16  inventor saying, I don't know --
17                MR. STREFF:  The inventor said, I don't know when
18  these two features were actually in the -- in the system.
19                THE COURT:  So I need to look at the record apart
20  from his -- he doesn't know, so it --
21                MR. STREFF:  So there's no evidence on that issue,
22  right.
23                THE COURT:  Well, I guess they contend that
24  there's other evidence.
25                MR. STREFF:  Okay, that's right.  But then we get

53

1   the question of fact in this.  Just to remind -- okay.  I

2   always do that because every now and then, Courts, when they

3   start writing, some Courts lose track of the standard and

4   that's why I keep saying it a lot.  Not --

5              THE COURT:  Wait until I have to go back to

6   Markman.

7              MR. STREFF:  Okay.

8              THE COURT:  One quick --

9              MR. STREFF:  Your Honor, one quick rebuttal point

10  to his reply and my rebuttal and my beginning.

11             The record that's different here, Rosemont, June

12  '89, telling the world exactly what was going on.  So

13  irrespective, he's talking -- we don't agree that the public

14  intent is an element.  You know, he pulls language out of

15  cases, that's fine.

16             What's different here is, they did tell the world,

17  the did put it in the public domain, the abstract, exactly

18  what was going on with the invention in June of '89, during

19  and before the time of the public uses.

20             THE COURT:  Well what about the fact that the

21  Patent Office had that information?

22             MR. STREFF:  Different issue, your Honor.  That

23  that goes to an invalidity based upon a prior art, goes to

24  anticipation or it goes to obviousness.  Public use stands

25  alone.  His point is, that he says accessible to the public

54

1    means you have to have done something that tells the public

2    that the invention is out there.  This tells the public that

3    the invention is out there.  We're not submitting this to

4    you under this motion as dispositive, per se, that this is

5    prior art, therefore it should be thrown out based upon this

6    reference.

7              But to counter his situation that they just didn't

8    know what was going on,

9              A:   Everything that the driver did, exercised each

10   and every one of the elements of the three claims, and;

11             B:   It was not a question -- they don't have to

12   know about it, they exercised it for its intended purpose,

13   it worked successfully, it worked well and at the same time,

14   June of '89, they go to this conference for three days with

15   all the IEEE folks in Rosemont, and they submit an abstract

16   telling exactly what the invention was all about with no

17   secrecy whatsoever.  They're trumpeting it.

18             Very different from the other situation we

19   discussed --

20             MR. BAUER:  Your Honor, it points exactly to what

21   the issue is.  If this doesn't invalidate it, and this is

22   what the students knew, then the public use cannot

23   invalidate it.  Because what makes -- what 102 says is that

24   anything that took place before the year, is prior art.  It

25   is -- that's what 102 does --

55

1          THE COURT:  Well, no.  Then the question then

2    becomes, does it have to be -- does the disclosure have to

3    be the equivalent of prior art.  And that's where you have a

4    very big distinction here as to what needs to be disclosed.

5          MR. BAUER:  Right.  Because 102 defines prior art,

6    that's what it is.  Section 102 defines the world of prior

7    art.  And prior art is, that which was publicly used more

8    than a year before.  And -- because you can't take it away

9    from the public.  Okay.

10          THE COURT:  All right.  Thesis.

11          MR. BAUER:  Thesis, your Honor.

12          Your Honor, this comes from the inequitable

13    conduct motion.  After we argued that motion in front of

14    you, and we went back and we said, you know, why are we even

15    arguing this thesis thing because there are no facts here on

16    the thesis.  So this is not a dispositive motion, this is

17    really a motion for partial summary judgement on this one

18    issue.  And the one issue is, was the thesis prior art that

19    invalidates the patent?

20          Now there's no question that the thesis is

21    material in the sense that it discloses the invention.  It's

22    not material if it's not prior art because proper

23    materiality requires two things, does it disclose everything

24    and is it prior art?  So it's not material in the legal

25    sense, but certainly in the substantive technology

56

1   disclosure.

2          We bring the motion, your Honor, because there's

3   only things -- fact discovery is closed -- there are only

4   six things that they point to, Harman points to, as trying

5   to make this thing prior art.  And what they've done, your

6   Honor, is the broad brush strokes of speculation here and

7   let me just tell you what the six things are -- and then

8   there's no evidence behind them.

9          The six points that they make to say it might be a

10  question of fact, is that the inventor said he could have

11  printed the thesis at any time.  They point to the fact that

12  it was on a computer, is irrelevant in this issue and

13  doesn't create a question of fact as to whether the thesis

14  was published more than a year before.

15         The second is that a University of Minnesota

16  student had sent an email to the inventor saying, can I get

17  a hold of your thesis?  That email is dated more than a year

18  before, there is no evidence that anything was ever sent to

19  the student.  The inventor doesn't say he sent it, there's

20  no record that it was sent.  Zero evidence that thesis was

21  ever sent.  Even if it was, one distribution wouldn't be a

22  publication.  But your Honor, on this record, zero evidence

23  and when there's no evidence --

24         THE COURT:  Didn't I find that there were disputed

25  facts as to when the thesis took place and when the -- the

57

1    defense took place and whether or not it was available and

2    what circumstances happened at that time?

3              MR. BAUER:  Your Honor, in out opposition to their

4    -- when it was their summary judgement, we came in and we

5    said it wasn't published, but at a minimum, it was questions

6    of fact and you agreed with us.

7              Now we're saying, now that we know what the size

8    issues are, we're going now --

9              THE COURT:  All right, I understand that.  But my

10   sense is, and I ned to parse it out again, but my sense was

11   that you had credibility issues of witnesses about what went

12   on.  People didn't really remember things, some of the

13   language was inconsistent, that the depositions were not as

14   clear as your briefs.  So unless there's --

15             MR. BAUER:  There's nothing new, your Honor.  It

16   was the six, but what I was saying is  --

17             THE COURT:  They're saying they haven't met their

18   burden, they've done --

19             MR. BAUER:  So we're flipping it around.  So

20   before -- right.  Was it -- because there's no dispute.  I

21   mean, I don't think that the -- the Minnesota student for

22   example, use that as an example.  Somebody says, can I have

23   a thesis?  No evidence, zero evidence one was disclosed.

24             Is it a question of fact as to whether the thesis

25   was actually sent to her or not?  I think that may be a

58

1  metaphysical question.

2  If we say there's no evidence, is it a question of

3  fact when they say, prove there's no evidence.  All I'm

4  saying, there is no evidence.  And that's the point of this

5  motion, your Honor.  On the six things that they say, all of

6  these could have resulted in a thesis going, we're

7  suggesting to your Honor that there's no evidence that a

8  thesis did go.

9  THE COURT:  Well, what I didn't know, and I need

10 to read your new materials as well.  But for example, if

11 Davis -- you know, he didn't remember when his thesis was, I

12 don't know his defense.

13 MR. BAUER:  Right.

14 THE COURT:  I don't know if on cross examination,

15 there's a chronology that somebody will come up with to

16 place this at some time period that becomes significant or

17 not.  I mean --

18 MR. BAUER:  Okay.  Well, that would be -- if your

19 Honor, thinks that that's a question of fact, then we'll

20 just --

21 THE COURT:  I don't mean to cut you off, but it's

22 the same record as was --

23 MR. BAUER:  That's right.

24 THE COURT:  I mean, I felt that with this other

25 motion on -- it was a broader record than what I had before

59

 1 | me --
 2 |          MR. BAUER:  Right.
 3 |          THE COURT:  -- on sort of the same scenario, but
 4 | it had more facts in it.  I think that your record here is
 5 | the same record ant you're just asking me to look at from --
 6 |          MR. BAUER:  From the flip side.
 7 |          THE COURT:  -- the flip side.
 8 |          MR. BAUER:  That's exactly right, your Honor.
 9 | Because now, we're saying from the flip side, they need a
10 | scintilla of evidence that the thesis was.
11 |          So for example, to use the thesis defense.  Davis
12 | says he did not defend it in May of '89.  That's his
13 | affidavit, defend in May '89.
14 |          They say, well, your Honor can speculate that it
15 | was defended somewhere between May '89 and August '89.  But
16 | we're saying that it's their burden to come up with some
17 | evidence.  There's no evidence as to when it was defended on
18 | this record.
19 |          THE COURT:  I guess my sense is -- and I don't
20 | know, I'll look at it again -- but my sense was, you know,
21 | he really fudged it and since you were dealing with August
22 | versus September --
23 |          MR. BAUER:  Right, right.
24 |          THE COURT:  You know, he was saying it was close
25 | to the end of the year so I could graduate.

60

1            MR. BAUER:  Right, that's right.

2            THE COURT:  How close is close and should a jury

3    make that determination?

4            MR. BAUER:  Well, if your Honor believes that it's

5    subject to cross examination, all I'm saying is that on this

6    record, there's no evidence as to when that thesis defense

7    took place and it's their burden to prove when it took place

8    and they have no evidence, it's just the speculation that it

9    could have been there.  And that's the point of our

10   argument, that there's no affirmative evidence being put

11   forth as to a date and they're asking the jury, pick any

12   date you want essentially and we don't think that's

13   (unintelligible).

14           THE COURT:  Okay.

15           MR. STREFF:  If you want to be heard, I'll hear

16   you.  But as long as the record -- Oh no, here's your

17   chance, you've been so patient.

18           MR. LEAVELL:  Your Honor, I think you're exactly

19   right.  I think we do -- we thought there were strong enough

20   presumptions that it would carry the day on summary

21   judgement.  The lack of evidence is entirely the result of

22   MIT's lack of preservation of documents.  We had hoped we'd

23   get more traction with you in the sense that they didn't

24   preserve those documents even though they were claiming work

25   product entitlement to preserve -- so they didn't have to

61

1    preserve those documents.

2              That's why we felt compelled to bring that motion

3    on those facts and say, if any doubt, it should be resolved

4    in our favor because they failed to preserve the documents

5    and they had the duty to do so.

6              THE COURT:  Okay.

7              MR. LEAVELL:  If you're not going to draw that

8    assumption and hold it against them, thin I think there is a

9    fact relationship that we can explore at trial to prove when

10   this thesis was defended and when it was sent to

11   Mr. Ritmeuller and when it was sent to Dr. Streeter.  And a

12   lot of the documents that talk about these things were given

13   to us after we deposed Mr. Davis and Mr. Schmap, the

14   inventors.

15             So we deposed them and then we found all the

16   documents that they didn't turn over, whether they withheld

17   them for privilege or whether we had to go to Mr. Ritmeuller

18   to get them, the documents that we assumed they would have

19   given to us, that's why we don't have the clear record, why

20   we don't have the exact time line, why we don't have the

21   admissions.  If we have to go to trial on this, and we don't

22   think we should because of the public use issue, but if we

23   do, we will prove those facts at trial.

24             THE COURT:  But the factual scenario is the same.

25   The world of facts at issue here is the same as what I dealt

62

1  with in the prior motion.

2           MR. LEAVELL:  With respect to the thesis.

3           THE COURT:  With respect to the thesis.

4           MR. LEAVELL:  Yes.

5           THE COURT:  Okay.

6           With that having been said, I'm taking it under

7  advisement.

8           (Whereupon, the hearing was concluded at 11:29

9  a.m.)

63

## CERTIFICATE OF TRANSCRIBER

This is to certify that the attached proceedings

before: U.S. DISTRICT COURT, DISTRICT OF MASSACHUSETTS

in the Matter of:

```
MASSACHUSETTS INSTITUTE OF      )
TECHNOLOGY,                     )
                  Plaintiff,  )
                                )
-V-                             )   CIVIL DOCKET NO.
                                )   05-10990-DPW
HARMAN INTERNATIONAL            )
INDUSTRIES, INC.,               )
                  Defendant. )
```

Place: Boston, Massachusetts

Date:  November 16, 2007

Were held as herein appears, and that this is the true,

accurate and complete transcript prepared from the

recordings taken  of the above entitled proceeding.

```
J. Mocanu                        05/05/08
Transcriber                      Date
```